**Volume 2**

**Pages 235 - 472**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

DARYELLE LAWANNA PRESTON,       )
                                )
            Plaintiff,          )
                                )
  VS.                           )     **NO. C 14-02022 NC**
                                )
CITY OF OAKLAND; DEANNA         )
SANTANA, in her individual      )
capacity; and DOES 1 through    )
10, inclusive,                  )
                                )
            Defendants.         )
_____)

San Francisco, California
Tuesday, September 15, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Daryelle LaWanna Preston:
                      Siegel & Yee
                      499 14th Street, Suite 220
                      Oakland, CA 94612
                      510) 839-1200
                      (510) 444-6698 (fax)
                **BY:  SONYA MEHTA**
                      **DANIEL MARK SIEGEL**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR
              Rhonda Aquilina, CSR No. 9956, RMR, CRR
              Official Reporters

1   **APPEARANCES (Continued):**

2   For Defendants City of Oakland; Deanna Santana:
3                       Lafayette & Kumagai LLP
                        101 Mission Street, Suite 600
                        San Francisco, CA  94105
4                       (415) 357-4600
                        (415) 356-4605 (fax)
5                **BY:  AFRICA EVANGELINE DAVIDSON**
                        **GARY T. LAFAYETTE**

6

7   ALSO PRESENT:  Kelvin Su

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                            **I N D E X**

2

3    Tuesday, September 15, 2015 - Volume 2

4
     **PLAINTIFF'S WITNESSES**                        **PAGE**  **VOL.**
5

6    **SANTANA, DEANNA J. (RECALLED)**
     Direct Examination resumed by Mr. Siegel         242    2
7    Cross-Examination by Mr. Lafayette               277    2
     Redirect Examination by Mr. Siegel               309    2
8

9    **BLACKWELL, FRED**
      (SWORN)                                         312    2
10   Direct Examination by Mr. Siegel                 313    2
     Cross-Examination by Mr. Lafayette               323    2
11   Redirect Examination by Mr. Siegel               334    2
     Recross-Examination by Mr. Lafayette             340    2
12   Further Redirect Examination by Mr. Siegel       341    2

13

14   **MCGEE, JR. OTIS**
      (SWORN)                                         342    2
15   Direct Examination by Mr. Siegel                 343    2
     Cross-Examination by Mr. Lafayette               348    2
16   Redirect Examination by Mr. Siegel               351    2
     Recross-Examination by Mr. Lafayette             354    2
17

18   **BROOKS, DESLEY**
      (SWORN)                                         357    2
19   Direct Examination by Mr. Siegel                 357    2
     Cross-Examination by Mr. Lafayette               376    2
20

21   **ANDERSON, WINNIE**
      (SWORN)                                         408    2
22   Direct Examination by Ms. Mehta                  409    2
     Cross-Examination by Mr. Lafayette               428    2
23

24

25

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| T | | 307 | 2 |
| 1 | | 244 | 2 |
| 1V | | 432 | 2 |
| 1X | | 435 | 2 |
| 1Z | | 442 | 2 |
| 2G | | 449 | 2 |
| 2C | | 453 | 2 |
| 2A | | 456 | 2 |
| 2W | | 460 | 2 |
| 2Z | | 467 | 2 |
| 3 | | 248 | 2 |
| 17 | | 414 | 2 |
| 20 | | 370 | 2 |
| 23 | | 368 | 2 |
| 26 | | 254 | 2 |
| 27 | | 421 | 2 |
| 32 | | 255 | 2 |
| 34 | | 258 | 2 |
| 36 | | 260 | 2 |
| 40 | | 262 | 2 |
| 41 | | 263 | 2 |
| 44 | | 268 | 2 |

<u>**Tuesday - September 15, 2015**</u>                              **8:23 a.m.**

                    P R O C E E D I N G S

                        ---oOo---

(Proceedings were heard outside the presence of the jury:)

          THE COURT:  Come on forward.  I hear you've got some
business to discuss.

          MR. LAFAYETTE:  One small question, just to let you;
know we did find Mr. Blackwell.  He will be here today.

          THE COURT:  Great.

          MR. LAFAYETTE:  And that was a good thing.

     The other thing is I wanted to know more about the Court's
processes and rules.  Ms. Santana's on the stand.  I do not
intend to do my entire examination of her at this time.  I want
to wait to see what plaintiff does.  And so I want to make sure
that we all understood what I was doing.

          THE COURT:  I appreciate that.  That's fine with me.

          MR. LAFAYETTE:  Okay.  Thank you, Your Honor.

          THE COURT:  You're deferring until your opportunity
to call her during your case.

          MR. LAFAYETTE:  To call her in my case-in-chief.
I'll have a few questions, but not my entire examination.

          THE COURT:  When you do call her, I will give the
plaintiff a chance to cross-examine her within the scope of
your examination.

          MR. SIEGEL:  So we'll have the other witnesses?

1     **MR. LAFAYETTE:**  We have just -- Barbara Parker will

2    be here today.  Otis McGee will be here today.  Fred Blackwell

3    will be here today.

4     **MR. SIEGEL:**  Right.

5     **MR. LAFAYETTE:**  I think you said you had arranged for

6    Desley Brooks to be here today.  I think that's all we have.

7     **MR. SIEGEL:**  We said "Reed" yesterday.

8     **MR. LAFAYETTE:**  I thought you said Reed only if you

9    couldn't get Blackwell.

10     **MR. SIEGEL:**  Actually, we got Blackwell.  If you're

11   not going to have much questioning of Ms. Santana, then I

12   assume Mr. McGee and Ms. Parker will be here this morning.

13     **MR. LAFAYETTE:**  Mr. McGee should be walking up

14   shortly --

15     **MR. SIEGEL:**  Okay.

16     **MR. LAFAYETTE:**  -- is what I understand.  And I

17   understand that Ms. Parker will be here, as well.

18     **MR. SIEGEL:**  Okay.

19     **THE COURT:**  Who'll be the very next witness?  Is

20   Ms. Parker going to be the very next witness?

21     **MR. SIEGEL:**  McGee, Parker, Blackwell.  Then we're

22   going to need Chief Reed.  And --

23     **MR. LAFAYETTE:**  I did not know you needed Chief Reed

24   today.  I'll see what I can do.

25     **MR. SIEGEL:**  Okay.

**PROCEEDINGS**

1          **MR. LAFAYETTE:**  I had not arranged for that, because

2    I'm looking at the sheet that you gave me, and that's not who's

3    there.

4          **MR. SIEGEL:**  That's true.  We talked about it

5    yesterday.  But anyway, I just want to be sure we have enough

6    witnesses to fill the day.  And many of the witnesses we want

7    to call are associated with the defendants.

8          **MR. LAFAYETTE:**  (Shakes head from side to side.)

9          **THE COURT:**  All right.  This I'm relying upon you to

10   have arranged.  So all I know is that there's going to be a

11   next witness when you finish with the first witness.

12         **MR. SIEGEL:**  Okay.  I also have a copy of my cheat

13   sheet for the Court.

14         **THE COURT:**  I appreciate it.

15   (Whereupon a document was tendered to the Court.)

16         **THE COURT:**  I assume defense counsel has a copy of

17   it, as well.

18         **MR. LAFAYETTE:**  I have one, Your Honor.  Thank you.

19         **THE COURT:**  Lili, you want to check; see if they're

20   here?

21         **THE CLERK:**  Yes.

22         **THE COURT:**  Mr. Siegel, I appreciate you doing this.

23   And could you file it at your convenience, just so it will be

24   in the record?

25         **MR. SIEGEL:**  Okay.

1        **THE COURT:**  If this case this case ever gets up on

2    appeal, the appellate court will also benefit from seeing it.

3        **MR. SIEGEL:**  All right.

4    (Proceedings were heard in the presence of the jury:)

5        **THE COURT:**  All right.  Please be seated, everyone.

6    Welcome to our jurors.  Thank you for being here punctually.

7    And we are ready to resume with day two of our trial.

8        A reminder of what's happening today:  A continuation of

9    the plaintiff's evidence.

10       And, Ms. Santana, if you can come forward and retake the

11   stand, you remain under oath.  And Mr. Siegel will resume his

12   questioning.

13       **MR. SIEGEL:**  Okay.  Thank you.  Good morning, ladies

14   and gentlemen.

15       **JURORS:**  Good morning.

16                    **DEANNA J. SANTANA,**

17   called as a witness for the Plaintiff, having been previously

18   duly sworn, testified further as follows:

19               **DIRECT EXAMINATION**  **(resumed)**

20   BY MR. SIEGEL

21   Q.   Ms. Santana, at some point you started reading

22   Ms. Preston's e-mail.  Is that right?

23   A.   Yes.

24   Q.   And did you get her permission to do that?

25   A.   No.

SANTANA - DIRECT / SIEGEL

1  **Q.**  Did you get a search warrant from the Court to do that?

2  **A.**  No.

3  **Q.**  Whose permission did you get to do that?

4  **A.**  I conferred with the City Attorney.

5  **Q.**  So the City Attorney gave you permission?

6  **A.**  She -- she said that it was within City policy.

7  **Q.**  Okay.  So did you ask her for permission, or not?

8  **A.**  I consulted with her.

9  **Q.**  Okay.  You didn't ask her for permission?

10 **A.**  No.

11 **Q.**  Correct?  You did it on your own?

12 **A.**  Yes.

13 **Q.**  Okay.  And when did you start 9S0 that?

14 **A.**  In April or May 2013.

15 **Q.**  May 2000 -- okay.  Okay.  And that was around the same

16 time as the, ah, issues arose with Local 55.  Is that right?

17         **MR. LAFAYETTE:**  Objection.  The question's vague and

18 ambiguous.

19         **THE COURT:**  Overruled.  If you can, answer it.

20         **THE WITNESS:**  Yes.

21 **BY MR. SIEGEL**

22 **Q.**  Okay.  Would you look at Exhibit 1 in the binder in front

23 of you?  Do you recognize that document?

24 **A.**  Yes.

25 **Q.**  And this is -- is it not? -- the City of Oakland's policy

1   on electronic media?  Is that right?

2   **A.**   Yes.

3        **MR. SIEGEL:**  Okay.  And, Your Honor, I'd offer

4   Exhibit 1; I believe there's a stipulation on that?

5        **MR. LAFAYETTE:**  No objection.

6        **THE COURT:**  Plaintiff's Exhibit 1 is admitted into

7   evidence.

8   (Trial Exhibit 1 received in evidence.)

9        **THE COURT:**  You may show it to the jury if you wish.

10       **MR. SIEGEL:**  Okay.  All right.

11  **Q.**   If you look, Ms. Santana, at page 3 of this exhibit -- do

12  you see that?

13  **A.**   Yes.

14  **Q.**   And this is the section on the electronic media policy,

15  which discusses how a -- how a City official may gain access to

16  an employee's e-mail.  Is that right?

17       **MR. LAFAYETTE:**  Objection.  The documents its own

18  best evidence.

19       **THE COURT:**  Overruled.

20     You may answer.

21       **THE WITNESS:**  Could I have some time to just review

22  the document?

23       **THE COURT:**  You may.  And while you do that,

24  Mr. Siegel, the helpful updated exhibit list you provided me

25  only has pages 1, 3, and 5.  I think it's a copying oversight.

```
 1   I don't have pages 2 and 4.
 2            MR. SIEGEL:  You mean in the binder that you have?
 3            THE COURT:  No.  What you just handed me:  The
 4   updated list.
 5            MR. SIEGEL:  Oh, I apologize.  Okay.
 6            THE COURT:  If you've got a copy there, we can go run
 7   make a copy of it --
 8            MR. SIEGEL:  Okay.
 9   (Whereupon a document was tendered to the Court.)
10            THE COURT:  -- while she's reading that.
11            MR. SIEGEL:  Great.
12            THE COURT:  Thank you.
13   (Pause in proceedings.)
14            THE WITNESS:  Okay.
15   BY MR. SIEGEL
16   Q.   Have you read it?
17   A.   I have.
18   Q.   Okay.  So before accessing Ms. Preston's e-mail, did you
19   submit a statement to the Director of Information Technology?
20   Did you submit a signed written statement that indicates what
21   electronic media you wished to inspect, and the legitimate
22   business purpose for that inspection?
23   A.   No.
24   Q.   Okay.  So there's no record that you filed with any
25   official in the City of Oakland, indicating that you were going
```

1    to start looking at Ms. Preston's e-mail; is there?

2    A.    There may be an e-mail from my Chief of Staff to the

3    Director of Information Technology.

4    Q.    There may be?

5    A.    There may be.

6    Q.    Okay.  And do you know where that statement is?

7    A.    You would have to search e-mails.  My Chief of Staff is

8    the individual who made arrangements to access the e-mail.

9    Q.    Okay.  So do you know where the statement is that your

10   Chief of Staff wrote?

11   A.    I do not.

12   Q.    Okay.  Now, I'd like to change the subject a little bit.

13   You said yesterday that you did not wish to see Ms. Brooks

14   turned over to the Alameda County District Attorney for

15   purposes of an investigation that could lead to criminal

16   charges.  Is that right?

17   A.    I don't think I said that much.

18   Q.    All right.  Well, let me ask you.  Did you want to have

19   Ms. Brooks investigated by the DA to see whether criminal

20   charges should be brought against her?

21   A.    I was -- I was going with the -- with the process of

22   investigation and complying with information requests that were

23   coming to me.

24   Q.    Okay.  That's not an answer to my question.  My question

25   is:  Did you want the DA of Alameda County to investigate

1   whether Desley Brooks should be subjected to criminal charges?

2   **A.**   I don't think I had an opinion either way.

3   **Q.**   Okay.  Then why was it that you asked Barbara Parker if

4   you had the authority to initiate such an investigation?

5            **MR. LAFAYETTE:**  Objection.  This is cumulative.

6            **THE COURT:**  Overruled.

7            **MR. LAFAYETTE:**  Misstates the witness' prior

8   testimony.  It's argumentative.

9            **THE COURT:**  Overruled.

10       You may answer.

11           **THE WITNESS:**  The issue at hand was whether for me to

12   do an investigation, which -- I did not have the administrative

13   credentials, or whether to ask the counsel if they wanted to

14   proceed with an independent investigation, and whether I had

15   the charter authority to even initiate an investigation on a

16   Councilmember, as I do with staff.

17   **BY MR. SIEGEL**

18   **Q.**   Okay.  Well, would it be fair to assume that you only

19   asked about whether you had the authority because you wished to

20   do it?

21   **A.**   No.

22   **Q.**   Okay.

23           **THE COURT:**  Mr. Siegel, I'll remind you that you are

24   making comments on each answer that you should not be making

25   comments on.  So the okays and all rights should be stricken

1   from any further questioning of this and other witnesses.

2           MR. SIEGEL:  Thank you, Your Honor.

3   Q.   Would you look at Exhibit 3, please?  Is Exhibit 3 an --

4   (Document displayed.)

5   Q.   -- exchange of e-mail involving yourself?

6           MR. LAFAYETTE:  I'm sorry, Your Honor.

7       I guess the copy I got is deficient, as well.  I don't

8   have the second page of the cheat sheet.

9           THE COURT:  It's H.  Exhibit H.

10          MR. SIEGEL:  Exhibit H.  3 on H.

11          THE COURT:  All right.

12  BY MR. SIEGEL

13  Q.   Is Exhibit 3 an exchange of e-mails that you had with

14  Desley Brooks and Howard Jordan on January the 5th, 2012?

15  A.   Yes.

16          MR. SIEGEL:  I'd offer Exhibit 3, Your Honor.

17          MR. LAFAYETTE:  No objection, Your Honor.

18      Mr. Siegel, this is a document that you objected to before

19  trial, so presumably you've changed your mind.

20          MR. SIEGEL:  I'd withdraw my objection.

21          THE COURT:  Exhibit 3 is admitted into evidence.

22  (Trial Exhibit 3 received in evidence.)

23  BY MR. SIEGEL

24  Q.   Now, in Exhibit 3, you sent an e-mail to Howard Jordan in

25  which you said, "My blood will flow."  Right?  That's your

1    e-mail.  Correct?

2    **A.**    That's partially correct.

3    **Q.**    You wrote --

4    **A.**    It says, "You know this.  Right?"

5    **Q.**    "My blood will flow.  You know this.  Right?"

6         Now, why did you write that message to Howard Jordan?

7    **A.**    This is a stream of e-mails to Vice Mayor Brooks, where I

8    called to her attention -- it's January 5th, 2012 -- the

9    inconsistencies of staff and potentially her actions to put in

10   place the Rainbow Teen Center.  Vice Mayor Brooks was known or

11   is known as a bully; very hard to work with.  And staff was

12   afraid of her.

13   **Q.**    Were you afraid of her?

14   **A.**    No.

15   **Q.**    Did you tell us yesterday that you had a professional

16   working relationship with her?

17   **A.**    Through January 2012, yes.

18   **Q.**    So the professional working relationship ended in

19   January 2012?

20   **A.**    I knew that sending this e-mail and calling these

21   inconsistencies to her attention would surface the issues and

22   potential actions that were inconsistent that she may have

23   taken.

24   **Q.**    Ms. Brooks' concern in this e-mail exchange with you was

25   that the bill from Pulte Homes for renovating the Rainbow Teen

1  Center be paid.  Is that correct?

2  A.   Yes.

3  Q.   So why did you write to Howard Jordan, "My blood will

4  floe?  You know this.  Right?"

5  A.   By this time, I was already familiar with the issues that

6  staff had raised to my attention about the inconsistencies with

7  the Rainbow Teen Center, and how they were treated during the

8  time to implement the Rainbow Teen Center actions.  They were

9  treated poorly.  And I knew that, surfacing those issues, I,

10 too, would be treated poorly by Vice Mayor Brooks.

11 Q.   And why did you share that reflection with the Police

12 Chief?

13 A.   By this time, the FBI was already looking into this issue.

14 And I would communicate on the issues that the FBI was looking

15 into with the Police Chief.

16 Q.   Was the FBI looking into whether your blood would flow?

17         MR. LAFAYETTE:  Objection, Your Honor.  Asking the

18 witness to speculate.

19         THE COURT:  Overruled.

20         THE WITNESS:  I think they knew that she had a

21 reputation for being a difficult person to work with in the

22 organization.

23 BY MR. SIEGEL

24 Q.   Did Ms. Brooks physically threaten you?

25 A.   No.

1   **Q.**   Did you ask Chief Jordan to protect you against the

2   physical threat from Ms. Brooks?

3   **A.**   No.

4   **Q.**   Would it be fair to say that this communication with

5   Chief Jordan was a personal communication between the two of

6   you?

7   **A.**   No.

8   **Q.**   Was it a professional communication between you and

9   Chief Jordan?

10  **A.**   Yes.

11  **Q.**   And what professional business did Chief Jordan have in

12  receiving your comments regarding your arguments with

13  Ms. Brooks?

14           **MR. LAFAYETTE:**  Objection.  Argumentative as phrased.

15           **THE COURT:**  Overruled.

16           **THE WITNESS:**  I think going forward, we knew that the

17  relationship with Vice Mayor Brooks was going to be difficult,

18  and that, as she had in the past, I would be one of her

19  targets.

20  **BY MR. SIEGEL**

21  **Q.**   Meaning she would criticize you.  Correct?

22  **A.**   Yes.

23  **Q.**   Let's move to the issue of the grievance filed by SEIU

24  concerning the failure to collect union dues.  In August of

25  2013, were you aware of whether the Mayor had concerns

1  regarding the SEIU grievance?

2  **A.**   I don't know.

3  **Q.**   Would you look at Exhibit 26, please?

4          **THE COURT:**  Which is also 5N.

5  **BY MR. SIEGEL**

6  **Q.**   Do you recognize this e-mail?

7  **A.**   I do.

8  **Q.**   And just -- is this an e-mail that you wrote on

9  August 6th, 2013, in the morning to Katano Kasaine and others?

10 **A.**   Yes.

11 **Q.**   And August 6, 2013, was the date of the meeting at which

12 Kasaine disclosed that union dues had not been collected for

13 SEIU part-time employees.  Is that right?

14         **MR. LAFAYETTE:**  Objection.  Lacking in foundation.

15 Constitutes in admissible hearsay with this witness.

16         **MR. SIEGEL:**  I can rephrase.

17         **THE COURT:**  All right.  Objection withdrawn.

18 **BY MR. SIEGEL**

19 **Q.**   Did you know on August 6 in the morning that there was to

20 be a meeting later that day involving Katano Kasaine and

21 representatives of SEIU, as well as Employee Relations staff in

22 the City of Oakland?

23 **A.**   No.

24 **Q.**   Did you know on August 6, 2013, that Mayor Jean Quan was

25 interested in the issue of the dues collection for the SEIU

 1  members?

 2           MR. LAFAYETTE:  Objection.  Previously asked and

 3  answered.

 4           THE COURT:  Overruled.

 5           THE WITNESS:  Can you repeat the question?

 6  BY MR. SIEGEL

 7  Q.   Did you know at about 6:00 o'clock on August 6, that

 8  Mayor Quan was interested in the issue regarding the dues

 9  collection from SEIU Temporary Part Time employees?

10  A.   No.

11  Q.   What was the Mayor's discussion that you were referring to

12  when you wrote this e-mail?

13  A.   Through the Temporary Part Time and Permanent Part Time

14  employees' discussions with SEIU, as part of maintaining City

15  services through the recession, many positions that were

16  previously Full Time were converted to Temporary Part Time and

17  Permanent Part Time.  And SEIU had brought that to our

18  attention; that Full Time positions with full benefits had been

19  converted to Temporary Part Time positions without benefits,

20  for purposes of maintaining services and saving money.

21           And the Mayor was concerned, as was I and the City, that

22  to the extent that we were able to restore Full Time jobs, that

23  we looked at the numbers of people that had been converted from

24  Full Time to Temporary Part Time work, so that we could begin

25  to create a work plan on how to begin putting people back into

1   Full Time work.  And there was a task force and a separate

2   proposal on creating the task force on working through these

3   issues, which required assembling data to understand the

4   problem that we were trying to fix.

5             **MR. SIEGEL:**  Your Honor, I'd offer Exhibit 26, also

6   known as 5N.

7             **MR. LAFAYETTE:**  I'm going to have an objection,

8   Your Honor.  I don't think it's relevant, but we can -- it's

9   fine.

10            **THE COURT:**  Is that an objection, or not an

11  objection?

12            **MR. LAFAYETTE:**  Not an objection, Your Honor.

13            **THE COURT:**  Exhibit 26 is admitted.

14  (Trial Exhibit 26 received in evidence.)

15  **BY MR. SIEGEL**

16  **Q.**  Would you turn to Exhibit 32, please?  Do you recognize

17  this e-mail exchange?

18  **A.**  I do.

19  **Q.**  You do?

20  **A.**  I do.

21  **Q.**  Okay.  And is this an e-mail exchange that you had with,

22  among other people, Ms. Preston, as well as Katano Kasaine on

23  September 10 and September 8th, 2013?

24  **A.**  Yes.

25            **MR. SIEGEL:**  Your Honor, I'd offer Exhibit 32.

1        **MR. LAFAYETTE:**  No objection.

2        **THE COURT:**  Exhibit 32 is admitted.

3   (Trial Exhibit 32 received in evidence.)

4        **MR. SIEGEL:**  Okay.  Thank you.

5   **Q.**  You wrote to Ms. Kasaine on September 10 that you were

6   very interested in tracking this issue closely.  Please ensure

7   a meeting is set.  Correct?

8   (Document displayed.)

9        **THE WITNESS:**  Yes.

10  **BY MR. SIEGEL**

11  **Q.**  Why were you interested in tracking this issue closely?

12  **A.**  As LaWanna stated in her e-mail advising both Katano and I

13  that this was a serious issue that was related to dues, I, too,

14  took it seriously.

15  **Q.**  And isn't it also true that the Mayor was interested in

16  the issue?

17       **MR. LAFAYETTE:**  Objection.  Constitutes hearsay.

18       **THE COURT:**  Overruled.

19       If you know.

20       **THE WITNESS:**  I don't know.

21  **BY MR. SIEGEL**

22  **Q.**  Did Katano Kasaine give you a report in response to your

23  e-mail to her:  Exhibit 32?

24  **A.**  I don't recall.

25  **Q.**  By the time you wrote this e-mail -- Exhibit 32 -- on

1    September 10, were you aware that the SEIU had filed a

2    grievance?

3    **A.**    Yes.

4    **Q.**    And were you aware that that grievance was based upon

5    statements that Ms. Katano Kasaine made at a meeting on

6    September 6?

7                    **MR. LAFAYETTE:**  Objection.  Hearsay.  Lack of

8    foundation.

9                    **THE COURT:**  Overruled.

10                   **THE WITNESS:**  I had heard that.

11   **BY MR. SIEGEL**

12   **Q.**    How had you heard that?

13   **A.**    From LaWanna.

14   **Q.**    So she reported to you that on September 6th,

15   Katano Kasaine had acknowledged at a meeting with union

16   representatives that she had not been collecting union dues

17   from SEIU members who were classified as Temporary Part Time?

18   **A.**    She reported that a statement had been made to the effect

19   that suggested that there was an issue with dues and fees

20   collection.

21   **Q.**    And Ms. Preston communicated to you that this was a matter

22   of some urgency.  Is that right?

23   **A.**    Yes.

24   **Q.**    And you agreed with her?

25   **A.**    Yes.

1  **Q.**   In fact, everyone in City government with whom you

2  discussed the issue agreed that this was an important matter.

3  Is that correct?

4              **MR. LAFAYETTE:**  Objection.  Constitutes hearsay.

5              **THE COURT:**  Overruled.  It goes to her notice.

6              **THE WITNESS:**  Yes.  We took it seriously.

7  **BY MR. SIEGEL**

8  **Q.**   Okay.  And did you discuss it with Mayor Quan?

9  **A.**   I think so.

10  **Q.**   And she took it seriously.  Is that right?

11  **A.**   She would have, yes.

12  **Q.**   And at some point after September 10th, you decided to

13  remove authority to investigate the grievance from Ms. Preston,

14  and turn it over to the City Attorney's Office.  Is that right?

15  **A.**   To work with the City Attorney's Office to conduct the

16  investigation.

17  **Q.**   Who was going to work with the City Attorney's Office?

18  **A.**   The City Attorney's Office was going to get a third-party

19  investigator.

20  **Q.**   And you advised Ms. Preston of that.  Correct?

21  **A.**   Yes.

22  **Q.**   And Ms. Preston coöperated professionally with your

23  decision to turn the matter over to the City Attorney's Office.

24  Is that right?

25  **A.**   No.

 1  Q.   She did not?

 2  A.   No.

 3  Q.   Well, would you look at Exhibit 34, please?  Do you have

 4  it?

 5  A.   I do.

 6  Q.   Okay.  And on the first page -- in fact, it just is one

 7  page here -- is there an e-mail from Ms. Preston to you?

 8  A.   Yes.

 9  Q.   And is that an e-mail --

10            MR. SIEGEL:  Well, excuse me.  First of all, let me

11  offer Exhibit 34, Your Honor.

12            THE COURT:  Any objection?

13            MR. LAFAYETTE:   No, Your Honor.

14            THE COURT:  I note that the exhibit is identified as

15  page 1 of 2, and there is no page 2; but given that there's no

16  objection, I'll admit Exhibit 34 into evidence.

17  (Trial Exhibit 34 received in evidence.)

18  (Document displayed.)

19  BY MR. SIEGEL

20  Q.   Now, in that e-mail Ms. Preston acknowledges your decision

21  to turn the matter over to the City Attorney's Office.  Is that

22  right?

23            MR. LAFAYETTE:  Objection.  The document is the best

24  evidence.

25            THE COURT:  Overruled.

1          **THE WITNESS:**  That's one of several communications.

2    **BY MR. SIEGEL**

3    **Q.**   Okay.  Was there anything that you thought of as impolite

4    in Ms. Preston's e-mail to you on December -- September 12th,

5    2013?

6    **A.**   No.

7    **Q.**   And would you agree that she disagrees with your decision

8    to turn the matter over to the City Attorney's Office, but does

9    so in a polite and professional manner?

10   **A.**   No.

11   **Q.**   Okay.  In what way do you view Exhibit 34 as not polite

12   and professional?

13   **A.**   This was in the -- this e-mail was drafted in the context

14   of telephone conversations that had already taken place on my

15   decision.

16   **Q.**   My question to you -- is there anything about

17   Ms. Preston's e-mail communication to you that you believed to

18   be impolite or unprofessional?

19   **A.**   Not what's in writing.

20   **Q.**   Excuse me?

21   **A.**   Not what's in writing.

22   **Q.**   Okay.  Would you look at Exhibit 36, please?  Does

23   Exhibit 36 include further communications between yourself and

24   Ms. Preston regarding turning over the investigation of the

25   grievance to the City Attorney's Office?

1  A.   Yes.

2           MR. SIEGEL:  And I'd offer Exhibit 36, Your Honor.

3           THE COURT:  Any objection?  This is also 3B.

4           MR. LAFAYETTE:  No, Your Honor.

5           THE COURT:  One moment.  One moment.

6  BY MR. SIEGEL

7  Q.   And is there anything --

8           THE COURT:  All right.  Exhibit 36 is admitted into

9  evidence.  Go ahead.

10 (Trial Exhibit 36 received in evidence.)

11 BY MR. SIEGEL

12 Q.   And is there anything that you view as impolite or

13 unprofessional regarding the communications from Ms. Preston

14 that are included in Exhibit 36?

15 A.   Yes.

16 Q.   And what is impolite or unprofessional about that?

17 A.   She references, "You stated that you were going to have

18 the City Attorney's Office conduct the grievance

19 investigation," and that's not what I had stated.  And there's

20 a series of back-and-forths of me correcting the record.

21 Q.   And what is it that's impolite or unprofessional about

22 Ms. Preston's communications?

23 A.   It's just it's unprofessional to misquote someone in an

24 e-mail on something that they did not say.  And I was

25 correcting that record.

1  Q.   Okay.  She also says that she is going to -- if you look

2  up, she says, "Deanna, SEIU has requested the status of the

3  grievance.  I will be sending out investigatory interview

4  notices this week.  Will you please provide the name of the

5  third party, so I can contact that person for dates?"  Did you

6  read that?

7  A.   Yes.

8  Q.   Did it appear to you that Ms. Preston was offering to

9  coöperate with the third party who was going to be

10 investigating the grievance?

11 A.   She had already been removed from the investigation by

12 September 18th.

13 Q.   So you thought she shouldn't be coöperating with the

14 person investigating the grievance?

15 A.   She should not be sending out investigative interviews or

16 investigatory interviews.

17 Q.   In fact, did Ms. Preston coöperate with the City

18 Attorney's Office and send to the City Attorney's Office the

19 information that she had regarding the grievance?

20        MR. LAFAYETTE:  Objection.  Requires this witness to

21 speculate.  Lacking in foundation as to what Ms. Preston had.

22        THE COURT:  Overruled.

23    You can answer, to the extent you know.

24        THE WITNESS:  I don't know.

25

1  BY MR. SIEGEL

2  Q.   Would you look at Exhibit 40, please?  Do you recognize

3  Exhibit 40?

4  A.   I do.

5  Q.   Are these communications that you had with Donna Hom on

6  September 29th, 2013, regarding obtaining the data that would

7  be necessary to evaluate the SEIU grievance?

8  A.   Yes.

9          MR. SIEGEL:  Your Honor, I'd offer Exhibit 40,

10  please.

11          MR. LAFAYETTE:  No objection.

12          THE COURT:  Exhibit 40 is admitted into evidence.

13  (Trial Exhibit 40 received in evidence.)

14  BY MR. SIEGEL

15  Q.   If you'd look at Exhibit 41, please.  Do you recognize

16  Exhibit 41?

17  A.   41?

18  Q.   Yes.

19  A.   Yes.

20  Q.   And is this an e-mail communication from Ms. Preston to

21  you and Barbara Parker on September 29th, 2013?

22  A.   Yes.

23          MR. SIEGEL:  Your Honor, I'd offer Exhibit 41.

24          MR. LAFAYETTE:  No objection.

25          THE COURT:  41 is admitted.

1   (Trial Exhibit 41 received in evidence.)

2   **BY MR. SIEGEL**

3   **Q.**   So did Ms. Preston advise you on September 29th that she

4   had become aware of information that Katano Kasaine was

5   attempting to interfere in the grievance process by contacting

6   you union officials?

7   **A.**   Yes.

8   **Q.**   All right.  And what was your reaction when you received

9   this e-mail?

10  (Document displayed.)

11           **THE WITNESS:**  I thought it was more set of facts that

12  needed to be investigated.

13  **BY MR. SIEGEL**

14  **Q.**   Did you think that it was appropriate for Ms. Preston to

15  bring this information to your attention?

16  **A.**   Yes.

17  **Q.**   Did you feel that she did so in a manner that was

18  professional and respectful?

19  **A.**   No.

20  **Q.**   And what was unprofessional or disrespectful regarding

21  this communication?

22  **A.**   The last comment.

23  **Q.**   And which was that?

24  **A.**   "Please let me know if I should forward this complaint to

25  IAD."

SANTANA - DIRECT / SIEGEL

1    Q.    And what was unprofessional or disrespectful about that?

2    A.    The investigation was already being handled by a third

3    party through the City Attorney's Office.  And the reference to

4    internal affairs is related to the investigation that I had

5    done on the allegations around Deborah Grant, and LaWanna's

6    misconduct related to investigation process and ethics.

7    Q.    Okay.  Well, so had you instructed Ms. Preston that the

8    Internal Affairs Division would not be involved in the

9    investigation of the SEIU grievance?

10   A.    That would have been a decision for me to make whether to

11   engage Internal Affairs or not.  LaWanna had already been

12   removed from the investigation.

13   Q.    She wrote to you, "Please let me know if I should forward

14   this complaint to IAD."  Correct?

15   A.    Correct.

16   Q.    So she was indicating to you that it was your decision.

17   A.    The forwarding of information to IAD would have come

18   through me --

19   Q.    Right.

20   A.     -- to Internal Affairs.

21   Q.    And she asked you whether she should.  Correct?

22   A.    That's correct.

23   Q.    And what did you tell her?

24   A.    We didn't have a conversation about that line.

25   Q.    You didn't respond?

1   **A.**   Right.

2   **Q.**   But you thought that -- what? -- it was impertinent of her

3   to ask you this question?

4   **A.**   I read it more as she was connecting it to the Internal

5   Affairs investigation that I had done on the other two matters

6   that I just referenced.

7   **Q.**   And you thought that was inappropriate?

8   **A.**   I did.

9   **Q.**   Okay.  So let me ask you this.  As of September 29th, had

10  a third party been engaged to handle the investigation of the

11  SEIU grievance?

12  **A.**   Yes.

13  **Q.**   And who was that?

14  **A.**   Otis McGee.

15  **Q.**   And when was Mr. McGee engaged?

16  **A.**   Sometime concurrent with -- with this time period.

17  **Q.**   Before or after September 29?

18  **A.**   I don't have the exact date.

19  **Q.**   So you don't know he had been engaged as of the date of

20  this e-mail?

21  **A.**   He was already on my calendar to meet and greet as the

22  investigator for October 2nd.

23  **Q.**   Okay.  So isn't it true that you subsequently learned that

24  Mr. McGee was engaged on October 2nd?

25  **A.**   He had already been selected.  And we were making

1 arrangements on October 2nd to meet and greet, and begin the

2 investigation together.

3 **Q.**   All right.  And, in fact, you met with Mr. McGee and

4 Barbara Parker in your office on October 2nd?

5 **A.**   Yes.

6 **Q.**   And that's when you advised Mr. McGee that he was being

7 given responsibility to investigate the grievance.  Is that

8 right?

9 **A.**   No.

10 **Q.**   When did you advise him that he'd been selected for this

11 job?

12 **A.**   He had already been selected for this work.

13 **Q.**   On what date?

14 **A.**   I don't recall.

15 **Q.**   Okay.  In any case, you met with him on October 2nd -- and

16 with Ms. Parker -- to discuss his work on the grievance.

17 Correct?

18 **A.**   Yes.

19 **Q.**   And it was during that meeting that Ms. Preston called on

20 the telephone.  Correct?

21 **A.**   Yes.

22 **Q.**   And, in your recollection, was very abusive and

23 unprofessional to you.  Is that right?

24 **A.**   Yes.

25 **Q.**   And on October 3 when she arrived at work, you arranged

1  for one of your assistants to meet her, and give her Notice of

2  Termination.  Is that right?

3  **A.**   Yes.

4  **Q.**   And she was not allowed to enter her office on

5  October 2nd; was she?

6  **A.**   No.

7  **Q.**   Or October 3rd?

8  **A.**   Correct.

9  **Q.**   Okay.  If you look at Exhibit 44 --

10          **THE COURT:**  This is 4Q also.  4Q?

11          **MR. SIEGEL:**  Yes, 4Q.  44.

12  **BY MR. SIEGEL**

13  **Q.**   Is this the Notice of Termination that you directed your

14  assistant to prepare with respect to LaWanna Preston?

15  **A.**   Yes.

16  **Q.**   All right.  And who is it signed by?

17  **A.**   Alexandra Orologas.

18  **Q.**   And what was her position on that date?

19  **A.**   Chief of Staff to the City Administrator.

20  **Q.**   Oh she was your Chief of Staff.  Correct?

21  **A.**   Yes.

22  **Q.**   And then the second page of Exhibit 44 is a letter that

23  you wrote to Ms. Preston.  Is that right?

24  **A.**   Yes.

25          **MR. SIEGEL:**  Your Honor, I'd offer Exhibit 44.

1              **MR. LAFAYETTE:**  No objection.

2              **THE COURT:**  44 is admitted.

3    (Trial Exhibit 44 received in evidence.)

4    **BY MR. SIEGEL**

5    **Q.**   And that is the Notice of Termination that you directed.

6    Is that right?

7    **A.**   Yes.

8    **Q.**   And I see it says no -- "Reason for separation."  And

9    under "Lack of work" it states, "See attached."  Box is

10   checked:  "See attached."  Correct?

11   **A.**   Yes.

12   **Q.**   And then there's another column there which is headed with

13   the word "Discharge," which includes various boxes referring to

14   various reasons why an employee might be discharged.  Is that

15   right?

16   **A.**   Yes.

17   **Q.**   None of those boxes are checked; are they?

18   **A.**   That's correct.

19   **Q.**   Okay.  And in your letter to Ms. Preston, you wrote to her

20   to say, "Your services are no longer needed."  Is that right?

21   **A.**   Yes.

22   **Q.**   Now, following the commencement of this litigation is it,

23   in fact, true that your counsel -- your attorneys -- asked you

24   to answer certain interrogatories that my office served on the

25   City.  Is that right?

 1          **MR. LAFAYETTE:**  Objection.  Calls for

 2  attorney-client-privileged communications.

 3          **THE COURT:**  Overruled.

 4      You can answer.

 5          **THE WITNESS:**  Can you repeat the question?

 6          **MR. SIEGEL:**  Sure.

 7  **Q.**   After this litigation began, isn't it true that your

 8  attorneys asked you to respond to certain written questions,

 9  called "interrogatories," that my office served on your

10  attorneys?

11  **A.**   Yes.

12  **Q.**   Okay.  And you did that.  Is that right?

13  **A.**   Yes.

14  **Q.**   And you did so on or about December 17, 2014.  Is that

15  right?

16  **A.**   Yes.

17  **Q.**   And you signed a verification, saying that the answers to

18  the interrogatories were true.  Is that right?

19  **A.**   Yes.

20  **Q.**   And did you read the interrogatory answers before you

21  signed them?

22  **A.**   Yes.

23  **Q.**   And do you recall that one of the interrogatories stated,

24  "Describe in complete detail each reason for plaintiff's

25  termination from the City of Oakland"?

1  A.    Yes.

2  Q.    And do you recall that the answer that you verified under

3  oath stated, quote, "Without waiving any objection, and in an

4  effort to provide" --

5          MR. LAFAYETTE:  Your Honor, Your Honor, I raised this

6  issue at the close of court yesterday.  I still don't have what

7  he's asking her to look at as an exhibit.

8          THE COURT:  All right.  The objection's overruled.

9          You may proceed with the question.

10          MR. SIEGEL:  Thank you.

11  Q.    I apologize.  I'll read that introductory language again.

12  You wrote -- did you not, Ms. Santana? -- without waiving any

13  objection, and in an effort to provide as complete a response

14  as possible, responding party states that plaintiff was an

15  at-will employee, and as such, could be terminated or could

16  leave her employment for any reason or without any reason.

17          Responding party further states that plaintiff disclosed

18  confidential information inappropriately to third parties not

19  authorized to receive it.

20          Responding party states that plaintiff failed to maintain

21  a professional relationship with the City Administrator and

22  failed to maintain professional relationships with other

23  colleagues.

24          Do you recall that that was your answer?

25  A.    Yes.

1  **Q.**   Okay.  And did I read it correctly?

2  **A.**   I don't have it in front of me to verify that.

3  **Q.**   Okay.  I'll give it to you in a second, but let me just

4  ask you one other thing.  Was there also an interrogatory which

5  asked you who made the decision to terminate plaintiff's

6  employment?

7  **A.**   Yes.

8  **Q.**   And your answer to that was that you made the decision.

9  Correct?

10  **A.**   Yes.

11  **Q.**   Okay.  If you'd just look at the answers to

12  interrogatories 2 and 3, and verify --

13           **MR. LAFAYETTE:**  Your Honor.

14  **BY MR. SIEGEL**

15  **Q.**    -- that I read them --

16           **MR. LAFAYETTE:**  Your Honor, I --

17           **MR. SIEGEL:**

18  **Q.**   -- correctly?

19           **MR. LAFAYETTE:**  I would appreciate a copy, as well.

20           **MR. SIEGEL:**  You have a copy, sir.

21           **THE COURT:**  If it's going to be an exhibit, we'll

22  make sure you get a copy.  It's one you should already have a

23  copy of.

24  **BY MR. SIEGEL**

25  **Q.**   So did I read it correctly?

———

SANTANA - DIRECT / SIEGEL

1   **A.**    Yes.

2   **Q.**    And you signed a verification.  Correct?

3   **A.**    I did.

4   **Q.**    And what's the date of that verification?

5   **A.**    December 17th, 2014.

6   **Q.**    Okay.  And at the time you signed that verification, did

7   you believe that the answer to the interrogatory was true and

8   correct?

9   **A.**    Yes.

10  **Q.**    Okay.  Are you aware that subsequent to December 17, 2014,

11  your attorneys submitted supplemental answers -- supplemental

12  responses to the interrogatories?

13  **A.**    Yes.

14  **Q.**    Okay.  And did you verify those supplemental responses?

15  **A.**    Yes.

16  **Q.**    When did you do that?

17          **MR. LAFAYETTE:**  Objection, Your Honor.  Could the --

18  I don't have this marked as an exhibit.  And I just want them

19  mark as exhibits, so I can look at them at the same time.

20          **THE COURT:**  Overruled.

21      You may proceed with the question, if you know the answer.

22          **THE WITNESS:**  I don't know the date.

23

24

25

SANTANA - DIRECT / SIEGEL

1  BY MR. SIEGEL

2  Q.   Well, isn't it true that your attorneys submitted

3  supplemental responses that you did not verify?

4           MR. LAFAYETTE:   Objection.   Calls for the

5  attorney-client privilege.   And we're still not getting these

6  documents as exhibits.

7           THE COURT:   Overruled.

8       You can answer, if you know the answer.

9           THE WITNESS:   Can you repeat the question?

10  BY MR. SIEGEL

11  Q.   Sure.   Are you aware that your attorneys submitted

12  supplemental interrogatory responses?

13  A.   Yes.

14  Q.   And do you recall that they did that in January of 2015?

15  A.   Yes.

16  Q.   And do you know whether you verified those additional

17  responses?

18  A.   Yes.

19  Q.   And did you?

20  A.   Yes.

21  Q.   When did you do that?

22  A.   I reviewed them.

23  Q.   And when did you review them?

24  A.   Before they were submitted and finalized.

25  Q.   And when did you verify them?

———

 1  **A.**   I don't know the date.

 2  **Q.**   Isn't it true that the responses to the supplemental

 3  interrogatories simply included the same verification that you

 4  had made in December?

 5          **MR. LAFAYETTE:**  Objection, Your Honor.  Best

 6  evidence.  The witness doesn't have the document.

 7          **THE COURT:**  She may remember, or she may not.

 8      The objection's overruled.

 9          **THE WITNESS:**  I don't know.

10  **BY MR. SIEGEL**

11  **Q.**   Let me show you defendant City of Oakland's supplemental

12  responses to plaintiff's interrogatories, set one.

13  **A.**   I see it.

14  **Q.**   Okay.  And are those the supplemental responses to the

15  interrogatories, set one?

16  **A.**   Yes.

17  **Q.**   And can you tell from looking at that document when those

18  supplemental responses were completed?  I think if you look at

19  the last page --

20  **A.**   January 23rd, 2015.

21  **Q.**   And is a verification from you attached?

22  **A.**   Yes.

23  **Q.**   And what is the date of the verification?

24  **A.**   It's not dated.

25  **Q.**   And what month is indicated on that verification?

SANTANA - DIRECT / SIEGEL

1   **A.**   December blank 2014.

2   **Q.**   Okay.  Now, isn't that the same verification that was

3   attached to the original interrogatory responses?

4   **A.**   No.

5   **Q.**   It's not?  Near -- the verification attached to the

6   original responses has your signature, the word "December," and

7   someone filled in "17" -- the number 17.  Correct?

8   **A.**   They're not the same signature.

9            **MR. SIEGEL:**  Okay.  May I?  Okay.  Can you show that,

10  please?

11  (Document displayed.)

12           **THE COURT:**  It has not been admitted as an exhibit,

13  so are you intending to --

14           **MR. SIEGEL:**  No, Your Honor.

15           **THE COURT:**  -- admit it as an exhibit?  All right.

16  Then you certainly need to show opposing counsel before you can

17  show the jury.  And I need to see it, too.

18           **MR. SIEGEL:**  All right.

19           **MR. LAFAYETTE:**  These have not been marked as

20  exhibits, Your Honor.

21           **THE COURT:**  He says he's not trying to admit them as

22  exhibits, but I'm going to ask him to show them to you first.

23           **MR. LAFAYETTE:**  Okay.  Your Honor, may I see the

24  other one?

25           **MR. SIEGEL:**  (Indicating.)

———

1    (Document displayed.)

2         **MR. LAFAYETTE:**  Objection, Your Honor.  If they're

3    publishing it, then they're making them exhibits.  And I'm

4    objecting to them because they're not marked as exhibits.

5         **MR. SIEGEL:**  I will not show them.  Fine.

6         **THE COURT:**  All right.  We'll resolve this outside

7    the presence of the jury.

8         **MR. SIEGEL:**  Okay.  Thank you.  I have no further

9    questions of Ms. Santana.

10        **THE COURT:**  All right.  Now is an opportunity for the

11   Defense to ask questions.  And I'll let the jury know that, as

12   Ms. Santana is a defendant in the case, the Defense does not

13   need to question her at this time.  They may question her now,

14   and they'll have an opportunity to call her as their own

15   witness later in the case if they wish to.  So in a sense, they

16   have two opportunities to ask her questions.  And it's up to

17   them as to how they wish to allocate their time.  And I

18   understand Mr. Lafayette's going to ask her some questions now,

19   but may ask questions later.

20      When he finishes his questioning, I'll allow the jury to

21   write down any questions, if you wish to.  Again, you're not

22   required to; but you'll have the opportunity to when he

23   finishes his questions.

24      Mr. Lafayette, go ahead.

25        **MR. LAFAYETTE:**  Thank you, Your Honor.

<u>CROSS-EXAMINATION</u>

**BY MR. LAFAYETTE**

**Q.**   Good morning.

**A.**   Good morning.

**Q.**   How are you?

**A.**   Good.

**Q.**   You weren't asked, so I'll ask you a couple of things about you before we get too far into this.  Okay.  Did you go to college?

**A.**   Yes.

**Q.**   Where did you go?

**A.**   UC Berkeley, and MIT.

**Q.**   UC Berkeley?

**A.**   Yes.

**Q.**   Did you get an undergraduate degree at UC Berkeley?

**A.**   Two.

**Q.**   Two?  What two undergraduate degrees did you get at UC Berkeley?

**A.**   I have a bachelor's degree in rhetoric, and a bachelor's degree in ethnic studies.

**Q.**   Thank you.  And then after you got your undergraduate degree at the University of California Berkeley, did you pursue any other education?

**A.**   Yes.

**Q.**   And where did you go after that?

1   A.   The Massachusetts Institute of Technology.

2   Q.   MIT?  And when you went to MIT, did you obtain a degree

3   there?

4   A.   Yes.

5   Q.   What degree did you obtain there?

6   A.   A master's of city planning.

7   Q.   Master's in city planning?

8   A.   Yes.

9   Q.   And after you obtained that master's in city planning,

10  what did you embark upon doing?

11  A.   I began work with the City of Oakland.

12  Q.   And what position was that?

13  A.   Management Intern in the City Manager's Office.

14  Q.   Okay.  And then after a series of jobs, did you come to

15  work in San Jose?

16  A.   Yes.

17  Q.   What position did you ultimately get in San Jose?

18  A.   Deputy City Manager.

19  Q.   Deputy City Manager.  Now, at the time was San Jose a

20  larger city than City of Oakland?

21  A.   Yes.

22  Q.   And as the Deputy City Manager in San Jose, what was the

23  size of the budget that you controlled?

24  A.   The operations budget was approximately 500 million.

25  Q.   500 million?

SANTANA - CROSS / LAFAYETTE

1  **A.**   Yes.

2  **Q.**   And can you just tell us what specific categories were

3  under the operations budget that you controlled?

4  **A.**   I had oversight responsibility for the public-safety

5  services -- fire department, police department, emergency

6  management -- and worked with the City Manager on items that

7  the independent police auditor was reviewing.

8       I had oversight of the utility and environmental city

9  service area, which was our water-pollution-control plant, our

10  environmental initiatives, and our water services that we

11  provided, as well as administrative services.  I had all of the

12  contract authority for the City Manager, City audits, and

13  representing the City Manager in many administrative functions.

14  And I oversaw the City Manager's Office.

15  **Q.**   So you had a significant role?

16  **A.**   Yes.

17  **Q.**   At some point were you recruited to come to the City of

18  Oakland?

19  **A.**   Yes.

20  **Q.**   And do you recall who suggested that you come to the City

21  of Oakland?

22  **A.**   Lamont Ewell.

23  **Q.**   All right.  And what was he doing at the time?

24  **A.**   He was the Interim City Administrator.

25  **Q.**   Okay.  So he was the Interim City Administrator for the

1  City of Oakland?

2  **A.**   Yes.

3  **Q.**   Okay.  And so when you came to the City of Oakland, did

4  you -- before you took the position, did you interview with the

5  Mayor?

6  **A.**   Yes.

7  **Q.**   Did you interview with any of the City Council people?

8  **A.**   Yes.

9  **Q.**   Did you interview with City Councilperson Brooks?

10  **A.**   Yes.

11  **Q.**   And when the announcement was made that you would become

12  the new Oakland City Administrator, was Councilman --

13  Councilperson Brooks present?

14  **A.**   Yes.

15  **Q.**   And did she say laudatory things about you?

16  **A.**   Yes.

17  **Q.**   Okay.  Now, when you came to the City of Oakland, was

18  there a budget-crunch issue?

19  **A.**   Yes.

20  **Q.**   And did Ms. Preston assist you with the budget-crunch

21  issues?

22  **A.**   Yes.

23  **Q.**   There, did you think she had done a good job?

24  **A.**   Yes.

25  **Q.**   Did you know her before you came to the City?

SANTANA - CROSS / LAFAYETTE

1  A.   No.

2  Q.   Now, at some point in time an issue arose with regard to

3  the Rainbow Center.   Right?

4  A.   Yes.

5  Q.   And at some point in time after that issue arose, did you

6  task individuals to sort of look into what had happened?

7  A.   Yes.

8  Q.   Was one of those people Ms. Preston?

9  A.   Yes.

10  Q.   And was the other one Mr. Blackwell?

11  A.   Yes.

12  Q.   What was the role, if any, of Ms. Orologas?

13  A.   Alex was responsible for -- there was multiple authors

14  submitting information.   And she was responsible for collecting

15  the information, and working with Fred and LaWanna to validate

16  it, and to help understand what happened and what did not

17  happen.

18  Q.   All right.   Now, at some point in time when the issue

19  first came up, was it an issue that related to whether or not

20  Pulte Homes should be paid?

21  A.   Yes.

22  Q.   Okay.   And in the process of investigating whether Pulte

23  Homes should be paid, did other issues surface?

24  A.   Yes.

25  Q.   Okay.   Without going to a whole lot of detail, just tell

1  me briefly what other issues surfaced after they started

2  investigating whether or not Pulte Homes should be paid.

3  **A.**   There was the absence of contracts and agreements in

4  place.

5       There was Councilmember staff in -- working in the Teen

6  Center, where traditionally City civil-service staff should be

7  working.

8       And there was examples of documents that Vice Mayor Brooks

9  should not have signed.

10  **Q.**   All right.  And so when these issues arose, did you make

11  any effort whatsoever to contact Councilperson Brooks to find

12  out answers to the questions that had surfaced?

13  **A.**   Yes.

14  **Q.**   By the time you had started that process, how long had you

15  been with the City of Oakland?

16  **A.**   I first started in the August/September time frame.

17  **Q.**   Okay.  So there was a document that you were shown which

18  is exhibit --

19            **MR. LAFAYETTE:**  I have it as Exhibit O, your Honor --

20  but has been marked by plaintiff's counsel.

21            **THE COURT:**  7.

22            **MR. LAFAYETTE:**  7.  Thank you, Your Honor.

23  (Document displayed.)

24  **BY MR. LAFAYETTE**

25  **Q.**   And I'd like to take you to the -- I'd like to take you to

1   the bottom of this document that -- I think we see your e-mail

2   down here (indicating).  Is that what I'm looking at?

3   A.   Yes.

4          MR. LAFAYETTE:  Actually, the second page.  This is

5   the second page.  H.  H.  Sorry.  Second page.

6   (Document displayed.)

7          MR. LAFAYETTE:  Yeah.  Pull her e-mail context up.

8   Yes.

9   Q.   So you write, "I am following up on discussion in December

10  regarding an outstanding council item re: Pulte Rainbow Center.

11  First, thanks again for allowing me more time to sort through

12  the various issues, and to defer this item until January 24th."

13         Had you had a conversation with Councilperson Brooks in

14  December?

15  A.   Yes.

16  Q.   Had you told her that there were issues outstanding with

17  regard to the Rainbow Teen Center?

18  A.   Yes.

19  Q.   Do you --

20  A.   I don't have that in front of me.  I just need to know the

21  number.  And I can't see the small numbers.  I'm sorry.

22         THE COURT:  Exhibit 3.

23         MR. LAFAYETTE:  Can Kelvin help her, Your Honor?

24  She's looking through plaintiff's book.  And I think --

25         THE COURT:  She has it before her.

1           **THE WITNESS:**  I have it now.  Thank you.

2  **BY MR. LAFAYETTE**

3  **Q.**   You write, "They're working on this matter.  Some

4  significant issues have surfaced that require attention and

5  discussion.  I need to resolve these issues before I can sign

6  off on the report.  Below are the issues that have surfaced

7  that we should discuss."

8       You point out some issues:  City access staff reports;

9  that this is a public facility; that public works and

10  recreation don't have access.

11      Was that true?

12  **A.**   At the time, that's what we knew to be true.

13  **Q.**   You wrote something about ADA compliance.  And the

14  facility not meeting --

15      That's the Americans with Disabilities Act.  Is that

16  right?

17  **A.**   Yes, yes.

18  **Q.**   And then on this last down at the bottom you say,

19  "Staffing.  No one can verify for me how this operating

20  facility is being staffed.  From a risk-management perspective,

21  I need to understand staffing, and whether any staff have

22  cleared the required background checks of interacting with

23  members of the public.  And I am told that your council

24  district staff work at the center.  Not sure if that is true or

25  correct."

1    Now who, between Mr. Blackwell and Ms. Preston, was

2  charged with evaluating the employment-related issues in

3  connection with the Rainbow Teen Center?

4  **A.**   LaWanna.

5  **Q.**   Ms. Preston.  So is Ms. Preston the person who brought to

6  your attention that there were individuals there who had not

7  gone through background checks?

8  **A.**   Ms. Preston brought to my attention that we -- that we

9  needed to investigate that issue.

10 **Q.**   Did you get a response back from Councilperson Brooks?

11 **A.**   Yes.

12 **Q.**   Did the response that you got back suggest that, oh, I'm

13 open to sitting down and talking with you to resolve these

14 issues?

15 **A.**   No.

16 **Q.**   Did the response that you got back from her indicate that

17 she had quick and easy answers, and she would provide them to

18 you in short order?

19 **A.**   No.

20 **Q.**   Oh.  Take a look at the first page:  Councilperson Brooks'

21 response right here at the bottom.

22 **A.**   Yes.

23 **Q.**   And did she write, "What do any of the issues raised below

24 have to do with getting Pulte paid?!"

25 **A.**   Yes.

1   **Q.**   Is this when you started believing that your relationship

2   with Ms. Brooks was about to change?

3   **A.**   Yes.

4   **Q.**   So now you forwarded the e-mail to Fred Blackwell.

5   Correct?

6   **A.**   Yes.

7   **Q.**   And then, if I see the e-mail up above, it's an e-mail

8   from Howard Jordan.  Do you see that?

9   **A.**   Yes.

10   **Q.**   To you?

11   **A.**   Yes.

12   **Q.**   And Howard Jordan puts a "Hm!"  Right?

13   **A.**   Yes.

14   **Q.**   So Howard Jordan was the person who wrote to you, instead

15   of you writing to Howard Jordan.  Right?

16   **A.**   Yes.

17   **Q.**   And you responded to Howard Jordan's "Hm!" by stating, "My

18   blood will flow.  You know this.  Right?"

19   **A.**   Yes.

20   **Q.**   Okay.  Now, can you explain what that comment was supposed

21   to mean?

22   **A.**   Vice Mayor Brooks was only focused on getting Pulte paid,

23   and not focused on the other irregularities that I had brought

24   to her attention.  And with the absence of contracts that would

25   have allowed me to issue payment, that's the focus that --

1  that's what she wanted to keep pressing with me, is just to pay

2  them.  And I would not pay them absent the appropriate

3  documentation.

4  Q.   Okay.  So in your mind, that put you -- well, I'll

5  withdraw that question.

6     Did you push forward with the report to be prepared for

7  Rainbow Teen?

8  A.   Yes.

9  Q.   And as you pushed forward with the report, did Ms. Preston

10 assist you in gathering information?

11 A.   Yes.

12 Q.   I'd like to direct your attention to what has previously

13 been marked as Exhibit 7.  Now, as a result of the work that

14 you had done regarding Rainbow Teen, had you investigated the

15 City Council person?

16 A.   No.

17 Q.   Were you -- prior to you publishing the report, had the

18 FBI contacted you?

19 A.   Yes.

20 Q.   Prior to you publishing the report, had the DA contacted

21 you?

22 A.   I think they contacted me after.

23 Q.   All right.  So now did you initiate the communications

24 with either the DA or the FBI?

25 A.   No.

1  Q.   Prior to you issuing the report, was the Rainbow Teen

2  Center staffing and financing issues an issue that was in the

3  newspapers?

4  A.   Yes.

5  Q.   So at the bottom of Exhibit 7 is an e-mail from you.

6  Correct?

7  A.   Yes.

8  Q.   Where you say, "Attached to the draft Rainbow Center

9  report as edited by several CAO staff."

10      Stop here.  Who was the CAO staff?

11  A.   Fred Blackwell, LaWanna Preston, Sabrina Landra,

12  Alexandra Orologas, Scott Johnson, and other staff that were

13  outside of the -- the City Administrator's Office.

14  Q.   "I am now sharing with the City Attorney's Office for

15  input.  Given the various media articles regarding this topic,

16  I ask that you use the greatest level of caution when editing

17  this report, and assure that a draft does not circulate beyond

18  this limited group."

19      Were you attempting to make sure that whatever was being

20  said at this point was kept confidential, until and unless

21  there was concurrence by all involved as to what the report

22  should actually say?

23  A.   Yes.

24  Q.   Was Ms. Preston within that group?

25  A.   Yes.

SANTANA - CROSS / LAFAYETTE

1  **Q.**   So in your e-mail to the City Attorney's Office, at the

2  top of the page did you indicate that you wanted to know if you

3  could refer this to the DA's Office?

4  **A.**   No.

5  **Q.**   Did you indicate that you wanted to send this to the

6  DA's Office?

7  **A.**   No.

8  **Q.**   At any point in time did you ever tell Ms. Preston that

9  you wanted to refer this matter to the DA's Office?

10  **A.**   No.

11  **Q.**   At any point in time did you tell her in the company of

12  Mr. Blackwell that you wanted to refer this matter to the

13  DA's Office?

14  **A.**   No.

15  **Q.**   Would it be accurate that the only thing you really wanted

16  to know was -- well, one of the things was if you had the

17  authority to initiate an investigation on a councilperson?

18  **A.**   Yes.

19           **MR. LAFAYETTE:**   I'd like for you to turn to

20  Exhibit 6.  There was some language shown to you on Exhibit 6

21  that -- unfortunately this language is so faint, we'll try --

22  but if we could go to page LP 112.  Well, we'll start there.

23  Just the -- just the -- up here.  Just this language here,

24  Kelvin.  Yeah, that.

25  (Document displayed.)

SANTANA - CROSS / LAFAYETTE

1  BY MR. LAFAYETTE:

2  Q.   Now, frankly, that's not an insert of language to be

3  included in a report; is it?

4            MR. SIEGEL:  Objection.  Lack of foundation.

5            THE COURT:  Overruled.

6       But can you specify which part of the exhibit you're

7  referring to?

8            MR. LAFAYETTE:  Oh, I'm sorry.

9            THE COURT:  That would be helpful.

10           MR. LAFAYETTE:  There's a passage that reads BJP

11  hyphen --

12           THE COURT:  All right.  There's a different part of

13  the -- different part shown to the jury when you started that

14  question.  That's why the confusion.

15           MR. LAFAYETTE:  That's fine, Your Honor.

16  Q.   I'm starting right there (indicating).  And it says, "The

17  CAO has power under the Charter to administer City, and a duty

18  to process administrative actions and manage assets of

19  construction projects in accord with City policies, laws, and

20  procedures.  These, in my view, are not policy issues for the

21  Council."  (As read.)

22      Did you understand this was an opinion from the City

23  Attorney, or did she actually want this language in the report?

24           MR. SIEGEL:  Objection.  Lack of foundation.

25           THE COURT:  Sustained.

1    Why don't you ask about her knowledge of that section

2   before you ask about her belief about it?

3   **BY MR. LAFAYETTE**

4   **Q.**   Did you get this language back from the City Attorney?

5   **A.**   Yes.

6   **Q.**   Did you have a conversation with the City Attorney?

7   **A.**   Yes.

8   **Q.**   Was Ms. Preston present when that conversation took place

9   with the City Attorney?

10  **A.**   Yes.

11  **Q.**   Was Mr. Blackwell present when that conversation took

12  place with the City Attorney?

13  **A.**   Yes.

14  **Q.**   And did the City Attorney, in that conversation that you

15  had -- did you reach an understanding as to whether this was

16  intended to be language input into this document, or whether or

17  not this was her expressing her opinion?

18  **A.**   Yes.

19  **Q.**   Which one was it?

20  **A.**   It was an opinion.

21  **Q.**   It was an opinion.

22    So she goes on and she says, "So the only policy issue

23  revolves around whether to go to the DA, whether to expend

24  resources to retain an independent investigator, and whether

25  counsel wants to go on record with the policy that mirrors City

1  Charter to a tee, although that is not necessary."  Was this

2  ever --

3          MR. SIEGEL:  Your Honor, excuse me.  I'm sorry.  Just

4  for clarification, could we say what document and what page

5  we're reading from?  Because this is not --

6          MR. LAFAYETTE:  This is a --

7          MR. SIEGEL:  Exhibit 6, page 112.

8          MR. LAFAYETTE:  This is Exhibit 6, page 102.

9          MR. SIEGEL:  Oh, 102.  I thought you said "112."

10          THE COURT:  Proceed.

11          MR. LAFAYETTE:  Thank you, Your Honor.

12          MR. SIEGEL:  Got it.

13          MR. LAFAYETTE:  Now Mr. Siegel just referenced page

14  112.  Let's go there, if we could.  Can you block that

15  language, where it says "BJP"?

16  (Document displayed.)

17  BY MR. LAFAYETTE

18  Q.  And it's even more difficult to read.  It's very faint,

19  but BJP -- this is the language that counsel cited to you

20  yesterday.  It says, "I think that although it is implicit in

21  the report that CAO intends to proceed to bring the facility

22  into compliance, that it should be stated in a comprehensive

23  way to a conclusion."

24      Was this -- based upon the conversations you had with

25  Ms. Preston, the conversations you had with Mr. Blackwell, the

1   conversation you had with the City Attorney, was this language

2   to be inserted into the document, or was this language where

3   the City Attorney was, again, expressing her view?

4   **A.**   She was expressing her view.

5   **Q.**   And was she responding to the questions --

6       Well, was this her telling you and everybody else what

7   options you may have had to go forward?

8   **A.**   Yes.

9   **Q.**   So after she presented those options to you on things that

10   you could do to go forward, did you say what you wanted to do?

11   **A.**   Yes.

12   **Q.**   What did you say?

13   **A.**   I referred the report to the City Council, with the option

14   to fund and conduct its own investigation.

15   **Q.**   To conduct and fund its own investigation.

16       And did Ms. Preston sign off on that?

17   **A.**   Yes.

18   **Q.**   Did she object in any way to signing that document?

19   **A.**   No.

20   **Q.**   During that meeting did she tell you in any way whatsoever

21   that she thought that you were trying to force her to put into

22   this document language that said, "Send this to the

23   DA's Office"?  Did she say that to you?

24   **A.**   No.

25   **Q.**   There's another document -- I think it was --

 1  (Discussion off the record.)

 2          MR. LAFAYETTE:  -- 87.  Just pull up 87.

 3  (Document displayed.)

 4          MR. LAFAYETTE:  Now, the document, Your Honor, I'm

 5  going to put to the witness is -- we had it listed as something

 6  else, but plaintiff called it yesterday.

 7          THE COURT:  I need a number or a name or something

 8  describing it.

 9          MR. LAFAYETTE:  Plaintiff's 8.  Plaintiff's 8,

10  Your Honor.

11          THE COURT:  8?  Is that what you said?

12          MR. LAFAYETTE:  8.

13          THE COURT:  Go ahead.  It's in evidence.  Do you have

14  a question for the witness?

15          MR. LAFAYETTE:  Yes.

16  Q.   In this document, Exhibit 8, did the -- Ms. Preston agree

17  to language indicating that there may be a need for further

18  investigation?

19  A.   Yes.

20          MR. SIEGEL:  I'm sorry.  Can we have an indication

21  what language we're referring to?

22          THE COURT:  Overruled.

23  (Document displayed.)

24  BY MR. LAFAYETTE

25  Q.   Would you turn to page 5 of the -- of the exhibit book,

1  which is Bates stamped 878?  The section at the top, under

2  "Analysis" -- this was a section approved and authorized

3  voluntarily and willingly by Ms. Preston.  Right?

4  A.    Yes.

5  Q.    It states, "While the below issues can be corrected

6  administratively, the inventory of issues collectively raise a

7  larger set of policy issues for the City Council to consider

8  with respect to its role and authority.  Clearly, it has

9  acknowledged that staff could and should have done better.

10  However, it is not entirely known the role or actions of the

11  Vice Mayor or Council District 6 staff that contributes to this

12  outcome."  Who was the Vice Mayor?

13  A.    Desley Brooks.

14  Q.    Who was -- and who was the -- who was the Councilperson

15  for Council District 6 staff?

16  A.    She had several staff members.

17  Q.    So at the end of the day, this report highlights that

18  there were problems for both staff and from

19  Councilmember Brooks' District and from Councilmember Brooks

20  that contributed to this problem.  Right?

21  A.    Yes.

22  Q.    All right.  Now, after you finalized the report, did

23  Ms. Brooks -- did Ms. Preston ever come to you and say that you

24  were trying to force her to do something that she thought was

25  unlawful?

---

1  **A.**    No.

2  **Q.**    Did she ever file a claim in the City, saying that she

3  thought you were trying to force her to do something unlawful?

4  **A.**    No.

5  **Q.**    To your knowledge, did she go to anyone and say that you

6  were trying to get her to do something unlawful?

7  **A.**    No.

8  **Q.**    Was it your belief at the time that everything that was

9  done was completely aboveboard?

10  **A.**    Yes.

11  **Q.**    Did you have any reason to believe that Ms. Preston

12  thought that something wrong was taking place?

13  **A.**    No.

14  **Q.**    March 6 you have the City Council meeting.  Correct?

15  March 6?

16  **A.**    Yes.

17  **Q.**    You attended?

18  **A.**    Yes.

19  **Q.**    How long did the Council meeting last?

20  **A.**    I don't remember.

21  **Q.**    Four and a half hours?

22  **A.**    Yes, around that.

23  **Q.**    Four and a half hours.  Was it all on the Rainbow Teen

24  Center Report?

25  **A.**    Yes.

SANTANA - CROSS / LAFAYETTE

1  Q.   Did various City Council members weigh in on the

2  discussion?

3  A.   Yes.

4  Q.   I'll ask you.  Was it one of those warm, quiet, fireside

5  chats, or was it something way more animated?

6  A.   Way more animated.

7  Q.   Were there Councilpeople taking opposite positions on what

8  to do?

9  A.   Yes.

10 Q.   Were there people cutting people off in the conversations?

11 A.   Yes.

12 Q.   Okay.  We'll view the videotape at some point, but you did

13 ask Ms. Preston to go up and say something.  Correct?

14 A.   Yes.

15 Q.   Regardless of what she said or how it was -- because we'll

16 play that.  We'll look at that.  In your mind, had she done

17 anything when she went up there that in any way whatsoever

18 offended you?

19 A.   No.

20 Q.   In your mind, when she went up there and did whatever she

21 did, did she do anything that made you upset?

22 A.   No.

23 Q.   In her mind --

24      In your mind, when she went up there and did whatever she

25 did, did she do anything that made you want to get her?

SANTANA - CROSS / LAFAYETTE

1  **A.**   No.

2  **Q.**   I'd like for you to take a look at Exhibit F.

3  **A.**   Can you translate that?  I don't have numbers.

4  **Q.**   It's in the black book.

5  **A.**   Volume 1?

6  **Q.**   Volume 1.  S.

7              **MR. SU:**  (Indicating.)

8              **THE COURT:**  Mr. Lafayette, how much more time are you

9  expecting your examination?

10             **MR. LAFAYETTE:**  About 15 minutes I would say,

11 Your Honor.

12             **THE COURT:**  All right.  We're going to take a break.

13             **MR. LAFAYETTE:**  Thank you, Your Honor.

14             **THE COURT:**  You've gone beyond what you planned.  So

15 we're going to take a morning break.  We'll come back in ten

16 minutes with a continuation of this witness.

17     I'm going to give you the opportunity now to pose any

18 questions to the witness since we're on a break.  Again, you're

19 not required to.  And there will be more questions for this

20 witness.  And I expect she'll be back later in the case, too.

21 So you may choose to defer your questions until later, until

22 you've heard more about the case; but if you'd like to write

23 down any questions, we'll consider them after the break.  Thank

24 you very much.

25 (Proceedings were heard outside the presence of the jury:)

1    **THE COURT:**  We'll go back on the record just a minute

2  more.

3      So, counsel, I've got a few logistical issues.

4      Ms. Santana, you may sit down if you'd like to.

5      Mr. Siegel, I'll need your attention, as well.

6      **MR. SIEGEL:**  Sure.

7      **THE COURT:**  Witnesses have been excluded.  There were

8  a few people who came into the courtroom during the

9  examination.  I don't know who they are.  I'm relying on

10  counsel to make sure who your witnesses are; if someone comes

11  in who shouldn't be here, that you bring it to my attention.

12      **MR. LAFAYETTE:**  I have been checking.  They are not

13  witnesses.  They're people who just want to witness the case.

14      **THE COURT:**  I just wanted to alert the parties:

15  While I know some of the witnesses, I don't know all of them

16  personally.  So if you see someone enter who should not be

17  present, it's upon you to bring it to my attention.

18      Mr. Lafayette, you have joined in the chorus of "all

19  rights" and "okays." in your questions.  So, just as I've

20  warned Mr. Siegel, seek to avoid that.

21      **MR. LAFAYETTE:**  Yes, Your Honor.

22      **THE COURT:**  Both sides have admitted into evidence

23  e-mails that lack foundation as far as their authenticity of

24  where they came from; how they were stored.  It appears to me

25  that they were produced in discovery, and that there's not a

1    dispute about their authenticity, and both sides are relying

2    upon them.  Therefore, I'm not going to be excluding any

3    documents for a lack of authenticity in an e-mail area, unless

4    someone brings to particular attention that there is a problem

5    with the authenticity of the document.

6          There are some documents that are e-mails where there

7    appears to be a second or more pages missing.  There were

8    objections raised in some of the amended joint trial exhibits

9    to the authenticity of those documents.  Again, unless

10   someone's going to make a challenge to where those e-mails came

11   from, I'm not going to exclude them, but I'm going to need to

12   hear what the challenge is with particularity if it comes up.

13         So you're getting to a point where there's going to be a

14   waiver of any authenticity challenge, because both sides are

15   referring to e-mails, and I'll just assume that they're

16   correct.  So I'm assuming that they are what they are, without

17   a need for someone to come up and say, "Here's where the

18   e-mails came from.  They were stored.  They were business

19   records," and other foundational issues.  We're kind of

20   skipping by that.  And that's fine with me, but I want to make

21   it's a volitional decision by both parties.

22             **MR. LAFAYETTE:**  That's fine.

23             **THE COURT:**  The screen.  I am not sure that the jury

24   can see the documents that plaintiff is putting on the screen.

25         You're welcome, once a document's in evidence, to blow it

1  up and to make it bigger and to highlight, just as the Defense

2  is doing on their screen, which is closer to the jury.  I have

3  an independent interest from the parties:  That of making sure

4  the jury can see and participate what's going on.  I note that

5  our average age of the jurors is 51.4 years.  Four of them are

6  wearing glasses.  I'm not so confident they can see what you're

7  trying to show them, but -- so you have the option of making it

8  bigger -- the demonstratives.

9       So you had two documents that you wanted to show the jury,

10  which are the responses to interrogatories.  We talked about

11  that briefly yesterday.  And I'm happy to give you a further

12  chance to put them on the screen as demonstratives if that's

13  your intention; but if that is your intention, I do need to

14  have the Defense -- although they've seen it before, I also

15  want to see them, just as far as seeing what it is you want to

16  show them.

17       My concern with those documents is:  Are there pages of

18  boilerplate objection that the jury's going to need to

19  understand what does all of that mean?  And are they being

20  confused or distracted by it?

21       I'll give you a chance to go back to that when

22  Mr. Lafayette's finished, if that's what you'd like to do, if

23  you can show me what it is you want to show them.

24       If you wanted to admit the parts of the answers as

25  exhibits, I'd be willing to do that, again, as long as they're

1   not going to be distracted with legalese, and things which are

2   not part of the answer.  So if you can have it be focused on

3   the answer, I'm willing to entertain that.

4       We've been spending -- both sides have gone past what you

5   intended with this witness.  We've spent a lot of time -- a

6   fare amount of time just on logistics of what the document

7   number is; and is this coming in or not.

8       In my assessment, there are many documents that both sides

9   have indicated you want to come into evidence with this witness

10  and other witnesses.  My suggestion would be:  Let's start the

11  witness with:  Here are the ten documents you're going to move

12  into evidence.  If there's no objection, move those all into

13  evidence.  Then we won't be fumbling around with moving it.  Is

14  it in?  Is it in?  Is it out?

15      If there's no objection, let's get those all into

16  evidence, and we won't be spending the jury's time about

17  hearing about exhibit numbers.  You can just get them in and

18  get it on the screen.

19      This probably shouldn't need saying, but we're not going

20  to have a repeat of this line of questioning if Ms. Santana

21  comes back later.

22          **MR. LAFAYETTE:**  I understand.

23          **THE COURT:**  So keep track of what you're asking.

24  We're going to respect the jury's time.

25          **MR. LAFAYETTE:**  Yes.

1          THE COURT:  That's everything on my checklist.  Be

2    back in a few minutes.  I want to give my reporters a break,

3    too.  Thank you.

4    (Recess taken from 10:38 a.m. until 10:51 a.m.)

5          (Proceedings were heard out of presence of the jury:)

6          THE COURT:  Back on the record.  We have one question

7    from the jury.  We may have more later.  Any objection to my

8    asking the witness?

9          MR. LAFAYETTE:  Actually, I do, Your Honor, because

10   this is not the witness who is prepared to answer this.  There

11   is another witness who is going to come and speak specifically

12   to that evaluation and how that document was created.  I think

13   she's done all that she can.  That's why I said -- that would

14   be my only objection.

15          THE COURT:  Mr. Siegel?

16          MR. SIEGEL:  Your Honor, I think it's a fair

17   question.

18          THE COURT:  All right.  I'll ask the question.

19       All right.  Let's bring in our jurors.

20       (Proceedings were heard in the presence of the jury:)

21          THE COURT:  All right.  We're back on the record.

22       All right.  We have a question from the jury.

23   Ms. Santana, you remain under oath, and here is the question.

24   You're free to answer just as you would any other question.

25   The question is:  Are you aware of any executive or managerial

1  staff having input into the writing of their own job

2  evaluation?  I'll read it again just for completeness:  Are you

3  aware of any executive or managerial staff having input into

4  the writing of their own job evaluation?

5           THE WITNESS:  Yes.

6           THE COURT:  And can you elaborate on your awareness

7  of that?

8           THE WITNESS:  As part of the process to evaluate

9  managers and directors, Fred and Scott, both of my Assistant

10 City Administrators, were delegated the development of the

11 directors that reported to them, and in some cases they chose

12 to have the directors get started on the evaluation for

13 purposes of expediting it, knowing that we would go through

14 them throughout our office and meet to review and find

15 concurrence on those evaluation documents.

16          THE COURT:  Thank you.  So I'll give you a chance to

17 follow-up on that if you wish, and then to continue your

18 examination.

19          MR. LAFAYETTE:  Thank you.

20 Q.  Aside from anything that you may know through counsel, do

21 you know if Scott initiated such a process with Ms. Preston?

22 A.  I don't.

23 Q.  Scott Johnson.

24 A.  I don't.

25          MR. LAFAYETTE:  Thank you.  I'd like to refer back to

SANTANA - CROSS / LAFAYETTE

1  Exhibit 8, Your Honor, which I think is the last Exhibit we

2  were looking at.

3          **THE COURT:**  Proceed.

4  **BY MR. LAFAYETTE:**

5  **Q.**  8.  8.  All right.  So with regard to Exhibit 8, there is

6  something -- a section that's called scope and due diligence

7  section here, and in the last --

8  **A.**  I'm sorry.  I don't have it.  8, is that -- I'm working

9  from two different documents, and they're coded different.  Is

10 it 8?

11 **Q.**  I know.  8, it's Exhibit 8.

12         **THE COURT:**  What page of Exhibit 8?

13 **BY MR. LAFAYETTE:**

14 **Q.**  Page 2, Bates stamp 875.

15 **A.**  Okay.

16 **Q.**  Do you have it there?

17 **A.**  Yes.

18 **Q.**  The bottom sentence says, "Staff notes that if the City

19 Council requires a report on past incidents, that the City

20 Council direct the City Administrator to allocate funding for

21 an independent review that includes:"

22      That was in the final report?

23 **A.**  Yes.

24 **Q.**  And if you go to the next page, it identifies the subjects

25 that would be identified in that subsequent review; correct?

1   **A.**   Yes.

2   **Q.**   If the City Council wanted it.   And if I go down, one,

3   two, three, four, five -- six bullets down, does it say "facts

4   related to inappropriate actions on the part of staff or the

5   vice-mayor"?

6   **A.**   Yes.

7   **Q.**   And was that something that Ms. Preston included or signed

8   off on in this document?

9   **A.**   Yes.

10  **Q.**   Did she ever object to signing off on that statement being

11  in this document?

12  **A.**   No.

13  **Q.**   Thank you.   Now, after the March 6th meeting, did you and

14  Ms. Preston have an email exchange?

15  **A.**   Yes.

16  **Q.**   And I'd like for you to take a look at Exhibit T in the

17  black book.   Do you have it there?

18  **A.**   Yes.

19  **Q.**   Does that appear to be -- is that the email exchange that

20  took place between you and Ms. Preston?

21  **A.**   Yes.

22  **Q.**   And so in this email exchange, Ms. Preston says, "I think

23  you came out of the meeting looking good."

24          **MR. SIEGEL:**   Your Honor, I think --

25          **MR. LAFAYETTE:**   I'm sorry.   I'm sorry.   It shouldn't

 1 | be on the screen.  Sorry.

 2 |     I'd like to move Exhibit T into evidence, Your Honor.

 3 |         **MR. SIEGEL:**  No objection.

 4 |         **THE COURT:**  Exhibit T is admitted.  It may be shown

 5 | to the jury.

 6 | (Trial Exhibit T received in evidence.)

 7 | **BY MR. LAFAYETTE:**

 8 | **Q.**  Ms. Preston says, "I think you came out of the meeting

 9 | looking good.  You took the high road and held your position.

10 | I'm sorry I had to contradict you tonight.  I hated doing it,

11 | but I had to tell the truth.  I hope you understand."

12 |     Do you see that?

13 | **A.**  Yes.

14 | **Q.**  And just above that did you respond to her?

15 | **A.**  Yes.

16 | **Q.**  And is this a true and accurate statement of what you felt

17 | at the time?

18 | **A.**  Yes.

19 | **Q.**  You wrote "You did not contradict me.  I was answering

20 | specifically to her comment 'three staff staying.'  I did agree

21 | with you when you commented on the director.  I thought you

22 | heard me.  We did not agree to keep her staff.  We did agree to

23 | assist them apply for the position, and noted that some did not

24 | meet the MQs."  What are MQs?

25 | **A.**  Minimum qualifications.

1    Q.    "That needed to be clarified, which we did.  You did tell

2    the truth, so did I.  Not clear where your concern is coming

3    from."

4         You sent that to her immediately after she sent something

5    to you; right?

6    A.    Yes.

7    Q.    She writes back:  "The comment about having the director

8    of the Rainbow recreation center manage both sites.  We had

9    that discussion with Audrey, not Brooks."

10        Did you respond to her?

11   A.    Yes.

12   Q.    Is your response at the top of the page?

13   A.    Yes.

14   Q.    "Right, and I agreed with you."

15        So, did you walk away from this conversation, on the

16   March 6th meeting, thinking that the two of you had said

17   different things at the March 6th City Council meeting?

18   A.    No.

19   Q.    Did something happen at the March 6th City Council meeting

20   that Ms. Preston said that made you think she had done

21   something wrong?

22   A.    No.

23   Q.    Were you angry at her for anything that happened at the

24   March 6th City Council meeting?

25   A.    No.

1          **MR. LAFAYETTE:**  Your Honor, I'll reserve the rest of

2   what I have for my case in chief.

3          **THE COURT:**  Mr. Siegel, do you have any further

4   examination for Ms. Santana?

5          **MR. SIEGEL:**  Very briefly, very briefly.

6                        **REDIRECT EXAMINATION**

7   BY MR. SIEGEL:

8   **Q.**   Now, Ms. Santana, I believe you testified a few moments

9   ago that in the conversation about whether there should be a

10  referral of Ms. Brooks to law enforcement, that Mr. Blackwell,

11  Ms. Preston and Ms. Parker were present; is that right?

12  **A.**   Yes.

13  **Q.**   Okay.  Isn't it true that there were several conversations

14  regarding whether there should be a referral of Ms. Brooks to

15  law enforcement?

16  **A.**   Yes.

17  **Q.**   Okay.  That was the conversation that on some occasion

18  Ms. Parker was present, and on other occasions only members of

19  your staff were present; correct?

20  **A.**   That may have been.

21  **Q.**   Okay.  Now, you, I believe, indicated, correct me if I'm

22  wrong, that Ms. Preston never objected to the idea of a

23  referral to law enforcement; is that right?

24  **A.**   That's right.

25  **Q.**   Do you recall saying something about -- different about

1    that issue in your deposition?

2    **A.**   I may have said something that none of us felt that it

3    needed to be referred.  They were already asking -- the FBI was

4    already asking something to that effect.

5    **Q.**   Did anyone from the FBI ever tell you why they were asking

6    about the Rainbow Teen Center?

7    **A.**   Yes.

8    **Q.**   Okay.  And what did they tell you?

9         **MR. LAFAYETTE:**  Objection, hearsay.

10        **THE COURT:**  Sustained.

11        **MR. SIEGEL:**  Your Honor, I'd like to read from

12   Ms. Santana's deposition at page 136, line 23 through 137,

13   line 3?

14        **THE COURT:**  One moment.

15   **BY MR. SIEGEL:**

16   **Q.**   It is Volume 2.  We're at page 136.

17   **A.**   Should I be looking at this?  Can you direct me where it's

18   at?

19   **Q.**   No, you don't have to.  The Court has to look at it.

20        **MR. LAFAYETTE:**  I think if she wants to, Your Honor,

21   she should be allowed to look.

22        **THE COURT:**  Are you trying to impeach her with that?

23        **MR. SIEGEL:**  Yes.

24        **THE COURT:**  It's a different question, so no.

25        **MR. SIEGEL:**  Well, whether it's impeachment or not,

1   it's a party deposition, which I believe can be used for any

2   purpose.

3           **THE COURT:**  Except you've got her here now to ask her

4   questions, and it's cumulative to other things.  So let's just

5   ask her questions now.

6           **MR. SIEGEL:**  Okay.

7   **Q.**   Do you recall stating in your deposition that you did not

8   recall what Ms. Preston said about whether Ms. Brooks should be

9   referred to the FBI?

10  **A.**   Could you refer me to the document?  I'm still looking for

11  it.  I have five or six binders.

12          **THE COURT:**  It's not a question of reading it, it's

13  do you remember it?

14          **THE WITNESS:**  Okay.  So then can you repeat the

15  question?

16  **BY MR. SIEGEL:**

17  **Q.**   Do you recall stating during your deposition that you

18  could not recall what Ms. Preston's position was regarding

19  whether Ms. Brooks should be turned over to the DA's Office?

20  **A.**   I don't remember the detail that you have in front of you.

21  **Q.**   Okay.  Well, haven't you testified previously that you did

22  not recall what Ms. Preston's position was on whether there

23  should be a referral to the District Attorney's Office?

24  **A.**   You have the deposition in front of you, so if it's there,

25  it's there.

———

1  Q.   Okay.  I mean, I'll have you look at it.

2  A.   Sure.

3  Q.   I'm not trying to trick you.  146, at the bottom, line 23.

4            THE COURT:  146 or 136?

5            MR. SIEGEL:  136.

6            THE WITNESS:  (witness examines document) I stated I

7  don't recall.

8            MR. SIEGEL:  Okay.  And thank you.  Those are all the

9  questions I have.

10           THE COURT:  All right.  Ms. Santana, you may step

11 down.  Thank you very much.

12      Plaintiff can call her next witness, please.

13           MR. SIEGEL:  Okay.  Thank you.  If he's here, we'll

14 call Fred Blackwell.

15           THE COURT:  Come forward, please.  Mr. Blackwell, is

16 your phone off?  Please turn it off.

17           THE WITNESS:  It is now.  Thanks.

18           THE COURT:  My deputy will swear you in.

19           THE CLERK:  Please raise your right hand.

20                        **FRED BLACKWELL**,

21 called as a witness for the **PLAINTIFF**, having been duly sworn,

22 testified as follows:

23           THE WITNESS:  Yep.

24           THE CLERK:  Please be seated.  Speak clearly into the

25 microphone and state your full name.

---

1          THE WITNESS:  I'm Fred Blackwell.

2          THE COURT:  You may proceed, counsel.

3                    **DIRECT EXAMINATION**

4   BY MR. SIEGEL:

5   **Q.**   Thank you.  Mr. Blackwell, are you presently employed?

6   **A.**   Yes, I am.

7   **Q.**   And what is your current job?

8   **A.**   I work at the San Francisco Foundation as its CEO.

9   **Q.**   So you're the head of the San Francisco Foundation?

10  **A.**   Yeah.

11  **Q.**   Okay.  And how long have you had that job?

12  **A.**   Since June of last year.

13  **Q.**   And prior to having that job, what was your job?

14  **A.**   I was the Interim City Administrator for the City of

15  Oakland.

16  **Q.**   How long did you hold the position of Interim City

17  Administrator?

18  **A.**   Maybe about two or three months.

19  **Q.**   And who did you follow as Interim City Administrator?

20  **A.**   Deanna Santana.

21  **Q.**   So when she left, you took over as Interim?

22  **A.**   Yes.

23  **Q.**   And then you went to the San Francisco Foundation?

24  **A.**   That is correct.

25  **Q.**   And before you served as Interim City Administrator at the

BLACKWELL - DIRECT / SIEGEL

1   City of Oakland, what was your job?

2   **A.**   I was the Assistant City Administrator.

3   **Q.**   And during what period of time did you serve as City

4   Administrator?

5   **A.**   As?

6   **Q.**   I'm sorry.  Assistant City Administrator.

7   **A.**   Okay.  That was from October 2011 through February of

8   2014.

9   **Q.**   And as Assistant City Administrator, did you report

10  directly to Deanna Santana?

11  **A.**   Yes, I did.

12  **Q.**   And did you have any specific jobs or specific functions

13  as Assistant City Administrator?

14  **A.**   Yes.

15  **Q.**   And what were they?

16  **A.**   They -- I had oversight responsibility for the City's

17  external service delivery departments with a particular

18  emphasis on kind of housing, economic development, and

19  redevelopment stuff, planning.

20  **Q.**   Did you have any involvement in employee relations while

21  you were Assistant City Administrator?

22  **A.**   No.

23  **Q.**   Did you ever become engaged in negotiating or assisting in

24  negotiating agreements with city unions?

25  **A.**   Yes.

1   Q.   And when did you do that?

2   A.   I don't remember the dates, but it was at the tail end of

3   the negotiation process with 1021 and 21.

4   Q.   1021 refers to Service Employees International Union Local

5   1021?

6   A.   Correct.

7   Q.   And when you were engaged in those -- tail end of those

8   negotiations, was there any other city official with whom you

9   worked?

10  A.   Yes.

11  Q.   Who was that?

12  A.   Lawanna Preston, and a couple of her staff people, mayor's

13  office staff was involved at the tail end directly in the

14  negotiations, and then, you know, there was always the back and

15  forth with counsel, as well as back and forth with the

16  leadership of the City Administrator's Office, so there was a

17  bunch of folks who were engaged in that.

18  Q.   Was one of the individuals who was engaged from the

19  Mayor's Office Deputy Mayor Sandre Swanson?

20  A.   Yes.

21  Q.   And were you and Deputy Mayor Swanson successful in

22  concluding the SEIU negotiations?

23  A.   Yeah, along with other folks as well, yeah.

24  Q.   In the course of working on labor relations, did you have

25  occasion to make an assessment of Lawanna Preston's performance

1  as Director of Employee Relations?

2          MR. LAFAYETTE:  Objection, relevancy.

3          THE COURT:  Overruled.  You may answer.

4          THE WITNESS:  Okay.  Can I ask you a question?  What

5  do you mean by "assessment"?

6  BY MR. SIEGEL:

7  Q.   I don't mean anything formal.

8  A.   Okay.

9  Q.   Did you develop an opinion as to whether she did her job

10  well?

11  A.   Oh, yes.

12  Q.   And what was your opinion?

13  A.   I thought she did well.

14  Q.   Did you form an opinion as to whether she was credible?

15          MR. LAFAYETTE:  Objection, character.

16          MR. SIEGEL:  Reputation for truth and honesty.

17          THE COURT:  Why don't you clarify your question then.

18  BY MR. SIEGEL:

19  Q.   Did you form an opinion as to whether she was truthful?

20          MR. LAFAYETTE:  Objection, same.

21          THE COURT:  Sustained.

22  BY MR. SIEGEL:

23  Q.   Did you have occasion to observe whether she behaved in a

24  truthful manner?

25          MR. LAFAYETTE:  Objection, character, opinion.

1            THE COURT:   Sustained.

2   BY MR. SIEGEL:

3   Q.   During the time that you worked and had involvement with

4   labor unions for the City of Oakland, did you hear any

5   complaints about Lawanna Preston's actions as a negotiator with

6   the labor unions?

7   A.   Yes.

8   Q.   Okay.  And what did you hear in that regard?

9   A.   So the folks who were a part of the negotiations on the

10  labor side complained about everybody who was at the table,

11  whether it was staff or consultants or whoever, so I think in

12  their eyes nobody was doing all that great a job over on the

13  City side, you know, and I think Lawanna was included in that

14  criticism.

15  Q.   Do you recall whether any of them complained that she was

16  too tough a negotiator with the unions?

17  A.   Yeah, I remember that.

18  Q.   Now, do you recall whether as Assistant City Administrator

19  you were involved in doing evaluations of persons at the level

20  of director on the staff of the City of Oakland?

21  A.   I was involved in that.

22  Q.   Do you recall what the process was?

23  A.   Yes, the -- let me think.  The process involved myself,

24  Deanna, and Scott Johnson, who was the other Assistant City

25  Administrator, and I can't -- I know at a minimum it was the

---

1   three of us.  I don't remember quite who else was in the room.

2   But for each one of them, for the folks that we had kind of

3   direct oversight responsibility for, we had a conversation

4   about performance mostly along the lines of kind of coming up

5   with performance plans for the upcoming year, rather than, you

6   know, comprehensive assessments of prior years' performance,

7   because we were relatively new and didn't have the opportunity

8   to engage in the prior years' performance planning, as I

9   recall.

10  **Q.**   Did you and Mr. Johnson and Ms. Santana divide up

11  responsibility among yourselves?

12  **A.**   Yes.

13  **Q.**   Do you recall who had responsibility for preparing the

14  performance evaluation for Lawanna Preston?

15  **A.**   I don't recall specifically, but I would imagine it was

16  probably Deanna, because that's where the direct reporting

17  relationship was.

18  **Q.**   Okay.  If you could grab the binder to your left with the

19  blue cover on it and look at Exhibit 12.

20          **THE COURT:**  And while you do that, Mr. Siegel, just

21  to clarify a prior ruling under 608(a), I will allow you to

22  examine the witness about his knowledge of the reputation for

23  the character of truthfulness or untruthfulness by Ms. Preston,

24  and his testimony as an opinion about that character, if he has

25  knowledge of that.

 1            MR. SIEGEL:  Okay.  Thank you.  I'm just looking it

 2    up myself.

 3            THE COURT:  You can come back to that, and you can

 4    proceed with your questioning.

 5            MR. SIEGEL:  Sure.  Thank you.

 6            THE WITNESS:  You want me to read all of this?

 7    BY MR. SIEGEL:

 8    Q.   I really would like to know whether you recognize it.

 9    A.   (witness examines document) I recognize the form, if

10    that's what you mean.

11    Q.   Trying to be more specific, we're trying to figure out to

12    let you know, since that document is not signed, we're trying

13    to find out who prepared it.

14            MR. LAFAYETTE:  Your Honor, I think the question is

15    now lacking foundation from the witness.  Has he ever seen it

16    before?

17            THE COURT:  Overruled.  The question is do you know

18    who prepared this document?

19            THE WITNESS:  No, I don't know who prepared this

20    document.

21    BY MR. SIEGEL:

22    Q.   Do you know whether Lawanna Preston prepared it herself?

23            MR. LAFAYETTE:  Objection, cumulative.

24            THE COURT:  Overruled.

25            THE WITNESS:  I don't know if Lawanna prepared this

1  herself.

2  **Q.**   Okay.  Thanks.  Let me ask you.  Did you have an opinion

3  as to whether Ms. Preston was truthful in her interactions with

4  you?

5  **A.**   No, I don't have any question about that.

6  **Q.**   The question is do you have an opinion as to whether she

7  was truthful?

8  **A.**   I assume she was.  I don't have any evidence that suggests

9  she wasn't.

10  **Q.**   Thank you.  Now I'd like to turn your attention to the

11  issue of a report that was prepared with respect to the Rainbow

12  Teen Center.

13  **A.**   Um-hm.

14  **Q.**   Do you recall preparing such a report?

15  **A.**   I was involved being -- involved in the preparation of

16  that report.

17  **Q.**   And is that Exhibit 8 in that same binder with the blue

18  cover?

19  **A.**   Yes, this is -- looks like this is it.

20  **Q.**   And that report, does it have your signature on it?

21  **A.**   Yeah, that's me.

22  **Q.**   Do you recall whether there was a discussion of the

23  Rainbow Teen Center on March the 6th of 2012?

24  **A.**   I don't recall the date, but that was involved in a lot of

25  discussions about the Rainbow Teen Center.

1   Q.   Do you recall that there was at some point after the date

2   of that report, which I believe is February 24th, a meeting of

3   the City Council which people discussed the Rainbow Teen

4   Center?

5   A.   It was an unforgettable meeting.

6   Q.   Why was it unforgettable?

7   A.   It was long, it was tense, it was controversial, it was

8   memorable.

9   Q.   Were there a lot of members of the public who spoke?

10  A.   Yes.

11  Q.   And did the people who came in from the community have

12  different opinions to express with respect to the Rainbow Teen

13  Center?

14  A.   Yes.

15  Q.   Do you recall whether during that meeting you were called

16  to the microphone?

17  A.   Yeah.

18  Q.   Who called you to the microphone?

19  A.   Deanna.

20  Q.   Ms. Santana?

21  A.   Yes.

22  Q.   And did you go to the microphone?

23  A.   I didn't make it to the microphone.

24  Q.   Why not?

25  A.   A couple of reasons.  One is it was -- it was a pretty

1  tense meeting, and so, you know, I was not anxious to get

2  there.  I wasn't rushing to get to the podium.  The second is

3  that, you know, I don't remember exactly what the question was,

4  but I remember feeling as though Deanna was seeking a kind of

5  black and white answer to an issue that was gray for me.

6  **Q.**   So you didn't think there was a clear black or white

7  answer to the question that Ms. Santana was raising?

8  **A.**   Correct.

9  **Q.**   And were you reluctant to get in the middle of the dispute

10 at that time?

11 **A.**   It was an awkward situation.

12 **Q.**   And did the awkwardness involve Ms. Santana and

13 Ms. Preston?

14 **A.**   No, I think the awkwardness involved Ms. Santana and

15 Ms. Brooks.

16 **Q.**   Okay.  Fair enough.

17     During the time that you worked for the City of Oakland,

18 did you occasionally, or more than occasionally, work from

19 home?

20          **MR. LAFAYETTE:**  Objection, relevance, Your Honor.

21          **THE COURT:**  Overruled.  You can answer.

22          **THE WITNESS:**  Yeah, I mean, there was a lot -- now

23 that I think about it, yeah, there was a lot of work from home

24 that went on.

25

1  BY MR. SIEGEL:

2  Q.   And did that work involve your working with documents that

3  related to City of Oakland business?

4  A.   Oh, absolutely.

5  Q.   And how was it that you were able to work on documents

6  involving City of Oakland business while you were at home?

7  A.   Utilizing iPads and iPhones and home computers and

8  telephone.

9  Q.   So did you send documents from City of Oakland computers

10  to your home computer or iPad or phone?

11  A.   Yes, sometimes.

12  Q.   And to your knowledge, was there any prohibition on your

13  doing such work at home?

14  A.   No.

15       MR. SIEGEL:   Okay.   Great.   Thank you, Mr. Blackwell.

16  That's all the questions I have.

17       THE COURT:   All right.   If you would stay there.   If

18  the defense would like to ask Mr. Blackwell any questions.

19       MR. LAFAYETTE:   I do, Your Honor.   Thank you.

20                      CROSS-EXAMINATION

21  BY MR. LAFAYETTE:

22  Q.   Good morning, Mr. Blackwell.

23  A.   Good morning.

24  Q.   It's been quite a while.

25  A.   It has.

1   Q.   Good to see you.

2   A.   You, too.

3   Q.   Now, Mr. Blackwell, you went to college?

4   A.   Hmm?

5   Q.   You go to college?

6   A.   Oh, yeah.

7   Q.   Where did you go?

8   A.   Morehouse College.

9   Q.   Okay.  Down in Atlanta?

10  A.   Yes, sir.

11  Q.   Okay.  Any schooling after Morehouse?

12  A.   Yes.

13  Q.   Where did you go?

14  A.   U.C. Berkeley.

15  Q.   U.C. Berkeley.  Which program?

16  A.   Department of City Planning.

17  Q.   All right.  And is that how you got into city government?

18  A.   That's part of how I got in.

19  Q.   Part of it is the way you were brought up?

20  A.   Sure.

21  Q.   Okay.  Now, I think in October 2011, you came to the City;

22  right?

23  A.   Yes.

24  Q.   So I'm going to ask you some questions about things that

25  happened at the city, but I'm going to first ask you how long

1    have you known Councilperson Brooks?

2    A.    I've known Councilperson Brooks probably since the late

3    '90s.

4    Q.    Since the late '90s?

5    A.    Yeah.

6    Q.    Okay.  And have you done social things with her?

7    A.    Yeah, occasionally.

8    Q.    Okay.  And would it be accurate that you had known

9    Councilperson Brooks longer than you've known Ms. Santana?

10   A.    That would be correct.

11   Q.    Okay.  And so in that meeting that took -- so before we go

12   to that meeting, let's go to the -- now, at the time that you

13   were drafting this report, after the time you were involved in

14   the labor negotiations, were you normally a person to go to the

15   labor union negotiations?

16   A.    No.

17   Q.    Had you ever, prior to the summer of 2013, gone to labor

18   union negotiations?

19   A.    For the City of Oakland?

20   Q.    Yes.

21   A.    No.

22   Q.    Do you recall who it was that asked you to go to the labor

23   union negotiations for the City of Oakland in the summer 2013?

24   A.    It was Deanna.

25   Q.    Deanna.  And did Ms. Santana indicate to you why it was

1  that she wanted you to go to the labor union negotiations?

2  A.   Yes, because I think it was a combination of the fact that

3  I had some good relationships with some of the folks who were

4  on the other side of the table, and I had a personality that

5  was one that was pretty calm and could bring some calmness to

6  the process.

7  Q.   Was there also -- was it your understanding that there was

8  a concern about Ms. Preston's integrity in the process?

9  A.   Concern from?

10  Q.   Ms. Santana.

11  A.   I'm hesitating, because at one point there was concern

12  that was expressed by Deanna about the integrity of Lawanna in

13  the process, but I can't recall as to whether that was in the

14  beginning or not.

15  Q.   All right.  But at some point it came up?

16  A.   Yeah.

17  Q.   Okay.  And did Ms. Santana in any way indicate to you that

18  she thought that Ms. Preston was not communicating the full

19  breadth of what was going on in the room and the side

20  conversations outside the rooms in the negotiation?

21  A.   I do recall that.

22  Q.   Now, you didn't -- Ms. Preston didn't report to you, did

23  she?

24  A.   No.

25  Q.   And to the extent that she would report to one of the

1  assistants, would it have been more directly that she would

2  have been engaged with Mr. Scott Johnson?

3  A.    To the extent that she would have engaged with one of us,

4  it would have been Scott more than me, because he was in the

5  internal service delivery side of things.

6  Q.    And to the extent that someone at the Assistant City

7  Administrator's level would have been involved in assisting

8  with her reviews, would that have been Mr. Scott Johnson as

9  opposed to you?

10  A.    Yes.

11  Q.    And so other than -- you didn't have a whole lot of

12  exposure to the full breadth of Ms. Preston's work performance,

13  did you?

14  A.    Very little.  It was mostly interaction with the senior

15  management team.

16  Q.    Okay.  Now, at that City Council meeting on March 6th --

17  well, let's bring it up to you.  Did you formulate in your own

18  mind, after -- as you were preparing the report, that there

19  were things that Ms. Brooks had done that were inappropriate?

20  A.    Yeah, I formed some opinions.

21  Q.    And did you come to those opinions on your own based upon

22  the information that you guys had uncovered?

23  A.    Yes.

24  Q.    Did you have conversations with Ms. Preston about similar

25  issues about whether or not the councilperson had performed

1  inappropriately?

2  **A.**   I don't recall, but likely so.

3  **Q.**   Okay.  Did you ever hear Ms. Preston say that she did not

4  think that the councilperson had performed inappropriately?

5  **A.**   I don't remember.

6  **Q.**   In the report that you guys worked on, did Ms. Preston

7  have responsibility for the HR employment components?

8  **A.**   Yes.

9  **Q.**   Now, I'll try and get my language right here, okay?

10      Did Ms. Santana ever suggest to you that you could -- a

11  suggestion of criminal charges in the final report?

12  **A.**   No.

13  **Q.**   Did she ever draft language suggesting criminal charges in

14  the final report?

15  **A.**   No.

16  **Q.**   Did she ever insert language into the draft reports

17  stating that this matter should be referred to the DA?

18  **A.**   No, not that I recall.

19  **Q.**   Did she ever tell you guys in a meeting that something in

20  connection with the report should be, in her opinion, referred

21  to the DA?

22  **A.**   I don't recall that.

23  **Q.**   Now, in your opinion, can Councilmember Brooks be somewhat

24  prickly?

25  **A.**   Yes.

1  Q.   Could Councilmember Brooks be somewhat argumentative and

2  defensive?

3  A.   Yes.

4  Q.   And so when you were being asked to, on the March 6th

5  meeting, to go up there, did it enter your mind that you were

6  standing in the middle of Ms. Brooks and Ms. Santana?

7  A.   Yeah.

8  Q.   Did it enter your mind that it was uncomfortable to do

9  that because of your long relationship with Ms. Brooks?

10 A.   Absolutely.

11 Q.   And as you sat there with the dialogue exchanges going

12 back and forth, was it clear what the issue was that you were

13 going to be asked to speak to?

14 A.   Yeah.  I don't remember the question.

15 Q.   All right.  I'll ask you this.

16 A.   Yeah.

17 Q.   As you were sitting in that room, with the dialogue going

18 back and forth, was it hard to keep track of what the questions

19 were?

20 A.   Absolutely.

21 Q.   Okay.  And when you say something about black and white

22 and something being crystal, was that in part because the

23 dialogue was so fast and furious that it was difficult to keep

24 track of what it was that was being asked?

25 A.   Probably.  I don't recall the exact moment, but that's --

1  Q.   Okay.  Now, after the meeting, did you receive an email

2  advising that you and Ms. Preston would be responsible for the

3  transition of Rainbow Teen?

4  A.   I don't know if it was an email or not, but it was clear

5  to me that at least I had some responsibility for transitioning

6  this into the right place.

7  Q.   Okay.  And after that meeting, did you see Ms. Santana do

8  anything to Ms. Preston that indicated that she was displeased

9  with her?

10 A.   No.

11 Q.   Did you see anything that seemed that Ms. Preston was --

12 that Ms. Santana was displeased with Ms. Preston?

13 A.   No.

14 Q.   To the extent that individuals in the City were

15 complaining about Ms. Preston, those wouldn't necessarily come

16 to your attention, would they?

17 A.   No.

18 Q.   To the extent that the Union was expressing displeasure

19 with Ms. Preston, that wouldn't necessarily come to your

20 attention, would it?

21 A.   That could.

22 Q.   That could?

23 A.   Yeah.

24 Q.   But not necessarily?

25 A.   Not necessarily, but it --

---

BLACKWELL - CROSS / LAFAYETTE

1  **Q.**   Okay.  That's fine.  And to the extent that Ms. Katano

2  Kasaine expressed displeasure with Ms. Preston, that wouldn't

3  necessarily come to your attention either, would it?

4  **A.**   Not necessarily, but it did.

5  **Q.**   It did?  Ms. Katano Kasaine expressed her displeasure to

6  you with regard to Ms. Preston?

7  **A.**   No, I -- well, wait a minute.  Yes, so first it was I

8  witnessed an actual interaction between the two that showed me

9  that Katano was not happy.  And then after that incident,

10  Katano did approach me and say that she was -- she was

11  explaining why she acted that way in the back and forth that I

12  witnessed.

13  **Q.**   That you witnessed.  Did you ever talk to Ms. Santana

14  about that?

15  **A.**   Probably.

16  **Q.**   Okay.  Did you come to understand that there was a tense

17  relationship between Ms. Preston and Ms. Katano Kasaine?

18  **A.**   Yes.

19  **Q.**   Did you come to understand that there was such

20  relationships between Ms. Preston and others?

21  **A.**   Nothing immediately comes to mind.

22  **Q.**   How about Andrea Gourdine?

23  **A.**   Yeah, possibly.

24  **Q.**   Yeah.  Did you come to understand -- and maybe this came

25  to you and maybe not, something about Ms. Preston tearing up an

1  investigative statement?

2  **A.**    No, I don't really remember being privy to that.

3  **Q.**    You were outside of that?

4  **A.**    Yeah.

5  **Q.**    I will leave you alone, okay?

6      When you would take documents home with you on your iPad,

7  did you email them to you or did you take them some other way?

8  **A.**    Sometimes I took hard copies, sometimes I would email

9  them, sometimes I didn't need to email them because I had my

10  iPad.

11  **Q.**    Okay.  There was a meeting where Barbara Parker was on the

12  phone.  Do you remember this meeting, a discussion about

13  Rainbow Teen, final report?

14  **A.**    Probably -- there were probably multiple discussions with

15  Barbara Parker about the Rainbow Teen Center.

16  **Q.**    Okay.  Did Ms. Preston say she thought she was being

17  forced to do something she didn't feel comfortable doing, that

18  one, with regard to Rainbow Teen?

19  **A.**    I don't recall her saying anything like that to me.

20  **Q.**    Okay.  Do you recall her saying anything like that at a

21  meeting with everybody else?

22  **A.**    No.

23  **Q.**    Okay.  Did you have any understanding whatsoever that

24  Ms. Preston thought such a thing in the February/March 2012

25  time period?

1  A.   No.

2  Q.   Okay.  Did Ms. Preston herself point out to you that she

3  thought that there were things which had been done

4  inappropriately in connection with Rainbow Teen?

5  A.   I don't recall.

6  Q.   There's a statute -- there's an ordinance called 218.  Do

7  you know what that is?

8  A.   Yes.

9  Q.   What is 218?

10  A.   218 essentially is the place in the City charter that lays

11  out where it's appropriate for Council involvement in city

12  matters and operations and where it's not.

13  Q.   Is that ordinance, it's a law; right?

14  A.   Yeah.

15  Q.   And if you violate that law, then is that a criminal

16  violation, or do you know?

17  A.   I'm not a lawyer.  My understanding was that a violation

18  of that meant that you could be removed from office or there

19  were other punitive things, but I -- you know, I don't know

20  where that stuff goes.

21  Q.   Okay.  Then in your mind, not that you're a lawyer, in

22  your mind, did you think that there had been a violation of

23  218?

24  A.   Oh, yeah.

25  Q.   And who was it that you thought had violated 218?

1  **A.**   In the Rainbow matter?

2  **Q.**   Yes.

3  **A.**   I thought Councilmember Brooks had violated it.

4  **Q.**   And did you express that view in the meetings that you had

5  with Ms. Preston, with Ms. Santana, and others?

6  **A.**   I don't remember, but I'd also -- if I felt that way, I

7  probably expressed it.

8  **Q.**   Okay.  Did you ever hear Ms. Preston say that she thought

9  otherwise?

10  **A.**   No.

11          **MR. LAFAYETTE:**  No further questions, Your Honor.

12          **THE COURT:**  Mr. Siegel, do you have any further

13  examination?

14          **MR. SIEGEL:**  I do.

15                       **REDIRECT EXAMINATION**

16  **BY MR. SIEGEL:**

17  **Q.**   Mr. Blackwell?

18  **A.**   Yes.

19  **Q.**   Mr. Lafayette asked you whether Ms. Santana had wanted to

20  put language in the Rainbow Teen Center report regarding

21  potentially referring Ms. Brooks to the District Attorney, and

22  your recollection was that Ms. Santana did not; is that right?

23  **A.**   That's correct.

24  **Q.**   Do you recall whether anyone else made such a suggestion?

25  **A.**   I definitely recall that there was discussion about that,

1  but I can't -- I don't remember who raised it.

2  Q.   Do you recall whether it was Barbara Parker who raised it?

3  A.   I think of all the characters in the room, that she would

4  be most likely to raise it, since, I mean, that's kind of her

5  domain.

6  Q.   And do you recall seeing email communications from

7  Ms. Santana to Barbara Parker asking Barbara Parker whether the

8  City Administrator had the authority to make a referral of a

9  councilmember to the District Attorney?

10 A.   I don't, but that doesn't mean that it didn't happen.

11 Q.   Sure.  I guess what you're telling us is that you were not

12 involved in all the communications.

13 A.   Right.

14 Q.   Okay.  Do you recall there being a conversation by

15 Ms. Santana regarding her interaction with the FBI over

16 Ms. Brooks' involvement in the Rainbow Teen Center?

17 A.   I'm hesitating, because Deanna and I had several

18 conversations about FBI involvement, the variety of

19 investigations going -- things happening in the City of

20 Oakland, but I don't remember around this particular issue.

21 Q.   Okay.

22 A.   But, you know, they were kind of omnipresent.

23 Q.   Was that, to kind of put a time frame on that, had you

24 subsequently learned that that was at the same time they were

25 investigating public officials in San Francisco?

1              MR. LAFAYETTE:  Objection, it's outside the scope.

2              THE COURT:  Sustained.

3    BY MR. SIEGEL:

4    Q.   All right.  You indicated, in response to a question from

5    Mr. Lafayette, that you had witnessed a disagreement between

6    Lawanna Preston and Katano Kasaine?

7    A.   Yes.

8    Q.   Do you recall what the nature of that disagreement was?

9    A.   Loosely, yes.  It was regarding Katano's presence in the

10   room during the negotiations.

11   Q.   In labor negotiations?

12   A.   The labor negotiations.

13   Q.   And do you recall what side or what position either of

14   them took?

15   A.   Lawanna was articulating the fact that she did not think

16   that Katano would be a productive presence in the room, and I

17   think that she, if I recall, was kind of channeling things that

18   the folks on the labor side of the table were expressing to

19   her, and Katano wanted to be in the room.

20   Q.   And Katano Kasaine came to you afterwards and explained

21   what her position was?

22   A.   She explained why she became so animated in that back and

23   forth.

24   Q.   And what did she say to you in that regard?

25             MR. LAFAYETTE:  Objection, hearsay.

BLACKWELL - REDIRECT / SIEGEL

1          **THE COURT:**  Overruled.

2          **THE WITNESS:**  I don't remember the specifics, but it

3    was along the lines of she and Lawanna didn't have a good

4    relationship, and she felt that Lawanna was trying to exclude

5    her from this.

6    **BY MR. SIEGEL:**

7    **Q.**   You understood at that point that Lawanna Preston was the

8    chief spokesperson for the City of Oakland and labor

9    negotiations?

10   **A.**   Absolutely.

11   **Q.**   Sorry.  I stepped on your answer.  You said absolutely?

12   **A.**   Absolutely.

13   **Q.**   Okay.  And do you recall whether this interchange -- and

14   I'm going to challenge your recollection of dates --

15   **A.**   No, yeah.

16   **Q.**   -- do you recall whether it occurred after August 6th,

17   2013?

18   **A.**   I don't -- I don't recall the date.  Yeah, it's hard for

19   me.

20   **Q.**   Let me perhaps put it in context.  Do you recall whether

21   it occurred after a dispute arose between the City and the

22   Service Employees International Union over the deduction of

23   Union dues for temporary part-time employees?

24   **A.**   Yes.

25          **MR. LAFAYETTE:**  Objection, lacks foundation.

1        **THE WITNESS:**  My mind was jogged, yes.

2        **THE COURT:**  One moment.  One moment, please.

3   Overruled.  You can answer the question.

4        **THE WITNESS:**  Yeah, it was after that, I believe.

5        **MR. SIEGEL:**  Okay.  That's great.  Okay.  Thank you.

6   Those are all the questions I have.

7        **THE COURT:**  All right.  So at this time, we're going

8   to take a break for five minutes to allow the jurors, if they

9   wish to, to write any questions for this witness.

10       I want to remind you of a few things before we do that.

11  I've given you a number of instructions.  This instruction is

12  just one of those, and I'm reminding you of the instruction.

13  It's not exclusive of the other instructions, but one of the

14  instructions I gave you at the beginning is that the evidence

15  includes testimony from witnesses, and so what a witness says

16  is evidence, and you are to consider it.  What the attorneys

17  say in their questions are not evidence, and you are not to

18  consider what the questions are and what the attorneys are

19  saying when you deliberate in this case.

20       There have been a number of questions from both attorneys

21  so far in the case where they expressed a reaction to what a

22  witness says, either by saying "okay" or "all right" or by

23  making a facial expression.  That is not evidence.  The fact

24  that an attorney agrees with what the witness says is not

25  proper, and not something that you should be considering in

BLACKWELL - REDIRECT / SIEGEL

1   evaluating the evidence.  So your focus should be on what the

2   witnesses are saying, because that's the only evidence that you

3   can consider in the case.

4        One separate topic is you're welcome to move around in the

5   jury box if it would help you to see the exhibits on the

6   screens or to hear and see the witness on the stand.  If it

7   would be helpful for you to stand up or move around, you're

8   welcome to do that within your area.  I want to make sure that

9   you can at all times see and hear the evidence.  If, at any

10  point, you can't see what is being displayed to you, you're

11  welcome to raise your hand so we can make an accommodation to

12  make sure you can see the evidence being presented.

13       All right.  So we'll take a five-minute break, and my

14  deputy will check with you to see if you have any questions for

15  the witness.

16       Mr. Blackwell, you may step down or stay there, but don't

17  leave yet.

18            THE WITNESS:  Okay.

19                 (Recess taken at 11:45 a.m.)

20                 (Proceedings resumed at 11:47 a.m.)

21       (Proceedings were heard out of presence of the jury:)

22            THE COURT:  All right.  There are no questions from

23  the jury or Mr. Blackwell.

24       Did you have further examination of him?

25            MR. LAFAYETTE:  I did, about one or two questions,

1    Your Honor.

2              **THE COURT:**  You have a maximum of two.  And are you

3    planning to recall him later in the case?

4              **MR. LAFAYETTE:**  No, I'm not.

5              **THE COURT:**  All right.  So let's call our jury back

6    in.

7        Mr. Blackwell, we'll be done with you in just a few

8    moments.

9              **THE WITNESS:**  All right.

10       (Proceedings were heard in the presence of the jury:)

11             **THE COURT:**  All right.  Our jurors have returned.

12   We're back on the record.

13       Mr. Lafayette, quick questioning.

14             **MR. LAFAYETTE:**  Thank you.

15                         **RECROSS-EXAMINATION**

16   BY MR. LAFAYETTE:

17   **Q.**  Sir, back in February 2012, was it your explicit

18   understanding that Deanna Santana was not trying to put

19   suggestions of criminal charges into the report?

20   **A.**  Yeah.  Deanna's specific direction to me, in terms of kind

21   of laying out the approach on this, was that that was -- the

22   criminal aspect of this or the kind of follow-up in that regard

23   was not our domain, and that it was our responsibility to lay

24   out the facts and get it on the right track.

25   **Q.**  Thank you.  One last question for you.

1        With regard to the dues collection of TPTs, do you know

2   what I'm talking about there?  Okay.  Do you know when and

3   whether a grievance was filed?

4   **A.**   I don't recall specifically, but I would imagine a

5   grievance was filed on that, but I --

6   **Q.**   So this conversation that you -- this incident that you

7   say you observed, do you know if it occurred before or after a

8   grievance was filed?

9   **A.**   I don't.

10        **MR. LAFAYETTE:**  Thank you.

11        **THE COURT:**  Mr. Blackwell, you may step down, unless

12   Mr. Siegel has got a question.

13        **MR. SIEGEL:**  Sorry.  But just in response to one of

14   Mr. Lafayette's questions.

15                    **FURTHER REDIRECT EXAMINATION**

16   BY MR. SIEGEL:

17   **Q.**   Did Ms. Santana ever indicate to you that she rejected

18   Barbara Parker's advice as to whether there should be a

19   referral to the DA to investigate Desley Brooks?

20   **A.**   I don't remember.

21        **MR. SIEGEL:**  Okay.  Great.  Thank you.

22        **THE COURT:**  Now, Mr. Blackwell, you may step down,

23   and are excused from the trial.  Thank you very much for being

24   here.

25        And Ms. Preston will call her next witness, please.

1          MR. SIEGEL:  We'll call Otis McGee.

2          THE COURT:  Mr. Blackwell, if you see Mr. McGee out

3   there, you can send him in.

4          THE WITNESS:  All right.  I will do that.

5          THE COURT:  Mr. McGee, come on up.  We're going to

6   swear you in as a witness.

7          THE CLERK:  Please raise your right hand.

8                      **OTIS MCGEE, JR.**,

9   called as a witness for the **PLAINTIFF**, having been duly sworn,

10  testified as follows:

11         THE WITNESS:  I do.

12         THE CLERK:  Please be seated and speak clearly into

13  the microphone.  Please state your full name and spell your

14  last name.

15         THE WITNESS:  My name is Otis, O-T-I-S, McGee,

16  M-C-G-E-E, Junior.

17         THE COURT:  And before there's questioning for

18  Mr. McGee, I want to explain something to the jury.  Mr. McGee

19  has been referenced earlier in the case as being one of the

20  attorneys for the defense in the case.  However, he's being

21  called today as a witness in the case, and you should consider

22  any testimony he provides as a witness.  I just admonished you

23  to ignore anything that the attorneys say, but that doesn't

24  apply to Mr. McGee, because he's being called as a witness, not

25  as an attorney, and what he says is evidence in the case.

1      Mr. Siegel, you may proceed.

2                    **DIRECT EXAMINATION**

3    **BY MR. SIEGEL:**

4    **Q.**   Now, Mr. McGee, are you an attorney?

5    **A.**   I am.

6    **Q.**   And how long have you been an attorney?

7    **A.**   Since 1976.

8    **Q.**   And over the course of your career, have you specialized

9    or emphasized particular areas of work as an attorney?

10   **A.**   I'm a civil litigator and trial attorney.

11   **Q.**   And do you currently work for the City of Oakland?

12   **A.**   I do.

13   **Q.**   And what is your position with the City of Oakland?

14   **A.**   I am one of the chief assistant city attorneys.  My

15   responsibility is for the litigation in the City of Oakland.

16   **Q.**   And are you a Chief Assistant to City Attorney Barbara

17   Parker?

18   **A.**   I am.

19   **Q.**   And is the City Attorneys' Office organized in a way so

20   that litigation is one of the main branches within the City

21   Attorneys' Office?

22   **A.**   Well, litigation is certainly one of the branches.  It's

23   no more significant, however, than the advisory side of our

24   office, but it is one of the two branches.

25   **Q.**   And you're head of the litigation side?

1    A.    Yes.

2    Q.    And how long have you been head of the litigation side?

3    A.    Since April 15th, 2014.

4    Q.    And prior to going to work for the City Attorneys'

5    Office -- well, first of all, is that when you joined the City

6    Attorneys' Office as a staff person?

7    A.    I joined the City Attorneys' Office in my present

8    capacity -- actually, it wasn't in my present capacity, but I

9    joined the City Attorneys' Office on April 15th, 2014.

10   Q.    Now, isn't it true that prior to that date, you had been

11   engaged by the City Attorneys' Office on particular

12   project-based responsibilities?

13   A.    Yes.

14   Q.    And one of those responsibilities was to do an

15   investigation related to a grievance that was filed by the

16   Service Employees International Union regarding the collection

17   of dues from temporary part-time employees?

18   A.    I think -- I think that's correct.  I was retained to

19   conduct an investigation regarding an SEIU grievance.

20   Q.    And have you completed that investigation?

21   A.    I've done all the work that I believe I was called upon to

22   do, but I was unable to complete the investigation to my

23   satisfaction.

24   Q.    Now, do you recall the date on which you were retained to

25   do that investigation?

1   **A.**   I don't recall the precise date, but it was either late

2   September or early October 2013.

3   **Q.**   Do you recall being present in City Administrator's Deanna

4   Santana's office for a meeting involving her and other persons

5   on October the 2nd, 2013?

6   **A.**   I do.

7   **Q.**   And do you recall who else was present at that meeting?

8   **A.**   I know that the City Administrator Deanna Santana was

9   present, the City Attorney Barbara Parker was present, I

10   believe, but I don't recall for certain, that one of the

11   Assistant City Administrators, Donna Hom, was present, and I

12   just don't recall whether there was anyone else in the room at

13   the time.

14   **Q.**   Okay.  So the three people you clearly recall being there

15   were Deanna Santana, Barbara Parker and yourself?

16   **A.**   Yes, and I believe Donna Hom was present as well.

17   **Q.**   Okay.  Now, during that meeting -- first of all, do you

18   recall what time of day the meeting took place?

19   **A.**   Generally, I recall that it was in the afternoon.

20   **Q.**   And what do you recall as the purpose of that meeting?

21   **A.**   I believe one of the purposes of the meeting was to

22   introduce me to the City Administrator.  Barbara Parker brought

23   me to the meeting to meet the City Administrator, and to

24   introduce me as the person that the City Attorneys' Office was

25   recommending be retained for the purpose of conducting the

1  investigation.

2  **Q.**    And was -- do you recall whether an agreement was reached

3  at that meeting as to whether you would be retained?

4  **A.**    I don't recall that.

5  **Q.**    Ultimately you were retained; is that right?

6  **A.**    Yes.

7  **Q.**    And is there some written documentation of the fact that

8  you were retained?

9  **A.**    I am virtually certain there was a professional services

10  agreement that was provided by the City Attorneys' Office, and

11  I believe that my law firm also issued an engagement letter

12  with the City Attorneys' Office for this project.

13  **Q.**    Now, during the course of that meeting on October 2nd of

14  2013, do you recall whether Deanna Santana received a call?

15  **A.**    Yes.

16  **Q.**    She received a call on the telephone?

17  **A.**    Yes.

18  **Q.**    And did she have the speakerphone on for all or part of

19  that call?

20  **A.**    I recall that she had the speakerphone on for part of the

21  call.  I don't know if it was all or not.

22  **Q.**    Do you recall who was on the other end of that phone call?

23  **A.**    I don't know personally who was on the other end, did not

24  know at the time anyway.

25  **Q.**    Do you recall whether the person who was on the other

———

1   line, or who was calling in on the speakerphone, raised her

2   voice?

3   **A.**   I do recall that, yes.

4   **Q.**   And what do you recall?

5   **A.**   I recall that the person on the other end of the line

6   raised her voice.

7   **Q.**   And what do you recall the person saying?

8   **A.**   I don't recall any of the words that were exchanged.

9   **Q.**   Do you recall the content of what was said?

10  **A.**   I do not.

11  **Q.**   You don't recall any of it?

12  **A.**   I don't recall the substance of the discussion that was

13  taking place, no.

14  **Q.**   Do you recall Ms. Santana stating that the person who had

15  called in was complaining to Ms. Santana about the fact that

16  Lawanna Preston was no longer responsible for conducting the

17  investigation into the TPT grievance?

18  **A.**   And your question is whether I recall that being the

19  substance that was being discussed on the phone?

20  **Q.**   Well, specifically my question was whether Ms. Santana

21  said that that was what the person on the phone was complaining

22  about or --

23  **A.**   During the time of this phone?

24  **Q.**   Yeah.

25  **A.**   I don't recall that.

1  Q.   And do you recall anything at all that was said by the

2  person on the other end of the phone?

3  A.   I do not.

4  Q.   Do you recall what Ms. Santana's reaction -- did she

5  express any reaction to the person who was on the line?

6  A.   I, I think generally she expressed a sense of surprise,

7  but I couldn't be more definitive than that.  I don't recall

8  anything that was actually said.

9  Q.   Do you recall, by the way, whether the person who was on

10 the phone was a woman?

11 A.   It sounded like a woman to me.

12 Q.   And do you recall whether the woman on the phone had --

13 was complaining to Ms. Santana about something?

14 A.   I don't recall what the discussion was about.

15         MR. SIEGEL:   Those are all the questions I have.

16 Thank you.

17         THE COURT:   Any cross-examination of Mr. McGee?

18         MR. LAFAYETTE:   Just a --

19                   CROSS-EXAMINATION

20 BY MR. LAFAYETTE:

21 Q.   This investigation that you say you started that you did

22 not complete, did you interview Ms. Sonia Lara?

23 A.   I did.

24 Q.   Did you interview Ms. Winnie Anderson?

25 A.   I did.

MCGEE - CROSS / LAFAYETTE

1  **Q.**   Did you think it was necessary to interview the union

2  people?

3  **A.**   I did.

4  **Q.**   Were you able to do that?

5  **A.**   I attempted to do so, but the union representatives and

6  their attorney refused to make them available to interview

7  them.

8  **Q.**   Were you able to interview Ms. Preston?

9  **A.**   No.

10  **Q.**   Are those the reasons why you have not completed the

11  investigation?

12  **A.**   That's correct.

13  **Q.**   Now, with regard to their interview of Ms. Sonia Lara, did

14  she shed information to you with regard to what had happened --

15  with regard to this grievance?

16  **A.**   I'm sorry.  I didn't hear your --

17  **Q.**   Did she provide information to you about how this

18  grievance came to be?

19  **A.**   Yes.

20  **Q.**   And did she indicate to you that she was present during

21  various conversations taking place between Ms. Preston and

22  union representatives?

23        **MR. SIEGEL:**  Your Honor, I object.  The question is

24  leading and calls for hearsay.

25        **THE COURT:**  Both sustained.

1  BY MR. LAFAYETTE:

2  Q.   Okay.  Were there -- the information that you retained

3  from them, did you share it with anyone?

4  A.   The information that I obtained from who?

5  Q.   Lara and Winnie, from Sonia Lara and Winnie Anderson.

6  A.   And your question was whether I shared that with anyone?

7  Q.   Yes.

8  A.   I did so when I invited it into my draft report.

9  Q.   And did you share that report with the City Attorney?

10 A.   I did.

11 Q.   Did you share it with anyone else?

12 A.   Well, I shared it with -- at least that part of the

13 investigation that incorporated these interviews, I shared it

14 with the individuals who I had interviewed in order to confirm

15 the accuracy of their statements.

16 Q.   Okay.  Mr. McGee, where did you go to law school?

17 A.   I went to -- I attended the University of California

18 Berkeley, Boalt Hall School of Law.

19 Q.   And where did you grow up?

20 A.   I grew up in San Francisco.

21 Q.   And did you serve in the military?

22 A.   I did.

23 Q.   And after the military, what did you do?

24 A.   Immediately after receiving my honorable discharge from

25 the military, I became a sworn police officer for the City of

1  Pacifica Police Department.

2  **Q.**   And after you became a sworn police officer, what did you

3  do?

4  **A.**   I attended the University of California Berkeley as an

5  undergrad.

6  **Q.**   And that's when, after that law school?

7  **A.**   After that I went directly to University of California

8  Berkeley School of Law.

9  **Q.**   And after law school, did you practice in San Francisco?

10 **A.**   I did, first at the law firm which was then known as

11 Pettit, Evers & Martin, later Pettit & Martin.  Following that,

12 I worked in my own law firm for nearly 18 years, and went back

13 to another law firm.

14           **MR. LAFAYETTE:**  Okay.  No further questions, Your

15 Honor.

16           **THE COURT:**  Mr. Siegel do you have any further

17 questions within the scope of the cross?

18           **MR. SIEGEL:**  Yeah.

19                      **REDIRECT EXAMINATION**

20 BY MR. SIEGEL:

21 **Q.**   Mr. McGee, you indicated that you did not interview

22 Ms. Preston in connection with your investigation.

23 **A.**   That's correct.

24 **Q.**   Did she refuse to be interviewed by you?

25 **A.**   I never reached out to Ms. Preston to interview her.

1  Q.   And with respect to sharing the results for your draft

2  report, you shared it with me; is that right?

3  A.   That's correct.

4  Q.   And that was on or about April 28th of this year?

5  A.   If that's when my deposition was taken, that's when I

6  shared it with you.

7          MR. SIEGEL:   Okay.   Thank you.   That's all I have.

8          THE COURT:   All right.   Mr. Lafayette, do you intend

9  to call Mr. McGee further during your case in chief?

10         MR. LAFAYETTE:   No, your Honor.

11         THE COURT:   All right.   Ladies and gentlemen of the

12 jury, we're going to take a break now to give you an

13 opportunity to ask any written questions if you wish of this

14 witness.   I'm going to have my deputy check with you in a few

15 minutes.   If you don't have any questions, then it will be time

16 for your lunch break.   If you do have some questions, then

17 we'll return to finish those questions so that I can then

18 excuse Mr. McGee from his further presence during the trial.

19 So we'll check in with you in a few minutes.   We'll take a

20 recess now.

21    (Proceedings were heard out of presence of the jury:)

22         THE COURT:   If everyone can hang on for a few

23 minutes, Mr. McGee, we'll know whether you're excused or not.

24 Thank you.

25              (Pause in proceedings.)

 1          **THE COURT:**  We have two questions for the witness.

 2   Let's call our jurors in.

 3          (Proceedings were heard in the presence of the jury:)

 4          **THE COURT:**  All right.  Our jurors have returned.

 5   We're back on record.

 6          These are juror questions number 2 and 3.

 7          Mr. McGee, you remain under oath.  These are questions

 8   posed by our jurors.  The first one has several parts.  I'll

 9   read all of them, and then go back to make sure you've heard

10   all the parts.

11          The question is, the juror observes:  "Usually a contract

12   has a scope of work.  You provided a draft report and not a

13   final report."  The question is "Why just a draft?  Did you get

14   paid for the draft report?"

15          So I'll read it all again just in its entirety.

16          "Usually a contract has a scope of work.  You provided a

17   draft report and not a final report.  Why just a draft?  Did

18   you get paid for the draft report?"

19          **THE WITNESS:**  I got paid for the work that I

20   performed, but I was paid on an hourly basis, so even though

21   the scope of work that I had included an amount that was

22   sufficient to do the completed investigation, I was only paid

23   for the work that I did at my hourly remuneration.

24          I think the other question was why didn't I complete the

25   investigation, and the reason was that the union

                          ———

1  representatives' attorneys would not allow me to talk to the

2  union representatives, which I thought was necessary in order

3  to resolve some inconsistencies that I had received in the --

4  during the course of the investigation.  I thought that by

5  talking to the union representatives, they would be able to

6  give me their recollection of the version of events that they

7  had seen, because the information that I had received up to

8  that point was inconsistent with what was being reflected in

9  the investigation itself.

10        **THE COURT:**  The next question from the jurors is:

11        "Do you recall if the person, Ms. Santana, was speaking to

12  was advised that she was on speakerphone and that there were

13  others in the room?"

14        **THE WITNESS:**  I just don't recall whether that

15  discussion took place or not.  I'm not sure one way or the

16  other.

17        **THE COURT:**  Mr. Siegel, do you have any follow-up

18  questions from those jury questions and responses?

19        **MR. SIEGEL:**  I do not, Your Honor.

20        **THE COURT:**  Mr. Lafayette, do you have any follow-up

21  questions?

22        **MR. LAFAYETTE:**  Yes.

23                    **RECROSS-EXAMINATION**

24  BY MR. LAFAYETTE:

25  **Q.**  The way in which you described the process by which you

1  were paid for the report, is that customary with lawyers to

2  pay -- to get paid by the hour up until -- for the work that

3  they do?

4  **A.**   The work that I did during -- or have done during the time

5  that I've been an attorney, has been done in a variety of

6  different fashions.  Being paid -- being compensated on an

7  hourly basis is probably the most frequent manner of work that

8  I've done over my career.

9         **MR. LAFAYETTE:**  Nothing further, Your Honor.

10        **THE COURT:**  Mr. McGee, thank you for being here, and

11  you may step down, and you're excused from participation in the

12  jury -- in the trial as a witness.

13        **THE WITNESS:**  Thank you, Your Honor.

14        **THE COURT:**  Or as a juror for that matter.

15     At this time, ladies and gentlemen, we're going to take

16  our lunch break.  Thank you for your continued attention.

17     A reminder that during the lunch break, and at any break,

18  you're not to deliberate, and you're to wait to start to form

19  any judgments about the case until you've heard all the

20  evidence in the case.

21     Let's return at 1:10.  It's a little less than an hour,

22  1:10 p.m. for the next witness.  See you then.

23     (Proceedings were heard out of presence of the jury:)

24     All right.  We're in recess until 1:10, and our next

25  witness will be?

 1          MR. SIEGEL:  I think it will be Desley Brooks.

 2          THE COURT:  All right.  I think it will be Desley

 3   Brooks at 1:10.  Thank you very much.

 4          MR. LAFAYETTE:  That's fine, Your Honor, but we had

 5   on our list Barbara Parker, and she's been here waiting as the

 6   City Attorney.

 7          THE COURT:  Then you talk to each other, and we'll

 8   call whoever is next at 1:10.

 9          MR. SIEGEL:  We'll probably have three people here by

10   1:00 o'clock, so --

11          THE COURT:  Very good.

12              (Luncheon recess was taken at 12:20 p.m.)

13   **AFTERNOON SESSION**                            **1:10 p.m.**

14   (Proceedings were heard outside the presence of the jury:)

15          THE COURT:  Our jurors are ready.  Who's our next

16   witness going to be?

17          MR. SIEGEL:  Desley Brooks.

18          THE COURT:  All right.  Let's call our jurors in, and

19   we'll return to examination.

20   (Proceedings were heard in the presence of the jury:)

21          THE COURT:  Our jurors have returned.  Let's call our

22   next witness, please.

23          MR. SIEGEL:  Okay.  So we call Desley Brooks, who's

24   our next witness.

25          THE COURT:  Ms. Brooks, can you come on forward,

 1   please?  We'll swear you in.  Watch your step as you go up the

 2   stairs.

 3             **THE WITNESS:**  Thank you.

 4             **THE CLERK:**  Please stand and raise your right hand to

 5   be sworn in.

 6                        **<u>DESLEY BROOKS</u>,**

 7   called as a witness for the Plaintiff, having been duly sworn,

 8   testified as follows:

 9             **THE WITNESS:**  Yes, I do.

10            **THE CLERK:**  Please be seated.  State your full name

11   for the record, and spell your full name, please.

12            **THE WITNESS:**  My name is Desley, D-e-s-l-e-y, Brooks,

13   B-r-o-o-k-s.

14                     **<u>DIRECT EXAMINATION</u>**

15   **BY MR. SIEGEL**

16   **Q.**   Okay.  And are you currently employed?

17   **A.**   Yes, I am.

18   **Q.**   What is your job?

19   **A.**   I'm a member of the Oakland City Council.

20   **Q.**   How long have you been a member of the Oakland

21   City Council?

22   **A.**   Thirteen years.

23   **Q.**   And is that an elected position?

24   **A.**   It is.

25   **Q.**   And do you represent a part of Oakland?

BROOKS - DIRECT / SIEGEL

1   **A.**   I represent Central East Oakland.

2   **Q.**   And could you --

3   **A.**   District 6.

4   **Q.**   I'm sorry?

5   **A.**   District 6.

6   **Q.**   District 6.  Can you please describe for the jury the

7   nature of District 6 as a community?

8   **A.**   District 6 has roughly 55,000 residents that live in the

9   District.  It's a District that had, prior to me coming on the

10  Council and being an advocate for the District, been

11  marginalized; a district that runs the gamut from very wealthy

12  residents to extremely poor residents, but a beautiful area of

13  the city.  I enjoy representing them.

14  **Q.**   Now, what is your own training, in terms of your

15  profession?

16  **A.**   My training is that I went to law school.  I practiced law

17  for 15 years.  I'm an inactive member of the Washington State

18  Bar Association.

19  **Q.**   And have you ever worked in this building?

20  **A.**   I worked in this building when I first moved to Oakland.

21  I worked for the Department of Housing and Urban Development.

22  I started out my career in law as a Public Defender, and ended

23  up as a prosecutor for the Immigration and Naturalization

24  Service.

25  **Q.**   You've had a variety of jobs?

1   **A.**   Absolutely.

2   **Q.**   Okay.  Now I'd like to ask you some questions about

3   something called "the Rainbow Teen Center."  Do you know what

4   the Rainbow Teen Center is?

5   **A.**   Absolutely.

6   **Q.**   Did you play any role in getting the Rainbow Teen Center

7   open?

8   **A.**   Absolutely.  I worked with the Department -- I worked --

9   **Q.**   Please explain.  Yeah.

10  **A.**   The Department of Parks and Recreation on trying to find a

11  nonprofit organization to open it.  We weren't able to do that.

12  And so the center sat for two years, fully furnished, in a

13  District that -- in that area at that time, there were

14  homicides happening on a regular basis in the area that is

15  economically depressed that needed a teen center open for the

16  children to have a safe refuge to go and learn real skills.

17      The Digital Arts and Culinary Academy is a -- it's a

18  culinary program.

19          **MR. LAFAYETTE:**  Can I get questions and answers?

20  Because it's becoming a narrative.

21          **THE COURT:**  Is that an objection?

22          **MR. LAFAYETTE:**  Yes, Your Honor.

23          **THE COURT:**  Say the word "objection," please.

24      Overruled.

25      You may continue.

1  BY MR. SIEGEL

2  Q.   Just so everyone can hear, and if you wouldn't mind

3  slowing down a little bit.

4  A.   Okay.  The Digital Arts and Culinary Academy has a

5  culinary program and an urban agriculture program.  The kids

6  can learn video skills with state-of-the-art equipment, and

7  audio mixed tapes, making raps and other things; but there are

8  professionals there that run the facilities.

9       So I had salary savings in my budget.  And so I used the

10 salary savings to hire personnel that would work that I loaned

11 to the center.  And they ran the center.

12 Q.   All right.  Why wasn't the City running the center?

13 A.   When --

14          MR. LAFAYETTE:  Objection.  Relevancy.

15          THE COURT:  Overruled.

16          THE WITNESS:  Each Councilmember got $500,000 in

17 order to build a teen center in their District.  Mine is the

18 only District that had, at that time, a teen center built.  It

19 was not until a couple of years ago that the second one was

20 ultimately built in West Oakland.

21      So with that $500,000, we didn't have money to pay for a

22 programming.  The City was going through an economic downturn,

23 as most cities were, and so there wasn't money.  And so that's

24 why I opted to be creative, and use my salary savings to staff

25 the facility.

BROOKS - DIRECT / SIEGEL

1   Q.   Was there also renovation or building work that had to be

2   done on the center?

3   A.   Yes.  The facility that was -- that ultimately became the

4   Digital Arts and Culinary Academy was -- prior to us using it

5   in that way, was a Head Start program that had left and gone to

6   another location.  And then the City bought the building, and

7   it sat vacant for two or three years before we even got Pulte

8   Homes and Rebuilding Together Oakland --

9       I don't know if people know about -- "Christmas in April"

10  is what they used to be called.  Rebuilding Together Oakland is

11  a program that works with either low-income individuals, or

12  with governmental entities to rehab buildings.  So they donated

13  much of the cost of the renovations.

14  Q.   Okay.  And what role did Pulte Homes play?

15  A.   A significant role.  We got -- the City ultimately put in

16  less than $150,000 in the building, and we got a beautifully

17  renovated facility that was valued at over half a million

18  dollars.

19  Q.   And was there some issue with respect to making sure that

20  Pulte Homes was paid for its work?

21  A.   Yes.  When I first knew of the opportunity, I went to the

22  then-City Administrator Dan Lindheim, to see if this was

23  something that we could take advantage of.  We met with the

24  appropriate staff.  They told Pulte what to do.  We did exactly

25  what they told us to do.  And then after they did the work, the

1  City didn't pay them.

2  Q.   And did you make any efforts to make sure that the City

3  paid them?

4  A.   Absolutely.   I believe that if we make a commitment, we

5  should honor our commitments.

6  Q.   And what did you do to try to make sure that Pulte was

7  paid for its work?

8  A.   We scheduled items before the Council.   I talked to every

9  single City Administrator, from Dan Lindheim -- we went through

10  a series of City Administrators; so Dan Lindheim, Lamont Ewell,

11  Deanna Santana.

12  Q.   Okay.   And what was the problem?   Why did you have to go

13  through so many City Administrators?

14  A.   You know, I don't know why it took so long, but it took,

15  as I said, from Dan Lindheim, Lamont Ewell, Deanna Santana.

16  And the issue finally came to a head, and so ultimately Pulte

17  was paid.

18  Q.   Okay.   Would you look at document that's Exhibit 3 in that

19  binder that's in front of you?   And this is a document that's

20  already in evidence.   Do you recognize that document?   It's a

21  multipage document, by the way.

22  A.   Okay.

23  Q.   Could you explain what your role was, in terms of the

24  message that you include in Exhibit 3, which is on the bottom

25  part of the page; first page?

**BROOKS - DIRECT / SIEGEL**

1  **A.**    Well, it says, "What do any of these issues raised below

2  have to do with getting Pulte paid?"

3  **Q.**    Right.  Why did you write that?

4  **A.**    So in the first paragraph it talks about City staff

5  access.  And it says -- it talks about no Department Public

6  Works or Parks and Rec staff have access to the building.

7        That wasn't true, but --

8  **Q.**    Now, are you reading from somebody's e-mail to you?

9  **A.**    Oh.  It's the e-mail from Deanna Santana.  And so the

10  response I wrote was my response to her.  And so then the first

11  paragraph -- the access to the building isn't a financial issue

12  on whether or not Pulte should be paid.

13        The second issue is that it's not ADA compliant.  Again,

14  it's not a financial issue on whether or not Pulte should be

15  paid; but more importantly, the ADA issues that were raised

16  were done by our Public Works staff, and so it wasn't even

17  Pulte's work that was being raised.

18        The last one is staffing.  No one can verify to me this --

19  how this operating facility is being staffed.  All of the

20  personnel in the teen center had to be hired through the

21  Department of Personnel.  I can't bring on and I can't pay a

22  single person as an employee of the City without going through

23  some process.  They -- so I can't even pay anybody on my own on

24  behalf of the City, without them going through some process.

25        And so none of the issues raised in the e-mail had

1  anything to do with whether or not Pulte should be paid, or any

2  objections as to why they shouldn't be paid.  These aren't

3  things that related to that.

4  **Q.**   Okay.  And do you recall that after this exchange between

5  yourself and Deanna Santana in January of 2012, there was a

6  report done at the direction of the City Administrator

7  regarding the Rainbow Teen Center?

8  **A.**   Yes.

9  **Q.**   And how did you become aware of that report?

10 **A.**   I -- I don't remember the specifics of how I became aware

11 of that report.  I -- you know, through the normal process, we

12 get our -- our binders.  There's a public noticing process.  So

13 reports have to be into the City Clerk's Office within a

14 certain time frame, so I'm not really sure how exactly.

15 **Q.**   If you look at Exhibit 8 in the same binder, is that the

16 report?

17 **A.**   Yes.

18 **Q.**   Okay.  And do you recall whether that report was discussed

19 at a meeting on March the 6th, 2012?

20 **A.**   Absolutely.

21 **Q.**   Okay.  Was that a meeting where a lot of people from the

22 public attended, to express their views on the Rainbow Teen

23 Center?

24 **A.**   It's -- it was a regularly scheduled City Council meeting.

25 **Q.**   Okay.

BROOKS - DIRECT / SIEGEL

1  **A.**   And the public is able to come to all of our City Council

2  meetings.

3  **Q.**   And speak, if they choose?

4  **A.**   Absolutely.

5  **Q.**   Okay.  Let me ask you this question.  Prior to that

6  meeting, had you been advised by anyone on City staff that

7  there was going to be one director for two centers:  Rainbow

8  Teen Center, and another center?

9  **A.**   Not that I recall.

10  **Q.**   Okay.  And did that issue come up at the Council meeting?

11  **A.**   Yes, it did.

12  **Q.**   Okay.  Go ahead.

13  **A.**   Do you want me to explain?

14  **Q.**   Sure.

15  **A.**   At a point during the public hearing on this particular

16  item, the City Administrator -- then-City Administrator --

17          **MR. LAFAYETTE:**  Your Honor, I have a continuing

18  objection to cumulative testimony of what's going to be on the

19  videotape.

20          **THE COURT:**  Then it's not a continuing objection.

21  You have an objection.

22          **MR. LAFAYETTE:**  Objection.  Yes, Your Honor.

23          **THE COURT:**  Can you rephrase the question?  It's

24  sustained.

25      And, Councilwoman, we have a prior discussion of the

BROOKS - DIRECT / SIEGEL

1  videotape that exists of the meeting.  And the parties have

2  informed the jury that they're going to show it to the jury.

3  So rather than have a recall of what the video shows, we're

4  going to show them the videotape sometime soon.  So that's why

5  we're not going into that topic.

6          **THE COURT:**  Okay.

7          **MR. SIEGEL:**  Okay.

8  **Q.**  Without repeating the conversation which is on the tape,

9  was there a conversation about whether you had been advised

10 prior to that meeting that there was going to be one director

11 for teen centers?

12 **A.**  No, I had not been advised.  And Miss Deanna Santana made

13 representations that --

14         **MR. LAFAYETTE:**  Objection, Your Honor.  It's outside

15 the scope of the question.

16         **THE COURT:**  Overruled.

17     You may answer.

18         **THE WITNESS:**  Deanna Santana, the then-City

19 Administrator, made representations that I was involved in a

20 meeting that I was not, where I assumed that issue was raised.

21 **BY MR. SIEGEL:**

22 **Q.**  Okay.  Now -- again, without going into the

23 conversation -- do you recall whether any City staff spoke with

24 respect to Ms. Santana's contention that you had been advised?

25 **A.**  Ms. Santana told the staff the -- her Assistant City

BROOKS - DIRECT / SIEGEL

1  Administrator for Blackwell and LaWanna Preston to go up and

2  confirm what she had said; that I had been present at this

3  meeting.

4          MR. LAFAYETTE:  Your Honor, I have a continuing

5  objection.  This is all that's on the videotape.  And that's my

6  objection.

7          THE COURT:  Okay.  State it shortly and cleanly.

8      Sustained.

9  BY MR. SIEGEL

10  Q.  Just let me ask you this.  Did Fred Blackwell speak?

11  A.  No.

12  Q.  Excuse me.  Did LaWanna Preston speak?

13  A.  Yes, she did.

14  Q.  Okay.  Now, following that meeting on March the 6th, was

15  there a conversation at a subsequent City Council meeting

16  regarding the issue of whether you should be censured with

17  respect to your activities on behalf of the Rainbow Teen

18  Center?

19  A.  Yes.  There was a meeting where a supposed censure vote

20  was actually supposed to take place.

21  Q.  Okay.  And would you look at Exhibit 23 in your binder?

22          MR. LAFAYETTE:  The corresponding exhibit number,

23  please?

24          MR. SIEGEL:  Oh, okay.

25          THE COURT:  2P.

1          MR. SIEGEL:  2P.

2   BY MR. SIEGEL

3   Q.   Is Exhibit 23 a copy of the minutes of the Oakland

4   City Council meeting where the issue of your being censured

5   arose?

6   A.   Yes.

7          MR. SIEGEL:  Your Honor, I'd offer Exhibit 23 in

8   evidence.

9          MR. LAFAYETTE:  No objection.

10          THE COURT:  Exhibit 23 is admitted.

11   (Trial Exhibit 23 received in evidence.)

12          THE COURT:  Proceed.

13   BY MR. SIEGEL

14   Q.   Now, were you censured?

15   A.   No.

16   Q.   Was the motion to censure you introduced?

17   A.   I don't believe so.

18   Q.   Did the Council take some action at that meeting?

19   A.   Yes.  It voted to censure itself.

20   Q.   What do you mean:  The Council voted to censure itself?

21   A.   The Council voted to censure all of the Councilmembers,

22   because there was a belief that many acts may have been done

23   that may have been violative of this section of the Charter.

24   Q.   Is that Section 218?

25   A.   That's correct.

1    Q.   So just to be clear, Councilmembers expressed the opinion

2    that if you were guilty, they were all guilty.  Is that right?

3    A.   That's --

4             MR. LAFAYETTE:  Objection.  Leading.

5             THE WITNESS:  That's correct.

6             THE COURT:  Overruled.

7             THE WITNESS:  That's correct.

8    BY MR. SIEGEL

9    Q.   Okay.  Now, to change the subject, do you have a

10   recollection of being advised that there was a problem in the

11   City with respect to the Fire Chief engaging in negotiations

12   and reaching agreements with the Firefighters Union, without

13   Council approval?

14   A.   Yes.

15   Q.   And by the way, as a member of the City Council, was the

16   Council's policy that before proposals could be made to

17   bargaining units, that the Council had to be consulted, and

18   approve?

19   A.   That's supposed to be the procedure.

20   Q.   Okay.  Would you look at Exhibit 20, please?  Exhibit 20

21   includes an e-mailed message from LaWanna Preston to you.  Is

22   that right?

23   A.   That's correct.

24   Q.   And that message is dated July the 4th, 2013?

25   A.   Yes.

1           MR. SIEGEL:  Your Honor, I'd like to offer

2   Exhibit 20.

3           MR. LAFAYETTE:  No objection.

4           THE COURT:  Exhibit 20 is admitted into evidence.

5   (Trial Exhibit 20 received in evidence.)

6           THE COURT:  Proceed.

7           MR. SIEGEL:  Would you mark that, please?

8   (Document displayed.)

9           MR. SIEGEL:  Make it any bigger?

10          MS. MEHTA:  Yeah.

11          MR. SIEGEL:  Great.  Okay.  All right.

12  Q.   You all read that question.  Can you see it?  So in her

13  message to you Ms. Preston wrote, "Below see attached.  The

14  Fire Chief conducted a meet-and-confer with Local 55; signed a

15  TA to extend an economic provision of their MOU.  After she

16  completed it, she convinced the newest member of my staff to

17  sign it.  You know I dealt with that employee.  Department

18  heads are not authorized to conduct bargaining or

19  meet-and-confers, pursuant to City Reso. 55881.  Only the City

20  Administrator and I have that authority.  What Diana is

21  bringing TA to next closed session without me.  This is the

22  second time the Fire Chief has done this."

23       Again, do you recall receiving that message?

24  A.   Yes.

25  Q.   Okay.  Can you just generally explain how the Council was

1  kept up to date on what was going on in labor negotiations?

2  A.   There was a lot of discontent in terms of the

3  communication flow from the City Administrator's Office to the

4  Council.  We were not -- we didn't feel like we --

5        MR. LAFAYETTE:  Objection.  It's nonresponsive to the

6  question.  And it --

7        THE COURT:  Overruled.

8     You may proceed with your answer.

9        THE WITNESS:  We felt like --

10        MR. LAFAYETTE:  Improper character.

11        THE COURT:  All right.  Please don't interrupt the

12  witness.  Just make your objection.

13     You may proceed.

14        THE WITNESS:  We were not pleased with the flow of

15  communication from the City Administrator's Office to the

16  Council with respect to the bargaining process and the budget

17  process.  And we felt like there -- we would ask questions.

18  They would be purposefully not provide us information, or they

19  would provide it in a less-than-timely manner, so that we'd be

20  getting things while we're sitting in closed session, trying to

21  make decisions about how to respond to different things.  So

22  there wasn't a good flow of communication.

23  BY MR. SIEGEL:

24  Q.   And was anything done to improve the flow?

25  A.   Oh, there was constant consternation about the -- the lack

BROOKS - DIRECT / SIEGEL

1  of information.  It was said publicly.  It was said in closed

2  session.  You know, we attempted to find ways that you could

3  get information in a timely fashion; but again, everything has

4  to flow through the City Administrator's Office, and so it was

5  very problematic.

6  **Q.**  Do you -- just putting aside labor relations for a second,

7  do you have a sense of what the scheduling was in terms of

8  staff reports to the City Council, and how much lead time was

9  necessary?

10       **MR. LAFAYETTE:**  Objection.  Lack of foundation.

11       **THE COURT:**  Overruled.

12       **THE WITNESS:**  So the City has two things that we have

13  to comply with.  One is the Brown Act, and the other one is the

14  Sunshine Ordinance.  With the Sunshine Ordinance, everything

15  has to be noticed at least two weeks prior to it being heard at

16  a public hearing.  And so there is a back process before things

17  even get to that two-week noticing process, beyond all of the

18  ins and outs; but there's a review by the City Administrator's

19  Office before things actually come to be scheduled.  And so

20  it's about a month time, minimal, before typically an item will

21  have its public hearing.

22  **BY MR. SIEGEL**

23  **Q.**  And did the Council take steps to ensure that at least

24  with respect to updates on employee labor relations, that there

25  was an expedited process that would avoid the one-month delay?

---

1  **A.**   Well, labor negotiations are done in closed session.  And

2  so we typically have closed session every two weeks.  We may

3  have special meetings.  And labor negotiations is a constant

4  item on the agenda.  So it doesn't have that same two-week

5  noticing requirement.

6  **Q.**   Okay.  I'd like to call your attention to one specific

7  matter.  Do you recall a meeting -- it's been described as a

8  meeting that occurred on October 1, 2013 -- where the

9  City Council was being briefed in closed session on the status

10  of the labor negotiations between the City and the Service

11  Employees International Union Local 1021?

12  **A.**   I believe -- I think I do.

13  **Q.**   Okay.  Okay.  And do you recall whether, during the course

14  of that meeting, an issue arose regarding a grievance that 1021

15  had filed regarding the issue of union dues?

16  **A.**   And I said "I think I do" in the last question because I

17  wanted to make sure it was the meeting about the grievance.  I

18  don't remember all of the dates, but I do remember the issue

19  around the grievance.  And the question was?

20  **Q.**   How -- how did the conversation regarding the issue of the

21  grievance come up?

22  **A.**   I raised the issue of the grievance.  The grievance was

23  about the City's failure to collect union dues from our

24  employees, and arguably had a fiscal impact.  And we weren't

25  being told about it.

1  Q.   And when you raised it, did anyone respond?

2  A.   Well, someone would have had to respond if it's the City

3  Administrator's Office or the City Attorney's Office.   So

4  somebody would have had to respond.

5  Q.   Would the somebody have included someone from Employee

6  Relations?

7         MR. LAFAYETTE:   Objection, Your Honor.   Asking for

8  speculation.

9         THE COURT:   One moment.   One moment.

10        THE WITNESS:   Absolutely.   Oh, sorry.

11        THE COURT:   Let's clarify the question so it's not a

12  hypothetical.

13        MR. SIEGEL:   Okay.

14        THE COURT:   Sustained.

15  BY MR. SIEGEL

16  Q.   Those closed-session meetings of the City Council to

17  discuss collective bargaining -- was the Director of Employee

18  Relations present?

19  A.   The Director of Employee Relations is typically present

20  when we are doing labor negotiations.   So my assumption would

21  be at this date that the Director of Employee Relations was

22  present.

23  Q.   But you don't have a specific recollection as you sit here

24  today?

25  A.   Well, it's been some years.

1  **Q.**   Okay.

2  **A.**   And so --

3  **Q.**   Fair enough, but you do recall the issue came up?

4  **A.**   Absolutely.

5  **Q.**   And someone spoke about it?

6  **A.**   Yeah.  I'm trying -- oh, okay.  Yeah.  I'm sorry.  LaWanna

7  was present at that meeting.  Yeah.  LaWanna was present.

8  LaWanna Preston.

9  **Q.**   And do you recall whether she was the one who responded to

10 your question about the grievance?

11 **A.**   Yes, she did.

12 **Q.**   Now, finally, do you have an opinion about

13 LaWanna Preston's honesty and credibility?

14       **MR. LAFAYETTE:**  Objection.  Lacking in foundation,

15 and improper character.

16       **THE COURT:**  Sustained.  Let's make it singular, not a

17 compound question.  Track it to truthfulness.

18 **BY MR. SIEGEL**

19 **Q.**   Okay.  Do you have an opinion based upon LaWanna Preston's

20 character for truthfulness?

21 **A.**   Yes.

22 **Q.**   Okay.  And what is that opinion?

23 **A.**   I think that she was very truthful.  I think that she did

24 a yeoman's job at the City of Oakland, trying to work around

25 people who were less than truthful.

1  Q.   And did you work with Ms. Preston during the entire time

2  of her tenure with the City, from 2007 through 2013?

3  A.   Yes.

4       MR. SIEGEL:   Okay.   Thank you.   Those are all of the

5  questions I have.

6       THE WITNESS:   Thank you.

7       THE COURT:   Now an opportunity for the Defense to

8  examine Councilwoman.

9       MR. LAFAYETTE:   Thank you, Your Honor.

10                    **CROSS-EXAMINATION**

11 BY MR. LAFAYETTE

12 Q.   Good afternoon. Councilwoman.

13 A.   Good afternoon.

14 Q.   Would it be accurate that you and I have never met before

15 today?

16 A.   Not before today.

17 Q.   But you have met Mr. Siegel before.   Right?

18 A.   Yes, I have.

19 Q.   And have you met with Mr. Siegel or someone from his

20 office concerning testifying here?

21 A.   I haven't gone in for a meeting, but Mr. Siegel is one of

22 my constituents.

23 Q.   Have you talked to him at all about your testimony here

24 today?

25 A.   I talked to him outside in the hallway, and I talked to

1  him yesterday.

2  **Q.**    You talked to him yesterday.   Thank you.

3        So now, Ms. Preston.   Have you -- how long have you known

4  him?

5  **A.**    I'm Ms. Brooks.

6  **Q.**    No.   I'm saying Ms. Preston --

7  **A.**    Oh, okay.

8  **Q.**    How long have you known her?

9  **A.**    Since she started at the City in 2007.

10  **Q.**    Okay.   Is she one of your constituents?

11  **A.**    No, she is not.

12  **Q.**    Does she -- have you done social things with her?

13  **A.**    I've been to dinner twice.

14  **Q.**    You've been to dinner with her.   Okay.   Now, did

15  Ms. Preston often communicate with you through her private

16  e-mail account?

17  **A.**    I wouldn't say often.   When there was a need to.

18  **Q.**    So there were times when the two of you were communicating

19  with each other through private e-mail accounts.   Correct?

20  **A.**    Well, we weren't the only City employees.   There's

21  actually communication between Deanna Santana and the City

22  Attorney on their private e-mail accounts.

23  **Q.**    Ma'am, I'm only asking about one thing, really.   You and

24  Ms. Preston communicated with each other through your private

25  e-mail accounts.   Correct?

———

1  **A.**    Yes.  It's demonstrated by the document that I --

2  **Q.**    I'm just trying to find out how often you guys did that.

3  **A.**    When there was a need on a particular issue.

4  **Q.**    Okay.  And so now when Ms. Santana was hired by the City,

5  did you get an opportunity to interview her; to sit down with

6  her before she was hired?

7  **A.**    No.

8  **Q.**    You never did?

9  **A.**    No.

10 **Q.**    Do you recall that when she was actually presented to the

11 public on television, you were present?

12 **A.**    Absolutely.

13 **Q.**    Did you make comments?

14 **A.**    Yes, I did.

15 **Q.**    Were they laudatory comments?

16 **A.**    Absolutely.

17 **Q.**    Thank you.  Okay.  And so now the Rainbow Teen Center --

18 at any point in time was it staffed by people who were in your

19 office?

20 **A.**    When you say who are in my office, can you clarify?

21 **Q.**    I'll roll it back.you're the Councilperson for District 6.

22 Yes?

23 **A.**    Absolutely.

24 **Q.**    Do you have staff as part of District 6?

25 **A.**    Yes, I do.

1   Q.   Okay.  Now, when you refer to them as staff, do you call

2   them staff in District 6, or how do you define them?

3   A.   Let me see if I can help with your question.  It may be

4   quicker.

5   Q.   I just want to know how you call them, ma'am.  That's all.

6   A.   Well I think that, you're trying to --

7       I paid for staff of the teen center out of my budget, but

8   they were not my staff.  They didn't report to me.

9   Q.   Okay.  So what I want to -- that's what I'm trying to get

10   to.  Okay?  At some point in time, there were people working at

11   the teen center.  Right?

12   A.   Mm-hm.  That's correct.

13   Q.   At any point in time, were any of the people who worked

14   there people who were ever on your staff?

15   A.   They never worked in my office.  They were --

16   Q.   If you --

17   A.   They were on my payroll.

18   Q.   They were on your payroll?

19   A.   That's correct.

20   Q.   So you hired them on your staff payroll, but you sent them

21   to work at Rainbow Teen.  Is that correct?

22   A.   They were on my payroll.  They never worked in my office.

23   Q.   I got that.  Thank you.  Okay.  Normally, people who work

24   in community centers -- are they hired from the budgets of

25   staff for Councilpersons?

**A.**   All of my hires went through the Personnel Department, so I assumed that it was proper.

**Q.**   I'll ask it again.  Normally, people who work in community centers -- are they paid through the budgets of the Councilpersons for staff?

**A.**   I don't know that.  You would need to ask a personnel person that question.  I can't speak to what's normal in the Department of Personnel.

**Q.**   That's fine.  I'm sorry.  I apologize.  I thought I'd made a comment on the answer, and I --

        **THE COURT:**  You haven't.  You can ask the next question.

        **MR. LAFAYETTE:**  Thank you.

**Q.**   So this issue of the building and operation and staffing of Rainbow Teen -- did it hit the newspapers?

**A.**   It hit the newspapers a number of times.  When we first got the opportunity with Pulte it was in the newspapers, because it was celebratory.  I talked about it from the dais. I made no -- I didn't try to hide, at all, that I was opening a teen center.  The fact that there was $500,000 set aside for each Councilmember -- that was because they needed the money to purchase the building.  So -- and so at many steps along the way it was in the newspaper.

**Q.**   I'll focus this -- thank you -- to December 2011/January 2012.  Did it hit the newspaper then?

1  **A.**   You would need to show me.  I -- again, I can't remember

2  all of the dates certain.  After a while when you're on the

3  Council, you tend to run dates together.  So to just say dates

4  to me -- I need to be able to see something.

5  **Q.**   Did you ever recall receiving or reading newspaper

6  accounts that were in any way whatsoever critical of the manner

7  in which the facilities were staffed, funded, and constructed?

8  **A.**   I don't read the newspaper.

9  **Q.**   You don't read any of them.  Right?

10  **A.**   Not the local papers.

11  **Q.**   Okay.  And you didn't read anything on the Internet that

12  said that, either.  Right?

13  **A.**   I don't know that that's what anything said, because I've

14  not seen anything.

15  **Q.**   So you haven't -- you -- as far as you know --

16  **A.**   You want me to commit to saying that certain things were

17  said in the newspaper, and you have not put anything in front

18  of me.  And so if you have something that you'd like to show

19  me, I'd be more than happy to look at it, but I don't have

20  anything before me, so I don't know.

21  **Q.**   As far as you know --

22  **A.**   I don't know.

23  **Q.**   As far as you know, in the January/February time period,

24  there was nothing written in any news outlet whatsoever that

25  was in any way whatsoever critical of the way in which the teen

1  center was funded, constructed, or staffed?

2  **A.**   I'm sorry.  That's a very broad question.  If there's

3  something that you'd like to put before me, I'd be more than

4  happy to look at it.

5  **Q.**   So without looking at something, you're not aware.  Is

6  that it?

7  **A.**   Well, you're asking me certain things.  And -- and again,

8  I'm an attorney.  Words have meaning.  And so you phrased

9  something in a way that you want to get into the record, and

10  then you want me to comment on it without seeing some document

11  that actually says that, and then it commits that fact into the

12  record.  And so I'm unwilling to do that.

13      If there's something you'd like me to look at, I'm more

14  than happy to do that.

15  **Q.**   Okay.  Could you take a look at Exhibit J?  H?

16          **THE COURT:**  Which one?

17          **MR. LAFAYETTE:**  H, Your Honor.

18          **THE COURT:**  All right.  That's in evidence.

19          **THE WITNESS:**  I don't --

20          **THE COURT:**  Councilwoman, you don't have that in

21  front of you, so you're going to need to --

22          **MR. LAFAYETTE:**  Ah.  What's 3?

23          **THE COURT:**  3.

24          **MR. LAFAYETTE:**  3.

25          **THE COURT:**  3 is the --

1            THE WITNESS:  That's the same document that

2   Mr. Siegel asked for himself.

3            MR. LAFAYETTE:  Yes, it is.

4            THE WITNESS:  Oh, I see.  I'm sorry.

5            THE COURT:  Yes.

6            THE WITNESS:  Oh.  I thought you were talking about

7   the newspaper.

8   BY MR. LAFAYETTE

9   Q.   So I want you to turn to the second page of the document.

10  "I am following up on a discussion in December regarding an

11  outstanding Council item re: Pulte and Rainbow Center.  First,

12  thanks again for allowing me more time to sort through the

13  various issues and to defer this item until January 24."  Do

14  you see that?

15  A.   Yes.

16  Q.   So prior to this e-mail, had you had communication with

17  Ms. Santana about issues that had arisen regarding the teen

18  center?

19  A.   Again, I'd phrase my answer a little bit differently to

20  your question.  I raised the issue with Ms. Santana myself

21  about the teen center, and Pulte needing to be paid.  As I

22  said, I talked to Dan Lindheim, Lamont Ewell, Deanna Santana.

23  I wasn't trying to hide anything.  So I raised the issue.

24       That's why she said, "Thanks for letting me defer this

25  until January."  When she first came in, we had a conversation

1  that I raised.

2  **Q.**   I'm just asking you, ma'am, if you had a conversation in

3  December.

4  **A.**   I -- again, don't know the month, but prior to this e-mail

5  I had had a conversation with Miss Santana when she first

6  became City Administrator, and we had our -- our regular

7  meeting.

8  **Q.**   So the answer is:  You did have a conversation at some

9  point in time about the Rainbow Center teen center before

10 January 5, 2012?

11 **A.**   That's correct.

12 **Q.**   Okay.  And these issues outlined in this letter -- prior

13 to January 5, 2012, had Ms. Santana raised them with you?

14 **A.**   No.

15 **Q.**   Okay.  So this is the first time she's raising with them

16 with you, is in this letter.  Right?

17 **A.**   That's correct.

18 **Q.**   Okay.  Do you think these issues are important issues to

19 resolve?

20 **A.**   Well --

21 **Q.**   Just those.  Do you think these issues here -- not --

22 **A.**   I'd like to go through them, and tell you what I think

23 about each one.

24 **Q.**   Let me frame my question specifically.  Okay?  My question

25 is this.  I know that it's important to get Pulte to get paid,

1  so I'll put this one over there.

2      I just want to ask you in the first instance:  Do you

3  consider any of these issues not to be important issues to be

4  resolved?

5  **A.**   So the first issue with respect to City staff having

6  access -- they absolutely had access.  The Director of the

7  Rainbow Center, which is different from the teen center, which

8  is the Digital Arts and Culinary Academy, had a key, and

9  informed Ms. Santana that he had a key.  So with respect to

10  that issue, it wasn't truthful.

11      With respect to the issue of the ADA compliance, as I

12  stated previously, the Department of Public Works performed the

13  work that was not compliant.  And so if they didn't have a key

14  to have access to the building, they wouldn't have been able to

15  do the work.  And so that issue wasn't an issue that was as a

16  result of Pulte's work.  It was as a result of the work that

17  City staff did.  And so if it needs to be corrected, it should

18  have been corrected when it was done initially.

19      With respect to the last issue, absolutely I would love to

20  have the staff taken off of my payroll so that that would free

21  up money on my payroll and my budget and go on to City staff.

22  So I -- that being resolved -- absolutely no problem.

23  **Q.**   So you think that all of these issues were important

24  enough that they needed to be resolved either by someone

25  saying, "This is the answer," or "No, that didn't happen"; but

 1  it's important to be clear about what these items are.  Would

 2  you agree with that?

 3  **A.**    I wouldn't agree with your characterization.

 4       Again, I said that the first issue wasn't an issue because

 5  it wasn't truthful.  It wasn't real.

 6       I said with respect to the second issue that the -- the

 7  noncompliant issues with ADA were created as a result of City

 8  staff.  And so it was under Ms. Santana's purview to have those

 9  issues corrected.  Had nothing do with me and nothing to do

10  with Pulte being paid.

11  **Q.**    Okay.  I am not asking you about Pulte getting paid.

12  Really I'm not.

13  **A.**    I'm clear on that, but you want to characterize in a way

14  that isn't accurate, so I'm just trying to give you an

15  accurate --

16  **Q.**    Well, she --

17  **A.**    -- assessment.  And I think --

18           **THE COURT:**  Let's have a question and answer.  We

19  can't overlap, because we are making a transcript of what's

20  being said.

21  **BY MR. LAFAYETTE**

22  **Q.**    Was she entitled to ask you these questions in the first

23  instance?  Was she -- I just want to know if, in your mind, the

24  City Administrator was entitled to ask you these questions.

25  **A.**    I'm not sure what you're trying to get at.  Again, the

```
 1   key -- Miss Santana was well aware that the Director of the

 2   Rainbow Recreation Center had a key to the teen center.  So why

 3   she would pretend in a letter that she -- that staff had no

 4   access is beyond me.

 5        There was a key that stayed in a box at the recreation

 6   center for -- for an extend period of time.  The director of

 7   the recreation center told Ms. Santana that.  And so this

 8   wasn't an issue.

 9        So was she entitled?

10        It wasn't truthful.  That was a part of the issue with

11   Ms. Santana; that she was not truthful, and would manipulate

12   facts.

13   Q.  If she was mistaken with regard to what she thought was

14   going on --

15   A.  It wasn't an issue of Ms. Santana being mistaken.

16        MR. LAFAYETTE:  Your Honor, can I ask my question

17   first, before the witness cuts me off?

18        THE COURT:  You also need to not cut her off.

19        MR. LAFAYETTE:  I'm not.

20        THE COURT:  All right.  Then let's have a clean

21   question.

22        MR. LAFAYETTE:  That's what I was trying.

23   Q.  Are you -- is she entitled to go to you and say, "Look.

24   This is my belief.  Can you please explain what this is really

25   all about"?  Is she entitled to do that?
```

1  A.   That is not what happened.  Ms. Santana --

2           MR. LAFAYETTE:  Your Honor, it's nonresponsive.

3           THE WITNESS:  Ms. Santana --

4           THE COURT:  One moment.  One moment.

5           MR. LAFAYETTE:  Objection.  It's nonresponsive to my

6  question.

7           THE WITNESS:  No.  It's not the answer that you want.

8           THE COURT:  We're going to take a break in a moment.

9  And, Mr. Lafayette, this line of questions about entitlement

10  is -- as far as I can tell, you've exhausted the topic.  So

11  let's move on to a new topic --

12          MR. LAFAYETTE:  I'll move on to a new topic.

13          THE COURT:  -- because it's not at issue in the

14  litigation.

15  BY MR. LAFAYETTE

16  Q.   So, now, did you provide written responses to Ms. Santana

17  concerning the issues that she raised?

18  A.   What -- what issues are you talking about now?

19  Q.   In that e-mail that we were looking at, did you provide

20  written responses to her?

21  A.   I think the document speaks for itself, in that I

22  responded to her.

23  Q.   So the response that you gave to her to the questions that

24  she supposed was, quote, "What do any of the issues raised

25  below have do with getting Pulte paid?"

1  **A.**   Because that was the issue I raised with her.

2  **Q.**   Thank you.  Now, you're a lawyer.  You know about

3  omission.  Right?  Do you know the concept of omission?

4  **A.**   I haven't practiced law in over 15 years.

5  **Q.**   Okay.  So do you understand the issue of omission, or not?

6  If you don't, I'll move on.

7  **A.**   You could explain it.

8  **Q.**   Okay.  So at some point in time you got a communication

9  from Ms. Preston.  Right?  An e-mail dated July 4?

10 **A.**   Are we back at another exhibit?

11 **Q.**   You got an e-mail dated July 4.  Correct?

12 **A.**   Is it -- it's still this exhibit?

13         **THE COURT:**  If you're asking about an exhibit, let's

14 draw her attention to the exhibit you're asking about.

15         **MR. LAFAYETTE:**  Yes.  I'll do that, Your Honor.

16         **MR. SIEGEL:**  I think we're on Exhibit 20.

17         **MR. LAFAYETTE:**  20?

18         **MR. SIEGEL:**  Yeah.

19         **THE WITNESS:**  July 4th.  Yes.

20 BY MR. LAFAYETTE

21 **Q.**   What did you do with this e-mail when you got it?

22 **A.**   Read it.

23 **Q.**   I didn't hear that.

24 **A.**   Read it.

25 **Q.**   Did you do anything else with it?

1  **A.**    No.

2  **Q.**    Did you share with anyone that you had gotten e-mail?

3  **A.**    Not that I know of.

4  **Q.**    Okay.  So to your knowledge, the only two people -- the

5  only people who were aware that this e-mail was sent to you

6  were you and Ms. Preston.  Correct?

7  **A.**    Are we talking about at that time?

8  **Q.**    At that time.

9  **A.**    As far as I know.

10  **Q.**    Now, do you know if, in 2013, you gave the letter to

11  anybody else?  The e-mail to anybody else?

12  **A.**    No, I -- I don't recall.

13  **Q.**    Okay.  So at least in 2013, it was your understanding that

14  the only people who were aware of this e-mail were you and

15  Ms. Preston.  Right?

16  **A.**    I never thought about this e-mail.

17  **Q.**    So is that a "Yes" or a "No"?

18  **A.**    Well, I -- your questions are a little bit difficult,

19  because they aren't as precise.

20  **Q.**    In 2013 did you give this e-mail to anybody else?

21  **A.**    I -- I don't recall.

22  **Q.**    Thank you.  And so did you believe that Ms. Preston had

23  shared with you in this e-mail everything that was truthful and

24  accurate about this event?

25          **MR. SIEGEL:**  Objection.  Vague, Your Honor.

---

1          **THE COURT:**  One moment.

2      Overruled.

3      You can answer if you know.

4          **THE WITNESS:**  All I had was the e-mail.

5  **BY MR. LAFAYETTE**

6  **Q.**   Did you believe it was truthful and accurate?

7  **A.**   I had no reason to disbelieve it.

8  **Q.**   I thought I heard you say earlier that you thought she was

9  a truthful person.

10  **A.**   I said I had no reason to disbelieve.  You asked me a

11  question.  And so the two aren't related.

12  **Q.**   Fine.  So in it she says, "The Fire Chief conducted a

13  meet-and-confer with Local 55" --

14  (Document displayed.)

15  **BY MR. LAFAYETTE**

16  **Q.**   -- "signed a TA to extend an economic provision of your

17  MOU?"  And then she says, "After she completed it, she

18  convinced the newest member of my staff to sign it?  You know I

19  dealt with that employee."

20      What does that phrase mean to you:  "You know I dealt with

21  that employee"?

22  **A.**   The document speaks for itself.  It's not --

23  **Q.**   I'm asking what it meant to you.

24  **A.**   It speaks for itself.

25  **Q.**   Did it have any significance or meaning to you, at all --

---

1  that phrase?

2  **A.**   To me, that wasn't the important issue in the e-mail.   I

3  wasn't focused on the employees of the Personnel Division.   I

4  was more focused on the fact that the Chief of Police had

5  entered into a TA that the City Council had not been made aware

6  of and had not approved.

7  **Q.**   And that would have been wrong.   Right?

8  **A.**   Absolutely.

9  **Q.**   And -- and if -- and for everybody who was involved in

10  that, that would have been wrong; wouldn't it?

11  **A.**   I don't know who all was involved in it.

12  **Q.**   I know --

13  **A.**   I'm talking about the substance of this e-mail.

14      I guess a part of the problem that I'm having with your

15  questions is that you asked me a question, and then you move a

16  little bit away and try to infer something else.   And it makes

17  it very difficult to respond.

18  **Q.**   Would everybody, in your mind, who had been involved in

19  that transaction is have been doing something wrong?

20  **A.**   I can't speak to everybody.   I don't know --

21  **Q.**   Thank you.

22  **A.**   -- who everybody would be.

23  **Q.**   But you knew it was wrong for people to engage in signing

24  TAs without Council approval.   Right?

25  **A.**   You're putting -- I -- please --

1  **Q.**  I thought --

2  **A.**  Please rephrase your question.

3  **Q.**  I --

4  **A.**  I don't know what the question is.

5  **Q.**  I thought you said that you thought it would be wrong for

6  someone to engage in signing a TA, without Council approval.

7  **A.**  I said I was.

8  **Q.**  Is that what you said?

9  **A.**  You asked me about the e-mail.  That was your question;

10  about the e-mail, and what -- and -- and a line in the e-mail

11  that I wasn't focused on.

12      I was focused on the fact that the Chief of Police --

13  **Q.**  Mm-hm.

14  **A.**  -- had entered into a TA, without Council authorization or

15  knowledge.  That was, to me, the import of this e-mail.

16  **Q.**  I got that.

17      So now let me ask you another question.  Did you talk to

18  Ms. Preston about this e-mail?

19  **A.**  I'm going to assume that I had a conversation with her as

20  a follow-up to the e-mail, or before the e-mail.  I don't know.

21  **Q.**  But -- but as you sit here today, do you have a specific

22  recollection of ever having a conversation with Ms. Preston in

23  2013 about this e-mail?

24  **A.**  About the e-mail?

25  **Q.**  About the comments that she wrote in this e-mail -- the

1   one she sent to you.

2   **A.**   Well, there -- there would have been the conversation in

3   closed session.   I don't know the date of that, but you asked

4   me about the e-mail.

5   **Q.**   So --

6   **A.**   Did I have a conversation with her about the fact that she

7   sent me an e-mail?   I don't remember.

8   **Q.**   I'm really asking about this.   Between here (indicating)

9   -- "Hello" -- and "Sent from my iPhone" -- that language

10  right there -- as you sit here today, do you have a specific

11  recollection of ever having a conversation with Ms. Preston

12  about what's between those two points?

13  **A.**   Well, with respect to everything between the two points, I

14  don't know.

15       With respect to the Fire Chief signing a TA without

16  bringing it to the Council -- that would have happened in

17  closed session.

18  **Q.**   So the only time you had a conversation with her that you

19  can have a specific recollection of today --

20  **A.**   That wasn't your question.

21  **Q.**   The only conversation you can talk about that you had with

22  her about what's between those two points is a conversation

23  that took place in closed session?

24  **A.**   No.

25  **Q.**   Right?

1   **A.**   I didn't say that.

2   **Q.**   So I'm asking you:  Do you have a specific recollection of

3   another one?

4   **A.**   I told you the one that I specifically remember.  Whether

5   or not there were other conversations, I don't remember.

6   **Q.**   Was that the closed-session conversation?

7   **A.**   You're -- you're doing it again.

8   **Q.**   I'm asking you:  Was that the closed-session conversation?

9   **A.**   I'm trying to be clear in my responses, but counsel will

10   ask me a question about the e-mail.  Then he'll jump to

11   something else and make it seem like I wasn't being responsive

12   to the first one.  And so it's creating a mess in terms of the

13   record and in terms of me being able to get out --

14          **THE COURT:**  Answer the question to the best of your

15   ability.  And listen to each one carefully.  And the jury is

16   disregarding and will not consider as evidence anything counsel

17   says in response to your questions.  So what you're saying is

18   what the jury's listening to.

19          **THE WITNESS:**  Thank you.

20   **BY MR. LAFAYETTE**

21   **Q.**   Aside from a conversation that you may have had with

22   Ms. Preston in closed session, did you have a conversation with

23   Miss Preston about the comments that she wrote on this e-mail

24   between the word "Hello," and "Let me know if you have any

25   questions"?

1   **A.**   I don't know.

2   **Q.**   Thank you.  Now, ma'am, did Ms. Preston ever communicate

3   to you that she was aware that that TA was being signed before

4   it was signed?

5   **A.**   I have no knowledge of that.

6   **Q.**   Did she ever communicate to you that it was her department

7   that, in fact, drafted the TA?

8   **A.**   I don't have any knowledge of that.

9   **Q.**   Did she ever communicate to you that it was her department

10  that was responsible for advising the Fire Department about how

11  to proceed with this TA?

12  **A.**   I have no knowledge of that.  I have the e-mail before me.

13  **Q.**   Did she ever advise you that it wasn't her that discovered

14  that the TA was signed without Council approval?

15  **A.**   Not that I'm aware of.

16  **Q.**   Did she ever advise you that Donna Hom was the person who

17  pulled her by the coattail and said, "Look.  They're in there

18  bargaining"?  Did she ever tell you that?

19  **A.**   Not that I recall.

20  **Q.**   Okay.  So the only thing that she told you was something

21  that the Fire Chief had done, but she never told you about what

22  her department had done.  Right?

23  **A.**   I don't know any of those facts.  All I know is what's in

24  this e-mail.

25  **Q.**   I'll just --

———

1    So now is Council -- City Council advised of every time a

2  grievance is filed?

3  **A.**   We should be.

4  **Q.**   I'm asking you if it's the case.

5  **A.**   We should be.  I don't know if that's the case.  There are

6  many things that should happen with respect to the City

7  Attorney's Office that we are not always advised of.

8  **Q.**   Now, let me go back to a process that you talked about.

9  You were talking about the Sunshine law and the Brown Act.

10 Right?

11 **A.**   Yes.

12 **Q.**   Okay.  And you said that in the normal course of events,

13 either should be presented to Council in advance of Council

14 meetings.  Right?

15 **A.**   I don't think that's exactly what I said.  I said there's

16 a public-noticing requirement.

17 **Q.**   There's a public-noticing requirement, which is a notice

18 that goes out to the public.  Right?

19 **A.**   Well, it goes out to -- yeah.  Very wide.  Not --

20 **Q.**   So now with regard to your binder that you get for Council

21 meetings, when do you get your binder for the Council meetings?

22 **A.**   Well, when I refer to it as a "binder" -- we put our -- we

23 used to put our stuff in a binder.  Now it's electronic.  So we

24 get our package.  It's usually two weeks before.

25 **Q.**   You get a packet two weeks before, which contains the

1  material for the items that are going to be discussed at the

2  Council meeting?

3  **A.**   That's correct.

4  **Q.**   And you get that so that you have an opportunity to review

5  it, digest it, and be a responsible City Councilperson when the

6  event comes up.  Yes?

7  **A.**   You get the package in advance.

8  **Q.**   Okay.  Now, do you know to what extent LaWanna Preston was

9  an obstacle to you getting information from the City

10  Administrator?

11 **A.**   I don't understand your question.

12 **Q.**   Do you know if the City Administrator was trying to get

13 LaWanna Preston to get the information to her sooner, so that

14 she could get it to you on time?  Do you know?

15 **A.**   The City Administrator is responsible for all staff.  So

16 I'm -- I'm at a loss as to how you phrased your question.

17 **Q.**   So it would be accurate, then, that you don't know if any

18 failures to get you information on time was a failure of the

19 City Administrator, as opposed to a failure of Ms. Preston.

20 Right?

21 **A.**   What I said is the City Administrator is responsible for

22 all staff.  And so they would control the time frames and be

23 able to get information to us, regardless of one staff member.

24 **Q.**   Regardless of one staff member.

25     Okay.  The meeting on October 2 -- did you get any e-mails

---

1  from anyone prior to that meeting on October 2 concerning

2  issues to be discussed?

3            **MR. SIEGEL:**  Your Honor, lack of foundation.  I think

4  counsel's referring to the meeting on October 1st.

5            **MR. LAFAYETTE:**  October 1st.  I stand corrected,

6  counsel.  Thank you.

7            **THE WITNESS:**  Is that -- again, the dates don't mean

8  anything to me.

9  **BY MR. LAFAYETTE**

10 **Q.**  There's -- I'll help.

11 **A.**  Please.

12 **Q.**  I appreciate that.

13 **A.**  Thank you.

14 **Q.**  There was a closed-session meeting on October 1 --

15 **A.**  Okay.

16 **Q.**  -- that you spoke about earlier?

17 **A.**  Right.  Okay.

18 **Q.**  Did you get an e-mail from anyone in anticipation of that

19 meeting?

20 **A.**  Oh, I don't -- I don't know.

21 **Q.**  Did you talk to Ms. Preston before that meeting?

22 **A.**  I could have.  I -- at this stage, I'm not certain.

23 **Q.**  So what was it that triggered you to ask a question about

24 the grievance?

25 **A.**  We have communication with our employee units.  And many

1  people in the union were talking about the fact that they had

2  failed to withhold the dues, and that the City was trying to

3  get the union to drop the grievance.

4  **Q.**   When Ms. Preston spoke to you, did Ms. Preston tell you

5  when the grievance was filed?

6  **A.**   That's a different question than what you originally asked

7  me.  And I don't know that Ms. Preston was the first place that

8  I heard this issue, or that she told me when the grievance was

9  filed.

10  **Q.**   Did Ms. Preston ever at any point in time tell you when

11  the grievance was filed?

12  **A.**   I don't -- I don't remember.

13  **Q.**   Did Ms. Preston tell you it was filed in September?

14  **A.**   I just said I don't remember.

15  **Q.**   I'm trying to refresh.  That's all.

16      Did you ever get an understanding that the issues embraced

17  in that grievance had actually been filed months earlier?

18  **A.**   Again, I don't know when that grievance was filed, or who

19  told me.  I knew that it was filed; not when it was filed.

20  **Q.**   So between June 26 and October 1, how many City Council

21  meetings were there?

22  **A.**   Well, I have no idea.

23  **Q.**   More than two?

24  **A.**   I have no idea.

25  **Q.**   Okay.  How many closed sessions were there?

1  A.   I have no idea.  So -- for -- so, for instance, the -- the

2  question doesn't mean a whole lot, because from June 30th

3  through September, the Council was typically on supposed to be

4  on recess, so there would be no Council meetings.

5       So I -- I really don't know if there's something specific

6  you'd like me to say.  I'm more than happy to --

7  Q.   Were there Council meetings in July?

8  A.   Again, typically, the Council's recess is June 30th, when

9  we pass the budget, through September.  There may have been --

10  we may have gone beyond the --

11      Well, I don't know.  I don't know.  I -- I can't remember.

12  Q.   Well, in this e-mail just in front of you there --

13  A.   Which one?  Are we back at 20 or --

14  Q.   Yes.  Ms. Preston writes, "What Deanna is bringing the TA

15  to next closed session without me."  Does that refresh your

16  recollection that there was a closed session that took place in

17  July?

18  A.   I'm assuming, based on what the document says, that there

19  was an upcoming closed session.

20  Q.   Did you get one of those back-channel e-mails from

21  Ms. Preston, indicating that a grievance has been filed on

22  June 26th, saying --

23  A.   I don't know what --

24  Q.   -- saying that the union dues had not been collected?

25  A.   I don't know what a back-channel e-mail is.

---

1  **Q.**   Did you get an e-mail from Ms. Preston's private e-mail

2  account to yours, stating that a grievance had been filed on

3  June 26th contesting or saying that the union had not -- the

4  City had not been collecting its union dues?

5  **A.**   I don't remember that -- receiving an e-mail from LaWanna

6  on that.   Again, I stated that the union -- I had very good

7  conversations with unions, and was aware of the issue.

8         **MR. LAFAYETTE:**   I don't think I have any further

9  questions, Your Honor.

10        **THE COURT:**   Mr. Siegel, do you have any follow-up?

11        **MR. SIEGEL:**   No, Your Honor.

12        **THE COURT:**   We'll take a break for the jurors to

13  draft any potential questions if you wish to.   Again, you're

14  not required to.   And Councilwoman, if you could hang on for a

15  few more minutes to see if there are juror questions, we'll

16  return in a few minutes.   Thank you.

17  (Recess taken from 2:16 p..m. until 2:25 p.m.)

18  (Proceedings were heard outside the presence of the jury:)

19        **THE COURT:**   The jury's not present.   We have three

20  questions with subparts from the jury I'm proposing to ask.

21  Any objection to that approach?

22        **MR. LAFAYETTE:**   I'm sorry, Your Honor.   I couldn't

23  hear the last and first thing.

24        **THE COURT:**   I'm intending to ask the questions.   Do

25  you have any objection?

1      **MR. SIEGEL:**  I don't have any objections.  It's

2  just -- the question about paying Pulte is --

3      **THE COURT:**  I'll give you a chance to follow up on

4  it.

5      **MR. SIEGEL:**  Okay.

6      **THE COURT:**  The witness is present, so I'm not going

7  to disclose question.  Does the Defense have any objection?

8      **MR. SIEGEL:**  Okay.

9      **MR. LAFAYETTE:**  No, Your Honor.

10      **THE COURT:**  All right.  Let's call the jury in.

11  (Proceedings were heard in the presence of the jury:)

12      THE COURT:  All right.  Everyone may be seated.  On the

13  record.  Jurors are present.  We have Notes 4, 5 and 6.

14      And, Councilwoman, you remain under oath.  And I'll give

15  each party a brief opportunity to follow up on answers if they

16  wish to.  And if you don't understand the question, please let

17  me know.

18      The first question is:  At the City of Oakland, how are

19  construction contracts/purchase orders typically issued?

20      And there's a follow-up question.  I'll give you both

21  parts.

22      Do Councilmembers have the authority to issue them in

23  various districts?

24      So to restate the whole thing:  At the City of Oakland,

25  how are construction contracts/purchase orders typically

1    issued?

2         And do Councilmembers have the authority to issue them in

3    their districts?

4         **THE WITNESS:**  So typical construction contracts are

5    governed by our ordinances.  They can either go through an RFP

6    process, or a request for a proposal process, which is an RFP;

7    or a request for qualifications proposal, which is an RFQ.

8    Those are two of the main ways that contracts are done.

9         The contract ordinance isn't always the only way that

10   construction can be done.  If there is -- there could be a

11   soul-source contract given to someone that is not done by an

12   RFP or an RFQ.  And then if there -- if it's in the best

13   interests of the City, then the contracting provisions can be

14   waived.  And so a contract can be entered into.

15        And so I'm assuming this is with respect to the Pulte

16   contract.  That was a combination of a gift to the City.  And

17   in that gift to the City, some additional items were paid for.

18   So we paid for an upgrade on the flooring.  We paid for -- boy.

19   I'm trying to -- trying to think.  There was so much donated

20   that it was more beneficial to us to accept that gift.  And --

21   and we did upgrades on things.  And that's what that additional

22   amount that was paid for.  So it wasn't a typical construction

23   contract.

24        I don't know if I'm being totally clear.

25        And so in -- in the opportunity -- again -- Rebuilding

1   Together Oakland is an organization that partners with schools,

2   cities, a host of nonprofit organizations.  And they find

3   low-income people or facilities to help refurbish.  And they

4   get contractors like Pulte to donate their -- their equipment,

5   their labor.  And then Pulte got additional people to donate,

6   as well.  Their subcontractors donated.  So it wasn't a typical

7   construction contract.

8           THE COURT:  I think I'm going to move on to the next

9   question.  It has two parts, as well.  The first part is:  Did

10  Ms. Santana ever say that there were other reasons to not pay

11  Pulte than the three listed in the e-mail?  And the e-mail is

12  the one in Exhibit 3.

13      And the second part of the question is:  Was Ms. Santana

14  waiting for contracts to be signed first?

15      So just to restate it again, did Ms. Santana ever say that

16  there were other reasons to not pay Pulte than the three listed

17  in e-mail 20?  And was Ms. Santana waiting for contracts to be

18  signed first?

19          THE WITNESS:  The -- what's not clear, I think, to --

20  what's not clear is that the work had already been completed by

21  the time Ms. Santana came on board.  This project started in

22  2005/2006, and was completed.  We actually built this facility

23  in 45 days.  This was a unique opportunity.  And so I was made

24  aware of the opportunity by Rebuilding Together Oakland.  I --

25  because they had deadlines.  It's a national organization, and

 1  they do a national day of building.  And so all of their

 2  projects are done on the same day.  So we literally had 45

 3  days, from start to finish, on this project.

 4        So whatever year -- and I don't remember what year it was.

 5  It was, like, 2006/2007.  This was years that Pulte went

 6  without payment.  That's why I went through so many City

 7  Administrators.  So at that juncture the work had been

 8  performed.  Pulte had done what they were told by staff to do,

 9  and still had not been paid.

10        And so with each City Administrator, that's why I raised

11  it with Deanna.  She didn't know about the issue.  I raised it

12  with her when she first came.

13        I hope that answered.

14        **THE COURT:**  Next question.  It also has several

15  subparts, so I'll go through each of them.  Did you send or

16  receive e-mails to or from other City employees about City

17  business using nonofficial e-mail accounts?  If so, with whom?

18  And why did you use nonofficial e-mail?

19        These are in reference to Document 20.

20        So to state the questions again, thinking about Document

21  20, did you send or receive e-mails to or from other City

22  employees about City business using nonofficial e-mail

23  accounts?  If so, with whom?  And why did you use nonofficial

24  e-mail?

25        **THE WITNESS:**  The climate during Deanna Santana's

1    tenure was one that they were scanning our e-mails.  It was a

2    very hostile environment for the employees, as well as the

3    Councilmembers.  And so those Councilmembers that Ms. Santana

4    didn't particularly care for -- your e-mail system -- a lot was

5    being compromised during that period of time.  And so I did

6    have the communication with Ms. Preston.  There may have been

7    other employees.  I get a lot of e-mails.  So there may have

8    been other employees.  I don't know.

9        I -- I am friends.  I've been on the Council for 13 years

10   with -- and so I know a host of employees at the City.  So I

11   may get e-mails from City employees that have nothing do with

12   City business.

13            THE COURT:  Well, the question is about:  Did you

14   have e-mails about City business using your nonofficial e-mail

15   accounts?

16            THE WITNESS:  Well, so about City business, people

17   will come up to you in the store.  People e-mail you all of the

18   time.  People text you all of the time on my private -- on my

19   Facebook, on my social media.  I'm very accessible.  And so any

20   way that people can get to me.  I have my office number

21   transferred to my cell phone.  And it's been like that for 13

22   years.  So I get calls at 3:00 o'clock in the morning.  I get

23   calls in real time.  And I'm very accessible to my constituents

24   as well as City staff.

25            THE COURT:  Thank you.

___

1    Mr. Siegel, do you have any follow-up questions you'd like

2  to ask?

3          **MR. SIEGEL:**  No, Your Honor.

4          **THE COURT:**  Mr. Lafayette, do you have any follow-up

5  questions you'd like to ask?

6          **MR. LAFAYETTE:**  One.  Actually, Your Honor, I won't

7  even ask it.  I'll ask someone else.

8          **THE COURT:**  Zero.  We'll save it.

9    Councilwoman, you may step down.  Thank you very much for

10 being here.

11         **THE WITNESS:**  Thank you so much.

12 (Witness excused.)

13         **THE COURT:**  And if plaintiff will call her next

14 witness.

15         **MS. MEHTA:**  The plaintiff calls Ms. Winnie Anderson.

16 And I have to --

17         **THE COURT:**  If you could bring her in.  Thank you.

18         **MR. SIEGEL:**  Thank you, ma'am.

19 (Recess taken from 2:34 p.m. until 2:36 p.m.)

20         **THE CLERK:**  Please stand and raise your right hand.

21         **MR. LAFAYETTE:**  Your Honor, could I?

22         **THE COURT:**  You can in a moment, but we're in the

23 middle of something.

24                  **WINNIE ANDERSON**,

25 called as a witness for the **PLAINTIFF**, having been duly sworn,

1  testified as follows:

2          THE WITNESS:  I do.

3          THE CLERK:  Please be seated.  State your full name

4  for the record and spell your full name, please.

5          THE WITNESS:  Winnie Wang Wen Lu Anderson,

6  W-I-N-N-I-E, W-A-N-G, W-E-N, L-U, A-N-D-E-R-S-O-N.

7          THE COURT:  Thank you very much, and if you would

8  keep the microphone pulled toward you, that's very helpful for

9  the jury to hear you.

10      Mr. Lafayette, you have something to raise?

11         MR. LAFAYETTE:  I'd rather go to the side, Your

12  Honor.

13         THE COURT:  We'll do that after the witness.

14      Proceed.  The jury is waiting.  Proceed with your

15  questioning.

16                   **DIRECT EXAMINATION**

17  BY MS. MEHTA:

18  **Q.**   Good afternoon, Ms. Anderson.

19  **A.**   Good afternoon.

20  **Q.**   Ms. Anderson, did you work for the City of Oakland?

21  **A.**   Yes.

22  **Q.**   And when did you start with the City of Oakland?

23  **A.**   March 2013.

24  **Q.**   Thank you.  And in March 2013, what was your position?

25  **A.**   I was a Senior Employee Relations Analyst, HR Analyst

```
 1  ELDE.

 2  Q.   Can you tell us what ELDE stands for?

 3  A.   Exempted limited term duration.

 4            THE COURT REPORTER:  I'm sorry.  Can you repeat that?

 5            THE WITNESS:  I'm sorry.  Limited term duration --

 6  essentially, I wasn't a permanent employee, I was a temporary.

 7  Q.   And who hired you into that position?

 8  A.   Lawanna Preston.

 9  Q.   Was Ms. Lawanna Preston -- did you work under Ms. Lawanna

10  Preston?

11  A.   Yes.

12  Q.   Do you still work for the City of Oakland?

13  A.   No.

14  Q.   And did you quit?

15  A.   I resigned, yes.

16  Q.   And do you recall when you gave your resignation notice?

17  A.   Probably officially December, maybe -- I notified -- yeah,

18  after Thanksgiving, but I officially put it in writing probably

19  December.

20  Q.   Okay.  And where are you currently employed?

21  A.   East Bay Mud.

22  Q.   Can you say what "Mud" is?

23  A.   Municipal Utilities District.

24  Q.   And when you were working for the City of Oakland, were

25  you ever promoted?
```

———

1  **A.**   Yes, to a Principal Employee Relations Analyst.

2  **Q.**   And who were you promoted by?

3  **A.**   I was promoted, I believe -- this is a little hazy for me,

4  so I apologize.  I think I stayed -- yeah, well, it's a little

5  weird.  I became -- I can't remember, honestly.  I think I

6  became a Principal Employee Relations Analyst, but that was

7  probably in October.  I may have -- or right before, but I know

8  the permit came in October.

9  **Q.**   Okay.  And did your position change beyond becoming -- did

10  your position change besides that?

11  **A.**   I took on an additional role just acting in the capacity

12  of Employee Relations Manager, Director.

13  **Q.**   And when was that?

14  **A.**   October also.

15  **Q.**   Of what year?

16  **A.**   2013.

17  **Q.**   And do you recall was this before or after Ms. Santana

18  terminated Ms. Preston's employment?

19  **A.**   This was after.

20  **Q.**   And was it soon after or long after?

21  **A.**   Maybe a day or two after.

22  **Q.**   And in this position as acting over employee relations,

23  who did you report to?

24  **A.**   I had Katano Kasaine and Deanna.

25  **Q.**   Okay.  Sorry.  And Ms. Anderson, when you worked for the

---

1  City of Oakland, did you ever work from home?

2  **A.**    At times when I needed something done and I wanted to go

3  home to do it instead of staying in the office, yes.

4  **Q.**    Did you ever work with City of Oakland documents at home?

5  **A.**    Yeah, like draft letters that I would write in regards to

6  like an appeal, but that's pretty much it, and then I would

7  send it back to myself.

8  **Q.**    You sent it back to yourself, what do you mean?

9  **A.**    Just like if I thought of something I wanted to write

10  about and like it clicked in my head, I would put it in writing

11  and then email it back to myself pretty much.

12  **Q.**    So I'd like to turn to Local 55.

13  **A.**    Okay.

14  **Q.**    Are you familiar with the Firefighter's Union Local 55?

15  **A.**    I am.

16  **Q.**    Were you assigned to Local 55 as a City Employee Relations

17  Representative?

18  **A.**    I was.

19  **Q.**    And in the summer 2013, did you meet with Local 55?

20  **A.**    I did.

21  **Q.**    Are you familiar with the Paramedic Support contract term

22  in the firefighter's contract?

23  **A.**    I was made aware of it at that time.

24  **Q.**    And did you meet with Local 55 about this contract term

25  having to do with Paramedic Support?

1  A.   We met about extending the time to talk about it.

2  Q.   Well, that leads me to my next question.

3       Was the term ending?

4  A.   I think it was ending like end of June.

5  Q.   2013?

6  A.   2013, yes.

7  Q.   And was the end result of this meeting in June 2013 a

8  signed agreement to extend the Paramedic Support term 30 days?

9  A.   I don't remember the exact writing, but the intent was to

10 allow for 30 days discussion since it was ending.  The

11 department wanted to have an opportunity, and so did 55, to

12 have more discussion about whether or not to continue the

13 program or not.

14          MS. MEHTA:  And Your Honor, I'd like to introduce

15 Plaintiff's Exhibit 17, Defendant's Exhibit 1W.  I have marked

16 as Exhibit 17, Defendant 1W an agreement between the City and

17 Local 55.

18          THE COURT:  On the Exhibit list it's referred as 2D,

19 not 1W.

20          MS. MEHTA:  My apologies.

21          THE COURT:  But your 17 is what you're referring to?

22          MS. MEHTA:  Yes.

23          THE COURT:  Any objection to Exhibit 17?

24          MR. LAFAYETTE:  Just a second, Your Honor.  No.

25          THE COURT:  No objection.

 1              **MR. LAFAYETTE:**  No objection, Your Honor.

 2              **THE COURT:**  Exhibit 17 is admitted into evidence.

 3       (Trial Exhibit 17 received in evidence)

 4   **BY MS. MEHTA:**

 5   **Q.**  Ms. Anderson, would you please open that binder and turn

 6   to Exhibit 17?  Do you see the document?

 7   **A.**   I do.

 8   **Q.**  Do you recognize it?

 9   **A.**   I do.

10   **Q.**  What is it?

11   **A.**   It's an agreement between the City and Local 55.

12   **Q.**  Okay.  And how do you recognize it?

13   **A.**   Because I helped draft it.

14   **Q.**  You drafted it?

15   **A.**   Correct.

16   **Q.**  And is it a fair and accurate copy of your draft?

17   **A.**   Yes.

18              **MS. MEHTA:**  Your Honor, I move to admit Exhibit,

19   Plaintiff's Exhibit 17.

20              **THE COURT:**  I already admitted it.  I got ahead of

21   you.

22              **MS. MEHTA:**  All right.  And I move to publish and

23   granted?

24              **THE COURT:**  You're doing it right.

25

———

1   BY MS. MEHTA:

2   Q.   Ms. Anderson, is that your signature on the document?

3   A.   Yes.

4   Q.   Ms. Anderson, after this agreement was signed, did you

5   ever discuss this signed agreement with Ms. Preston?

6   A.   I discussed this with her probably officially in July for

7   the second meeting with 55.

8   Q.   And what did you tell her?

9   A.   That we have this agreement to have more conversation with

10   55, and whether or not to extent this program or not.

11   Q.   And what did she tell you?

12   A.   She said Donna told her we were talking about money, and

13   we need to stop the conversation, and so we did.

14   Q.   Did she tell you anything -- well, why did she tell you

15   you have to stop the conversation?

16           MR. LAFAYETTE:   Objection, speculation, hearsay.

17           THE COURT:   Sustained.

18   BY MS. MEHTA:

19   Q.   Did she tell you why she was telling you you needed to

20   stop the conversation?

21   A.   Because we needed council authorization.

22   Q.   And that's City Council authorization?

23   A.   Correct.

24   Q.   And prior to you signing this document, did you ever talk

25   to Ms. Preston about signing this document?

1   **A.**   I don't remember.  I did tell her that we were meeting

2   about this, but that was my first meeting on June 28th

3   originally.  I told her before I even met with 55 that there

4   was this issue, and the money was new to her, and it was new to

5   me.

6   **Q.**   So when you met with her, you told her you were going to

7   discuss this issue about the Paramedic Support, but did you

8   tell her that you or anyone else was planning to sign this

9   tentative agreement?

10  **A.**   I don't remember that.  I don't remember that

11  conversation, if we had that conversation.

12  **Q.**   You don't remember it or it didn't happen?

13  **A.**   I honestly don't remember what we talked about.

14  **Q.**   To your knowledge, was Ms. Preston aware of the fact that

15  this document was going to be signed at that meeting?

16  **A.**   June, June 28th, I'm going to say I don't remember.

17  **Q.**   Well, I have here your deposition, and I think it would

18  refresh your recollection as to whether or not.  So I'm going

19  to hand you the deposition, and I want you to look at

20  lines 4 through 12.

21  **A.**   Okay.

22          **MR. LAFAYETTE:**  Which page?

23  **BY MS. MEHTA:**

24  **Q.**   Sorry about that.  Can you tell me the page?

25  **A.**   33.

———

1   Q.   Are you done?

2   A.   Um-hm.

3   Q.   Okay.  Thank you.  Ms. Anderson, does that refresh your

4   recollection that Ms. Preston had not been made aware that this

5   agreement would be signed at that meeting?

6   A.   No, because that is something that happened after I was

7   called out at the meeting to not have continued conversation,

8   to stop the meeting, so that doesn't refresh that part of the

9   memory.

10       So what I remember is I was informed by Trinette when she

11  had first gone to Fire that this was an issue or topic that was

12  coming up.  I had mentioned to Lawanna this is not on her case

13  review sheet; do you know anything about it, you know, because

14  we keep track of what cases and issues we work on.  She was

15  never made aware by Trinette that there was such a thing.  So

16  this was pretty much, again, that statement means we were in

17  the dark.  Nobody really knew what this was about at that time.

18  So until I met with Trinette, and then also had an initial

19  meeting with 55, you know, then I was informed that, you know,

20  there was no new monies, this was just extension of a term or a

21  section in the MOU, because that was sunsetting in the MOU,

22  even though the MOU wasn't going to sunset until later.  You

23  know, so it was pretty much just all trying to gather

24  information.  So the meeting with 55 was can we agree to at

25  least extend this for another 30 days to have more

1  conversation, otherwise the program is completely gone, and so

2  that was the intent of the agreement.

3      So this was drafted, Trinette helped me draft this, and I

4  think on July -- and Donna Hom was asked to come to the July

5  meeting.  I think she may have even been on -- I don't remember

6  who was at the 28th, but that's when they wanted to kind of go

7  over the program, the cost, is it something worthwhile.  And

8  then before Donna left -- well, after she left, she went to

9  Lawanna's office and said, *hey, they're starting to talk*

10 *about* -- I don't know what she told Lawanna.  And so then

11 Lawanna text me and told me, *Hey, get me out of the meeting*,

12 and then she told me, *Hey, stop this meeting don't have anymore*

13 *conversation*, and that was pretty much it.

14     But we did have this signed, and at different times,

15 probably, just to say we were going to continue having a

16 conversation.  That's why we had the July 2nd meeting.

17 **Q.**   So when you say everyone was in the dark, do you include

18 Ms. Preston in that statement?

19 **A.**   I do.

20 **Q.**   Now, did you know the agreement was supposed to be

21 approved by City Council?

22 **A.**   No.

23 **Q.**   Did you believe that it had been approved by City Council?

24 **A.**   I didn't know what to believe.  So in reality, I was

25 informed that this was ready to go, ready to proceed, so --

1  Q.   By who?

2  A.   By Trinette.  So I just proceeded based upon what

3  information she gave me, because we were transitioning.

4  Q.   Can you tell us who Trinette is?

5  A.   Trinette is a former Employee Relations Analyst, a

6  Principal Employee Analyst that worked for Lawanna, and was

7  promoted to a Fire Division Manager in the Fire Department.

8  Q.   And you believe she had already done the procedures

9  necessary in order for you to sign this agreement?

10  A.   Correct.

11  Q.   So I'm going to turn to SEIU.

12  A.   Okay.

13  Q.   And are you familiar with the temporary part-time Service

14  Employees International Union?

15  A.   Yes.

16  Q.   Were you present at an August 6, 2013 SEIU meeting

17  regarding these TPT, temporary part-time employees?

18  A.   Yes.

19  Q.   Do you recall, was Ms. Katano Kasaine present?

20  A.   Yes.

21  Q.   Do you recall what Ms. Kasaine said at that meeting?

22  A.   Some of it.

23  Q.   Can you tell us?

24  A.   We talked about who, from her staff, sends the dues and

25  fees to, and we talked about -- well, she talked about -- she

 1  went over some of the spreadsheets, so --

 2  Q.   I'm sorry to interrupt, but I'm going to focus the

 3  questions for time.

 4       At that meeting, did Ms. Kasaine say anything about

 5  collecting dues from TPT members?

 6  A.   She did.

 7  Q.   What did she say?

 8  A.   She said that she does collect dues, but people -- the

 9  employees have to tell her that -- to collect the dues.

10  Q.   When you say she does collect dues, do you mean that she

11  was collecting dues at that time?  She said "I am collecting

12  dues at this time"?

13  A.   No, I mean, it's a payroll.  You know, the City of Oakland

14  is a pass-through from the employees' paycheck to the union, so

15  they pass through it.  But yeah, she said, you know, there are

16  people that we are collecting dues from, and the employees just

17  need to let her know when to collect dues.

18  Q.   Okay.  Do you recall taking notes at that meeting?

19  A.   Briefly.

20  Q.   So I'd like to introduce Plaintiff's Exhibit 27, and what

21  I believe is Defendant's Exhibit 2Q.  These are Winnie

22  Anderson's notes from the SEIU meeting.

23           THE COURT:  Your chart calls it 2X.

24  BY MS. MEHTA:

25  Q.   Are you looking at that exhibit?

1   A.    Yes.

2   Q.    Do you recognize it?

3   A.    Yes.

4   Q.    What is it?

5   A.    My notes.

6   Q.    And how do you recognize it?

7   A.    It's my handwriting.

8   Q.    And is it a fair and accurate copy of your notes?

9   A.    Yes.

10          MS. MEHTA:  I move to admit Exhibit 27.

11          MR. LAFAYETTE:  Objection, hearsay.

12          THE COURT:  Given it appears on your Joint Trial

13  Exhibit list without an objection, the objection is overruled.

14  Exhibit 27 is admitted into evidence.

15      (Trial Exhibit 27 received in evidence)

16          MS. MEHTA:  I move to publish.

17          THE COURT:  Proceed.

18          MS. MEHTA:  Oh, I don't have to tell you that.

19  Q.    I know it's hard to read, so I'm going to read it.

20      In the middle of the page you see it says "Katano:  I

21  think employees have to tell us.  I get many calls if I take

22  dues out now."

23      Is that an accurate reflection of what Ms. Kasaine said?

24  A.    Well, there's a little bit more to that.

25  Q.    Can you --

1  **A.**   Yeah.  So she says -- so this is the conversation --

2  **Q.**   So Ms. Anderson, I'm just going to ask you --

3        **MR. LAFAYETTE:**  Objection, Your Honor.  She's cutting

4  the witness off.

5        **THE COURT:**  Overruled.  Proceed.

6  **BY MS. MEHTA:**

7  **Q.**   I'm just going to ask you that's what she wrote; right?

8  Because it said, "I get many calls if I take out -- if I take

9  dues out now;" correct?  You did write that?

10 **A.**   I did write that.

11 **Q.**   And you did hear Ms. Kasaine say that?

12 **A.**   That was a concern of hers, if she started taking dues out

13 for people that hadn't gotten dues taken out, and so her

14 payroll people would be overwhelmed by a lot of calls.  So then

15 the Union just asked for a caucus to get help with that.

16       **THE COURT:**  Let her finish her answer, please.

17       **MS. MEHTA:**  Sorry.

18 **Q.**   Okay.  So this statement, did Ms. Santana ever question

19 you about the statement that Kasaine made in this meeting?

20 **A.**   No.

21 **Q.**   So I'm going to turn now to the history of this SEIU

22 grievance.

23 **A.**   Okay.

24 **Q.**   Okay.  Was this the first time that you -- I'm sorry.  Let

25 me correct that.

1    You're familiar with the grievance from SEIU regarding

2  Kasaine not taking out these TPT dues?

3  **A.**  I heard about it.  I'm actually not familiar with it.

4  **Q.**  But you know that it happened?

5  **A.**  I knew when -- yeah, I knew it happened, but I never got

6  to see it until much, much -- I don't think I ever saw the

7  grievance itself.

8  **Q.**  Had you ever received a grievance in June of 2013 from

9  SEIU about failure to collect TPT dues?

10  **A.**  From Joe Keffer?

11  **Q.**  Yes.

12  **A.**  Yes.

13  **Q.**  And do you remember the date -- I'm sorry.  Can you

14  describe that email to us that you received from Joe Keffer?

15  **A.**  He was saying that dues weren't being taken out for TPTs,

16  that's all I can remember.  I can't give you anything more.

17  **Q.**  Do you recall the date?

18  **A.**  No.

19  **Q.**  So I have a copy of that email.  I'm going to show it to

20  you.

21  **A.**  Okay.

22  **Q.**  I think you'll remember the date.

23  **A.**  June 26th.  Yeah, June 26th.

24  **Q.**  Okay.

25  **A.**  2013.

1  **Q.**   So Ms. Anderson, can you relate to us what your response

2  was to Mr. Keffer regarding the SEIU grievance that he was

3  attempting to file June 26th, 2013?

4  **A.**   So I wrote "We received your grievance and ask you to

5  follow the grievance procedure, and ask you to complete the

6  grievance form by identifying the grievance by name, and to the

7  extent reasonably known for this class action; and second, the

8  first step of a grievance procedure is to resolve this

9  informally and meet with the appropriate department in regards

10 to the dues deduction."

11      I believe the department would be payroll, because he

12 jumped and went straight to Employee Relations without

13 following the grievance procedure.

14          **MR. LAFAYETTE:**   The witness has been shown a

15 document.  Can we get the exhibit number?

16          **THE COURT:**   You can proceed.

17 **BY MS. MEHTA:**

18 **Q.**   Did you take any further action after this response to

19 Mr. Keffer?

20 **A.**   I don't recall.

21 **Q.**   Would it be fair to say that you were telling Mr. Keffer

22 that this grievance was incorrectly submitted?

23 **A.**   I -- more than likely based on what I'm saying is he needs

24 to follow the grievance procedure.  That would be the best way

25 to go.

1  Q.   And did Employee Relations -- was it your job duty to

2  follow-up on grievances that had not -- or, I'm sorry -- on

3  complaints from unions or members that had not followed the

4  grievance procedure?

5  A.   It depends on the -- well, there's a lot of things that

6  come through, and, you know, the grievance procedure is

7  negotiated, so if it's formally done, we have timelines that we

8  need to meet, so, you know, we would follow those.  Those would

9  be our priority.  Anything else, you know, it could be the

10 department could reach out -- I mean, there's a lot of things

11 that we do to help support the departments, so I don't even

12 know how to -- it's nothing ever is totally dead, but it's just

13 a matter of the union also has an obligation to follow-up too.

14 It's not just, you know, Employee Relations or Management need

15 to follow-up all the time.  It's mutual, that's the process.

16 Q.   So where a union submitted a complaint that was not

17 formally filed, it was your responsibility to follow-up on that

18 even though it was not formally filed or did not follow the

19 grievance procedure?

20 A.   Well, I followed up just informally with the process so

21 that they would actually have the means to, you know, have it

22 addressed.  You know, they chose to take that action, great.

23 You know, either way, at least we've informed them.  But you

24 know, we're there to -- we have a process we negotiated, we

25 agreed to.  You know, I can't remember all of Oakland

1  processes, it's been a while, so we always refer people back to

2  the process.

3  **Q.**   So there was a procedure to follow if you wanted to file a

4  grievance?

5  **A.**   Correct.

6  **Q.**   Okay.  And this June 26th email from Mr. Keffer did not

7  follow that procedure?

8  **A.**   I think he didn't fill out the form appropriately, and we

9  couldn't identify like, you know, I think in the grievance

10 procedure, and I don't have the contract, they may have some

11 requirements that they have to meet even for a class action.

12 So, you know, again, I'm -- I don't remember any of this.

13 **Q.**   But I refreshed your recollection?

14 **A.**   Some of it, yeah.

15 **Q.**   Okay.  So just a few more questions.

16     Ms. Anderson, did you ever see or hear Ms. Preston

17 instigate unions to file a grievance?

18 **A.**   No.

19 **Q.**   Did you ever tell Ms. Santana that Preston -- that

20 Ms. Preston was keeping you on as a temporary employee to

21 control or manipulate you?

22 **A.**   No.

23 **Q.**   Did you ever complain to Scott Johnson about Ms. Preston?

24 **A.**   No.

25 **Q.**   Did you complain to anyone at the City of Oakland about

1    Ms. Preston?

2    **A.**    I never complained about her.  I shared concerns.

3    **Q.**    And what were those concerns?

4    **A.**    Just things I probably didn't agree with in the work, but

5    that's natural.

6    **Q.**    So work-related disagreements?

7    **A.**    Yeah.

8    **Q.**    Okay.  And did you conduct investigations for Employee

9    Relations?

10   **A.**    We help departments with their investigations in the

11   times -- yeah.

12   **Q.**    It's not a trick question.  And did Ms. Preston supervise

13   those investigations?

14   **A.**    I don't recall any investigations she had supervised.

15   **Q.**    Did you report to her about employee issues at departments

16   that you were dealing with?

17   **A.**    Yes.  She knows every -- she -- yeah, that's why we have a

18   tracking sheet.  She's made aware, yeah.

19   **Q.**    So did you investigate any employee misconduct at City of

20   Oakland departments?

21   **A.**    I couldn't remember.  I wouldn't remember if I did.  I

22   don't think so.  Well, yeah, I would, because they're

23   disciplinaries, so yeah.

24   **Q.**    And those disciplinary issues, did you report to

25   Ms. Preston about how you were handling those disciplinary

1   issues?

2   **A.**    Yeah, because they're all in -- anything I'm doing, we let

3   her know.  She was our supervisor.

4   **Q.**    Did Ms. Santana ever tell you to stop reporting these

5   employee misconduct issues to Ms. Preston?

6   **A.**    No.

7   **Q.**    From the entire tenure of your time there, Ms. Santana

8   never told you that?

9   **A.**    No, I've talked to her three times total probably in my

10  whole time there.

11  **Q.**    I have one last question.  Did Ms. Preston make sure you

12  got a pay increase that you were scheduled to receive?

13              **MR. LAFAYETTE:**  Objection, relevancy.

14              **THE COURT:**  Sustained.  Cross-examine.

15              **MR. LAFAYETTE:**  Yes, Your Honor.

16                      **CROSS-EXAMINATION**

17  BY MR. LAFAYETTE:

18  **Q.**    Good afternoon, ma'am.

19  **A.**    Good afternoon.

20  **Q.**    How are you?

21  **A.**    I'm good.  How are you?

22  **Q.**    I'm good.  Thank you.

23      Taking you back to about May 2013, if I can.  As of

24  May 2013, how long had you been working at the city?

25  **A.**    Two months.

1  Q.   Two months.  And when you came to work at City of Oakland,

2  did you start out in the Labor Relations Unit?

3  A.   Yes.

4  Q.   And that was working with Ms. Preston?

5  A.   Yes.

6  Q.   And was Ms. Gist Skinner there?

7  A.   Yes.

8  Q.   And what was her position?

9  A.   She was also -- she was a Principal HR Analyst for Labor

10 Relations.

11 Q.   And were you hired to back up -- to come in behind her as

12 she left to go to the Fire Department?

13 A.   I think I was.  That was a little confusing for a while.

14 Q.   Okay.  And so --

15 A.   And she -- yeah.

16 Q.   I'm sorry.  Go ahead.

17 A.   Yeah, I think I was.  I wasn't sure for her or for Ian or

18 for somebody else.  Oh, no, maybe it wasn't for her.  I think

19 someone was on medical leave.  Someone was on medical leave.

20 Q.   And then we get to -- and so when you were in the

21 department, did the department have weekly meetings?

22 A.   Yes.

23 Q.   And these weekly meetings, what would be covered at the

24 weekly meetings?

25 A.   Current cases, current appeals, I think they were

1  primarily preparing also for bargaining or already in

2  bargaining at that time.

3  Q.   Would new items come up?  If something new was coming up,

4  would it be brought up at the weekly meeting?

5  A.   Yeah.

6  Q.   And so was this a mechanism for everybody in the

7  department to get a sense of what everybody else was working

8  on?

9  A.   Yes.

10  Q.   Was this also a mechanism for Ms. Preston to get an

11  understanding of what everybody was working on?

12  A.   Yes.

13  Q.   Okay.  Now, was Ms. Preston one of those supervisors who

14  wanted to make sure that she understood everything that was

15  happening?

16  A.   Yeah, I would think so.  She wanted to know what was

17  happening.

18  Q.   Okay.  So now, when you -- when Ms. Gist Skinner left, did

19  you get responsibilities for Local 55 Fire Department?

20  A.   I did.

21  Q.   Now, were there any units -- any issues to bargain with

22  Local 55 other than this Paramedic Program?

23  A.   No.

24  Q.   That was it?

25  A.   That's all I was involved with.

---

1   Q.   Okay.  And so when you got it, when was it about that you

2   first learned that there was some type of an issue with the

3   Paramedic Program?

4   A.   I know it was in June.

5   Q.   It was in June, so --

6             MS. MEHTA:  Objection.  What is "it"?

7             THE COURT:  Overruled.

8   BY MR. LAFAYETTE:

9   Q.   And was it brought to your attention by Ms. Gist Skinner?

10  A.   About the paramedics?

11  Q.   Yes.

12  A.   Yes.

13  Q.   And did she send it to you by way of an email?

14  A.   I think she called me first.

15  Q.   Okay.  I'd like for you -- there's a black binder up

16  there.  It's probably Volume 1 right in front of you there.  Do

17  you see it there?  Do you need any help?

18      Okay.  I'd like for you to look at tab 1V, as in Victor.

19  Is Exhibit 1V an email that you received from Trinette Gist

20  Skinner?

21  A.   Yes.

22  Q.   Is that on or about September 20, 2013?

23  A.   Did you say September or June?

24  Q.   I'm sorry.  June 20, 2013.

25  A.   Yes.

1  Q.   And is it related to the Paramedic Support Program, PSP?

2  A.   Yes.

3  Q.   And is that an email where she's communicating to you what

4  the status is with regard to Local 55 and the MOU regarding the

5  Paramedic Support Program?

6  A.   Yes.

7          MR. LAFAYETTE:   Your Honor, I'd like to move this

8  document into evidence.

9          MS. MEHTA:   No objections.

10         THE COURT:   Exhibit 1, Victor, is admitted into

11 evidence.

12    (Trial Exhibit 1V received in evidence)

13         THE COURT:   You may proceed.

14 BY MR. LAFAYETTE:

15 Q.   Now, with regard to Exhibit 1, Victor, the next to the

16 last paragraph here, you write:

17     "Also, given the impending program end date, in light of

18 negotiations and budget workloads, Local 55 was open to

19 extending the PSP for a brief period (30 days).  If this is to

20 occur, we will need a side letter."

21     You received this email from Ms. Gist Skinner on or about

22 June 20th; correct?

23 A.   Yes.

24 Q.   Okay.  Now, did you know what a side letter was at the

25 time you received this?

1  **A.**   I do know what a side letter is.

2  **Q.**   Okay.  Tell us what it is.

3  **A.**   It's essentially -- it's an agreement that you would

4  attach to the primary Collective Bargaining Agreement.

5  **Q.**   All right.  So now, when she wrote this to you, is this

6  the email that you got that sort of framed whatever the issue

7  was as it related to Local 55?

8  **A.**   Yes.

9  **Q.**   So when you were talking about you communicated with

10 Ms. Preston about the issues related to Local 55, are the

11 issues that you spoke about with Ms. Preston the issues that's

12 framed in Exhibit 1V?

13 **A.**   Yes.

14 **Q.**   All right.  And so as far as you know, Ms. Preston was

15 aware of the issues set forth in 1V on or about the time that

16 you got this email?

17 **A.**   Yes, because I had mentioned to her I got this email from

18 Trinette, and that Trinette had called me about it, and that it

19 was kind of frustrating, because I never saw it on any of her

20 case review work.

21 **Q.**   That's -- so what had happened is you had looked at what

22 Trinette had been working on before she left, and you didn't

23 see this issue, and now the issue has come up, and she's also

24 asking for a side letter; right?

25 **A.**   Correct.

1  **Q.**   Okay.  So after that happens, did you respond back to

2  Trinette Gist Skinner?

3  **A.**   I don't remember.

4  **Q.**   Take a look at the next document, which is Exhibit 1X.

5       Do you see that?

6  **A.**   Yes.

7             **THE COURT:**  Actually, the next document is 1W.

8             **MR. LAFAYETTE:**  You're right, Your Honor.  I'm asking

9  her to look at 1X though.  I'm sorry.

10            **THE WITNESS:**  Okay.

11 **BY MR. LAFAYETTE:**

12 **Q.**   Is that an email that's dated from you June 24th, 2014?

13 **A.**   There's nothing in 1X.  There's only 1W.

14 **Q.**   You don't have a 1X tab?

15 **A.**   I do, but there's nothing behind 1X.

16                     (pause in proceedings.)

17 **Q.**   So while he's doing that, your department, were you guys

18 the specialists with regard to bargaining and MOUs?

19 **A.**   The department had the authorization through the manager.

20 The department had the authorization.

21 **Q.**   The department, your department had?

22 **A.**   Right.  Through the manager, yes.

23            **MR. LAFAYETTE:**  Your Honor, can I approach the

24 witness?

25 **Q.**   Here's a copy of 1X.

1   A.   Okay.

2   Q.   Is 1X a copy of an email that you sent to Ms. Gist Skinner

3   on June 24, 2013?

4   A.   Yes.

5   Q.   And is it a document where you transmitted a side letter?

6   A.   Yes.

7        **MR. LAFAYETTE:**  I'd like to move Exhibit 1X into

8   evidence, Your Honor.

9        **MS. MEHTA:**  No objection.

10        **THE COURT:**  1X is admitted.

11       (Trial Exhibit 1X received in evidence)

12   **BY MR. LAFAYETTE:**

13   Q.   So with regard to Exhibit 1X, you write:

14        "Happy Monday.  Here is a draft side letter to allow the

15   parties to extend the PSP Program until June 30 in order to be

16   able to move to have time to meet and confer."

17        Did you write that?

18   A.   Yes.

19   Q.   And did you prepare the side letter that's attached?

20   A.   Yes.

21   Q.   Okay.  Now, side letters, are there copies of side letters

22   in the files over at the Labor Department, the Labor Relations

23   Department?

24   A.   Yes.

25   Q.   And did you just pull up one of the side letters that's

1  used as an example over there?

2  **A.**   More than likely.

3  **Q.**   All right.  And so in the scheme of things, the Fire

4  Department fights fires.  Labor is supposed to provide advice

5  to the Fire Department on how to proceed; would that be

6  accurate?

7  **A.**   On fighting fires?

8  **Q.**   No.  How to proceed with MOUs in the union.

9  **A.**   Yeah, we advise.

10 **Q.**   Okay.  You advise.  Now, okay, so you sent this over, and

11 you had already alerted Ms. Preston that this was an issue;

12 okay?  So would the next thing be that there took place a

13 meeting on June 28, 2013 to actually sign and execute this

14 document?

15 **A.**   So yes, we did meet on June 28th to sign this document.

16 **Q.**   Okay.  And just to be clear, if we go back to 1X, can we

17 take a look at the last page of 1X, which is Bates stamped

18 1023?  That's the side letter that you drafted and sent over to

19 the Fire Department; correct?

20 **A.**   Yes.

21 **Q.**   And that's the letter that you were indicating was an

22 appropriate letter to sign; right?

23 **A.**   Yes.

24 **Q.**   And in that letter it has your signature -- a block for

25 your signature "Winnie Anderson" at the very bottom, doesn't

1  it?

2  A.   Yes.

3  Q.   So you prepared the side letter for your signature, for

4  Ms. Gist Skinner's signature, Mark Hoffman's signature, and

5  Police Fire Chief Reed's signature; correct?

6  A.   Yes.

7  Q.   Now, as of the date that you prepared this document, had

8  you ever met with Chief Reed?

9  A.   I met her before, but not on this topic.

10  Q.   You had never met her on this topic?

11  A.   No.

12  Q.   Okay.  So the only person that you communicated with at

13  the Fire Department on this topic was Ms. Gist Skinner; right?

14  A.   Correct.

15  Q.   And Ms. Gist Skinner had been a person who had previously,

16  up until recently, been under the supervision of Ms. Preston?

17  A.   Yes.

18  Q.   Now, did you know how long Chief Reed had actually been

19  with the City?

20  A.   Not long, not real sure.

21  Q.   Not long.  Okay.  So now, so after you sent that over, was

22  there a meeting held where this document was executed?

23  A.   Yes.

24  Q.   Were you present?

25  A.   Yes.

1   Q.   Was Ms. Gist Skinner present?

2   A.   Yes.

3   Q.   Was Chief Reed there?

4   A.   I don't remember.

5   Q.   Okay.  But there were union people there; right?

6   A.   Yes.

7   Q.   Okay.  And so, but you don't have a recollection of Chief

8   Reed being in that room, did you?

9   A.   No.

10  Q.   All right.  And so do you even have an idea of how Chief

11  Reed's signature wound up on that document?

12  A.   Yeah, I do.

13  Q.   After everybody else signed it, it was presented to her,

14  wasn't it?

15  A.   Yeah, Trinette gathered signatures.

16  Q.   And so at no point in time did Chief Reed ever force you

17  to sign your signature on that document, did she?

18  A.   No.

19  Q.   And you never told anyone that Chief Reed forced you to

20  sign your name on that document, did you?

21  A.   No.

22  Q.   So now, after you did that, did you do the next thing that

23  you thought was appropriate to do, which was to proceed to

24  discuss going forward with the negotiations in that 30-day

25  window?

---

1    **A.**    Yes.

2    **Q.**    And when you did that, did you include Budget in that

3    discussion?

4    **A.**    Yes.

5    **Q.**    And who was that?

6    **A.**    Donna Hom.

7    **Q.**    And did you include the Fire Department in that

8    discussion?

9    **A.**    Yes.

10   **Q.**    And did you include the Union in those discussions?

11   **A.**    Yes.

12   **Q.**    In your mind, were you guys at that point bargaining?

13   **A.**    We may have been.

14   **Q.**    Now, before you sat down and started doing that

15   bargaining, did you tell Ms. Preston that you were going to be

16   sitting down with the union?

17   **A.**    Yes, I did.

18   **Q.**    So Ms. Preston was fully aware that on July 2nd, you, the

19   Union, the Fire Department would all be sitting down in a room

20   bargaining; right?

21   **A.**    She knew we were having a meeting.  The gist of the

22   meeting may not have been clear, because there was no intent

23   to -- from give -- essentially change the terms.

24   **Q.**    You understood, though, that you were going to talk about

25   a request to modify the way that payments were made.  There was

1  something about premium pay; right?

2  **A.**   Right.  So I knew that the Union was going to ask for a

3  higher percentage.  The only thing that we were interested in

4  discussing was extending the program until the MOU had ended

5  until the expiration date.  That was -- there was no other

6  conversation, because Trinette had told me it's not new monies,

7  it's current monies that's already been budgeted and allocated.

8  **Q.**   Let's -- I'm sorry.

9  **A.**   So that's the difference in a sense of they weren't trying

10  to get more money, they were trying -- the Department was not

11  intending to give more money.  They wanted to keep it at

12  3 percent, so therefore there was no Council authorization

13  needed.

14  **Q.**   So I understood that.  I'll deviate from where I was just

15  to sort of work with this; okay?

16      Whatever was going to happen that the Union was asking for

17  wasn't going to mean that the City was going to have to pay

18  more dollars than what it had already been paying each month;

19  would that be accurate?

20  **A.**   Yeah.

21  **Q.**   What was going to happen is there were going to be fewer

22  paramedics and more money distributed to the fewer paramedics;

23  would that be accurate?

24  **A.**   That may have been a proposal.

25  **Q.**   Okay.  That may have been the proposal, but the bottom

 1  line is there were -- total dollars paid by the City would

 2  remain constant, the allocation of those dollars would differ?

 3  A.   Correct.

 4  Q.   And just so that I understand it, because you believed

 5  that the total dollars paid by the City wasn't going to change,

 6  you didn't believe that you needed Council approval at the time

 7  you did this?

 8  A.   I had questioned it, but I was informed that I didn't --

 9  we didn't need it.

10  Q.   Okay.  Now, let's keep going here.

11       1Z, why don't you take a look at Exhibit 1Z.  Now, 1Z

12  starts out with an email at the bottom of the page from Zach

13  Unger dated June 24; do you see that?  Just look -- I'm sorry.

14  Just look at the first page, and there's a email from Zach

15  Unger?

16  A.   Yeah.

17  Q.   Now, is this an email string that you participated in that

18  ends with an email from Ms. Gist Skinner on June 25, 2013?

19  A.   Yeah, I was cc'd on it.

20  Q.   So now, and the top email is from Ms. Gist Skinner to you;

21  correct?

22  A.   Correct.

23  Q.   And that's in response to an email that you wrote on

24  June 25 at 8:51 a.m.; right?

25  A.   Correct.

1   Q.   Okay.  Slow down.  Is this a true and correct copy of this

2   email string?

3   A.   I suppose so.

4            MR. LAFAYETTE:   I would like to move this into

5   evidence, Your Honor.

6            MS. MEHTA:   No objection.

7            THE COURT:   Exhibit 1Z is admitted into evidence.

8       (Trial Exhibit 1Z received in evidence)

9            THE COURT:   Proceed.

10  BY MR. LAFAYETTE:

11  Q.   Now, you write -- first, Mr. Unger writes:

12       "Local 55 would love to meet at 9:00 on Friday the 28th."

13  That's on the second page.  "Let's touch base on Thursday to

14  make sure that Budget has finished its work.  If we're still

15  unable to discuss money then, we feel that there is not much

16  reason to meet."

17       That's what Zach wrote; right?

18  A.   Um-hm.

19  Q.   So when Zach writes that, he's basically talking about

20  bargaining, isn't he?

21  A.   It sounds like it.

22  Q.   And so when you get Zach's email and your email, second

23  one up, you write to Ms. Gist Skinner:

24       "Good morning.  How are you?  I'm curious about the

25  meeting on Friday.  I thought we were meeting to have folks

1  sign the side letter and hold a discussion at a later date.  Or

2  is Budget and Fire ready to discuss the PSP Program at length

3  that morning?"

4       What you're saying here is that you thought you were just

5  going to sign the letter, and now you want to know if Budget

6  and Fire is prepared to start bargaining; would that be

7  accurate?

8  **A.**   Right, because based on what Zach is saying in the back

9  and forth, it kind of piqued my -- it changed the conversation

10 that she and I had about why we were doing this.

11 **Q.**   And Ms. Skinner writes back to you at the top of the page;

12 right?

13 **A.**   Correct.

14 **Q.**   And she says, "Per our conversation, we would like to sign

15 the side letter and then begin good faith discussion on

16 June 28th, 2013."

17      Good faith discussions, is that another way of saying

18 "bargain"?

19 **A.**   Yes.

20 **Q.**   So what you understood from Ms. Gist Skinner's email of

21 June 25, that three days later you would sign this document,

22 and you would then commence to participate in negotiations;

23 accurate?

24 **A.**   Yes.

25 **Q.**   And so when you met on July 2nd, you understood that you

1  were then bargaining; right?

2  A.    Yes.

3  Q.    And Ms. Preston understood that as well; right?

4          MS. MEHTA:   Objection, speculation.   Ms. Anderson

5  doesn't know what Ms. Preston was thinking.

6          THE COURT:   Sustained.

7  BY MR. LAFAYETTE:

8  Q.    You shared what had happened with Ms. Preston, didn't you?

9  A.    I did share.

10  Q.    And you advised her of what all had transpired, and what

11  you were going to be doing on the 2nd; right?

12  A.    Yes.

13  Q.    So from your communications, Ms. Preston had been aware a

14  TA had been signed, and that bargaining was about to commence;

15  correct?

16  A.    What Ms. Preston was aware was that we extended the

17  conversation for 30 days, and that we were going to meet again

18  on July 2nd.

19  Q.    And the only way you could extend the conversation for 30

20  days was by a TA; right?

21  A.    There was an agreement, yes.

22  Q.    Thank you.

23  A.    But she didn't see the agreement.

24  Q.    She may not have seen it, but she was aware; right?

25  A.    I'm going to say yes.

1  **Q.**   Thank you.  So now, at any time between June 28th and

2  July 2nd, did Ms. Preston come to you and say "Stop, don't do

3  anything"?

4  **A.**   No.

5  **Q.**   So you proceeded to have a meeting on July 2nd with

6  Ms. Hom, the Union, and Ms. Gist Skinner; correct?

7  **A.**   Yes.

8  **Q.**   And was it Ms. Gist -- was it Ms. Hom -- what was her, she

9  was the budget director?

10  **A.**   Yes.

11  **Q.**   So Ms. Hom gets up to leave, and she whispers to you

12  "Don't agree to anything"?

13  **A.**   Yes.

14  **Q.**   And then after she does that to you, she leaves; right?

15  **A.**   Correct.

16  **Q.**   And it's your understanding she then ran into or spoke to

17  Ms. Preston; right?

18  **A.**   Yes.

19  **Q.**   Now, as of this moment in time, were you aware that others

20  in the administration had been complaining about Ms. Preston

21  for not being more on top of bargaining sessions with unions?

22         **MS. MEHTA:**  Objection, speculation.

23         **THE COURT:**  Sustained.  And when you say, "as of this

24  moment in time," are you talking about now or then?

25         **MR. LAFAYETTE:**  Oh, I'm sorry.

1          THE COURT:   Clarify.

2    BY MR. LAFAYETTE:

3    Q.   As of the 2nd of July, 2013, were you aware to what extent

4    others in the administration had been complaining about and to

5    Ms. Preston concerning her lack of involvement in bargaining?

6    A.   No, I didn't hear complaints.

7    Q.   Okay.  So now, after Ms. Hom leaves, did you get a text

8    message?

9    A.   I believe I got a text message from Sonia and probably

10   Lawanna, and calls, because I didn't look at my phone until --

11   Q.   And in this text message, did Ms. Preston direct you to

12   stop what you were doing?

13   A.   I don't recall.  I know I read an email, a text message

14   telling me to come to her office and to excuse myself.

15   Q.   And you went?

16   A.   Yes.

17   Q.   And what happened?

18   A.   I excused myself from the meeting and went to see Lawanna,

19   Ms. Preston, and she shared with me that we didn't have

20   authorization to negotiate, and to stop the meeting, and so I

21   went back to stop it, and informed 55 that we didn't have

22   authorization to continue this, and that was it.

23   Q.   How did the union take that?

24   A.   They weren't happy.

25   Q.   Now, when she said you didn't have authorization, did she

1  say you don't have authorization to bargain, or did she say you

2  didn't have authorization to sign the TA?

3  **A.**   That was after the meeting was concluded completely.

4  **Q.**   So what she said to you is you didn't have authorization

5  to bargain; right?

6  **A.**   After the meeting.

7  **Q.**   Okay.  At some point did she also say to you that you

8  should not have signed the TA?

9  **A.**   Yes.  After we concluded the meeting with 55, yes, when we

10 got into more detail about what was going on.

11 **Q.**   I want to ask you, okay, when she says this to you, did

12 she say to you that she should have signed the TA as opposed to

13 you?

14 **A.**   She may have, that her signature needs to be on.

15 **Q.**   And so was it your understanding that her complaint about

16 the TA to you was that you signed it as opposed to her, the

17 initial complaint that she had?

18         **MS. MEHTA:**  Objection, speculation.

19         **THE COURT:**  Overruled.  You can answer it if you

20 recall.

21         **THE WITNESS:**  I don't think that was most of the

22 conversation -- there was more conversation than that.

23 **BY MR. LAFAYETTE:**

24 **Q.**   I will get there.  I'm just asking you about that piece;

25 okay?

1      Initially, when she said the thing about signing it, was

2  it that she said she should sign it as opposed to you?

3  **A.**   Yeah, she's supposed to sign it.

4  **Q.**   Okay.  So after this happens, did you write an email to

5  the fire chief?

6  **A.**   I'm thinking I did.

7  **Q.**   Take a look at Exhibit 2F, as in Frank.  Did you write

8  that email?

9  **A.**   Yes.

10  **Q.**   Did anybody else look at that email before you wrote it,

11  before you pushed the "send" button?

12  **A.**   I don't think so.

13  **Q.**   Ms. Preston didn't look at it?

14  **A.**   No, she was cc'd on it, so she knew what I wrote.

15  **Q.**   Now, take a look at Exhibit 2G.  Did you get that email

16  from the chief?

17  **A.**   Yes.

18  **Q.**   Was that in response to an email that you had sent to the

19  chief?

20  **A.**   Yes.

21          **MR. LAFAYETTE:**  I would like to move Exhibit 2G into

22  evidence, Your Honor.

23          **THE COURT:**  And 2F or just 2G?

24          **MR. LAFAYETTE:**  Just 2G.  It embraces both of them,

25  that's why I did it that way.

1              **THE COURT:**  Any objection?

2              **MS. MEHTA:**  No.

3              **THE COURT:**  Exhibit 2G is admitted.

4      (Trial Exhibit 2G received in evidence)

5  **BY MR. LAFAYETTE:**

6  **Q.**  Let's take a look at this first paragraph up here.

7      Chief writes:  "I am very confused by the email.  It is my

8  understanding EOPD" -- now EOPD, is that your department?

9  **A.**   EOPD is not my department.  ER is my department.

10  **Q.**   What is EOPD?

11  **A.**   EOPD is another department that's under Lawanna.

12  **Q.**   Another department that's under Ms. Preston, right, was

13  the one to draw up the agreement to extend the PSP Program, and

14  EOPD was the one to present it at the meeting on June 28th?

15      Now, was the department under Lawanna the department that

16  drew up the letter?

17  **A.**   Yes.

18  **Q.**   Was it a department under Lawanna that actually presented

19  the letter at the meeting on June 28th?

20  **A.**   Yes.

21  **Q.**   "It was during this same meeting where the City side of

22  the table finalized and clarified the operational issues you

23  are referring to."

24      So now, would it be accurate that no agreements were

25  reached on July 2nd?

1  **A.**    Correct.

2  **Q.**    So now, after that happened, did you continue to have

3  responsibilities with regard to this side letter or this

4  program with the Fire Department?

5  **A.**    No.

6  **Q.**    You did not?

7  **A.**    No.

8  **Q.**    What happened to you on this project?

9  **A.**    I was taken off of it.

10  **Q.**    Who took you off?

11  **A.**    Ms. Preston.

12  **Q.**    Okay.  Can you take a look at Exhibit 2J for me, please?

13  Is Exhibit 2J a letter that you wrote on July 5, 2013?

14  **A.**    Yes.

15  **Q.**    Is that in response to the chief's letter on July 3rd,

16  2013?

17  **A.**    Yes.

18  **Q.**    And did you say in your email:

19       "Because such an agreement would mean opening the MOU for

20  negotiations, the Department should have been advised to get

21  the approval of the City Administrator"?

22  **A.**    And/or the Employee Relations Director, yeah.

23  **Q.**    Okay.  So now, did Ms. Preston get an opportunity to

24  review this email before it was sent out?

25  **A.**    Probably not.  I cc'd her.

1  Q.   Okay.  So when you say, "the Department should have been

2  advised," you mean the Fire Department; right?

3  A.   Correct.

4  Q.   And you're saying that someone should have been advising

5  them.  Which department was it that you're saying should have

6  been advising the Fire Department?

7  A.   Employee relations or the City Administrator's Office.

8  Q.   All right.  Employee Relations meaning Ms. Preston's

9  office; right?

10 A.   Yes.

11 Q.   Now, do you know if the -- is it your understanding that

12 the City Council ultimately met, extended this thing out for

13 the 30 days?

14 A.   I think the best of my recollection, yes.

15 Q.   I'll just ask you this.  Was it Ms. Preston who resumed

16 primary responsibility for this issue after you were removed?

17 A.   Yes.

18 Q.   Do you know if the issue was finally resolved within the

19 new 30-day time limit?

20 A.   I can't remember on what time frame it was resolved in.

21 Q.   Do you know if the Union was complaining at the end of

22 July and saying that it's still not done, and we're going to

23 have to extend this thing out even further?

24 A.   I don't remember.  I wasn't a part of this anymore.

25 Q.   All right.  Thank you.  So now, I want to direct your

1  attention to something else here.

2              THE COURT:  Did you intend to move 2J into evidence?

3              MR. LAFAYETTE:  Not at this point, Your Honor.

4              THE COURT:  All right.  Proceed.

5  BY MR. LAFAYETTE:

6  Q.   I'd like for you to take a look at Exhibit 2I.  And I'll

7  represent to the Court and the jury it's the same as

8  Exhibit 20, which is in evidence.

9       Do you have it in front of you?

10 A.   (witness examines document).

11 Q.   Did Ms. Preston deal with you with signing the MOU?

12 A.   Did she deal with me?

13 Q.   Yeah.  Did she discipline you or anything like that?

14 A.   No.

15 Q.   All right.  So now let's go to June 26, and I want you to

16 take a look at Exhibit 2C.

17      Is Exhibit 2C an email you received from Joe Keffer on

18 Wednesday, June 28, 2013?

19 A.   Yes.

20 Q.   In this email, is Mr. Keffer sending to you, Ms. Lara, or

21 Ms. Preston a grievance?

22 A.   He did.

23 Q.   Take a look at the two pages here and tell me if this is a

24 true and correct copy of his email and a true and correct copy

25 of the grievance.

1  A.   Yes.

2          MR. LAFAYETTE:   I'd like to move Exhibit 2C into

3  evidence, Your Honor.

4          MS. MEHTA:   Objection, incomplete.

5          THE COURT:   What is missing?

6          MS. MEHTA:   It's missing Ms. Anderson's response.

7          THE COURT:   Is that elsewhere in the record?

8          MR. LAFAYETTE:   It's a separate exhibit.  This is a

9  complete exhibit.

10          THE COURT:   Which is the other part?

11          MR. LAFAYETTE:   The other exhibit is Exhibit 2A.

12  I'll get to that in a second.

13          THE COURT:   All right.  Exhibit 2C is admitted with

14  potential for 2A being admitted later.

15      (Trial Exhibit 2C received in evidence)

16  BY MR. LAFAYETTE:

17  Q.   Okay.  Now, in this email, just this piece here

18  (indicating), he says, "Attached, please find a grievance filed

19  on behalf of TPTs;" correct?

20  A.   Yes.

21  Q.   He didn't say *I want to file a grievance*, he said *This is

22  a grievance*, didn't he?

23  A.   Yes.

24  Q.   So there was nothing tentative about this document at all,

25  was there?

1    A.   No.

2    Q.   You treated this like it was a properly-filed grievance,

3    didn't you?

4    A.   No.

5    Q.   Well, let's look at it and see.  On the back side of this

6    he signed it, didn't he?

7    A.   He did.

8    Q.   On the grievance on the second page he signed it

9    June 26th, 2013; right?

10   A.   Yes.

11   Q.   And he says that it relates specifically to, and it's the

12   language the "Relief requested" right there (indicating), this

13   paragraph right there (indicating).

14        "Requested solution:  Make whole remedy, including but not

15   necessarily limited to:  Immediately start to collect dues from

16   employees that have not become members of the Union or

17   submitted an application for membership within the time

18   allotted in the contract; cease and desist from future

19   violations of contract provisions; and pay Union for all dues

20   and agency fees that have not been collected or submitted to

21   the union."

22        Did I read that accurately?

23   A.   Yes.

24   Q.   Now, did you and Ms. Preston initiate an investigation

25   into this grievance?

1  **A.**   I don't recall at that time if we did.

2  **Q.**   Did you contact payroll to say, *Payroll, we need to know*

3  *what's going on with this grievance*?

4  **A.**   No, not that I recall.

5  **Q.**   Did you call up Ms. Katano Kasaine and say, *Hey, you had a*

6  *payroll, I want to know what you're doing and how you're doing*

7  *it with regard to collections of these dues*?

8  **A.**   I don't remember if I did that.

9  **Q.**   Let's take a look at Exhibit 2A.  Is Exhibit 2A an email

10 dated June 26, 20 -- June 26th, 2013 at 9:07 a.m.?

11 **A.**   Um-hm.

12 **Q.**   Yes?

13 **A.**   Yes.

14 **Q.**   And that's approximately two hours after the email came in

15 to Ms. Preston; isn't it?

16 **A.**   Yes.

17 **Q.**   And Ms. Preston is telling you exactly what to do to

18 handle this grievance, isn't she?

19 **A.**   Yes.

20 **Q.**   And she is not telling you to conduct an investigation, is

21 she?

22 **A.**   No.

23       **MR. LAFAYETTE:**  I'd like to -- and is that a true and

24 correct copy of her email to you and your email back to her?

25       **THE WITNESS:**  Yes.

1          MR. LAFAYETTE:  I'd like to move Exhibit 2A into

2   evidence.

3          MS. MEHTA:  No objection.

4          THE COURT:  Exhibit 2A is admitted.

5      (Trial Exhibit 2A received in evidence)

6   BY MR. LAFAYETTE:

7   Q.   What she told you to do:  "Your response should state the

8   Union is required to state what section of the MOU was

9   violated.  The grievance does not contain any factual

10  information to verify.  When, where, who, et cetera;" correct?

11  A.   Yes.

12  Q.   And actually, Ms. Preston was wrong, wasn't she?

13  A.   Only on one matter that he did state the MOU section.

14  Q.   He did, didn't he?  And so when she said he had not, you

15  wrote back in your top email, and you said, "Joe did provide

16  the MOU sections in the attachment.  The only thing missing in

17  this grievance is identifying grievance by name to the extent

18  reasonably known as required in the MOU, 1021 MOU."

19      Did I read that accurately?

20  A.   Yes.

21  Q.   What do you mean by 1021 MOU?

22  A.   So we refer to SEIU Local 1021 as "1021" instead of

23  writing SEIU Local 1021.

24  Q.   And you quoted some language here.  You said, "To the

25  extent reasonably known;" did I say that right?

1  A.   Yes.

2  Q.   And that's because to the extent the grievant knows the

3  identity of the person, you're telling -- you're saying to the

4  extent that that name is known, they need to put it in a

5  grievance; right?

6  A.   Yes.

7  Q.   And that comes out of the bargaining agreement, doesn't

8  it?

9  A.   Yes.

10  Q.   And so you didn't make that up, did you?

11  A.   No.

12  Q.   So now, you then write:  "I initially would want to inform

13  Joe that he needs to resolve the following steps of the

14  grievance procedure and meet with payroll in regards to dues

15  deduction and remedy it there;" right?

16  A.   Yes.

17  Q.   So you're basically telling the Union, one, if there's a

18  person's name that's associated with that, put it in there;

19  right?

20  A.   Yes.

21  Q.   And then you're saying to the union, and to the extent

22  that this is something that can be resolved at the department

23  level, take it there and negotiate with them or talk with them

24  and see if it could get resolved; right?

25  A.   Yes.

1  Q.   And that would have been appropriate, wouldn't it?

2  A.   Yes.

3  Q.   So now, August 6 --

4        THE COURT:  Mr. Lafayette, let me pause there.  I

5  know the jury would like me to keep my eye on the clock.  How

6  much further are you planning your examination?  You've gotten

7  almost 3X times the direct examination.  What have you got in

8  mind?

9        MR. LAFAYETTE:  I probably have about 20 minutes

10 more, Your Honor, to be fair.

11       THE COURT:  Well, that's going to cause Ms. Anderson

12 to return here tomorrow, and it also will take us past when

13 we're ending, so that won't work.  So can you get it done

14 sooner than that?

15       MR. LAFAYETTE:  I will try my best.  I'll do that,

16 Your Honor.

17       THE COURT:  I'll stop you if you don't.

18       MR. LAFAYETTE:  I know you will, Your Honor.  Thank

19 you.

20 Q.   Let us proceed to August 6th; okay?

21       MS. MEHTA:  Sorry, counsel.  What was the exhibit?

22       MR. LAFAYETTE:  I haven't called it off yet.

23 Q.   Now, you sent an email.  Take a look at Exhibit 2W.  Did

24 you send Exhibit 2W to Ms. Katano on Friday August 2nd at

25 2:13 a.m.?

---

1  **A.**    Yes.

2  **Q.**    And did you tell her that topics A, "SEIU wishes to

3  discuss on August 6th if you're available"?

4  **A.**    Yes.

5  **Q.**    So you basically gave her a day's notice for a meeting;

6  right?  Four days; right?

7  **A.**    Yes.

8  **Q.**    Over a weekend?

9  **A.**    Yes.

10  **Q.**    Now, when this was originally set up, was Ms. Preston

11  supposed to go to this meeting?

12  **A.**    I don't recall.

13  **Q.**    And you told her that you wanted to sit down with her and

14  the Union to discuss three issues; right?

15  **A.**    Yes.

16  **Q.**    And you never told her that the three issues you were

17  going to discuss with the Union, with her there, that there was

18  going to be a discussion about whether or not dues had been

19  collected from these temporary part-time employees; correct?

20  **A.**    I don't think I wrote that in there.

21  **Q.**    So she was unaware, when she went into a meeting on

22  August 6th, that this issue that had been raised in a grievance

23  on June 26th might actually come up in a meeting on August 6th,

24  was she?

25  **A.**    I believe a phone conversation was had with her to further

1    clarify what the concerns were, but no, not in writing.

2    **Q.**   Did anybody ever tell her that a Union grievance had been

3    filed on June 26th?

4    **A.**   I don't know.

5    **Q.**   You didn't do it, did you?

6    **A.**   I did not.

7    **Q.**   And did anybody ever tell her that the Union might come

8    into this meeting on August 6th and start asking questions

9    relative to this union grievance that was filed?

10   **A.**   No.

11   **Q.**   And did you make sure that your supervisor, Ms. Preston,

12   was aware of what you were doing here?

13   **A.**   She was cc'd on the email.

14          **MR. LAFAYETTE:**  And at the top of the email chain

15   that we have here -- and I'll move this into evidence, Your

16   Honor, Exhibit 2W?

17          **THE COURT:**  Any objection?

18          **MS. MEHTA:**  No objection.

19          **THE COURT:**  2W is admitted.

20      (Trial Exhibit 2W received in evidence)

21   **BY MR. LAFAYETTE:**

22   **Q.**   At the top of the email, 2W, Ms. Preston writes back:

23      "Hello.  Please remember this is not a bargaining session,

24   this is an informational meeting only.  Sonia will also be

25   attending the meeting."

1    Up until that point in time, had Ms. Sonia Lara had any

2 involvement whatsoever with the issues raised in this document?

3 A.   Not directly.

4 Q.   Had she been negotiating or bargaining with the Union with

5 regard to these issues?

6 A.   Not at this table.

7 Q.   So that was a new development; right?

8 A.   Yes.

9 Q.   And whatever happened on that meeting on the 6th, when you

10 came back, did Ms. Preston say, "do you have notes of what

11 happened?"

12 A.   She asked if we took notes, and Sonia was there to help

13 take notes.

14 Q.   And were anybody's notes revised?

15 A.   No, not mine.

16 Q.   Not yours.  Was Ms. Lara's notes revised?

17 A.   I never saw Ms. Lara's notes.

18 Q.   You don't know?

19 A.   I don't know.

20 Q.   Now, I'd like for you to take a look at Exhibit 3E.  Do

21 you recognize Exhibit 3E?

22 A.   I've seen it before.

23 Q.   Do you recognize that as a grievance filed on September 2,

24 2013?

25 A.   That's what it says.

 1  Q.   Do you recognize that it requests the same relief that was

 2  requested in the grievance filed on June 26th?

 3  A.   It looks similar.

 4  Q.   And does it have the same deficiencies in it that you

 5  found in the grievance that was filed on June 26th?

 6  A.   Yeah, it doesn't state parties that are reasonably known.

 7  Q.   And is it subject to the same type of response that you

 8  sent on June -- to the June 26th grievance?

 9  A.   Do you want my personal opinion?

10  Q.   Is there any way not to treat it the same way?

11  A.   Well, yeah, a little bit.

12  Q.   A little bit?

13  A.   Yeah.

14  Q.   Go ahead.

15  A.   Primarily, because, you know, because they were at the

16  table, this topic was raised.  There was an agreement by

17  payroll to start taking action, but also the Union also

18  taking -- giving notification, so there was like both -- there

19  was actions on both parties.

20  Q.   Take a look at Exhibit 2Z.  Is Exhibit 2Z an email that

21  you prepared after the meeting on August 26th?

22  A.   Yes, August 6th.

23  Q.   And is that an email summarizing what you understood the

24  agreements were that were reached in that meeting that you had

25  with Katano Kasaine and the Union representatives?

ANDERSON - CROSS / LAFAYETTE

1  **A.**    Yes.

2  **Q.**    And Ms. Lara?

3  **A.**    Yes.

4  **Q.**    And is it your understanding -- is this your understanding

5  as to how everyone was to proceed forward after that meeting?

6  **A.**    Yes.

7  **Q.**    And does your email contemplate that anyone is going to

8  file a grievance again?

9  **A.**    I mean, the Union has a right to file a grievance if we're

10  not taking the actions that we've agreed to.

11  **Q.**    Did you walk away thinking that this was resolved on

12  August 6th?

13  **A.**    I sent an email making sure that we met what we were

14  supposed -- that we were doing what we were supposed to do.

15  **Q.**    And that the Union did what it was supposed to do; right?

16  **A.**    Yep.

17  **Q.**    And because there were certain parts of this that the

18  Union was supposed to do; right?

19  **A.**    Correct.

20  **Q.**    And there were certain parts that Labor Relations was

21  supposed to do; right?

22  **A.**    I don't think Labor Relations was supposed to do anything.

23  **Q.**    So let me ask you something.  When a new hire comes in,

24  there's an orientation; right?

25  **A.**    Yes.

1   Q.   When orientation takes place, different stakeholders sit

2   down with that new hire, and they explain to the new hire what

3   types of things might happen; right?

4   A.   Right.

5            MS. MEHTA:   Objection, speculation, and lack of

6   foundation.

7            THE COURT:   Sustained.   The jury will disregard the

8   response to the last question.

9   BY MR. LAFAYETTE:

10  Q.   Do you understand that what happens -- do you understand

11  that Labor Relations participates in new hires or supposed to

12  participate in new hires?

13  A.   We may have a section when their -- but I don't remember

14  if that's the case in Oakland.   It's been a while.

15  Q.   Were you aware that there were communications back in

16  April involving Deb Grant where the issue specifically raised

17  was whether or not Labor Relations is participating in the new

18  hire orientations?

19  A.   No, I have no idea about that.

20  Q.   So Union information is at the bottom of this document;

21  right?

22  A.   Yes.

23  Q.   If I want to find out what the Union's obligations are,

24  what am I supposed to look for in this document?

25  A.   In my email?

___

1  Q.   Yes.

2  A.   That they will send out a Hudson notice or a notice to

3  employees representative by SEIU for the TPTs.  The follow-up

4  was that SEIU was going to essentially assuage Katano's concern

5  about getting a lot of calls about why the dues weren't coming

6  out, and so they were going to notify their TPTs and inform

7  them that if you see these dues or these fees or dues come out,

8  don't fret, this is what it's supposed to be, and so they were

9  supposed to give us something.

10  Q.   So the union was supposed to send out something to its

11  membership alerting them that the City is now going to start

12  taking out these union dues, and that way everybody was

13  supposed to be able to go forward; correct?

14  A.   Yes.

15  Q.   Do you know if the Union ever did that?

16  A.   I don't believe they did.

17  Q.   And was that a precondition that was supposed to take

18  place for purposes of going forward?

19  A.   No.  The reality of it is payroll, Katano, was supposed to

20  have taken out the dues.  SEIU was going to send out the

21  notice, but no matter what, we still had to pay, essentially

22  withdraw, deduct the dues.

23  Q.   But Katano Kasaine had said that that's exactly what she

24  would do, wasn't it?

25           MS. MEHTA:  Objection, misstates testimony.

 1             THE COURT:  Sustained.

 2   BY MR. LAFAYETTE:

 3   Q.   Well, take a look at your document here.  In this meeting,

 4   or in meetings with you, did Katano Kasaine say that she would

 5   take these dues out?

 6   A.   Yes.

 7   Q.   She did.  Did she say that in the meeting with the Union?

 8   A.   Yes, she did say that.

 9   Q.   So now, so SEIU will send out a Hudson notice.  The City

10   will continue to provide to SEIU the current dues list that

11   they have been receiving to Patrick Wells.  The City will also

12   provide to Union a separate list of newly-hired employees or

13   specialized employees.  This list will be provided to also

14   Patty Wells pursuant to the MOU.

15        These were all things that were worked out with the Union,

16   weren't they?

17   A.   Yes.

18             MR. LAFAYETTE:  Everything in this email.  I'd like

19   to move the Exhibit 2Z into evidence, Your Honor.

20             MS. MEHTA:  No objection.

21             THE COURT:  So is "Everything in this email" a

22   question or is that --

23             MR. LAFAYETTE:  I wanted to move this into evidence,

24   the document.

25             THE COURT:  All right.  Let's stick to questions.

1    Exhibit 2Z is admitted, and we're now out of time for the

2   day.

3    (Trial Exhibit 2Z received in evidence)

4    **THE COURT:**  Ladies and gentlemen of the jury, you're

5   excused for the day, returning tomorrow at 9:00 a.m.  The

6   witness will take the stand at that time.

7    I remind you of the admonishment I've previously given to

8   you not to communicate with anyone about the case, not to do

9   any research on your own about the case, and to resolve the

10  case solely on the evidence that you hear in the courtroom.

11   When we do resume at 9:00 a.m. tomorrow, in the morning,

12  if you get here before 9:00 a.m. there could be an opportunity

13  for you to write out any questions for this witness.  That will

14  make it a little more efficient.  We won't be taking a short

15  break after she's talked for five more minutes to take your

16  questions.  So if you have occasion to write out a question, if

17  you wish to in the morning, we will start with your questions,

18  and then resume with Mr. Lafayette's questions.

19   So thank you for your continued attention, and we will see

20  you tomorrow at 9:00 a.m.

21   (Proceedings were heard out of presence of the jury:)

22   **THE COURT:**  Ms. Anderson, you may step down.  Thank

23  you.  And you are ordered to return for your testimony at

24  9:00 a.m. tomorrow.

25   **THE WITNESS:**  Okay.

 1           THE COURT:  Mr. Lafayette, do you have any intentions

 2   of recalling this witness after she concludes?

 3           MR. LAFAYETTE:  No, your Honor.

 4           THE COURT:  Good.  Because it's been -- you've gone

 5   more than two times past your pretrial estimate of how long you

 6   were planning to examine her.  There's not been a witness yet

 7   so far where either party has gone under their estimate.  And

 8   to my knowledge, and I'm -- I have no good cause so far to

 9   extend the deadlines set before trial, so if that trend

10   continues, you're collectively going to run out of time.  But

11   you are on fair notice of how much time you have, so...

12           MR. LAFAYETTE:  I had an issue, Your Honor.

13           THE COURT:  What is your issue?

14           MR. LAFAYETTE:  Yesterday, plaintiff's counsel said,

15   *Have the City Attorney here*.  We did.  We had the City Attorney

16   here this morning.  We did.  She's been sitting outside in the

17   hallway all day.

18        And in the interim, he called witnesses who were not

19   supposed to be here today.  I think that's just offensive, and

20   that's what I was trying to bring to your attention.  This

21   witness wasn't on a list until later this week.  And so when he

22   did that, that's what I stood up for, because I've got the City

23   Attorney sitting out there in the hallway, and it was just

24   inappropriate to do that.

25        I have now -- and because he said do it, and then he

1  brings Ms. Anderson in here, I also have the fire chief leave

2  Oakland and come over here for this too.  And I just need

3  someone to explain to counsel this is not the way to do this.

4  I shouldn't have to deal with this.

5     **THE COURT:**  That might have been occasion for you to

6  have a shorter examination of Ms. Anderson when you have the

7  City Attorney out in the hallway.  I was aware of that, and I

8  don't understand why you went for an hour when you could have

9  stopped in 20 minutes or called the witness later in the case.

10    So when she's here, I'll explain to her the circumstances

11  of the timing that occurred, and both parties can work with

12  each other.  There's been some accommodations in both

13  directions about people being called out of turn, and I expect

14  you to work it out.

15    The jury's time, to make this very clear, I'll repeat it,

16  is preeminent.  The time of your witnesses is secondary to the

17  time of the jury, so we're not going to take time out for

18  arguments while the jury is sitting there about who is going

19  next.

20     **MR. LAFAYETTE:**  I don't want -- I just want to make

21  sure that I don't have to deal with this again.  It's very

22  frustrating for witnesses, particularly given the traffic

23  that's out there today.

24     **THE COURT:**  It is.  It is.  And the jury has come

25  much further than any witness, so...

1      **MR. LAFAYETTE:**  I understand.

2      **THE COURT:**  So let's think about their time.  And I

3   feel some frustration too, because it's been going longer than

4   is necessary from my perspective to get through witnesses,

5   aside from your pretrial filings that says 10 minutes, 20

6   minutes, 30 minutes.  That's not been happening.  That's not

7   because their answers have been too long.  There's been too

8   many questions.

9      Mr. Siegel, anything further.

10     **MR. SIEGEL:**  Well, I just want to say that I'm

11  conscience of not having blank spots, so I'm over scheduling.

12  When we were told yesterday that Mr. Blackwell was not going to

13  be available today, I said, *well, we'll move up Winnie Anderson*

14  *who is scheduled to be the first witness tomorrow.*  So we're

15  actually a little bit ahead of the schedule, since I -- the

16  person who was scheduled for today who didn't testify was the

17  City Attorney Barbara Parker, who at least on my examination

18  will be 15 minutes.  And I didn't realize Anderson would take

19  so long, so I said bring the fire chief over again, because I

20  wanted to be sure we had enough witnesses to fill up the time.

21  And I'm not trying to cause anyone frustration or

22  embarrassment, I'm simply trying to comply with.

23     **THE COURT:**  So who is coming next?  Who is coming

24  next?

25     **MR. SIEGEL:**  Okay.  So tomorrow we're going to finish

 1  with Ms. Anderson.

 2          THE COURT:  Yes.

 3          MR. SIEGEL:  We're going to have Barbara Parker,

 4  we're going to have the Fire Chief Teresa Reed, Ms. Kasaine,

 5  who is now, according to Mr. Lafayette, not available tomorrow,

 6  so she'll have to go Thursday, we have Keffer's deposition

 7  transcript, Mayor Jean Quan, Sandre Swanson, Lamont Ewell, so

 8  hopefully that will fill tomorrow.

 9          THE COURT:  And Keffer is deposition transcript, the

10  others are live?

11          MR. SIEGEL:  Yes.  He's kind of a fill-in, so we make

12  sure, again, if there's some blank space, we can do something.

13          MR. LAFAYETTE:  The problem with that is Howard

14  Jordan, we've spoken about him.  He's supposed to be in

15  tomorrow, tomorrow morning, and that's -- and so it may be that

16  we can contact Ms. Anderson and let Mr. Jordan come in and get

17  out of here to finish up with Ms. Anderson.

18          THE COURT:  No, we're going to finish Ms. Anderson,

19  because we should be done with her imminently, and the jury is

20  already preparing questions for her.  We can do --

21          MR. LAFAYETTE:  Mr. Jordan.

22          THE COURT:  Right after that.

23          MR. LAFAYETTE:  All right.  Thank you, Your Honor.

24          MR. SIEGEL:  So we can take Jordan after Anderson,

25  and then they'll have the Fire Chief and the City Attorney.

1        **THE COURT:**  The City Attorney will be next after

2  that.  She's been waiting the longest.

3        Yes, Ms.Bee?

4        **MS. BEE:**  I'm sorry, Your Honor.  The City Attorney

5  is not available tomorrow.

6        **THE COURT:**  Well, then you're going to work that out.

7  But we'll do Mr. Jordan immediately after Ms. Anderson, and

8  then on to the others.

9        We're in recess.  See you tomorrow.  Thank you.

10  (Proceedings adjourned at 4:05 p.m.)

11                    **CERTIFICATE OF REPORTERS**

12        We certify that the foregoing is a correct transcript

13  from the record of proceedings in the above-entitled matter.

14

15

16  _____        September 15, 2015

17  Signature of Court Reporter/Transcriber    Date
    Lydia Zinn, CSR 9223, FCRR

18

19

20

21  _____        September 15, 2015

22  Signature of Court Reporter/Transcriber    Date
    Rhonda L. Aquilina, CSR No. 9956, RMR, CRR

23

24

25