```
                              Volume 3

                              Pages 473 - 719

                  UNITED STATES DISTRICT COURT

                 NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

DARYELLE LAWANNA PRESTON,        )
                                 )
            Plaintiff,           )
                                 )
  VS.                            )      NO. C 14-02022 NC
                                 )
CITY OF OAKLAND; DEANNA          )
SANTANA, in her individual       )
capacity; and DOES 1 through     )
10, inclusive,                   )
                                 )
            Defendants.          )
_____  )


                              San Francisco, California
                              Wednesday, September 16, 2015




                    TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff Daryelle Lawanna Preston:
                         Siegel & Yee
                         499 14th Street, Suite 220
                         Oakland, CA 94612
                         510) 839-1200
                         (510) 444-6698 (fax)
                    BY:  SONYA MEHTA
                         DANIEL MARK SIEGEL



Reported By:  Lydia Zinn, CSR No. 9223, FCRR
              Rhonda Aquilina, CSR No. 9956, RMR, CRR
              Official Reporters
```

1    <u>**APPEARANCES (Continued):**</u>

2    For Defendants City of Oakland; Deanna Santana:

3                                   Lafayette & Kumagai LLP
                                    101 Mission Street, Suite 600

4                                   San Francisco, CA  94105
                                    (415) 357-4600

5                                   (415) 356-4605 (fax)
                      **BY:   AFRICA EVANGELINE DAVIDSON**

6                            **SUSAN TAYEKO KUMAGAI**
                             **GARY T. LAFAYETTE**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**I N D E X**</u>

Wednesday, September 16, 2015 - Volume 3

| <u>**PLAINTIFF'S WITNESSES**</u> | <u>**PAGE**</u> | <u>**VOL.**</u> |
|---|---|---|
| <u>**ANDERSON, WINNIE (RECALLED)**</u> | | |
| Cross-Examination by Mr. Lafayette | 486 | 3 |
| Redirect Examination by Ms. Mehta | 496 | 3 |
| Recross-Examination by Mr. Lafayette | 506 | 3 |
| | | |
| <u>**REED, TERESA**</u> | | |
| (SWORN) | 526 | 3 |
| Direct Examination by Mr. Siegel | 526 | 3 |
| Cross-Examination by Mr. Lafayette | 548 | 3 |
| Redirect Examination by Mr. Siegel | 562 | 3 |
| Recross-Examination by Mr. Lafayette | 564 | 3 |
| | | |
| <u>**KEFFER, JOE**</u> | | |
| By Deposition | 569 | 3 |
| By Deposition | 615 | 3 |
| | | |
| <u>**SWANSON, SANDRE**</u> | | |
| (SWORN) | 572 | 3 |
| Direct Examination by Mr. Siegel | 573 | 3 |
| Cross-Examination by Mr. Lafayette | 578 | 3 |
| | | |
| <u>**QUAN, JEAN**</u> | | |
| (SWORN) | 584 | 3 |
| Direct Examination by Mr. Siegel | 585 | 3 |
| Cross-Examination by Mr. Lafayette | 594 | 3 |
| Cross-Examination by Mr. Siegel | 600 | 3 |
| | | |
| <u>**PRESTON, LAWANNA**</u> | | |
| (SWORN) | 620 | 3 |
| Direct Examination by Mr. Siegel | 621 | 3 |

<u>**I N D E X**</u>

| **<u>DEFENDANTS' WITNESSES</u>** | | **<u>PAGE</u>** | **<u>VOL.</u>** |
|---|---|---|---|
| **<u>JORDAN, HOWARD ALONZO</u>** | | | |
| (SWORN) | | 511 | 3 |
| Direct Examination by Mr. Lafayette | | 512 | 3 |
| Cross-Examination by Mr. Siegel | | 518 | 3 |
| Redirect Examination by Mr. Lafayette | | 523 | 3 |

<u>**E X H I B I T S**</u>

| **<u>TRIAL EXHIBITS</u>** | **<u>IDEN</u>** | **<u>EVID</u>** | **<u>VOL.</u>** |
|---|---|---|---|
| 2Z | | 486 | 3 |
| 2F | | 497 | 3 |
| 2M | | 552 | 3 |
| 2U | | 556 | 3 |
| 3F | | 564 | 3 |
| 3H | | 618 | 3 |
| 11 | | 529 | 3 |
| 18 | | 657 | 3 |
| 22 | | 548 | 3 |
| 31 | | 669 | 3 |
| 33 | | 671 | 3 |
| 37 | | 675 | 3 |

1   **Wednesday - September 16, 2015**                    **8:56 a.m.**

2                        **P R O C E E D I N G S**

3                            ---oOo---

4   (Proceedings were heard outside the presence of the jury:)

5          **THE COURT:**  Come on forward.  The jurors are not

6   present.

7          **MR. SIEGEL:**  Good morning, Your Honor.

8          **THE COURT:**  Good morning.  I hear that there were one

9   or more issues to present outside the presence of the jury.

10         **MR. SIEGEL:**  Today we're having a perfect storm of

11  witness problems.  Ms. Anderson called Ms. Mehta about an hour

12  ago, and said she was sick and couldn't come.  Ms. Mehta

13  advised her that she had to come.

14     Lamont Ewell advised us about an hour and a half ago that

15  his flight from San Diego was canceled, due to weather; and so

16  he's going to come tomorrow.

17     Witnesses we had expected the City to provide us today or

18  yesterday -- or yesterday -- Barbara Parker and Katano

19  Kasaine -- are not available today.  So today's kind of a

20  little unclear as to what will happen.  Hopefully, Ms. Anderson

21  will show up.

22     Then we have the former Police Chief.  He'll be here.  In

23  fact, he's here.

24     The Fire Chief will be here.

25     Mayor -- former Mayor Quan will be here.

**PROCEEDINGS**

1          THE COURT:  I'm sorry.  Just catch up with my

2  note-taking.

3          MR. SIEGEL:  Okay.  So what we know --

4          THE COURT:  Jordan.  Reed.

5          MR. SIEGEL:  Swanson and Quan.  Those, we know.

6      Anderson hopefully, again, will show up as required.

7          MR. LAFAYETTE:  Is -- and then I think we were going

8  to read Joe Keffer.

9          MR. SIEGEL:  Yeah.  We can read Joe Keffer.

10          MR. LAFAYETTE:  Completing Joe Keffer today.

11      I think that -- I haven't talked to Mr. Ewell.  Are you

12  sure there's no way he can get up here by the close of biz

13  today?

14          MR. SIEGEL:  That's what he tells us.

15          MR. LAFAYETTE:  I know there were storms down there.

16  I just don't -- this is the first I've heard of that.

17      I can tell Your Honor that it looks to Mr. Siegel and I

18  that until I heard this, at least as of last night, we thought

19  we were ahead of the game, and would be through with the

20  evidence by Friday.  That's kind of what I was looking at.

21          THE COURT:  Let me go back over some of these names

22  that were on plaintiff's exhibit last back on August 11th, to

23  see if some of these folks are still coming this week, or if

24  you've decided that we don't need them.

25          MR. SIEGEL:  Okay.

1              THE COURT:  So Barry Donelan.

2              MR. SIEGEL:  We may not need him.  Depends upon how

3    the testimony of Chief Jordan goes.

4              THE COURT:  Okay.  T.C. Everett, I think, was covered

5    by a Pretrial Order which -- is T.C. Everett still coming?

6              MR. SIEGEL:  Yes, very briefly.

7              THE COURT:  All right.  Chuck Garcia.

8              MR. SIEGEL:  Same as Donelan.

9              THE COURT:  So depending?

10             MR. SIEGEL:  Right.

11             THE COURT:  Yvonne Hudson?

12             MR. SIEGEL:  You struck.

13             THE COURT:  I struck her.  Right?

14       Sonia Lara?

15             MR. SIEGEL:  We are not going to call her.  I assume

16   the Defense will.

17             THE COURT:  Dwight McElroy?

18             MR. SIEGEL:  He will be here tomorrow, as scheduled.

19             THE COURT:  Dan Robertson?

20             MR. SIEGEL:  Same as -- as Donelan.

21             THE COURT:  So they are, depending on whose testimony

22   are you needing -- feeling like you need to have before they

23   testify to make the decision?

24             MR. SIEGEL:  Jordan's.

25             THE COURT:  So you may know that here in half an

 1  hour:  Whether you want to call him?

 2          MR. SIEGEL:  Correct.

 3          THE COURT:  And Cheryl Thompson?

 4          MR. SIEGEL:  She -- well, Mr. Lafayette and I have a

 5  disagreement about that.  She turned out the couple of days

 6  before trial to be unavailable.  And we proposed to use part of

 7  her deposition.  And --

 8          MR. LAFAYETTE:  Obviously, it's my understanding

 9  she's been unavailable for over a month, because she had

10  planned a vacation.  And it was only a few days ago that

11  plaintiffs advised us that they thought she was unavailable,

12  and that they wanted to read her deposition transcript,

13  instead.

14          MR. SIEGEL:  That's all true.  And she is one of the

15  witnesses that the Court ruled at some point ago could testify

16  on emotional distress.  And we have very -- like, less than a

17  page of deposition testimony, really.

18          THE COURT:  All right.  So as to today's schedule,

19  we've got Jordan, Reed, Swanson, and Quan who are expected.

20      Why is Kasaine not available today?

21          MR. LAFAYETTE:  Why is who?

22          THE COURT:  Ms. Kasaine.  Why is she not available

23  today?

24          MR. LAFAYETTE:  Ah, I'll have to go outside and find

25  out.  I knew that this was not a day that she was available,

**PROCEEDINGS**

1   which is why we moved everything until tomorrow.  And so --

2       I mean, there is another witness here, and it's the

3   plaintiff.

4           THE COURT:  I'm going to get that to that.  My

5   question --

6           MR. LAFAYETTE:  I'll find out, Your Honor, what the

7   reason is for that.

8           THE COURT:  My direction to both of you is that

9   you're going to -- these other witnesses -- well, you tell me.

10  Are they in the area?  If they're in the East Bay now, that's a

11  lot easier than telling someone from San Diego they've got to

12  appear today, no matter what; versus someone who's in Oakland,

13  and could get over here by this afternoon.

14          MR. SIEGEL:  Right.  Everyone is in Oakland.

15          THE COURT:  All right.  So and if it's dependent upon

16  Mr. Jordan's testimony, then as soon as you finish with

17  Mr. Jordan, you need to make a decision if you're intending to

18  call those witnesses.  Those are people who it makes sense to

19  bring over today to fill the schedule.

20          MR. SIEGEL:  I've just been advised Ms. Anderson has

21  made it here, despite her illness.

22          THE COURT:  Great.  Well, we appreciate that.  And so

23  we'll have her at the beginning, and hope to be done with her

24  quickly.

25      And then Mr. Jordan will come up next.

1    And then if there's -- I'm not encouraging anyone to try

2    to filibuster and fill time, because I will notice if you are,

3    and the jury will, too.

4         Ms. Preston ought to testify if no other witnesses are

5    available for the plaintiff.  She's here, and will testify

6    after Mayor Quan if we get through Mayor Quan and there's no

7    other witnesses here to call.

8         And, of course, we can use the Keffer deposition, you

9    know.  If there are other deposition transcripts you want to

10   read in, that would be a good time to do it, too, if we're at a

11   point in time that that makes sense.

12        I know there's a video that hasn't been shown to the jury

13   yet.  It's been referenced many times.  So things like that.

14   You know, if you're planning to put it in at some point --

15   seems like you'll do that before.

16        Make sense?

17             **MR. SIEGEL:**  Yes.  We'll do our best.

18             **THE COURT:**  Very good.  That's all I can ask for.

19        A few other just programming notes.  At 4:00 o'clock

20   today, once the jury is done, if you can plan, that will give

21   us an opportunity for us to talk about the closing

22   instructions.  We're not at the closing instructions yet, but

23   there are a few fact stipulations that I contemplate that are

24   implicit in the Verdict Form and the Jury Instructions I sent

25   you.  You haven't agreed to them.  So the fact that I'm

1  thinking about them -- we need to have more of a meeting of the

2  minds about some elements that I think are not really in

3  dispute, but I need to get us all to agree that they're not in

4  dispute.  And if there are legal issues focusing into the case

5  that you want to present to me, we can start talking about them

6  at 4:00 o'clock today.

7      There was a document filed yesterday at 9:29, Docket 142,

8  which is a further amended list of defense exhibits -- or it's

9  a further amended exhibit list.  I don't know what's different

10  about it, and it doesn't have any explanation on it as to

11  what's different about it than what was filed before.  So can

12  you tell me if I should read that; and if so, why?

13          MR. LAFAYETTE:  I think it was filed, Your Honor, in

14  response to your request on Monday that if there were some

15  additional objections.  And I think the only ones that there

16  are additional objections on are to Exhibits --

17          MS. DAVIDSON:  O, P, and Q.

18          MR. LAFAYETTE:  -- O, P, and Q, which you've already

19  admitted.  Okay?

20          THE COURT:  P and Q.  Q is also Plaintiff's

21  Exhibit 6.

22          MR. LAFAYETTE:  Yes.

23          THE COURT:  So I see that was admitted.

24      And P -- when was Exhibit P admitted?

25          MR. LAFAYETTE:  Oh, it's not been admitted.  I

1  apologize to the Court.  P has not been admitted.

2          **MR. SIEGEL:**  (Indicating.)

3          **MR. LAFAYETTE:**  Oh, thank you.

4          **THE COURT:**  And are you intending to --

5          **MR. LAFAYETTE:**  Offer?

6          **THE COURT:**  -- move Exhibit P into evidence?

7          **MR. LAFAYETTE:**  Not yet, Your Honor.

8          **THE COURT:**  Are you intending to do so?

9          **MR. LAFAYETTE:**  If I could take a look at P again --

10          **THE COURT:**  We need to resolve these disputes outside

11  the presence of the jury, rather than in front of them.

12          **MR. LAFAYETTE:**  No, Your Honor.

13          **THE COURT:**  All right.  Mr. Noble, if you could,

14  check to see if our jurors are ready.

15          **THE CLERK:**  Yes, sir.

16          **MR. SIEGEL:**  Should we ask Ms. Anderson to come in?

17          **THE COURT:**  Yes, please.  And I failed to bring in my

18  jury notes, so you can get them.  I'll get that.

19  (Proceedings were heard in the presence of the jury:)

20                          **WINNIE ANDERSON**,

21  called as a witness for the Plaintiff, having been previously

22  duly sworn, testified further as follows:

23          **THE COURT:**  All right.  Please be seated, everyone.

24  Thank you to our jurors for making it through traffic one more

25  day.

**PROCEEDINGS**

1    We return with Ms. Anderson on the stand.  Ms. Anderson,

2 thank you for returning for a second day.

3    I do have one note from the jury.  It's Note Number 7.

4 Ms. Anderson, this is a question from the jurors.  You should

5 treat it just like any other question.  It's a question calling

6 for a response from you to the best of your ability.  You

7 remain under oath, and your testimony is under penalty of

8 perjury.  The question has two different parts to it, so I'll

9 read the whole thing once, and then go back and read it again,

10 just so you have the entire context of the question.

11    The question is:  The Local 55 MOU Side Letter extended

12 the Paramedic Support Program by 30 days.  The program --

13    And this is according to what the juror heard.

14    The program has a 3 percent premium pay.  Did the

15 paramedics in the program receive a 3 percent premium pay for

16 the additional 30 days?  And was there a budget adjustment made

17 since the Side Letter increased the cost?

18    So I'll read that all again, just to make sure you heard

19 it all.

20    The Local 55 MOU Side Letter extended the Paramedic

21 Support Program by 30 days.  The program has a 3 percent

22 premium pay.  Did the paramedics in the program receive a

23 3 percent premium pay for the additional 30 days?  And was

24 there a budget adjustment made since the Side Letter increased

25 the cost?

ANDERSON - CROSS / LAFAYETTE

 1           **THE WITNESS:**  So none -- not to my knowledge --

 2  anybody was paid or would -- there was an adjustment.

 3           **THE COURT:**  So not to your knowledge as to both parts

 4  of the question?

 5           **THE WITNESS:**  Correct.

 6           **THE COURT:**  All right.  Then we return with

 7  Mr. Lafayette examining Ms. Anderson.  Of course, you may

 8  follow up on that question, and continue with your examination.

 9           **MR. LAFAYETTE:**  Thank you, Your Honor.

10                  <u>**CROSS-EXAMINATION**</u>    **(resumed)**

11  **BY MR. LAFAYETTE**

12  **Q.**   I think we're looking at Exhibit 2zZ.  And if I could --

13  thank you.  Good.

14  (Reporter requests clarification.)

15           **MR. LAFAYETTE:**  Z, as in "zebra."

16      And I think it's in evidence, Your Honor.

17           **THE COURT:**  I don't think it's in evidence.

18           **MR. LAFAYETTE:**  I'd like to move Exhibit 2z into

19  evidence.

20           **THE COURT:**  Any objection?

21           **MS. MEHTA:**  No objection.

22           **THE COURT:**  Okay.  Exhibit 2Z -- "zebra" or "Zulu" --

23  is admitted into evidence.

24  (Trial Exhibit 2Z received in evidence)

25           **THE COURT:**  You may proceed.

1      **MR. LAFAYETTE:**  Thank you.

2  **Q.**   Now, the first paragraph of Exhibit 2Z -- it states to --

3  and this is an e-mail that you wrote to Ms. Kasaine.  Correct?

4  **A.**   Correct.

5  **Q.**   And you wrote it after the meeting with the union.  Right?

6  **A.**   Correct.

7  **Q.**   And with regard to this meeting, did you write this

8  memo -- this e-mail at the suggestion of Ms. Preston?

9  **A.**   Yes.  She said it would be a good idea to summarize what

10  happened.

11  **Q.**   And did she indicate to you what items that you -- that

12  she thought should be summarized?

13  **A.**   Well, one definitely was to inform Ms. Kasaine that she

14  needed to collect and deduct the agency fees and dues.

15  **Q.**   Okay.  So let's go through it.  In the first paragraph

16  there -- here --

17  (Document displayed.)

18  **BY MR. LAFAYETTE**

19  **Q.**   After the salutation, "Thank you for being part of the

20  information session with SEIU TPT bargaining team," then it

21  says, "Throughout the course of bargaining, the union has

22  raised the issue that dues have not been taken out of TPT

23  employee paychecks."  Now, had there been bargaining taking

24  place for some time, where this had been an issue in

25  bargaining?

1  **A.**    I think it was raised, through -- in bargaining that we

2  started in July, as a topic.

3  **Q.**    So as of August 6th, it had been raised in bargaining.

4  And it had been raised in the grievance filed on June 26?

5  **A.**    Yes.

6  **Q.**    And then it says, "You did confirm that dues had not been

7  taken, and that you will be taking action in deducting dues

8  from paychecks of TPT -- S" -- I can't read that very well.   S?

9  **A.**    SI1 or S --

10  **Q.**    Employees?

11  **A.**    I can't remember.

12  **Q.**    So what you're acknowledging is that, at least with regard

13  to this dues issue, Ms. Kasaine had said that in addition to

14  anything else, that this issue would be resolved, and she would

15  be taking these dues out of these paychecks.  Right?

16  **A.**    Yes.

17  **Q.**    Now, there are two things that are referenced here.  One

18  is dues, and one is administrative fees.  Right?  An agency

19  fee?

20  **A.**    Right.

21  **Q.**    An agency fee is that thing where an employee --

22          **MS. MEHTA:**  Objection.  Agency fees are not

23  referenced, number one.

24          **MR. LAFAYETTE:**  Could you take a look at the second

25  paragraph, the second bullet down, where there's a statement

1  about agency fee?

2  **Q.**    Now, can you define?  Tell us what an agency fee is.

3  **A.**    Essentially, it's a fee for the employees.  Because

4  they're represented by the union, they contribute to what has

5  been negotiated for them.  So it's also -- we're an agency shop

6  in Oakland.

7  **Q.**    Isn't that something that's paid, where the person -- the

8  employee indicates they don't want to become part of the union,

9  so there's an agency fee taken, nonetheless, as opposed to

10  dues?

11  **A.**    Right.  They take a -- if they elect to be a full member

12  of the union to be able to vote, they're -- they'll sign a

13  card, and that will be considered membership dues, and

14  categorized as that.

15      And if they don't, we automatically, as a condition of

16  employment, have them pay a -- you know, a service fee/agency

17  fee for the union's representation of them in their -- in

18  their -- essentially, their conditions in their wages and

19  salary.

20  **Q.**    Now, was this meeting that you were -- that you were

21  attending on the 6th with the union -- was this an extension of

22  the bargaining?

23  **A.**    It was an informational session.  So the union had, you

24  know, in bargaining, at times, there are opportunities for them

25  to get more information; but there's no formal proposal being

1  passed.  It's just getting to learn; gaining knowledge of how

2  certain things work.

3  **Q.**   All right.  Now, the next bullet down that says, "City's

4  obligations" -- do you see that?

5  **A.**   Yes.

6  **Q.**   Did you understand at that time that there was always the

7  possibility that a person, by mistake or otherwise, could wind

8  up not having dues or agency fees deducted from their checks?

9  **A.**   Yes.

10 **Q.**   And did -- was this something that indicated that the

11 union would so notify you if it believed a person fell in that

12 category?

13 **A.**   Yes.

14 **Q.**   That was something that was agreed to in that meeting?

15 **A.**   Well, I think this was something agreed to for many years.

16 It's part of the MOU.  It's not new language.

17 **Q.**   Okay.  Now, turning to the second page, the Item 5 states,

18 "The union will be sending a new information request for a list

19 of active TPT employees during certain pay periods, in order to

20 decipher between active and inactive TPTs."

21     Do you know why that one's in there?

22 **A.**   Yes.

23 **Q.**   Why?

24 **A.**   Because a lot of the TPTs are seasonal workers, and so

25 they come to work occasionally.  So they'll still be on our

1   payroll list.  And we can't deduct any agency fees or dues,

2   because they aren't being paid.  So you can't deduct anything

3   from somebody who's not being paid.

4        So the active ones are the ones who are currently in

5   payroll, having an active assignment.  And the inactive ones

6   are just still in the list.  They may be called again in the

7   future to take on an assignment, if they so choose.

8   Q.   So there were still some feasibility issues with regard to

9   collecting data, and making sure the data was consistent for

10  purposes of going forward?

11  A.   Yes.

12  Q.   And that's what this is all about?

13  A.   Yes.

14  Q.   Okay.  Now -- and I thought I heard yesterday -- I want to

15  make sure -- that after this meeting, you no longer had

16  responsibilities for -- for the TPTs?

17  A.   Probably.  I think I was done with the TPT bargaining.

18  Q.   And was that bargaining over, or was that transferred to

19  someone else?

20  A.   It was transferred.

21  Q.   And who was it transferred to?

22  A.   Sonia Lara.

23  Q.   Thank you.  The -- could you take a look at Exhibit 2X.

24  Are these your notes?

25  A.   Yes.

1    Q.   Are these notes supposed to be contemporaneously taken at

2    the time the meeting took place?

3    A.   Yes.

4    Q.   So was the first --

5              MS. MEHTA:  Objection.

6              THE COURT:  What is the objection?

7              MS. MEHTA:  Lack of foundation.

8              THE COURT:  This exhibit's already in evidence.

9    Overruled.

10             MS. MEHTA:  No.

11             THE COURT:  It is.  Overruled.

12        Proceed.

13   BY MR. LAFAYETTE

14   Q.   So was the first thing that happened in the meeting

15   Ms. Katano [sic] saying -- well, why don't you read what it

16   says on your notes where it says "Katano:"?

17   A.   "I can," and "What you want?"

18   Q.   Okay.  Now, what was that a reference to?

19   A.   It was reference to what Joe was asking in regards to

20   reviewing of the data, and asking for more information or a

21   data that SEIU wanted.

22        And she responded that sheik do that.  And just asked him:

23   What do you want?

24   Q.   So what was the next thing that happened in the meeting?

25   A.   I think we went over the data.  And then Joe had said,

1    "What about dues?"

2    **Q.**   So was that the very next thing that happened in the

3    meeting:  "What about dues?"

4    **A.**   I think after reviewing the data, Joe had asked a

5    question:  Well, what about dues?

6        And she said, "Employees did not request dues, so I don't

7    take it."

8    **Q.**   Okay.  Now, a few procedural questions.  Was there a

9    calendar that Ms. Preston kept with regard to activities in her

10   department?

11   **A.**   I think she --

12          **MS. MEHTA:**  Objection.  Speculation.

13          **THE COURT:**  Overruled.

14       You may answer.

15          **THE WITNESS:**  I think she can view our calendars.  I

16   don't know if she had her own; what she kept as her own

17   calendar.

18   **BY MR. LAFAYETTE**

19   **Q.**   So you're not aware if Ms. Preston kept a calendar of all

20   activities in the department?

21   **A.**   Again, she can view our calendars.  Her calendar was her

22   own.

23   **Q.**   Do you have your deposition transcript up there?

24   **A.**   I have a copy.

25          **MR. SU:**  (Indicating.)

1  BY MR. LAFAYETTE

2  Q.   Could you take a look at page 51?  And I'd like for you to

3  take a look at lines 15 through 19.  Do you see that?

4  A.   Yes.

5  Q.   Does that refresh your recollection that she had a

6  calendar, and everything goes into it?

7  A.   It does.

8  Q.   Does it refresh your recollection that everything goes

9  through her?

10  A.   So everything does go through her.  And she looks at her

11  calendar with what we populate on our calendars.  So she looks

12  at our calendars.

13  Q.   Okay.  Now, do you know who Deborah Edgerly is?

14  A.   Yes.

15  Q.   Was Deborah Edgerly a consultant for one of the unions?

16  A.   Yes.

17  Q.   Did you witness Ms. Preston passing suggestions on how the

18  union should negotiate against the City with Ms. Edgerly?

19  A.   I was witness to a conversation between Ms. Edgerly and

20  Ms. Preston.

21  Q.   And was she suggesting to Ms. Edgerly how this union

22  should approach the City?

23  A.   She was offering suggestions, because they weren't

24  understanding what was going on.

25  Q.   Okay.  And before coming to Oakland, did you go to

1    college?

2    **A.**    Did I go to college?

3    **Q.**    Yes.

4    **A.**    Yes.

5    **Q.**    Where did you go to?

6    **A.**    I went to USC, and UC Irvine.

7    **Q.**    And UCLA?

8    **A.**    No.   USC:   University of Southern California.

9    **Q.**    Yes.

10   **A.**    And UC Irvine.

11   **Q.**    What was your degree at UC Irvine?

12   **A.**    I was a biohumanities major.

13   **Q.**    Did you get a B.A.?   A B.S.?

14   **A.**    Yes.

15   **Q.**    And what was your degree at USC?

16   **A.**    A master's in public administration.

17           **MR. LAFAYETTE:**   I have no further questions at this

18   time, Your Honor.

19           **THE COURT:**   Thank you.

20      Mr. Siegel or Ms. Mehta, any further questions for

21   Ms. Anderson?

22      And, Ms. Mehta, the exhibit you objected to, 2X, is the

23   same as Exhibit 27 you moved into evidence yesterday.

24           **MS. MEHTA:**   I made an error.   I was on the wrong tab.

25

1                        **REDIRECT EXAMINATION**

2    **BY MS. MEHTA**

3    **Q.**   Ms. Anderson, do you know what a sidebar is?

4    **A.**   Yes.

5    **Q.**   Isn't that where two representatives from the opposing

6    sides discuss with each other what's happening in the

7    negotiations?

8    **A.**   Yes.

9    **Q.**   Isn't it normal to have sidebars in negotiations?

10   **A.**   Yes.

11   **Q.**   Now, isn't it true that Trinette Gist-Skinner led you to

12   believe that the signed agreement -- the agreement you

13   signed -- between Local 55 and the City was authorized by

14   City Council before you signed it?

15              **MR. LAFAYETTE:**  Objection.  Leading.

16              **THE COURT:**  Sustained.  Please rephrase the question.

17   **BY MS. MEHTA**

18   **Q.**   Did anyone lead you to believe that the agreement between

19   Local 55 and the City was authorized by City Council before you

20   signed it?

21   **A.**   I was led to believe that we did not need City Council

22   authorization before I signed it.

23              **MS. MEHTA:**  So Exhibit 2F was identified by

24   defendants yesterday, but not admitted.  Your Honor, I had

25   marked as Exhibit 2ZF an e-mail between Anderson,

1    Fire Chief Reed, and Ms. Preston -- sorry -- dated July 3rd,

2    2013.

3    **Q.**   Can you turn to that, please, Ms. Anderson?  Do you see

4    it?

5    **A.**   Yes.

6    **Q.**   Do you recognize it?

7    **A.**   Yes.

8    **Q.**   How?

9    **A.**   I wrote it.

10   **Q.**   And is it a fair and accurate copy?

11   **A.**   Yes.

12          **MS. MEHTA:**  I move to admit 2F.

13          **MR. LAFAYETTE:**  No objection, Your Honor.

14          **THE COURT:**  2F --

15          **MS. MEHTA:**  Yes.

16          **THE COURT:**  -- is admitted.  Thank you.

17   (Trial Exhibit 2F received in evidence.)

18   (Document displayed.)

19   **BY MS. MEHTA**

20   **Q.**   Do you see the second sentence in this e-mail?  "Dear

21   Teresa"?  And here's the second sentence.  "Based on my

22   conversation with Trinette" --

23        And that's Trinette Skinner.  Correct?

24   **A.**   Correct.

25   **Q.**   -- "the dialogue between 55 and Oakland Fire Department,

 1  OFD, about operational changes for the PSP program was approved

 2  prior to me engaging in this."

 3      You wrote that.  Right, Ms. Anderson?

 4  A.   Yes.

 5          MS. MEHTA:  I'm going to publish again Exhibit 27.

 6  (Document displayed.)

 7          THE COURT:  Are you sure that's 27?

 8          MS. MEHTA:  Yes.

 9          THE COURT:  Ms. Mehta.

10  BY MS. MEHTA

11          THE COURT:  That's not 27 in my book.

12          MS. MEHTA:  It's also marked as Defendant's

13  Exhibit 2X.

14          MR. SIEGEL:  Your Honor, that's what you said was

15  admitted earlier.

16          MR. LAFAYETTE:  No.  This is --

17          THE COURT:  No the --

18          MR. SIEGEL:  27.

19          THE CLERK:  Your Honor, it's admitted.

20          THE COURT:  It's admitted, but 27 is the notes.

21          MS. MEHTA:  17, which is admitted.

22          THE COURT:  Yes.

23  BY MS. MEHTA

24  Q.   I know it's hard --

25          THE COURT:  Proceed.  Go ahead.

ANDERSON - REDIRECT / MEHTA                    499

1   BY MS. MEHTA

2   Q.    Ms. Anderson, this is the agreement you signed on

3   June 28th, 2013.   Correct?

4   A.    Correct.

5   Q.    Now, doesn't it say here, "Agreement.   Number 1.   The City

6   and the union hereby agree to extend the Paramedic Support

7   Program, PSP, for an additional 30 days from its expiration"?

8   Isn't that what it says?

9   A.    Yes.

10  Q.    So isn't it true that this agreement that you signed on

11  6/2/13 was to extend the actual Paramedic Support Program; not

12  just talk about extending it?

13  A.    The intent was to just talk about extending it.

14  Q.    But this agreement that you signed -- you would agree it

15  says to extend the actual program?

16  A.    That is how it reads, yes.

17  Q.    Thank you.

18        Isn't it true that extending a City program -- I'm

19  sorry -- extending this program for an additional 30 days past

20  its expiration costs the City money?

21          MR. LAFAYETTE:   Objection.   Leading.

22          THE COURT:   Sustained.

23  BY MS. MEHTA

24  Q.    Does this agreement cost the City money?

25  A.    It may, if they were still implementing the program at the

1    time.

2    **Q.**    Does this agreement, as written, cost the City money?

3    **A.**    It could.  Yes.

4    **Q.**    Now, you didn't tell Ms. Preston that you were going to

5    sign this agreement here before you signed it on June 28th,

6    2013?

7              **MR. LAFAYETTE:**  Inconsistent with the testimony.

8    Argumentative.

9              **THE COURT:**  You may proceed.  I didn't hear the word

10   "objection."  Go ahead answer the question.

11             **THE WITNESS:**  Could you repeat the question?

12   **BY MS. MEHTA**

13   **Q.**   You didn't tell Ms. Preston that you were going to sign

14   this agreement here before you signed it on June 28th, 2013?

15   **A.**   I did tell Ms. Preston that we were going -- they were

16   asking for an extension of 30 days.  I did not show her that

17   exact agreement.  Yes.

18   **Q.**   So you didn't tell her you were going to sign this

19   agreement?

20             **MR. LAFAYETTE:**  Objection.  It's argumentative.  And

21   prior being asked and answered.

22             **THE COURT:**  Overruled.

23   **BY MS. MEHTA**

24   **Q.**   You didn't tell her you were going to sign this agreement

25   on June 2nd, 2013?

**ANDERSON - REDIRECT / MEHTA**

1  **A.**   I did not tell her.

2  **Q.**   Thanks.  Isn't it true that it was only after June 28th,

3  2013, after you'd signed this agreement, that you told

4  Ms. Preston about this agreement here on the screen?

5  **A.**   That was when she was made aware and got a copy of it.

6  She was aware that we were going to agree to extend it by 30

7  days, but she did not get the actual copy of this until then --

8  the actual signed copies.

9  **Q.**   So you told her about this agreement after you had signed

10  it on June 28th?

11  **A.**   I told her we were going to -- yeah, I told her after -- I

12  showed up her a copy of it after we signed it, not before; but

13  she knew we were extending it for 30 days.

14  **Q.**   She knew you were -- you had signed this agreement after

15  you signed it?

16  **A.**   She knew I signed it after, but she knew I was going to

17  have this meeting about extending it for 30 days.  So there's a

18  difference here.  Knowing about it, and then seeing the actual

19  signature are two different circumstances.

20  **Q.**   So are you testifying today that you told her you were

21  going to sign this agreement before you signed it?

22  **A.**   No.  I am saying --

23          **MR. LAFAYETTE:**  Objection, Your Honor.

24          **THE COURT:**  Sustained.

25      Any question that starts with "So" is leading, and also

1  argumentative.  Any question that starts with, "Isn't it true"

2  is leading and argumentative.

3      So you've already had a chance for direct exam.  We're not

4  just repeating this for the jury.  They paid attention

5  yesterday.  If you have a new question, ask a question; but

6  it's not closing argument.  So proceed with the question.

7  **BY MS. MEHTA**

8  **Q.**  When Ms. Preston found out about this agreement, she told

9  you that you did not have authority to sign this agreement.

10 **A.**  Correct.

11 **Q.**  Ms. Anderson, yesterday defendants identified a number of

12 exhibits:  1V, 1X, and 1Z.  And these were communications

13 between you and various other people, all before June 2nd,

14 2013, regarding this agreement?

15 **A.**  Correct.

16 **Q.**  So as quickly as we can, I'm going to ask you to look at

17 1V -- "one victory" -- and tell me if any of these

18 communications included Ms. Preston.

19 **A.**  1V did not.

20 **Q.**  Please look at 1X.

21 **A.**  1X did not.

22 **Q.**  Please look at 1Z.

23 **A.**  1Z did not.

24      **MS. MEHTA:**  Now, turning to the SEIU matter of the

25 City not collecting dues, here is Exhibit 2A, which was

1  admitted yesterday.

2  (Document displayed.)

3  **BY MS. MEHTA**

4  **Q.**   Looking at 2A, the bottom e-mail is from Joe Keffer, to

5  you and Ms. Preston, regarding his attempted grievance on

6  June 26, 2013.

7  **A.**   Yes.

8  **Q.**   And this was the grievance about not collecting dues from

9  SEIU.  Correct?

10  **A.**   Yes.

11  **Q.**   Now, if you look up one e-mail, you will see that

12  Ms. Preston then wrote to you on June 26th, 2013, at 9:07 a.m.

13  "Winnie, please respond to the e-mail below.  Your response

14  should state that the union is required to state what section

15  of the MOU is violated."

16      Ms. Preston's e-mail to you is instructing you to respond

17  to Mr. Keffer.  Correct?

18  **A.**   Correct.

19  **Q.**   And if you look above that, you respond to Ms. Anderson,

20  and you say, "I will do that."  Correct?

21  **A.**   I said I would respond.  Yeah.

22          **MS. MEHTA:**  This is the document I showed you

23  yesterday.

24  (Discussion off the record.)

25          **MR. LAFAYETTE:**  All right.  It appears that this is

ANDERSON - REDIRECT / MEHTA

1  going to be cumulative of yesterday's testimony.

2          THE COURT:  Well, you need to include me in the

3  conversation.  What are you talking about?

4          MS. MEHTA:  It's solely to refresh recollection.

5          THE COURT:  What document are you talking about?

6          MS. MEHTA:  It was Ms. Anderson's Exhibit 7 to her

7  deposition.

8          MR. LAFAYETTE:  It's not a trial exhibit.

9          MS. MEHTA:  It's solely to refresh recollection.

10          THE COURT:  About what?

11          MS. MEHTA:  About whether or not she responded to

12  Mr. Keffer as Ms. Preston instructed her to, and when.

13          THE COURT:  Establish a foundation for something she

14  can't recall first.

15  BY MS. MEHTA

16  Q.  Ms. Anderson, you did respond to Mr. Keffer on June 26,

17  2013, that same day that Ms. Preston asked you to?

18  A.  I believe so.

19  Q.  And you responded to Mr. Keffer, "First, we ask that you

20  complete the grievance form by identifying grievance by name."

21          MR. LAFAYETTE:  Objection.  It's leading.

22          THE COURT:  Sustained.

23  BY MS. MEHTA

24  Q.  Did you tell Mr. Keffer to identify the grievance by name?

25  A.  Yes.

1   Q.   And did you also tell Mr. Keffer that the first step of

2   the grievance procedure is to resolve it informally, and meet

3   with the appropriate department?

4   A.   Yes.

5   Q.   Which, in this case, would be payroll?

6   A.   We suggested payroll.  Yes.

7   Q.   And Katano Kasaine was head of payroll at this time?

8   A.   Yes.

9   Q.   And isn't it true after this e-mail, this June 26th, 2013,

10  grievance died?

11          MR. LAFAYETTE:  Objection.  It's cumulative.

12          THE COURT:  Overruled.

13          THE WITNESS:  Nothing came of it, because we were

14  about to enter bargaining with the TPTs.

15  BY MS. MEHTA

16  Q.   Now, if a union files a grievance without following

17  procedure, you most likely would not take any further action on

18  that improperly filed grievance?

19          MR. LAFAYETTE:  Objection.  Calls for speculation.

20          THE COURT:  Also leading.  Sustained.

21  BY MS. MEHTA

22  Q.   Would you take any further action on an improperly filed

23  grievance?

24  A.   Likely not.

25  Q.   And finally -- this is my last question.  Finally,

1   Ms. Preston removed you from the Local 55 negotiations after --

2   after the June 28th, 2013, signed agreement?

3   A.   She removed me after July 2nd's meeting.

4           MS. MEHTA:  Thank you.  No more questions.

5           THE COURT:  Mr. Lafayette, do you have any further

6   questions.

7           MR. LAFAYETTE:  Very quick, Your Honor.  Very, very

8   quick.

9           THE COURT:  I'll hold you to that.

10          MR. LAFAYETTE:  You shall.  You shall.

11                          **RECROSS-EXAMINATION**

12  BY MR. LAFAYETTE

13  Q.   On this issue of you saying that you were misled by

14  Ms. Gist-Skinner, isn't it true, ma'am, that neither

15  Ms. Skinner or Chief Reed ever told you that the side agreement

16  had already been approved by the City Council?

17  A.   No, they never said that the side agreement was approved

18  by City Council.

19  Q.   Isn't it true that no one ever told you that the side

20  agreement had been previously approved by the City Council?

21  A.   There was no side agreement prior --

22  Q.   Well, they -- isn't it true that no one told you that the

23  TA had been previously approved by the City Council?

24  A.   No one told me that -- let me correct this.  No one said

25  that there was City Council authorization needed.  So that's

 1  different.

 2  **Q.**    And no one told you that City Council authorization had

 3  been obtained.   Correct?

 4  **A.**    Correct.

 5  **Q.**    So the other thing with regard to this grievance that

 6  we've been talking about -- the grievance of June 26 -- when

 7  you're writing as an objection to the grievance -- correct?

 8      When you responded to Mr. Keffer, your response was in the

 9  nature of an objection to the grievance.   Correct?

10  **A.**    I wouldn't say that.

11  **Q.**    Well, with regard to filing a grievance --

12  **A.**    Oh, to Mr. Keffer.   I'm sorry.

13  **Q.**    Yes.

14  **A.**    I'm looking at the wrong e-mail.   So my response to

15  Mr. Keffer -- was that an objection to his grievance?

16  **Q.**    Yes.

17  **A.**    Yes.   It's letting him know we're not accepting it.

18  **Q.**    But in terms of the way in which he proceeded, a grievance

19  is supposed to be filed by giving it to your department.

20  Right?

21  **A.**    Not --

22  **Q.**    So when you file --

23          **THE COURT:**  Let her answer the question.   Let her

24  answer the question.

25          **THE WITNESS:**  Not necessarily.   Again, there's a few

1  steps in the grievance process.  We pretty much -- Employee

2  Relations would be, like, Step 3 or 4.

3  **BY MR. LAFAYETTE**

4  **Q.**  But at Step 3 or 4, a grievance is filed by sending it to

5  the department -- right? -- in the first instance?

6  **A.**  Initial step is to deal with a direct supervisor.

7  **Q.**  I'm saying it's Step 3.

8  **A.**  In Step 3, I can't recall fully, because it's been a while

9  since I looked at the MOU for Oakland.

10  **Q.**  Okay.  So you don't recall if he actually followed the

11  procedure to file the grievance at Step 3?

12  **A.**  I can't recall that right now.

13  **Q.**  Okay.  And you don't know if he had followed the procedure

14  at any other point in time; do you?

15  **A.**  No.

16  **Q.**  And so when you object to a grievance, do you know --

17           **MS. MEHTA:**  Objection.  Misstates testimony.

18           **THE COURT:**  Overruled.

19       Ask the question.

20  **BY MR. LAFAYETTE**

21  **Q.**  When you object to a grievance, do you know if the union

22  has the right to proceed forward, notwithstanding your

23  objection?

24  **A.**  Again, it depends on the language.  So I can't recall

25  that.

**PROCEEDINGS**

**Q.**   So your objection, just because you made it, doesn't mean that the grievance may not go forward; does it?

**A.**   Depends on the language.

        **THE COURT:**   You have one minute left, Mr. Lafayette.

        **MR. LAFAYETTE:**   Nothing further, Your Honor.

        **THE COURT:**   Thank you.

    Ms. Anderson, you may step down, and you're excused from the trial.   Thank you for coming in today.

(Witness excused.)

        **THE COURT:**   Just a programming note, ladies and gentlemen of the jury.   We're going to have a next witness in a moment.   You undoubtedly noticed that my courtroom deputy, Lili, left yesterday during the trial.   She had a family emergency, and I don't expect that she'll be back this week. You may have seen that she was crying in the courtroom.   That was not related to the evidence or the attorneys or anything having do with the trial.   It was a personal matter, and that's why she's not here.

    Mr. Noble has stepped in to assist us today.   Yesterday Mr. Lucero was here.   We may have other deputies assisting us throughout the rest the trial, and I appreciate their help. They're coming from other courtrooms to assist us now during the trial.

    An instruction which I'd given you at the beginning -- and I gave you many instructions at the beginning, so this is not

1    to single out this instruction over others, but given how many

2    objections there have been during the trial, I wanted to remind

3    you of this instruction.  It is that the things the lawyers say

4    are not evidence.  The reactions of the lawyers to the

5    evidence -- how they feel about the evidence -- is not

6    evidence.  You are to disregard anything the lawyers say,

7    whether it's objections, responses to objections, opening

8    statements, closing arguments.  That is not evidence.

9         What the witnesses say or what the documents show -- that

10   is evidence, and you are to consider it.

11        The lawyers are not under oath.  They're not under penalty

12   of perjury.  They have a job to advocate for their clients.

13   And they're doing their job; but they are not the witnesses in

14   the case.  And what they say is not evidence in the case.  So

15   if they say something different from what you hear from the

16   witnesses, what governs is what you hear from witnesses.  And I

17   wanted to remind you of that instruction.

18        Judge Alsup is a colleague here in the building.  He says

19   it's so important to spell it out.  So the weight of the

20   evidence to give to lawyers is zero.  Z-e-r-o.  Zilch.

21   Z-i-l-c-h.  So nothing.  They play a very prominent role, and

22   they get a lot of talking time during trial.  That's to help

23   you interpret the evidence and to help explain it to you; but

24   their job is to give it to you in the best light possible from

25   their clients' perspective.  And that's what they're doing.  So

**PROCEEDINGS**

1  keep that in mind as you hear the evidence going forward in the

2  case.

3  　　Ms. Preston will call her next witness, please.

4  　　　　**MR. LAFAYETTE:**  I think we're calling a witness out

5  of turn, Your Honor.

6  　　　　**THE COURT:**  I appreciate that reminder.  All right.

7  The next witness is being called by the Defense.  Due to

8  scheduling challenges, we're allowing the Defense to call this

9  witness out of turn.  Therefore the Defense will be examining

10  the witness first.  And there will be cross-examination by

11  plaintiff.  You should give no consideration to the fact that

12  it's being done out of order.  And this will be evidence, just

13  as any other evidence that you will hear in the case.

14  　　Mr. Jordan, if you can come on forward here, we'll swear

15  you in.

16  　　　　**THE CLERK:**  Please raise your right hand.

17  　　　　　　　**HOWARD ALONZO JORDAN**,

18  called as a witness for the Defendants, having been duly sworn,

19  testified as follows:

20  　　　　**THE WITNESS:**  I do.

21  　　　　**THE CLERK:**  Thank you.  Please be seated.

22  　　　　**THE WITNESS:**  Good morning, Your Honor.

23  　　　　**THE COURT:**  Good morning.

24  　　　　**THE CLERK:**  Please state your full name and spell

25  your last name.

1          THE WITNESS:  Howard Alonzo Jordan.  J-o-r-d-a-n.

2          MR. LAFAYETTE:  Thank you, Your Honor.

3                      **DIRECT EXAMINATION**

4   BY MR. LAFAYETTE

5   Q.   Mr. Jordan, have you ever gone by another name; say,

6   "Chief"?

7   A.   Yes, I have.

8   Q.   And when were you known as "Chief"?

9   A.   I was known as "Chief" from 2011 to 2013.

10  Q.   And as Chief, what were you chief of?

11  A.   I was a Chief of Police for the Oakland Police Department

12  in Oakland, California.

13  Q.   And how long were you with the Oakland Police Department?

14  A.   Twenty-five years.

15  Q.   And did you become the Interim Chief, under Mayor Quan?

16  A.   Yes, I did.

17  Q.   And then were you appointed to become the Chief?

18  A.   Yes, I was.

19  Q.   And so in February of 2012 were you the Chief?  Permanent

20  Chief?

21  A.   Yes, I was.

22  Q.   And in January you were the Interim Chief?

23  A.   January of 2012?

24  Q.   2012.

25  A.   Yes, I was.

1  Q.    Now, as the Chief, are you responsible for managing the

2  Police Department?

3  A.    Yes, I was.

4  Q.    Now, did you at some point did you leave the Police

5  Department?

6  A.    Yes.

7  Q.    When was that?

8  A.    I retired in August of 2013.

9  Q.    So now in that time period that you were either Interim or

10  the Acting Chief, did it come to your attention that the FBI

11  was conducting an investigation regarding something referred to

12  as "the Rainbow Teen Center"?

13  A.    Yes.  I was.

14  Q.    And did you consult with Mayor -- with the City

15  Administrator with regard to that?

16  A.    Yes, I did.

17  Q.    There is a book in front of you that's probably the white

18  binder.  And it has something in it that's been referred to as

19  "Exhibit 3."  I'd like you to take a look at that.

20          THE COURT:  Are you referring to the Plaintiff's

21  Exhibit 3?

22          MR. LAFAYETTE:  Plaintiff's Exhibit 3, Your Honor.

23          THE COURT:  I think it's a blue cover there.

24          MR. LAFAYETTE:  It's also -- if that's --

25  (Document displayed.)

1    **THE COURT:**  He's getting to it.  There you go.

2    **BY MR. LAFAYETTE**

3    **Q.**   At the top of the page, there's an e-mail from you where

4    you say, "Yeah."  Do you see that?

5    **A.**   Yes, I do.

6    **Q.**   And just before that -- it seems to be in response to an

7    e-mail from Ms. Deanna Santana.  Do you see that?

8    **A.**   Yes.

9    **Q.**   Okay.  Do you know if that comment from Ms. Santana was in

10   relation to something involving the FBI?

11   **MR. SIEGEL:**  Objection.  Calls for speculation.  Lack

12   of foundation.

13   **THE COURT:**  Sustained.

14   **BY MR. LAFAYETTE**

15   **Q.**   This comment -- was it in response to a conversation that

16   you --

17   As you understand it, was it in response to a conversation

18   that you had had with Ms. Santana?

19   **A.**   Yes.

20   **Q.**   And what was the conversation about that you had had with

21   Ms. Santana?

22   **MR. SIEGEL:**  Your Honor, again, same objection.

23   Speculation.  Lack of foundation.  The document speaks for

24   itself.

25   **THE COURT:**  Overruled.

1    The question is about a conversation.  You may answer it.

2         **THE WITNESS:**  Yes.  So the conversation was regarding

3    the FBI's interest in the Pulte investigation.

4    **BY MR. LAFAYETTE**

5    **Q.**    Thank you.

6         Now, at some point did you come to Ms. Santana in 2013 and

7    advise her that you had received information relating to

8    Ms. Preston?

9    **A.**    Yes, I did.

10   **Q.**    And can you share with us what information you relayed to

11   Ms. Santana?

12   **A.**    Yes, I can.

13   **Q.**    Please do.

14   **A.**    I had a relationship with our union president,

15   Mr. Barry Donelan.  Barry Donelan and I met every Tuesday or --

16   I'm sorry -- every third Tuesday of the month for coffee, to

17   discuss things that were related to the police, Police

18   Department, and to establish a working relationship between the

19   union and executive management.  And that was a practice that

20   we've had with the -- that I had with the previous union

21   president.  And Barry and I continued that when he became

22   president of the union.

23        At some point Barry and I were talking, and he told me

24   that Ms. Preston was undermining Ms. Santana's authority by

25   providing information that she knew about the negotiations

1  between the police union and the fire to the Fire Department,

2  in an effort to undermine Ms. Santana.  And he specifically

3  talked about the offer that was on the table regarding a

4  give-back.

5      Prior to that time, the City had, in a concession

6  agreement, agreed with the union, in order to save money and

7  not lay off officers, that the union would have to give back

8  some of their holidays.  Instead of getting paid, they would

9  just not -- they would work at regular pay, instead of double

10  time and a half.  And the agreement was that at some point when

11  the City's in better financial situation, that the City would

12  allow those officers to regain those holiday pay, and not be

13  furloughed in an effort to save money.

14      So the negotiations were taking place.  And Barry Donelan,

15  the President, told me that Ms. Preston was providing

16  information -- confidential information -- to the Fire

17  Department, stating that the -- Ms. Santana was offering the

18  POA more than what she was offering the Fire Department -- Fire

19  Department, which was not true.  Both unions were --

20          **MR. SIEGEL:**  Objection.  I'd object to the narrative,

21  and also the extended hearsay.

22          **THE COURT:**  All right.  Objection to hearsay is

23  overruled.  Let's have a new question, so that we can have a

24  question and answer.

25

1  BY MR. LAFAYETTE:

2  Q.   So you shared -- did you share this information with

3  Ms. Santana?

4  A.   Yes, I did.

5  Q.   And do you recall approximately when it was that you

6  shared this information with Ms. Santana?

7  A.   I believe it was in the summer of 2012; either June or May

8  or sometime around that point.

9  Q.   Was this -- that's fine.

10      So now -- and did you make a suggestion to Ms. Santana as

11  to what she should do?

12  A.   Yes.

13  Q.   And what suggestion did you make to Ms. Santana?

14  A.   I recommended that Ms. Santana conduct an analysis of

15  Ms. Preston's computer, which she had the authority to do, in

16  order --

17           MR. SIEGEL:  Objection.  May I ask that the comment

18  about authority be stricken?  This is not responsive, and it's

19  beyond this witness' ability.

20           THE COURT:  Overruled.

21      You may continue answering the question.

22           THE WITNESS:  That she exercise her authority as a

23  City Administrator to conduct an analysis directing

24  IT Department to analyze Ms. Preston's computer -- her work

25  computer -- in order to determine what information she was

 1  sharing with others; confidential information she was sharing

 2  with other City employees.

 3  **BY MR. LAFAYETTE**

 4  **Q.**   Now, in addition to the unions coming to you, did

 5  Ms. Brooks come to you with information?

 6  **A.**   No.

 7  **Q.**   Did Ms. Brooks come to you regarding the negotiations?

 8  **A.**   No, she did not.

 9  **Q.**   Did Mr. Donelan ever say --

10          **MR. LAFAYETTE:**  Actually, Your Honor, no further

11  questions.

12          **THE COURT:**  All right.  Now some cross-examination

13  from plaintiff's counsel.

14          **MR. SIEGEL:**  Okay.  Thank you.

15                          <u>**CROSS-EXAMINATION**</u>

16  **BY MR. SIEGEL**

17  **Q.**   Now, Mr. Jordan, you're no longer a police officer; are

18  you?

19  **A.**   I'm not.

20  **Q.**   And your service as Chief of Police lasted slightly more

21  than 18 months.  Is that right?

22  **A.**   Give and take, yes.

23  **Q.**   Yeah.  It started October 11, and left May of 2013?

24  **A.**   Yes.

25  **Q.**   Okay.  And you had testified that the -- you learned that

1    the FBI was looking into the Rainbow Teen Center?

2    **A.**    Yes.

3    **Q.**    Isn't it true that no arrests were made as a result of

4    that investigation?

5    **A.**    I'm not aware of any arrests being made.

6    **Q.**    Okay.  Now, you met with Barry Donelan on occasion?

7    **A.**    Yes.

8    **Q.**    And he was critical of Ms. Preston.  Is that right?

9    **A.**    Yes.

10   **Q.**    He was also critical of you.  Is that right?

11   **A.**    I'm not aware of that.

12   **Q.**    Isn't it true that the POA -- the Oakland Police Officers

13   Association -- made public criticisms of you during the time

14   you were Chief?

15           **MR. LAFAYETTE:**  Objection.  Relevance, Your Honor.

16           **THE COURT:**  Overruled.

17       You can answer.

18           **THE WITNESS:**  There were occasions when they

19   criticized me, but that's not unusual in this profession.

20   **BY MR. SIEGEL**

21   **Q.**    Exactly.  The unions typically criticize management.  Is

22   that right?

23   **A.**    Typically, yes.

24   **Q.**    Okay.  So whether they were criticizing you as Chief, or

25   Ms. Preston as the head of Employee Relations -- that was kind

1    of to be expected.  Is that right?

2    A.    In some regards, yes.

3    Q.    Okay.  Now, were you involved in supervising the Employee

4    Relations Department?

5    A.    Of the City, or the Police Department?

6    Q.    Of the City of Oakland.

7    A.    No, I was not.

8    Q.    Okay.  And were you responsible for determining what

9    Ms. Preston spoke about with the representatives of the various

10   unions?

11   A.    No, I was not.

12   Q.    During the time the negotiation that you refer to -- that

13   is, the restoring of some of the concessions that the unions

14   made -- there was a process of determining the value of those

15   concessions.  Is that right?

16   A.    Yes.

17   Q.    And part of that process had to do with the fact that you

18   could calculate the salary given to many City employees on a

19   daily basis.  Correct?

20   A.    I'm not sure what process they used to calculate that; but

21   I'm assuming it was, yes.

22   Q.    Okay.  And isn't it true that the Fire Department was

23   different, because Fire Department employees are not paid on a

24   daily basis; instead, they're paid on the basis of 24-hour

25   shifts?

1      **MR. LAFAYETTE:**  Objection.  Lacking foundation with

2  this witness.  Constitutes hearsay.

3      **THE COURT:**  Overruled.

4    He can answer if he knows.

5      **THE WITNESS:**  Yes.

6  **BY MR. SIEGEL**

7  **Q.**   Okay.  And do you know what a sidebar is?

8  **A.**   A sidebar?

9  **Q.**   A sidebar in connection with labor negotiations.

10 **A.**   Yes.

11 **Q.**   And isn't it true that a sidebar is when representatives

12 of the union and representatives of management get together

13 informally to discuss the issues that may be coming up during

14 bargaining?

15 **A.**   Yes.

16 **Q.**   Okay.  Now, with respect to your advice to Ms. Santana to

17 look at Ms. Preston's e-mails -- that wasn't part of your job

18 as Police Chief:  To decide which employees' e-mails should be

19 looked at.  Was it?

20 **A.**   It wasn't, but I felt obligated, knowing that information

21 was being given to other people that was undermining the City

22 Manager's authority; that I should advise her about that; just

23 similarly like I would expect, if someone knew about someone

24 undermining me in that circumstance, that one of my

25 subordinates would advise me to do the same.

1  Q.   Just to be clear, Mr. Jordan, you didn't know -- did you?

2  -- that LaWanna Preston was undermining the City Administrator?

3  A.   Until -- up until Mr. Donelan told me, yes; then I became

4  aware of that.

5  Q.   Mr. Donelan told you that it was his opinion that

6  Ms. Preston was undermining City Administrator.  Correct?

7  A.   I don't think it was his opinion.

8       I think it was factual information that he shared with me.

9  Q.   Okay.  And you relied on what he told you?

10 A.   Yes, I did.

11 Q.   You didn't do any independent investigation to determine

12 whether what Barry Donelan said was true or not?

13 A.   I did not, because I didn't feel it was necessary to do

14 that.  He was a credible person, and he wouldn't have any

15 reason to make something up like that.

16 Q.   So likewise, when he criticized your performance as Police

17 Chief, you accepted what he said was true?

18          MR. LAFAYETTE:  Objection as argumentative.

19          THE COURT:  Overruled.

20          MR. LAFAYETTE:  Relevancy.

21          THE COURT:  I think you can answer.

22          THE WITNESS:  I accepted it as part of doing

23 business.  I'm critical of the union, as well.  So it was

24 accepted practice that management and union don't always get

25 along.

1  BY MR. SIEGEL

2  Q.   And you took what the union would say, in criticizing you,

3  with a grain of salt.  Correct?

4  A.   Depending on -- some -- some of them had merit, and some

5  didn't.

6  Q.   All right.  Do you know whether Ms. Santana went through

7  the procedures required by Oakland City policy when she

8  accessed Ms. Preston's e-mail?

9            MR. LAFAYETTE:  Lacking foundation.

10            THE COURT:  Overruled.

11            THE WITNESS:  I don't.

12            MR. SIEGEL:  Thank you.  I have no further questions.

13            THE COURT:  All right.  Do you have redirect?

14            MR. LAFAYETTE:  (Indicating.)

15            THE COURT:  Quickly.

16                    **REDIRECT EXAMINATION**

17  BY MR. LAFAYETTE

18  Q.   Prior to Mr. Donelan coming to you with this undermining

19  comment, had anyone else come to you with something like that

20  before?

21  A.   No.

22            MR. SIEGEL:  Beyond the scope.

23            THE COURT:  Overruled.

24      You can answer again, just so the jury hears.

25            THE WITNESS:  No.

 1          **MR. LAFAYETTE:**  Thank you, Your Honor.  That's it,

 2    Your Honor.

 3          **THE COURT:**  All right.  Mr. Jordan, we're going to

 4    take a brief break.  And I'm going to give the jurors an

 5    opportunity to ask you any questions -- they write them down --

 6    if they wish to.  So we'll take a five-minute recess for the --

 7    actually, let's make it a ten-minute recess.  We'll call it our

 8    morning break.  Ten-minute recess.  And if the jurors wish to

 9    write any questions, they may.  We'll return either with

10    Mr. Jordan or the next witness.  Thank you very much.  You may

11    step down.  We'll be back in ten minutes.  Thank you.

12    (Recess taken from 9:59 a.m. until 10:12 a.m.)

13          (Proceedings were heard out of presence of the jury:)

14          **THE COURT:**  All right.  We have one question for

15    Mr. Jordan for the jury, and we'll call the jury in.

16          Mr. Jordan, if you could return to the stand.

17          (Proceedings were heard in the presence of the jury:)

18          **THE COURT:**  All right.  Please be seated.

19          Mr. Jordan, you remain under oath.  This is question

20    number 8.  First question for you from the jury, it has two

21    parts.  I'll read the entire thing and go back to make sure you

22    heard the whole question.

23          The question is:  "Would you continue your meetings with

24    Mr. Donelan during times when the City was negotiating with the

25    Police Officers' Association?  The second part of the question

1    is in parenthesis, (or the union, if that's different from the

2    POA.)"

3        So just to restate the entire thing.

4        "Would you continue your meetings with Mr. Donelan during

5    times when the City was negotiating with the Police Officers'

6    Association (or the union, if that's different from POA.)"

7            **THE WITNESS:**  Yes, I would, and the reason for that

8    is there were a lot of --

9            **MR. SIEGEL:**  Objection, Your Honor.  The answer was

10   complete.

11           **THE COURT:**  Overruled.  You may explain your answer.

12           **THE WITNESS:**  We discussed a number of things other

13   than labor management issues.  We had working conditions, shift

14   change, disciplinary issues with officers, and a whole host of

15   things that we talked about.  We had -- he had maybe five

16   items, and I had five items, and that's where we met and

17   discussed in trying to come to some kind of agreement

18   irrespective of what was happening with negotiations.

19           **THE COURT:**  Thank you.  You may step down.  Thank you

20   for being here.

21           **THE WITNESS:**  Thank you.

22           **THE COURT:**  And we're now returning to the

23   plaintiff's side of the case, and Ms. Preston will call her

24   next witness.

25           **MR. SIEGEL:**  Can we call Teresa Reed?

1          **THE COURT:**  Come on forward.  Come right up here,

2    please.  Thank you.  Watch your step.

3          **THE CLERK:**  Please raise your right hand.

4                          <u>**TERESA REED**</u>,

5    called as a witness for the <u>**PLAINTIFF**</u>, having been duly sworn,

6    testified as follows:

7          **THE WITNESS:**  I do.

8          **THE CLERK:**  Please be seated.  Speak clearly into the

9    microphone, and state your full name, and spell your last name,

10   please.

11         **THE WITNESS:**  My full name is Teresa Lynette Deloach

12   Reed.  My last name is spelled D-E-L-O-A-C-H, Reed, R-E-E-D.

13                     <u>**DIRECT EXAMINATION**</u>

14   **BY MR. SIEGEL:**

15   **Q.**   Good morning, Chief Reed.

16   **A.**   Good morning.

17   **Q.**   You are the chief of the Oakland Fire Department; correct?

18   **A.**   Yes, I am.

19   **Q.**   And you became the chief on March the 5th, 2012; am I

20   correct?

21   **A.**   That's correct.

22   **Q.**   Before becoming chief of the Oakland Fire Department, you

23   worked for the Fire Department in San Jose; is that right?

24   **A.**   That's correct.

25   **Q.**   And you were appointed as chief of the Oakland Fire

1  Department by Deanna Santana; is that right?

2  **A.**    That's correct.

3  **Q.**    And you knew Ms. Santana from when the two of you worked

4  together in San Jose?

5  **A.**    That's correct.

6  **Q.**    Okay.  Now, when you came to Oakland, you learned some

7  things about how labor relations were conducted in Oakland; am

8  I right?

9  **A.**    I'm -- no.

10  **Q.**    Well, weren't you --

11  **A.**    You mean -- could you clarify that?

12  **Q.**    Sure.  Okay.  Let me be more specific.

13       When you came to Oakland, you learned that in the City of

14  Oakland, labor negotiations were conducted by the Employee

15  Relations Department; is that right?

16  **A.**    I'm aware of that, yes.

17  **Q.**    And you learned that soon after you came to Oakland?

18  **A.**    Correct.

19  **Q.**    And you learned also that before a department, such as the

20  Fire Department or any other department, made a proposal at the

21  bargaining table to a union, the City Council's authorization

22  was required?

23  **A.**    I learned that it was Employee Relations' responsibility

24  for that.

25  **Q.**    Let me repeat my question.

REED - DIRECT / SIEGEL

1   **A.**   Okay.

2   **Q.**   Did you learn, when you came to Oakland, that before a

3   proposal could be made at the bargaining table, the City

4   Council's authorization was required?

5   **A.**   Yes.

6   **Q.**   And you learned that in part from your senior staff; is

7   that right?

8   **A.**   Correct.

9   **Q.**   You had people on your staff, specifically Donna Hom and

10   Mr. Hoffman, who made sure that you understood the procedures;

11   is that right?

12   **A.**   Well, I -- I'm kind of -- you know, you make it sound as

13   if we had this conversation and they walked me through what the

14   process was, and I do recall that there was an issue that was

15   on the table when I first came to Oakland regarding brownouts,

16   and during those brownouts, after having conversations with

17   Local 55, we thought of some different ways to do brownouts,

18   but the brownouts was already negotiated that they were to be

19   done specifically this way, and it was in a side letter that

20   had been signed and agreed to.  And Donna Hom did tell me that

21   any changes to that agreement, that I would have to go through

22   Employee Relations and through Council, yes.

23   **Q.**   Okay.  Great.  Now, you mentioned the issue of brownouts.

24   Brownouts refers to a process by which a particular fire

25   station may be closed for a period of time in order to save

1 money?

2 **A.**   And it depends, sometimes it's a fire station if there's

3 only one engine company located at that fire station, it may

4 just be a company if that fire station has two companies

5 located there.

6 **Q.**   Okay.  And what you mean by that is that some fire

7 stations have fire engines, some have fire trucks, and some

8 have both?

9 **A.**   Some fire stations have fire engines, and some fire

10 stations have both, fire engines and trucks.

11 **Q.**   Okay.  Great.  In the binder that's in front of you with

12 the blue cover, would you please look at tab 11?

13 **A.**   I have it.

14 **Q.**   Do you recognize that document?

15 **A.**   Yes, this is the document that I was referring to.

16 **Q.**   Okay.  So this is an email message that you wrote to

17 Daryelle Lawanna Preston on March 23, 2012?

18 **A.**   Correct.

19         **MR. SIEGEL:**  Your Honor, I'd offer Exhibit 11.

20         **MR. LAFAYETTE:**  No objection.

21         **THE COURT:**  Exhibit 11 is admitted in evidence.

22    (Trial Exhibit 11 received in evidence)

23 **BY MR. SIEGEL:**

24 **Q.**   And this email was written quite soon after you started

25 working in the City of Oakland; correct?

1  A.   Correct.

2  Q.   And you knew that Lawanna Preston was the person that you

3  needed to deal with over issues relating to union negotiations

4  and related matters; was that right?

5  A.   I'm going to guess that my staff knew Lawanna, and I was

6  advised that this was the process.

7  Q.   Okay.

8  A.   And I don't believe that I had -- I don't recall if I had

9  known that Lawanna was the person.

10 Q.   Okay.  But either Ms. Hom or Mr. Hoffman or both of you --

11 or both of them made it clear that you should be in touch with

12 Ms. Preston?

13 A.   Through this email, yes.

14 Q.   Okay.  Fair enough.  So I'd like to move ahead.

15      Were you familiar with something called the Paramedic

16 Support Program?

17 A.   Correct.

18 Q.   And that was a program that would provide premium pay to

19 certain personnel in the Fire Department; correct?

20 A.   It's a program that had been in existence since 1999, and

21 yes, they did get a premium pay to participate.

22 Q.   Okay.  And when you say premium pay, that would mean

23 something that was in addition to their normal pay?

24 A.   Correct.

25 Q.   So the Paramedic Support Program actually cost the Fire

1  Department and the City of Oakland money?

2  **A.**    Correct.

3  **Q.**    So when the premium pay program was continued during July

4  of 2013, that meant that the persons who participated in that

5  program would get some additional money; correct?

6  **A.**    That's -- yes, that is correct.

7  **Q.**    Okay.  Now, your understanding, in spring of 2013, was

8  that the program was going to expire as of June 30; is that

9  right?

10  **A.**    Correct.

11  **Q.**    And fair to say that it was your intent to let the program

12  expire?

13  **A.**    Correct.

14  **Q.**    But you were directed to have a conversation with the

15  union about the extension of the program; correct?

16  **A.**    Correct.

17  **Q.**    And the person who directed you in May or June of 2013 to

18  have a conversation with the union about extending the

19  Paramedic Support Program was your direct supervisor Deanna

20  Santana; correct?

21  **A.**    There was no conversation about extending the program.

22  The conversation just was about having a conversation with

23  them.

24  **Q.**    Okay.

25  **A.**    There was no specifics in regards to what to do with the

1  program.

2  Q.   Okay.  But in May of 2013, Ms. Santana directed you to

3  have negotiations with Local 55; is that correct?

4  A.   That's not correct.  She just asked us to have a

5  conversation with them, to meet with them.

6  Q.   So I'm confused.  How did -- how was my statement

7  incorrect?

8  A.   Well, negotiations means that you would have to have

9  Employee Relations at the table.

10  Q.   I see.  So she just told you to meet with them?

11  A.   Correct.

12  Q.   Okay.  And to meet with them about the Paramedic Support

13  Program?

14  A.   Correct.

15  Q.   And you thought, did you not, that because Ms. Santana

16  directed you to meet with Local 55 about the Paramedic Support

17  Program, that that gave you the authority to meet with them?

18  A.   Well, I -- the authority to meet with them?  Yes.

19  Q.   Yes?

20  A.   Well, actually, I don't need the City Administrator's

21  authority to meet with 55, because we typically have meetings

22  once a month, but for this particular thing, yes, she did ask

23  us to have a conversation with 55 in regards -- that was my

24  impression.  That was my understanding, yes.

25  Q.   And you felt, since she was your boss, you didn't need

1   anyone else's permission to have that conversation with Local

2   55?

3                   **MR. LAFAYETTE:**  Cumulative, Your Honor.

4                   **THE COURT:**  Overruled.  You may answer.

5                   **THE WITNESS:**  Could you ask the question again?

6   **BY MR. SIEGEL:**

7   **Q.**   Sure.  You understood, because Ms. Santana was your boss,

8   and she told you to meet with them, you didn't need anyone

9   else's permission; correct?

10  **A.**   Correct.

11  **Q.**   Okay.  Now, is it fair to say that there was a meeting set

12  up for Friday, June the 28th?

13  **A.**   I know there was a meeting on June 28th, yes.

14  **Q.**   Okay.  You don't recall if that was a Friday?

15  **A.**   No, I don't.

16  **Q.**   Okay.  And you, I believe, were not present at that

17  meeting, correct?

18  **A.**   Correct.

19  **Q.**   But there was some email communications that you were part

20  of prior to that meeting; is that right?

21  **A.**   There was a lot of emails.  Do you have one specifically?

22  **Q.**   I do.  I do.

23  **A.**   Okay.

24  **Q.**   In that big black binder.

25  **A.**   This one here?

1  Q.    Yes.  Would you please look at Exhibit 1Z?

2  A.    Okay.

3  Q.    Now, once you get to Exhibit 1Z, would you turn to the

4  page that's numbered at the bottom 1042?

5  A.    Okay.

6  Q.    Okay.  And do you see that 1042 includes some email

7  communications between Zac Unger and Trinette Gist Skinner?

8  A.    Yes.

9  Q.    And who is Zac Unger?

10 A.    Zac Unger is the vice-president of Local 55.

11 Q.    And Trinette Gist Skinner is who?

12 A.    Trinette Gist Skinner is the Division Manager of

13 Administrative Services for the Oakland Fire Department.

14 Q.    Okay.  And do you see that you were copied on these email

15 communications between Zac Unger and Trinette Gist Skinner on

16 June the 24th, 2013?

17 A.    Yes.

18        MR. SIEGEL:  Your Honor, I would like to offer

19 page 1042 of Exhibit 1Z.

20        THE COURT:  That exhibit is already in evidence, so

21 you may show the jury.

22        MR. SIEGEL:  All right.

23 Q.    So I'd like to just have you look at this for a second.

24 Before I put it up, do you see that Zac Unger says:

25        "Trinette, quote, I am available any time on the 28th.

1  Will we have authorization to discuss all outstanding issues,

2  including money, at that meeting?"

3       Do you see that?

4  A.   Yes.

5  Q.   Okay.  And you received that email or a copy of that email

6  from Mr. Unger, didn't you?

7  A.   Yes.

8  Q.   Okay.  And you then sent Trinette Gist Skinner, Mark

9  Hoffman, and Stewart McGehee to the meeting on June 28th?

10 A.   Well, I know that there was a meeting prior to, and so

11 these were the individuals that the department had that was

12 familiar with it.  So yes, they did attend the meeting on the

13 28th, to my understanding.  I was not there.

14 Q.   And that was at your direction, correct?

15 A.   I can't specifically say on this meeting on the 28th that

16 I gave them directions to go, because there was another meeting

17 prior to that, and I think the individuals that attended the

18 meeting prior to just continued to meet; and it's the same

19 with -- we see Tracey Chin is also copied on this email.  I

20 wasn't aware that she was a part of this, and also Winnie

21 Anderson was part of this email, and so we can say that all of

22 them, because this is how it was communicated, that they all

23 may have attended the meeting, because it looks like they were

24 all copied in previous emails.

25 Q.   Okay.  And after that meeting, excuse me, after the

REED - DIRECT / SIEGEL

1  meeting on June 28th, someone came back to you and said, well,

2  we reached an agreement; correct?

3  A.   I don't recall the conversation.  Reaching agreement on

4  what?

5  Q.   For extending the Paramedic Support Program for one month?

6  A.   I don't recall.

7  Q.   Okay.  In the binder that is with the blue cover, would

8  you look at Exhibit 17, please?

9  A.   Okay.

10  Q.   All right.  Now, you recognize Exhibit 17; correct?

11  A.   Yes, I do.

12  Q.   Okay.  And you signed it?

13  A.   Yes, I did.

14  Q.   Someone from your staff came to you and said:  Chief, at

15  the meeting on June 28th, we reached an agreement, and we need

16  your signature; is that the way it happened?

17  A.   Well, I don't know if those were the words, but I did sign

18  it.

19  Q.   Okay.  Well, why did you sign it then?

20  A.   Because we were -- from the conversations that I've had,

21  they were looking for an extension, and they agreed that they

22  reached this extension, so I signed it.

23  Q.   Okay.  And after you signed that agreement, were you

24  advised by someone that a mistake had been made?

25  A.   Yes.

**REED - DIRECT / SIEGEL**

1  Q.   And who were you advised of that?

2  A.   Winnie Anderson.

3  Q.   Okay.  Would you look at Exhibit 2G, please?

4  A.   2?

5  Q.   G, in the big binder.

6  A.   Okay.

7  Q.   Do you recognize that document?

8  A.   Yes, I do.

9  Q.   And does that include a communication to you by Winnie

10 Anderson?

11 A.   Yes.

12 Q.   And as a result of receiving that communication, did you

13 realize that a mistake had been made?

14 A.   I don't know if you could say I realize or was I told the

15 mistake was made.  I think in this email I was told a mistake

16 was made.

17 Q.   And the mistake was that you had reached this agreement on

18 June 28th, even though the Council had not authorized it in

19 advance?

20 A.   Right.  But the thought, too, was that because Employee

21 Relations was at the table, I thought the Employee Relations

22 were checking all the boxes that needed to be checked in

23 regards to any agreement.

24 Q.   Well, I don't know about checking boxes, but I believe you

25 said before that you thought you had all the authority you

1  needed, because Ms. Santana had directed you to meet with Local

2  55.

3          **MR. LAFAYETTE:**  Objection.  Misstates the witness'

4  testimony.  It's argumentative.

5          **THE COURT:**  Overruled.  The witness can answer the

6  question.

7          **THE WITNESS:**  What I also understood is that Employee

8  Relations was responsible for any negotiations, and Employee

9  Relations was at the table and actually drew up the agreement

10 that myself, members of my staff, members of Local 55, and

11 Employee Relations signed.

12 **BY MR. SIEGEL:**

13 **Q.**  Okay.  Well, let me ask you this.

14 **A.**  Okay.

15 **Q.**  Did you tell Trinette Gist Skinner that Deanna Santana had

16 directed you to meet with Local 55?

17 **A.**  I told Trinette that I got the impression from the

18 conversations I had with Deanna that she wanted us to talk,

19 yes.

20 **Q.**  Okay.  And do you know whether Ms. Gist Skinner told

21 Winnie Anderson that you had been directed or given

22 authorization by Deanna Santana to sit down with Local 55?

23 **A.**  I don't know what conversations Trinette may have had with

24 Winnie.

25 **Q.**  Okay.  And you knew, at the time you signed Exhibit 17,

**REED - DIRECT / SIEGEL**

1   that the extension of the Paramedic Support Program was going

2   to require that the people who participated in it be paid

3   during July of 2013?

4   **A.**    Correct.

5   **Q.**    Now, after the agreement was signed on June 28th, did you

6   have a conversation with Ms. Santana regarding the making of

7   the agreement with Local 55?

8   **A.**    Could you ask that again?

9   **Q.**    Did you have a conversation with Deanna Santana after

10  June 28th regarding the agreement with Local 55?

11  **A.**    I believe the next conversation I had with Ms. Santana was

12  after we were told that we didn't have authorization to make

13  this agreement with 55, and so there was a conversation, an

14  email to her stating -- because I believe it stated in the

15  email that I received from Winnie that we needed authorization

16  either from the City Administrator's Office or Employee

17  Relations in order to negotiate.  And so after I was told that

18  we didn't have authorization, there was contact with

19  Ms. Santana clarifying what I understood in regards to having

20  that conversation.

21  **Q.**    And in your communications with Ms. Santana, you said to

22  her I thought I had authority to do this, because you told me

23  to do it?

24          **MR. LAFAYETTE:**  Objection.

25          **THE WITNESS:**  I don't recall what the exact words

 1  were.

 2              **THE COURT:**  Objection what?

 3              **MR. LAFAYETTE:**  Question is vague.

 4              **THE COURT:**  You may answer.  Overruled.

 5              **THE WITNESS:**  I don't recall what the exact words

 6  were.  I believe I sent her an email.

 7  **BY MR. SIEGEL:**

 8  **Q.**   I know you -- and I'm not trying to give you a test here.

 9  Did you say to Ms. Santana:  *I thought you gave me the*

10  *authority to do this?*

11  **A.**   I sent Ms. Santana an email, and I can't say verbatim what

12  that email states.

13  **Q.**   Okay.  Let me ask you this then.  Do you recall saying to

14  Ms. Santana:  "I have an email from you to meet with Local 55

15  regarding the PSP program.  Your email asked me to let you know

16  when we are scheduled to meet.  Did I misinterpret your

17  direction?"

18  **A.**   Is that in an email form?  Is that an email that you're

19  quoting or --

20  **Q.**   Indeed it is.

21  **A.**   Okay.  Then if I could see that, then I can state for sure

22  if that's what I said.

23              **MR. SIEGEL:**  Okay.  Your Honor, to refresh the

24  witness's recollection, I would like to show her Exhibit 4 to

25  the deposition of Deanna Santana.

REED - DIRECT / SIEGEL

1    THE COURT:  Is that an email?

2    MR. SIEGEL:  Yeah.

3    MR. LAFAYETTE:  Could I see?

4    MR. SIEGEL:  Yeah, you can see.

5    THE WITNESS:  (Witness examines document.)  Yep.

6  This is what I sent to her.

7  BY MR. SIEGEL:

8  Q.   Okay.  And did I quote you correctly?

9  A.   It states:  "I have an email from you to meet with 55

10 regarding the PSP program.  Your email asked me to let you know

11 when we were scheduled to meet.  Did I misinterpret your

12 direction?  See below."

13 Q.   Now, after the June 28th agreement was signed, did you

14 hear from Lawanna Preston?

15 A.   No.

16 Q.   Isn't it true that Lawanna Preston indicated to you that

17 an error had been made?

18 A.   The first email that I received I recall was from Winnie

19 Anderson.

20 Q.   I'm asking you about one from Lawanna Preston.

21 A.   I don't recall an email from Lawanna.

22 Q.   Do you recall that I took your deposition on March the 20,

23 2015?

24 A.   I do recall taking a deposition.

25 Q.   Okay.  And you were -- sworn an oath and agreed to tell

1  the truth during that deposition?

2  **A.**   Yes.

3  **Q.**   And do you recall that I asked you whether, after the

4  agreement was signed, whether you had any conversations with

5  Ms. Preston about the agreement?

6           **MR. LAFAYETTE:**  Objection, relevancy.

7           **THE COURT:**  Overruled.  It's relevant, but it's a

8  different question than the one you just asked in court.

9  **BY MR. SIEGEL:**

10 **Q.**   Okay.  Well --

11          **THE COURT:**  Emails and conversations are not the same

12 question.

13 **BY MR. SIEGEL:**

14 **Q.**   After the agreement was signed, did you have any

15 conversations with Ms. Preston about the agreement?

16 **A.**   Yes, I did.

17 **Q.**   And do you recall whether she indicated to you that

18 signing the agreement was not appropriate, because Council had

19 not approved?

20 **A.**   I don't recall having that conversation with Lawanna.  The

21 conversation that I recall was more along the lines:  What is

22 the process, and so we can make sure that we follow the correct

23 process.

24 **Q.**   Okay.  And did Ms. Preston indicate to you what had to be

25 done in order to fix the problem?

1  A.   I don't -- I don't recall.  All I do recall is that we

2  went through and had to -- got on the schedule to go to closed

3  session.

4  Q.   Okay.  And you went to the City Council; correct?

5  A.   Correct.

6  Q.   And the City Council approved the agreement retroactively;

7  correct?

8  A.   Yes.

9  Q.   And so the members of the Fire Department who participated

10 in the Paramedic Support Program in fact received the money

11 that was due them under that program for July of 2013?

12 A.   Correct.

13 Q.   So the problem was resolved?

14 A.   Well, to an extent, because the negotiations wasn't over,

15 just the extension.

16 Q.   Right.

17 A.   So the problem was resolved in regards to that agreement;

18 correct.

19 Q.   Okay.  Now, after you learned that there had been a

20 problem in entering into the agreement, did you tell people in

21 Local 55 that we have a problem here?

22 A.   I may have called 55 and advised them, yes.

23 Q.   Okay.  And would it be fair to say that they were quite

24 unhappy about the fact that they had signed an agreement and

25 then later learned that the agreement was improper?

REED - DIRECT / SIEGEL

1  **A.**    Yes, they were, and so were we.

2  **Q.**    Everyone was unhappy; correct?

3  **A.**    Yes.

4  **Q.**    And would it be fair to say this added to ongoing problems

5  between the Fire Department and Local 55?

6            **MR. LAFAYETTE:**  Objection, calls for an opinion.

7            **THE COURT:**  Overruled.

8            **THE WITNESS:**  Could you repeat the question?

9  **BY MR. SIEGEL:**

10 **Q.**    Yeah.  Isn't it true that the situation that had occurred

11 with the agreement to extend the Paramedic Support Program

12 added to existing problems between you and the Firefighters

13 union?

14           **MR. LAFAYETTE:**  Objection.

15           **THE WITNESS:**  I'm really not sure how to answer,

16 because then I would have to speak for Local 55.

17           **THE COURT:**  Please, one moment.  What is the

18 objection?

19           **MR. LAFAYETTE:**  It would require her to speculate.

20           **THE COURT:**  All right.  Then say that.  Overruled.

21 If you know the answer, you can answer it.  Go ahead.

22           **THE WITNESS:**  I don't know what Local 55 was feeling.

23 **BY MR. SIEGEL:**

24 **Q.**   Fair enough.  But you did learn that they had criticisms

25 of your leadership of the department; correct?

**REED - DIRECT / SIEGEL**

1  **A.**   I knew that Local 55 had some concerns, yes, they did.

2  **Q.**   And those were criticisms; right?

3          **MR. LAFAYETTE:**  Objection, relevance, Your Honor.

4          **THE WITNESS:**  I know that Local 55 --

5          **THE COURT:**  Hold on.  Overruled.  You may answer.

6          **THE WITNESS:**  -- had some concerns.

7  **BY MR. SIEGEL:**

8  **Q.**   But not criticisms?

9  **A.**   Well, I don't -- when you talk about criticisms, I mean,

10 that could be like the whole range of things, and a lot of

11 times when you criticize people, you may criticize someone to

12 someone else, and the issues that we spoke to were very

13 specific.

14 **Q.**   Okay.  Deanna Santana told you that Local 55 had conveyed

15 to her criticisms that Local 55 had of you; correct?

16         **MR. LAFAYETTE:**  Objection, hearsay.

17         **THE COURT:**  Sustained.

18 **BY MR. SIEGEL:**

19 **Q.**   Okay.  Lawanna Preston instructed the Fire Department on

20 how negotiations should proceed; is that right?

21 **A.**   There was an email, to my recall, that was sent by

22 Vice-President Zac Unger, and I followed up with that email to

23 Lawanna detailing the -- asking her to detail the steps that we

24 needed to take to make sure that as we moved this process

25 forward, that it went correctly.

1   Q.   Okay.   And she did that; right?

2   A.   Yes.

3   Q.   Okay.   And would you agree that in your interactions with

4   Ms. Preston regarding negotiations, she behaved in a

5   professional manner?

6   A.   During what negotiations?

7   Q.   During all the negotiations that you had with Local 55

8   since you became fire chief up until the time Lawanna Preston

9   was fired.

10  A.   I was in one negotiations which was the Promoted Support

11  Paramedic Program.   Lawanna stated to me that Employee

12  Relations is the bargaining representative for the City, and

13  that they are responsible for doing all bargaining.

14       When we went into -- to bargaining with 55 to discuss

15  salary, I ended up being the one during the bargaining, and

16  Ms. Preston did not participate, though she was in the room,

17  she did not participate in those bargaining efforts.   And so I

18  was a little confused at that time, because it was -- she was

19  very clear, saying that she's the -- her office was the chief

20  negotiators for the City, but during that negotiations, she did

21  not participate as the chief negotiator.

22  Q.   Okay.   Do you recall meeting with Ms. Preston to talk

23  about the whole Paramedic Support Program process and asking

24  her to sit down and explain to you and your staff what the

25  process is, so we make sure that we don't make that mistake

1   again?

2   A.   Correct.

3   Q.   Okay.  And was that at some point after July 5th, 2013?

4   A.   I don't recall, but I know that it was after everything

5   had come to light.

6   Q.   Regarding the June 30 agreement?

7   A.   Correct.

8   Q.   Okay.  And how did Ms. Preston conduct herself in that

9   conversation with members of the Fire Department?

10   A.   She's very professional.  You know, she told us how it

11   worked.  She spoke about her role and what Employee Relations

12   were responsible for, and as mentioned, she stated that

13   Employee Relations was the chief negotiators for the City.

14   Q.   Okay.  And were there any problems in your working

15   relationship with Lawanna Preston?

16   A.   Aside from that issue right there with the Promoted

17   Support Paramedic Program, no.

18   Q.   Do you recall ever complaining about her performance, that

19   is about Lawanna Preston's performance to Deanna Santana?

20   A.   I don't recall.

21   Q.   You don't recall doing that, do you?

22   A.   No, I don't recall.

23   Q.   And then finally, would you look at Exhibit 22 in the

24   binder with the blue front?

25   A.   Okay.

REED - CROSS / LAFAYETTE

1  **Q.**   Is Exhibit 22 a couple of email messages between your

2  department or within your department concerning the

3  notification to Local 55 regarding what had occurred with

4  respect to the Paramedic Support Program?

5  **A.**   Okay.

6  **Q.**   Is it?

7  **A.**   Yes.

8          **MR. SIEGEL:**  Your Honor, I would offer Exhibit 22.

9          **MR. LAFAYETTE:**  Just a second, Your Honor.

10          **THE COURT:**  It's also 2K.

11          **MR. LAFAYETTE:**  2K, no objection, Your Honor.

12          **THE COURT:**  All right.  Exhibit 22 is admitted in

13  evidence.

14      (Trial Exhibit 22 received in evidence)

15          **MR. SIEGEL:**  Thank you.  I have no further questions.

16          **THE COURT:**  Cross-examine.

17          **MR. LAFAYETTE:**  Yes, Your Honor.

18                          **CROSS-EXAMINATION**

19  BY MR. LAFAYETTE:

20  **Q.**   Good morning, Chief Reed.

21  **A.**   Good morning.

22  **Q.**   When you came to the City of Oakland, how long had you

23  been working in Fire?

24  **A.**   23 years.

25  **Q.**   And how long have you been a chief -- you've been a chief

REED - CROSS / LAFAYETTE

1   at Oakland since March 2012?

2   **A.**   Yes.

3   **Q.**   And when you were the chief of Fire -- well, what position

4   did you hold before chief in Oakland?

5   **A.**   I was the Assistant Chief.

6   **Q.**   And as the Assistant Chief, how many people did you have

7   under your command?

8   **A.**   I had all of our operations bureau, so it was close to

9   650.

10  **Q.**   Okay.  And so when you came to Oakland -- well, let's just

11  fast forward to this issue.

12       At any point in time prior to June 28, did anyone come to

13  you and tell you that there was something amiss with regard to

14  signing the TA, the extending the term of the contract by 30

15  days?

16  **A.**   Before June 28th?

17  **Q.**   Yes.

18  **A.**   No.

19  **Q.**   Was that something that you would have expected Labor

20  Relations to communicate to you?

21  **A.**   Yes, because Labor Relations drew up the TA and presented

22  it to 55, and if there was an issue with it at that time, I

23  would have thought Employee Relations would have identified

24  that when the request was even made to draw up the TA.

25  **Q.**   And did you personally handle that through June 28th all

1  the discussions taking place with the union and with Labor

2  Relations?

3  **A.**   I didn't handle any of those discussions.   In fact, I

4  wasn't present at any of those discussions.

5  **Q.**   Now, let's get to what happens afterwards.   I want to

6  direct your attention to a document, which has been previously

7  marked as Exhibit 3F.

8       Do you have 3F in front of you?

9  **A.**   I have it.

10 **Q.**   So if I understand it, the City Council retroactively

11 extended the Paramedic Program for an additional 30 days until

12 July 30 for this issue to be resolved as to what would happen

13 going forward; is that accurate?

14 **A.**   Correct.

15 **Q.**   And did you work with people to make sure that by July 30,

16 that this issue would be resolved?

17 **A.**   We actually knew that we weren't going to resolve it by

18 July 30th, but the team still worked together, my staff and

19 Employee Relations.

20 **Q.**   When was it actually finally resolved?

21 **A.**   I believe sometime in September.

22 **Q.**   Is Exhibit 3F the document memorializing the date upon

23 which this issue is finally resolved?

24 **A.**   (witness examines document)   Yes.

25 **Q.**   So now, I'd like to direct your attention to a few other

1  documents.  Can you take a look at Exhibit 2U?  Well, let me

2  just ask you.  Were there difficulties getting this --

3  actually, go to 2M.

4  **A.**    2?

5  **Q.**    M.  Exhibit 2M, is that an email that commences on page 3

6  from you to Zac Unger?

7  **A.**    I'm sorry.  Could you repeat?  And also if you could speak

8  up a little --

9  **Q.**    Okay.  I'll try that.

10  **A.**    -- louder.

11  **Q.**    2M.

12  **A.**    Um-hm.

13  **Q.**    And can you look at page 3?

14  **A.**    1058 at the bottom?

15  **Q.**    Yes, 1058.

16  **A.**    Okay.

17  **Q.**    Is that an email from you to Zac Unger?

18  **A.**    (witness examines document)  There's a couple of emails on

19  this page, so I'm trying to see which ones --

20  **Q.**    I will start at the bottom.

21         **THE COURT:**  Just one second.  We're in 2M, as in

22  Mary.

23         **MS. MEHTA:**  Thank you.

24         **THE COURT:**  Go ahead.

25         **MR. LAFAYETTE:**  Oh, Thank you, Your Honor.

1  Q.   The first one at the bottom of the page is an email from

2  Zac Unger to you?

3  A.   Right.

4  Q.   And he's asking you what's the discussion -- paramedic

5  discussion from last night's council meeting?

6  A.   Actually, it looks like that one --

7  Q.   I'll simplify this.  Do you remember this email string?

8  A.   I do remember this email string.

9            MR. LAFAYETTE:  I'd like to move this in evidence,

10 Your Honor.

11           THE COURT:  Any objection?

12           MR. SIEGEL:  No objection.

13           THE COURT:  Exhibit 2M is admitted into evidence.

14     (Trial Exhibit 2M received in evidence)

15 BY MR. LAFAYETTE:

16 Q.   Now, at some point in time in this email string, did you

17 indicate to the union that the union needed to deal with

18 Lawanna Preston for purposes of going forward?

19     And I draw your attention to page 2 near the bottom here

20 (indicating)?

21 A.   Right.

22 Q.   You write:  "It appears to me, to get on the same page

23 regarding the process, since I am new to this, I am going to

24 refer to Trinette or Lawanna to explain, to define the process

25 in regard to next steps prior to L55 membership vote."

1   A.   Correct.

2   Q.   And so were you advising the union and everyone else that

3   for purposes of going forward, that it was going to be Labor

4   Relations that was going to be basically laying out the

5   process?

6           MR. SIEGEL:   Your Honor, I'd have to object.   It

7   misstates the email.   She was advising Mr. Unger, not everyone

8   else.

9           THE COURT:   Overruled.   The witness can answer in her

10   own words.

11           THE WITNESS:   Yes, we were -- yes, that we had to get

12   on the same page and have an understanding with Employee

13   Relations of how we move this forward.

14   BY MR. LAFAYETTE:

15   Q.   And so the email up above, you see an email dated July 11,

16   2013 at 10:21 a.m., is that an email from Mr. Unger to you and

17   others, including Ms. Preston?

18   A.   Correct.

19   Q.   In the email is he now addressing to Ms. Preston the

20   issues about how you proceed going forward?

21   A.   Correct.

22   Q.   Go to the first page.   Is the first page in fact an email

23   from Ms. Preston that outlines the process for going forward?

24   A.   Yes.

25   Q.   So she advises that the City will have authorized

1  representatives at the table; right?

2  A.    Um-hm.

3  Q.    She advises that the Council has authorized the extension

4  of the side letter until July 30?

5  A.    Yes.

6  Q.    She then advises that under something -- "under City

7  Resolution 55881, Employee Relations Officer means the City

8  Manager and/or his designated representative.  Pursuant to the

9  resolution, I am designated as the Employee Resolutions

10  Relations Officer and have the authority to sign the tentative

11  agreements on behalf of the City."

12  A.    Correct.

13  Q.    And then she lays out a process about -- for purposes of

14  going forward, at what point you need to get authorization from

15  Council?

16  A.    Yes.

17  Q.    Now, one of the questions that Mr. Unger posed in his

18  email is "What is the mechanism for signing the second

19  extension it now appears we will need?  How can we ensure that

20  that extension will be valid."

21      Did you understand that Ms. Preston was stating in part

22  that she could sign the extension, and that it may require

23  Council approval?

24  A.    Correct.

25  Q.    Now, the agreement did not get resolved by the 30th, did

**REED - CROSS / LAFAYETTE**                                    555

1   it, this issue?

2   **A.**    Correct.

3   **Q.**    And did the union express dissatisfaction that

4   notwithstanding Ms. Preston's comments, this issue had not been

5   resolved?

6   **A.**    Yes, I do recall an email that spoke to the fact that the

7   issue hadn't been resolved yet.

8   **Q.**    Now, did the union express concern to you as to why at the

9   end of July they were still at the point that they didn't have

10  agreement, notwithstanding the point -- the fact that they had

11  communicated with Winnie Anderson and Ms. Lawanna Preston about

12  trying to get this resolved?

13  **A.**    I believe there is an email to that effect.  I recall an

14  email to that effect.

15  **Q.**    Could you take a look at Exhibit 2U?  Does Exhibit 2U

16  refresh your recollection?

17  **A.**    Yes.

18  **Q.**    That Zac Unger wrote to you "advising that in both written

19  and oral form, I have issued repeated reminders about this

20  deadline --

21          **THE COURT:**  One moment, counsel.  There's an

22  objection to this document before trial, which you have not

23  resolved.  Also before you start reading it out loud, you have

24  to deal with the objection.

25          **MR. LAFAYETTE:**  I appreciate that.

REED - CROSS / LAFAYETTE                    556

 1          MR. SIEGEL:  Your Honor, we withdraw the objection,

 2   and it may be admitted.

 3          THE COURT:  All right.  You may proceed then.

 4          MR. SIEGEL:  So is it admitted, though?

 5          THE COURT:  Are you moving it into evidence?

 6          MR. LAFAYETTE:  Not at this point, Your Honor.

 7          THE COURT:  All right.  Go ahead with your questions.

 8          MR. SIEGEL:  Well, then I object to it being read if

 9   it's not in evidence.

10          THE COURT:  All right.  Which way are you going to go

11   on this one?  Are you objecting or not objecting to the

12   document?

13          MR. SIEGEL:  I'm asking that it be admitted into

14   evidence without objection, and I'm also saying that the

15   exhibit should not be read if it is not in evidence.

16          THE COURT:  Exhibit 2U is admitted in evidence.  You

17   may question the witness about it.

18      (Trial Exhibit 2U received in evidence)

19   BY MR. LAFAYETTE:

20   Q.   Now, do you understand that at some points in time people

21   complain to you directly?

22   A.   Correct.

23   Q.   And when they complain to you, you understand that the

24   complaint is related to the people who are under your command?

25   A.   Correct.

1  **Q.**   Is this one of those types of communications?

2  **A.**   Yes.

3  **Q.**   And so the complaint is to you, and it names you.  As of

4  this date, had you delegated responsibility for handling this

5  matter to Labor Relations or had Labor Relations assumed

6  control?

7  **A.**   Yes.

8  **Q.**   And Ms. Preston in an earlier email had so stated; right?

9  **A.**   Yes.

10  **Q.**   And so now you get this document where the union is saying

11  "in both written and oral form, I have issued repeated

12  reminders about this deadline to you, Stewart McGehee, Winnie

13  and Lawanna.  I'm mystified as to why we again find ourselves

14  on the brink of chaos due to a completely foreseeable much

15  discussed deadline."

16      Did you have an understanding as to who it was that was

17  supposed to be helping you meet this deadline?

18  **A.**   Well, I knew it was Employee Relations, because they were

19  the negotiators.

20  **Q.**   So now you're on July 31?

21  **A.**   Yes.

22  **Q.**   The TA that was in place only applied up until July 30;

23  right?

24  **A.**   Correct.

25  **Q.**   Did Ms. Preston get another extension?

**REED - CROSS / LAFAYETTE**

1  **A.**   I do recall another extension.

2  **Q.**   Do you know if it took place before this date of this

3  letter?

4  **A.**   I don't recall.

5  **Q.**   Do you know if she was able to get Council approval for

6  that extension?

7  **A.**   Yes.

8  **Q.**   And when did she get it for the additional extension?

9  **A.**   I don't recall, but I do recall being in closed session.

10  You know, I went to closed session, and I don't recall if

11  Ms. Preston was there or not asking for another extension.

12  **Q.**   Okay.  Now, at some point did you advise the union that

13  the agreement -- I'd like you to take a look at Exhibit 2G.

14  **A.**   2G.  You said G, as in George?

15  **Q.**   G, as in George.

16  **A.**   Okay.  I have it.

17  **Q.**   Is 2G an email that you sent at the top of the page?

18  **A.**   Yes, it is.

19  **Q.**   And did you send that email in response to an email at the

20  bottom of the page from Winnie Anderson?

21  **A.**   Correct.

22  **Q.**   And did you, in reaction to the email that you got from

23  Winnie Anderson, advise the union that the TA signed on

24  June 28th wasn't enforceable?

25  **A.**   I do recall speaking to 55 to that extent, yes.

1          **MR. LAFAYETTE:**  So at the bottom -- I think this is

2    in evidence, Your Honor.

3          **THE COURT:**  It is.

4    **BY MR. LAFAYETTE:**

5    **Q.**   The bottom email states:  "Dear Teresa, I have received an

6    email from the City Administrator, and the Department had no

7    authorization to sign an extension or have had the conversation

8    with Local 55 in regards to the PSP program."

9          Were you surprised by that?

10   **A.**   I was.

11   **Q.**   She writes, at the last paragraph:  "I understand that

12   Local 55 is taking this to the membership for a vote, and it

13   would be imperative that you contact Local 55 immediately to

14   stop this vote.  Thank you for your attention to this matter."

15         Could I ask you a question?

16   **A.**   Sure.

17   **Q.**   The way things work at the City, should that have been

18   something handled by Labor Relations to contact the union and

19   tell the union that they couldn't do a vote?

20   **A.**   Employee Relations is the -- through, you know, trial and

21   error, Employee Relations is the bargaining group for the City,

22   so those conversations that should have been Employee

23   Relations, but we found ourselves doing a lot of that work

24   ourselves.  And with this, my surprise came because from the

25   beginning, Employee Relations was at the table, and at any time

1   Employee Relations could have said *you guys shouldn't even be*

2   *having this conversation, because, you know, we haven't*

3   *received authorization.*  But that was never stated until after

4   the TA was signed, a TA that was drawn up and presented by

5   Employee Relations.  So I was, when I received this email, I

6   was confused and surprised.

7        **MR. LAFAYETTE:**  Okay.  Now -- Your Honor, I don't

8   think I have any other questions of this witness.

9        **THE COURT:**  Thank you.

10       Mr. Siegel, do you have any further questions within the

11  scope of cross?

12       **MR. SIEGEL:**  I do not.

13       **THE COURT:**  All right.  We'll take a brief break for

14  the jurors, if they wish to, to pose any questions of their own

15  of this witness.  Come back in five minutes, or as long as it

16  takes for that process to be completed.

17       So we're in recess momentarily.  Chief, if you'd hang on

18  for a few more minutes.

19       **THE WITNESS:**  Okay.

20       **THE COURT:**  Thank you.

21   (Proceedings were heard out of presence of the jury:)

22       **THE COURT:**  And we're in recess.

23            (Recess taken at 11:10 a.m.)

24        (Proceedings resumed at 11:16 a.m.)

25   (Proceedings were heard out of presence of the jury:)

REED - CROSS / LAFAYETTE

1        THE COURT:  We're back in session.  The jurors will

2   return in a moment.  We do have one question for the chief, if

3   we could let our jurors back in.

4        (Proceedings were heard in the presence of the jury:)

5        THE COURT:  All right.  Please be seated.  We have a

6   question from our jurors.

7        And you remain under oath to answer this one.

8             THE WITNESS:  Okay.

9        THE COURT:  It has two parts, so I'll read you the

10  entire question and then read it back to make sure you heard

11  all of it.

12       The question is:  Was the PSP ended or continued, and if

13  it was ended, if you know, what is your best estimate of how

14  much the extensions cost the City?

15       So I'll read it all again:  Was the PSP ended or

16  continued, and if it was ended, if you know, what is your best

17  estimate of how much the extensions cost the City?

18            THE WITNESS:  The Promoted Support Paramedic Program,

19  the PSP program, was not ended.  It was extended.  It's still

20  in place today.  With that particular agreement that we agreed

21  to at that time, the agreement was to reduce the number of

22  participants within the program, and increase the pay to three

23  and-a-half percent.  Prior to, they were getting 3 percent,

24  they increased it to three and-a-half, but reduced the number

25  of individuals.  The thought process behind that was not to

1   seek any additional funds that was already allocated through

2   the program, but just redistribute the funds that were already

3   budgeted.

4        And then when the contract was opened up again, we did a

5   full contract negotiations where the Paramedic Program was

6   again renegotiated, and it was increased from three and-a-half

7   percent to 4 percent.

8        **THE COURT:**  Any follow-up on that question,

9   Mr. Siegel?

10                     **REDIRECT EXAMINATION**

11  **BY MR. SIEGEL:**

12  **Q.**   Just to be clear, Chief Reed, it was extended in various

13  steps; is that right?

14  **A.**   So maybe I -- extended wasn't the proper word.  It was

15  continued.

16  **Q.**   Okay.  I'm not trying to quibble with you about the words.

17  But in July, the Council approved the June 30 agreement, which

18  extended it through the end of July; correct?

19  **A.**   Right.  So it was extended twice, and then it was approved

20  for three and-a-half once we got to the table to negotiate

21  salaries.

22  **Q.**   Okay.  But just to be clear, in July, the June 30

23  agreement was approved by Council to extend the program through

24  the end of July; correct?

25  **A.**   Yes.

1  Q.   And then after that, it was extended up through some date

2  in September?

3  A.   I believe so, yes.

4  Q.   And then there was a full contract negotiated to extend it

5  up to now?

6  A.   The contract, the full contract negotiation was not to

7  extend it, it was really just negotiating the incentive pay

8  that the individuals received.  So there was no -- after the TA

9  that was signed in September, there was no need to discuss

10 extending the program, because it was a program that was

11 established, because it had been a pilot program since 1999.

12 And so we took it out of the pilot status, made it a, you know,

13 city-sponsored program.  And so when the contract was reopened

14 I believe the following year, I think in 2014, that all they

15 negotiated -- not the program as a whole or whether to extend

16 it, they just negotiated the incentive pay or the pay those

17 members received that participated in the program.

18 Q.   So the new contract that you have described incorporated

19 the program that had already been negotiated?

20 A.   Correct.  Correct.

21          MR. SIEGEL:  Okay.  Thank you.

22          THE COURT:  Mr. Lafayette, any further questions on

23 your side?

24          MR. LAFAYETTE:  Just to clarify.

25

1                    **RECROSS-EXAMINATION**

2   BY MR. LAFAYETTE:

3   Q.    Exhibit 3F, which I asked you to take a look at before,

4   which is the September 5, 2013 Agenda Report?

5   A.    Is this --

6   Q.    3F, as in Frank?

7   A.    Okay.

8   Q.    Is that the agenda report summarizing what the final

9   disposition was on this issue in 2013?

10  A.    Correct.

11          MR. LAFAYETTE:  I'd like to move that into evidence,

12  Your Honor.

13          MR. SIEGEL:  No objection.

14          THE COURT:  One moment.  3F, as in Frank, is

15  admitted.

16     (Trial Exhibit 3F received in evidence)

17          THE COURT:  Go ahead.

18  BY MR. LAFAYETTE:

19  Q.    And is this the document that relates to the three

20  and-a-half percent for the participants?

21  A.    Correct.

22  Q.    And there's a statement on page 3 that says "sustainable

23  opportunities," and it talks about what the sustainable

24  opportunities are to the extent that there are any; right?

25  A.    Correct.

1  Q.   I think what you're saying is you extended the existing

2  program two times up until September, and then at that point

3  you completed the negotiations, changed some of the numbers

4  with regard to how much each person would get?

5  A.   Correct.

6  Q.   And then that was it?

7  A.   Right.  Changed how much each person would get, and also

8  how many individuals were actually in the program.

9  Q.   And so was there a net monthly increase to the City over

10  what had been going on before?

11  A.   The idea was to stay within the money that was in the

12  program already, so I don't have those figures off the top of

13  my head.  When it -- here, where it talks about -- I don't know

14  if there was an increase in the budget, because of the increase

15  in participants and the increase where we were able to stay

16  with what was already allotted for the program.

17  Q.   A little more to clarify.

18  A.   Okay.

19  Q.   Now, this was a component of one already existing MOU; is

20  that right?

21  A.   Correct.

22  Q.   And in 2014, you renegotiated the entire MOU?

23  A.   Correct.

24  Q.   And when you did that, it addressed the issues that are

25  embraced in this document?

1  **A.**    Correct.

2            **MR. LAFAYETTE:**  Thank you.  No further questions.

3            **THE WITNESS:**  And I'm sorry, just one more thing.

4       And so the -- in 2014, this program went from three

5  and-a-half percent to 4 percent.

6            **MR. LAFAYETTE:**  All right.  Thank you.

7            **THE COURT:**  Ms. Reed, you may step down.  Thank you

8  very much for being here today.

9       And if Ms. Preston will call her next witness, please.

10           **MR. SIEGEL:**  Okay.  I think we'll call Joe Keffer

11  through deposition.

12           **THE COURT:**  All right.  And how would you like to

13  present Joe Keffer's testimony?

14           **MR. SIEGEL:**  I'm going to play Joe Keffer.

15           **THE COURT:**  All right.  So ladies and gentlemen,

16  we're now going to have a deposition presented to you.  A

17  deposition is testimony under oath, under penalty of perjury

18  that is of the same oath given here in court.  The rules permit

19  that deposition testimony may be presented and considered by

20  you just like any other evidence and testimony in the case.

21       Mr. Siegel is going to be providing the testimony to you.

22  It's not his own testimony.  You have to imagine that it's Joe

23  Keffer, and so this is an exception to my admonition to ignore

24  that the words coming out of the mouths of the attorneys is not

25  evidence.  In this occasion it will be evidence, because it's

 1  not his words, it's the words of the witness Keffer.

 2          MR. LAFAYETTE:  Your Honor, there were objections

 3  made to the designations.

 4          THE COURT:  All right.  So which portions?  Whoever

 5  is doing the examination here, which portions of it -- of the

 6  deposition are you planning to present?

 7          MS. MEHTA:  What we submitted to the Court earlier,

 8  and what the --

 9          THE COURT:  Identify it for me.

10          MS. MEHTA:  The discovery excerpts that we showed --

11  okay.  Page 21, line 22 through 22:2.

12          MR. SIEGEL:  You started on page 12, didn't you?

13          MS. MEHTA:  Oh, excuse me.

14          THE COURT:  And I need a copy of it as well.

15          MS. MEHTA:  Of the deposition?

16          THE COURT:  Yes, please.

17          MR. LAFAYETTE:  If I could, Your Honor, at -- we

18  filed Appendix A with the Court, a document which contains each

19  one of the excerpts, along with the objections to the excerpts,

20  and I would suggest that that might be helpful.

21          THE COURT:  Thank you.

22          MS. MEHTA:  Your Honor, this was a defense

23  deposition, so they should provide it to the judge.

24          THE COURT:  Just one moment.  I've got it, the mini

25  deposition transcripts here.

1          **MR. LAFAYETTE:**  And I would lastly point out, Your

2    Honor, that the document that was referring to contains the

3    exact language.  It includes the testimony.

4          **THE COURT:**  So I have been given three volumes of

5    deposition transcripts by the defense; is what you're referring

6    to in one of these volumes?

7          **MR. LAFAYETTE:**  Oh, I would -- if I could, Your

8    Honor, approach.  I was actually pointing to this document that

9    contains his testimony.

10         **THE COURT:**  Why don't you answer my question.  Is it

11   in one of these binders.

12         **MR. LAFAYETTE:**  Volume 1.

13         **THE COURT:**  All right.  I have the Keffer transcript

14   before me, and tell me which parts you're planning to read to

15   the jury.

16         **MS. MEHTA:**  Page 12:1 through 17; page 21,

17   line 22 through page 22, line 23; page 26:1 through 16;

18   page 27:5 through 14; page 27:24 through page 28, line 8;

19   page 28, line 12 through line 24; page 30, line 11 to line 13;

20   page 30, line 18 through line 24; page 32, line 16 through

21   line 21; page 34, line 18 through page 36, line 23; page 37,

22   line 23 through page 38, line 6; page 38 line 13 through

23   line 25; page 40, line 15 through line 4 on page 41; page 43,

24   line 22 through page 44, line 5; page 46, line 17 through

25   page 47, line 3; page 47, line 7 through page 48, line 10;

1  page 54, line 10 through line 17; page 54, line 2 through

2  line 24; page 59, line 21 through page 60, line 2; page 65,

3  line 11 through page 66, line 1; page 72, line 21 through

4  page 74, line 17; page 77, line 23 through page 79 line 15; and

5  finally, page 80, line 9 through page 81, line 3.

6         **THE COURT:**  Thank you.  One moment.

7      Mr. Lafayette, the document number you referred to as far

8  as the Exhibit A --

9         **MR. LAFAYETTE:**  Yes.

10        **THE COURT:**  -- is what?

11        **MR. LAFAYETTE:**  It is docket number 115, 115-1, and

12 it starts on page 1.

13        **THE COURT:**  Thank you.  One second.

14        **MR. LAFAYETTE:**  I stand corrected, Your Honor.  These

15 are only objections to the passages, otherwise --

16               (Pause in the proceedings.)

17        **THE COURT:**  All right.  I've considered the

18 objections within the context of other rulings at trial, and

19 given the leeway given to both parties for hearsay, the

20 objections are overruled.

21     You may proceed with the questions and answers.

22        **MS. MEHTA:**  Thank you, Your Honor.

23                       **JOE KEFFER,**

24 called as a witness for the Plaintiff, having been duly sworn,

25 was examined and testified through **DEPOSITION TESTIMONY** off the

1   record.

2   **BY MS. MEHTA:**

3   **Q.**    I'm sorry.  Go ahead, Mr. Keffer, when did you meet

4   Ms. Preston that you recall?

5   **A.**    I worked for SEIU 1021 as a city representative for about

6   two years.  I imagine I met her early on in the process.  She

7   was the Personnel Director or Human Resources Director or

8   something of that nature, and she was the one that was

9   responsible for grievances and doing negotiations, and so

10  forth, so I had some dealings with her.  Most of my dealings

11  were with the people that worked underneath her.

12  **Q.**    Did you meet Ms. Preston before she had taken a position

13  with the City of Oakland?

14  **A.**    Not to the best of my recollection.  I had not met her

15  before that time.

16  **Q.**    So let's turn to this meeting on August 6th, 2013.  I

17  recognize --

18          **THE COURT:**  Hold on, Ms. Mehta.  When you jump to a

19  new section, could you indicate the new page and line number

20  you're going to just, so that the jury knows it's a new part of

21  the examination.

22      And for all parties, we're not making a transcription of

23  this part, because there already is a transcription made.

24    (reporter goes off the record as instructed by the Court)

25          **MR. LAFAYETTE:**  Your Honor, on August 11th,

1  plaintiff's counsel served us a list of designations to which

2  we were supposed to provide counter designations.  It appears

3  to me, as I'm listening to her call out the citations, that

4  she's referring to citations that were not on the list that

5  were sent to us mid-August.

6            **THE COURT:**  What is your response?

7            **MS. MEHTA:**  There may have been some slight changes.

8            **THE COURT:**  It's not a good time to hear about slight

9  changes.

10      All right.  I'm limiting any further exam to those that

11  are disclosed August 11th.  So the objection is sustained.  But

12  as to any of them that have been read so far, I find there's

13  been no prejudice or anything improper.  Continue.

14                    (reading of deposition continues.)

15                    (end of deposition reading.)

16            **THE COURT:**  Does the defense have any counter

17  designations that you would like to have read in at this time?

18            **MR. LAFAYETTE:**  We have counter designations, Your

19  Honor.  Given we only have five minutes, I could start, but I

20  think there are witnesses who would rather come in.

21            **THE COURT:**  Are there witnesses available to come in

22  next?

23            **MS. MEHTA:**  Yes.  Mr. Sandre Swanson is here.

24            **THE COURT:**  All right.  Then let's proceed with

25  witness Swanson.  The defense, of course, is not required to

1  have additional designations to cover, but if you wish to, you

2  may read them in at a later time.

3          **MR. LAFAYETTE:**  Thank you, Your Honor.

4          **THE COURT:**  Thank you.  Witness Keffer, you may step

5  down.

6          **THE WITNESS:**  Thank you.

7          **THE COURT:**  All right.  And if we could have

8  Ms. Preston call her next witness, please.

9          **MR. SIEGEL:**  Okay.  We would call Sandre Swanson.

10          **THE COURT:**  Mr. Swanson, come on forward.

11          **THE WITNESS:**  Okay, your Honor.

12          **THE COURT:**  We've got some steps here.  Would it be

13  easier for you if we got a chair down?

14          **THE WITNESS:**  No, I got it, Your Honor.

15                     (pause in proceedings.)

16          **THE WITNESS:**  Thank you so much.  I appreciate it.

17          **THE CLERK:**  Could you remain standing for just a

18  moment?

19          **THE WITNESS:**  Oh, yes, absolutely.

20          **THE CLERK:**  Please raise your right hand.

21                          **SANDRE SWANSON**,

22  called as a witness for the **PLAINTIFF**, having been duly sworn,

23  testified as follows:

24          **THE WITNESS:**  Yes, yes, absolutely.

25          **THE CLERK:**  You may be seated.  Please speak clearly

SWANSON - DIRECT / SIEGEL

1    into the microphone.  State your full name and spell your last

2    name, please.

3              THE WITNESS:  All right.  Let me just get adjusted

4    here.

5         Sandre Swanson, S-A-N-D-R-E, Swanson, S-W-A-N-S-O-N.

6                        **DIRECT EXAMINATION**

7    BY MR. SIEGEL:

8    Q.   Good morning, Mr. Swanson.

9    A.   Good morning.  Good morning.  Is this water, by the way?

10             THE COURT:  It is.

11             THE WITNESS:  Excuse me if I --

12             THE COURT:  Yes, go right ahead.

13             THE WITNESS:  All right.  Good morning.

14   BY MR. SIEGEL:

15   Q.   All right.  Now, Mr. Swanson, could you tell us in what

16   city you currently live?

17   A.   City of Alameda, California.

18   Q.   And are you currently employed?

19   A.   I am -- no, I'm not employed right now.  I'm retired.

20   Q.   Mr. Swanson, have you ever served in the California state

21   legislature?

22   A.   Yes, from 2006 to 2012.

23   Q.   And in what branch of the legislature did you sit?

24   A.   I served in the State Assembly, and I served as Chair of

25   the Assembly Labor and Employment Committee.

SWANSON - DIRECT / SIEGEL

1  Q.   And what was the function of that committee?

2  A.   To write laws governing personnel matters in the state of

3  California.

4  Q.   And when did your term in the assembly end?

5  A.   2012.

6  Q.   And what did you do after that?

7  A.   I became a deputy mayor for the City of Oakland in 2012.

8  Q.   And after you became Deputy Mayor, did you become

9  acquainted with Lawanna Preston?

10  A.   Yes.  One of my assignments was to assist the Mayor and

11  the City in labor negotiations.

12  Q.   And did you participate in such negotiations alongside of

13  Ms. Preston?

14  A.   Absolutely.

15  Q.   Did you have an ability in that context to observe her

16  performance as a labor relations negotiator?

17  A.   Absolutely.

18       MR. LAFAYETTE:  Relevancy, Your Honor.  I think this

19  was part of the motions in limine.

20       THE COURT:  Mr. Siegel, what's your view on that?

21       MR. SIEGEL:  My view is that the defense claims as

22  its defense that they fired Ms. Preston because she did a poor

23  job, and I believe that someone who worked with her

24  side-by-side is capable of responding to that allegation.

25       THE COURT:  Mr. Lafayette, direct me to the order you

1 think applies.

2      One moment.  Hang on, Mr. Swanson.

3           **MR. LAFAYETTE:**  If I look at the order, Your Honor, I

4 think it's on page 2, line 16 through 18.

5           **THE COURT:**  Of docket?

6           **MR. LAFAYETTE:**  Docket number 118, page 2 of 5.

7           **THE COURT:**  One moment.

8                     (pause in proceedings.)

9           **THE COURT:**  All right.  The objection is overruled.

10 The motion in limine was as to character testimony.  This is

11 different than that.  You may ask the question again so the

12 jury can hear it.

13           **MR. SIEGEL:**  Yes, thank you.

14 **Q.**   Mr. Swanson, what did you observe with respect to

15 Ms. Preston's work as a labor relations negotiator?

16 **A.**   If I can first outline the relationship between the

17 Council and these negotiations, the Council would ask its staff

18 to pursue negotiation in a particular way, and so they would do

19 that in closed session, and I witnessed Ms. Preston receiving

20 those instructions and going into negotiations and carrying

21 those instructions out.

22 **Q.**   Okay.  And what did you observe, if anything, in terms of

23 her relationships with the labor organizations at the other

24 side of the tables?

25 **A.**   Well, it was a very professional relationship.  She was

SWANSON - DIRECT / SIEGEL

1   representing the City, and they understood that.  And in any

2   labor negotiations, you know, it's adversarial, but she was

3   firm in representing the City's position and very careful with

4   the limits of authority that the Council was giving her.

5   **Q.**   And you were present during these negotiations yourself?

6   **A.**   Yes.

7   **Q.**   Okay.  And by the way, were you ever participating in

8   negotiations in which Fred Blackwell was also participating?

9   **A.**   I can't remember whether Mr. Blackwell was in the room, to

10  be honest with you.

11  **Q.**   Now, did you work with Deanna Santana when she was City

12  Administrator and you were Deputy Mayor?

13  **A.**   Well, yes, we had meetings on a regular basis, you know,

14  dealing with general city policy.  As deputy mayor, I sat next

15  to the Mayor, and we received briefings on various city

16  matters.

17  **Q.**   And at any time during your meetings with Ms. Santana, did

18  she say anything regarding her intent to terminate

19  Ms. Preston's employment?

20  **A.**   No, she never talked to me about that.

21  **Q.**   And when did you first learn that Ms. Preston had been

22  terminated?

23  **A.**   It was after -- it was after it happened, and I was very

24  surprised, actually.

25  **Q.**   What did you observe of Ms. Santana's management style?

1              MR. LAFAYETTE:  Objection, relevance, Your Honor,

2    character.

3              THE COURT:  Sustained.  Why don't you rephrase it if

4    you're getting more precise.

5    BY MR. SIEGEL:

6    Q.   Okay.  Did you have occasion to observe how it was that

7    Deanna Santana handled relations with her subordinate staff?

8              MR. LAFAYETTE:  Objection, Your Honor, improper

9    character evidence and not relevant.

10             THE COURT:  Overruled.

11             THE WITNESS:  Well, she was very authoritarian, you

12   know, people understood that, and she -- she supervised with a,

13   you know, with a hard hand.

14   BY MR. SIEGEL:

15   Q.   Under the City of Oakland while you served as Deputy

16   Mayor, to whom was the City Administrator responsible?

17   A.   City Administrator was responsible to the Mayor, and she

18   had other responsibilities to the Council.

19   Q.   And was she accountable to the Mayor?

20             MR. LAFAYETTE:  Objection, calls for a legal

21   conclusion.

22             THE COURT:  Overruled.

23             THE WITNESS:  The charter gives the Mayor authority

24   to hire and fire the City Administrator.

25

BY MR. SIEGEL:

Q.   And was there an individual by the name of Ann Campbell
Washington who worked with you and the Mayor while you were
Deputy Mayor?

A.   Yes, she was the Mayor's Chief of Staff.

          MR. SIEGEL:   Thank you.   Those are all the questions
I have.

          THE COURT:   All right.   Any cross-examination?

          MR. LAFAYETTE:   Just a little bit, Your Honor.

                     <u>CROSS-EXAMINATION</u>

BY MR. LAFAYETTE:

Q.   Good afternoon.

A.   Good afternoon.

Q.   It's been a minute.

A.   Yes.

Q.   The Deputy Mayor position, was that an elected position?

A.   That was an appointed position by the Mayor.

Q.   You were appointed by Mayor Quan?

A.   Yes.

Q.   Okay.   And so your direct reporting relationship was to
Mayor Quan, not to the City Administrator?

A.   That's correct.

Q.   And did Mayor Quan share with you everything that she was
doing at all points in time?

A.   Most of the things that she was doing she would share with

1  me.  This particular action she did not share with me.

2  Q.   Okay.  At some point in time were you asked to participate

3  in negotiations?

4  A.   Yes, because I have a long history of involvement in

5  personnel matters.  I served as the Chairman of the Oakland

6  Civil Service Commission for a number of years, and Chair of

7  the Alameda County Retirement Board, and in my assembly tenure,

8  Chair of Labor Employment, so I had this long history of

9  involvement in labor negotiations matter.

10 Q.   Were you asked to do that in the summer of 2013?

11 A.   Yes, I believe -- I believe there were several matters.

12 Q.   And when you were asked to do that, had the negotiations

13 been going on already?

14 A.   Yes.

15 Q.   And as those negotiations had been going on already, had

16 Ms. Preston been the person for the City at those tables?

17 A.   I believe so.

18 Q.   And so you were asked to come in to start the -- to

19 participate in negotiations after they had already commenced

20 with Ms. Preston at the tables; right?

21 A.   Yes.  There was a fear the mayor had that the negotiations

22 were not going well, and she wanted me to use my expertise to

23 and get involved, and the labor community had respect for my

24 history and what I could add to the honesty of negotiations.

25 Q.   And did you participate in closing some of those tables?

1   Did you participate in closing some of the negotiating tables?

2   **A.**   Oh, yes, uh-huh.

3   **Q.**   Okay.  And did you make -- directly make proposals at some

4   of those tables?

5   **A.**   Well, actually, like I said before, the way it works is

6   that the Council is the one that it has to approve the

7   negotiations, and so they -- once a negotiation takes place,

8   and Ms. Preston and staff would come back to closed session,

9   and she would offer the union's position, the Council would

10  discuss it and decide how far they would want to go to meet

11  that position, and Ms. Preston would go back and negotiate to

12  that limit, and that's how it was conducted, and because the

13  Council had to approve the final document.

14  **Q.**   Couple of questions, and then we'll be done; okay?

15  **A.**   No problem.

16  **Q.**   Investigations, were you aware that Ms. Preston had torn

17  up a witness statement as part of an investigation?

18  **A.**   I don't know anything about that.

19  **Q.**   Okay.  No one ever brought that to your attention?

20  **A.**   No.

21  **Q.**   Ms. Santana never brought that to your attention?

22  **A.**   No, they never talked to me about any of Ms. Preston's --

23  any little issues like that, because I -- frankly, I was

24  impressed the way she handled negotiations.  They were done

25  successfully.

 1  **Q.**   But to the extent that there were criticisms of her

 2  performance, those weren't brought to your attention; right?

 3  **A.**   They were not.  I wish they were.

 4           **MR. LAFAYETTE:**  Okay.  Thank you.  No further

 5  questions, Your Honor.

 6           **THE COURT:**  Mr. Siegel, do you have any follow-up?

 7           **MR. SIEGEL:**  Nothing further.

 8           **THE COURT:**  All right.  I'm going to give the jurors

 9  an opportunity, if they wish to, to pose some questions of

10  their own.

11      So Mr. Swanson, if you could hang on for just a few more

12  minutes.

13           **THE WITNESS:**  I'm fine.

14           **THE COURT:**  Very good.  We'll take a brief break, and

15  I'll have my deputy check with you.  If you do have questions,

16  let him know; if you don't, then we'll be taking a lunch break

17  at that time.  So we'll check with you in a few moments.

18      (Proceedings were heard out of presence of the jury:)

19           **THE COURT:**  Back on the record.

20      There are no questions from the jury.  So Mr. Swanson,

21  you're going to be excused.  I want to make sure you get down

22  there successfully.  We're going to take a lunch break and

23  return at 1:05 for the next witness.

24           **THE WITNESS:**  I can go?

25           **THE COURT:**  You're excused.  Thank you very much for

1  being here.

2          THE WITNESS:  Thank you.

3          THE COURT:  Mr. Siegel, any further clarity about

4  witnesses coming after Mayor Quan?

5          MR. SIEGEL:  I believe it will be the plaintiff.

6          THE COURT:  All right.  And that means that the --

7  that Mr. Ewell is not -- didn't catch a flight, as far as you

8  know?

9          MR. SIEGEL:  He's got a flight for tomorrow morning.

10          THE COURT:  And the other name I didn't put on my

11  roster of potential people, you've got an expert, who is going

12  to testify at some point.

13          MR. SIEGEL:  Tomorrow.

14          THE COURT:  Tomorrow.  All right.  Then we'll see you

15  after lunch.  Thank you.

16          (Luncheon recess was taken at 12:15 p.m.)

17  **AFTERNOON SESSION**                                    **1:05 p.m.**

18  (Proceedings were heard outside the presence of the jury:)  quo

19          THE COURT:  All right.  Are we ready to go?

20          MR. LAFAYETTE:  There's one issue, Your Honor.  It's

21  the issue of the Cheryl Thompson re -- I think what's going to

22  happen is -- I talked with Mr. Siegel.  We're going to have

23  Mayor Quan testify, and get her out of here.

24      And then we're going to have my read on the Keffer piece.

25  Okay?

PROCEEDINGS

1      And after that --

2              THE COURT:  Let me pause there.

3      And are you in agreement as to what you're reading from

4  Keffer?  Any objection to --

5              MR. LAFAYETTE:  I designated to you guys.  I don't

6  think you guys raised objections.

7              MS. MEHTA:  No objections.

8              THE COURT:  So you know what you're going do with

9  that.  Okay.

10             MR. LAFAYETTE:  I know what I'm going to do with

11  that.

12     And after that, I think there's an issue with the Thompson

13  read that I think the Court still has to resolve.  And then

14  we'll know what we're going to do with the Thompson read.  And

15  then if that's going to go forward, we'll have some

16  counterdesignations on that, which -- that's just another

17  issue.

18     And then I think after that, it's Ms. Preston.  Is that

19  accurate?

20             MS. MEHTA:  Sounds right.

21             MR. SIEGEL:  Fair enough.

22             MR. LAFAYETTE:  I thought it would be nice to let you

23  know where we were going right now.

24             THE COURT:  Thompson.  Then we'll take a break after

25  those two parts.

 1              **MR. LAFAYETTE:**  Thank you, Your Honor.

 2              **THE COURT:**  Thank you.

 3         Let's bring in the jury.

 4    (Proceedings were heard in the presence of the jury:)

 5              **THE COURT:**  All right.  Please be seated.  Our jurors

 6    have returned.  We continue with our case, with plaintiff

 7    calling her next witness.

 8              **MR. SIEGEL:**  Yes, Your Honor.  We call Jean Quan.

 9              **THE COURT:**  And if someone can --

10              **MR. LAFAYETTE:**  Oh.

11              **THE COURT:**  -- retrieve Ms. Quan.

12         Good afternoon.  Come on forward.  We'll swear you in.

13    Watch your step as you go up the stairs there.

14              **THE WITNESS:**  All right.  Thank you.

15              **THE CLERK:**  Please raise your right hand.

16                        **JEAN QUAN,**

17    called as a witness for the Plaintiff, having been duly sworn,

18    testified as follows:

19              **THE WITNESS:**  I do.

20              **THE CLERK:**  Thank you.  Please be seated.

21              **THE WITNESS:**  Thank you.

22              **THE CLERK:**  Please state your full name, and spell

23    your last name.

24              **THE WITNESS:**  Jean Quan.  Q-u-a-n.

25

1    <u>**DIRECT EXAMINATION**</u>

2    **BY MR. SIEGEL**

3    **Q.**   Okay.  Now, Ms. Quan, you're the former Mayor of Oakland.

4    Is that right?

5    **A.**   It is.

6    **Q.**   And when did you serve as Mayor?

7    **A.**   A million years ago, between 2011 and January of 2015 --

8    of this year.

9    **Q.**   Okay.  And while you were Mayor, did you appoint

10   Howard Jordan as Police Chief?

11   **A.**   Yes, I did.

12   **Q.**   And while you were Mayor, did you appoint Deanna Santana

13   as City Administrator?

14   **A.**   Yes, I did.

15   **Q.**   Okay.  And while you were Mayor, did you appoint

16   Sandre Swanson as your Deputy Mayor?

17   **A.**   Yes, I did.

18   **Q.**   Okay.  And you had known Sandre Swanson for some time

19   prior to appointing him as Deputy Mayor?

20   **A.**   Probably for 25 years or so.

21   **Q.**   Okay.  And you had confidence in his expertise when you

22   appointed him as Deputy Mayor?

23   **A.**   His expertise in general?  A particular expertise?

24   **Q.**   Well, I was going to start out in general.  You thought he

25   would be a good Deputy Mayor to help you run your office as

1  Mayor?

2  **A.**   Well, the role of Deputy Mayor is not in the Charter, as

3  you know, but I thought that he would be a good representative

4  of the City, and a good liaison of the Mayor's Office to the

5  community.

6  **Q.**   Okay.  And did that include the labor community?

7  **A.**   Yes.

8  **Q.**   And did you agree or believe, let's say, that when

9  Sandre Swanson began to work with you or for you, that he would

10  be helpful in terms of collective bargaining and relations with

11  the unions that represent City employees?

12  **A.**   Not for collective bargaining.

13      Clearly, the Mayor's Office is often asked to mediate.

14  And I think we mediated at least four strikes while I was

15  Mayor.  And that we were liaison for the building trades and

16  others to make sure that Oaklanders got hired --

17  **Q.**   Okay.

18  **A.**   -- but not necessarily for negotiations.  That's -- I

19  don't think that's Sandre's strength.

20      I, on the other hand, am a former SEIU organizer.

21  **Q.**   Okay.  Well, let me ask you this.  Isn't it true that

22  towards the end of 2013, that Deputy Mayor Swanson did assist,

23  along with Fred Blackwell, in closing out some of the contract

24  negotiations with the unions?

25  **A.**   Yes.

QUAN - DIRECT / SIEGEL

1   **Q.**   Okay.  Now, you brought this up, yourself.  You -- you,

2   yourself, have experience in labor relations.  Is that right?

3          **MR. LAFAYETTE:**  Your Honor, can I have an objection?

4   This exceeds the scope of the designations which were filed.

5          **MR. SIEGEL:**  What designations?

6          **MR. LAFAYETTE:**  It exceeds the scope of the

7   designations filed mid August with this Court.

8          **THE COURT:**  Overruled.

9          **MR. SIEGEL:**  Okay.

10  **Q.**   You have personal experience in labor relations.  Is that

11  right?

12  **A.**   I was honored to be one of SEIU's Asian-American

13  international organizers.

14  **Q.**   And when did you do that?

15  **A.**   I'll have to look.

16  **Q.**   1980s, would it be?

17  **A.**   In the '80s, for about seven years.  I worked mostly

18  organizing immigrants, but also running the division for the

19  health-care workers.

20  **Q.**   Okay.  And what did your responsibilities include when you

21  were running a division for the health-care workers?

22  **A.**   Mostly -- for SEIU, mostly organizing immigrants who were

23  often afraid; and then negotiating contracts with the

24  hospitals.  And probably the most important thing was

25  recruiting young Asian-Americans into the union movement, and

1  training them to be shop stewards, and working with SEIU to be

2  more sensitive to the needs of immigrant workers.

3  **Q.**   Okay.  You mentioned doing some collective bargaining.  Is

4  that right?

5  **A.**   Yes.

6  **Q.**   In your experience, is it common in the course of doing

7  collective bargaining to have what are called "sidebars"?

8            **MR. LAFAYETTE:**  Objection, Your Honor.  Relevancy.

9            **THE WITNESS:**  Depends on the --

10            **THE COURT:**  One moment.

11            **MR. LAFAYETTE:**  Objection, Your Honor.  Relevancy.

12  And it's calling for opinion testimony.

13            **THE COURT:**  That is sustained.

14  **BY MR. SIEGEL**

15  **Q.**   In your experience doing collective bargaining, did you

16  engage in sidebar conversations with management?

17            **MR. LAFAYETTE:**  Objection.  Relevancy and opinion.

18            **THE COURT:**  That didn't call for an opinion.  It is

19  overruled.

20     But we're not going to have expert testimony from the

21  Mayor that was not disclosed before trial.

22            **MR. SIEGEL:**  It's not expert testimony.  It's just

23  speaking about her experience.

24            **THE COURT:**  We're not going to have expert testimony

25  from the Mayor.  So --

QUAN - DIRECT / SIEGEL

1          **MR. SIEGEL:**  Okay.

2          **THE COURT:**  -- proceed.

3          **MR. SIEGEL:**  Yes.

4  **Q.**   Did you engage in sidebars with management when you were

5  an SEIU negotiator?

6  **A.**   That's hard to say.  You know, SEIU has huge contracts.

7  As a young organizer, I'd be way down at that level, so I was

8  never at the level where I did sidebars.

9  **Q.**   Okay.  You were aware of other people doing sidebars?

10 **A.**   I really wouldn't speculate.

11 **Q.**   Sorry?

12 **A.**   I wouldn't speculate, because you're asking my personal

13 experience.  I wouldn't speculate.

14 **Q.**   Okay.  Well, let me ask you this.  You knew

15 LaWanna Preston.  Correct?

16 **A.**   Yes.

17 **Q.**   And there was a time when you knew that Deanna Santana had

18 some issues regarding Ms. Preston?

19 **A.**   Yeah.  As Mayor, I don't directly supervise staff, but

20 City Hall's a small world, and you hear when people are not

21 getting along.  And so not particularly with Deanna, but I

22 heard other issues with other employees.

23 **Q.**   Okay.  Isn't it true that you called Ms. Santana and

24 Ms. Preston into your office at some point in mid 2013 for a

25 conversation?

1  **A.**   We met regularly on negotiations.

2  **Q.**   You met --

3  **A.**   So the only time I remember that configuration of people

4  is in our monthly reports on how negotiations were going.

5  **Q.**   So you would meet with Ms. Santana and Ms. Preston

6  regarding how negotiations were going?

7  **A.**   Yes, and I think one or two other staff people.

8  **Q.**   Okay.  And isn't it true that on one occasion you said to

9  Ms. Santana, "I need you to get along with LaWanna Preston.

10  She's not going anywhere"?

11          **MR. LAFAYETTE:**  Objection.  Leading.

12          **THE COURT:**  Sustained.

13          **MR. SIEGEL:**  This is cross-examination, Your Honor.

14          **THE COURT:**  No.  This is your witness.  She's not

15  adverse to you.  She's not a party to the case.

16  **BY MR. SIEGEL**

17  **Q.**   All right.  Did you have a conversation with the two of

18  them about how they were getting along?

19  **A.**   I don't recall that, but it's not unlike my Office to be

20  mediators; encourage everybody to get along.

21  **Q.**   Okay.  And specifically do you recall encouraging the two

22  of them to get along?

23  **A.**   No, I don't remember that.

24  **Q.**   Do you know who Pat Washington is?

25  **A.**   Excuse me?

1   Q.   Do you know who Pat Washington is?

2   A.   Pat Washington?

3   Q.   Yes.

4   A.   No.

5   Q.   Do you know who Pat Ford is?

6   A.   Yes.

7   Q.   And who is Pat Ford?

8   A.   Pat Ford is a former International Vice President of SEIU

9   International.  She came up the ranks in Oakland, and is

10  probably one of my best friends.

11  Q.   Okay.  And did Pat Ford encourage you to convene a meeting

12  of Deanna Santana and LaWanna Preston?

13           MR. LAFAYETTE:  Objection.  Relevancy, Your Honor.

14           THE COURT:  Overruled.

15       You can answer.

16           THE WITNESS:  Yes, she did.

17  BY MR. SIEGEL

18  Q.   Okay.  And did you then meet with LaWanna Preston and

19  Deanna Santana?

20  A.   No, I didn't.

21  Q.   Did you ever speak with Sandre Swanson about

22  Deanna Santana's criticisms of LaWanna Preston's performance?

23  A.   I might have.

24  Q.   Well, do you recall?

25  A.   I don't know when, but it -- Sandre and I worked together

1  every day, and it would not be unlikely that I did at some

2  point.

3  **Q.**   Okay.   What is your opinion of Sandre Swanson's honesty

4  and integrity?

5              **MR. LAFAYETTE:**  Objection.   Relevancy and opinion

6  testimony.

7              **THE COURT:**  Overruled.

8              **THE WITNESS:**  Yeah.   Sandre is like a brother to me,

9  but I -- I don't know what that has to do with this case.

10 **BY MR. SIEGEL**

11 **Q.**   Well, with all due respect, that's not your call.   Please

12 answer my question.

13             **MR. LAFAYETTE:**  Objection, Your Honor.

14             **THE COURT:**  No.

15     If you would like to ask the question again, you may; but

16 you don't get to argue with the witness or to tell her what she

17 has to do.

18 **BY MR. SIEGEL**

19 **Q.**   Please answer my question.

20             **THE COURT:**  And ask the question in the singular.

21             **MR. SIEGEL:**  What is your opinion --

22             **THE COURT:**  Strike the last answer.

23     Go ahead.

24 **BY MR. SIEGEL**

25 **Q.**   What is your opinion of Sandre Swanson's character for

1  honesty?

2  **A.**   Like I said, I believe that Sandre is one of the most

3  principled elected officials; not afraid to go against the

4  tide; and who really cares about people.

5  **Q.**   Okay.

6  **A.**   And that, unfortunately, is not so dominant in politics

7  today.

8  **Q.**   But what is your opinion about his honesty?

9  **A.**   I think that Sandre will always give what he thinks; that

10  he'll be honest about what he thinks.

11  **Q.**   Okay.  Now, you're aware that Ms. Preston's employment as

12  Employee Relations Director of the City of Oakland was

13  concluded on October 3, 2013?

14  **A.**   I couldn't say to the date, but I know that after

15  negotiations she was let go.

16  **Q.**   Okay.  And was that termination for cause?

17          **MR. LAFAYETTE:**  Objection.  Calls for a legal

18  conclusion as --

19          **THE COURT:**  I'll sustain it, and first see if there's

20  a foundation to establish whether she knows something's for

21  cause or not.

22          **MR. SIEGEL:**  Okay.

23  **Q.**   Do you know whether Ms. Preston's termination was for

24  cause?

25  **A.**   She was an at-will employee.  And she had finished the job

1   that we had brought her in for.

2   **Q.**   So does that mean, to your understanding, that she was not

3   terminated for cause?

4   **A.**   She was not terminated for cause, as far as I knew.

5            **MR. SIEGEL:**   Thank you.   No further questions.

6            **THE COURT:**   Cross-examination.

7            **MR. LAFAYETTE:**   Yes, Your Honor.

8                      <u>**CROSS-EXAMINATION**</u>

9   BY MR. LAFAYETTE

10  **Q.**   Good afternoon, ma'am.   You were the Mayor.   Right?

11  **A.**   Good morning.   Yes, I was.

12  **Q.**   Okay.   And as the Mayor, you brought in Deanna Santana, I

13  think you said.   Correct?

14  **A.**   Could you get a little bit closer to the microphone?   I'm

15  sorry.   I have this cold.

16  **Q.**   I have an unnaturally soft voice, which is odd, and I

17  really need to use the mic.   Thank you.

18       So let me just ask you to go to the heart of the matter.

19  Okay?   In 2013 did you have some discussions with

20  Deanna Santana regarding whether or not Ms. Preston should

21  remain in her position?

22  **A.**   Yes, I did.

23  **Q.**   And in the discussions that you had with Ms. Santana in

24  March of 2013 --

25            **MR. SIEGEL:**   Objection.   Lack of foundation as to

1  date.

2          MR. LAFAYETTE:  I haven't gotten my question out.

3          THE COURT:  Overruled.

4  BY MR. LAFAYETTE

5  Q.   With regard to the conversations you had in March of 2013

6  with Ms. Santana, did she explain to you that she was

7  interested in making a change in that position?

8  A.   Your Honor, could I just say something to lay a foundation

9  to that answer?

10         THE COURT:  If it's necessary to answer it, yes.

11         THE WITNESS:  Yes.  I just want to make it very clear

12  that the Mayor of Oakland is not as really a strong Mayor as

13  San Francisco, and that I actually only hire and fire.

14      Ms. Santana, however -- under our agreement, we would -- I

15  have basically veto.  Not through the Charter, but through my

16  agreement with Ms. Santana, I had the ability to veto

17  department-head choices.  So the head of Personnel or HR would

18  be one of those positions.

19      And so the conversation we had was because

20  Andrea Gourdine, who was our HR person, retired.  And

21  Ms. Preston interim-ly filled that position.  The -- the issue

22  was:  Would we do a national search for the head of that

23  department?  And that was my policy in general; that when we

24  had a department-head position, that we would do a national

25  search.  Right?  And so that was the bulk of our conversation

1  in March; that he felt that we should do a national search, and

2  look for someone who had very broad personnel experience.

3  **BY MR. LAFAYETTE**

4  **Q.**   Okay.  And at some point after that conversation, was

5  there a conversation that you had with Ms. Santana about

6  removing Ms. Preston?

7  **A.**   At the time we got into later spring, negotiations were

8  dragging on much longer than we thought.  And Ms. Santana

9  wanted to just go ahead and remove Ms. Preston, and bring in --

10  or raise the level of another negotiator.

11  **Q.**   Bring in another negotiator?  Did she want to -- did she

12  talk to you about terminating Ms. Preston?

13  **A.**   Yeah, she did.

14  **Q.**   And was that in the spring of 2013?

15  **A.**   That would probably be -- by that time, it would probably

16  be about April; maybe May.

17  **Q.**   Okay.  And did the two of you talk about why she wanted to

18  terminate Ms. Preston?

19  **A.**   Not in detail at that time.  It's more that it seemed that

20  negotiations were going much longer than we expected.  We had

21  actually hoped to be winding up, and we had a strike; a one-day

22  strike.  And I thought that was unnecessary; that they didn't

23  really get our final offer; but I asked Ms. Santana to not rock

24  the boat, and let negotiations finish.

25  **Q.**   You asked her not to terminate at that point in time?

QUAN - CROSS / LAFAYETTE

1    A.    Yes.

2    Q.    And you asked her to wait until the negotiations were

3    finished?

4    A.    Yes.

5    Q.    Okay.  And because the negotiations weren't wrapping up --

6    A.    I'm sorry?

7    Q.    Did -- at some point in time, did you bring in -- did you

8    request others to participate in the negotiations?

9    A.    After we had the strike, I was very concerned.  And so

10   both myself and the Deputy Mayor sat in so the employees could

11   see that we really did care, and that we were hearing both

12   sides.  And so we started sitting in the negotiations during

13   the last month.  And we made the -- the best and final offer,

14   ourselves.  Right?  And it was in order to try to gain the

15   trust of the employees.  So Mr. Swanson and I both appeared at

16   the last -- I don't know -- four or five bargaining sessions.

17   Q.    You and Mr. Swanson did?

18   A.    Excuse me?

19   Q.    You and Mr. Swanson participated in the last four or five

20   bargaining sessions?

21   A.    I probably participated in two of the five, in the middle

22   of the night, I think.  About a week later, Sandre and -- and I

23   were on the phone, and I think we -- we finalized the numbers

24   on the final settlement.

25   Q.    Okay.  Was there a moment -- a point in the negotiations

1  where you and Mr. Swanson actually presented the final demand?

2  **A.**   Yes.  So about five meetings out, right -- right before

3  they went out on strike, we presented what I thought was a very

4  good offer.  And it was very similar to what they finally

5  settled for.  And I think they were surprised how good the

6  offer was, but they were already told to strike, and so we

7  resumed talking after the strike.

8  **Q.**   Prior to submitting that proposal, had you shared it with

9  Ms. Preston?

10  **A.**   The only people who knew about our best and final was our

11  budget director, Ms. Santana, Mr. Swanson, and myself.

12  **Q.**   Was there a reason why the Director of Labor wasn't

13  included in that circle?

14  **A.**   I think that -- that the unions -- both the unions and

15  City Hall are full of holes.  Right?  And once people know what

16  you're willing to offer, then the union -- and I've done it,

17  myself -- will ask for more than what you're willing to put on.

18  They use that as the base, and then ask for more.

19       And what I was assigned to do is keep our best and final

20  really among ourselves so that, you know, they could see it

21  fresh, and wouldn't have time to ask for twice as much,

22  basically.

23  **Q.**   So you kept your circle tight?

24  **A.**   We kept it very tight.

25  **Q.**   In order to make sure that information didn't leak and go

1  to the union?

2  A.   Yes.

3  Q.   Were you involved in the actual decision to terminate

4  Ms. Preston?

5  A.   You know, the -- the -- the -- yes and no, because she

6  wasn't a department head.  And the Mayor -- I only asked for a

7  permanent department head.  I only asked for the right to be

8  able to veto a candidate once we -- once we were considering

9  hiring them.  I wasn't involved in any terminations.

10      Ms. Santana, as a courtesy, would always confer with me.

11  We talked every day at 7:00 o'clock in the morning, just to

12  touch bases.  And she would let me know, but the decision to

13  fire people was generally not mine.  If a department head was

14  to be let go, we would -- we would confer; but the authority to

15  hire and fire, under the Charter, belongs to the City

16  Administrator.

17  Q.   Even though you may not be able to talk -- may remember

18  what the actual problems were, if any, at some point in time

19  did Ms. Santana come to you and say that she had

20  specifically -- that she had reasons as to why she wanted to

21  let Ms. Preston go?

22  A.   In about April she raised a series of issues that were

23  happening within the City, and how it was troublesome.  We

24  didn't necessarily link it with letting Ms. Preston go at that

25  point, but there were issues that -- that we were trying to

1  avoid, and fires we were trying to put out.

2       Like I said, many people think the Mayor is the boss, but

3  I actually spent a lot of time just mediating between people,

4  and trying to get people to move together.

5  Q.  Did you suggest to Ms. Santana that she work with

6  Barbara Parker to facilitate a termination of Ms. Preston?

7  A.  Whenever we let someone go or were not going to renew the

8  contract, Ms. Parker would sit in with us.

9  Q.  Did you ever speak to Howard Jordan about Ms. Preston?

10 A.  No.

11           MR. LAFAYETTE:  No further questions, Your Honor.

12           THE COURT:  Mr. Siegel.  Under Rule 611, there's now

13 been a foundation established that this witness is adverse to

14 you.  So I'll grant you to ask leading questions if you wish

15 to.

16           MR. SIEGEL:  Okay.  Thank you, Your Honor.

17 BY MR. SIEGEL

18 Q.  Let me just clarify a couple of things with you, Ms. Quan.

19 You said that you and Mr. Swanson sat in during the

20 negotiations.  Is that right?

21 A.  Yes.

22 Q.  And do you recall when that was?

23 A.  Well, I think I was there when we first started, which

24 would have been months and months beforehand, because, like --

25 basically say that the City of Oakland employees had given back

1    9 percent during the first 2 years I was Mayor, so we could

2    avoid layoffs.  So I went at the opening negotiations to thank

3    them for that, and to assure them that we were going to return

4    that 9 percent salary to them.  So that was the starting point.

5    And so I was there for that first meeting.

6        And then I was there the day before the strike.  So

7    whenever the BART strike was, I was there to make what we

8    thought was the best offer that we could make.  And then I

9    think I was there right after that for a short while; and then

10   Sandre stayed.

11   **Q.**   Okay.  So what was the month and year when you made that

12   best and final offer?

13   **A.**   The which offer?

14   **Q.**   The best and final you spoke about.

15   **A.**   So that would be it.  I don't know.  When was the BART

16   strike?

17   **Q.**   So you don't recall?

18   **A.**   I don't recall the exact date.  I just remember it was the

19   day before the BART strike.

20   **Q.**   Okay.  So was that in 2013?

21   **A.**   Yes.

22   **Q.**   Okay.  And who formulated that last best and final

23   proposal?

24   **A.**   Again, it was a work meeting with the budget director,

25   Ms. Santana, and myself.  And then Sandre came in later.

1  Q.   The budget director was who at the time?

2  A.   What?

3  Q.   The budget director was who at the time?

4  A.   We were doing a transition.  So it may be way back in the

5  preparation, it would have been Scott Johnson; but at that

6  time, I'm guessing it was Donna Hom.

7  Q.   Okay.  And did you run that last best and final offer by

8  the City Council before you presented it to the unions?

9  A.   We'd asked them for parameters.  Right?  So we go to

10  City Council, and we ask them for parameters.  And last best

11  was within those parameters.

12      No, we had not gone back to the City Council.  If I had

13  done that, it would have been on the front page of the

14  *Chronicle*.

15  Q.   Okay.  So you didn't?  You did not do that?

16  A.   No, absolutely not.

17  Q.   Okay.  And a few moments ago you mentioned that there was

18  an issue regarding Andrea Gourdine leaving, and Ms. Preston's

19  position?

20  A.   I'm sorry?  I don't understand the question.

21  Q.   Yeah.  I -- I didn't understand what you said about

22  Andrea Gourdine leaving City employment, and what that had to

23  do with Ms. Preston's employment.

24  A.   When I first became Mayor, I pretty much had to hire or

25  ascertain whether I was going to keep all of the department

1  heads.  In many cases, I decided to get new department heads.

2  At the time I became Mayor, we really didn't have a strong

3  Personnel Director.  And I was able to get Andrew Gourdine to

4  come from San Francisco.  And she promised to work for me for a

5  year; and she actually ended up working for two years.  So she

6  finally begged off and said, "I want to retire.  And I need to

7  travel."

8      And it was pretty grueling, if you remember.  We had -- I

9  walked in, and had a 50 million deficit.  We had to eliminate

10  200 positions.  Then the Governor eliminated redevelopment.  So

11  it was brutal.  We were, like, cutting people; cutting and

12  merging positions; trying to not lay off people.

13      Finally, she basically said, "Okay, Jean.  I promised you

14  a year.  I gave you two.  I've got to go."  So it was vacant,

15  and we had to decide what to do.

16      So Ms. Santana and I had probably a couple of months of

17  discussion as to whether we were going to reorganize it, et

18  cetera.  And then we finally decided we would reorganize it.

19  We'd write a new job description, and we'd do a national

20  search.

21      That's -- that was a long answer, but that's the process.

22  **Q.**  And was Ms. Preston considered as one of the people you

23  were talking about, in terms of replacing Ms. Gourdine?

24  **A.**  So if I remember correctly, she headed one division

25  under -- and again, I don't promise to be totally accurate on

1    this, because I didn't do the day-to-day organizing or

2    supervision of staff, but if I remember correctly -- that she

3    headed one of the divisions within HR.

4          And when Ms. Gourdine left, the way I saw -- and again,

5    just my interpretation, because I wasn't looking at the

6    contracts.  And you'd have to ask -- basically she rose to be,

7    in my viewpoint, the acting head of that department while we

8    were having a conversation about whether it would stay one

9    department, whether it would stay two divisions, and what kind

10   of responsibilities it would have.

11   **Q.**   So you're saying that LaWanna Preston became the acting

12   head of HR for a while?

13   **A.**   Yeah.  That's how I saw it.

14   **Q.**   Okay.  And was there a time -- excuse me.  At the time of

15   the termination of her employment, was she a department head,

16   or not?

17   **A.**   She would have been acting in Andrea's position; but by

18   the time she was terminated, we'd already started the national

19   search and was probably interviewing a finalist.

20   **Q.**   So you're saying that time Ms. Preston was terminated, she

21   was the acting head of HR?

22   **A.**   I don't know what the official title was, but she

23   basically stepped up.  And it happened a lot during that period

24   of time, because we'd literally lost 400 job positions until

25   the economy turned around, and then we were slowly adding them

1   back.  So we left a lot of positions vacant.  A lot of people

2   were doing two or three jobs, whether they had the title or

3   not.

4        So to be honest, I don't remember whether she got the

5   title, didn't get the title, or whether, you know, like -- so

6   we were "All" -- sort of -- "hands on deck."  So we were all

7   doing multiple things.  I was the Mayor, and I was, like,

8   picking people up from the airport.  I mean, it was very tough

9   during the recession.

10  **Q.**   Okay.  Last question.  Do you know who it was who replaced

11  Ms. Preston after she was terminated?

12  **A.**   I don't know who immediately.

13       But I got to interview Neil -- and I forgot his last

14  name -- who was the person we chose of the three finalists

15  after a national search for that position.

16  **Q.**   And which position is that?

17  **A.**   Well, of the new combined HR.  Right?

18  **Q.**   Neil?

19  **A.**   At one time -- I don't know.  I'm looking at Ms. Santana

20  because at one time, it had been divided in two.  And then it

21  was merged together.  As we laid off people, people were doing

22  everything.  We weren't doing a lot of hiring during the

23  recession, so we let a lot of positions be vacant.

24  **Q.**   Okay.  And what's Neil's last name?

25  **A.**   Excuse me?

1   **Q.**   Neil's last name?

2   **A.**   I'm not very good.   I think it's a Nepalese name or an

3   Indian name.

4   **Q.**   And do you know someone by the name of Katano Kasaine?

5   **A.**   Yes.

6   **Q.**   Do you know whether she was placed as the head of Employee

7   Relations when Ms. Preston was fired?

8   **A.**   Katano probably is one of those people who did five

9   different positions; probably was even acting Assistant City

10  Manager at one point.   She did everything from finance, et

11  cetera, because we had, again, a lot of empty positions because

12  of the layoffs, and how long it took to hire top-notch people

13  for departments.   So I know that she had personal functions

14  under her, as she went in to the -- to fill tentatively part of

15  Scott Johnson's position.   And Scott Johnson was the City

16  Manager in charge of finances.

17          **MR. SIEGEL:**   Okay.   Thank you.   Those are all of the

18  questions I have.

19          **THE COURT:**   All right.   I'm going to defer to you for

20  a moment to give the jury a chance.   And I'll give you a chance

21  after their questions.

22      So, Ms. Quan, we're going to take a break here, and allow

23  the jurors to write out any questions of their own, if they

24  wish to.   So we'll take a five-minute break, or as long as

25  necessary for the jurors to write any questions they wish to.

1   And I'll return with any further examination of the witness.

2               THE CLERK:  All rise.

3   (Proceedings were heard outside the presence of the jury:)

4               THE COURT:  Mayor, you may step down if you wish.

5        Counsel, while we're at the break, can you tell me more

6   about the Thompson deposition; so what the issues are?

7               MR. LAFAYETTE:  I'll frame it at the top, and come

8   back.

9               THE COURT:  Very good.

10              MR. LAFAYETTE:  Thompson was disclosed, as you'll

11  recall, as a person who'll testify about emotional distress.

12  She was one of the two.  And so when we came here, your Order

13  asked us to identify excerpts that we wanted, so that counters

14  could be done.  So that was done approximately August 11.  And

15  she wasn't on the list.

16       And it must have been about five to -- about a week

17  before, maybe four days before the trial.  I can't remember the

18  exact date, and I don't want to get it completely wrong.  We

19  were notified by plaintiffs Council that Ms. Preston -- that

20  Ms. Thompson was going to be away, and wouldn't be able to

21  testify.  And they wanted to use excerpts from her deposition.

22       And I had spoken to Ms. Thompson at about the same time,

23  and learned that this had been a trip that she's planned for

24  quite some time.  And so that's the issue.  The issue is the

25  timeliness of providing notice to us with regard to the

**PROCEEDINGS**

1  excerpts.  And that's it.

2  　　　　THE COURT:  And what are the pages?  Are there

3  particular pages that you want to read?  Have they been shared

4  with the Defense?

5  　　　　MS. MEHTA:  Yes.

6  　　　　THE COURT:  And are they set forth in the document I

7  have seen, then?

8  　　　　MS. MEHTA:  No, Your Honor.

9  　　　　THE COURT:  Do I have it in writing somewhere, so I

10  can follow along when we get to that stage?

11  　　　　MS. MEHTA:  I don't.  There are very few.

12  　　　　THE COURT:  How many?  How many different excerpts,

13  roughly?

14  　　　　MS. MEHTA:  Well, one, two, three, four, five, six,

15  seven, eight, nine, and -- there's eleven.

16  　　　　THE COURT:  What is your proffer as to how long it

17  will take for us to read the 11 excerpts to the jury?

18  　　　　MS. MEHTA:  Less than ten minutes.

19  　　　　THE COURT:  All right.  The objection is overruled

20  for a few reasons.

21  　　　One, there was disclosure about the witness earlier, so

22  it's -- and we've had prior disagreements and resolution of

23  those disagreements as to whether Thompson's testimony will be

24  allowed, at all -- or other witnesses on this point.  And since

25  I've precluded other witnesses from testifying on the same

```
 1   issue, and because I don't think there would be prejudice to

 2   the Defense, I'll permit those 11 excerpts to be read.

 3             MR. LAFAYETTE:  There were some specific

 4   objections --

 5             THE COURT:  Yes.

 6             MR. LAFAYETTE:  -- that we also had to the excerpts.

 7             THE COURT:  Let's deal with those.  What are the

 8   particular objections?

 9             MR. LAFAYETTE:  I could -- do you have a copy of

10   the --

11   (Whereupon a document was tendered to the Court.)

12             THE COURT:  And have those been filed or --

13             MR. LAFAYETTE:  No.  They --

14             THE COURT:  I'll look at them now.

15             MR. LAFAYETTE:  No, they were --

16             THE COURT:  I understand.  Just a point of

17   clarification.

18       All right.  Has this document been shared with plaintiff's

19   counsel?

20             MS. MEHTA:  No.

21             THE COURT:  All right.  You need to give it to them

22   at the same time you give it to me.

23             MR. LAFAYETTE:  (Indicating.)

24             MS. MEHTA:  Thank you.

25             THE COURT:  Does it set forth the designations that
```

 1  have just been identified in court, as far as you know,

 2  Mr. Lafayette?

 3          **MR. LAFAYETTE:**  As far as I know, from what I

 4  understand, this contains the excerpts; that they've identified

 5  our objections.  And I think it includes our

 6  counterdesignations in it, as well.

 7          **THE COURT:**  All right.  Thank you.

 8      They're looking for -- I'll be silent for a minute.  Let's

 9  check with our jurors to see if they have any questions.  See

10  if Mayor Quan has any further need to testify.

11  (Pause in proceedings.)

12          **THE CLERK:**  Your Honor, they have questions, but they

13  need a few more minutes.

14          **THE COURT:**  Very good.  All right.

15      Ms. Mehta, if you're the one addressing the objections

16  focusing on excerpts seven, eight, and nine, which are

17  Ms. Thompson testifying as to things told her by Ms. Preston,

18  why aren't those hearsay statements?  The objection -- one of

19  the objections is hearsay.  Why are those statements not

20  excludable as hearsay?

21          **MR. SIEGEL:**  (Discussion off the record.)

22          **MS. MEHTA:**  Right.  They're not offered for the

23  truth.  They're offered as evidence of her state of mind.

24      And also I was attempting to provide some background as to

25  how it is that Ms. Thompson called Ms. Preston.

1      **THE COURT:**  All right.  Well, this is pretty much the

2  point of the whole thing.  It's not background.  It's the

3  testimony as to what she said.

4      All right.  And, Mr. Lafayette, why doesn't the

5  state-of-mind exception apply?

6      **MR. LAFAYETTE:**  This is offered for the truth of the

7  matter asserted.  There's no way of getting around that.  The

8  state of mind of what?  Ms. Thompson?  Whose state of mind are

9  we talking about?  This is just straight hearsay.

10      **THE COURT:**  Well, she's asserting that it's the state

11  of mind of Ms. Preston that's being asked about; not the truth.

12      **MR. LAFAYETTE:**  Well, but that would be --

13  Ms. Preston could say that in court.  To have someone else say

14  it isn't an example of that person's state of mind.  This is

15  just hearsay.  And if that's the case, then anyone could always

16  pick up the phone and call someone sand say something, and have

17  that become admissible statement in court.

18      **MR. SIEGEL:**  State of mind.

19      **THE COURT:**  Anything further, Ms. Mehta?

20      **MS. MEHTA:**  You know, I don't actually think it's

21  that important.  Lines 20 -- page 13, line 22 through 25.  And

22  that's the hearsay statement.

23      So if I can keep page 13, lines 10 through 21, you know,

24  or just that Ms. Thompson initiated a phone call to her.

25      **MR. LAFAYETTE:**  But then it's not relevant.

 1          **THE COURT:**  I'm going to think about it for a few

 2  more minutes while we conclude with the Mayor and the Keffer

 3  designations.  So I'll have a ruling for you after Keffer.

 4      And, Mr. Lafayette, if you can, make sure that this

 5  document gets filed.

 6          **MR. LAFAYETTE:**  Yes.  We will, Your Honor.

 7          **THE COURT:**  Thank you.

 8  (Pause in proceedings.)

 9          **THE COURT:**  All right.  Let's go back on the record.

10  Return our jurors.

11  (Proceedings were heard in the presence of the jury:)

12          **THE COURT:**  All right.  Our jurors have returned.

13  Please be seated, everyone.

14      Mayor, we have two questions for you from the jury.  You

15  remain under oath.  You should treat these just like any other

16  questions, and answer them to the best of your ability.  And

17  I'll give the parties an opportunity to ask any follow-up

18  questions, if they wish to.  I'm sure that would be what they'd

19  like to do.

20      So the first question is:  Did Ms. Preston know that her

21  position as Director of Employment Relations was temporary, and

22  that there was a nationwide search going on to possibly replace

23  her?

24      I'll ask it again, just to make sure you got it.

25      Did Ms. Preston know that her position as Director of

1   Employee Relations was temporary, and that there was a

2   nationwide search going on to possibly replace her?

3          THE WITNESS:  You know, I really don't know.

4      I do know that she knew that she had come in to do

5   negotiations; that is, that that was an at-will and temporary

6   position that we put in, because we had all of the union

7   contracts up.

8      Under our contract with the union, if someone stays with

9   us as a provisional for more than a year, we're actually

10  supposed to either -- have her apply for it through the regular

11  civil-service position.  And we're not allowed to, like, just

12  take people off the street, because we have these civil-service

13  provisions.  So she was brought in at a much lower level.  I

14  would think that she would have known, because we did put out

15  a -- through Personnel -- a description for that position.  And

16  you have to do that as part of a national search.

17         THE COURT:  Next question.  Is it your belief that

18  Ms. Preston was let go because she completed the job she was

19  hired to do, or that she was fired?

20         THE WITNESS:  An at-will person doesn't get fired.

21  They're just basically -- it's at will.  You know, you don't

22  have to do anything for cause.

23     You know, Ms. Preston and I have known each other for a

24  long time.  And, you know, I think she probably does a good job

25  at what she does.

1    Whether or not she had the skills to be the Director of

2  what was going to be a more unified HR -- not just Employee

3  Relations, but all of Personnel -- was another question, which

4  is why I agreed with Ms. Santana that she should do a national

5  search.  She certainly could have applied for that, but I think

6  that the persons that eventually got into the finalists' pool

7  had much broader experience than she did.  And it's one of the

8  things I tried do, really.  It got me politically in trouble

9  all of the time.  I really tried to do national searches, and

10 let both inside and outside people apply, so that we could get

11 the best people as we reformed the Oakland City Government.

12    THE COURT:  Thank you.  That answers the jury's

13 questions.

14    Mr. Siegel, do you have any further questions?

15    MR. SIEGEL:  None, Your Honor.

16    THE COURT:  Mr. Lafayette, do you have any further

17 questions?

18    MR. LAFAYETTE:  No, Your Honor.

19    THE COURT:  All right.  Mayor, you may step down.

20 Thank you for being here.

21    THE WITNESS:  Thank you.

22 (Witness excused.)

23    THE COURT:  All right.  And should we have the

24 counterdesignations as to Witness Keffer now?

25    MR. LAFAYETTE:  Yes, Your Honor.

1    **THE COURT:**  So, ladies and gentlemen, earlier today

2    before lunch we had the deposition transcript read as to

3    Witness Joe Keffer.  And I gave the Defense an opportunity to

4    wait a little bit longer to give their designations.  At this

5    time, they're going to read their questions and answers from

6    that same Keffer deposition.  You should treat it the same way.

7    This is testimony under oath that was given before trial.  You

8    should consider it just as any other testimony you hear during

9    trial.

10    **MR. LAFAYETTE:**  I will read, and Ms. Davidson will

11    answer.

12    **THE COURT:**  Very well.  Ms. Davidson, why don't you

13    come up and play the role of Witness Keffer?  And, as before,

14    if you'd just identify where you're starting in your reading,

15    that will assist us to follow along.

16    **MR. LAFAYETTE:**  At page 26, lines 11 through 16.

17    <u>**JOE KEFFER,**</u>

18    called as a witness for the Plaintiff, having been duly sworn,

19    was examined and testified through **DEPOSITION TESTIMONY** off the

20    record.

21    (Reporter goes off the record as instructed by the Court)

22    (Reading of deposition.)

23    **MR. LAFAYETTE:**  Your Honor, these are the trial

24    exhibits.  These are the deposition exhibits, and they relate

25    to trial exhibits.  So if you didn't mind, I was going to

KEFFER - DEPOSITION TESTIMONY

1  insert the trial exhibit number --

2          THE COURT:  Are they in evidence?

3          MR. LAFAYETTE:  They are.  They are in the witness --

4  Exhibit List.  I can't tell you actually in evidence right now.

5          THE COURT:  Well, that's what I need to know the

6  answer to if you're hoping to tell them to the jury.

7          MR. LAFAYETTE:  No, 5 is not.

8          THE COURT:  All right, then.  And which Trial Exhibit

9  is it?

10          MR. LAFAYETTE:  Which one?

11          MR. SU:  3Z.

12          MR. LAFAYETTE:  3D?

13          MR. SU:  Zebra.  Z.

14          MR. LAFAYETTE:  3Z, as in "zebra."

15          THE COURT:  One moment.

16      Are you going to seek to have 3Z admitted?  3Z is

17  stipulated; is in evidence.

18          MR. LAFAYETTE:  It is, Your Honor.  Yes, Your Honor.

19          THE COURT:  So, yes, you may refer to 3Z and ask.

20  Continue as you were.

21          MR. LAFAYETTE:  Thank you, Your Honor.

22  (Reading of deposition continues.)

23          MR. LAFAYETTE:  I'll omit the colloquy, Your Honor.

24          THE COURT:  Yes.

25          MR. LAFAYETTE:  Same as 3X, your Honor.

1          THE COURT:  Okay.  That is not in evidence, so --

2          MR. LAFAYETTE:  Okay.  I won't refer to it.

3  (Reading of deposition continues.)

4          MR. SU:  4L.

5          MR. LAFAYETTE:  4L, your Honor.  I know that's not

6  in.

7  (Reading of deposition continues.)

8          MR. LAFAYETTE:  Omit the colloquy.

9  (Reading of deposition continues.)

10          MR. LAFAYETTE:  Pick up at page 60, line 3 through

11  22; and then 61, line 10, through 62, 6.

12  (Reading of deposition continues.)

13          MR. LAFAYETTE:  Not a corresponding trial exhibit,

14  Your Honor.

15  (Reading of deposition continues.)

16          MR. LAFAYETTE:  Page 63, lines 5 through 24; and

17  thereafter page 66, 10, through 67, 3.  Then 67, 22, through

18  68, 20, and then 70, 15, through 71, 7.

19  (Reading of deposition continues.)

20          MR. SU:  3H.

21          MR. LAFAYETTE:  3H?

22  (Reading of deposition continues.)

23          MR. LAFAYETTE:  Your Honor, at this point I'd like to

24  move Exhibit 3H into evidence.

25          THE COURT:  Any objection?

 1              MR. SIEGEL:  No.

 2              THE COURT:  3H. is admitted.  Proceed.

 3              MR. LAFAYETTE:  Thank you, Your Honor.

 4  (Trial Exhibit 3H received in evidence.)

 5  (Document displayed.)

 6  (Reading of deposition continues.)

 7              MR. LAFAYETTE:  Not a trial exhibit, Your Honor.

 8  (Reading of deposition continues.)

 9              MR. LAFAYETTE:  Not a trial exhibit.

10  (Reading of deposition continues.)

11              MR. LAFAYETTE:  Page 80, lines 22, through 81, line

12  3.

13  (End of deposition reading.)

14              MR. LAFAYETTE:  That's it, Your Honor.

15          THE COURT:  Thank you.  The witness may step down.

16      And as to Witness Keffer, are there any -- having had the

17  counterdesignations read on the record, are there any further

18  excerpts for finality and completeness that plaintiff thinks is

19  necessary?

20          MR. SIEGEL:  No, sir.

21          THE COURT:  All right.  At this time, ladies and

22  gentlemen, we're going to take a short break.  There's no

23  opportunity for you to ask questions of this witness, because

24  this is witness is not here for you to ask questions to.  So

25  for this witness and any other depositions, you won't get a

1  chance to ask the questions.  Let's take a make it an

2  eight-minute break.  Come back at 2:25.  I've got a little bit

3  of legal work to talk about with the lawyers, and we'll have

4  our next witness.

5         **THE CLERK:**  All rise.

6  (Proceedings were heard outside the presence of the jury:)

7         **THE COURT:**  All right.  Our jurors are back in their

8  room, not present.

9      And I want to rule on the objections to the proposed

10  designations of Witness Cheryl Thompson.  This was raised at

11  the last break.  And there's a document that's been submitted

12  to the Court, but not yet filed -- it will be filed -- which is

13  the defendants' objections.  The principal objection is

14  hearsay.  And under Rule 803, the asserted exception is 803(8)

15  [sic], which is the existing mental, emotional, or physical

16  condition of the declarant.  The declarant here is

17  Ms. Thompson, but the proffered testimony is the testimony of

18  Ms. Preston, so I don't think that exception applies.  My

19  ruling is that I'm excluding the testimony as hearsay.

20      The remaining testimony beyond the statements of

21  Ms. Preston are irrelevant, because they only set the stage for

22  the phone call, and establish that there was a phone call; but

23  if there's not going to be testimony about the phone call, then

24  there's no relevant testimony of Ms. Thompson.

25      So the objections are granted, and the deposition of

1    Thompson is excluded.

2        So after the break we need plaintiff's next witness.

3    Who'll that be?

4            MR. SIEGEL:  The plaintiff.

5            THE COURT:  All right.  So we'll be back in six

6    minutes for Ms. Preston's testimony.  Thank you.

7    (Recess taken from 2:19 p.m. until 2:26 p.m.)

8        (Proceedings were heard out of presence of the jury:)

9            THE COURT:  Back on the record.  Let's bring our

10   jurors in.

11       (Proceedings were heard in the presence of the jury:)

12           THE COURT:  All right.  Our jurors have returned.

13       We're on the homestretch.  Plaintiff will call her next

14   witness, please.

15           MR. SIEGEL:  Plaintiff calls the plaintiff.

16   Ms. Preston, please step forward.

17           THE COURT:  You know the drill now.

18           THE WITNESS:  I think so.

19           THE CLERK:  Please raise your right hand.

20                   **LAWANNA PRESTON**,

21   called as a witness for the **PLAINTIFF**, having been duly sworn,

22   testified as follows:

23           THE WITNESS:  I do.

24       Thank you.  Please be seated.

25           THE CLERK:  Please state your full name and spell

PRESTON - DIRECT / SIEGEL

 1  your last name.

 2           THE WITNESS:  Daryelle Lawanna Preston,

 3  P-R-E-S-T-O-N.

 4           MR. SIEGEL:  Ms. Preston, maybe you could pull the

 5  microphone just a couple inches closer if you don't mind, if

 6  you could do that, nice and loud.

 7           THE WITNESS:  Okay.

 8                    <u>DIRECT EXAMINATION</u>

 9  BY MR. SIEGEL:

10  Q.   Okay.  Where do you live?

11  A.   I live in Pinole, California.

12  Q.   And with whom do you live?

13  A.   Presently I live by myself.  My youngest son just went off

14  to college.

15  Q.   Okay.  And how old are you?

16  A.   I'm 57.

17  Q.   Are you currently married?

18  A.   No.

19  Q.   And you mentioned your younger son.  How many children do

20  you have?

21  A.   Two.

22  Q.   And what are their names and ages?

23  A.   Jacob Tyler Moore, he just turned 18, and Gary Eugene

24  Lewis, who is 28.

25  Q.   And where were you born?

PRESTON - DIRECT / SIEGEL

1   **A.**   Martinez, California.

2   **Q.**   Do you have any siblings?

3   **A.**   Yes, two, a sister and a brother.

4   **Q.**   And did you grow up in Martinez?

5   **A.**   No, I grew up in Richmond, California and Pinole,

6   California.

7   **Q.**   What sort of work did your parents do?

8   **A.**   My father worked at Mare Island Shipyard in Vallejo.  He

9   rose to be one of the first African-American superintendents at

10  Mare Island Shipyard in Vallejo, and my mother was a nursing

11  assistant for Kaiser for 35 years.

12  **Q.**   Okay.  Have you lived in Contra Costa County for your

13  entire life?

14  **A.**   Yes.

15  **Q.**   And where did you go to high school?

16  **A.**   Pinole Valley High.

17  **Q.**   Did you attend college?

18  **A.**   One year at San Jose State.

19  **Q.**   And did you go to work after San Jose State?

20  **A.**   Yes.

21  **Q.**   Where is that?

22  **A.**   I worked at a number of clothing stores, one is Goldman's,

23  The Little Daisy, different retail outlets for a few years.

24  **Q.**   Did you go to work for the City of Berkeley?

25  **A.**   Yes, I did.

PRESTON - DIRECT / SIEGEL

1   Q.   And what was your job when you first went to work for the

2   City of Berkeley?

3   A.   I was initially hired as a parking enforcement

4   representative.

5   Q.   And what does a parking enforcement representative do?

6   A.   I think most people in the public call them meter maids.

7   Q.   So you gave people parking tickets?

8   A.   Yes.

9   Q.   And did you get a promotion after that?

10  A.   Yes, I did.

11  Q.   And what was your promotion to?

12  A.   I was promoted to the supervising parking enforcement

13  representative for the City of Berkeley.

14  Q.   And how long did you work for the City of Berkeley?

15  A.   Oh, five, six years, maybe a little longer, somewhere

16  around there.  It was quite a while ago.

17  Q.   And where did you go to work after the City of Berkeley?

18  A.   Service Employees International Union Local 790.

19  Q.   That's an SEIU local?

20  A.   Yes.

21  Q.   And what sort of work did you do for them?

22  A.   I was -- initially did internship for one year for SEIU

23  790, and then after the internship, I was hired permanently as

24  a business field rep, representative.

25  Q.   And what does a field representative do?

**A.**    A field representative is a staff person for the union who
organizes work sites, you represent employees in personnel
actions with their employers, you engage in political activity,
and you engage in collective bargaining process and meet and
confers.

**Q.**    Is that where you learned how to do that kind of
collective bargaining work?

**A.**    Yes.

**Q.**    And after you worked as a field representative for a
while, did you receive a promotion from SEIU?

**A.**    Yes.

**Q.**    To what position?

**A.**    I was promoted to a senior business representative, and I
held that position for a few years, and then I was promoted to
the San Francisco Director for Service Employees International
Union.

**Q.**    And as the San Francisco Director for the Union, what was
your job?

**A.**    I supervised a staff in the City and County of San
Francisco who was responsible for representing the employees in
San Francisco in day-to-day matters, filing grievances.  I also
was responsible for the political operation, and the collective
bargaining, conducting meet and confers, and political actions
of the union in the City and County.

**Q.**    Approximately how many people did you supervise in that

PRESTON - DIRECT / SIEGEL

1  position?

2  **A.**    Max, I believe I had approximately ten union

3  representatives and approximately three administrative staff

4  employees.   At one point I was also the political director, and

5  I supervised the political staff as well.

6  **Q.**   And what employers did the union that you worked for

7  represent, what employees?

8  **A.**    The employees, the employees in San Francisco SEIU

9  represented approximately 11,000 City and County workers, and

10  SEIU also had approximately between 15 and 20 nonprofit

11  organizations in the City and County that they represented, and

12  the San Francisco Unified School District, and the San

13  Francisco Community College.

14  **Q.**   And at that time did the union that you supervised

15  represent employees at the City of Oakland?

16  **A.**    No.   Well, I'm sorry.   The union itself represented

17  employees in the City of Oakland, yes.

18  **Q.**   But did you have responsibility for Oakland employees?

19  **A.**    No.

20  **Q.**   And during the time that you worked for SEIU, did you work

21  with Joe Keffer?

22  **A.**    No.

23  **Q.**   Did you work with Dwight McElroy?

24  **A.**    No.

25  **Q.**   How long in total did you work for the SEIU?

1  **A.**    Approximately 17 years.

2  **Q.**    And then what did you do?

3  **A.**    I took a position in the City of Oakland.

4  **Q.**    And what position was that?

5  **A.**    I was hired as the Labor Relations Manager.

6  **Q.**    And when were you hired?

7  **A.**    I believe it was July 2007.

8  **Q.**    And were you hired into a temporary position?

9  **A.**    No, I was not.

10  **Q.**    Was it a full-time position?

11  **A.**    Yes, it was.

12  **Q.**    And what was your job?

13  **A.**    I was, as the Labor Relations Manager, I reported to the

14  personnel director, and I was responsible for supervising the

15  unit of employee relations.

16  **Q.**    Why did you make the change from the labor side to the

17  management side?

18  **A.**    After working in organized labor for a very long period of

19  time, I decided that I needed a change, and I -- the skills

20  that I had gathered over the long period of time that I worked

21  for the union could be applied to the management side of the

22  table.  So I was really good, and I enjoyed doing labor

23  relations.  It's something I feel I'm very good at, and I have

24  done for a long time, and I decided that because the rules

25  governing public sector labor relations are the same, I decided

PRESTON - DIRECT / SIEGEL

1   I was able to perform those same type of functions on the

2   management side of the table.

3   **Q.**   Okay.  Who was it who hired you to work for the City of

4   Oakland?

5   **A.**   City Administrator Deborah Edgerly.

6   **Q.**   And at the time she hired you, did Ms. Edgerly give you

7   any direction about how to do your job?

8            **MR. LAFAYETTE:**  Objection, hearsay.

9            **THE COURT:**  Overruled.

10           **THE WITNESS:**  Yes.

11  **BY MR. SIEGEL:**

12  **Q.**   And what did she have to say?

13  **A.**   Ms. Edgerly explained to me that the City of Oakland had a

14  lot of severe employee problems.  There were problems with

15  employees performance that she felt was widespread.  There was

16  a lack of management enforcing a lot of the policies, personnel

17  policies.  She stated that there were employees in the

18  corporation yard that she had heard were drinking on city

19  property during business hours.  There were employees, she

20  understood, that had been doing things like smoking weed while

21  driving city vehicles on city time.  There was an incident, she

22  explained to me, of a recreation and parks director who hired

23  an employee once to supervise a children's program without

24  doing a background check --

25           **MR. LAFAYETTE:**  Objection, Your Honor.

PRESTON - DIRECT / SIEGEL

1            THE COURT:  Just one second.  Sustained.  Let's get

2   to a more particular question.

3            THE WITNESS:  Okay.

4   BY MR. SIEGEL:

5   Q.   Okay.  So she advised you that there were lots of issues,

6   and that she wanted you to clean up those problems?

7   A.   Yes, she did.

8   Q.   And did you go to work to try to clean up those problems?

9   A.   Yes, I did.

10  Q.   And were you successful in that?

11  A.   Yes.  Under Ms. Edgerly's administration, yes, I was.

12  Q.   And do you know whether doing the work that you were asked

13  to do made you popular with the unions at the City of Oakland?

14           MR. LAFAYETTE:  Objection, calls for speculation on

15  her part, and lacking in foundation.

16           THE COURT:  Sustained.

17  BY MR. SIEGEL:

18  Q.   Did representatives of the unions representing City of

19  Oakland employees make clear to you how they felt about your

20  activities?

21           MR. LAFAYETTE:  Objection, leading, and constitutes

22  hearsay.

23           THE COURT:  Both sustained.

24  BY MR. SIEGEL:

25  Q.   Were you aware that union representatives made public

1  complaints about your work?

2  **A.**    Yeah.

3          **MR. LAFAYETTE:**  Objection, relevancy, hearsay.

4          **THE COURT:**  Hearsay objection is sustained.

5  **BY MR. SIEGEL:**

6  **Q.**    What was the position of the person who was your direct

7  supervisor when you were working in the position that you've

8  described as Labor Relations Rep?

9  **A.**    When I was hired, I reported to the personnel director

10 Marcia Meyers.

11 **Q.**    And again, I'm not so much interested in the names as the

12 job title of the person to whom you reported.

13 **A.**    The personnel director.

14 **Q.**    Okay.  And was the personnel director -- let me do this

15 another way.

16        Do you recall when Mayor Jean Quan took office?

17 **A.**    Yes.

18 **Q.**    And when was that?

19 **A.**    I believe it was in 2011.

20 **Q.**    January?

21 **A.**    Yes.

22 **Q.**    And who was the personnel director at the time that Mayor

23 Quan took office?

24 **A.**    I believe it was a gentleman by the name of Wendell Pryor.

25 Andrea Gourdine was the personnel director, I believe.  There

1  was a transition -- there were many personnel directors.  After

2  Marcia Meyers was Wendell Pryor, and then there was Andrea

3  Gourdine.  I believe Andrea Gourdine was the Mayor -- Andrea

4  Gourdine was the personnel director when Ms. Quan was sworn in.

5  **Q.**   Let me ask you this.  Was Andrea Gourdine the personnel

6  director before Ms. Quan became mayor?

7  **A.**   I believe so.

8  **Q.**   Okay.  Let's jump ahead to 2012.  Were you still working

9  for the City of Oakland?

10  **A.**   Yes.

11  **Q.**   Okay.  And prior to 2012, that is during 2011, was Andrea

12  Gourdine the personnel director?

13  **A.**   Yes.

14  **Q.**   And do you recall becoming involved in a issue that arose

15  during 2011 concerning the employment of Assistant City

16  Administrators Scott Johnson and Fred Blackwell?

17         **MR. LAFAYETTE:**  Objection, relevancy.

18         **THE COURT:**  What is the relevancy?

19         **MR. SIEGEL:**  This relates to her subsequent promotion

20  and her work with Director Gourdine.

21         **THE COURT:**  All right.  For that foundational

22  purpose, the objection is overruled.  You may proceed with the

23  questioning.

24         **MR. SIEGEL:**  Thank you.

25         **THE WITNESS:**  Sorry.  Could you repeat the question?

1    BY MR. SIEGEL:

2    Q.    All right.  Let me go back.

3          At some point after Ms. Quan became mayor, did Deanna

4    Santana become the City Administrator?

5    A.    Yes.

6    Q.    And do you recall when that was?

7    A.    I believe she was hired in August of 2011.

8    Q.    Okay.  And after she was hired, do you recall whether she

9    undertook to hire her assistants?

10   A.    Yes.

11   Q.    And did a problem arise in connection with the hiring of

12   Ms. Santana's assistants?

13            MR. LAFAYETTE:  Objection, relevancy.

14            THE COURT:  Overruled.

15            THE WITNESS:  Yes.

16   BY MR. SIEGEL:

17   Q.    What was the problem?

18            MR. LAFAYETTE:  Relevancy again, Your Honor.

19            THE COURT:  Overruled.  You may answer.

20            THE WITNESS:  Ms. Santana was provided inaccurate

21   information about her level of authority to offer economic

22   enhancements to her two Assistant City Administrators by the

23   personnel department.

24            MR. LAFAYETTE:  Objection, relevance, and I move to

25   strike.

 1              THE COURT:  Overruled.

 2    BY MR. SIEGEL:

 3    Q.   Were you asked to help in straightening the situation out?

 4    A.   Yes.

 5    Q.   And who asked you to straighten it out?

 6    A.   Ms. Santana.

 7    Q.   Would you look at Exhibit 2 in the blue binder just to

 8    your left.

 9              THE COURT:  There is a defense objection raised to

10    this document, so you're aware.

11    BY MR. SIEGEL:

12    Q.   Can you describe what Exhibit 2 is?

13    A.   It's an email communication between Deanna Santana, Andrea

14    Gourdine, Sabrina Landreth and myself.

15    Q.   And what's the subject of this exchange?

16    A.   The subject is the inaccurate information that Ms. Santana

17    was provided by Kip Walsh who reported to Andrea Gourdine.

18              MR. SIEGEL:  Your Honor, I'd offer Exhibit 2.

19              MR. LAFAYETTE:  Objection.  It's not relevant.

20              THE COURT:  Objection sustained.

21    BY MR. SIEGEL:

22    Q.   Let's jump ahead then to early 2012.  Were you still

23    working for the City of Oakland?

24    A.   Yes, I was.

25    Q.   And at that time did you receive a change in your job

1   assignment?

2   **A.**   Yes, I did.

3   **Q.**   And what was that change?

4   **A.**   I was promoted from the Employee Relations Manager to the

5   Employer Relations Director.  I no longer reported directly to

6   the personnel director, and I reported directly to Ms. Santana,

7   the City Administrator.

8   **Q.**   So you became director yourselves?

9   **A.**   Yes.

10  **Q.**   You were the Employee Relations Director?

11  **A.**   Yes.

12  **Q.**   Andrea Gourdine was the personnel director?

13           **MR. LAFAYETTE:**  Objection, leading.

14           **THE COURT:**  Overruled.

15           **THE WITNESS:**  Yes.

16  **BY MR. SIEGEL:**

17  **Q.**   So did that mean that you and Ms. Gourdine were at the

18  same level?

19  **A.**   Yes.

20  **Q.**   Both of you reported to Ms. Santana?

21  **A.**   Yes.

22  **Q.**   When you became the Employee Relations Director, was that

23  a permanent position?

24  **A.**   Yes.

25  **Q.**   Were you appointed to that position on a short-term basis

1  so that you could negotiate some contracts?

2  **A.**    No, I was not.

3  **Q.**    Did you ever become the HR Director?

4  **A.**    There were short periods of time during the absence and

5  transition of personnel directors that I acted for short

6  periods of time as the personnel director.

7  **Q.**    Okay.  Was that after you became the Employee Relations

8  Director?

9  **A.**    It was -- I believe I probably did it once prior to

10  becoming the Employee Relations Director, and after I also

11  became the Employee Relations Director.

12  **Q.**    When you say short periods of time, what do you mean?

13  **A.**    For example, if one of -- we had several different

14  personnel directors, but if one of them went on vacation for a

15  period of time, I would be appointed as acting to cover for

16  them, and during blocks of time when one personnel director

17  left and another personnel director was coming on, I would act

18  in that capacity until a new personnel director started.

19  **Q.**    Do you recall when it was that Andrea Gourdine left her

20  position as personnel director with the City of Oakland?

21  **A.**    It was toward the end of 2012, I believe.  I don't

22  remember the exact date.

23  **Q.**    And when she left, did you become the HR Director or the

24  personnel director?

25  **A.**    I believe I acted for a short period of time.

1  **Q.**   And did you continue to serve as the Employee Relations

2  Director?

3  **A.**   Yes.

4  **Q.**   When you were promoted to Employee Relations Director, did

5  you receive a salary increase?

6  **A.**   Yes.

7  **Q.**   I'd like you to look at Exhibit 5, please.

8  **A.**   (witness examines document)  Okay.

9  **Q.**   Can you tell us what Exhibit 5 is?

10 **A.**   It's an email communication between Alexandra Orologas,

11 myself --

12 **Q.**   Regarding what?

13 **A.**   Regarding the issuance of a memo, although the memo is not

14 attached.  It's an email saying this is -- (reading) this is to

15 go as the first paragraph of our inner office memo to set the

16 tone before you talk about how we begin impact bargaining.

17 Please review and revise.  I'm sure you'll have great ideas on

18 how to better state what she wants to say.  Thanks.

19    Apparently it's a draft memo that Alex would have sent me.

20 **Q.**   Okay.  And was that memo to go out with your name on it?

21    **MR. LAFAYETTE:**  Objection, lacking in foundation,

22 constitutes hearsay.

23    **MR. SIEGEL:**  It is not offered for the truth of

24 anything.  It's not hearsay, and the foundation will be

25 established by the witness's answer to my question.

1          **THE COURT:**  Overruled.  You may answer.

2          **THE WITNESS:**  I believe the memo went out under the

3   City Administrator's signature.

4   **BY MR. SIEGEL:**

5   **Q.**  Okay.

6   **A.**  I'm not a hundred percent sure about that.  It was a

7   little while ago, but I think so.

8   **Q.**  Do you know the purpose of this memo?

9   **A.**  It was to clarify the level of authority of -- it says,

10  "Events have led me to remind the organization of our

11  obligation to adhere to the City's Memorandum of Understanding,

12  MOUs, and delegated authorities.  More importantly, we should

13  not be misleading labor groups on what our authorities are with

14  respect to their concerns."

15      It outlines the authority protocols outlined by the City

16  Administrator's office.

17  **Q.**  Okay.  And do you know what protocols governed labor

18  relations activity in the city in February --

19          **MR. LAFAYETTE:**  I'm sorry, Your Honor.  The document

20  that is being discussed is Exhibit 5?

21          **MR. SIEGEL:**  Yes.

22          **THE COURT:**  Yes.

23          **MR. LAFAYETTE:**  My document says that that's the same

24  as -- I'm sorry.  My error, Your Honor.

25          **THE COURT:**  It's the same as document 5K.

1        MR. LAFAYETTE:  Yes, I have it.

2        THE COURT:  Proceed with your questioning.

3   BY MR. SIEGEL:

4   Q.   Okay.  What were the rules, if you want to put it that

5   way, governing employee relations in terms of bargaining with

6   unions in the City of Oakland in February of 2012?

7   A.   The City Council had adopted a few ordinances dictating

8   the realm of authority of staff dealing with organized labor.

9   One was a city resolution, I believe it's 12903, and there was

10  another city resolution, I believe it was 55881, and

11  additionally, the City of Oakland has what they call an

12  employee relations ordinance.

13  Q.   Okay.  And in summary, what do those documents provide?

14       MR. LAFAYETTE:  Objection, Your Honor, best evidence

15  are the documents.

16       THE COURT:  Sustained.

17  BY MR. SIEGEL:

18  Q.   What did you understand the process was in 2012 when you

19  became Employee Relations Director for developing authority to

20  negotiate with the unions?

21  A.   I was very clear that staff did not have the authority to

22  offer proposals to organized labor, that the City Council had

23  complete authority as to what was moved across the bargaining

24  table.  Therefore, before any staff person could meet with

25  organized labor to amend any Collective Bargaining Agreement or

1    change wages, hours, or terms of working conditions, you had to

2    seek Council authority prior to meeting with any organized

3    labor group.

4    Q.   Okay.  And was there also a protocol as to who would be

5    the negotiator at the table on behalf of the city during

6    negotiations with unions?

7    A.   Yes.  The Employee Relations Unit was responsible for

8    bargaining, and the Employer Relations Unit reported and took

9    direction from the City Administrator.

10   Q.   And the Employee Relations Unit was the unit that you led?

11   A.   Yes.

12   Q.   Now, in 2012, do you recall an issue arising concerning

13   the Rainbow Teen Center?

14   A.   Yes.

15   Q.   And were you asked to work on a project regarding that

16   issue?

17   A.   Yes.

18   Q.   And specifically what were you asked to do?

19   A.   I was asked to work with Assistant City Administrator Fred

20   Blackwell to do an investigation and present a report to the

21   Council on issues that had come up related to the Rainbow Teen

22   Center.

23   Q.   And you specifically, Ms. Preston, was there some aspect

24   of that report which you were asked to look into?

25   A.   Yes.

PRESTON - DIRECT / SIEGEL

1   Q.   And what aspect was that?

2   A.   There were allegations that employees had not been hired

3   appropriately and had not followed the civil service process in

4   order to be placed in their positions, and I was asked to

5   verify if that was true.

6   Q.   Was the report that you worked on completed?

7   A.   Yes.

8   Q.   And would you look at Exhibit 8, please?  Is Exhibit 8 the

9   complete report?

10  A.   Yes.

11  Q.   And does it have your signature on it?

12  A.   Yes.

13  Q.   And who else, if anyone, signed that?

14  A.   Fred Blackwell signed the back page, and Deanna Santana

15  signed the front page as approved.

16  Q.   Okay.  And what was the date of the final version of that

17  report?

18  A.   February 24th, 2012.

19  Q.   Now, do you recall whether, in the process of completing

20  that report, there were various draft versions?

21  A.   There were many, many draft versions.

22  Q.   And do you recall in particular whether there was a

23  dispute regarding the draft of the report?

24  A.   Yes.

25  Q.   And what was the dispute that you recall?

**PRESTON - DIRECT / SIEGEL**

1  **A.**   There was a dispute about whether or not to include

2  language in the report that would refer Councilwoman Desley

3  Brooks to the District Attorney's Office for prosecution of

4  violating Charter Section 218.

5  **Q.**   And will you look at Exhibit 6, please?

6  **A.**   Okay.

7  **Q.**   Is Exhibit 6 the draft report?

8  **A.**   Yes.

9  **Q.**   And with respect to the language about reporting

10  Ms. Brooks to the District Attorney, did you have any

11  conversations with anyone about whether that language should be

12  in the report?

13         **MR. LAFAYETTE:**   Objection, assumes facts not in

14  evidence, lacks foundation.

15         **THE COURT:**   Overruled.

16         **THE WITNESS:**   Yes.

17  **BY MR. SIEGEL:**

18  **Q.**   And who did you have conversations with regarding

19  including in the report language that would refer Ms. Brooks to

20  the District Attorney?

21  **A.**   Ms. Deanna Santana and Barbara Parker.

22  **Q.**   And can you tell us what you recall about those

23  conversations?

24  **A.**   I recall stating that I didn't think it would be

25  appropriate for a report that was submitted by staff, and

1  particularly at my level, to contain language that would refer

2  an elected official to the District Attorney's Office for

3  prosecution.

4  **Q.**   And did either Ms. Santana or Ms. Parker respond to that

5  concern?

6  **A.**   Yes, the language was taken out eventually.

7  **Q.**   Okay.  Did you have other concerns about whether that

8  language should be in the report?

9  **A.**   I did.

10 **Q.**   And what were those concerns?

11         **MR. LAFAYETTE:**  Objection, Your Honor.

12         **THE COURT:**  What is your objection?

13         **MR. LAFAYETTE:**  That's all right, Your Honor.  I

14 withdraw my objection.

15         **THE COURT:**  The question was then what were those

16 concerns?

17         **THE WITNESS:**  Many members of the Oakland City

18 Council violated Charter Section 218 of the charter as it

19 related to interfering with staff.  And in my tenure there, I

20 had never seen or heard before that the administration would

21 want staff to include in a report that City Council members

22 should be referred to the District Attorney's Office for

23 prosecution, and Ms. Brooks at that time was the only

24 African-American woman on the Council.

25

1  BY MR. SIEGEL:

2  Q.    So what.

3  A.    I believe that she was being singled out and discriminated

4  against.

5  Q.    Okay.  So did you have conversations regarding this

6  proposed language in the report on one occasion or more than

7  one occasion?

8  A.    I believe it was more than one occasion.

9  Q.    And who did you have those conversations with?

10 A.    Ms. Deanna Santana.

11 Q.    And what was Ms. Santana's position about whether that

12 language should be included in the report?

13        MR. LAFAYETTE:  Objection, previously asked and

14 answered, Your Honor.

15        THE COURT:  Overruled.

16        THE WITNESS:  She believed that Ms. Brooks was in

17 violation of Charter Section 218.

18        MR. LAFAYETTE:  Objection as framed.  It's talking

19 about the state of mind of someone.

20        THE COURT:  Let's clarify the question.  What did

21 Ms. Santana say?

22        THE WITNESS:  She stated that she believed that

23 Ms. Brooks was in violation of Charter Section 218.

24 Eventually, she did agree with me that the language did not

25 have to go into the report.

BY MR. SIEGEL:

Q.   Now, was the report, the final report, Exhibit 8,

presented to the City Council?

A.   Yes.

Q.   And was that at a council meeting on March the 6th, 2012?

A.   Yes.

Q.   And what happened at that meeting?

          MR. LAFAYETTE:   Objection, overbroad, and in a video

it will be shown.

          THE COURT:   Sustained.

BY MR. SIEGEL:

Q.   Did you speak at the meeting?

A.   Yes.

Q.   Did Fred Blackwell speak at the meeting?

A.   On the Rainbow Teen Center issue?

Q.   Yes.

A.   No, he did not.

Q.   Did you speak in response to a request from Ms. Santana

that you speak?

A.   Yes.

Q.   And did you agree with the comments that were made by

Ms. Santana?

          MR. LAFAYETTE:   Objection, Your Honor.   The video is

going to be shown.

          THE COURT:   Sustained.

1   BY MR. SIEGEL:

2   Q.   After the meeting on March the 6th, I take it at some

3   point that night you went home; is that right?

4   A.   Yes.

5   Q.   And what did you do when you went home?

6   A.   I sent Ms. Santana an email.

7   Q.   And why did you do that?

8   A.   Because I could tell she was annoyed and upset with me,

9   and I wanted to explain to her why I made the statement that I

10  made.

11  Q.   How could you tell that she was annoyed or upset with you?

12  A.   It's obvious when Ms. Santana is annoyed or upset with

13  you.  She displays it in her mannerisms, her tone, the way she

14  speaks to you.

15  Q.   Would you look at Exhibit 10 in the exhibit binder?

16  A.   Okay.

17  Q.   Can you tell us what that is?

18  A.   It's an email communication between Ms. Santana and

19  myself.

20  Q.   And when did that email communication take place?

21  A.   I sent it to her the night of March 6.

22  Q.   At what time?

23  A.   10:50 p.m.

24          MR. SIEGEL:  Your Honor, I'd offer Exhibit 10.

25          THE COURT:  10 is already in evidence.

1              MR. LAFAYETTE:  10 is already in.

2              MR. SIEGEL:  All right.  It's not marked.  Okay.  Put

3   it up there.

4   Q.   So let's start at the bottom.  So this was the first email

5   that you wrote to Ms. Santana; is that correct?

6   A.   On this issue that night?

7   Q.   Yes.

8   A.   Yes.

9   Q.   And you wrote at 10:50:  "I think you came out of the

10  meeting looking good.  You took the high road and held your

11  position.  I'm sorry I had to contradict you tonight.  I hated

12  doing it, but I had to tell the truth.  I hope you understand."

13       Do you see that?

14  A.   Yes.

15  Q.   Did you think you had contradicted her?

16  A.   Yes.

17  Q.   And why do you think you had contradicted her?

18              MR. LAFAYETTE:  Objection.  Video will speak for

19  itself.

20              MR. SIEGEL:  The video will not speak --

21              THE COURT:  Overruled.  It will be easier to

22  understand if that video had been shown, but you can ask the

23  question.

24  BY MR. SIEGEL:

25  Q.   Okay.

1  A.    I'm sorry.  Could you repeat the question?

2  Q.    Sure.  Why did you think when you wrote this video (sic),

3  that you had contradicted her?

4  A.    There was a point during the debate or discussion in

5  council whether or not Councilmember Brooks had been provided

6  with staffing information regarding there would be one director

7  to run --

8          MR. LAFAYETTE:  Objection, Your Honor.  We're going

9  into the content of the video.

10          THE COURT:  Why aren't you showing the video?

11          MR. SIEGEL:  Because until we discussed the

12  scheduling problems this morning, I thought that Ms. Preston

13  would be testifying tomorrow, so we didn't bring the video.

14          MR. LAFAYETTE:  We have it, Your Honor.  It's

15  available to show it right now.

16          THE COURT:  Let's move on to a different topic,

17  because right now it's impossible to understand without

18  referencing to what occurred in the meeting, and that video

19  shows the meeting.

20  BY MR. SIEGEL:

21  Q.    Okay.  Did Ms. Santana reply to your email at 10:50?

22  A.    Yes.

23  Q.    And she wrote, quote.  "You did not contradict me.  I was

24  answering specifically to her comment re staff staying.  I did

25  agree with you when you commented on the director.  I thought

1    you heard me."

2         Do you see that?

3    A.   Yes.

4    Q.   Was Ms. Santana being accurate when she wrote that email

5    to you?

6    A.   No.

7    Q.   Did you write back to Ms. Santana?

8    A.   Yes.

9    Q.   You wrote at about 11:15:  "The comment about having the

10   director of the Rainbow Rec Center manage both sites.  We had

11   that discussion with Audree, not Brooks."

12        Did you write that?

13   A.   Yes.

14   Q.   And who is Audree?

15   A.   Audree Taylor Jones was the director of the Recreation and

16   Parks Department for the City of Oakland.

17   Q.   Okay.  And did Ms. Santana write back?

18   A.   Yes.

19   Q.   And what did she write?

20   A.   "Right, I agreed with you.  I agreed with" -- it's "W" and

21   a "U."

22   Q.   And was that statement accurate?

23   A.   No.

24   Q.   Now, was there a change in your relationship with

25   Ms. Santana following that meeting on March the 6th, 2012?

**PRESTON - DIRECT / SIEGEL**

1   A.   Yes.

2   Q.   And how did your relationship change after that meeting?

3   A.   Ms. Santana became very cold, standoffish.  I stopped

4   being invited to certain meetings.  The directors that reported

5   to her met with her on a weekly basis in the morning one day a

6   week.  She called it her core team meeting, and I was a part of

7   their core team.  And after this, there were several meetings

8   that I was not invited to anymore, and our whole relationship

9   changed.

10  Q.   Now, let me ask you.  Also during the early part of 2012,

11  do you know whether there were performance evaluations taking

12  place by members of the City Administrator's Office?

13        MR. LAFAYETTE:  Objection, hearsay, lacking in

14  foundation.

15        MR. SIEGEL:  Again, I was trying to lay the

16  foundation with the question.

17        THE COURT:  Overruled.  You may answer.

18        THE WITNESS:  Yes.

19  BY MR. SIEGEL:

20  Q.   And how did you know that?

21  A.   There was an email communication that went out to

22  directors that told us which City Administrator, there's

23  Deanna, and then there was Scott Johnson and Fred Blackwell.

24        MR. LAFAYETTE:  Objection, hearsay, and move to

25  strike, also best evidence.

 1              THE COURT:  Is this an email you'll be seeking to

 2   admit?

 3              MR. SIEGEL:  Your Honor, Mr. Blackwell testified

 4   yesterday that it was Ms. Santana's role to evaluate

 5   Ms. Preston.

 6              MR. LAFAYETTE:  Same objection, Your Honor.

 7              THE COURT:  All right.  The objection is sustained.

 8   BY MR. SIEGEL:

 9   Q.   Would you look at Exhibit 12, please.  Do you recognize

10   that document?

11   A.   Yes.

12   Q.   And what is it?

13   A.   My performance evaluation.

14   Q.   And when did you first see it?

15   A.   Back in 2012.

16   Q.   Do you recall what month it was?

17   A.   I don't remember the exact month.  I don't remember the

18   exact day.

19   Q.   Okay.  Do you recall how it was that it came to your

20   attention?

21   A.   I believe Alex Orologas sent an email to us saying this

22   is -- these are the performance evaluations, this is when

23   they're due back to Ms. Santana.

24   Q.   So did you receive this evaluation by email?

25   A.   Objection, move to strike as hearsay again.

1        THE COURT:  Overruled.  You can answer to establish a

2   foundation if you can.

3        THE WITNESS:  Yes, I believe it was by email.

4   BY MR. SIEGEL:

5   Q.   Okay.  And who was it that sent you that email?

6   A.   Deanna Santana's chief of staff.

7   Q.   And did you look at it when you received it?

8   A.   Yes.

9   Q.   And is this Exhibit 12?

10  A.   Yes.

11       MR. SIEGEL:  Okay.  Your Honor, I'd offer Exhibit 12.

12       MR. LAFAYETTE:  Objection, Your Honor.  This document

13  is not signed.  There's been no testimony from anyone who said

14  they prepared it, and therefore it's inadmissible hearsay.

15       MR. SIEGEL:  It is the evaluation that was forwarded

16  to her by Ms. Santana's chief of staff.

17       MR. LAFAYETTE:  Objection, that's hearsay.

18       THE COURT:  The objection is sustained, both as to

19  authenticity and hearsay, and under Rule 403.  And the jury, as

20  it's disregarded other statements by counsel, will disregard

21  the statements of counsel interpreting documents that have not

22  been admitted in evidence.

23  BY MR. SIEGEL:

24  Q.   Now, jumping ahead for about a year, do you recall an

25  issue having to do with department heads bargaining with unions

PRESTON - DIRECT / SIEGEL

1   without Council approval?

2   **A.**    Yes.

3   **Q.**    And what was the issue?

4   **A.**    There was one issue that came up regarding brownouts with

5   Local 55 and the Fire Department, and an issue regarding a

6   paramedic premium.

7   **Q.**    Okay.  And I want to direct your attention to what we've

8   heard about the issue dealing with the paramedic premium.

9   **A.**    Okay.

10   **Q.**    Did something about the negotiation for the paramedic

11   premium come to your attention?

12   **A.**    Yes.

13   **Q.**    And how did it come to your attention?

14   **A.**    I believe Donna Hom was the first person who told me that

15   I had a staff person who was in the process of signing a TA to

16   extend the paramedic premium.

17   **Q.**    Okay.  And is that Exhibit 17?

18            **MR. LAFAYETTE:**  Objection, leading.

19            **THE COURT:**  Overruled.

20            **THE WITNESS:**  Yes.

21   BY MR. SIEGEL:

22   **Q.**    And when was it that you learned that your staff person

23   had signed that agreement?

24   **A.**    I believe it was on July 2nd when Donna Hom came to my

25   office and told me about it.

**PRESTON - DIRECT / SIEGEL**

1  **Q.**   As of that time, had the City Council approved the

2  agreement to extend the paramedic program to July 30, 2013?

3  **A.**   No.

4  **Q.**   So when you learned that this agreement had been signed,

5  what was it that you did?

6  **A.**   I believe I sent Winnie Anderson a text message and

7  instructed her to please come to my office as soon as possible.

8  **Q.**   And did she?

9  **A.**   Yes, she did.

10 **Q.**   Would you look at Exhibit 20?  Do you recognize that

11 document?

12 **A.**   Yes.

13 **Q.**   And what is it?

14 **A.**   It's an email communication between myself -- well, it's a

15 couple different emails, one email communication between

16 myself, Barbara Parker, Doryanna, and Jamie Smith, and an email

17 that I sent to Councilwoman Desley Brooks.

18 **Q.**   Okay.  And did you send out this email when you learned

19 that the agreement had been signed without Council

20 authorization?

21 **A.**   Yes.

22 **Q.**   And at that time did you make a request from the City

23 Attorney?

24 **A.**   Yes.

25 **Q.**   What was your request?

1          **MR. LAFAYETTE:**  Objection, best evidence rule.

2          **THE COURT:**  Are you reading from the email?

3          **MR. SIEGEL:**  I am not yet, but the email is in

4    evidence.  It's Exhibit 20.

5          **THE COURT:**  You may read it, and just -- the

6    objection is sustained.  And if you can restate whether you're

7    asking her to testify about the email or a separate

8    conversation.

9    **BY MR. SIEGEL:**

10   **Q.**   In Exhibit 20, page 288, it says the following:  "I need a

11   legal opinion regarding the following.  The MOU has explicit

12   language that this provision expires on a specific date.  Does

13   the fire chief have the authority to extend a provision in the

14   MOU without council authorization?  Two, can the fire chief

15   reduce the number of employees a premium is applicable to in

16   order to increase the premium pay without council

17   authorization?  Please feel free to contact me if you have any

18   questions."

19        Have I read that correctly?

20   **A.**   Yes.

21   **Q.**   Why were you asking the City Attorney to provide a legal

22   opinion?

23   **A.**   Because this was the second time this had occurred with

24   the fire chief, and I thought maybe -- and I had explained to

25   the fire chief after the first time what the process was, so I

1  thought maybe if the City Attorney would issue a legal opinion

2  to department heads clarifying the authority of department

3  heads and the City resolutions that govern the City's ability

4  to engage in labor relations with labor organizations, then

5  this incident would not occur again, because I felt it was a

6  significant incident.

7  **Q.**   Why did you think it was significant?

8  **A.**   Because whenever you enter -- you sign a tentative

9  agreement with a union, and then you have to contact that union

10  to say that the tentative agreement that we signed I didn't

11  have the authority to enforce, that is a significant problem.

12  Under certain standards it would be considered, I believe,

13  pursuant to the Meyers Milias Brown Act --

14       **MR. LAFAYETTE:**  Objection, Your Honor.  What's about

15  to be spoken will constitute a legal opinion.

16       **MR. SIEGEL:**  I can ask another question.

17       **THE COURT:**  Ask another question.  The objection is

18  sustained.

19  **BY MR. SIEGEL:**

20  **Q.**   Did you have a concern when you wrote Exhibit 20 as to

21  whether the City's action in signing the tentative agreement

22  might violate any particular law?

23  **A.**   Yes.

24  **Q.**   And what law were you concerned that the City's actions

25  might violate?

1  A.   Meyers Milias Brown Act.

2  Q.   And what is the Meyers Milias Brown Act?

3  A.   It's a state law in the state of California governing the

4  employer/employee relations with public sector employees.

5  Q.   And was that a law that you were familiar with back in

6  2013 -- excuse me, 2013, yes.

7  A.   Yes.

8  Q.   Was that a law that you applied on a regular basis when

9  you were heading up the Employee Relations Department?

10         MR. LAFAYETTE:   Objection, leading.

11         THE COURT:   Overruled.

12         THE WITNESS:   Yes.

13  BY MR. SIEGEL:

14  Q.   Okay.   And how would the action of the city in signing an

15  agreement with a union, where the City negotiators did not have

16  authority to sign that agreement, implicate the Meyers Milias

17  Brown Act in your opinion back when this occurred?

18  A.   I believe it's an unfair labor practice charge which is

19  governed by the state body called the Public Employees Relation

20  Board.

21  Q.   And explain a little bit more so we know what you are

22  saying when you say you think that it was an unfair labor

23  practice?

24  A.   In -- I'll call it, labor world, there are rules of

25  engagement in the collective bargaining process and meet and

1  confers, and one of the rules in Meyers Milias Brown is that

2  the employer is supposed to -- both parties are supposed to

3  send people to the table that have the authority to reach an

4  agreement, and if you send someone to the table who the union

5  engages with in good faith bargaining and that person did not

6  have the authority to reach an agreement, it could be

7  considered as an unfair labor practice charge.

8  Q.   Okay.  And did you know all that when you wrote

9  Exhibit 20?

10  A.   Yes.

11  Q.   And before you wrote Exhibit 20 to the City Attorney, did

12  you discuss Chief Reed's actions with Ms. Santana?

13  A.   Yes.

14  Q.   And tell us about that?

15  A.   I called her and informed her that I learned that this had

16  happened for a second time, and I was concerned about it.  It

17  was a very significant problem.  The City and Local 55's

18  relationship was not that strong to begin with, and that this

19  would do further damage to the City's relationship with this

20  particular union.

21  Q.   And what was her response to you?

22  A.   She did not believe it was necessary for the City Attorney

23  to issue a legal opinion.  She stated that Teresa was already

24  aware that she did not have authority to sign a grievance with

25  organized labor without Council approval.

**PRESTON - DIRECT / SIEGEL**

1  **Q.**   When you spoke with her on the telephone, what was her

2  tone towards you?

3  **A.**   She was very curt, short, and hostile.

4  **Q.**   Would you look at Exhibit 18, please?  Can you tell us

5  what Exhibit 18 is?

6  **A.**   It's an email communication between myself, Deanna,

7  Barbara Parker, Randy Hall, Doryanna Moreno was also included

8  on these emails.

9  **Q.**   And what are they about?

10  **A.**   They're about my request for the legal opinion from the

11  City Attorney's Office.

12             **MR. SIEGEL:**  Your Honor, I'd like to offer

13  Exhibit 18.

14             **MR. LAFAYETTE:**  Is 18, Your Honor, the same as 2E?

15             **THE COURT:**  Correct.

16             **MR. LAFAYETTE:**  No objection.

17             **THE COURT:**  Exhibit 18 is admitted.

18       (Trial Exhibit 18 received in evidence)

19             **THE COURT:**  You may proceed.

20  **BY MR. SIEGEL:**

21  **Q.**   Now, Ms. Santana's email to you says -- well, actually, to

22  Doryanna Moreno with a copy to you is:  "What is the legal

23  question to answer?  Teresa had no authority to sign an

24  extension."

25       Do you see that?

PRESTON - DIRECT / SIEGEL

1  A.   Yes.

2  Q.   Did the City have to retract the agreement it made with

3  local --

4          MR. LAFAYETTE:   I'm sorry, Your Honor.   Are we

5  looking at Exhibit 18, which is the same at 2E?

6          THE COURT:   Yes, that's what's indicated on the

7  exhibit list.

8          MR. LAFAYETTE:   Well, my 2E is a different document,

9  and so the key that I have is different.

10         THE COURT:   You are correct.

11         MR. LAFAYETTE:   I think there's a -- I found that

12 it's 2H, but I just wanted to make sure I was on the same page.

13 So when I agreed, I was looking to the admissibility of the

14 document 2E, but I would still agree to not have an objection

15 to 2H, Your Honor.

16         THE COURT:   Thank you for the clarification.   And I

17 will clarify the ruling.   Exhibit 18 is admitted, and we will

18 correct the chart provided by plaintiff's counsel that 18 is

19 2H, rather than 2E.   2E has not been admitted yet.

20 BY MR. SIEGEL:

21 Q.   And after you received Ms. Santana's email where she said

22 "what is the legal question to answer," you wrote back:   "The

23 legal question is, what do we say to Local 55?   Is it a ULP?"

24 Is that right?

25 A.   Yes.

1   Q.   And is that for the reasons you were just describing to

2   us?

3   A.   Yes.

4   Q.   Okay.  Did the City have to retract the agreement it made

5   with Local 55?

6          MR. LAFAYETTE:   Objection as framed.  It's lacking in

7   foundation, requiring an opinion.

8          THE COURT:   Sustained.

9   BY MR. SIEGEL:

10  Q.   Did you provide any advice to staff as to what they were

11  required to do concerning the agreement that had been signed

12  between the City and Local 55 on June 30?

13  A.   Yes, the TA that was signed on June 28th?

14  Q.   Yes.  Sorry.

15  A.   Yes.

16  Q.   And what was your direction to staff?

17  A.   That we needed to go to City Council and receive

18  authorization from Council prior to implementation.

19  Q.   And prior to going to the City Council, did you direct

20  that any information be provided to Local 55?

21  A.   I did.

22  Q.   And what was that?

23  A.   We needed to tell Local 55 what was going on so that they

24  would not be blindsided when Council agendas come out or made

25  public.

1   **Q.**   Okay.  And did you decide who it was who was going to

2   contact Local 55?

3   **A.**   I believe there was an email to the Fire Department,

4   because this was an issue that they had been in discussions

5   with with Local 55.

6          **MR. LAFAYETTE:**  Objection, unresponsive, Your Honor.

7          **MR. SIEGEL:**  I can rephrase.

8          **THE COURT:**  Rephrase.  Sustained.

9   **BY MR. SIEGEL:**

10  **Q.**   Did you make the decision as to who was going to tell

11  Local 55 that the agreement that the City had signed was not

12  valid?

13  **A.**   Yes, I sent an email to the fire chief.

14  **Q.**   And did you direct the fire chief to make that disclosure

15  to Local 55?

16  **A.**   I wouldn't call it a directive.  I definitely suggested

17  that she should talk to Local 55.

18  **Q.**   And did you learn that she did?

19          **MR. LAFAYETTE:**  Objection, hearsay.

20          **THE COURT:**  It's within the scope of hearsay,

21  previously asked and answered.  I'll permit the answer.

22  Overruled.

23          **THE WITNESS:**  Yes.

24  **BY MR. SIEGEL:**

25  **Q.**   And did the City administration then go to the City

1  Council to obtain retroactive approval of the agreement that

2  had been made on June 28th?

3  **A.**   Yes.

4  **Q.**   And did you -- were you present at the closed session of

5  the City Council when that approval was given?

6  **A.**   No, I was not.

7  **Q.**   Do you know why not?

8        **MR. LAFAYETTE:**  Objection, it requires speculation

9  and hearsay.

10        **MR. SIEGEL:**  I'll rephrase.

11  **Q.**   Did anyone direct you not to attend that meeting?

12  **A.**   Yes.

13  **Q.**   Who directed you not to attend that meeting?

14  **A.**   Ms. Santana.

15  **Q.**   Was it unusual in your experience, while you were the

16  Director of Employee Relations, for you not to attend closed

17  session City Council meetings at which labor relations issues

18  were discussed?

19  **A.**   I believe it was the first time in my tenure that I was

20  instructed not to attend a closed session on labor issues.

21  **Q.**   Does the City of Oakland have a responsibility in your

22  view to collect union dues from employees and turn the dues

23  over to the unions?

24  **A.**   Yes.

25  **Q.**   And where does that duty come from?

1  **A.**   It begins in the Meyers Milias Brown Act, and it's also

2  part of the Collective Bargaining Agreements.

3  **Q.**   Okay.  So there is a provision in the Meyer Milias Brown

4  Act on the question of deducting -- collecting and deducting

5  union dues?

6       **MR. LAFAYETTE:**  Objection as phrased, calls for a

7  legal conclusion, interpretation of law, and the best evidence

8  rule of the document itself.

9       **MR. SIEGEL:**  Your Honor, this case is about her

10  complaining about a violation of law.

11       **MR. LAFAYETTE:**  Your Honor, I object to the argument

12  being asked in front of the jury.

13       **THE COURT:**  Hold on.  So ladies and gentlemen of the

14  jury, the witness is being asked a question about a legal

15  provision, and you'll recall at the beginning I asked you and

16  told you that I'll be instructing you on the law at the end of

17  the case.  What the witness will be allowed to answer, and what

18  you'll be hearing, is her view at the time as to a provision of

19  law that she was applying in her position for Oakland, so she's

20  giving you her opinion about the law.

21       At the end of the case I'll instruct you on what the law

22  is, and it's my instruction on what the law is that you'll

23  follow, and I am going to allow her, because it's her point of

24  view, and something you can consider, and that's the purpose, a

25  limited purpose that she's allowed to talk about what the law

1   is.

2           **MR. SIEGEL:**  Thank you, Your Honor.

3   **Q.**  So back to you.

4       What was your understanding in August of 2013 regarding

5   the legal basis for the requirement that the City deduct union

6   dues from the paychecks of employees and turn that money over

7   to the unions?

8   **A.**   I believe that the City had the legal responsibility to

9   deduct union dues and submit them to the union for their

10  membership.

11  **Q.**   Okay.  And what was that based on?

12  **A.**   Meyers Milias Brown Act and the Collective Bargaining

13  Agreements.

14  **Q.**   When you say Collective Bargaining Agreements, is that the

15  same thing that people have referred to as MOUs?

16  **A.**   Yes.

17  **Q.**   MOU is Memorandum of Understanding?

18  **A.**   Yes.

19  **Q.**   And those are the contracts between the City and the

20  unions that represent city employees?

21  **A.**   Yes.

22  **Q.**   Okay.  So how did you become aware that there was a

23  problem in August 2013 regarding the deduction of unions dues?

24  **A.**   I was in my office, and two of my staff people came into

25  my office to report to me what had occurred at and

1  informational meeting with Service Employees International

2  Union.

3  **Q.**   And who were those employees?

4  **A.**   Winnie Anderson and Sonia Lara.

5  **Q.**   And what did they have to tell you?

6  **A.**   They informed me that the treasury payroll manager made a

7  statement during the course of the meeting, when the union was

8  asking her about union dues, that she had not deducted unions

9  dues for temporary part-time employees not -- she had not

10  deducted unions dues for many of the temporary part-time

11  employees and Service Employees International Union, because

12  they would complain to her if she had done so.

13  **Q.**   Okay.  Would you look at Exhibit 39 -- excuse me, 31 in

14  the binder in front of you.

15      Do you see that?

16  **A.**   Yes.

17  **Q.**   Starting from the bottom and going up, please tell us what

18  is in Exhibit 31.

19  **A.**   The bottom of the page is an email from Joe Keffer to

20  myself, Deanna Santana, Jean Quan, and members of his

21  bargaining team, a grievance for temporary part-time employees

22  lack of collecting union dues.

23  **Q.**   And what is the date of the grievance included in

24  Exhibit 31?

25  **A.**   The date on this page is September 2nd, 2013.

1  Q.   That's not the date on the copy in front of me.

2  A.   Well, the date of the email is September 5th.

3  Q.   Right.

4  A.   And then on the top of the second page it says

5  September 2nd, but the date of the email is dated

6  September 5th, 2013 at 1:52 p.m.

7  Q.   Okay.  Now, did you receive that document?

8  A.   Yes.

9  Q.   And when you received that document, what was your

10  understanding of what you were supposed to do?

11  A.   My understanding was that I needed to begin an

12  investigation to determine if the allegations the union lodged

13  were accurate or true.

14  Q.   And why did you think you had to begin an investigation?

15  A.   Because in earlier in the year when the union had filed a

16  similar grievance, they had not followed the steps of the

17  grievance process by trying to resolve it at the lowest

18  possible level with the payroll department.  But since the

19  payroll manager allegedly had made these statements directly to

20  them, I think the City had an obligation at that point to

21  determine whether or not the allegations were true.

22  Q.   Okay.  When you say earlier in the year, was that the

23  grievance that was discussed as having been filed on June 26?

24  A.   Yes.

25  Q.   And was there some deficiency in that June 26 version of

1  the grievance?

2  **A.**    It was, as I previously stated, the grievance process

3  states that grievances should be -- you should try to resolve

4  grievances at the lowest possible level, and since this issue

5  was a payroll issue, the first place to start at would be to

6  have a conversation with payroll, which Ms. Anderson had

7  instructed them to do so earlier in the summer.

8            **MR. LAFAYETTE:**  Objection, move to strike the last

9  piece as hearsay.

10           **MR. SIEGEL:**  We have the exhibit, Your Honor.

11           **THE COURT:**  One moment.  One moment.  Overruled.

12           **MR. LAFAYETTE:**  Starting with the word "Ms. Anderson,

13  instructing them," that's the piece I'm objecting to, Your

14  Honor.

15           **THE COURT:**  Overruled.  Next question.

16  **BY MR. SIEGEL:**

17  **Q.**    Again, referring to the earlier version of this grievance,

18  after Ms. Anderson had her communication -- well, first of all,

19  did Ms. Anderson's communication with the union regarding the

20  June 26 version of the grievance, did that reflect your

21  instruction to her?

22  **A.**    Yes.

23  **Q.**    After that instruction was given to the union, to your

24  knowledge did the union continue to pursue the grievance that

25  they filed on June 26?

1          **MR. LAFAYETTE:**  Objection, lacking in foundation, may

2    constitute hearsay as phrased.

3          **THE COURT:**  Sustained.

4    **BY MR. SIEGEL:**

5    **Q.**   Was it your responsibility as Director of Employee

6    Relations to keep track of grievances that had been filed by

7    the unions against city departments?

8    **A.**   Yes.

9    **Q.**   In that regard, did you learn whether Local 1021 had taken

10   further action on the June 26 grievance?

11         **MR. LAFAYETTE:**  Objection, still constitutes hearsay

12   as to what the union did.

13         **THE COURT:**  Were you aware of it?

14         **THE WITNESS:**  Yes.

15         **THE COURT:**  You may proceed.

16   **BY MR. SIEGEL:**

17   **Q.**   And what were you aware of?

18   **A.**   The grievance process in the Collective Bargaining

19   Agreement has specific time lines that if you are not satisfied

20   with a grievance response at one level, you either have, I

21   think it's either 10 or 15 days to move it to the next level.

22   If the union does not move the grievance to the next level,

23   then the grievance basically dies.

24         **MR. LAFAYETTE:**  Objection, that's unresponsive to the

25   question.

1    **THE COURT:**  Overruled.  Let's tailor it to things

2    that she knows and particular things.

3    **BY MR. SIEGEL:**

4    **Q.**   Did the June 26 grievance die because it wasn't moved to

5    the next level?

6    **A.**   Yes.

7    **Q.**   So now we have a new grievance on September 2 or

8    September 5; correct?

9    **A.**   Yes.

10   **Q.**   And when you received that grievance, what did you

11   understand that your responsibilities were as Director of

12   Employee Relations?

13   **MR. LAFAYETTE:**  That question was recently asked and

14   answered.

15   **THE COURT:**  Overruled.  You may answer it.

16   **THE WITNESS:**  I believed it was my responsibility to

17   conduct or have staff conduct an investigation to determine if

18   the allegations were true.

19   **BY MR. SIEGEL:**

20   **Q.**   And why did you think it was yours or your staff's

21   responsibility to do the investigation?

22   **A.**   Because Employee Relations did all of the investigations

23   regarding grievances that we received.

24   **Q.**   Okay.  Now, what is the next message up the page on

25   Exhibit 31, up the page from the union grievance message?

1  **A.**   It's an email from me to Katano and Deanna Santana and

2  Sonia Lara are copied on it.

3  **Q.**   And what was the reason for sending that email?

4  **A.**   To schedule an interview with Katano Kasaine, the payroll

5  manager, treasury manager.

6  **Q.**   And why did you want to have an interview with her?

7  **A.**   Because both of my staff people had informed me that she

8  admitted in an open meeting that she had not been deducting

9  union dues.

10  **Q.**   And then what was the date of your message to Katano

11  Kasaine requesting an interview with her?

12  **A.**   Sunday, September 8th.

13  **Q.**   And did you contact her again?

14  **A.**   Yes, I did.

15  **Q.**   Why did you contact her again?

16  **A.**   She never responded to my initial email.

17  **Q.**   So when did you respond to her again?

18  **A.**   On Tuesday, September the 10th.

19  **Q.**   And is that message also included in Exhibit 31?

20  **A.**   Yes.

21        **MR. SIEGEL:**  Your Honor, I'd offer Exhibit 31.

22        **MR. LAFAYETTE:**  No objection.

23        **THE COURT:**  I think that is already in evidence.

24        **MR. LAFAYETTE:**  Same as 3J, I think.

25        **THE COURT:**  Same as 3J, but in an abundance of

1   caution, Exhibit 31 is admitted.

2       (Trial Exhibit 31 received in evidence)

3   BY MR. SIEGEL:

4   Q.   Now, did Ms. Kasaine respond to your request for a

5   meeting?

6   A.   She called me on the phone, I believe, a couple of days

7   after the second email.

8   Q.   And what did she have to say?

9   A.   She stated she was unclear why I was trying to reach her

10  to interview her, that people were not telling the truth about

11  what she said, and that she was not going to have anything to

12  do with this.

13  Q.   And were you ever able to interview Ms. Katano Kasaine?

14  A.   No.

15  Q.   Would you then turn to Exhibit 33.

16  A.   Okay.

17  Q.   After you sent the second email requesting an interview

18  with Katano Kasaine, did you have a communication with

19  Ms. Santana regarding the investigation of the SEIU grievance?

20  A.   Yes.

21  Q.   And when do you recall that that conversation occurred?

22  A.   It occurred on September the 12th.

23  Q.   And would you look at Exhibit 33?

24  A.   Yes.

25  Q.   What is Exhibit 33?

**A.**   It's an email from me to Deanna following up on the conversation we had.

**Q.**   And what occurred in the conversation that you had?

**A.**   She called to inform me that I would not be and my unit would not be conducting the investigation on this grievance, that she had assigned it to Barbara Parker in the City Attorney's Office, and the City Attorney's Office would be conducting the investigation.

**Q.**   And did she explain to you why she was doing that?

**A.**   No, not really.  She just said she decided that was the best way to handle it.

**Q.**   And Exhibit 33, what was the purpose of your sending Exhibit 33?

**A.**   From the conversation I had with her, it sounded like she did not believe that I could conduct a fair and impartial investigation, and I just wanted to go on record to be clear that as a professional, my personal feelings do not have anything to do with investigations.  Investigations are based on facts, and that I was more than capable of conducting a fair and impartial investigation.

          **MR. SIEGEL:**  Your Honor, I'd offer Exhibit 33.

          **MR. LAFAYETTE:**  No objection.

          **THE COURT:**  33, which is also 3M, is admitted.

     (Trial Exhibit 33 received in evidence)

1   BY MR. SIEGEL:

2   Q.   In Exhibit 33, you describe for Ms. Santana some of the

3   previous investigations that you had conducted as Director of

4   Employee Relations; is that right?

5   A.   Correct.

6   Q.   And why did you do that?

7   A.   One of the statements she made was because Audree was the

8   director and I was a director, maybe it was not appropriate for

9   me to investigate another director, so I wanted to point out to

10  her that in the past I had been assigned to investigate other

11  directors, department heads within the City of Oakland.

12  Q.   And you mentioned that you had done an investigation of

13  Katano; is that right?

14  A.   That is correct.

15  Q.   And who is Katano?

16  A.   Katano Kasaine is the payroll, treasury manager.

17  Q.   And you also say:  "I investigated Audree."

18  A.   Yes, Audree Taylor Jones, who was the Recreation & Parks

19  Director for the City of Oakland.

20  Q.   And did you receive any response from Ms. Santana to

21  Exhibit 33?

22  A.   I don't remember receiving a response from her.

23  Q.   Would you look at Exhibit 34, please?

24  A.   Yes.

25  Q.   Does Exhibit 34 refresh your recollection as to whether

1  you did receive a response from Ms. Santana?

2  A.   Yes.

3  Q.   And did you?

4  A.   Yes.

5  Q.   And what did Ms. Santana advise you?

6  A.   The email states:  "I did not state that I was going to

7  have Barbara conduct the investigation.  I stated that I had

8  consulted with Barbara, and that what I was going to add a

9  third party -- I was going to add a third party.  Please

10 reflect my comments correctly.  I have added Barbara to this

11 email string because she and I had just discussed my desire to

12 add a third party and not have her take over the

13 investigation."

14 Q.   Okay.  And did you respond to Ms. Santana?

15 A.   I responded on Tuesday, September 17th.

16 Q.   And what did you respond to her?

17 A.   I wanted to let her know that I was being contacted by the

18 union requesting a response, and their pursuant to our

19 Collective Bargaining Agreements, the City only has so much

20 time to respond to grievances at different levels.

21       MR. LAFAYETTE:  Is this 3T, is this in evidence?

22       MR. SIEGEL:  It is in evidence.

23 BY MR. SIEGEL:

24 Q.   And you wrote to Ms. Santana, you said:  "Deanna, SEIU has

25 requested the status of the grievance.  I will be sending out

1   investigatory interview notices this week.  Will you please

2   provide the name of the third party, so that I can contact that

3   person for dates?"

4        Is that what you wrote to Ms. Santana?

5   A.   Yes.

6   Q.   And when you wrote that, were you attempting to facilitate

7   the work of the third party in investigating the grievance?

8            MR. LAFAYETTE:  I would object, Your Honor.  It's

9   leading, but --

10           THE COURT:  Sustained.

11  BY MR. SIEGEL:

12  Q.   Okay.  Why did you indicate to Ms. Santana that you wanted

13  to send the information to the third party?

14  A.   To help the third party begin the investigation so the

15  union would not believe that the City was ignoring its

16  grievance.

17  Q.   Okay.  Now, what was your personal reaction when

18  Ms. Santana told you that you were being taken off this

19  grievance investigation?

20  A.   I was very shocked, honestly.  I had -- that had never

21  occurred to me before, and I was dismayed, and I felt

22  slightly -- I felt like she was attempting to paint a picture

23  that I was not capable of conducting a fair and impartial

24  investigation.  I felt like she was trying to make reference to

25  my professionalism and the work that I had been engaged in for

1  over 20 years.

2  **Q.**   And despite your feeling about that, did you undertake in

3  a professional way to assist whoever was going to investigate

4  the grievance?

5  **A.**   Absolutely.

6  **Q.**   I'd like you to look at Exhibit 37, and particularly the

7  message from you in the middle of the first page of Exhibit 37.

8  Can you tell us what that message is?

9  **A.**   It's an email from me to Barbara Parker and Doryanna

10 Moreno, and Deanna Santana is copied on it, and the email is

11 saying:  "Attached is the grievance from SEIU regarding the

12 City not deducting union dues for temporary part-time

13 employees.  Deanna informed me last night that she has decided

14 to work with the City Attorney's Office to coordinate and

15 complete the investigation of the grievance.  This is the only

16 document I have.  As instructed, I had not started the

17 investigation."

18 **Q.**   And then how did you conclude that?

19 **A.**   "Thanks."

20      **MR. SIEGEL:**  Your Honor, I'd like to offer

21 Exhibit 37.

22      **MR. LAFAYETTE:**  No objection, Your Honor.

23      **THE COURT:**  37, also known as 3W, is admitted.

24    (Trial Exhibit 37 received in evidence)

25

1  BY MR. SIEGEL:

2  Q.   So that's the message that you wrote on September 19th at

3  about 1:00 in the afternoon; is that correct?

4  A.   Yes.

5  Q.   And who is Doryanna Moreno?

6  A.   She is one of the deputy city attorneys in the City

7  Attorney's Office for the City of Oakland.

8  Q.   So again, despite the way you felt about the situation,

9  were you doing your best to conduct yourself in a professional

10 manner regarding --

11          MR. LAFAYETTE:  Objection, leading.

12          THE COURT:  Sustained.

13 BY MR. SIEGEL:

14 Q.   In fact, was there ever a time that you responded to

15 Ms. Santana in a rude manner about the fact that she had taken

16 away this grievance responsibility from you?

17 A.   No.

18 Q.   Now, following your efforts to transfer grievance

19 responsibility to the City Attorney's Office, did something

20 come to your attention regarding the conduct of a city manager

21 with respect to the grievance investigation?

22 A.   The conduct of the City Manager?

23 Q.   No, a city manager?

24 A.   "A," yes.

25 Q.   And what was it that you learned?

**PRESTON - DIRECT / SIEGEL**

1   **A.**   The president of the Service Employees Union chapter in

2   the City of Oakland, Dwight McElroy, contacted me to say

3   that --

4              **MR. LAFAYETTE:**   Objection, Your Honor.   She's about

5   to give hearsay testimony.

6              **THE COURT:**   Sustained.

7              **MR. SIEGEL:**   The communication from Mr. McElroy is

8   offered, Your Honor, not for the truth of the matter asserted,

9   but as an explanation for the actions taken by Ms. Preston when

10  she received the --

11             **THE COURT:**   Rephrase it to accomplish that objective.

12             **MR. SIEGEL:**   Okay.

13  **Q.**   Did you receive a communication from a union official

14  regarding Katano Kasaine's actions with respect to the

15  grievance?

16  **A.**   Yes.

17  **Q.**   And what was it that you -- what was the information that

18  you received?

19             **MR. LAFAYETTE:**   Still object.   It's hearsay.

20             **MR. SIEGEL:**   Again, it's offered to explain why she

21  acted as she did.

22             **THE COURT:**   Overruled.

23             **THE WITNESS:**   I was contacted by Dwight McElroy, and

24  he informed me that Katano Kasaine had contacted him and was

25  applying pressure to him to withdraw the grievance, and stated

PRESTON - DIRECT / SIEGEL

1  that if he would withdraw it, that she would make sure that the

2  union got every dime that they were due, and that they would be

3  made whole if he would withdraw his grievance.

4          **MR. SIEGEL:**  Okay.  I'd like to put up Exhibit 41,

5  which is already in evidence.

6          **THE COURT:**  It is.

7          **MR. SIEGEL:**  Yes.

8          **THE COURT:**  Yes.  Go ahead.

9  BY MR. SIEGEL:

10 **Q.**  So is this Exhibit 41, if we can just look at the date for

11 a second, please.  This is an email, isn't it, that you wrote

12 on Sunday, September 29th, at 4:40 in the afternoon to Barbara

13 Parker and Deanna Santana?

14          **MR. LAFAYETTE:**  Just object to the frame of the

15 question as leading.

16          **MR. SIEGEL:**  Your Honor, this is --

17          **THE COURT:**  Overruled.

18          **MR. SIEGEL:**  -- in evidence.

19          **THE COURT:**  Overruled.  Go ahead.

20 BY MR. SIEGEL:

21 **Q.**  Did you write this email?

22 **A.**  Yes, I did.

23 **Q.**  And why did you write this email to Barbara Parker and

24 Deanna Santana?

25 **A.**  Because I felt it was my responsibility to inform them

1  that I had been contacted by Dwight regarding this issue, and I

2  also feared that if I didn't tell them and it came out later,

3  that I would be blamed for it.

4  Q.   Okay.  Well, let me ask you this.  At this point you were

5  no longer handling the grievance; is that right?

6  A.   No, I was not.

7  Q.   But nonetheless, you took responsibility to send that

8  email to Ms. Parker and Ms. Santana; correct?

9  A.   Yes, I did.

10  Q.   So the date of that email is Sunday; right?

11  A.   Correct.

12  Q.   And two days later, on October 1st, 2013, was there a City

13  Council meeting?

14  A.   Yes, there was.

15  Q.   And is Tuesday the normal date for City Council meetings

16  in Oakland?

17  A.   Yes, it is.

18  Q.   And was there a closed session meeting?

19  A.   Yes, it was.

20  Q.   And did you attend that meeting?

21  A.   Yes, I did.

22  Q.   Prior to that meeting, had Ms. Santana given you any

23  instructions about what you could or should not say?

24  A.   Yes, she did.

25  Q.   And what was the instruction that she gave to you?

**A.**    She instructed me not to raise the issue regarding the

SEIU grievance while I was doing my presentation on the status

of bargaining the SEIU part-time MOU.

**Q.**    And the grievance, did you understand that the grievance

that she was referring to is the grievance that was -- you

discussed a few minutes ago that Joe Keffer had sent to you?

**A.**    Yes.

**Q.**    Okay.  And was the status of the negotiations a separate

matter from the grievance?

**A.**    No, I believe they were combined.  Could I explain?

**Q.**    Sure.  Please explain.

**A.**    Because the union kept raising the issue at the bargaining

table, and --

**Q.**    What issue?

**A.**    They kept raising the issue of the SEIU part-time union

dues not being collected at the bargaining table, and so

although the grievance process is separate from the collective

bargaining process, the union was raising the issue about part

timers' dues not being collected on a regular and consistent

basis.  Additionally, on the bottom of their proposals for the

part-time MOU, they had a proposal in which they wrote on the

bottom of the proposal that they will not be dropping, even if

the City agreed to their language, because they had a proposal

to amend the union dues section --

          **MR. LAFAYETTE:**  Objection, Your Honor.  This is all

1  hearsay and best evidence now.

2            THE COURT:  All right.  Sustained at this point.

3  Let's ask a new question.

4  BY MR. SIEGEL:

5  Q.  Okay.  Was the document with the language containing the

6  SEIU proposals on the table at the closed session of the City

7  Council meeting on October 1?

8  A.  Yes.

9  Q.  And did any member of the City Council ask you a question

10 about the SEIU grievance?

11 A.  Yes.

12 Q.  And who was it who asked you that question?

13 A.  Councilmember Desley Brooks.

14 Q.  And did you respond to her question?

15 A.  Yes.

16 Q.  And why did you do that?

17 A.  Because I had an obligation to tell the truth.

18 Q.  And you did so even though --

19           MR. LAFAYETTE:  Objection, it's leading.

20           THE COURT:  Sustained.

21 BY MR. SIEGEL:

22 Q.  Okay.  Now, let me ask you, on the day following that City

23 Council meeting, was there a negotiation between the Local SEIU

24 1021 team and the team for the City led by you?

25 A.  I believe so.

PROCEEDINGS

1  Q.   Would you look at Exhibit 43, please?

2  A.   Yes.

3  Q.   Can you tell us what Exhibit 43 is?

4  A.   It's a tentative agreement between the City of Oakland and

5  SEIU regarding the obligation -- "union notifies the city that

6  a unit member has not executed a payroll deduction

7  authorization form.  The City shall immediately begin automatic

8  payroll deductions."

9            MR. LAFAYETTE:  Objection.

10           THE COURT:  One moment.  We're going to stop there

11  for the day.  I've got a legal matter to talk about with the

12  parties, and we're near the 4:00 o'clock hour.

13      So thank you for your continued attention of the jury.

14  We're going to resume our trial.  We're on case to finish it

15  ahead -- or on schedule, and we'll resume tomorrow at 9:00 a.m.

16  with Ms. Preston back on the stand.

17      Thank you for your time.

18      (Proceedings were heard out of presence of the jury:)

19           THE COURT:  Ms. Preston, you may step down.  We're

20  going to be in recess for five minutes, and then talk about

21  some evidentiary issues.

22  (Recess taken from 3:56 p.m. until 4:02 p.m.)

23  (Proceedings were heard outside the presence of the jury:)

24           THE CLERK:  Remain seated, and come to order.  Court

25  is now in session.

**PROCEEDINGS**

 1          THE COURT:  All right.  We're back on the record.

 2   The jury is not present.  Some evidentiary issues to discuss.

 3          MR. SIEGEL:  Yes.

 4          THE COURT:  Exhibit U.  Exhibit U:  An important

 5   video referenced now 15 times during the trial.  Why do we not

 6   have it to show to the jury?

 7          MR. SIEGEL:  Well, excuse me, Your Honor.  As I said,

 8   we had Ms. Preston teed up to testify tomorrow with a video.

 9   So, you see, because --

10          THE COURT:  Where is it?

11          MR. SIEGEL:  It's in my office with the laptop that

12   includes it, which we just as soon schlep over here once,

13   instead of multiple times.  And since we planned to use it

14   tomorrow, we planned to bring it tomorrow.  That's all.  No

15   mystery.

16          THE COURT:  All right.  Well, it's a mystery to me

17   why you wouldn't be prepared for it, but all right.  Your

18   prognostication was that the testimony would be an hour.

19   You've gone an hour and a half now, and the efficiency of it is

20   diminished by not having a video to play along with it.  I'm

21   confident that you'll bring it tomorrow, and we can show it.

22       There are three e-mails -- 3O, 3U, and 4H -- which are

23   e-mails from Ms. Preston to Mr. Siegel.  And I understand

24   there's an objection about privilege from those e-mails.  And I

25   want to resolve that now, outside the presence of the jury, so

1  we don't have a dispute about it in the presence of the jury.

2  So let me ask the Defense if they are intending to use those

3  exhibits with Ms. Preston tomorrow.

4          **MR. LAFAYETTE:**  Yes, Your Honor.

5          **THE COURT:**  All right.  And then let me hear from

6  plaintiff's side as to what the privilege that attaches to

7  those e-mails, if you are, in fact, continuing to assert an

8  objection to those e-mails.

9          **MR. SIEGEL:**  Well, Your Honor --

10         **THE COURT:**  Yeah.  Go ahead.

11         **MR. SIEGEL:**  Your Honor, the Court issued an Order on

12  February 11th, 2015, regarding whether there was some

13  misconduct on the part of Ms. Preston with respect to sending

14  those e-mails to her attorneys.  I believe the Court concluded

15  in that Order that there was nothing blameworthy with respect

16  to Ms. Preston's actions.  If there was nothing blameworthy,

17  then those actions are simply ordinary communications between a

18  client and her attorney.  So --

19         **THE COURT:**  All communications between a client and

20  attorney are not privileged.  A topic does not become cloaked

21  in privilege just by sending it to an attorney.  So what is it

22  about those particular communications that evidences a

23  communication with a legal purpose?

24         **MR. SIEGEL:**  Ms. Preston sent me those e-mails in the

25  context of our ongoing relationship -- attorney-client

**PROCEEDINGS**

1  relationship -- to later me as to some incidents that --

2      Now I'm actually explaining the communication.

3      -- it was to ask my legal advice as to what she should do,

4  in light of what was disclosed in the e-mails.  I think I can

5  say that much without --

6          THE COURT:  And what's the evidence of that

7  foundation; that purpose?

8          MR. SIEGEL:  What is the evidence?

9          THE COURT:  Yeah.  You know, I'm not trying to hide

10 the ball.  There are a few.  Some of them have text and

11 e-mails.

12         MR. SIEGEL:  Right.

13         THE COURT:  That evidence is something.  So you can

14 start with that.  That's not giving away something

15 confidential.

16         MR. SIEGEL:  Yeah, as well as background

17 conversations that we had by telephone and in person.

18         THE COURT:  And are you going to lay a foundation as

19 to when your representation began, and whether -- and when it

20 was contemplated that there would be litigation?

21         MR. SIEGEL:  I would, but I'm not going to be able to

22 pull that date out of the air.  I can certainly do that, but --

23         THE COURT:  Your proffer is:  This was after that?

24         MR. SIEGEL:  It was after that.  And it was when

25 Ms. Preston had concerns about her employment security.  I

1  guess I could say that much without, again, violating the

2  privilege.

3       **THE COURT:**  All right.  Go back to Defense.

4       What is the probative value?  What's the relevance?  And

5  that's one of the objections of the e-mails from Ms. Preston to

6  her counsel.

7       **MR. LAFAYETTE:**  It goes to our case that this has

8  been an attempt by plaintiff to orchestrate a dispute; to file

9  a lawsuit against my client.  And it starts with the -- and I

10  can draw the lines through it, all the way commencing from the

11  e-mail that she sent on the -- I think it's the 3rd or 4th of

12  July, where she's asking for a legal opinion, and omitting

13  Deanna Santana.  There are all these different lines that I

14  start drawing through this, where she is not exercising her

15  rights or whatever she has under the City of Oakland policies

16  and procedures.  Instead, it -- from where we stand, this is

17  all part of an orchestrated scheme.  And that's part of our

18  defense in this case.

19       There is nothing about these documents that are --

20       **THE COURT:**  Keep facing me and the reporter.  There's

21  no jury to talk to now.

22       **MR. LAFAYETTE:**  I'm sorry.  I was going to pick my

23  binder up, because I could see more.

24       **THE COURT:**  And why aren't the communications

25  privileged?

PROCEEDINGS

1          **MR. LAFAYETTE:**  The only time that they're --

2      Because there has been no attorney-client relationship

3   created yet.  I haven't heard a proffer that says that there

4   was something.  In fact, I heard the proffer that it was

5   something after that.

6      So these are nothing more than improper communications,

7   again, where she's sending documents from the City to someone

8   else.  And that's exactly one of the things that we're saying

9   she's been doing, is sending documents to third parties who

10  shouldn't be receiving them.

11         **THE COURT:**  All right.  Mr. Siegel, anything further?

12         **MR. SIEGEL:**  Your Honor, I can tell you that -- that

13  Ms. Preston and I had established an attorney-client

14  relationship prior to her sending me these materials in

15  connection with the questions that she had regarding her

16  employment relationship.

17      And I -- frankly, I -- I don't know what to say to

18  Mr. Lafayette's statements about trying to conjure up a

19  dispute.  Ms. Preston did not want to be fired by the City of

20  Oakland.  She was interested not in creating a lawsuit at her

21  termination.  She was interested in forestalling a termination,

22  and the need to file litigation.

23         **MR. LAFAYETTE:**  I would state it this way,

24  Your Honor.  There is an exhibit, which I think is probably B.

25  Exhibit B.  It's an early exhibit for plaintiff, as well.

PROCEEDINGS

1       There's no expectation of any type of privacy with regard

2  to the e-mails from City-owned computers.  This is what this

3  appears to be, because if you look at this document, this is a

4  document produced --

5       For example, 3U -- that's a document produced by the City

6  of Oakland in this litigation.  And that policy that we

7  produced specifically states there's no expectation of any form

8  of privacy with regard to this.  If she wanted to keep this a

9  private communication between her and a lawyer, she should have

10  used her personal e-mail.

11       Specifically looking at Exhibit 3U, there is nothing in

12  that document that in any way whatsoever relates to a

13  communication that would be a protected communication.  All

14  she's doing is sending here a salary ordinance to him, but it's

15  not something where it's seeking legal advice from him.  That's

16  not what this is.  3U is clearly not a privileged document.

17  And I'm sorry.

18       **THE COURT:**  Okay.  3O, which she is now sending to

19  him, is the e-mail where her boss has directed that she is not

20  going to do this investigation.

21       There is no appropriate reason as to why she would be

22  sending someone out to -- out of the City an e-mail from her

23  boss, direct an e-mail that she sends to her boss, objecting to

24  an investigation being handled by someone else.  There is no

25  opinion requested here.

**PROCEEDINGS**

1        **THE COURT:**  All right.  Here's my ruling on 3O, 3U,

2   and 4H.  Those are the e-mails I'm aware of identified in the

3   joint Exhibit List that are e-mails from Ms. Preston to

4   Mr. Siegel.  If there are other documents of the same type, I'm

5   not aware of them; but I would address them if the parties

6   brought them to my attention.

7        The first objection is whether the -- those documents are

8   relevant; and if they are relevant under Rule 403, if that

9   probative value is outweighed by the danger of confusion,

10  distraction, and unfair prejudice.

11       And the second objection is privilege; whether they are

12  communications seeking legal advice from counsel.

13       Starting with the second issue, there is also a response

14  that even if intended to solicit legal advice, they were sent

15  from a City computer.  And it's asserted there's not a

16  reasonable expectation of privacy in any communication.

17  Therefore, there could not be a privilege that attaches to it.

18       There's also a presently a foundational hole in whether an

19  attorney-client relationship had been established; and if so,

20  on what date.

21       I'm not going to reach the issue of whether an

22  attorney-client privilege has been reached and at what date at

23  this time.

24       I'm not going to reach the issue of whether there's a

25  reasonable expectation of privacy in an e-mail from a City

1  computer to Council.

2      My ruling is that, if probative, the probative value is

3  substantially outweighed by the danger of confusion to the

4  jury, and unfair prejudice to Ms. Preston.

5      There is other ways.  And Mr. Lafayette's referenced other

6  e-mails which are in the record, and other information in the

7  record about Ms. Preston's motives that can be more directly

8  used to challenge her credibility and her motives.  But I think

9  that there is a great danger of confusion to the jury, and the

10 possibility that it will be sliding right on into other

11 attorney-client-privileged communications, once I let in -- if

12 I were to let in three e-mails between a client and her

13 counsel.  And that could consume many hours, itself, as well as

14 being confusing to the jury about which communications are in,

15 and which are out.

16     So on that basis, Rule 403, that I'm going to exclude each

17 of those e-mails, and any communications that might have gone

18 along with those e-mails.

19         MR. LAFAYETTE:  Could I just speak to one of the

20 e-mails, Your Honor?

21         THE COURT:  You may.

22         MR. LAFAYETTE:  Exhibit 3U.  That's one where there

23 is no solicitation there.  And it's clearly sending something;

24 not, now, something that she's created.  It's sending documents

25 from the City that shouldn't be sent out.  And I don't have

1  anything that is as clean and clear as that.

2      You see, the problem it would create is I'm talking about

3  sending e-mails to Desley Brooks.  Then you're asking me to

4  break up against her communicating with a government official.

5      The same thing with Mr. Swanson.

6      This is the clearest example that I actually have.  And so

7  in the interest of protecting her, you're actually putting my

8  hands behind my back as to what I can say was an inappropriate

9  communication outside of the City.

10      **THE COURT:**  Well, let me respond to that, because

11  there's another reason why that e-mail, in particular, is not

12  admissible.  It was not a basis for Ms. Preston being fired.

13  The 9/17/13 e-mail to Mr. Siegel was not a basis of her being

14  fired.

15      **MR. LAFAYETTE:**  We haven't had testimony on that yet.

16      **THE COURT:**  Do you have a proffer that she was fired

17  because of the 9/17/13 e-mail to Mr. Siegel?

18      **MR. LAFAYETTE:**  I will talk to my client, Your Honor.

19  I think what you're -- because what I haven't done is examined

20  my client with regard to all of the reasons why she was fired.

21  I specifically stopped my examination at the March 6th meeting.

22  I didn't go beyond that.  And so my case is still relevant on

23  these items.

24      **THE COURT:**  Do you have a proffer as I sit here right

25  now --

1          **MR. LAFAYETTE:**  Yes.

2          **THE COURT:**  -- as to whether that e-mail to

3   Mr. Siegel was a basis, stated in October, for her being fired?

4          **MR. LAFAYETTE:**  I appreciate that, Your Honor.  And

5   if I -- if I can't, I will so advise you.  Okay?  But I do not

6   intend to sort of slip up on -- I'm not going to do anything

7   like that.

8          **THE COURT:**  Well, I haven't heard it.  So based on

9   not having heard it -- and we're here in the middle of trial --

10  I'm not intending to admit it, because the danger of jury

11  confusion is that it might lead to the inference that she was

12  fired on October 2nd because of the e-mail she sent to

13  Mr. Siegel, when, in fact, that's not the facts of what

14  occurred; but it could be an argument an inference of that is a

15  basis for her being fired, when, in point of fact, that's not

16  the reason that she was fired.  So we don't want to confuse the

17  jury with different theories.  And I know you don't want to

18  confuse them, either.

19          You've got other facts you can argue.  And I'm not

20  preventing you from arguing those facts.  I'm not tying your

21  hands behind your back, but I want it to be a fair fight.

22          So my ruling is 3U is excluded.  If there is some

23  additional foundation that would establish its relevance and

24  its fairness as an exhibit under Rule 403, then I'll hear that

25  later.

1          **MR. LAFAYETTE:**  Thank you, Your Honor.  I appreciate

2  it.

3          **THE COURT:**  Mr. Siegel, anything further about that

4  topic?

5          **MR. SIEGEL:**  No.  A different topic.

6          **THE COURT:**  All right.  What's your next topic?

7          **MR. SIEGEL:**  Exhibit 12.

8          **THE COURT:**  Yes.

9          **MR. SIEGEL:**  The evaluation.  I would submit,

10  Your Honor, that it is -- I take it the concern is foundation.

11  And I --

12          **THE COURT:**  I've stated a number of different bases:

13  Foundation, authenticity, hearsay.  And I think under Rule 403

14  that there could be additional bases.

15      Very little foundation as to where the document came from.

16  You got testimony that there was an e-mail.  It's not an

17  e-mail.  It's a document that doesn't, on its face, evidence

18  any e-mail or e-mail attachment.  So -- or how it was stored,

19  or who edited it.  There are a lot of questions about it that

20  have not been answered.

21          **MR. SIEGEL:**  Okay.  I think that foundation is

22  established when there's a communication from one party to

23  another, and one party says, "Yes, I received this document

24  from the other."

25      Secondly, the document was produced to my firm by

1  defense -- by defense counsel in response to a request for the

2  documents contained in Ms. Preston's personnel file.  So we

3  could show you that's where it came from.

4       And thirdly, the document has elements of

5  self-authentication, where there is a statement in the document

6  that could only reasonably be -- have been made by Ms. Santana,

7  where she recites that I -- "I" -- that is, Miss Santana --

8  promoted you in January to be in charge of EOPD, I think.

9            THE COURT:  I don't think that's a fair inference.

10  There was testimony that those evaluations were written by

11  different people using different voices.  And the use of the

12  word "I" doesn't mean that it was written by any one person.

13  On the face of it, it's not signed.  It's unclear if there were

14  different drafts.  And what you're saying about its creation is

15  not evidence in the trial.  You're telling me as a proffer, but

16  it's not a foundation that's been laid by a witness during the

17  trial, or by some other means of a stipulation or something

18  else.

19            MR. SIEGEL:  Okay.

20            THE COURT:  So the -- my ruling on that issue stands.

21       I -- let's touch base on who's coming tomorrow, and what

22  evidence is coming tomorrow.  What's our plan?

23            MR. LAFAYETTE:  We just discussed that, Your Honor.

24            THE COURT:  Great.

25            MR. LAFAYETTE:  Mr. Siegel says he has approximately

**PROCEEDINGS**

 1  15 minutes left with plaintiff.

 2          **THE COURT:**  Great.

 3          **MR. LAFAYETTE:**  And because we have Ms. Parker

 4  coming, I'm going to hope the Court will indulge us by allowing

 5  Ms. Parker to come and testify before I do my cross -- start my

 6  cross-examination of plaintiff.

 7      And then Mr.  --

 8          **THE COURT:**  How long are you planning to examine

 9  Ms. Parker?

10          **MR. LAFAYETTE:**  I can give you a better --

11      Ms. Parker?

12          **THE COURT:**  Yes.  You want her to go next?

13          **MR. LAFAYETTE:**  Yeah.  I don't know.  Fifteen

14  minutes.  I think I've been kind of short today with my

15  examinations.  I'm trying to do that.

16          **THE COURT:**  We'll see what the jury thinks.

17      Do you have any objection to having Ms. Parker go next?

18          **MR. SIEGEL:**  No, not at all.

19          **THE COURT:**  So after -- at the conclusion of

20  Ms. Preston's direct examination, we'll have Ms. Parker go next

21  with your direct --

22          **MR. LAFAYETTE:**  Yeah.

23          **THE COURT:**  -- and cross-examination.  And we'll

24  conclude Ms. Parker?

25          **MR. LAFAYETTE:**  We'll conclude Ms. Parker.

 1             **THE COURT:**  All right.

 2             **MR. LAFAYETTE:**  As I think we're talking about, we'll

 3  go back to plaintiff.

 4             **THE COURT:**  All right.

 5             **MR. LAFAYETTE:**  I don't think there's going to be --

 6  but there's a possibility, I think, Mr. -- Mr. Siegel has said

 7  at 1:00 o'clock he has Ms. Ogus coming.  And then he has

 8  Mr. Ewell coming.  I hope to be done with plaintiff before

 9  that.  Okay?  But if that's the case, then I've advised him

10  that bring them in, because they're traveling people; get them

11  done.  That's where I'm at with that.

12             **THE COURT:**  Have you made a decision, or are you

13  calling Donelan?  Are you calling Robertson?  Are there other

14  witnesses?

15             **MR. SIEGEL:**  We're calling Donelan; not Robertson.

16             **THE COURT:**  Okay.

17             **MR. SIEGEL:**  What's the other -- or Garcia?

18             **THE COURT:**  McElroy?

19             **MR. SIEGEL:**  We are calling Dwight McElroy, yes.

20             **THE COURT:**  When is Dwight McElroy coming?

21             **MR. SIEGEL:**  Well, we need to see if they're

22  flexible -- the other witnesses.  The witnesses who are not

23  flexible are Barbara Parker, and Margo Ogus, and Lamont Ewell.

24             **THE COURT:**  And what about with Katano?

25             **MR. SIEGEL:**  And Mr. Lafayette is going to find out

 1  if Katano Kasaine is flexible or not.  If she's not flexible,

 2  then we have to get her on tomorrow, also.

 3      **MR. LAFAYETTE:**  We talked about this, and I've got

 4  people trying to resolve that issue.  And hopefully we'll have

 5  that issue resolved before we show up here tomorrow morning at

 6  9:00 o'clock.  I just want to make sure I understand.

 7  Mr. Garcia is not going to testify, at all.  Right?

 8      **MR. SIEGEL:**  Correct.

 9      **MR. LAFAYETTE:**  Does not come on.  And Mr. Robertson

10  is not going to testify at all in their case.  And

11  Barry Donelan will.

12      **MR. SIEGEL:**  Will.

13      **MR. LAFAYETTE:**  And Dwight McElroy?

14      **MR. SIEGEL:**  Will.

15      **MR. LAFAYETTE:**  Will testify.

16      **THE COURT:**  And, Mr. Lafayette, you've got

17  Mr. Donelan on your list, too.  Can we conclude your

18  examination when he's called, likely?

19      **MR. LAFAYETTE:**  Yes, I'm assuming, when he takes the

20  stand.  I will try.  There have only been a few where it can't.

21  And I'm trying to do that where I can.

22      **THE COURT:**  All right.  And you're on notice that

23  your case is going to be here on Friday.

24      **MR. LAFAYETTE:**  Yeah.

25      **THE COURT:**  You need to have witnesses ready to go on

 1   Friday.

 2             **MR. LAFAYETTE:**  I'll have witnesses available on

 3   Friday.

 4             **THE COURT:**  So there's some flexibility to work out,

 5   but the starting task for tomorrow is finish the direct with

 6   Ms. Preston.  We'll do the direct and the complete exam of

 7   Barbara Parker; conclude Ms. Preston's examination; then fill

 8   in from there, with Ogus expected at 1:00 o'clock; potentially

 9   Ewell immediately after that; and others to be followed.

10             **MR. SIEGEL:**  Correct.

11             **THE COURT:**  We're all seeing eye to eye on that?

12             **MR. LAFAYETTE:**  I think we are, Your Honor.

13             **THE COURT:**  Great.

14             **MR. LAFAYETTE:**  I think we're working pretty good.

15             **THE COURT:**  Outstanding.  Any other document issues

16   with that expected cast tomorrow?

17             **MR. LAFAYETTE:**  I don't think so.

18             **THE COURT:**  Can you foreshadow -- are there any --

19             **MR. SIEGEL:**  Big problems?  No.

20             **THE COURT:**  Any objections that should be raised now,

21   outside the presence of the jury?

22      I don't see that there are many documents left in this

23   stack that I foresee being -- I've seen a few documents, but

24   it's your case.

25             **MR. LAFAYETTE:**  No.  And I think you're right.  I

1  would be the first to say there's overdesignation for purposes

2  of just making sure that they're available.

3          THE COURT:  All right.  Mr. Siegel, do you see any

4  other evidentiary objections that I can resolve now, before

5  tomorrow's evidence?

6          MR. SIEGEL:  I do not, Your Honor.

7          THE COURT:  All right.  Let's talk about some of the

8  closing instructions, and Verdict Form.  You may have some

9  additional issues beyond the ones that I want to talk about.

10 This is not a final word on it, but I wanted to touch base with

11 you along the way, to make sure we are going the same

12 direction.

13     All right.  Now I'm looking at the annotated jury

14 instructions re: claims and damages that we sent out to you

15 this weekend as the working draft of that, as well as the

16 proposed Verdict Form.  Do you have that with you somewhere?

17         MR. LAFAYETTE:  Is that Document 140 Your Honor?

18         THE COURT:  That sounds right.

19         MR. SIEGEL:  Yes.  140.

20         THE COURT:  All right.  So one of the issues is

21 starting on page 1.  Ms. Preston must prove each of the

22 elements by a preponderance of the evidence that Santana acted

23 under color of law.  And I'm talking about the 1983 claim

24 against Ms. Santana in her individual capacity.  Can we

25 stipulate that she was acting under color of law?  Is that an

**PROCEEDINGS**

1  issue that's in dispute?  Is there some evidence that's going

2  to be coming disputing whether she was acting under color of

3  law, or can we stipulate to that fact?

4       **MR. LAFAYETTE:**  We may, Your Honor, but I haven't

5  spoken to Ms. Santana about that, and I would like the ability

6  to do that.

7       **THE COURT:**  All right.  I have no problem with that.

8      My perception is that that's not really a disputed

9  question; and if so, we can take it off the Verdict Form if

10  it's not in dispute.  So if you can, get back to me tomorrow

11  morning with that.

12      I assume that the -- I shouldn't assume.

13      Would Ms. Preston agree if we can stipulate to that fact?

14       **MR. SIEGEL:**  Yes.

15       **THE COURT:**  Next question, turning to the second

16  page.  This is within, still, the claim for violation of 1983

17  against Ms. Santana; and that is whether Ms. Preston's speech

18  was on a matter of public concern.  This is the second of the

19  four elements.

20      The pattern instruction -- and I put this in brackets, to

21  get your input.  The pattern instruction provides that the

22  Court is to instruct the jury that the speech was not a matter

23  of public concern, and therefore the second elements requires

24  no proof.

25      And I wonder if the Defense agrees to that.

1          **MR. LAFAYETTE:**  No, Your Honor.  I think this was not

2  a matter of public concern.  I think this was manufactured.

3  And so if I -- if I stipulate to that, I'm going to be deprived

4  of saying what I think I need to say.

5          **THE COURT:**  And here I'm not asking you to stipulate

6  to it.  I'm telling you that the pattern instruction, which is

7  civil 9.9, provides that it's an issue that requires no proof.

8  And I'm asking for you to give me authority that says that's

9  wrong --

10          **MR. LAFAYETTE:**  Oh, it --

11          **THE COURT:**  -- and why I should not give that

12  instruction.  It's a separate issue from the facts.

13          **MR. LAFAYETTE:**  Yes.

14          **THE COURT:**  If that's the law, then we don't need to

15  go into the facts; but if there's case law that says that

16  instruction is improper or would be improper in this case, I

17  need you to --

18          **MR. LAFAYETTE:**  I'll provide you with some legal

19  authority as to why that --

20      Because I read that as an option; that there are some --

21  that that's not necessarily mandated.  Otherwise, it wouldn't

22  be in the brackets.  So it's --

23          **THE COURT:**  Well, to be clear, I put it in brackets

24  to bring it to your attention.

25          **MR. LAFAYETTE:**  Okay.  I'll give you something on it.

**PROCEEDINGS**

1          THE COURT:  And I also wanted to bring it up now, so

2     that Ms. Preston and her counsel would be on fair notice that

3     there's not been many facts -- maybe no facts -- brought in on

4     whether her actions were on a matter of public concern, versus

5     a private concern.  And I wanted to give them an opportunity to

6     think about the law as well as to develop the facts before we

7     get to the close of plaintiff's case.

8          MR. LAFAYETTE:  Okay, Your Honor.

9          THE COURT:  The next issue right next to it is

10    whether Ms. Preston's termination was an adverse employment

11    action.  I think it could be stipulated as a matter of fact

12    that her being terminated was adverse.

13         MR. LAFAYETTE:  I -- I think that I would be hard

14    pressed to say that a termination is not an adverse employment

15    action.

16         THE COURT:  I'll -- again, because Ms. Santana's not

17    here, I'll allow to you confer with her to alert her that

18    that's my expected ruling.

19         MR. LAFAYETTE:  Yes.

20         THE COURT:  And if it is, then there will not be a

21    box in the Verdict Form deciding whether termination was

22    adverse or not.

23         MR. LAFAYETTE:  Can you just do me a courtesy,

24    Your Honor?  Let me know which page and line.

25         THE COURT:  It's on page 2, lines 21 and 22.  And.

1      I've drafted it to instruct the jury that termination is

2   adverse.

3      If you thought that was an improper instruction, I'll give

4   you until tomorrow to persuade me why that's wrong, but I --

5            **MR. LAFAYETTE:**  I may suggest and -- rather than say

6   that Ms. Preston's termination was, just something more neutral

7   that says "A termination is an adverse employment action."

8            **THE COURT:**  All right.  I'll consider that.

9            **MR. LAFAYETTE:**  Okay.

10           **THE COURT:**  All right.  Turning to the next page,

11  page 3, this -- under the *Dahlia* factors, turning to

12  Ms. Santana's standard, if Ms. Preston can prove the first four

13  elements, then she can defeat the retaliation claim through a

14  preponderance of evidence by establishing two elements; and

15  they're identified as five and six.

16     Five is that Santana had adequate justification for

17  treating Preston differently than other members of the general

18  public.  And again, that's -- that's the law.  I am searching

19  for law that might explain that, and also highlighting for the

20  parties the scarcity of facts that have come in as to that

21  element.  So if you have some further instruction that you

22  would suggest on that, I welcome your ideas.  And ultimately,

23  as this is Santana's burden, I'll be looking for the Defense to

24  identify facts that would support this element, if that's one

25  of the ones you're arguing.

1          **MR. LAFAYETTE:**  I will look at this, Your Honor.  I

2   can tell you that seems to come -- and I'll look at more

3   particular cases involving discrimination, where someone is

4   treated differently than other people.  That's what that

5   language seems to be.  And this is not a discrimination case,

6   so that's what concerning me about the language.

7          **THE COURT:**  It seems from your opening statement that

8   Issue 6 -- that Santana would have terminated Preston, even

9   absent protected speech -- is what you're going for.

10          **MR. LAFAYETTE:**  Yes.

11          **THE COURT:**  But 5 is also part of the instruction.

12   So if that's improper --

13          **MR. LAFAYETTE:**  Yes.

14          **THE COURT:**  -- or the law makes it the alternative, I

15   need to be persuaded -- I want to make sure I'm following the

16   law correctly in instructing the jury, as you also need to

17   follow the law.

18          **MR. LAFAYETTE:**  Yes.

19          **MR. SIEGEL:**  Your Honor, I also have --

20          **THE COURT:**  Yes.

21          **MR. SIEGEL:**  -- concerns about Item 5.  And we can

22   look into it more.  It kind of doesn't make sense, in the sense

23   that -- in the sense that Ms. Santana didn't have the authority

24   to treat other members of the public differently or the same.

25   She could only take an adverse action against Ms. Preston,

1   because Ms. Preston was an employee of the City of Oakland.

2          **THE COURT:**  It doesn't really fit with the facts of

3   this case very well.  So we have to think about it; if we

4   should be jettisoning that instruction or modifying it.

5          **MR. LAFAYETTE:**  Work something out.

6          **THE COURT:**  All right.  So put that on your homework

7   list.

8       Turning to the 1102.5 claim against the City of Oakland,

9   elements that Preston must prove:  That Oakland was Preston's

10  employer -- I think that's stipulated to, or I propose that we

11  stipulate that Preston was employed by the City of Oakland.

12      And the next element is that the City of Oakland believed

13  that Preston -- and here, I just have a question about agency.

14  The City of Oakland is not a person.  It doesn't have a belief.

15  So we could have an additional instruction on agency, and that

16  a city acts through its employees; or we could have it say that

17  Santana -- if Santana is the person with the authority to

18  terminate Preston, if we inserted Santana's name for "Oakland"

19  here, and have it agreed that Santana believed that Preston did

20  A. B, and C, I think that would be -- would fit the facts of

21  the case, but I throw it open to you for your thought.

22          **MR. LAFAYETTE:**  I -- I think, Your Honor, that, from

23  what I've been hearing, it's not that she is saying that it is

24  racially -- I think 11 -- that the Labor Code requires her to

25  show that she was protesting something that was unlawful.  If

1    it's racially discriminatory --

2              THE COURT:  Well, that's a different issue.  The

3    first issue is whether it's Oakland, or through any of its

4    employees --

5              MR. LAFAYETTE:  Okay.

6              THE COURT:  -- or if it's Santana in particular.

7              MR. LAFAYETTE:  I will grapple with that, Your Honor.

8    And I understand the importance of the issue.

9              THE COURT:  And the danger of confusion is that this

10   claim is against Oakland.  The first claim is against Santana.

11   And they're separate claims.

12       If we inserted Ms. Santana's claim here, it could be

13   confusing as to whether they're both against Santana, but

14   really it was Santana, acting as Oakland's agent, who

15   terminated Preston.  So I think that might be a factually

16   correct statement.

17       On the next page, page 5, at the top, in paragraphs 4 and

18   7 -- same issue, where the instruction says that the City of

19   Oakland terminated Preston, and that Oakland's conduct was a

20   substantial factor causing Preston's harm; whether we should

21   either insert Santana's name there, being the person who did

22   the terminating, or we should just explain to the jury that

23   when we say "Oakland," we mean Oakland, through its employees

24   or agents.  From plaintiff's version, that would mean it could

25   be -- plaintiff's view, that means it could be Santana who did

1  these things, or someone else on behalf of Oakland who did

2  these things.  Maybe it's a little broader.

3     I'm not sure what your preference is, Mr. Siegel, as to

4  whether you want to specify who it is for Oakland that you

5  allege took those actions.

6          **MR. SIEGEL:**  You mean the termination actions?

7          **THE COURT:**  Right.

8          **MR. SIEGEL:**  Well --

9          **THE COURT:**  Would you prefer to say "Oakland, through

10 its employees and agents," or would you prefer to say that

11 Santana terminated Preston?

12         **MR. SIEGEL:**  That Oak --

13    Well, I think to be accurate, it would be Oakland, acting

14 through City Administrator Santana.

15         **THE COURT:**  You don't have a theory as -- somebody --

16 someone different from the City Administrator is the one that

17 terminated Preston?

18         **MR. SIEGEL:**  No.  I mean, we accept the interrogatory

19 response that it was Ms. Santana's decision.

20         **THE COURT:**  All right.  So I'll give the Defense a

21 chance to think about that.  And if there's --

22         **MR. LAFAYETTE:**  Your Honor, also line 18.

23         **THE COURT:**  Yes.

24         **MR. LAFAYETTE:**  I may look at the

25 clear-and-convincing standard, because I -- for some reason, in

1  the back of my mind I think there's a State Supreme Court

2  Opinion that addresses this issue.  And I'll just take a look

3  at it.  If there is, I'll give it to you.

4          **THE COURT:**  Very good.

5      Moving on to page 6 -- and we haven't gotten to the

6  damages part of the case, as far as what the experts want to

7  say, but I'm just identifying for you in the Verdict Form the

8  we've broken it into past economic damages, future economic

9  damages, pain and suffering.

10     This has got an instruction that's a little bit different

11  than that:  Earnings, earning capacity, salary.

12     We could modify that to fit exactly the Verdict Form.

13  Because I haven't heard how the expert is going to testify to

14  it, I haven't made any effort at changing that yet, but I

15  welcome your drafting.  I think this is primarily a

16  plaintiff's-side issue of defining it -- the damages you're

17  seeking, so that the jury will be able to match up the

18  instruction to the testimony that comes in.

19     Does that make sense?

20          **MR. SIEGEL:**  Yes.  Yeah.  And what the expert's going

21  to testify is past economic, future economic.

22          **THE COURT:**  Yeah.  And we want it to not be using

23  different terminologies, so that the jury gets confused by

24  hearing something about earning capacity, when we're not

25  referring to earning capacity during the testimony.

PROCEEDINGS

1              **MR. LAFAYETTE:**  There's -- there is something --

2         Go ahead, Your Honor.

3              **THE COURT:**  No.  Is there something in that section?

4              **MR. LAFAYETTE:**  You were just in the -- it's in the

5    damages section on page 7.

6              **THE COURT:**  All right.  I'm headed that way.

7         Nominal damages.  I haven't put nominal damages into the

8    Verdict Form.  It is, on 1983 claim, a recoverable if there are

9    facts to support it.

10        Mr. Siegel, do you want me to have an instruction for

11   nominal damages in the Instructions and Verdict Form?

12             **MR. SIEGEL:**  Yes.

13             **THE COURT:**  All right.  So then I think that I

14   will -- I need to modify the Verdict Form to have a blank for

15   that, so that it's a possible recovery.

16        All right.  Punitive damages.  I think there's some

17   controversy as to whether the burden should be by a

18   preponderance, or clear and convincing evidence.  I've drafted

19   it as "by a preponderance of the evidence."  That's on the

20   bottom of page 6/top of page 7.

21        If there are additional authorities that the Defense would

22   like to bring to my attention as to why it should be

23   clear-and-convincing standard, please advise me.

24             **MR. LAFAYETTE:**  I -- I think that you have a

25   state-law claim that you're proceeding on.  And the state-law

PROCEEDINGS

```
 1  statute, which is 3294, provides a clear-and-convincing

 2  standard.

 3          THE COURT:  Now, the only punitive damage is against

 4  Santana.

 5          MR. LAFAYETTE:  Yes.  That's right, Your Honor.

 6          THE COURT:  So --

 7          MR. LAFAYETTE:  I stand corrected.

 8          THE COURT:  So there's no opportunity for punitive

 9  damages against Oakland on the 1102.5 claim.

10          MR. LAFAYETTE:  I would still argue that

11  state-damages statute is 3294.  And that's the statute that

12  authorizes punitive damages.  And it has a clear-and-convincing

13  standard.

14          THE COURT:  All right.  Compare that to the

15  Ninth Circuit's Model Instruction 5.5.

16          MR. LAFAYETTE:  I will do that.

17          THE COURT:  And if there's a case that goes your way

18  in this circumstance, bring it to my attention.

19          MR. LAFAYETTE:  I will.

20          THE COURT:  I drafted it to be "by a preponderance."

21          MR. LAFAYETTE:  I understand.

22          THE COURT:  And I've left blank, and will fill in

23  once we hear from the economic expert, the categories of

24  damages.  And we'll put some facts in, as well as the law, to

25  give examples to the jury that match what the plaintiff is
```

 1  actually seeking in the case.  All right.

 2          MR. LAFAYETTE:  I have a comment on page 7.

 3          THE COURT:  Go ahead.

 4          MR. LAFAYETTE:  Where it says, "You may award

 5  punitive damages only if you find that Santana's conduct that

 6  harmed Preston was malicious" -- in this case, we've heard a

 7  lot of things about not getting a search warrant, or looking at

 8  her e-mails -- so all of those types of things -- but that's

 9  not one of the issues in this case.  And what I don't want is a

10  risk that, because this is this language, that that becomes

11  something that someone runs down the street with.  And I think

12  this language needs to be addressed, and focused to what we're

13  talking about here, because it's the termination.

14          THE COURT:  All right.  I'll consider that.  And if

15  there's language you would propose to add explaining the harm,

16  I'll consider adding it in.

17          MR. LAFAYETTE:  Thank you.

18          THE COURT:  There's a Ninth Circuit reversal -- not a

19  reversal -- a Ninth Circuit affirmance last week in a 1983

20  case, where there was some conduct that was not part of the

21  actionable claim that the jury awarded $3 million on.  And

22  ultimately, the verdict was thrown out.  There was a retrial.

23  And the Ninth Circuit affirmed that that was -- the proper way

24  of going with things was to focus the punitive damages on the

25  particularly unconstitutional harm.  So I think there's some

1  support for targeting punitive damages to the unconstitutional

2  harm, rather than just to general badness.

3          **MR. LAFAYETTE:**  Yeah.

4          **THE COURT:**  So if there's a way to accomplish that, I

5  think that's reasonable targeting.  All right.

6      Anything else from the Defense side?

7          **MR. LAFAYETTE:**  Not that I can think of right now.

8          **THE COURT:**  Okay.  I'll give you a further chance to

9  elaborate on these topics, but I wanted to start focusing our

10 thoughts.

11     Mr. Siegel, anything further?

12         **MR. SIEGEL:**  There was one thing I was thinking

13 about -- and I'm not sure what the Court thinks, and what the

14 Defense thinks -- whether there needs to be an instruction

15 which lays out the state and federal law that Ms. Preston

16 thought was being violated in connection with her 1102.5 claim.

17         **MR. LAFAYETTE:**  Dan, do you have statutes that you

18 want to suggest that we take a look at?

19         **MR. SIEGEL:**  Well, I don't have it written out, but

20 she believed that discriminatory action would violate state and

21 federal law, and that the issues relating to the Local 55

22 bargaining and the failure to deduct fees would violate --

23     LaWanna, do you remember the provisions of MMD 3505 and

24 3506?  Was that the ones we were talking about?

25         **MS. PRESTON:**  I believe so.  I think so.  I'd have to

 1   look at it to be sure, but I believe so.

 2          MR. LAFAYETTE:  We'll talk about these, Your Honor;

 3   see if we can come up with something.

 4          THE COURT:  What's implicated is -- on page 4,

 5   paragraph 3 -- whether Preston can prove reasonable cause to

 6   believe that one of the prior categories disclosed activities

 7   or refused or violations or noncompliance with the law.  So

 8   "reasonable" is the word in there, modifying "cause."

 9          And, of course, there's not the cross-examination

10   yesterday of Ms. Preston to see if her belief was reasonable or

11   not.  And that could require a comparison to objective

12   categories -- comparison to what the law actually is.  If --

13   and I don't know if you're going to make that defense, or not.

14          If you do make that challenge, then I think it would be

15   pragmatic to advise the jury what the law is, rather than have

16   them be guessing what the law is from each side.

17          The down side of that approach is I don't want to give the

18   jury an entire code book of 3,000 laws, and have them guess at

19   which law might have been violated, and which one wasn't

20   violated.  And I'm particularly concerned that there is an

21   attorney and a legal secretary on the jury who might, despite

22   instruction, go off on their own investigation to decide if

23   there was a violation of law.  So we don't want to encourage

24   courage that collectively.

25          So we need to be precise about which laws the plaintiff is

1   asserting that she had reasonable cause to believe were

2   violated.  And if there's a difference of opinion from the

3   Defense about whether that was reasonable or not, that we have

4   a very pointed counter to that, and can only instruct the jury

5   on something that's in dispute.

6        Long-winded, but does that make sense to you?

7           **MR. LAFAYETTE:**  I think so, Your Honor.  We'll talk.

8   And I don't want to open up any doors that we don't need to

9   open up here.

10          **THE COURT:**  Yeah.  So it may ultimately be this is

11  not an issue in dispute; or you can leave it without further

12  instruction on the law, but I'm open to instructing on the law

13  as long as we can make it focused on the law that's actually

14  implicated by the testimony.

15       Anything else, Mr. Siegel, that you think we should be

16  thinking about?

17          **MR. SIEGEL:**  No, Your Honor.

18          **THE COURT:**  I've got one other, which is:  Both on

19  the 1983 claim against Santana and the 1102.5 claim against the

20  City, there are elements for emotional-distress damages.

21       As of yet, we haven't heard much testimony about the

22  emotional-distress damages, and who caused it; but it seems

23  likely that there might be some overlap between those areas of

24  damages.  If Ms. Preston establishes the elements for each

25  claim, and we get to a damages phase, how we ask the jury to

1   award damages in those two different categories.

2       And if there's going to be evidence of emotional-distress

3   damages caused by someone at Oakland other than Ms. Santana.

4   And that's really going to be first a question for the

5   plaintiff, as to whether your theory of the case is that, say,

6   for example, Jean Quan caused emotional distress, or

7   Sandre Swanson, or someone else on the Council, or --

8       You know, if there was someone else from Oakland who

9   caused emotional distress that's separate from the distress

10  caused by Ms. Santana, I think we need to spell out what it is

11  that you're asserting, and potentially instruct the jury that

12  as to -- you know, we're not going to have double recovery for

13  emotional distress against -- that Ms. Santana caused.  If

14  Ms. Santana caused it, that's one measure of damages.  That's

15  not going to be that, plus that again.

16      If there's some emotional distress that someone else at

17  Oakland caused that's separate from what Ms. Santana caused,

18  well, then I can hear that evidence.  I haven't heard it yet.

19          **MR. LAFAYETTE:**  I think the emotional distress -- my

20  understanding is that emotional distress derives from the

21  termination.  And that's kind of the case.  It's the

22  termination that's the issue.  And so because it's the

23  termination that is the issue, it is -- it's really the

24  decision to terminate that I think we focused on.

25          **THE COURT:**  Well the 1102.5 claim is a retaliation

 1  claim for a refusal to participate in unlawful acts.  I think

 2  theoretically it could go beyond the termination.

 3          **MR. LAFAYETTE:**  But the retaliatory act, even for

 4  that, is the termination.  You see, for -- it doesn't make any

 5  difference which vehicle -- which cause of action you're

 6  looking at.  The -- the adverse action is always going to wind

 7  up being the termination.  That's -- that's the way I thought

 8  of it, because you have to have an adverse action.  And that is

 9  the adverse action.  And so I think we should be looking at the

10  damages from the standpoint of:  Those did arise from the fact

11  that she loses her job.

12          **THE COURT:**  Yeah.

13      And does plaintiff agree with that assertion; that the

14  emotional-distress injury is the same for each cause of action?

15          **MR. SIEGEL:**  Your Honor, what I agree with is your

16  point that there should not be double recovery for emotional

17  distress.  And I've been thinking about how the Verdict Form

18  might be revised so that there's only one opportunity for the

19  jury to consider each type of damages.

20          **THE COURT:**  That's the area of overlap.  I mean,

21  that's got an entry right now in both places --

22          **MR. SIEGEL:**  Right.

23          **THE COURT:**  -- to think about, to avoid this problem.

24  And maybe you put it in one category or the other if you don't

25  have any additional facts that are, you know --

**PROCEEDINGS**

1          **MR. SIEGEL:**  Right.

2          **THE COURT:**  If you agree it's all an Santana-caused

3    damages, and you think that claim is your best shot, you put it

4    in that column, and you avoid the confusion of:  It was

5    somebody else who did it, so not awarded.

6          **MR. SIEGEL:**  Right.  I mean, it's a little

7    technically difficult in terms of devising the Verdict Form,

8    you know, just because, in part, the structure of 1983 law is

9    Ms. Santana's responsible for the damages that flowed from her

10   action, but it's the City that actually terminated her

11   employment.  You know, if we were doing a discrimination case,

12   Ms. Santana might be the manager who made the decision; but

13   it's always the entity which is responsible for certain types

14   of damages.

15         In the context of 1983, the law is a little bit different

16   when you have a public actor acting in her personal capacity,

17   but I think we should -- we should design the Verdict Form so

18   that it says, "If you decide that Ms. Santana violated the

19   plaintiff's constitutional rights, or you decide that the City

20   violated her rights under 1102.5, then answer, you know,

21   Question 7X in terms of the amount of damages that flowed

22   from -- from those actions together or singularly."  Something

23   like that.

24         **MR. LAFAYETTE:**  It's kind of -- if you do a stacked

25   instruction, where you have first cause of action; and if, for

```
 1   some reason, they don't hit one of the bullets, you drop down
 2   to the second.  And then only after you go through the second
 3   do you get to the issue of damages.  And if they hit on both of
 4   the damages -- if they hit on liability on both, then it hits
 5   down to the damages.  And the only separate item that would be
 6   for Ms. Santana would be the punitive-damages piece of that.
 7   That's kind of the way.
 8            MR. SIEGEL:  Right.
 9            THE COURT:  The -- the danger of stacking it like
10   that to the Defense is that you put punitive damages at the
11   bottom of this.  And although we'll be instructing the jury
12   that punitive damages can only be awarded against Ms. Santana,
13   it comes to the bottom of the stack.  They've gone through it.
14   They've filled out numbers against Oakland.  And they say, "Now
15   let's do punitive damages against Oakland, too."  And they fill
16   in all of the blanks in the Damages section.
17       I'm not predicting that.  I'm not forecasting that.  But
18   the concern, if you put it all at the bottom, is that they kind
19   of give you the rough justice at the bottom, rather than
20   parsing it out when you're in Part 1 to say, "Okay.  We're
21   deciding against Ms. Santana.  Now we're moving into the
22   Part 2."
23            MR. LAFAYETTE:  I'll give more thought to it.  And I
24   see the dilemma.  And we've been grappling with it, to be
25   honest with you, in this case.
```

**PROCEEDINGS**

 1          **THE COURT:**  I think part of it is, I think, a

 2  fairly -- it could be a solution to just take the emotional

 3  distress out of one part or the other, to avoid any confusion.

 4  It would be problematic potentially if there's a different

 5  number in each category for emotional distress, without any

 6  explanation for or evidence that would support 10,000 for one

 7  and 5,000 for the other, when there's no evidence of someone

 8  other than Ms. Santana causing emotional distress.

 9          **MR. SIEGEL:**  All right.  We'll take a look at the

10  form.  Maybe we will come up with an agreement.  Maybe we'll at

11  least sharpen the disagreement, so it will be easier for you to

12  resolve.

13          **THE COURT:**  Very well.  Thank you for your additional

14  attention and consideration.  We're going to retouch on some of

15  those Verdict Form issues and Jury Instructions.  Thank you.

16  We're in recess until tomorrow morning.

17  (At 4:53 p.m. the proceedings were adjourned.)

18

19

20

21

22

23

24

25

1   I certify that the foregoing is a correct transcript from the

2   record of proceedings in the above-entitled matter.

3

4

5                                              September 16, 2015

    _____   _____
    Signature of Court Reporter/Transcriber    Date
6   Lydia Zinn

7

8

9                                              September 16, 2015

    _____   _____
    Signature of Court Reporter/Transcriber    Date
10  Rhonda Aquilina

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25