**Volume 4**

**Pages 720 - 937**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

```
DARYELLE LAWANNA PRESTON,        )
                                 )
          Plaintiff,             )
                                 )
   VS.                           )      NO. C 14-02022 NC
                                 )
CITY OF OAKLAND; DEANNA          )
SANTANA, in her individual       )
capacity; and DOES 1 through     )
10, inclusive,                   )
                                 )
          Defendants.            )
_____  )
```

San Francisco, California
Thursday, September 17, 2015


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Daryelle Lawanna Preston:
                    Siegel & Yee
                    499 14th Street, Suite 220
                    Oakland, CA 94612
                    510) 839-1200
                    (510) 444-6698 (fax)
             **BY:  SONYA MEHTA**
                    **DANIEL MARK SIEGEL**


Reported By:  Lydia Zinn, CSR No. 9223, FCRR
              Rhonda Aquilina, CSR No. 9956, RMR, CRR
              Official Reporters

1   **APPEARANCES (Continued):**

2   For Defendants City of Oakland; Deanna Santana:
                       Lafayette & Kumagai LLP
3                      101 Mission Street, Suite 600
                       San Francisco, CA  94105
4                      (415) 357-4600
                       (415) 356-4605 (fax)
5                BY:  **AFRICA EVANGELINE DAVIDSON**
                      **GARY T. LAFAYETTE**

6

7   ALSO PRESENT:   Kelvin Su

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          <u>I N D E X</u>

2

3    Thursday, September 17, 2015 - Volume 4

4
     <u>PLAINTIFF'S WITNESSES</u>                              <u>PAGE</u>   <u>VOL.</u>
5

6    <u>PRESTON, LAWANNA (RECALLED)</u>
     Direct Examination by Mr. Siegel                733    4
7

8    <u>PARKER, BARBARA</u>
     (SWORN)                                         747    4
9    Direct Examination by Mr. Siegel                747    4
     Cross-Examination by Mr. Lafayette              764    4
10   Redirect Examination by Mr. Siegel              771    4
     Recross-Examination by Mr. Lafayette            780    4

11

12   <u>PRESTON, LAWANNA (RECALLED)</u>
     (PREVIOUSLY SWORN)                              783    4
13   Cross-Examination by Mr. Lafayette              784    4

14

15   <u>OGUS, MARGO RICH</u>
     (SWORN)                                         825    4
16   Direct Examination by Mr. Siegel                826    4
     Cross-Examination by Mr. Lafayette              840    4
17   Redirect Examination by Mr. Siegel              853    4
     Recross-Examination by Mr. Lafayette            862    4

18

19   <u>EWELL, PHILIP LAMONT</u>
     (SWORN)                                         863    4
20   Direct Examination by Mr. Siegel                863    4
     Cross-Examination by Mr. Lafayette              884    4
21   Cross-Examination resumed by By Mr. Lafayette:  886    4

22                      <u>E X H I B I T S</u>

23   <u>TRIAL EXHIBITS</u>                      <u>IDEN</u>   <u>EVID</u>   <u>VOL.</u>

24   U                                                747    4

25   1D                                               805    4

# **I N D E X**

## **E X H I B I T S**

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|---|---|---|---|
| 4D | | 916 | 4 |
| 4I | | 917 | 4 |
| 4N | | 919 | 4 |
| 43 | | 734 | 4 |
| 45 | | 738 | 4 |

1  **Thursday - September 17, 2015**                    **8:59 a.m.**

2                    **P R O C E E D I N G S**

3                        ---000---

4  (Proceedings were heard outside the presence of the jury:)

5          **THE COURT:** How's everybody today?

6          **MR. LAFAYETTE:** Good.

7          **THE COURT:** All right. Today's Thursday. Every day

8  is blurring together. Our jurors are assembling. When we left

9  off, we were talking about document 4P. "P," as in "Peter."

10  And -- but I forgot to bring up in our post-jury discussions

11  yesterday there were --

12          **MR. SIEGEL:** Okay.

13          **THE COURT:** -- objections raised by the Defense on

14  the Amended Joint Trial Exhibit List. Those objections were

15  relevance, and Rule 407 subsequent remedial measures. We had

16  not talked about those objections since the beginning of trial,

17  so I wanted to see if there was going to be a Defense objection

18  to the document.

19          **MR. LAFAYETTE:** No, Your Honor.

20          **THE COURT:** All right. And will you be moving it

21  into evidence, Mr. Siegel?

22          **MR. SIEGEL:** Trying. Yes.

23          **THE COURT:** All right. Well, if there's no

24  objection, I'll admit it, but I just wanted to have that

25  discussion outside the presence of the jury if we were going to

1   have an argument about it.

2       All right.  And we've got our much-anticipated video

3   almost ready to go.

4           MR. LAFAYETTE:  I'm -- I'm not sure.  Are you running

5   the clip that we just gave you?

6           MS. MEHTA:  I am not.

7           MR. LAFAYETTE:  Well, then I have an objection.

8           THE COURT:  What is your objection?

9           MR. LAFAYETTE:  In the middle of the month we

10  designated.  And the only clip that was designated was the clip

11  which had the page -- had the time stamps on it, which we put

12  into the -- as an exhibit.

13      Now I think plaintiff is about to play some clip other

14  than the clip that was designated almost a month ago.  And

15  that's my concern, because I haven't seen what they're going to

16  designate.

17          MR. SIEGEL:  Well, actually, you have, because what

18  we want to show is within what you want to show.

19          MR. LAFAYETTE:  And if that's the case, Your Honor,

20  they should have said that before today to me.  I can't sit

21  here and look at this now, and talk about what they're talking

22  about.  I clipped it to frame the issue.

23          MR. SIEGEL:  But that was the Defense exhibit.

24          THE COURT:  One at a time, since we are keeping track

25  of what you're saying.

**PROCEEDINGS**

1    **MR. LAFAYETTE:**  The only thing I'm saying is, if

2    plaintiff's counsel wanted to do something different, they

3    should have alerted me to that earlier than right now, just

4    before it's going to get played.  That's the only concern I

5    have, because I don't have an opportunity now to look at this.

6    I've given them -- and they didn't object to -- the clip that

7    we designated.  There's no objection to the clip.

8    **MR. SIEGEL:**  Well, that's true.

9    **THE COURT:**  Just one at a time here.  And I'm sorry

10   to interrupt.

11   So the plaintiff has also designated a video recording as

12   Exhibit 9, although there was not a copy of what you were

13   planning to propose that was provided to the Court.  So

14   describe for me how this video recording is different from what

15   the Defense has identified as their exhibit.

16   **MR. SIEGEL:**  Okay.  First of all, we don't object to

17   the Defense playing whatever it wants.  Okay?  So it's not --

18   we don't have an argument with them.  We just want to play

19   less.  And part of it has to do with timing.  I'm getting

20   worried about my time.  You know, they can play the whole

21   meeting if they want.  I don't care.  But we just want to play

22   a couple minutes.

23   **THE COURT:**  How many minutes are you going to play?

24   **MS. MEHTA:**  Four minutes.  Almost five minutes.

25   **THE COURT:**  And how much does the Defense wish to

1  play?

2          **MR. LAFAYETTE:**  I think it's about six or seven.

3          **THE COURT:**  Let's play six or seven.  If you want to

4  show more of it, then let's show more of it.  Then we won't be

5  showing it once, and then twice, with different parts, and have

6  to explain what the different parts are.  Let's play -- I don't

7  want to play it ten times if we can -- if we can play it fewer

8  times than more, as long as the parties have an opportunity to

9  show the jury what you wish to show the jury.  So if you have a

10  seven-minute, six-minute clip of it, let's play that, rather

11  than the four-minute clip.

12          **MR. SIEGEL:**  Okay.

13          **THE COURT:**  That's my suggestion.

14          **MR. SIEGEL:**  Question, Your Honor.

15          **THE COURT:**  Yes.

16          **MR. SIEGEL:**  Will the jury have the ability to review

17  this in its deliberations?

18          **THE COURT:**  That's one of the issues we touched upon

19  during the pretrial conference.  Yes, they will, if it's in

20  evidence.

21      And the format of how they look at it -- this is another

22  reason to have agreement about what it is that's being shown --

23  is to have one version of it, rather than two different

24  versions, and have them reading different things.  If you're

25  only going to show them a seven-minute version, then what they

**PROCEEDINGS**

1   should be able to review during the deliberations is the

2   seven-minute version, unless the parties stipulate and agree

3   and are wishing the jury to watch a much longer version, which

4   I would discourage, because then they're going to be looking at

5   evidence that they've never seen or heard before, and won't

6   know what to look for.  That means that you have to have a

7   seven-minute version for them to review.

8       And then there's a technology question, which is:  What

9   equipment are you showing it to them on?  And I don't know how

10  you've addressed that.

11          **MR. LAFAYETTE:**  We have it on a flash drive -- just

12  that clip.  Nothing more; nothing less.  So we can do that.

13      And we can come up with a piece of technology that they

14  can take in.

15          **THE COURT:**  All right.  So there is a

16  Court-available, but not on a 30-second notice to the Court,

17  piece of computer equipment.  They can view lots of things, but

18  it has to be available to view the software that you've got it

19  on, and it has to be able to use your flash drive.  So if

20  that's what you wanted, you need to coördinate with our IT

21  Department before you get to that moment to make sure it works

22  together.  That's available.

23      The alternative is that you have a -- you designate a

24  piece of equipment that you both agree to, and give that to the

25  jury.  You've got to make sure it doesn't have any other

1  evidence on it; doesn't have the ability to -- we're not

2  encouraging the jury to use it to do their own research in the

3  case.  We're not going to have something else on there they

4  shouldn't have.  If you can agree upon a piece of hardware to

5  view it, make sure it works.  That's acceptable, too.

6          **MR. SIEGEL:**  As long as it doesn't have

7  Mr. Lafayette's autobiography on it.

8          **MR. LAFAYETTE:**  Ha, ha, ha.

9          **THE COURT:**  You can decide who that would be

10  prejudicial to, but -- no.

11      I had -- Mr. Lafayette had a prior trial with Judge Ware.

12  And I had a bad experience, where I sent back to the jury some

13  things that were not in evidence on a laptop.  And there is a

14  Ninth Circuit case about that now.  I'm sensitive -- having

15  screwed that up before, as an attorney -- not to mess it up

16  here.  So check what you're going to provide them.  And make

17  sure you're both comfortable that they don't have evidence

18  that's improper evidence.

19          **MR. SIEGEL:**  Okay.

20          **THE COURT:**  In speaking of the *Brown* case -- and

21  it's, I think, 08-3972.  And Mr. Lafayette knows that case, as

22  he tried it.  I was looking at the Verdict Form and Jury

23  Instructions in that case last night, to see if there was

24  anything we could learn and use from that Verdict Form.  It

25  came from before the *Dahlia* case, so the law is not on all

 1   fours with this trial, but I think I'm going to make some

 2   modifications to our Verdict Form that are consistent with the

 3   methodology there, to make our Verdict Form a little easier to

 4   follow.

 5          **MR. LAFAYETTE:**  I'll look at that, Your Honor.  It

 6   slipped my mind.

 7          **THE COURT:**  Water under the bridge, maybe; but it has

 8   a similar claim to this case, so I think it's a helpful

 9   exemplar.

10          **MR. SIEGEL:**  Is that a case you tried against each

11   other?

12          **THE COURT:**  Not a case I was involved in.

13          **MR. SIEGEL:**  Oh.

14          **THE COURT:**  This is a case that was against the City

15   of Oakland on a similar retaliation claim.  Judge Ware was of

16   the trial Judge.  No connection to me, other than having read

17   about --

18     All right.  Any other legal issues before we talk about

19   4P -- or not talk about 4P -- before we bring in the jury?

20          **MR. SIEGEL:**  Just -- so do we have this cued up at

21   the right spot now?

22          **MR. LAFAYETTE:**  Can we help?  Her computer can't play

23   the MP4s, but we can play it.  So if no one minds -- okay? --

24   we'll just play it, so we just get through the technology

25   issue.

PROCEEDINGS

1          THE COURT:  I support the coördination on technology

2     that works.

3          MR. SIEGEL:  Okay.

4          MR. LAFAYETTE:  All right.

5          MR. SU:  Whenever you're ready.

6          MR. LAFAYETTE:  Whenever you're ready, he'll put it

7     on the screen over there.

8          MR. SIEGEL:  Okay.

9          THE COURT:  This screen or that screen?

10          MR. LAFAYETTE:  That one.

11          THE COURT:  I think that's great.  Then the jury can

12     see it after.  And are we going to do that first, or is that

13     later in your examination you want to do it?

14          MR. SIEGEL:  See, we're already past that, so let's

15     do it first.

16          THE COURT:  All right.  So we're going to get that

17     cued up.  I'll give you a minute more to get that set up.  So

18     do your thing.  I'll sit here quietly.

19          MR. LAFAYETTE:  Okay.

20     (Pause in proceedings.)

21          THE COURT:  Let's check.  See if our jurors are

22     ready.

23     (Proceedings were heard in the presence of the jury:)

24          THE COURT:  All right.  Our jurors have returned.

25     Thank you for your diligence and attendance, participation.

 1      We return with the plaintiff's case continuing.

 2  Ms. Preston is on the stand, and remains under oath.  And I

 3  think we're going to start with the anticipated video that was

 4  referenced yesterday.  I'll turn it over to Mr. Siegel.

 5           MR. SIEGEL:  Yes.  Thank you, Your Honor.

 6       Good morning, ladies and gentlemen.

 7           JURORS:  Good morning.

 8           MR. SIEGEL:  Both sides have agreed as to what

 9  portion of the tape of the March 6th meeting will be shown to

10  you.  So we're ready to do that now.

11  (Videotape was played but not reported.)

12           MR. SIEGEL:  Can we get a little more sound?

13  **(Videotape resumed.**)

14           THE COURT:  Let make it louder.

15           JUROR RODRIGUEZ:  Can we start it over, too?

16           THE COURT:  Yeah.  Let's start it over with more

17  volume, too.  Thank you.

18           MR. LAFAYETTE:  Just a second, Your Honor.

19  **(Videotape resumed.**)

20           MR. SU:  Give me a second.

21           MR. LAFAYETTE:  Okay.

22           MR. SU:  Yeah, it's the cable.  Give me a second.

23  I'll just connect it directly.  Should we bring it all the way

24  back to --

25           MR. SIEGEL:  We don't need to see it.  I don't care

 1  about Councilmembers.

 2  **(Videotape resumed.)**

 3          THE COURT:  All right.  Ready to continue with the

 4  questioning?

 5          MR. SIEGEL:  Yes, Your Honor.  I'd like to continue

 6  with Ms. Preston.

 7          THE COURT:  All right.  Ms. Preston, if you can come

 8  forward, please.  Good morning.  And you remain under oath.

 9                      <u>LAWANNA PRESTON</u>,

10  called as a witness for the Plaintiff, having been previously

11  duly sworn, testified further as follows:

12              <u>DIRECT EXAMINATION (RESUMED)</u>

13  BY MR. SIEGEL

14  Q.  Good morning, Ms. Preston.

15  A.  Good morning.

16  Q.  I think when we finished yesterday, we were having a

17  conversation about some activities that took place on

18  October 2nd.  Right?

19  A.  Yes.

20  Q.  Okay.  And that's the Wednesday after the Tuesday night

21  closed-session meeting, where the SEIU grievance and

22  negotiations were discussed.  Is that correct?

23  A.  Correct.

24  Q.  Okay.  Would you look at Exhibit 43 in the blue -- the

25  book with the blue cover?  And this is also known as Exhibit

1    4P.

2    **A.**    Okay.

3    **Q.**    Can you please describe for the Court what Exhibit 43 is?

4    **A.**    It is a Tentative Agreement between the City of Oakland

5    and SEIU that was signed on October 2nd, 2013, regarding the

6    City's obligation to notify union members who had not had

7    payroll deductions for union dues.

8            **MR. SIEGEL:**  Okay.  Your Honor, I'd like to offer

9    Exhibit 43.

10           **THE COURT:**  Forty-three is admitted.

11   (Trial Exhibit 43 received in evidence.)

12           **MR. SIEGEL:**  Thank you.  Show it, please.

13           **MS. MEHTA:**  Mm-hm.

14   (Document displayed.)

15   **BY MR. SIEGEL**

16   **Q.**    So first of all, the date of this is October 2?

17   **A.**    Yes.

18   **Q.**    And were you in negotiations with Local 1021 on October 2?

19   **A.**    Yes.

20   **Q.**    And would it be fair to say that this is an agreement as

21   to what would happen going forward?

22   **A.**    Yes.

23   **Q.**    And can you tell us who signed that agreement on behalf

24   of, first of all, SEIU?

25   **A.**    Joe Keffer, Dwight McElroy, Michael Pandolfo, and

 1  Marcus Brown, Stephanie -- I think that's "Humboldt."  The

 2  writing is a little sketchy.

 3  **Q.**  Looks like "Hamilton" to me.

 4  **A.**  Hamilton.  Okay.

 5  **Q.**  And who signed on behalf of the City?

 6  **A.**  Myself and Sonia Lara.

 7  **Q.**  Okay.  And just to be clear, was this an agreement that

 8  resolved the grievance that Local 1021 had filed?

 9  **A.**  No.

10  **Q.**  All right.  Thank you.  Now let me ask you this.  Do you

11  recall having a telephone conversation on October 2 with

12  Deanna Santana?

13  **A.**  No, I do not.

14  **Q.**  Do you recall ever being engaged in an argumentative way

15  with Deanna Santana regarding her decision to transfer

16  responsibility for investigating the SEIU grievance from your

17  office to the City Attorney's Office?

18  **A.**  No, I did not.

19  **Q.**  Okay.  And without going through the memos that we

20  introduced into evidence yesterday, is it, in fact, the case

21  that you did send various e-mail messages, both to Ms. Santana

22  and to City Attorney Barbara --

23          **MR. LAFAYETTE:**  Objection.  Leading.

24          **MR. SIEGEL:**  Let me rephrase.

25          **THE COURT:**  Please.

1  BY MR. SIEGEL

2  Q.   Was the tone that you used in the e-mail communications

3  that we looked at yesterday the same tone that you utilized in

4  having any oral conversations with Ms. Santana?

5  A.   Yes, it was.

6  Q.   Okay.  Now, when was the next time after October 1 --

7  after the meeting on the evening of October 1 that you heard

8  from anyone from the City Administrator's Office?

9  A.   The morning of October 3rd.

10  Q.   And what happened on October 3rd?

11  A.   When I came up the stairs to my office, one of -- the City

12  Administrator's assistant, Arturo Sanchez, and two security

13  guards were in front of my door.

14  Q.   And what did they say to you?

15  A.   That -- Arturo said, "I regret" -- I believe his words

16  were, "I regret to inform you you're being terminated," and

17  handed me an envelope, and requested that I give him my keys

18  and my City I.D.

19  Q.   And I'd just like to show you what's already been admitted

20  as Exhibit 44.  Was Exhibit 44 in the envelope that Arturo gave

21  you?

22  A.   No, it was not.

23  Q.   Okay.  Okay.  Was the second page of Exhibit 44 in that

24  envelope?

25  (Document displayed.)

1           THE WITNESS:  Yes, it was.

2           MR. SIEGEL:  Could we keep that up for a second?

3    Q.   So what it says -- "Dear Ms. Daryelle LaWanna Preston,

4    This letter is to inform you that your services are no longer

5    needed.  Please remit your facilities access card keys and any

6    City-owned equipment in your possession to Ms. Amber Todd

7    immediately."  Is that what the letter said?

8    A.   Yes, it did.

9    Q.   Okay.  Was there any indication in the materials that you

10   were given as to an explanation for what had occurred?

11   A.   No.  None, at all.

12   Q.   Okay.  Did you subsequently receive any e-mail

13   notification from Ms. Santana regarding her actions?

14   A.   When I got home, there was an e-mail from the City

15   Administrator's Office that had that letter in there.  And then

16   later on in the afternoon, I received two calls requesting that

17   I return back to the City Administrator's Office to pick up my

18   final check.  And I responded to the first request that said

19   mailed it.  And then shortly after that I received a second

20   call requesting that I return to the City Administrator's

21   Office to pick up my final check.

22   Q.   Okay.  Would you look at Exhibit 45 in the binder, please?

23   A.   Okay.

24   Q.   Do you recognize that document?

25   A.   Yes.

1  Q.   Okay.  And what is it?

2  A.   It's an e-mail that I received when I -- when I got home

3  that morning from Ms. Santana with the same language.  "This

4  letter is to inform you that your services are no longer

5  needed."

6           MR. SIEGEL:  Your Honor, I'd offer Exhibit 45.

7           MR. LAFAYETTE:  No objection, Your Honor.

8           THE COURT:  Exhibit 45, also known as 4R, is

9  admitted.

10  (Trial Exhibit 45 received in evidence.)

11           MR. SIEGEL:  Thank you.

12  Q.   Now let me ask you, Ms. Preston.  At any time prior to

13  October 3, 2013, had Ms. Santana advised you that your job was

14  on the line?

15  A.   No.  Never.

16  Q.   Had she ever given you a written document, explaining to

17  you that she was dissatisfied with your job performance?

18  A.   No, never.

19  Q.   Had she ever given you a warning?

20  A.   No.

21  Q.   Had she ever given you a written censure?

22  A.   No.

23  Q.   Letter of reprimand?

24  A.   No.

25  Q.   Progressive discipline was not followed.  Is that right?

 1          **MR. LAFAYETTE:**  Objection.  Assumes a fact not in

 2   evidence.  Lacking foundation.

 3          **THE COURT:**  Overruled.

 4          **THE WITNESS:**  No.

 5   **BY MR. SIEGEL**

 6   **Q.**  Just as an employee-relations professional, can you

 7   explain to the jury what progressive discipline is, please?

 8          **MR. LAFAYETTE:**  Objection.  Relevance, Your Honor.

 9          **THE COURT:**  Overruled.

10          **THE WITNESS:**  Progressive --

11          **MR. LAFAYETTE:**  And opinion.

12          **THE COURT:**  Overruled.

13          **THE WITNESS:**  Progressive discipline is a process

14   that -- and particularly in public sector -- employers are

15   required to use to discipline employees, which normally

16   requires that you counsel an employee.  If counseling does not

17   work, then you provide them with a written warning.  If written

18   warnings do not rectify the problem, then you could provide

19   them with a suspension.

20          For management employees, it normally starts off with five

21   days.  And then after that, you normally, in the progressive

22   disciplinary process, would get a minimum of two suspensions

23   prior to termination in most government entities in the state

24   of California.

25

1   BY MR. SIEGEL

2   Q.   Okay.   In your experience working for the City of Oakland,

3   was that process followed in dealing with the discipline of

4   employees?

5           MR. LAFAYETTE:   Objection.   Lacking in foundation.

6   Calls for opinion.   Not relevant.

7           THE COURT:   Sustained.

8       Also vague as to what employees you're talking about.

9           MR. SIEGEL:   Okay.   Well, let me move on.

10  Q.   Ms. Preston, can you tell us how you felt about being

11  notified on October 3 that your services were no longer needed

12  by the City of Oakland?

13  A.   I was shocked.   I was stunned.   I was devastated.   In all

14  my career, I'd never been fired from a job in my entire life.

15  And it was an extremely emotional.   It was very hard.   I

16  couldn't -- I didn't leave my house for a couple of weeks.   I

17  couldn't tell my children for two weeks, because I was so

18  embarrassed.   It was -- it was devastating to my life.

19      I had a child in high school who went through the Catholic

20  school system.   And he was in the 11th grade.   And he had

21  always been in the same school system.   And I didn't know how

22  to tell him that he would probably have to be pulled out of the

23  school that he had been in his whole life, because I couldn't

24  pay for it anymore.

25  Q.   And did you have other financial obligations that you were

1  concerned about meeting?

2  **A.**   Yes.  My mortgage.  Feeding my family.  And it -- I -- I

3  had a small savings, but I in no way had enough savings that

4  would take care of my family, my bills, and keep my -- my son

5  in school.  So I eventually had to withdraw my retirement out

6  of the CalPERS retirement system, just to pay my mortgage and

7  feed my kids.

8  **Q.**   And how did it feel to be confronted by Arturo Sanchez and

9  security guards when you attempted to enter your office on

10 October 3?

11 **A.**   It felt like -- that Miss Santana was sending a message to

12 the City that I was some criminal or something that had to have

13 a guards --

14      Thank you.

15      -- around my office, because I was, you know, such an

16 awful person.  And those guards were stationed around.  There

17 were two doors to my office, so there was a guard at each door,

18 and they were there all day.

19      And when I was being contacted by the City Administrator's

20 Office to return to pick up my check, I was informed that she

21 had an armed police officer at her office, waiting for me.  It

22 was --

23           **MR. LAFAYETTE:**  Objection.  Hearsay.

24           **THE WITNESS:**  -- the most awful experience of my

25 life.

```
 1              THE COURT:  Overruled.
 2   BY MR. SIEGEL
 3   Q.   And did you have personal items in your office when you
 4   arrived there on the morning of October 3?
 5   A.   Yeah, I had lots of personal items:  Pictures of my
 6   children; pictures of my mother, who had passed away prior to
 7   that; and just personal stuff on my desk; little knickknacks
 8   and stuff inside my desk.  And I was not allowed to even go in
 9   and take the pictures of my children.
10   Q.   And you started to mention this, but did you remain at
11   home for some time after your termination?
12              MR. LAFAYETTE:  Objection.  It's cumulative.
13              THE COURT:  Overruled.
14              THE WITNESS:  Several weeks.  I was too embarrassed
15   to leave.  Everyone knew what had happened.  I was receiving
16   calls constantly.  I just stopped answering my phone, because I
17   didn't know what to say to people.
18   BY MR. SIEGEL
19   Q.   Now, Ms. Preston, moving on, I guess at some point did you
20   begin to look for work?
21   A.   Yes, I -- I did.
22   Q.   And how long after your termination did you begin to look
23   for work?
24   A.   It was a few weeks.  Probably around the third week or so,
25   I started sending e-mails to government agencies' job openings
```

1  that I saw posted online, just trying to look for work anywhere

2  I could.

3  Q.   And were you able to find a job?

4  A.   Yes.  Thank God, yes.  I was hired for -- in the City and

5  County of San Francisco.

6  Q.   And so did you accept that job?

7  A.   Yes, I did.

8  Q.   Okay.  And when did you begin work in San Francisco?

9  A.   In January of 2014.

10  Q.   And what was your job title?

11  A.   I was initially hired as the Senior Employee Relations

12  Representative.

13  Q.   And could you please explain briefly what your duties were

14  in that job?

15  A.   When I started in January, the City was beginning its

16  collective-bargaining process with its 35 unions.  The City and

17  County of San Francisco has approximately over 29,000

18  employees, and approximately 38 contracts.  And I was hired to

19  negotiate three of those contracts, and I ended up negotiating

20  six of them.

21  Q.   So the job was to negotiate contracts initially?

22  A.   Initially, yes.

23  Q.   Okay.  And what was your salary when you began in

24  San Francisco?

25  A.   I think it was pretty low.  Well, it was somewhere around

PRESTON - DIRECT / SIEGEL

1    105-, 107-.  Initially, it wasn't that high.

2  **Q.**   105-?

3  **A.**   Between 105-, 110-.  Something like that.

4  **Q.**   And what was your salary in Oakland when you were fired?

5  **A.**   157,000.

6  **Q.**   And did you continue to work in San Francisco?

7  **A.**   Yes, I do.

8  **Q.**   And did you receive a promotion?

9  **A.**   Yes, I did.

10  **Q.**   And when did you receive your promotion?

11  **A.**   I was promoted to the Manager of Employee Relations in

12  December of 2014.

13  **Q.**   And what are -- do you continue to be the Manager of

14  Employee Relations?

15  **A.**   Yes, I am.

16  **Q.**   And what are your responsibilities in that job?

17  **A.**   I oversee the Employee Relations Division for the City and

18  County of San Francisco.  Implementation, and consultation, and

19  management of the Collective Bargaining Agreements.

20  Disciplinary process.  Grievance process.  Meet-and-confers.

21  All of the traditional labor-relations responsibilities for a

22  government entity.

23  **Q.**   So is this job you have now -- does that have the same

24  responsibilities as the job you were fired from in Oakland?

25  **A.**   Yes.

1  Q.   Pretty much a parallel job?

2  A.   Yes.

3  Q.   How many employees are there in the City and County of

4  San Francisco, versus the employees in the City of Oakland when

5  you were fired?

6  A.   Last time I looked at employee count, it was 29,500 or so

7  employees in the City and County of San Francisco.

8      When I left Oakland, I believe it was between 35- and

9  3,700 employees for the City of Oakland.

10  Q.   Okay.  So about eight times more employees in

11  San Francisco?

12  A.   Yes.

13  Q.   And I think you mentioned 38 contracts?

14  A.   Yes.

15  Q.   And how many contracts were there in the City of Oakland

16  when you were Director of Employee Relations?

17  A.   Seven.  Maybe eight.

18  Q.   And what is your current salary?

19  A.   My current salary is 137-.  I believe 137,000.

20  Q.   So would it be fair to say, Ms. Preston, that after your

21  experience in the City of Oakland, you kind of landed on your

22  feet?

23  A.   I did.  Thank God.  Yes, I did.

24          MR. SIEGEL:  Okay.  Thank you.

25      No further questions, Your Honor.

1    **THE COURT:**  Thank you.  Cross-examination now, or do

2  you want to defer that until a little later?

3    **MR. LAFAYETTE:**  I think we're deferring, for

4  Ms. Parker.

5    **THE COURT:**  Very well.  Because of some scheduling

6  juggling, we're going to defer the cross-examination and jury

7  questions for Ms. Preston until a little bit later today.  Both

8  the Defense and you will have an opportunity to ask questions,

9  if you wish to.

10    And, Ms. Preston, you may step down now.  And we'll return

11  to your testimony later today.

12  (Witness excused subject to recall.)

13    **THE COURT:**  The next witness will be Barbara Parker.

14    **MR. LAFAYETTE:**  Yes, Your Honor.

15    **THE COURT:**  And, Mr. Siegel, did you intend to move

16  into evidence the video, or you want to wait on that?

17    **MR. SIEGEL:**  Yeah.  I think that we have jointly

18  agreed that the section of the video that we showed should be

19  part of the record in the case.

20    **THE COURT:**  All right.  And should we call that

21  Exhibit --

22    **MR. LAFAYETTE:**  It's been marked, Your Honor.  It was

23  Exhibit U.

24    **THE COURT:**  All right.  We'll admit Exhibit U into

25  evidence.  And that is the video shown to the jury today.

PARKER - DIRECT / SIEGEL

1    (Trial Exhibit U received in evidence.)

2              THE COURT:  Good morning.

3              THE WITNESS:  Good morning.

4              THE CLERK:  Please raise your right hand.

5                        BARBARA PARKER,

6    called as a witness for the Plaintiff, having been duly sworn,

7    testified as follows:

8              THE WITNESS:  I do.

9              THE CLERK:  Please be seated.  Clearly state your

10   name, and spell your last name.  Speak into the microphone.

11             THE WITNESS:  Barbara Parker.  P-a-r-k-e-r.

12   BY MR. SIEGEL

13                      DIRECT EXAMINATION

14   BY MR. SIEGEL

15   Q.  Good morning, Ms. Parker.

16   A.  Good morning.

17   Q.  Ms. Parker, you are the elected City Attorney of the City

18   of Oakland.  Is that correct?

19   A.  Yes.

20   Q.  And how long have you had that position?

21   A.  I've been in this position since July of 2011.  I was the

22   appointed City Attorney from 2011 through 2012, and then I was

23   elected to a four-year term.

24   Q.  Do you need a glass of water?

25   A.  No.  This is the way my voice is.  It's a condition I

 1  have.  It might help a bit, but my voice is like this all of

 2  the time now.  Sorry.

 3  **Q.**   Okay.

 4  **A.**   Can you understand me?

 5  **Q.**   All right.  Now, prior to becoming the City Attorney, you

 6  were an attorney with the City Attorney's Office.  Correct?

 7  **A.**   Yes.

 8  **Q.**   And when did you start working for the City Attorney's

 9  Office?

10  **A.**   In approximately -- it was May or June of 1981.

11  **Q.**   Okay.  So you were staff attorney for about 20 years

12  before you were appointed as the acting City Attorney?

13  **A.**   Well, I started out as a staff line attorney.  And in one

14  of the units I became the supervisor of that unit.  And I was

15  the Chief Assistant City Attorney beginning in 2000, until I

16  became the City Attorney.  So for about ten years I was the

17  second in command.

18  **Q.**   Okay.  And you are a graduate of Harvard Law School.  Is

19  that right?

20  **A.**   Yes, I am.

21  **Q.**   Okay.  Now, Ms. Parker, did you advise Deanna Santana

22  regarding the investigation of the Rainbow Teen Center?

23           **MR. LAFAYETTE:**  It's a bit overbroad as framed.  And

24  that -- and I need focused --

25           **THE COURT:**  I need an objection.  Is that what you're

1    making?

2            MR. LAFAYETTE:  Overbroad.  It may violate the

3    attorney-client privilege.

4            THE COURT:  Objection?

5            MR. LAFAYETTE:  Yes, Your Honor.

6            THE COURT:  Say that magic word, and then I'll know

7    why you're speaking.

8            MR. LAFAYETTE:  Okay.

9            THE COURT:  Overruled.  It's just background.

10       Okay.  You may answer.

11           THE WITNESS:  Yes.  As City Attorney, I provided

12   advice to Miss Santana regarding the Rainbow Teen Center

13   Report.

14   BY MR. SIEGEL

15   Q.   Okay.  Now, is it fair to say that during the time that

16   you were advising Ms. Santana regarding the Rainbow Teen

17   Center, she asked for your advice as to whether it would be

18   possible to initiate an investigation of a City Councilmember?

19   A.   In my role as City Attorney, I provided her advice

20   regarding her options.  I don't recall whether she asked me

21   that specific question.  She asked me what her options were

22   with respect to this report.

23   Q.   Okay.  Would you look at Exhibit 7, please, in the binder

24   that's in front of you?

25   (Document displayed.)

1    BY MR. SIEGEL

2    Q.    So do you recall receiving this e-mail message, Exhibit 7,

3    from Deanna Santana in -- on February 20, 2012?

4    A.    I don't have a specific recollection of receiving this

5    e-mail on that date, but this does refresh my recollection that

6    she asked this question.

7    Q.    Okay.

8    A.    Yes.

9    Q.    Thank you.

10   A.    I just didn't remember specifically when she asked.

11   Q.    Okay.  And would you kindly look at Exhibit 6?  Do you

12   recognize Exhibit 6?

13   A.    Yes.

14   Q.    Okay.  And did you have some input into the preparation of

15   Exhibit 6?

16   A.    Yes.  I provided advice to City Administrator regarding

17   the report.

18   Q.    Okay.  And was that in response to the questions that

19   Ms. Santana had asked you in Exhibit 7?

20   A.    Yes, and other questions that she asked me.

21   Q.    Okay.  Would you look at page 16?

22   A.    I have new glasses.  I have to keep taking them off.  I

23   can't see with them on.

24         Yes.

25   Q.    Okay.  And towards the bottom of page 16 of Exhibit 6, is

1  that a paragraph that you inserted into the draft of the

2  report?

3          MR. LAFAYETTE:  Objection.  The question is vague.

4          THE COURT:  Overruled.

5          THE WITNESS:  This is my advice to Deanna about her

6  options.  This is not part of the report.  This is merely a

7  comment.

8      It says, "BJP."  I don't know if it's legible.  It's

9  "BJP."  Those are my initials:  Barbara Jean Parker.

10      And this was a comment that included my advice to her

11  about her options.  It was -- it should be bracketed; I can't

12  tell if it's clear -- indicating that it's simply my advice to

13  her.  It was never part of the report at any point in time.

14  BY MR. SIEGEL

15  Q.  Okay.  All right.  But you went through the report, and

16  you, when you thought it was appropriate, put in your comments

17  for consideration by the writers of the report?

18  A.  This was simply advice about her options.  This had

19  nothing to do about what would be in the report, itself.  She

20  had asked me about her authority to conduct an investigation,

21  and I was telling her her options in that regard.

22  Q.  And clearly if Ms. Santana had chosen to, she could have

23  included your comments or a summary of them in the report,

24  itself?

25          MR. LAFAYETTE:  Objection.  Compound.

1          THE WITNESS:  No.

2          THE COURT:  Objection what?

3          MR. LAFAYETTE:  Objection.  That was compound, and

4   required speculation on the part of Ms. Santana.

5          THE COURT:  Overruled.

6      You may answer.

7          THE WITNESS:  Magistrate Cousins, could I have just a

8   moment?  I forgot to turn off my phone.  I just heard it

9   ringing, or if somebody could --

10          THE COURT:  Not a problem.  You have good hearing.

11          THE WITNESS:  I apologize.  I was working outside.

12          THE COURT:  It's okay.

13          THE WITNESS:  I think it's interfering with the jury

14   here.

15   (Pause in proceedings.)

16          THE WITNESS:  My apologies.

17          THE COURT:  As long as it's not my phone going off,

18   we're okay.

19          THE WITNESS:  I had it off.  I was waiting.  I turned

20   it on, and forgot.

21          THE COURT:  You want to repeat the question?

22          THE WITNESS:  Yes, please.

23   BY MR. SIEGEL

24   Q.   Okay.  The comments that you made in the draft of the

25   report were for the consideration of Ms. Santana.  Correct?

1   A.    It was advice to her, as I indicated, of her options with

2   respect to the investigation.

3   Q.    And it was your understanding that if she chose to, she

4   could include your comments or some version of them in the

5   report going forward?

6   A.    That would not have been appropriate to include that

7   advice in the report.

8   Q.    Okay.  But your advice, as it appears at various places in

9   Exhibit 6, were in the body of the report, itself, rather than

10  in a separate memorandum to her.  Correct?

11          MR. LAFAYETTE:  Objection.  Best evidence.

12          THE COURT:  Overruled.

13          THE WITNESS:  The way I work as City Attorney with my

14  clients, who include City Administrator, the Mayor, the

15  Council, and all of the Departments, is to provide them advice.

16  It can be verbal.  It can be in separate documents.  It can be

17  in documents, themselves, as they come to me.

18      That doesn't mean that any particular advice is to be

19  included in the report.  If we are doing that, I typically do a

20  redline, and have it indicated that way.  So it's not correct

21  to say that anything that I put into a report as a comment

22  would be something that would be included in the report.  It

23  is, as I indicated, advice to my client about options.

24  BY MR. SIEGEL

25  Q.    Okay.  And again, I -- maybe my question wasn't clear.  My

1   question to you is:  You put the language there.  And

2   Miss Santana could, if she chose, include the language, or a

3   summary of the language, or part of your language into the

4   report.  Is that right?

5               **MR. LAFAYETTE:**  Objection.

6               **THE WITNESS:**  That's not correct.  I'm sorry.

7               **MR. LAFAYETTE:**  I said objection.  Cumulative,

8   Your Honor.

9               **THE COURT:**  Overruled.

10      You may answer.

11              **THE WITNESS:**  That's not correct.

12  **BY MR. SIEGEL**

13  **Q.**   She could not have included your comments in her report,

14  if she had chosen to?  You're saying she could not have done

15  that?

16  **A.**   She would not include the comments of the City Attorney in

17  her report.  If she wanted to have advice provided to the

18  Council, then I would provide that independently.  If she

19  wanted to advise the Council of a decision she had made

20  regarding her approach, then she would put it in; but she

21  wouldn't be putting in my language, which was what I understood

22  you were saying.

23  **Q.**   She could have adopted your ideas as her own, and put them

24  in the report.  Correct?

25  **A.**   This was advice.  And so if she had decided that she

1  wanted to take action regarding the advice and advise the

2  Council of her position, yes, she could.

3  **Q.**   Okay.  Now, after you provided your comments into

4  Exhibit 6, did you have occasion to discuss those comments with

5  LaWanna Preston?

6  **A.**   I don't have any recollection of that --

7  **Q.**   Okay.

8  **A.**   -- one way or the other.

9  **Q.**   Okay.  Did you know that LaWanna Preston and

10  Fred Blackwell were the authors of Exhibit 6?

11  **A.**   You mean, that they had drafted this report?

12  **Q.**   Yes.

13  **A.**   I might have at the time.  I just don't recall at this

14  point.

15  **Q.**   Okay.  Do you recall seeing the final version of the

16  report?

17  **A.**   Yes.  It went to the City Council --

18  **Q.**   Okay.

19  **A.**   -- in open sessions.  I would have seen it at that time.

20  **Q.**   Yeah.  And it indicated, as did Exhibit 6, that it was

21  from Fred Blackwell and LaWanna Preston.  Correct?  If you look

22  at the first page, I think it will confirm that.

23  **A.**   That's what it says.  Yes.

24  **Q.**   Okay.  Now, you were aware -- were you not? -- as of

25  February 24th, 2012, that there was considerable friction

1 between Deanna Santana and Councilmember Desley Brooks?

2          **MR. LAFAYETTE:**  Objection.  Relevance.

3          **THE COURT:**  Overruled.

4          **THE WITNESS:**  I don't recall there was friction

5 between them as of February 24th.  I don't -- again, I don't

6 have a sense in time as to when that was.

7 **BY MR. SIEGEL**

8 **Q.**  Okay.  Were you aware that there was friction between

9 yourself and Councilmember Desley Brooks as of February 24,

10 2012?

11          **MR. LAFAYETTE:**  Objection.  Relevancy.

12          **THE COURT:**  Overruled.

13          **THE WITNESS:**  I think I -- I can't -- I don't have a

14 specific recollection of the status of things as of February

15 24th, 2012.  So I'm -- you know, is this the date --

16     Well, I'm answering questions.

17 **BY MR. SIEGEL**

18 **Q.**  Okay.  Whether it was on February 24th, 2012, or not,

19 isn't it true that during the early part of 2012, there was

20 considerable friction between yourself and Councilmember

21 Desley Brooks?

22 **A.**  I don't recall, but -- in terms of that specific time

23 frame.

24 **Q.**  All right.  Shall we --

25     Let's move ahead to another topic.  All right?  Do you

1    recall that in September 2013, that City Administrator Santana

2    asked your office for assistance with investigating a grievance

3    which had been filed by SEIU Local 1021 over the City's failure

4    to deduct union dues from Temporary Part Time employees?

5    **A.**    I don't recall the specific time when that request was

6    made, but a request was made for my office to retain an outside

7    investigator to conduct that investigation.

8    **Q.**    Okay.  Would you look at Exhibit 37 in the binder, please?

9    This is an exhibit that was offered yesterday.

10   (Document displayed.)

11   **BY MR. SIEGEL**

12   **Q.**    Do you recall seeing Exhibit 37?

13   **A.**    Yes.

14   **Q.**    And do you recall that Ms. Preston, on September the 19th,

15   2013, forwarded to you the grievance that the SEIU had filed?

16   **A.**    I don't know if she forwarded it to me on that specific

17   date, but I did receive it from her.

18   **Q.**    Okay.  And if you look at Exhibit 37, the grievance that

19   had been filed by SEIU had been attached to the e-mail message

20   to you.  Is that right?

21   **A.**    Yes.

22   **Q.**    Okay.  And your office then undertook to arrange for the

23   grievance to be investigated.  Is that right?

24   **A.**    That's correct.

25   **Q.**    And in early October, your office retained Mr. Otis McGee

1  to investigate the grievance?

2  **A.**   We retained him to investigate, yes.

3  **Q.**   Okay.  And has that grievance been resolved?

4         **MR. LAFAYETTE:**  Objection.  Relevancy.  Subsequent

5  remedial.

6         **THE COURT:**  Sustained.

7  **BY MR. SIEGEL**

8  **Q.**   Was it unusual for your office to be asked by the City

9  Administrator's Office to assume the investigation of an

10  employee grievance?

11  **A.**   Not in this type of situation.  When grievances involve

12  high-level -- high-level individuals in the administration, the

13  City Attorney is often asked to do that.

14  **Q.**   Were there other occasions while Ms. Preston was the

15  Director of Employee Relations that your office took over the

16  investigation of a grievance filed by a union?

17  **A.**   I don't know.  I can't remember.

18     But I'm saying it's not unusual with high-level people.

19  And there may not have been any others of that type during her

20  tenure.  I just don't recall.

21  **Q.**   And Ms. Preston was coöperative with your office in

22  turning over the information that she had regarding the

23  grievance.  Is that right?

24  **A.**   I think.  I don't know, because she gave us this

25  information, and then it was turned over to the investigator,

1  who then proceeded to collect the documents.

2  Q.   Okay.  Now, is it true that Deanna Santana consulted with

3  you regarding her decision to terminate Ms. Preston's

4  employment?

5  A.   Yes.

6  Q.   Okay.  And were you present in Ms. Santana's office at a

7  meeting on October 2, 2013, for a discussion of Mr. McGee's

8  role in going forward to investigate the SEIU grievance?

9  A.   Okay.  I just want to -- I'm not trying to be evasive, but

10  I don't remember the specific date.  But yes, I was.

11  Q.   There was such a meeting?

12  A.   There was such a meeting.  I just don't remember the exact

13  date.

14  Q.   Okay.  Fair enough.

15  A.   Yes.

16  Q.   And that was in Ms. Santana's office?

17  A.   Yes.

18  Q.   And Mr. McGee was present?

19  A.   Yes.

20  Q.   And Ms. Santana?

21  A.   Yes.

22  Q.   And yourself?

23  A.   Correct.

24  Q.   And anyone else?

25  A.   No, not to my recollection.

1  **Q.**   Okay.  And was that the meeting in which it was agreed

2  that Mr. McGee would go forward and investigate the grievance?

3  **A.**   That's not my recollection.  We had already retained him

4  for that purpose.

5      My recollection is we were having the meeting to introduce

6  him to Ms. Santana --

7  **Q.**   Okay.  All right.

8  **A.**   -- so that she would be acquainted with him as he

9  conducted the investigation.

10 **Q.**   Was it -- was her approval necessary to retain Mr. McGee,

11 or was that your call?

12 **A.**   It was my call; but if she had had concerns, we would take

13 those into account.  It was my call, and she had no concerns

14 about who we had retained.  It's usually something that we do

15 with our expertise in selecting counsel to investigate.

16 **Q.**   Okay.  Now, at that meeting on October 2nd, you did not --

17 you do not have any recollection of hearing Ms. Preston over

18 the speaker phone abusing Miss Santana; do you?

19 **A.**   Abusing?

20 **Q.**   Abusing.  Yeah.  Being angry, abusive, disrespectful,

21 hostile?

22 **A.**   I do recall that her voice was raised.  Her tone was

23 upset, angry.  And, yes, I believe she was rude and

24 insubordinate.

25 **Q.**   So you heard Ms. Preston over the speaker phone.  Is that

1  right?

2  **A.**   Yes.

3  **Q.**   And what do you recall her saying?

4  **A.**   I don't recall the substance of it.  I know she was upset

5  about -- it might have been about the investigation, but I

6  don't remember.  But she had called Ms. Santana while we were

7  in this meeting on her cell phone.  And Ms. Santana had said,

8  "This is LaWanna."  And then she had said to her, "I'm in a

9  meeting"; and then said, "I'm going to put you on speaker

10  phone."  And so we were present -- Mr. McGee and I.  And her

11  voice was raised, and she was clearly not happy.

12  **Q.**   So you heard her voice, but you don't recall anything that

13  she said?

14  **A.**   I don't recall the details of what the subject was, but it

15  may have been related to the investigation.  I just don't

16  recall at this time.

17  **Q.**   You say it may have been related to the investigation?

18  **A.**   Yeah, but I don't recall specifics.

19  **Q.**   Do you recall what Ms. Santana said at the conclusion of

20  that telephone call?

21  **A.**   No.

22  **Q.**   Now finally let me ask you this.  Do you agree with former

23  Mayor Jean Quan that Ms. Preston's termination of employment

24  was not for cause, but rather was based on the conclusion of

25  the work that she was hired to do?

1          **MR. LAFAYETTE:**  Objection.  Lacking in foundation.

2  Invades the attorney-client privilege.  Requires this witness

3  to speculate otherwise.

4          **THE COURT:**  Sustained.

5      Also, Ms. Parker was not present for Ms. Quan's testimony,

6  so you are confronting her with evidence that she does not

7  possess; and therefore, you're arguing with her with

8  information that she does not have access to.

9      So ask her what she knows; not what someone else testified

10  to when she wasn't here.

11          **MR. SIEGEL:**  Okay.

12  **Q.**  Are you aware that Ms. Preston was terminated from her job

13  with the City of Oakland because her work assignment had been

14  concluded?

15          **MR. LAFAYETTE:**  Objection.  Attorney-client

16  privilege.  Irrelevant to this witness.

17          **THE COURT:**  Overruled.

18          **THE WITNESS:**  I am not aware that that was a reason

19  for termination.

20  **BY MR. SIEGEL**

21  **Q.**  Are you aware that her termination was not for cause?

22  **A.**  Ms. Preston was an at-will employee, and thus she could be

23  terminated for any reason.

24  **Q.**  Could she be terminated because she complained about

25  violations of the law with respect to the operations of the

 1  City of Oakland?

 2          **MR. LAFAYETTE:**  Objection.  Attorney-client

 3  privilege.  Work product with regard to this witness.  Calls

 4  for a legal conclusion.

 5          **THE COURT:**  It does call for that.

 6      And, Mr. Siegel, you're treading onto thin ice, in the

 7  sense that you're asking for this witness to testify about the

 8  law.  And you may get a response that you may not like.

 9          So I'll remind the jury that you will be instructed on

10  what the law is by me.  And that's the law you'll follow; not

11  the law that comes from any witness, whether it's Ms. Preston

12  testifying about the law, or Mayor Quan testifying about the

13  law, or Ms. Parker testifying about the law, although they all

14  may have expertise in the law.  The law you'll follow will be

15  the law that I instruct you on at the end of the case.

16          So you may proceed to the question.

17  **BY MR. SIEGEL**

18  **Q.**   Okay.  I just was following up, Ms. Parker, on your

19  testimony that because she was an at-will employee, Ms. Preston

20  could be fired without cause.  Is that right?

21  **A.**   I said she could be terminated for any reason, except, of

22  course, an unlawful reason.

23          **MR. SIEGEL:**  Okay.  Thank you.  Those are all of the

24  questions I have.

25          **THE COURT:**  Thank you.  Cross-examination?

1          **MR. LAFAYETTE:**  Yes, Your Honor.

2          **THE COURT:**  And, following up on my prior admonition,

3    Ms. Parker is testifying as a witness, so what she says is

4    evidence in the case.  Even though she's an attorney, she's

5    here in the role of being a witness in the case, and you should

6    consider what she says just like any other witness as evidence

7    in the case.

8                       **CROSS-EXAMINATION**

9    BY MR. LAFAYETTE

10   **Q.**  Good morning.

11   **A.**  Good morning.

12   **Q.**  I'd like to take you between Harvard Law School, and you

13   going to the City Attorney's Office -- and you going to the

14   City Attorney's Office.  Prior to coming to the City Attorney's

15   Office, did you work in this building?

16   **A.**  I did.  Brings back many memory's being here.  I worked --

17   **Q.**  Go ahead.

18   **A.**  I worked here as an Assistant U.S. Attorney for more than

19   five years.

20   **Q.**  And prior to being an Assistant U.S. Attorney in this

21   building, where did you work?

22   **A.**  I worked for the law firm of Pillsbury, Madison & Sutro,

23   in San Francisco.

24   **Q.**  And was that one of the largest law firms in the country?

25   **A.**  At that time it was the largest law firm in the country,

1   is my understanding.

2   **Q.**    So -- and as the -- I think you were the -- really, the

3   Deputy City Attorney at some point, prior to becoming the

4   Interim City Attorney?

5   **A.**    I was -- I was the Chief Assistant City Attorney.

6   **Q.**    Chief Assistant.  And who was the Mayor when you became

7   the Chief Assistant?

8   **A.**    I believe it was Jerry Brown.  Mayor -- Governor.

9   Governor Jerry Brown.  Now Governor.  Then Mayor.

10  **Q.**    Now, you used a phrase that Ms. Preston was an "at-will

11  employee"?

12  **A.**    Yes.

13  **Q.**    Does that mean she could be fired for any reason, or no

14  reason at all, and with or without notice?

15  **A.**    That is correct.

16  **Q.**    So you were shown a document a few minutes ago which was

17  shown as a Document 3W -- I -- actually, it's -- you have it

18  right there in front of you:  37.

19  **A.**    Document 37.  Yes.

20  **Q.**    There's a document -- there's an e-mail at the top of the

21  page on 37, where it says, "From Preston to Preston."  Do you

22  see that?

23  **A.**    Yes.

24  **Q.**    You didn't get that; did you?

25  **A.**    Preston to Preston?

PARKER - CROSS / LAFAYETTE

1  Q.   Where she forwarded it to herself?

2  A.   I would not have received that.

3  Q.   What you received is what's below that?

4  A.   Yes.

5  Q.   And the language --

6         MR. LAFAYETTE:  Could I get this on the screen,

7  please?

8  (Document displayed.)

9  BY MR. LAFAYETTE

10  Q.   And I want to focus on what Ms. Preston wrote here

11  (indicating).  It says there, "This is the only document I

12  have.  As instructed, I had not started the investigation."

13        Did I read that accurately?

14  A.   Yes.

15  Q.   At any -- did she give to you some notes from Sonia Lara

16  and Winnie Anderson?

17  A.   No.

18  Q.   Did she give to you a grievance had been filed on June 26,

19  2013?

20  A.   No.

21  Q.   Did she give to you an e-mail that Ms. Winnie Anderson had

22  drafted and sent to Ms. Katano [sic] on August 6?

23  A.   No.

24  Q.   Did she give to you an e-mail that she had sent on

25  August 4?

1  **A.**   No.

2  **Q.**   Now, did you take -- could you turn to -- there's a big,

3  black binder behind you there, where it has an Exhibit 4C in

4  it.

5          **THE COURT:**  There are five binders, so you might want

6  to assist her.

7          **MR. LAFAYETTE:**  Oh.

8          **THE WITNESS:**  Yeah.

9          **MR. LAFAYETTE:**  Let me see if I can help you.

10         **THE WITNESS:**  Okay.

11         **THE COURT:**  This document is already in evidence.

12         **MR. LAFAYETTE:**  Yes, Your Honor.  You know what,

13  Your Honor?  I'm not going to ask any questions about that

14  document.  And I don't think I have any further questions of

15  this witness.

16         **THE COURT:**  All right.  We're going to take a brief

17  recess now.  Ms. Parker, if you can hang on just for a few more

18  minutes, I'm going to give the jurors an opportunity, if they

19  wish to, to write out anymore questions of their own for you.

20  And I'll give Mr. Siegel a chance for further examination after

21  that.

22      You may step down, if you wish, or --

23         **MR. LAFAYETTE:**  Your Honor, I'm sorry.  I did have

24  another question.

25         **THE COURT:**  You'll have to come back after the break.

1          **MR. LAFAYETTE:**  Okay.

2    (Recess taken from 10:12 a.m. until 10:23 a.m.)

3    (Proceedings were heard out of presence of the jury:)

4          **THE COURT:**  All right.  The jurors are not present.

5    We have two questions from the jury, which we'll pose for

6    Ms. Parker.  These will be numbers 12 and 13.  And if we could

7    get our jurors, we'll resume.

8          (Proceedings were heard in the presence of the jury:)

9          **THE COURT:**  All right.  Our jurors have returned.  Be

10   seated everyone.

11         All right.  Ms. Parker, these are questions from our

12   jurors.  You remain under penalty of perjury, and we'll have

13   follow-up questions from counsel, and I'll read the question

14   twice to make sure you get the entire context of it.

15         First question is about the day that Ms. Preston called

16   Ms. Santana, when you testified that you were in a meeting with

17   Ms. Santana.  And the question is:  Did Ms. Preston call

18   Mrs. Santana on Santana's cell phone or desk phone?

19         **THE WITNESS:**  It was on her cell.

20         **THE COURT:**  Next question about the same

21   conversation:  Did you hear Ms. Santana say over the phone with

22   Ms. Preston that she, Santana, was in a meeting, and on

23   speakerphone?

24         I'll read it again since I was a little bit disjointed.

25         Did you hear Ms. Santana say over the phone with

 1  Ms. Preston that she, Santana, was in a meeting and on

 2  speakerphone?

 3          THE WITNESS:  I have to explain that.  The call to

 4  her speakerphone -- I mean, the call to her cell phone occurred

 5  first, and then she said, "I'm in a meeting, and I'm putting

 6  you on speakerphone," and then she put it on speakerphone.

 7          THE COURT:  Speakerphone on her cell phone?

 8          THE WITNESS:  On her cell phone, yes.

 9          THE COURT:  All right.  Mr. Lafayette, you indicated

10  you had one more question from your examination.  Would you

11  like to ask that now and any follow-up to that?

12          MR. LAFAYETTE:  Yes.  I have no follow-up to that.  I

13  just have my question I wanted to ask.

14          THE COURT:  Go ahead.

15  BY MR. LAFAYETTE:

16  Q.  Could you take a look at, ma'am, at Exhibit -- and I may

17  have to walk up there again, Your Honor -- it's B, and I'll

18  walk up there to her.

19          THE COURT:  Is it B as in "boy" or V, "Victor"?

20          MR. LAFAYETTE:  B as in "boy."

21          THE COURT:  Thank you.  This document is not in

22  evidence.

23          MR. LAFAYETTE:  I think it is as a different number

24  on it.

25          MR. SIEGEL:  Yes, it's Exhibit 1.

1          MR. LAFAYETTE:  Exhibit 1.

2          THE COURT:  All right.  Go ahead.

3  BY MR. LAFAYETTE:

4  Q.   Do you recognize this document, ma'am?

5  A.   I do.

6  Q.   Is this the City's electronic media policy?

7  A.   Yes.

8  Q.   And can you tell me in the City of Oakland who issues

9  these policies?

10  A.   The City Administrator.

11  Q.   And with regard to these policies -- and I specifically

12  want to focus your attention to page 3 where it talks about

13  procedures here (indicating).  Now, where it says "Access to

14  employees' electronic media by agency and department heads,"

15  does that refer to the City Administrator?

16  A.   It does not.  The City Administrator is the Chief

17  Administrative Officer of the city, and she oversees all of the

18  affairs of the city, and the department heads are her

19  subordinates who report to her.

20  Q.   So this procedure where it talks about what agency and

21  department heads are supposed to do, is that a procedure that

22  applies to the City Administrator?

23  A.   It does not.

24  Q.   Going to the second page of this where it says something

25  about maintaining these records, does any of this apply to the

1  City Administrator?

2  **A.**   Can you show me where --

3  **Q.**   The next page over, the top of the page where it's 2 and

4  3, does any of this apply to the City Administrator?

5  **A.**   None of this applies to the City Administrator.

6  **Q.**   Notwithstanding that, did the City Administrator approach

7  you about accessing Ms. Preston's email?

8  **A.**   Yes.  She contacted me to consult with me about doing so.

9           **MR. LAFAYETTE:**  All right.  Now no further questions,

10  Your Honor.

11          **THE COURT:**  Mr. Siegel, any further examination?

12          **MR. SIEGEL:**  Yes.

13                     <u>**REDIRECT EXAMINATION**</u>

14  **BY MR. SIEGEL:**

15  **Q.**   When was it that Ms. Santana approached you about

16  eavesdropping on Ms. Preston's electronic media?

17          **MR. LAFAYETTE:**  Objection.  It's argumentative.

18          **THE COURT:**  It is, but I think Ms. Parker can

19  respond.

20          **THE WITNESS:**  I don't remember the exact time, but it

21  was at a time before she proceeded to access those emails.

22  **BY MR. SIEGEL:**

23  **Q.**   And when was that?

24  **A.**   As I sit here, I can't tell you.  It was several years

25  ago.

1  Q.   Do you recall what year it was?

2  A.   It would have been during the time when she was proceeding

3  to conduct the investigation.

4  Q.   And what year was that?

5       MR. LAFAYETTE:   Objection, it's cumulative, asked and

6  answered.

7       THE COURT:   Overruled.

8       THE WITNESS:   I don't recall, as I sit here today,

9  which year it was, but, as I've stated, it was during the time

10 frame when this investigation was being commenced.   It could

11 have been 2012, it could have been 2013, I don't recall

12 specifically.

13 BY MR. SIEGEL:

14 Q.   Okay.   And did she -- did you write a legal opinion on

15 whether she could access Ms. Preston's emails?

16 A.   I did not.

17 Q.   Did you write her a note?   Did you say as City Attorney,

18 it is my opinion that you can do this without telling anyone

19 else?

20 A.   I did not, because this policy doesn't apply to her.   And

21 as the City Administrator under the City of Oakland under the

22 charter, she's responsible for assuring the efficient and

23 proper operation of all administrative affairs, and including

24 conducting investigations as she deemed so appropriate.

25 Q.   So she can look at any employee's email without getting

1  permission from anyone or following any process that requires

2  creating a memo of some sort; is that right?

3  **A.**   In the course of performing her duties, she has access to

4  the City's emails for purposes of performing her job.

5  **Q.**   So kind of like the NSA, she could conspire in any way she

6  wants?

7             **MR. LAFAYETTE:**  Objection.  He's cutting her off,

8  Your Honor, and it's argumentative as of what I've heard.

9             **THE COURT:**  It is argumentative.  Sustained.

10  **BY MR. SIEGEL:**

11  **Q.**   Okay.  Let me ask you about some of the language on page 3

12  of this memo where it says "Procedures" at the bottom.

13       Do you see that?

14  **A.**   Yes.

15  **Q.**   Okay.  It says, "Only agency/department heads and the City

16  Manager have authority to request access to an employee's

17  electronic media."

18       Do you see that?

19  **A.**   Yes.

20  **Q.**   Oakland doesn't have a City Manager anymore, does it?

21  **A.**   It does not, but the City Administrator is the successor

22  to the City Manager.  This policy simply has not been updated

23  to reflect that.  The City charter also has areas in which it

24  has not been updated.  But under the strong mayor form of

25  government, the City Administrator's title was changed to -- I

PARKER - REDIRECT / SIEGEL

1   mean, the City Manager's title was changed to City

2   Administrator.  The responsibilities are still the same under

3   the charter, and the powers and duties.

4   **Q.**   Okay.  So I want your legal opinion as the City Attorney

5   procedures.  It says "Procedures" where it says "only

6   agency/department heads and the City Manager have authority to

7   request access to an employee's electronic media."

8        What is your understanding as City Attorney as to what the

9   phrase "have authority to request access" means?

10  **A.**   I think it's pretty clear what it says.  They have the

11  authority.

12  **Q.**   They have authority to request access; isn't that what it

13  means?  Isn't that what it says?

14  **A.**   That's what it says, yes.

15  **Q.**   And requesting access doesn't mean you can simply give

16  yourself access; right?  Request means you have to make a

17  request; is that right?

18  **A.**   The way the City works --

19  **Q.**   No.  Please answer my question.

20          **MR. LAFAYETTE:**  Objection.  Argumentative.

21          **THE COURT:**  One moment.

22          **MR. LAFAYETTE:**  Objection.

23          **THE COURT:**  Mr. Siegel, let her answer the question.

24          **MR. SIEGEL:**  I'm sorry?

25          **THE COURT:**  Let her answer the question.

1      MR. SIEGEL:  Well, I wish she will answer my

2   question.

3      THE COURT:  And not argue.  Ask questions.

4      THE WITNESS:  Okay.  The way the City works, we have

5   an IT department which has the access to these emails, and

6   certain other offices have their own IT departments, so the

7   requests were put to them for purposes of them doing forensic,

8   you know, analysis, and that is my opinion that you requested

9   as to what it means in this context.

10     The City Administrators, I indicated also, is the head of

11  the entire city administration.  So it is sort of an informal

12  way of saying she requested it, but her department heads, IT is

13  under her, as are all city departments, they would then comply

14  with her requests, and this is, just to be clear, on who has

15  that authority.  That's my legal opinion.

16  Q.  The policy statement says, does it not --

17     MR. LAFAYETTE:  Objection, Your Honor.  He's cutting

18  her off again.

19     THE WITNESS:  I was just saying that was my legal

20  opinion, which you requested.

21     THE COURT:  Question.

22  BY MR. SIEGEL:

23  Q.  The policy says that the City Manager has the authority to

24  request access; correct?  That's what it says.

25  A.  I think it speaks for itself, yes.

1  Q.   I'm sorry?

2  A.   It does say that, yes.

3  Q.   And as an attorney, I know you agree with the idea that in

4  interpreting the meaning of a document, it's important to take

5  into account all the words that need to be interpreted and not

6  simply ignore some; correct?

7            MR. LAFAYETTE:  Objection, Your Honor.  The question

8  is an incomplete hypothetical.  The question is asking for

9  opinion.  It invades her work product.

10            THE COURT:  Overruled.  You asked about it first.

11  You kicked the door wide open.

12            MR. LAFAYETTE:  I did.

13            THE COURT:  You may answer.

14            THE WITNESS:  It is correct that in providing a legal

15  analysis, we look at the totality of the circumstances in doing

16  so.

17  BY MR. SIEGEL:

18  Q.   Isn't it your opinion that the reason the language is

19  there as written, instead of simply saying the City Manager or

20  City Administrator has the authority to access an employee's

21  email, it says the City Manager has the authority to request

22  access, so that there are some protections of employee privacy,

23  and the City Administrator may not simply help herself to other

24  people's email accounts; isn't that why it says "request

25  access"?

1  **A.**   I do not agree with your statement.

2  **Q.**   Okay.  Doesn't the policy require that the Director of

3  Information Technology must submit a written statement to the

4  City Attorney or the Employee Relations Manager for

5  authorization?

6       **MR. LAFAYETTE:**  Objection.  It's incomplete and

7  vague.

8       **THE COURT:**  Overruled.  It's on page 4, where he's

9  reading from.

10      **THE WITNESS:**  As I said, this policy is issued by the

11  City Administrator herself, and, you know, predecessor City

12  Administrators.  It does not apply to her.  There is no one for

13  her to request to get approval for her determinations, in the

14  course of her duties as the Chief Administrative Officer and an

15  officer of the city, when she deems it necessary and

16  appropriate to access employees' emails.

17  **Q.**   Now, wait a minute.  The City Administrator doesn't go

18  into the system herself.  Rather, she must go to the Director

19  of Information Technology in order to actually gain access to

20  employees' account; correct?

21  **A.**   That's my understanding, yes.

22  **Q.**   And in order to protect the process and protect the

23  privacy of the city employee involved, there must be a written

24  statement to the City Attorney or the Employee Relations

25  Manager for authorization; correct?

PARKER - REDIRECT / SIEGEL

1  **A.**    Not for the City Administrator.  As I've said, this policy

2  is written and issued by the City Administrator to govern an

3  organization with nearly 5,000 employees, so that people can't

4  just access emails, only department heads can make those

5  requests, and when they do so, this procedure applies to them.

6  The City Administrator is not a department head or agency head.

7  She is -- she oversees and hires and fires those persons, so

8  this policy does not apply to her.

9  **Q.**    And is it your legal opinion that the third requirement

10 which states that a record of this statement will be maintained

11 by the Office of Information Technology does not apply to the

12 City Administrator?

13 **A.**    Yes.

14 **Q.**    And so there doesn't need to be any record of the City

15 Administrator helping herself to employee emails?

16 **A.**    That is correct.

17 **Q.**    And you think that's okay; is that what you're telling us?

18       **MR. LAFAYETTE:**  Objection, Your Honor.  That's asking

19 for a different legal opinion.

20       **THE COURT:**  It is.  Sustained.

21 **BY MR. SIEGEL:**

22 **Q.**    You think it's legally appropriate that there be no record

23 made and maintained of the City Administrator's access to any

24 employee's email?

25       **MR. LAFAYETTE:**  Objection, Your Honor, same as I've

 1  made before.  It's asking for a different legal opinion.

 2          **THE COURT:**  Overruled.

 3          **THE WITNESS:**  It is clear at the highest official in

 4  the City over the entire administration, and City Officer is

 5  the City Administrator, and she's retained as a City Officer to

 6  exercise the judgment and the control of the affairs, so yes,

 7  she, in the capacity, makes those determinations in the course

 8  of her employment as to when access is necessary and

 9  appropriate.

10  **BY MR. SIEGEL:**

11  **Q.**   Elected officials of the City of Oakland have accounts on

12  the same email system as do the appointed officials of the City

13  of Oakland; is that right?

14  **A.**   I'm not certain, they very well made.  There are several

15  different systems.  I think they are part of the systems.

16  **Q.**   And you as City Attorney are on the same email system as

17  well; correct?

18  **A.**   We have a separate system, but it's accessible.

19  **Q.**   It's part of the same IT system?

20          **MR. LAFAYETTE:**  Objection, Your Honor.  He's cutting

21  her off again.

22          **THE COURT:**  Slow down and ask the question.

23          **THE WITNESS:**  We have our own system, but it's

24  integrated, so that I think they have access to it, but I'm not

25  certain.

1    BY MR. SIEGEL:

2    Q.    You are barbaraparker@oaklandnet.com; correct?

3    A.    No, I am not.   I am BJParker@oaklandcityattorney.org.   We

4    have our own IT staff, and we have our own server and system.

5    Q.    So under this policy, can the City Administrators decide

6    to start looking at your email without your permission?

7    A.    I believe she could.

8                MR. SIEGEL:   No further questions.

9                THE COURT:   Any further examination?

10               MR. LAFAYETTE:   Yes, Your Honor.

11                         **RECROSS-EXAMINATION**

12   BY MR. LAFAYETTE:

13   Q.    Would you take a look at the last page of the document?

14   This was issued by City Administrator Deborah Edgerly.

15         Do you see that?

16   A.    Yes.

17   Q.    And was that the City Administrator who was -- well, you

18   don't know if that was the one who hired Ms. Edgerly --

19   Ms. Preston or not.

20         But let's go back a second.   Could we look at the first

21   page of this document, not the first page, but page 3 of the

22   document.   Could you put that up for me?   And I want to focus

23   on that language right there at the bottom of the page.

24   A.    Procedures?

25   Q.    Procedures.   I'll walk you through it.   Okay.   First line

1   says, "Access to an employee's electronic media by

2   agency/department heads;" is that what it's called?

3   **A.**   I'm not sure.  Is what called?

4   **Q.**   Is item A, quote --

5   **A.**   Yes.

6   **Q.**   "Access to an employee's electronic media by

7   agency/department heads?"

8   **A.**   Yes.

9   **Q.**   So this specifically relates to access by agency and

10  department heads; correct?

11  **A.**   Correct.

12  **Q.**   Let's look at the next sentence underneath that, in the

13  interest of giving meaning to the words.

14      "Only agency/department heads and the City Manager have

15  authority to request access to an employee's electronic media."

16      Did I read that accurately?

17  **A.**   Yes.

18  **Q.**   In reading that, it simply says that those are the only

19  two groups of people who can even remotely, under any

20  circumstances, request to look at this media; correct?

21  **A.**   That is correct.

22  **Q.**   And then it has a subparagraph one, and subparagraph one

23  speaks to a specific class of person, doesn't it?

24  **A.**   It does.

25  **Q.**   It says:  "An agency/department head who identifies that

1  an employee under his/her supervision may be using electronic

2  media inappropriately must submit to the Director of

3  Information Technology a signed, written statement" -- and it

4  goes on.

5      Did I read that accurately?

6  **A.**   Yes.

7  **Q.**   Okay.  I'm sorry.  But does that sentence include the City

8  Administrator?

9  **A.**   It clearly does not.

10 **Q.**   So then it goes on to the next paragraph on page 2, and

11 now it's talking again about what people other than the City

12 Administrator must do; is that accurate?

13 **A.**   That's correct.

14 **Q.**   And then when it gets to item three, it's talking about

15 what must be done if one of those people other than the City

16 Administrator makes such a request; is that accurate?

17 **A.**   That's correct, because this whole section applies only to

18 agency/department heads.

19 **Q.**   Now --

20     **THE COURT:**  Mr. Lafayette, let's stand at the podium

21 so the jury and witness and I can hear you, rather than talking

22 to the audience.

23     **MR. LAFAYETTE:**  Thank you, Your Honor.

24 **Q.**   Now, for whatever it's worth, this is the policy of the

25 City of Oakland; correct?

1  **A.**   It is.

2  **Q.**   Okay.  And for better or worse, the City of Oakland's

3  policy doesn't require the City Administrator to fill out a

4  written statement that's maintained by Information Technology,

5  does it?

6  **A.**   That is correct.

7  **Q.**   And to the extent that Ms. Santana contacted you to talk

8  about this and then proceeded to look at emails, that was in no

9  way whatsoever a violation of this policy, was it?

10 **A.**   That's correct, it was not.

11           **MR. LAFAYETTE:**  No further questions, Your Honor.

12           **THE COURT:**  Ms. Parker, you may step down.  Thank you

13 very much.

14           **THE WITNESS:**  Thank you, Your Honor.

15           **THE COURT:**  And is Ms. Preston going to return to the

16 stand?

17           **MR. LAFAYETTE:**  Yes, Your Honor.

18           **THE COURT:**  All right.  So as previously mentioned,

19 we made a change in the schedule, and now Ms. Preston will

20 return to the stand for her cross-examination.  And at the

21 conclusion of that, we'll give the jury an opportunity to ask

22 some questions if it wishes to.

23      Ms. Preston, you remain under oath?

24                     **LAWANNA PRESTON**,

25 Called as a witness for the PLAINTIFF, having been previously

1    duly sworn, testified further as follows:

2                        **CROSS-EXAMINATION**

3    BY MR. LAFAYETTE:

4    Q.   Good morning, Ms. Preston.

5    A.   Good morning.

6    Q.   You were hired by Deborah Edgerly?

7    A.   That is correct.

8    Q.   And was Deborah Edgerly the administrator who drafted the

9    document that we were just looking at with Ms. --

10   A.   It is signed by her.  I don't know who drafted it, but

11   it's signed by her.

12   Q.   It was signed by her, okay.  And had you known Ms. Santana

13   before she came to the City of Oakland?

14   A.   No, I did not.

15   Q.   And the first time you met her was when she came on as the

16   City Administrator?

17   A.   Yes.

18   Q.   And at that time you were reporting to Andrea Gourdine?

19   A.   Yes.

20   Q.   And had you talked to anyone at the city about a desire to

21   be a direct report to the City Administrator?

22   A.   No, I never requested to be a direct report to the City

23   Administrator.

24   Q.   You never said to anyone that that was a desire that you

25   had?

1  A.    No.

2  Q.    You never said that to Dan Lindheim?

3  A.    Let me rephrase it.  I never said that when Deanna Santana

4  was the City Administrator.

5  Q.    So let us go back again.  Did you ever say that to

6  anybody, period, that you had a desire to report to the City

7  Administrator?

8  A.    Not under Deanna Santana's administration.  Working with

9  Mr. Lindheim, I would have requested to be a director, but I

10  never requested that under Ms. Santana's administration.

11  Q.    So the answer to my question is yes, at some point in time

12  you advised someone in the City of Oakland that you had a

13  desire --

14        THE COURT:  Let me stop you there.  You get to ask

15  the questions, not to testify, and the jury has been reminded

16  that you're not a witness.  So ask a question, please.

17  BY MR. LAFAYETTE:

18  Q.    Okay.  So did you tell Mr. Lindheim that you had an

19  interest in being a direct report to the City Administrator?

20  A.    To work with him.

21  Q.    Okay.  Only if it meant working with him?

22  A.    Well, I also would have enjoyed reporting to Lamont Ewell

23  or Deborah Edgerly, those were the three City Administrators

24  prior to Ms. Santana that I worked for.

25  Q.    I'm asking if you ever said to him it was only if you

1  could work for those people?

2  **A.**   No.   At the time Mr. Lindheim was the City Administrator.

3  **Q.**   Thank you.   So now, you know the phrase "at-will;" right?

4  **A.**   Yes, I do.

5  **Q.**   And you know that means that a person who is at will can

6  be fired at any time for any reason or no reason at all, with

7  or without cause; right?

8  **A.**   Yes.

9  **Q.**   And you were such an employee at the city, weren't you?

10 **A.**   Yes.

11 **Q.**   And so as an at-will employee, it wasn't necessary in the

12 first instance for the City to have a justification for letting

13 you go; was it?

14 **A.**   No.

15 **Q.**   It wasn't necessary that the City of Oakland come to you

16 and tell you that your performance was poor before it decided

17 to let you go as an at-will employee, was it?

18 **A.**   It was not legally required, but it was a practice for

19 at-will employees.

20 **Q.**   It wasn't legally required; right?

21 **A.**   Correct.

22 **Q.**   Okay.   And so at some point in time, while you were there,

23 you first assumed a role of -- what was the role that you had

24 reporting to Ms. Gourdine?

25 **A.**   Employee Relations Manager.

1   Q.   Employee Relations Manager.  And as the Employee Relations

2   Manager, what were your responsibilities?

3   A.   I was responsible for supervising the Employee Relations

4   Division in the Department of Human Resources.

5   Q.   And what all was included underneath that?

6   A.   I was -- the unit was responsible for responding to

7   grievances at level 3.  The unit was responsible for conducting

8   employee investigations and responding to grievances.  The

9   large bulk of the time was consulting with department heads and

10   city management staff, providing consultation on how to deal

11   with employee issues, conducting meet and confers.

12       Prior to me coming on, they had contracted out the

13   collective bargaining process for almost 20 years.  So prior to

14   that, the staff in Employee Relations didn't really

15   collectively bargain, but when I was hired we started also

16   conducting bargaining.

17   Q.   Did you have any responsibilities for the EEO unit?

18   A.   Once I was promoted to the Employee Relations Director, I

19   believe that was in January or December, then I was also

20   assigned the EEO unit to supervise as well.

21   Q.   So now, in your position that you had with the City of

22   Oakland, was it your responsibility to bring to the attention

23   of the city issues that fell within your department?

24   A.   Could you repeat the question?

25   Q.   Was it your responsibility as the director of that unit to

1  bring to the attention of the city any problem that happened

2  within your department?

3  **A.**    I'm unclear what you mean by any problems.  Employee

4  Relations function is to deal with problems.  Did I report

5  every issue I worked on to the City Administrator?  No.  If

6  there was something out of the normal or something that my unit

7  couldn't handle or if there was some reason I believed the

8  issue should be raised to the City Administrator's Office, then

9  I would do that.

10 **Q.**    All right.  So I'm going to put a timeline together for

11 us; okay?

12 **A.**    Okay.

13 **Q.**    At some point you get requested to help with the Rainbow

14 Teen matter; right?

15 **A.**    Yes.

16 **Q.**    And then a final report is prepared; right?

17 **A.**    Yes.

18 **Q.**    And was there a supplemental report prepared, too?

19 **A.**    I believe there were additional reports that came out

20 after the initial report.

21 **Q.**    Was there a supplemental report prepared prior to the City

22 Council meeting on March 6?

23 **A.**    I'm -- I'm not certain.

24 **Q.**    Okay.  So then there was a City Council meeting on

25 March 6, 2012; right?

**PRESTON - CROSS / LAFAYETTE**

1  A.   Yes.

2  Q.   And did you get a salary increase in the spring of 2012?

3  A.   I received a retroactive salary increase that was four

4  months late, yes.

5  Q.   So you got a salary increase in 20 -- in the spring of

6  2012 that was retroactive to January of 2012; would that be

7  accurate?

8  A.   I don't remember the exact dates, but it's around that

9  time period.

10 Q.   Okay.  And did Ms. Santana approve that?

11 A.   Yes.

12 Q.   Okay.  And that was after the Rainbow Teen report; right?

13 A.   The raise --

14 Q.   My only question, ma'am, was her decision to approve the

15 retroactivity something that took place -- that decision that

16 she made to approve it, was that something that took place

17 after the Rainbow Teen report had been submitted?

18 A.   No.

19 Q.   Okay.  So, are you saying that she signed the document

20 retroactively approving a payment in the spring at an earlier

21 point in time?

22 A.   I was promised that raise increase prior to the Rainbow

23 Teen Center report.  The raise was supposed to kick in when I

24 received the promotion.

25 Q.   I'm asking you a different question, with all due respect,

1  ma'am.

2  **A.**    Oh, okay.

3  **Q.**    When she finally approved the retroactivity to it, was

4  that something that took place in the spring of 2012?

5  **A.**    The retro -- yeah, the retro, but the initial raise was

6  provided prior to the Rainbow Teen Center.

7  **Q.**    She made it retroactive in the spring; right?  I'm not

8  trying to -- I just want to know if ultimately in the spring

9  she said *oh, I need to sign this and make this retroactive so*

10 *that you get this money going back to January.*

11 **A.**    After I wrote several emails, yes.

12 **Q.**    Okay.  After you wrote several emails.  We'll talk about

13 those in a couple minutes; okay?

14 **A.**    Okay.

15 **Q.**    Now, then I kind of get to January 2013; all right?

16 **A.**    Okay.

17 **Q.**    Did an issue involving Deb Grant arise in January of 2013?

18 **A.**    I don't remember the exact months, but there was an issue

19 regarding Deb Grant and computers.

20 **Q.**    Do you know Deb Grant?

21 **A.**    Yes.

22 **Q.**    Did you ever do anything social with her?

23 **A.**    I believe we had dinner once after work.

24 **Q.**    You think you've only had dinner once?

25 **A.**    I believe so.

PRESTON - CROSS / LAFAYETTE

1  **Q.**   Have you ever been to her house?

2  **A.**   No.

3  **Q.**   Has she ever been to yours?

4  **A.**   No.

5  **Q.**   Did you ever have lunch together?

6  **A.**   We may have had lunch together once or twice.

7  **Q.**   Did you ever tell anybody she was your friend?

8  **A.**   I might have.  We worked well with one another.

9  **Q.**   Okay.  So then we moved to the spring of 2013; right?  In

10  the spring of 2013, had you commenced union negotiations?

11  **A.**   Yes, union bargaining, I believe, started in March.

12  **Q.**   Started in March.  And when it started in March, did you

13  give anyone an expectation as to when the bargaining -- that

14  you thought the bargaining would be completed?

15  **A.**   It was our goal to try to conclude prior to the Council

16  adopting a budget for the upcoming fiscal year.

17  **Q.**   And when is that?

18  **A.**   They normally adopted a budget in June, by the end of June

19  for July 1st fiscal year.

20  **Q.**   So you started the negotiations at the table in March with

21  an expectation that you would have the table wrapped up by the

22  end of June, so that whatever economics went in the bargaining

23  agreement could be incorporated into the upcoming budget;

24  accurate?

25  **A.**   That was the goal.

PRESTON - CROSS / LAFAYETTE

1  Q.   And did you request that there be something called a

2  budget labor meeting?

3  A.   I'm not certain if I requested it, but we definitely had

4  budget labor meetings.

5  Q.   And the purpose of the budget labor meeting was what,

6  ma'am?

7  A.   To receive information about what we would be able to

8  offer economically during the collective bargaining process.

9  Q.   And so would you agree that it was important that those

10 people who were responsible for the money be at this meeting?

11 A.   It would be important for someone from budget to attend

12 the meetings.

13 Q.   And likewise, would it be important for someone from Labor

14 Relations who was conducting negotiations to be present?

15 A.   It would be important for someone from Labor Relations to

16 be present.

17 Q.   Okay.  And if either one of those parts wasn't fair, did

18 you understand that that could interfere with the negotiating

19 process?

20 A.   Well, it would be -- depend on what items were up for

21 bargaining at that time.  All proposals that are discussed

22 during the collective bargaining process are not economic.

23 Sometimes you'd have bargaining sessions where you would only

24 discuss language.

25 Q.   But if you don't go to the meetings, do you really

PRESTON - CROSS / LAFAYETTE

1  understand what all is going to be discussed at the labor

2  budget meetings?

3  **A.**   I believe there were agendas and reports.

4  **Q.**   And so is it your belief that nothing was ever discussed

5  that wasn't on the agenda?

6  **A.**   No, it's not my belief.

7  **Q.**   Okay.  So you understand that there could be an agenda,

8  but there are always new items; right?

9  **A.**   It's possible.

10  **Q.**   So now, after the -- do you know Katano Kasaine?

11  **A.**   Yes.

12  **Q.**   And what was her position at the city when you became a

13  director?

14  **A.**   She was the Treasury Payroll Manager.

15  **Q.**   Treasury Payroll Manager.  And after Ms. Gourdine -- did

16  you ever express to anyone, anyone at all at the city, that you

17  had an interest in becoming the HR Director?

18  **A.**   No.

19  **Q.**   You never told anybody that; right?

20  **A.**   No.

21  **Q.**   Okay.  After Ms. Gourdine left, who became the acting

22  human resources director?

23  **A.**   I may have acted for a while.

24  **Q.**   Did it ever move to Ms. Kasaine?

25  **A.**   There were times I believe Ms. Kasaine was appointed to,

1   I'm not sure what time periods it was, but I believe there were

2   times when she supervised the personnel department.

3   Q.   Now, are you experienced in conducting investigations?

4   A.   Yes.

5   Q.   Have you been trained to conduct investigations?

6   A.   I have taken several training courses on employee

7   investigations.

8   Q.   So hallmarks of a good investigation, is one of the

9   hallmarks of a good investigation to have a fair and impartial

10  investigator?

11  A.   Yes.

12  Q.   And is -- and if there's any doubt as to whether or not

13  the investigator can be fair and impartial, is it ever

14  appropriate to move forward with that investigator?

15  A.   I'm not sure if -- who would have the doubts.

16  Q.   If anyone in the process, the person being -- the person

17  being accused, the person doing the accusing, if any one of

18  them believes that the investigator cannot be fair and

19  impartial, would it ever be appropriate to move forward with

20  that investigator?

21  A.   In most employee disciplinary processes that I've been

22  engaged with, most employees have questions about who is

23  conducting the investigation, so it's not unusual for employees

24  who are under investigation to have concerns or reluctance

25  about the individual who may be conducting the investigation.

PRESTON - CROSS / LAFAYETTE

1  Q.   So you're saying that their concerns shouldn't be

2  significant, that you should move forward with the investigator

3  that you want even if the people involved believe that the

4  investigator is not fair and impartial?

5  A.   I believe from a management perspective, if management --

6  every time an employee objected to a person who was conducting

7  the investigation, then it would be extremely difficult to run

8  a government entity, or you would have to continually remove

9  investigators or remove management employees who conduct

10 investigations, because employees did not have faith in the

11 investigator.  I think that would create an administrative

12 nightmare.

13 Q.   In your mind, at what point would it be appropriate to say

14 *I think there's enough of an issue here with an investigator*

15 *being fair and impartial that I should just pick another one*?

16 A.   I think if the employee who was being investigated could

17 provide sufficient documentation as to why they believed that

18 that investigator could not be fair and impartial, then that

19 should be reviewed, and a determination should be made at that

20 point.

21 Q.   So, playing with that, one thing that a person could bring

22 forward would be documentation showing friction between the

23 investigator and the accused; would that be something that you

24 could look at?

25 A.   It would be something to review.

PRESTON - CROSS / LAFAYETTE

1  **Q.**   Okay.  And how about that person coming up with a history

2  of friction between the investigator and the accused; would

3  that be something to take a look at?

4  **A.**   It would be something to review.

5  **Q.**   Okay.  And at the end of the day, would it actually be in

6  the hands of the person selecting the investigator to decide

7  whether or not there was enough information there to say, *I*

8  *think I need to pick another investigator*?

9  **A.**   If -- could you repeat the question again?

10  **Q.**   Would that be a decision that the person who is selecting

11  investigators have to make, look at all this information, and

12  say, *I think I got enough and I think I need to go on a*

13  *different direction*; would that be appropriate?

14  **A.**   It would be appropriate for the person responsible for the

15  investigation to review all information regarding the

16  investigator and make a determination.

17  **Q.**   So you and Ms. Kasaine, was there friction between the two

18  of you?

19  **A.**   At times.

20  **Q.**   Yes.  And at times that friction was so substantial

21  between the two of you that you wrote emails, didn't you?

22          **THE COURT:**  One moment.  Your comments of "yes" and

23  "okay" that you're repeating in each question are improper, and

24  the jury has been instructed to disregard them, but I'll remind

25  them that what you're saying is not evidence, and the jury may

1  not consider it when they decide the case, and you must stop.

2           MR. LAFAYETTE:  I will, your Honor.

3           THE COURT:  Ask a question.

4           MR. LAFAYETTE:  Thank you.

5           THE WITNESS:  I'm sorry.  Could you repeat the

6  question?

7           MR. LAFAYETTE:  I will.

8  Q.   At times there was friction between you and Ms. Kasaine?

9  A.   Yes.

10  Q.   And at times was that friction so substantial that you

11  wrote emails about it?

12  A.   Yes.

13  Q.   I'd like to take your attention to the spring of 2012.

14  A.   Okay.

15  Q.   Can we do that?

16      Now, the spring of 2012, did you have any type of

17  reporting relationship to Scott Johnson?

18  A.   I believe my -- I became the Employee Relations Director

19  in January of that year, so I reported directly to Ms. Santana.

20  Q.   Did you have any type of reporting relationship to

21  Mr. Johnson?

22  A.   I didn't report to Scott.  Scott and I -- Scott requested

23  that I help him review personnel requisitions and personnel

24  transactions that he was responsible for.

25  Q.   What was Scott's position?

1  **A.**    Scott Johnson was one of the Assistant City Administrators

2  who came with Ms. Santana.

3  **Q.**    Was he higher on the org chart than you?

4  **A.**    Yes.

5  **Q.**    So at some point did he come to you and talk to you about

6  your relationship with Ms. Kasaine?

7  **A.**    At one point Scott sent me -- he called me -- I believe he

8  called me or either sent me an email and said he wanted -- he

9  made a comment about *you and Katano have been complaining to me*

10  *about each other, and you guys need to learn how to work with*

11  *each other*.

12  **Q.**    Didn't he come to you and tell you that you needed to

13  learn to get along with Katano?

14  **A.**    He said --

15  **Q.**    -- with Katano Kasaine, did he say that to you?

16  **A.**    What he specifically said is that "you and Katano need to

17  learn how to work with one another."

18  **Q.**    I'd like to direct your attention to Exhibit 1A, ma'am.

19  **A.**    Is it in this book?

20         **MR. LAFAYETTE:**  I'll take a look.

21         **THE COURT:**  It's not in evidence.

22         **MR. LAFAYETTE:**  No, it's not, Your Honor.

23                  (pause in proceedings.)

24  **BY MR. LAFAYETTE:**

25  **Q.**    Is that an email that you wrote, ma'am?

PRESTON - CROSS / LAFAYETTE

1  **A.**    Yes, it is.

2  **Q.**    Is that on May 11, 2012?

3  **A.**    Yes.

4  **Q.**    And is that an email that you wrote to Scott Johnson?

5  **A.**    Yes.

6  **Q.**    And is that on a date that fell after the Rainbow Teen

7  City Council meeting on March 6th?

8  **A.**    Yes.

9  **Q.**    Does this refresh your recollection that you wrote to

10 Mr. Johnson:  "Over the last few weeks you have stated on

11 several occasions that I need to learn how to get along with

12 Katano;" is that what you wrote?

13 **A.**    That's the first sentence.

14 **Q.**    Okay.  Did you then go on to say that in your mind his

15 comments indicated that you were not professional, and that you

16 have difficulty communicating with staff who may disagree with

17 you?

18 **A.**    That's in this email.

19 **Q.**    And so just so that I understand it, you understood, as of

20 May 11, that a person higher on the org chart than you had made

21 comments which you interpreted as indicating that you were not

22 professional, and you had a difficult time communicating with

23 staff who disagreed with you; right?

24 **A.**    I don't believe Scott used the words that I was not

25 professional.

1  Q.   You interpreted whatever he said to mean that, didn't you?

2  A.   I interpreted that he was trying to indicate that I was

3  not professional.  But there is a prior email to this email

4  that I sent to Scott Johnson regarding this, prior to this

5  May 11th date.

6  Q.   Well, we'll get there.

7  A.   Okay.

8  Q.   Did you acknowledge also that it was your understanding

9  that on several occasions Ms. Kasaine had come to him to

10  complain about you?

11  A.   Scott informed me of that, yes.

12  Q.   Did he tell you that Ms. Katano -- Ms. Kasaine had told

13  him that you were sending emails regarding payroll without her

14  approval?

15  A.   That is in this email.

16  Q.   So you understand that this email -- now, you actually

17  write back and say you disagree with whatever Ms. Katano

18  Kasaine is saying, right, about you?

19  A.   I would have to see the email you're referring to.

20  Q.   You informed Mr. Johnson that you didn't believe that

21  there was truth in the things that Ms. Kasaine was saying about

22  you; right?

23  A.   Absolutely.

24  Q.   Okay.  But you understand that this document shows that

25  there's friction between the two of you?

PRESTON - CROSS / LAFAYETTE

1  **A.**   Yes.

2  **Q.**   Now, this friction between you and her, it didn't end in

3  the spring of 2012, did it?

4  **A.**   There were times when Katano and I worked well together

5  and times when Ms. Kasaine would overstep her bounds and I

6  would have to say something to her, so it depended on what time

7  of the year you were referring to.

8  **Q.**   I'm just asking, ma'am.  The friction between the two of

9  you did not end in the spring of 2012, did it?

10  **A.**   There were times where it ended and times when it didn't,

11  so you'd have to be more specific.

12  **Q.**   So there were times after that where the friction

13  resurfaced; correct?

14  **A.**   There were times when we disagreed on issues.

15  **Q.**   I'd like you to take a look at Exhibit 1C, ma'am.  It's an

16  email dated August 14, 2012.

17      Do you see that?

18  **A.**   Yes.

19  **Q.**   Now, it's an email from Ms. Kasaine to Scott Johnson and

20  to Deanna Santana, isn't it?

21  **A.**   Yes, yes, the top part.

22  **Q.**   Now, did either Ms. Santana or Mr. Johnson come to you and

23  tell you, in the summer of 2012, that Ms. Kasaine was making

24  even more complaints about you?

25  **A.**   I don't recall that.

1  Q.   When you say you don't recall that, are you saying it

2  didn't happen, or are you saying you just can't recall one way

3  or the other?

4  A.   I'm saying I do not recall in the summer any specific --

5  if you have a specific date.  I don't recall any further

6  discussion with Mr. Johnson regarding Ms. Kasaine.

7  Q.   Well, I'm talking about August 14, 2012.  Do you recall

8  anyone coming to you on or about August 14, 2012 with further

9  complaints from Ms. Kasaine?

10  A.   I don't recall that.

11  Q.   Now, did you have frictions with Ms. Gourdine?

12  A.   At times.

13  Q.   At times.  Now, I thought I heard you say, you correct me

14  if I'm wrong, that initially you reported to Ms. Gourdine;

15  right?

16  A.   That is correct.

17  Q.   And you reported to Ms. Gourdine up until the point in

18  time you became a director?

19  A.   Yes.

20  Q.   And I thought that you had said that up until the time you

21  became a director, you got along pretty well with Ms. Gourdine.

22  A.   That is correct.

23  Q.   And after you became a director, you started having some

24  frictions with her?

25  A.   After I was instructed to review her work, we started

1    having friction.

2    **Q.**   So -- and when was that, after you became a director?

3    **A.**   After I became the Employee Relations Director, I was

4    requested by Mr. Johnson to review the work of Kip Walsh and

5    Andrea Gourdine because of errors that they were making.

6    **Q.**   And so when did you get that directive?

7    **A.**   I wouldn't remember the exact date.  That was several

8    years ago.

9    **Q.**   Was it in 2012?

10   **A.**   It was shortly after I became a director.

11   **Q.**   And who did you -- and who gave you this directive?

12   **A.**   Scott Johnson.

13   **Q.**   And so you reported to Scott Johnson on these issues?

14   **A.**   I didn't report to Scott.  Scott would request that I sit

15   in on personnel meetings in his office that he had on a regular

16   basis with Ms. Gourdine and Kip Walsh regarding hiring

17   packages, personnel transactions, and those type of personnel

18   issues.

19   **Q.**   Now, at some point did your issues with Ms. Gourdine

20   become so significant to you that they came to the attention of

21   Ms. Santana, your frictions with Ms. Gourdine?

22   **A.**   I wouldn't actually characterize it as friction, but I

23   do -- I don't remember if Deanna and I had conversations about

24   it.

25   **Q.**   Well, why don't you take a look at Exhibit 1B.

1    **A.**    1B?

2    **Q.**    Yes, 1B.

3    **A.**    Okay.

4    **Q.**    Was that an email that you wrote?

5    **A.**    There is an email on this page that I wrote.

6    **Q.**    At the very top of the page is an email that you wrote on

7    July 20, 2012; right?

8    **A.**    There is an email from me that's dated July 18th, and then

9    there's an -- there's two emails from me that's dated

10   Wednesday, July 18th.

11   **Q.**    I'm really focused on the one at the top from Ms. Preston

12   dated July 20 to Ms. Santana; do you see that one?

13   **A.**    This says July 18th, so I'm not --

14   **Q.**    Are you looking at 1B?

15   **A.**    Oh, it's the top page, I'm sorry.  The second page is

16   dated July 18th.  Yeah, the top page is dated July 20th.

17   **Q.**    And are you raising to Ms. Santana an issue of friction

18   between you and Ms. Gourdine?

19   **A.**    I am.

20   **Q.**    August 15, 2012.  I'd like you to take a look at

21   Exhibit 1D.  Is this an email string between you and

22   Ms. Santana at the top and between Scott Johnson and you and

23   others down below?

24   **A.**    Yes.

25          **MR. LAFAYETTE:**  I'd like to move this document into

1  evidence, Your Honor.

2           THE COURT:  Any objection?

3           MR. SIEGEL:  I think we had a 403 objection to this.

4           THE COURT:  You had or have?

5           MR. SIEGEL:  Have.

6           THE COURT:  It's not set forth in docket 137.

7           MR. SIEGEL:  Let me check.  That is correct.  No

8  objection.

9           THE COURT:  Exhibit 1D, Delta, is admitted in

10 evidence.

11      (Trial Exhibit 1D received in evidence)

12 BY MR. LAFAYETTE:

13 Q.   Now, ma'am, this is an email string related to the

14 processing of a check; right?

15 A.   (witness examines document)  It seems to be an email

16 communication regarding COBRA reimbursement checks.

17 Q.   So it's about a check; right?

18 A.   It -- yes.

19 Q.   And the Controller's Office, do you know the Controller's

20 Office, they write the checks; right?

21 A.   I believe so.

22 Q.   They're asking for additional documentation; correct?

23 A.   It appears that's what they requested.

24 Q.   And you -- Deb Grant, on page 221, page 2 of 5, writes at

25 the bottom of this page:  The union did not agree to this level

 1  of documentation, basically telling the Controller's office

 2  that the amount of documentation that the Controller's Office

 3  wants shouldn't be provided because the union didn't agree with

 4  this level of documentation.

 5      Did I read that right?

 6  **A.**   Deb Grant is saying, "The union did not agree to this

 7  level of documentation.  We have not required it in the past

 8  three to four years since the program has been in place.  We do

 9  not have the basis to change the requirements now."

10  **Q.**   And you agreed with her that it wasn't necessary for the

11  Controller's Office to get the level of documentation that the

12  Controller's Office thought it needed in order to process this

13  check; right?

14  **A.**   No, I agreed with Deb Grant's statement that this was not

15  what the union -- the union did not agree to this level of

16  documentation.

17  **Q.**   And ultimately, this got to Mr. Scott Johnson's attention,

18  didn't it?

19  **A.**   I don't know.

20  **Q.**   Take a look at the first page, and look at the email from

21  Scott Johnson to you that's dated August 15, 2012 at

22  8:00 o'clock a.m.

23  **A.**   Okay.

24  **Q.**   And he writes:  "It is unclear to me how the MOU allows

25  for inadequate documentation.  Please include the specific

1   language from the MOU that holds the Controller to reimburse

2   for COBRA, this standard that appears to lack clarity for

3   appropriate documentation.  I would question the documentation

4   as described below as appropriate proof that the payment was

5   made, and I doubt it would hold up in an audit.

6        "Please excuse brevity and typos.  Sent from my iPhone."

7        Now, rather than respond to Mr. Johnson, you wrote to

8   Ms. Santana, didn't you?

9   **A.**   That is correct.

10  **Q.**   And when you wrote to her, you didn't say *I can provide*

11  *the documentation in the MOU*, did you?

12  **A.**   No.

13  **Q.**   You said, "I would like a private meeting with you this

14  week to discuss your labor philosophy, principles, and

15  standards.  If it is necessary to meet after normal hours, work

16  hours, I will make myself available.  I also -- also, we need

17  to discuss how Scott responds to me publicly.  His response to

18  my request for a meeting is inappropriate."

19            **THE COURT:**  And the word "thanks" follows, if you're

20  reading the entire email.

21            **MR. LAFAYETTE:**  I'm sorry, Your Honor.  Thank you.

22  "Thanks."

23  **Q.**   I don't see -- can you show me where it was in this email

24  string you made a request for a meeting with Scott?

25  **A.**   I don't see it in this particular email string.

1  Apparently it wasn't included in your package.

2  **Q.**   So did you understand that at that moment Scott Johnson

3  had some concerns about you?

4  **A.**   No.

5  **Q.**   Now, in the summer of 2012, did you have some frictions

6  with any of the unions?

7  **A.**   You'd have to be more specific.

8  **Q.**   I will.  September 2012, did you start having frictions

9  with Barry Donelan?

10 **A.**   You would have to be more specific.

11 **Q.**   Well, maybe I can show you a document to refresh your

12 recollection.

13           **MR. LAFAYETTE:**  I'm showing the witness a document,

14 Your Honor, for purposes of identification only.  I'm labeling

15 it as 5R, and I'll hand the Court a copy as well.

16 **Q.**   Is this a letter that you're copied on, ma'am?

17 **A.**   Yes.

18 **Q.**   So --

19           **THE COURT:**  If you're refreshing her recollection,

20 then you take the document back.

21           **MR. LAFAYETTE:**  Absolutely.

22           **THE COURT:**  Then take it back.  We're not going to

23 have her read from it.  It's not evidence in.

24           **MR. LAFAYETTE:**  I'm not asking her to.

25 **Q.**   Does this refresh your recollection that on or about that

1  date, September 24, 2012, Mr. Donelan was writing critically --

2  was making criticisms of your performance?

3  A.   I didn't read the whole letter.  (witness examines

4  document)  Yes.

5  Q.   And did you understand that he was making those criticisms

6  of your performance to your supervisor, Ms. Santana?

7  A.   Yes.

8  Q.   And did you have an understanding that because of his

9  concerns, he no longer wanted to have informal discussions with

10  you?

11  A.   That's what the letter says.

12  Q.   Now, so I think this takes us to the Deb Grant episode.

13       All right.  So I want to talk about that with you.

14       Sonia Lara, do you know who she is?

15  A.   Yes.

16  Q.   She was one of your subordinates?

17  A.   She was.

18  Q.   How long did she work with you?

19  A.   Work for me or work with me?

20  Q.   Well, let's start out with work for you.

21  A.   She was selected -- I selected her to work in my unit.  I

22  don't remember the exact timing of when she was selected.  It

23  was probably about toward the end of 2012, I believe, somewhere

24  around there.

25  Q.   And how long had you worked with her before that?

PRESTON - CROSS / LAFAYETTE

1  A.    When I was hired, she was the executive assistant to the

2  personnel director, so she was already in the department.

3  Q.    And so you worked with her since the day you were hired

4  until the day you left?

5  A.    Yes.

6  Q.    Were you friends?

7  A.    We did not -- we were colleagues.  I wouldn't call us

8  friends.

9  Q.    Did you ever call yourselves friends?

10 A.    I think we were friendly, but we never like hung out with

11 each other or had dinner or anything like that.  We were work

12 friends, I will say.

13 Q.    Did you ever refer to yourself with her as a friend?

14 A.    I might have called her a work friend.

15 Q.    So now, January 29, 2013, did you find a statement that

16 Ms. Lara had prepared left on a copy machine?

17 A.    Yes, I did.

18 Q.    Now, you conduct investigations; right?

19 A.    Yes, I have.

20 Q.    And you know that others may also be conducting

21 investigations and trying to get information; right?

22 A.    That's possible.

23 Q.    And when you conduct investigations, do you tell people

24 that what they're asked shouldn't be shared with other people?

25 A.    It depends on the investigation.

1  Q.   Do you ever tell them that the investigation should be

2  kept confidential?

3  A.   It depends on the investigation.

4          MR. LAFAYETTE:   So -- excuse me, Your Honor.

5  Q.   Sometimes you do, sometimes you don't?

6  A.   Recently, last year, there was a PERC decision that ruled

7  that public sector employers could no longer inform employees

8  that they could no discuss investigations with outside people,

9  so that's why I said it depends.

10 Q.   So that was last year.  Prior to last year when that

11 decision came out, did you ever tell people that the

12 investigations should be kept confidential?

13 A.   In certain investigations, yes.

14 Q.   Thank you.  Now, this statement that you found on the

15 copier, was it a statement prepared by Ms. Lara?

16 A.   Yes.

17 Q.   Did it have to do with Deb Grant?

18 A.   Yes.

19 Q.   Did you read it?

20 A.   Yes.

21 Q.   Was your name mentioned in it?

22 A.   I believe so.

23 Q.   And then did you confront Ms. Lara with the statement?

24 A.   No, I did not confront her.

25 Q.   Did you talk with her about the statement?

**PRESTON - CROSS / LAFAYETTE**

1  **A.**    Yes.

2  **Q.**    And did she tell you it was a statement that she had

3  prepared?

4  **A.**    She told me it was a statement that Andrea Gourdine

5  instructed her to write.

6  **Q.**    Instructed or asked her to write?

7  **A.**    I believe she said instructed, because she told me she

8  didn't want to write it.

9  **Q.**    Okay.  So instructed her to write it?

10  **A.**    Correct.

11  **Q.**    At some point in time had Ms. Gourdine been her

12  supervisor?

13  **A.**    Yes.

14  **Q.**    And so this statement that she had written that had your

15  name in it, okay, did you give it back to her?

16  **A.**    No.

17  **Q.**    Did you dispose of it?

18  **A.**    Yes.  I believe I threw it in the trashcan.

19  **Q.**    Did you understand that the statement related to an

20  attempt by Ms. Gourdine to find out if there had been an abuse

21  of the City's assets?

22  **A.**    Did I understand what?

23  **Q.**    Did you have an understanding as to whether or not that

24  statement related to the Human Resources Director's efforts to

25  try and find out if there had been an abuse of the City's

PRESTON - CROSS / LAFAYETTE

1  assets?

2  **A.**   I believe, from my recollection, without looking at the

3  statement, it was signed as detailing how she purchased certain

4  computers.

5  **Q.**   Did this statement, in a reference to you, have a

6  statement in it that said that you didn't want to know how

7  Ms. Grant was going about getting what could have been

8  inappropriate staff?

9  **A.**   I would have to see the document you're referring to.

10        **MR. LAFAYETTE:**   Your Honor, would you like to see it

11  before I present it to her, only for purposes of refreshing her

12  recollection?

13        **THE COURT:**   What document is it?  Is it previously

14  marked?

15        **MR. LAFAYETTE:**   6C, I think so.

16        **THE COURT:**   Proceed.

17  **BY MR. LAFAYETTE:**

18  **Q.**   Using this, ma'am, to refresh your recollection, is

19  Exhibit 6C a document -- the document that you found on the

20  copier?

21  **A.**   (witness examines document) I believe so.

22  **Q.**   Does this refresh your recollection that Ms. Lara had

23  included a statement in this document about you indicating that

24  you didn't want to know how Ms. Deb Grant may have been getting

25  people inappropriately?

1        **MR. SIEGEL:**  Your Honor, the document was shown to

2   her to refresh her recollection, not to --

3        **THE COURT:**  Correct.  So she can look at it, and then

4   you can take it back, and then you can ask a question about it.

5   It's not a backdoor way to get in an inadmissible document.

6   And we're going to move on, since -- I'll give you a few more

7   questions on this topic.

8        **THE WITNESS:**  I didn't finish reading it.

9        **MR. LAFAYETTE:**  I'm not trying to take it from her.

10        **THE COURT:**  You have to let her read it, rather than

11   asking her questions about it.

12        **THE WITNESS:**  (Witness examines document.)

13   BY MR. LAFAYETTE:

14   Q.   Does it refresh your recollection?

15   A.   Yes.

16   Q.   Does it refresh your recollection that Ms. Lara, Sonia

17   Lara had stated that you didn't want to know how Ms. Deb Grant

18   was going about getting these employees?

19   A.   It was said in a joking manner, that's what Sonia wrote.

20   But I always, always made sure that any personnel actions that

21   I dealt with followed policy and procedure.

22   Q.   Did you understand that Ms. Lara was then going to go and

23   talk to Ms. Gourdine about what had happened?

24        **MR. SIEGEL:**  Sorry, Your Honor.  The question is

25   vague.

1          **THE WITNESS:**  I have no idea what Ms. --

2          **THE COURT:**  One moment.  Overruled.  You may answer.

3          **THE WITNESS:**  I have no idea what Ms. Lara was going

4    to do.

5    **BY MR. LAFAYETTE:**

6    **Q.**   Well, did you tell her to go down and talk to Ms. Gourdine

7    and tell her that you were not going to allow her to sign the

8    statement?

9    **A.**   No.  What I said to Sonia is -- my specific words was I

10   will go and talk to Andrea to ask her, one, why did she ask you

11   to sign -- to write a statement about Deb Grant when she was

12   leaving the City, and she would not have enough time to follow

13   the process; and two, I said that I would talk to her about it,

14   and Sonia said "No, let me talk to her about it."

15   **Q.**   So you wanted to go down and say to Ms. Gourdine "I don't

16   know why you're following up on this, because you're going to

17   be leaving the City"?

18   **A.**   That was not what I was going to say.

19   **Q.**   Okay.  Was that your concern, is why is she doing this

20   since she's leaving the City?

21   **A.**   That memo was written during a conversation when I had

22   approached Andrea about doing a contract to bring in note

23   takers for the bargaining process.

24        One of the things you have to do for bargaining is to take

25   accurate notes.  And so when I -- if you read the entire memo,

1    it starts off by saying I came down to Ms. Gourdine's office to

2    speak with her about hiring note takers.  And at that time

3    Sonia began to explain to me that she thought Deb got a way of

4    hiring people, because Deb had administrative staff in her unit

5    that Sonia did not believe was hired appropriately.  And I said

6    *you need to make sure that the personnel director, if that's*

7    *true, knows that there are employees working in personnel who*

8    *were not hired through the appropriate process.*

9    **Q.**  So that was in September of 2012, wasn't it, the

10   conversation?

11   **A.**  I believe that's the date on that email -- on the notice

12   you just showed me.

13   **Q.**  Okay.  And so between 2000 -- September 2000 -- so if Deb

14   Grant were doing that, would that actually have any

15   implications to any of the MOUs?

16   **A.**  If Deb Grant was hiring people outside of the civil

17   service process, it would be, one, grievable, and two, a

18   violation of the civil service rules.

19   **Q.**  So it would be -- when you say grievable, that would mean

20   it would be in violation of the MOUs?

21   **A.**  Depending on the classification, it could be in violation

22   of a Collective Bargaining Agreement.

23   **Q.**  And so to the extent that someone is doing something in

24   violation of a Collective Bargaining Agreement that could lead

25   to a grievance, would that be an unfair labor practice?

PRESTON - CROSS / LAFAYETTE

1  **A.**  It would not be an unfair labor practice charge, it would

2  be grievable.

3  **Q.**  It would be grievable.  So as the person who was in charge

4  of labor relations, the MOUs, the grievances, would that be

5  something that your department would have some interest in?

6  **A.**  Absolutely.

7  **Q.**  So what action did you take between September of 2012 and

8  January 29, 2013 to address this issue?

9  **A.**  I spoke with Deb Grant's boss, Andrea Gourdine.

10  **Q.**  Did you do anything else?

11  **A.**  I asked them to verify whether or not the employees that

12  Sonia believed were hired outside of the civil service process,

13  was that true.  And I believe there was some investigation

14  done, and, from my recollection, without going back and reading

15  any documents, I believe there was one person who had to be let

16  go out of Deb Grant's unit.

17  **Q.**  So after you did this on the 29th, meaning read Ms. Lara's

18  report, statement, took it from her, threw it in the trash,

19  after you did that --

20  **A.**  That's not the statement.

21  **Q.**  Well, did you throw her statement in the trash?

22  **A.**  Not the document that's in your hand, no, I did not.

23  **Q.**  Did you throw a draft of it in the trash?

24  **A.**  No, I did not.

25  **Q.**  What did you throw in the trash?

1  **A.**    Regarding that situation, nothing.

2  **Q.**    So you didn't -- so you took it from her.  Did you give it

3  back to her?

4  **A.**    That memo I did not take from Sonia.  You're referring to

5  a different memo on a different time.

6  **Q.**    I'm talking about the one that you found on the copier.

7         **MR. SIEGEL:**  Your Honor, sorry.  Things have gotten

8  unclear.  We're talking about two different memos, and counsel

9  is not clear, so his question is vague.

10         **THE COURT:**  Are you stating an objection?

11         **MR. SIEGEL:**  Objection, vague, lack of foundation.

12         **THE COURT:**  Sustained.  Rephrase your question.

13         **MR. LAFAYETTE:**  Thank you, Your Honor.

14  **Q.**    I'm only talking about one document, ma'am, and that is

15  the document that you found on the copier.

16  **A.**    That is not the document you showed me.

17  **Q.**    So did you find a document on the copier?

18  **A.**    At the end of December 12, I found a document on the

19  copier.

20  **Q.**    So I'm going to show you something that may refresh your

21  recollection, and you tell me if --

22         **MR. SIEGEL:**  Could I see it a second?

23         **THE COURT:**  He needs to see it.

24         **MR. LAFAYETTE:**  I couldn't hear him, Your Honor.

25  It's the same one.

1    MR. SIEGEL:  Yeah, it's the same one.

2  BY MR. LAFAYETTE:

3  Q.   6C, not the back side, 6C, the front side, is that the one

4  that you found on the copier?

5  A.   No.

6  Q.   The back side?

7  A.   No.

8  Q.   Okay.  So the one you found on the copier --

9         THE COURT:  Let's have your questions be to the

10  witness from the podium.

11         MR. LAFAYETTE:  Thank you, Your Honor.

12  Q.   But you found a statement nonetheless; right?

13  A.   Not that document.

14  Q.   But you found a statement?

15  A.   In the end of the year in 2012, I found a statement on a

16  copy machine.

17  Q.   Okay.  And that's the one you had the conversation about

18  with Ms. Lara?

19  A.   That's the conversation I had with Ms. Lara about would

20  she like for me to go and meet with Andrea to discuss the

21  issues in that document, not the document you showed me.

22  Q.   And is that the one that you tore up or threw in the

23  trash?

24  A.   It's a document I threw in the trash.

25  Q.   So now, did something happen such that on January 29,

1    2013, you felt compelled to write a memorandum about what had

2    happened?

3    **A.**   You'd have to show me the document.

4    **Q.**   Do you have any recollection of you preparing a document

5    at all in January of 2012 relating to this statement that

6    Ms. Lara had prepared?

7    **A.**   Relating to the statement, to the document you just showed

8    me or the document that occurred in December?

9    **Q.**   Any document whatsoever.  Did you prepare a document in

10   January of 2013 in any way whatsoever reflecting what had

11   happened on the day that you actually saw the document on the

12   copier?

13   **A.**   I believe I wrote a statement in January, but I want to be

14   clear, it's not the issues that you were referring to.

15   **Q.**   Your statement, did it in any way whatsoever relate to the

16   document you found on the copier?

17   **A.**   What statement?

18   **Q.**   The document that you wrote in January, did it relate to

19   what had happened with the document at the copier?

20   **A.**   Yes.

21   **Q.**   I'd like for you to take a look at Exhibit 1G.

22   **A.**   Okay.

23   **Q.**   Take a look.  Is this a document that you prepared, ma'am?

24   **A.**   This is the document I prepared.

25   **Q.**   Had you prepared this on January 29th, 2013?

1  **A.**   It's the date of the document, yes.

2  **Q.**   Did anyone ask you to prepare this document?

3  **A.**   I'm not sure. I don't remember.

4  **Q.**   And with regard to this document, did you go and ask Sonia

5  Lara to prepare a document on that day?

6  **A.**   I'm not sure. I don't know if I asked Sonia to prepare a

7  document.

8  **Q.**   Take a look at Exhibit 1F.

9  **A.**   Okay.

10  **Q.**   Is that a document dated January 29, 2013 from Sonia Lara

11  to you?

12  **A.**   Yes.

13  **Q.**   Did you ask her to prepare this document?

14  **A.**   I'm not sure if I asked or she offered.

15  **Q.**   So did you tell Ms. Lara that with regard to that document

16  that you found in the copier, that because she now worked for

17  you, she could not participate in Andrea's attempts to

18  discipline Deb Grant in connection with that investigation.

19  **A.**   I believe I told her it would not be appropriate.

20  **Q.**   And the reason you said that she couldn't prepare a

21  statement for what it was that she had observed and seen was

22  for what reason, ma'am?

23  **A.**   I -- what I said to Ms. Lara was that she -- the

24  information that Ms. Gourdine needed in order to pursue

25  disciplining Deb Grant -- she had all of the information she

1  needed without Sonia writing a document.

2      From my understanding, Ms. Gourdine wanted to discipline

3  Ms. Grant based on purchasing computers that she felt Deb had

4  ordered -- Ms. Grant had ordered that were beyond standard city

5  regulations.  And Ms. Gourdine had all of the purchase orders,

6  she had all of the communications, she had all of the

7  documentation she needed if she wished to pursue disciplining

8  Ms. Grant.

9      Additionally, Ms. Gourdine had that information for

10  several months, and she waited, I believe, till the last day or

11  the day before her last day to attempt to discipline Ms. Grant,

12  and she was not going to be present for the process, which

13  would have left Sonia as the only city employee who would have

14  been pursuing a disciplinary action, so to speak, against Deb

15  Grant, because Ms. Gourdine was leaving.

16      **THE COURT:**  We're going to take a break there.  It's

17  time for lunch.  Maybe you can beat the lunch line today.  It's

18  11:54 now.  We'll return at 12:50, ten minutes to 1:00 o'clock,

19  to resume our questioning with Ms. Preston.

20      I've got some words for the attorneys, but the jurors are

21  excused now.

22      (Proceedings were heard out of presence of the jury:)

23      **THE COURT:**  Ms. Preston, you may step down.  Thank

24  you.

25      All right.  Back on the record.  The jury is not present.

 1          Are you intending to offer into evidence Exhibits 1F and

 2   1G?

 3          MR. LAFAYETTE:  I'm sorry, Your Honor.  I need to

 4   look at them again.  I'm sorry.

 5          THE COURT:  Those were the ones you were just

 6   questioning the witness about.

 7          MR. LAFAYETTE:  Not at this moment, Your Honor.

 8          THE COURT:  Okay.  That wasn't my question.  Are you

 9   planning to admit into evidence Exhibits 1F and 1G?

10          MR. LAFAYETTE:  No.

11          THE COURT:  All right.  The questioning about

12   documents that the jury doesn't have and won't have, including

13   the ones in the 6 series I've excluded, has taken a lot of

14   time, it's confusing the jury, and you need to move ahead in

15   your examination on the things that the jury knows about and is

16   relevant to the case, because you're spending a lot of time.

17   We're now an hour -- more than a hour in, and there's many

18   topics, I think, you have to go with this witness.  You're down

19   into the seven-hour range for your remaining time in this case,

20   that's your allotment of the time, so you need to move on.  So

21   if there's more areas where you're not going to move documents

22   in, let's move more quickly, so that we can get to the things

23   that are actually in evidence.

24          All right.  Anything else?  Yes, Mr. Siegel, do you agree?

25          MR. SIEGEL:  Do I agree?  You know --

1              THE COURT:  You won't touch that one.

2              MR. SIEGEL:  I think Mr. Lafayette should use all of

3    his remaining time questioning plaintiff.

4              THE COURT:  Very well.

5              MR. SIEGEL:  But we have agreed to interrupt the

6    examination for two witnesses immediately after lunch.

7              THE COURT:  How much time do you have remaining with

8    Ms. Preston?

9              MR. LAFAYETTE:  About 45 minutes.

10             THE COURT:  And how long -- your expert is going to

11   be the first one?

12             MR. SIEGEL:  Yes.

13             THE COURT:  How long do you expect your expert

14   testimony will be from your side?

15             MR. SIEGEL:  20 minutes, 20 minutes.

16             THE COURT:  20 minutes.  And then?

17             MR. SIEGEL:  Mr. Ewell.

18             THE COURT:  After that?

19             MR. SIEGEL:  Whose plane has landed.

20             THE COURT:  Outstanding.  All right.  That will be

21   our plan.  So 12:50 for your expert.

22             MR. SIEGEL:  Right.  And then Mr. Ewell, and then we

23   can get back to plaintiff.

24             THE COURT:  Very well.  That's your plan.  Thank you.

25             MR. LAFAYETTE:  Thank you.

1          **MR. SIEGEL:**  Thank you, sir.

2               (Luncheon recess was taken at 11:56 a.m.)

3   **AFTERNOON SESSION**                                    **12:50 p.m.**

4   (Proceedings were heard outside the presence of the jury:)

5          **THE COURT:**  Good afternoon.  Our jurors are ready.

6   Is our next witness ready?

7          **MR. SIEGEL:**  Yes.

8          **THE COURT:**  All right.  Let's bring in our jurors.

9   (Proceedings were heard in the presence of the jury:)

10          **THE COURT:**  All right.  Please be seated.  Our jurors

11   have returned.  We're going to have another shift in the

12   schedule, in that we're going to have a different witness come

13   before the jury now.  We're returning to Ms. Preston's

14   testimony later this afternoon, due to some scheduling

15   balancing.  We're going to take a few different witnesses out

16   of order, and then return to Ms. Preston.

17     Mr. Siegel.

18          **MR. SIEGEL:**  Right.  Thank you, Your Honor.  We call

19   Margo Ogus as our next witness.

20          **THE CLERK:**  Please raise your right hand.

21                           **MARGO RICH OGUS**,

22   called as a witness for the Plaintiff, having been duly sworn,

23   testified as follows:

24          **THE WITNESS:**  I do.

25          **THE CLERK:**  Please be seated.  State your full name

OGUS - DIRECT / SIEGEL

1    for the record, and spell your last name, please.

2              THE WITNESS:  My name is Margo Rich Ogus.  O-g-u-s.

3                        **DIRECT EXAMINATION**

4    BY MR. SIEGEL

5    Q.   Okay.  And what is your profession?

6    A.   I'm an economist.

7    Q.   And do you have a degree in economics?

8    A.   I do.  I have three degrees.

9    Q.   Okay.  And what are they, and where did you get them?

10   A.   I have a bachelor of science degree in agricultural

11   economics which was obtained at Cornell University in 1973; and

12   a master of arts and Ph.D., both in applied economics, both

13   obtained at Stanford University; the master's in 1975, and the

14   doctorate in 1980.

15   Q.   And are you currently employed?

16   A.   I am.

17   Q.   Where?

18   A.   At an economic consulting firm called "Economic Solutions"

19   in Palo Alto.

20   Q.   And what kind of work does Economic Solutions do?

21   A.   Economic Solutions is my firm, and I provide consulting to

22   attorneys in civil litigation, similar to what I've been asked

23   to do in this matter.  I'm retained by attorneys representing

24   plaintiffs and representing defendants to calculate economic

25   loss in civil litigation.

OGUS - DIRECT / SIEGEL

1   Q.   Okay.  And how long have you been doing this kind of work?

2   A.   A little over 30 years.

3   Q.   And have you testified in court before?

4   A.   I have.

5   Q.   About how many times?

6   A.   About 250 times.

7   Q.   Okay.  And do you testify just for one side, or for both

8   sides?

9   A.   No.  I'm retained about evenly by attorneys representing

10  plaintiffs and attorneys representing defendants, and I testify

11  for both.

12  Q.   And were you retained by my firm in this case?

13  A.   I was.

14  Q.   And have you been retained by my firm in the past?

15  A.   Yes.

16  Q.   Approximately how many times?

17  A.   All told, my best estimate would be about a dozen times

18  over probably 15 years or more.

19  Q.   Okay.  And what were you asked to do in this case?

20  A.   I was asked to calculate Ms. Preston's economic loss as a

21  result of the termination of her employment on October 3rd,

22  2013.

23  Q.   Okay.  And can you explain in general terms how you do

24  this kind of work?

25  A.   Yes.  The way I approach it is I think of it in terms of

1    two streams of earnings.  What would Ms. Preston have earned,

2    had she not been terminated, and continued to be employed by

3    the City of Oakland?  Both wages, and to the extent it's

4    appropriate, fringe benefits.

5         And the second --

6         So that I call "the earnings without termination."

7         Second stream of earnings is earnings with termination.

8    That's anything she has earned to date, and what she might

9    reasonably expect to earn in the future.

10        The difference between her earnings without termination

11   and her earnings with termination are -- are her loss.

12   **Q.**   And in making your calculations, did you rely on certain

13   information that you obtained regarding Ms. Preston's

14   employment?

15   **A.**   I did.

16   **Q.**   And what kind of information is that?

17   **A.**   So I was provided with W-2 earnings statements showing her

18   earnings in Oakland in 2012 and 2013.  I had a document showing

19   her promotion and her rate of pay in January of 2012.  So that

20   documented her rate of pay.  I also had some information

21   provided about what her prior wage-rate increases had been for

22   the few years prior to her promotion.

23        I had some personnel information related to fringe

24   benefits; in particular, the CalPERS pension plan that

25   employees of Oakland participate in; both the terms of those

1  plans, and also the employees' obligation to contribute to

2  them.

3       With respect to her post-termination employment with the

4  City of San Francisco, I had her W-2 for 2014.  I had a pay

5  stub in 2015, showing me her current rate of pay; and also

6  information about the San Francisco pension plan; and again,

7  how the terms of that operate, and also how employees need to

8  contribute to it.  I think in general, that was the information

9  that I had to rely upon.

10  **Q.**   Okay.  And did you rely upon any other information, except

11  for the information that was specific to Ms. Preston?

12  **A.**   I relied on a little bit.  There -- there wasn't too much

13  I needed to obtain with respect to data sources that I keep in

14  my office.  One thing I did review was information on the

15  Oakland website about the salary range for the position that

16  Ms. Preston held in Oakland.  Beyond that -- oh, I guess I

17  needed her statistical life expectancy for purposes of her

18  pension loss.  Other than that, I don't think there was any

19  other information I obtained myself.

20  **Q.**   Okay.  Did you also make certain assumptions in doing your

21  analysis of Ms. Preston's earnings without termination?

22  **A.**   I did.

23  **Q.**   And what were those assumptions?

24  **A.**   So the first assumption I started with was her wage rate

25  at the time of termination.  It was an assumption I made, but I

1  assumed it was the documented rate that was on her promotion

2  documentation:  $153,358 per year.

3      I assumed there had not been any kind of wage-rate

4  increase in 2013.  So I relied on that as the wage rate she was

5  earning at the time of her termination.

6      I did assume in 2014 and in 2015 that she would receive

7  wage-rate increases.  This is partly cost-of-living adjustment

8  that the City of Oakland would have brought into the entire

9  salary scale, and it was partly an adjustment for the fact that

10  she was very far from the maximum range of her salary.  So

11  there was opportunity for increases beyond just cost of living.

12  I assumed that she would receive 3 percent increases in 2014,

13  and again in 2015.

14      What I knew from the documents I reviewed was that she'd

15  had about a 3.9 percent average increase per year in the years

16  that she had been there, if you just average it over the whole

17  time period.  So I used 3 percent.

18      And finally -- and this was with respect to fringe

19  benefits, and in particular the pension -- as an employee she

20  was obligated to contribute 8 percent of her wages into the

21  pension plan.  I didn't consider any other fringe benefits.

22  Her medical coverage has been replaced by her current employer,

23  and so that wasn't considered.  So the only thing that was

24  considered with respect to fringe benefits was actually a

25  negative.  It was her obligation to contribute, which

1    subtracted from her wages.

2    **Q.**    And did you also make some assumptions with respect to

3    what her earnings would have been -- or will be, without -- in

4    light of her termination by City of Oakland?

5    **A.**    Yes.  So this refers to that second stream of earnings:

6    The earnings with termination.

7        In -- I took the whole year of 2013, because, to the

8    extent that she had any payments in conjunction with her

9    termination that might have been appropriate, I simply offset

10   what she would have earned by what she did earn in Oakland in

11   2013 on her W-2.

12       2014, I knew she had become employed in the City of

13   San Francisco.  I had her W-2 for that year.  That documents

14   what she earned in 2014.

15       And in 2015, I had a pay stub from, I believe, February

16   that showed that her wage -- wages had gone up a bit.  And I

17   took into account her current rate of pay this year, which is

18   $137,644 per year.  And I used that figure from her pay

19   statements.

20       So whenever possible, the assumptions I made were based on

21   documented information.

22       With respect to fringe benefits, similar to how I

23   described the fringe benefits in Oakland, Ms. Preston can

24   participate in San Francisco's pension plan.  And for that one,

25   she needs to contribute 11 and a half percent of her wages.  So

**OGUS - DIRECT / SIEGEL**

1  that's an offset to -- to her earnings.

2  **Q.**   Okay.  Did you make any assumptions about how long she

3  would work; in other words, what her age would be at

4  retirement?

5  **A.**   I did.  I was asked to assume that she intended to work

6  until age 65.  And that's -- that's the date I used.

7  **Q.**   And you had mentioned earlier life expectancy.  Did you

8  make an assumption regarding her life expectancy?

9  **A.**   I did, for purposes of calculating her pension loss.

10 **Q.**   Okay.  And what was your assumption regarding her life

11 expectancy?

12 **A.**   I always hate to say these things in front of the people

13 whose life expectancy it is, but the statistical figure from

14 the vital-statistics document is 25.2 years from the time I

15 wrote the report, which was in April of 2015.

16 (Reporter requests clarification.)

17         **THE WITNESS:**  Vital statistics.

18 **BY MR. SIEGEL**

19 **Q.**   Yeah.  So as a result of doing all of that, have you

20 reached any opinions about Ms. Preston's loss of earnings?

21 **A.**   I have.

22 **Q.**   And what are those opinions?

23 **A.**   I've reached three different opinions to collect.  The

24 first is her past loss of earnings.  Her past economic loss.

25 And with respect to just the wages and fringe benefits, this

1  runs from the time of her termination through the time I wrote

2  the report, which was April 1st, 2015.  So it was through April

3  of this year.  And the figure is $92,050:  The difference

4  between what she should have earned, and what she did earn.

5  **Q.**  So just to stop there for a second, Dr. Ogus.  So that's

6  essentially a straightforward subtraction of what she would

7  have earned had she remained in Oakland, and what she's

8  actually earned in San Francisco up to April of this year?

9  **A.**  That's correct.

10 **Q.**  Okay.  And did you also then have an analysis of what her

11 future economic loss would be?

12 **A.**  I do.

13 **Q.**  And what is your opinion in that regard?

14 **A.**  So this loss runs from May 1st, 2015, through August of

15 2023, which is the year -- the month and the year in which she

16 would turn 65 and would retire.  And the figure, reduced to

17 present value, is $252,886.

18 **Q.**  Okay.  First of all, how did you reach that conclusion

19 regarding $252,000?

20 **A.**  I started with my estimate of what she would be earning

21 now if she was still employed by the City of Oakland.  That

22 figure in current dollars in 2015 is $166,942 per year.

23     I reduced that by the 8 percent pension obligation,

24 because I was dealing with a pension separately, which we'll

25 talk about.  And I reduced it further by what she is currently

834

1    earning in San Francisco, which is $137,644, reduced by 11 and

2    a half percent for that pension plan.

3        I did not make any assumptions that there were any further

4    promotions, either in Oakland or in San Francisco; but that

5    both of those positions would have increases consistent with

6    the average increases of U.S. workers.

7        And then I reduced that difference to present value, and

8    came up with the number that I've indicated.

9    **Q.**   What do you mean when you say you reduced the figures to

10   present value?

11   **A.**   So when economists are asked to make calculations of an

12   individual's loss for a period in the future -- so the loss

13   hasn't been incurred yet.  The past loss has been incurred.

14   And those numbers are just what they are.  In the future, the

15   loss hasn't been incurred yet.  And when -- when we are asked

16   to make these calculations in a legal setting such as this one,

17   we're asked not to calculate just what the full value of that

18   loss is, but how much would be needed today so that, were

19   Ms. Preston to be awarded the losses, for example, as I've

20   calculated it, she could take that money -- the future part of

21   it -- and she could invest it in a safe, risk-free investment.

22   And through a combination of the principal that she invested

23   and the interest that she earned on it, she could withdraw in

24   each year the amount of her loss, and compensate herself.  And

25   at the end of that loss period, there'd be nothing left.

1      So for economists to do that, there are two kinds of

2   assumptions we need to make.

3      One is:  What is a reasonable rate of return in a safe,

4   risk-free investment?

5      And the second is:  Since we're talking about these losses

6   in 2015 dollars, and we all hope to get at least cost-of-living

7   increases in our employment as -- as we continue to be employed

8   in the future, there is some kind of growth rate that would be

9   reasonable to take into account of how that loss might

10  increase.

11     So what I do -- what most economists do is, instead of

12  coming up with a particular interest rate and a particular

13  growth rate, we look historically at how interest rates and

14  growth rates for compensation of U.S. workers has -- has

15  compared over time.  And I look at a historical period.  And

16  what I've learned from it is that, on average, interest rates

17  in safe, risk-free investments have been about 1 percent higher

18  than growth rates for U.S. workers.  So I take into account

19  effectively a net interest rate of 1 percent after you remove

20  the growth from it.

21     I understand that might be a little bit complicated, but

22  that's how I take into account both of those factors.  And the

23  figure that I provide -- the 252,000 figure -- is intended to

24  be an amount that can be invested; that interest will be earned

25  on it that would probably grow, in terms of how much that loss

OGUS - DIRECT / SIEGEL

1  would be, if I really had escalated it in each year between now

2  and her retirement; and that at the end of the period in 2023,

3  if she withdrew her loss in each year, there would be nothing

4  left.

5  **Q.**  Okay.  And just in terms of those two figures, if people

6  are interested, what was your projected interest rate that you

7  used in these calculations?

8  **A.**  That's a good question, because I -- I looked at the

9  averages; the difference between them.  I didn't look

10 particularly at the interest rates, but --

11      And that difference would be --

12      So over that historical period, if I had to recall,

13 because I'll admit I didn't do it specifically for this case,

14 we were probably talking historically about interest rates

15 between 4 and 5 percent higher than they are now, and wage

16 growth that was between 3 and 4 percent.

17      So -- but the important thing is that, because we're

18 looking at that relationship over time, it doesn't matter if

19 the interest rates are high or low.  The question is:  How did

20 it compare to wage growth in each of those, you know, during

21 that historical time?

22 **Q.**  And your calculation on wage growth sounds similar to what

23 your testimony was as to what Ms. Preston's wage growth really

24 was in the past.

25 **A.**  Well, her wage growth was actually -- yeah -- was close to

1  4 percent per year, on average; but to that extent, I'd say

2  it's a coincidence.

3  Q.   All right.

4  A.   She's had a somewhat higher -- during that time period, if

5  you looked at the statistic for the wage increases of U.S.

6  workers, I don't believe it would be as high as 4 percent a

7  year.  So her -- her own experience is probably a little higher

8  than the guideline that I used, but I didn't assume also that

9  it would continue.  And part of that did include a promotion,

10 and I hadn't assumed further promotions.

11 Q.   Okay.  Now you also calculated a figure with respect to

12 her pension.  Is that right?

13 A.   I did.

14 Q.   And what did you calculate in that regard?

15 A.   Well, I can tell you the figure; and if you'd like, I can

16 explain.  We haven't really talked about the pension.

17 Q.   Right.  Let's start with the figure --

18 A.   Okay.

19 Q.   -- and then go to the calculation.

20 A.   The pension loss is $494,640.

21 Q.   And please explain the calculation.

22 A.   So when Ms. Preston was employed by the City of Oakland,

23 she participated in a CalPERS -- California pension retirement

24 system plan that the City of Oakland participated in, which is

25 called, "2.7 percent at 55."  That's the name of the plan.

1    That means that with enough years of service, at the age

2  of 55 you're eligible to receive 2.7 percent of your average

3  compensation.  One year -- the highest year of your earnings --

4  times the years of service, times 2.7 percent.  That's how the

5  CalPERS system calculates her pension.

6    So in her case, this would be the first pension that I

7  calculated.  This is the one she's not going to receive because

8  of her termination.  And she would have had a certain amount of

9  service; I think about 15 years at age 65.  And it would have

10  taken into account her highest year of compensation -- probably

11  the last year -- and worked through that formula.

12    And in doing that formula and those factors, I determined

13  that her pension -- I think I have the figure here.  Well, the

14  total figure -- I don't have the monthly figure.  The total

15  figure is about $85,000 a year, just by that formula:  What she

16  was earning; the years of service; and the 2.7 percent.  And

17  she would start receiving that at age 65.  And it would run

18  through her life expectancy.

19    Instead, she's now working for the City of San Francisco.

20  They have a pension plan, as well.  Their plan is called

21  "2.3 percent at 65."  So it's the same idea.  It's years of

22  service times 2.3 percent times your average final

23  compensation.  For San Francisco, it's the average of your

24  highest three years; not your highest year.  So -- so they

25  average in a few years of compensation.

1      I have determined that if she retires at age 65 from this

2    newer employment, that her pension will initially be about

3    35,000 a year.  And again, that will run through her life

4    expectancy.  So both of those figures have cost-of-living

5    adjustments up to 2 percent a year that -- that are built into

6    the pension once you start receiving it.  And again, both would

7    be reduced to present value.  And that figure I provided was

8    the present-value figure.

9    **Q.**   The 494,000?

10   **A.**   Yes.

11   **Q.**   Now, does that figure have to be adjusted in any way, to

12   take into account what Ms. Preston did with respect to her

13   Oakland pension when she left the City of Oakland?

14   **A.**   It should be, yes.  When she left the City of Oakland, she

15   received a check from the CalPERS system.  She withdrew,

16   essentially, her contributions into the system; those 8 percent

17   contributions.  And she received a payment, I believe, in the

18   order of about 80- or $85,000.  And so the figure that I

19   provided initially -- the 494- -- should be reduced by the fact

20   that that figure is really taking into account that she

21   contributes, and the employer contributes.  And what she was

22   actually able to pull out was -- was this amount:  Her

23   contribution.

24      So what she's received as a result of her termination is

25   the withdrawal of her funds of that amount.  And that would

1  reduce the pension loss to $409,829.

2  **Q.**   So just to sum up, Dr. Ogus, you calculate her past loss

3  as $92,050.  Correct?

4  **A.**   Yes.

5  **Q.**   And the present value of her future wage loss as 252,886?

6  **A.**   Yes.

7  **Q.**   And the present value of her future pension loss as

8  494,640, which should be reduced by her pension pay-out,

9  leaving a future pension loss at 409,821?

10  **A.**   -829.

11           **MR. SIEGEL:**  -829.  Sorry.  Thank you.  I have no

12  further questions.

13           **THE WITNESS:**  Okay.

14           **THE COURT:**  Any cross-examination?

15           **MR. LAFAYETTE:**  Yes, Your Honor.

16                   **CROSS-EXAMINATION**

17  **BY MR. LAFAYETTE**

18  **Q.**   Good afternoon, Dr. Ogus.

19  **A.**   Good afternoon.

20  **Q.**   Seems like we do this at least once a year now.  Huh?

21  **A.**   It's getting to be our anniversary.

22  **Q.**   It is.  You've done this for Mr. Siegel, I think you said,

23  about 12 times?

24  **A.**   Best estimate.

25  **Q.**   And for this case, how much has he paid you?

OGUS - CROSS / LAFAYETTE

1   **A.**   That's a very good question.  And I am not prepared with

2   it.  The last bill was sent last April, and I don't have that

3   information in my file.  I'm sorry.  I can give you a really

4   ballpark estimate, but I don't recall.

5   **Q.**   A ballpark is fine.

6   **A.**   It probably took five to ten hours to do the work.  And I

7   charge at 425 an hour.  So --

8   **Q.**   Okay.

9   **A.**   2- to $4,000.

10  **Q.**   And do you have a different rate for trial?

11  **A.**   I do.

12  **Q.**   And how much do you charge for trial?

13  **A.**   600 per hour.

14  **Q.**   600 per hour for trial.  And do you charge from the moment

15  you leave your house until the moment you reach here?

16  **A.**   Not at that rate; but yes, I charge for my time.

17  **Q.**   So for each one of these cases that you've handled for

18  Mr. Siegel, approximately how much money has he paid you?

19  **A.**   That, I really couldn't answer with any kind of

20  credibility.  I -- I've given you my best guideline for how

21  long it takes to do an analysis.

22  **Q.**   All right.  And so we could just multiply the total of

23  what you've done here by 12, and we'd come out with how much

24  money you've made work withing Mr. Siegel over the last -- I

25  don't know how many years.  Right?

1   **A.**   Well, you'd have to take inflation into account, too.   I

2   didn't charge that much ten years ago or fifteen years ago.

3   **Q.**   All right.   Thank you.   Now, I'm assuming you were hired

4   by Mr. Siegel's office?

5   **A.**   I was.

6   **Q.**   And when Mr. Siegel's office hired you, did you ask him to

7   deliver to you the standard documents that you need when you

8   perform an evaluation like this?

9   **A.**   I do.

10   **Q.**   And so standard, for you, is to request a -- a set of

11   documents with more than two years of wage stubs.   Right?

12   **A.**   I ask for more W-2s than that, yes, or other kinds of

13   information.

14   **Q.**   And so standard for you is to ask for at least six years

15   of wage stubs in order to calculate a -- a trend with regard to

16   how much money a person has been making?

17   **A.**   I have a questionnaire that's a one-size-fits-all.   And

18   it's more important to have that history for some kinds of

19   cases than for others.   When I know an individual's rate of pay

20   in a particular year, and I know how those rates of pay change,

21   then I have reason to believe she doesn't get extra payment, or

22   worked fewer than full-time hours, then that history becomes

23   less critical.

24   **Q.**   Now, you never met with Ms. Preston; did you?

25   **A.**   I did not.

1  **Q.**   You never talked to her; did you?

2  **A.**   No.

3  **Q.**   And so the only communications you've had have been with

4  Mr. Siegel's office.  Correct?

5  **A.**   That's correct.

6  **Q.**   And with Mr. Siegel's office -- they gave you three

7  documents.  Right?

8  **A.**   Three documents?  I'm not sure what your three

9  documents --

10  **Q.**   He gave you a document which reflected her termination

11  date.  Right?

12  **A.**   I believe so.  Yes.  A letter.

13  **Q.**   He gave you a document which showed a personnel action

14  relating to the termination.  Right?

15  **A.**   I'm not sure what document you're referring to.  I have a

16  personnel action with respect to her promotion.

17  **Q.**   Is that document --

18         **MR. SIEGEL:**  Your Honor --

19         **THE COURT:**  Can you speak into the microphone,

20  please, at the jurors' request and mine?

21         **MR. LAFAYETTE:**  Yes, Your Honor.

22  **Q.**   The Personnel Action Record 89 --

23         **THE COURT:**  Same request.  Move it closer --

24         **MR. LAFAYETTE:**  I'll try.

25         **THE COURT:**  -- if you're going to move down.

1  **BY MR. LAFAYETTE**

2  **Q.**   The Personnel Action 896, that was a document --

3  **A.**   Yes, I have that document.  Yes.

4  **Q.**   Okay.  So that was a one-page document?

5  **A.**   That's my understanding.

6  **Q.**   And then you received another one-page document:  912?

7  **A.**   I did.

8  **Q.**   And then you received a -- the termination notice of --

9  which was Document 895?

10 **A.**   I believe I did.

11 **Q.**   Aside from that, Mr. Siegel's office gave you two W-2s

12 from the City of Oakland:  2012 and 2013.  Correct?

13 **A.**   Yes.

14 **Q.**   Then he gave you the wage stub there -- W-2 from the City

15 and County of San Francisco for 2014?

16 **A.**   Yes, he did.  Well, that W-2, yes.

17 **Q.**   Did he give you any documents relating to how much money

18 she was making prior to her promotion in 2012?

19 **A.**   The document that you indicated that was Number 912 showed

20 the progression in her rates of pay prior to her promotion, so

21 that would have told me what she was making.

22 **Q.**   Okay.  Now, in terms of your assumptions from CalPERS, did

23 you get her 1099 for 2014?

24 **A.**   I did.

25 **Q.**   Did you get any other documents relating to CalPERS, other

1   than that?

2   **A.**   I have a document that shows her account summary as of

3   June 30th, 2012, which shows her years of service.

4   **Q.**   When did you get that?

5   **A.**   Sometime before April 1st 2015.

6   **Q.**   Does that document detail how much money she gets from

7   CalPERS?

8   **A.**   No.

9   **Q.**   Do you have any document that details how much money she

10  gets from CalPERS?

11  **A.**   My understanding is that she's not getting money from

12  CalPERS; that she withdrew money from CalPERS.

13  **Q.**   Did you get any documents which show how much money she

14  received from CalPERS?

15  **A.**   That she received from CalPERS?

16  **Q.**   That she will receive from CalPERS.

17  **A.**   It's my understanding that she will not receive money from

18  CalPERS, because she withdrew the balance of her account at the

19  time of her termination.

20  **Q.**   And so if she had not withdrawn the balance of her account

21  at the point of termination, did you receive any documents that

22  would indicate how much money she would have received?

23  **A.**   No.  It can be calculated --

24  **Q.**   Did you do a calculation as to how much money she would

25  have received, had she not withdrawn her money from CalPERS?

1  **A.**    I did not.

2  **Q.**    Did you make any determination as to -- did you do

3  anything to determine whether or not she rolled that money into

4  some other retirement plan?

5  **A.**    I don't know what she did with the money when it was

6  withdrawn.

7  **Q.**    So would it be accurate that you don't know, as you sit

8  here right now, if she rolled that money into another

9  retirement plan which would fund her retirement when she turns

10  age 65?

11  **A.**    That's correct.

12  **Q.**    And if she had done that, would that be something that you

13  would want to know for purposes of your calculations?

14  **A.**    If it's going to enhance some pension that she's eligible

15  to receive, then it would impact her pension loss.

16  **Q.**    And it would impact her pension loss by bringing it down.

17  Right?

18  **A.**    If she's going to be able to earn more than I have

19  calculated she's going to be able to earn; but that presumes

20  that the years of service and the ability to take advantage of

21  that could be rolled into another plan.  Credited service.

22  **Q.**    The only thing I'm asking is:  If she took the money and

23  put it in a pension plan, whatever the plan may be, it would

24  theoretically pay something.  Right?

25  **A.**    Well, my understanding is you can't roll the funds into a

1  pension plan, unless that pension plan is willing to accept it.

2      I know that her San Francisco plan -- I saw a statement.

3  And it does not include years of service in Oakland.  So I

4  don't believe it was rolled into that.

5      The only thing I believe you can do with those funds would

6  be to put them in a rollover IRA and earn some interest on

7  them, but not earn a pension.

8  **Q.**  Well, maybe my terminology is wrong.  She could have

9  taken -- you don't know to what extent she took the money and

10  put it in some type of investment vehicle for purposes of her

11  retirement.  Right?

12  **A.**  I don't know if she rolled it over, or if she needed to

13  use the funds.  That's correct.

14  **Q.**  And so if she had rolled it over into one of these

15  vehicles, theoretically, it would be paying something that you

16  would want to look at for purposes of evaluating her pension

17  loss.  Right?

18  **A.**  To the extent that there's some interest earned which then

19  gets reduced to present value by the ability to earn interest

20  on it, I have taken into account the amount that was rolled

21  over.  I haven't considered what it might earn up to the point

22  that she would start withdrawing it for her own use, if she

23  hasn't already spent it.

24  **Q.**  Now, did you get any documents which showed how much she

25  would actually receive as a result of the San Francisco pension

1  plan?

2  **A.**   I haven't seen any estimates.  I simply have the formula.

3  **Q.**   Okay.  So you calculated her pension-plan loss by using

4  numbers that you did not get from the San Francisco pension

5  plan, and by not taking into consideration the possibility that

6  she rolled this money over into some other retirement program.

7  Right?

8  **A.**   I'm not aware that the San Francisco pension plan has

9  provided her with an estimate of her expected pension at

10  retirement.  The best that can happen is to -- is for them or

11  for me to use the terms of their formula, and calculate what

12  the pension might be.  And that's what I've done.

13  **Q.**   So now did you make an assumption that at the City of

14  Oakland she would get salary increases?

15  **A.**   I made an assumption with respect to 2014 and 2015.  And

16  after that, I simply included it in the reduction to present

17  value.

18  **Q.**   Did you ever ask the City of Oakland to provide you with

19  information as to whether or not there would be such salary

20  increases for her?

21  **A.**   I did not.

22  **Q.**   Did you get data from the City of Oakland explaining

23  whether or not non-bargaining-unit employees were getting any

24  type of increases since 2013?

25  **A.**   What I did get from the City of Oakland website was the

1  range of salary for her position, which showed that what she

2  was earning was somewhat above the midpoint of the salary

3  range, which meant that there was opportunity, even without

4  changes in the salary schedule, for her salary to increase.

5  **Q.**  So --

6  **A.**  So I did assume that the opportunity for it to increase

7  and move closer to the end of the range would be an opportunity

8  in those two years.

9  **Q.**  So did you make an assumption that, because she wasn't at

10  the max point with regard to that position, that she would

11  automatically be getting salary increases at 3 percent?

12  **A.**  I didn't assume it was automatic.  I looked at her salary

13  history which, as I've described, in the last three years of

14  her employment ranged from 5 percent to 9.8 percent, and over

15  her whole employment was at 3.9 percent per year.  And I

16  reduced that to 3 percent and assumed that, yes, that 3 percent

17  was a reasonable guideline for those 2 years of increases.

18  **Q.**  And if your assumption were wrong, would that have any

19  impact on your analysis?

20  **A.**  It would.  It would reduce what I have assumed about what

21  her rate of pay with the City of Oakland would be.  And

22  therefore, if it was lower than I have assumed, going forward

23  the past loss and the future loss might be lower than what I

24  have computed.

25  **Q.**  Now, she received a salary increase at the City and County

1  of San Francisco since she's been there?

2  **A.**   Yes, she has.

3  **Q.**   Do you recall how much the salary increase was that she

4  had received?

5  **A.**   I can calculate it.  I don't think I have.

6  **Q.**   Well.  Could you do it for us?

7  **A.**   Yeah.  I didn't know if you wanted me to.

8  **Q.**   I'll ask it this way.  Maybe it's quicker.

9  **A.**   Okay.

10 **Q.**   Do you recall how much she was making when she started

11 there per year?

12 **A.**   That's a good question, because I relied on her W-2.  I --

13 I believe the increase was in the order of about one and a

14 half percent.  Might have been a little bit -- a little bit

15 higher.

16 **Q.**   One and a half percent?

17 **A.**   I don't have in front of me her rate of pay at the date of

18 hire.  I do have her current rate of pay in front of me.

19 **Q.**   What's her current rate of pay?

20 **A.**   It's $66.00.  66.175 per hour.

21 **Q.**   What's her annual pay?

22 **A.**   Her annual pay is 137,644.

23 **Q.**   Didn't you report her as making $104,000 a year in 2014?

24 And so what you're now saying is she's making approximately

25 $30,000 more a year?

1  **A.**   Well, first of all, I believe she started her employment

2  sometime in January:  January 20th, 2014.  So the 104,000 was

3  not a full year of salary.  And I don't know how their -- their

4  pay schedule works; whether they're --

5      The W-2 might not reflect the exact period of time,

6  depending on how payroll happens; but it would have been

7  11-point-something months of earnings.  So it was higher.  Her

8  rate of pay was higher than 104-.

9  **Q.**   Whatever it was, did you calculate out, going into the

10  future, that her rate of pay would increase at that same rate

11  until the date of retiring?

12  **A.**   I did not.

13  **Q.**   And if you had done that calculation, would it have

14  adversely -- would it have effected your calculation?

15  **A.**   It would have.

16  **Q.**   And would it have decreased the amount of -- the number

17  that you offered to us today?

18  **A.**   It would have.

19  **Q.**   It seems to me --

20      Well, no.

21      Would it be accurate that in each instance where there was

22  an opportunity to find a number that would reduce the amount of

23  damages, you made the assumption to go in a different

24  direction?

25  **A.**   I disagree.  And I can explain why.

1        With respect to this discussion of her earnings in

2   San Francisco, I have asked whether there was reason to believe

3   that there was an imminent promotion that would cause her to

4   have an increase in her pay, above and beyond the kinds of

5   increases that U.S. workers that I've taken into account.  And

6   I was told -- and I have no further information -- that -- that

7   what she's earning is a reasonable basis for projecting

8   forward.

9        Getting the kinds of increases that she might have had

10  between when she first became employed and the current job

11  she's in would probably raise my estimate of what she would

12  earn, but I don't have information that suggests that that

13  opportunity to earn at that rate of growth is available to her

14  at this time.  So I was working on what she's actually earning;

15  both what I estimated she would have been earning in Oakland,

16  and what she's actually earning in San Francisco.  And that's

17  what I used.  And as I grew both of those salaries in the

18  future using the net discount rate, I grew them at the same

19  rate.

20  Q.   With whom did you speak to get this --

21       You said you asked someone something.  Who did you ask?

22  A.   It would have been Ms. Preston's counsel.

23  Q.   Mr. Siegel?

24  A.   Or Ms. Mehta.

25  Q.   So Mr. Siegel or Ms. Mehta are the ones who told you that

1  it was reasonable to take the number that you did.  Right?

2  **A.**   That's correct.

3  **Q.**   Has that ever come up for you in any of your other cases?

4  **A.**   It comes up very often.  And there's -- there's a certain

5  amount of information about which I do not have an opinion, and

6  I need to rely on the testimony of others.

7  **Q.**   In court, have any Courts ever commented on you just

8  taking the assumptions of plaintiff's counsel for purposes of

9  you making these calculations?

10 **A.**   On one occasion in 30 years.

11 **Q.**   On one occasion?  And was it in this building?

12 **A.**   It was in this court.  Yes.

13 **Q.**   It was in this court.  And were you told that that was not

14 an appropriate thing do?

15 **A.**   I was.  And I was not provided with alternative

16 information to rely upon.

17        **MR. LAFAYETTE:**  All right.  No further questions,

18 Your Honor.

19        **THE COURT:**  Mr. Siegel, do you have any further

20 examination?

21        **MR. SIEGEL:**  Yeah.

22                **REDIRECT EXAMINATION**

23 BY MR. SIEGEL

24 **Q.**   Dr. Ogus, I just want to clear up a couple of things.

25        If I can have marked, Your Honor, as Plaintiff's 49 --

1        THE COURT:  If you can mark what as Exhibit 49?

2        MR. SIEGEL:  This document that I have in my hand.

3        THE COURT:  What is it?

4        MR. SIEGEL:  It is her -- Dr. Ogus' spreadsheets that

5   were part of her expert-witness report that was submitted to

6   the Court and counsel.

7        THE COURT:  Why, on redirect, are you bringing up

8   documents that could have been cross-examined?

9        MR. SIEGEL:  Well, they're in response to the

10  cross-examination.

11       MR. LAFAYETTE:  I object.  They should have been part

12  of the case-in-chief.  They should be on the Exhibit List.

13       THE COURT:  Why aren't they on the Exhibit List?

14       MR. SIEGEL:  Because they were attached to the Expert

15  Report, which was also part of the plaintiff's submission to

16  you in our pretrial proceedings.  It was on one list rather

17  than the other.

18       THE COURT:  What is the Defense intention as to your

19  expert?

20       MR. LAFAYETTE:  I'm sorry, Your Honor?

21       THE COURT:  As to your expert, are you going to wish

22  to bring in these; equivalent charts?

23       MR. LAFAYETTE:  I have an expert.  I'm not bringing

24  in any reports; anything like this.  They would have been on

25  the Exhibit List.

1      **MR. SIEGEL:**  I will not offer it.  I will simply --

2      Let me just clarify a couple of things.

3          **THE COURT:**  The objection's sustained.

4      Go ahead.

5          **MR. SIEGEL:**  All right.

6  **BY MR. SIEGEL**

7  **Q.**   When you calculated your figure for future wage growth

8  that you used as part of calculating the net discount rate, was

9  the number you used a number that was less than the wage

10  increases that Ms. Preston actually received at the City of

11  Oakland?

12  **A.**   Let me make sure I understand the question.  Are you

13  talking about the assumptions I made in the past, or the ones

14  that got built into the reduction to present value?

15  **Q.**   The ones that were built into the reduction to present

16  value.

17  **A.**   I would say historically the increases of the U.S.

18  workers -- the data that I used, which is published by the U.S.

19  Government, over the time period that I reviewed, which is the

20  last 20 years, would have, on average, been lower than her

21  experience between 2007 and -- and her termination.  I -- I

22  can't tell you specifically for that particular time period,

23  but -- actually, I can.  They had been lower during that time

24  period:  Since 2007.

25  **Q.**   So responding, though, to Mr. Lafayette's questions, if

1   you had used Ms. Preston's actual annual wage growths instead

2   of the average workers' wage growth, would your estimate of her

3   loss been greater or lesser than -- than it was?

4   A.   It would have been greater, because I would have built in

5   higher growth in the City of Oakland; but for the same reason

6   that I didn't build in the one year of increase in

7   San Francisco from when she was hired to what she's earning

8   now, I also would not have thought it was appropriate to use

9   that as a guideline going forward.  And that's why I used the

10  net discount rate that I use.

11  Q.   And turning to that question, Mr. Lafayette asked you why

12  you didn't calculate the same rate of wage growth in

13  San Francisco that Ms. Preston received in 2014.  Correct?

14  A.   That's correct.

15  Q.   And the data you received showed that she got a salary

16  increase of about $30,000 in 2014, between the beginning of the

17  year and the end of the year.

18  A.   I'm afraid I don't have in front of me exactly how much it

19  is, but if -- if you -- you know, so -- so I'm not sure.  I

20  don't -- it could be in that order.  I just don't -- am not

21  prepared with that rate.

22  Q.   Okay.  Would it have made sense for you to assume that she

23  would have her salary increase by $30,000 each year that she

24  worked for the City and County of San Francisco?

25  A.   No, it wouldn't.  And the fact that it did increase, to

1    me, is not surprising, because often someone comes into a job,

2    especially when they don't have one at the time they're

3    applying, and -- and may make less than they prove themselves

4    to their employer to be worth.

5        So it's not unusual, in my experience in these kinds of

6    cases, that someone who comes in at one rate in the first

7    couple of years might promote to -- to a higher rate, but it

8    doesn't necessarily set a pattern for the future; similar to

9    the fact that she had the promotion after a few years in

10   Oakland.  I would not use that experience as a basis for

11   projecting either of those wages ahead, either continued

12   promotions in Oakland or continued promotions in San Francisco.

13       And the best information that I had was what she was

14   earning; what she is earning right now; and what, by my best

15   estimate, she would be earning in Oakland.  And there are no

16   promotions built into either of those.

17   **Q.**   Okay.  Now, you were also asked about the pension formula

18   for Oakland and San Francisco pension programs?

19   **A.**   Yes, I was.

20   **Q.**   Correct?

21       Are those figures -- 2.7 at 65; 2.0 at 65 -- are those

22   publicly available information?

23   **A.**   They are.  And the defense economist made his

24   calculations, as well, of those pensions; I assume using the

25   same formulas.

1  **Q.**   Okay.   Are -- in your opinion, are those formulas subject

2  to any reasonable doubt by economists doing this sort of work

3  that you're doing?

4           **MR. LAFAYETTE:**   Objection.   Outside the scope.

5           **THE COURT:**   One moment.

6      Sustained.

7  **BY MR. SIEGEL**

8  **Q.**   Do you know of opinions regarding pension growth or

9  pension eligibility that use different calculations for those

10 two pension plans than the ones you used?

11          **MR. LAFAYETTE:**   Objection.   Outside the scope.

12          **THE COURT:**   Sustained.

13 **BY MR. SIEGEL**

14 **Q.**   In calculating Ms. Preston's pension loss, when you

15 calculated the pension she would have received if she had not

16 been fired in Oakland -- without being terminated in Oakland --

17 did you calculate it based upon the assumption that she did not

18 withdraw her pension contributions?

19          **MR. LAFAYETTE:**   Objection.   Cumulative.

20          **THE COURT:**   Overruled.

21     But this is a redirect; not a redo.

22          **MR. SIEGEL:**   Right.   Understood.

23          **THE WITNESS:**   I assumed she would not have withdrawn

24 her funds had she continued to be employed, and would have

25 participated in the pension plan at her retirement.

1          **MR. SIEGEL:**  Right.  Okay.  Thank you.

2          **THE COURT:**  Ladies and gentlemen, we're going to take

3    a break now for you to ask any questions that you wish to.

4          For Dr. Ogus, as with any expert witness, she's been

5    allowed to testify about topics that she is an expert on, based

6    on her skills and experience.  There are some special rules

7    that apply to that testimony which require disclosure of that

8    expert opinion before trial.  Therefore, you might have

9    questions you'd like to ask her that I'm not going to allow her

10   to answer; and that's because the Defense will not have had an

11   opportunity to inquire into those views before the trial.  So

12   for this type of a witness, it may be that you have questions

13   you'd like to have answered that, for reasons of not having

14   surprise during trial, I will exclude.  So I wanted to alert

15   you to that particular evidentiary rule for expert witnesses.

16        So we'll come back in five minutes.  Thank you.

17   (Proceedings were heard outside the presence of the jury:)

18          **THE COURT:**  And you may step down if you wish to.

19          **THE WITNESS:**  You're going to want me here.

20          **THE COURT:**  Back on the record.  Jurors are not

21   present.

22        To elaborate on proposed Document 49, before trial --

23          **MR. SIEGEL:**  Yes, Your Honor.

24          **THE COURT:**  -- I made clear that any exhibits needed

25   to be identified.  There were -- there was -- both parties

1    submitted proposed Exhibit Lists.  At the beginning of the week

2    I excluded documents that the Defense had not identified on its

3    Exhibit List in a timely way, and that's one of the bases for

4    excluding proposed Document 49.

5        A second independent reason is:  An expert, in particular,

6    called by a party -- it's known what the scope of your

7    examination's going to be.  I don't think anything Dr. Ogus

8    said was a surprise.  So if you wish to get in her reports or

9    some part of it, the proper time would have been on direct

10   examination, not after cross-examination, because that

11   multiplies the proceedings at least 2X.  And the proceedings

12   don't need to be elongated any more than is necessary.

13       So if you have a document that you want to bring in -- for

14   the witness that you are in control of, then bring it in in the

15   beginning, so that that witness can be cross-examined.  It goes

16   both ways.

17       Back in five minutes.

18           **MR. LAFAYETTE:**  Thank you, Your Honor.

19   (Recess taken from 1:47 p.m. until 1:56 p..m.)

20   (Proceedings were heard in the presence of the jury:)

21           **THE COURT:**  First question which we'll identify as

22   Question Number 14:  Is there reciprocity between the CalPERS

23   pension system and the City and County of San Francisco pension

24   system?  And if so, was that calculation performed assuming

25   Ms. Preston redeposited her funds?

**PROCEEDINGS**

1      I'll read it all again, just to make sure you got it all.

2      Is there are reciprocity between CalPERS' pension system

3 and the City and County of San Francisco pension system?  And

4 if so, was that calculation performed assuming Ms. Preston

5 redeposited her funds?

6           **THE WITNESS:**  I am not aware of there being

7 reciprocity.

8      What I can tell you is that she received a statement from

9 the San Francisco retirement system, showing her years of

10 service as of 6/30/14.  So it would have been about six months

11 into her employment, and -- and actually showed her membership

12 date.  And what it showed was that the credited years of

13 service that she was given was about half a year, which would

14 be about the length of her employment.

15      So had there been reciprocity, I would have expected that

16 this statement would have reflected the additional years of

17 service that the reciprocity would have allowed, and it's not

18 on there.  Beyond that, I don't have any further information.

19           **THE COURT:**  Next question.  Did you include the

20 difference in costs regarding transportation; i.e., gas, bridge

21 fare, parking?

22           **THE WITNESS:**  I did not.  And to the extent that it

23 costs her more to commute to San Francisco, that's an

24 out-of-pocket expense to her, but it has not been included in

25 the calculations.

OGUS - RECROSS / LAFAYETTE

1      **THE COURT:**  Thank you.  Mr. Siegel, any further

2  follow-up on the jury's questions?

3      **MR. SIEGEL:**  No, Your Honor.

4      **THE COURT:**  So any further follow-up on those

5  questions?

6      **MR. LAFAYETTE:**  I don't have.  Not on those

7  questions, Your Honor.

8      **THE COURT:**  All right.  Did you have a further

9  examination?

10     **MR. LAFAYETTE:**  Just one question, Your Honor.  I

11  think it's one going to be one.

12                    <u>**RECROSS-EXAMINATION**</u>

13  **BY MR. LAFAYETTE**

14  **Q.**   That document that you said you got from -- that

15  Mr. Siegel's office provided -- I think it was 10982.  Bates

16  stamped 912.

17  **A.**   Yes.

18  **Q.**   That's only a document that shows her income in 2009 and

19  '8.  Right?

20  **A.**   The document that I'm looking at, which is from the City

21  of Oakland, shows the rate -- shows in the middle of the page

22  her current salary; but below that it shows her salary history

23  from the point of first employment.

24  **Q.**   And the current salary was for 2009?

25  **A.**   July 30th, 2009.  Yes.

1          MR. LAFAYETTE:  Thank you.  That's it, Your Honor.

2          THE COURT:  All right.  You may step down.  Thank you

3  very much.

4          THE WITNESS:  Okay.

5          THE COURT:  And Ms. Preston will call her next

6  witness, please.

7          MR. SIEGEL:  Great.  We call Lamont Ewell.

8          THE COURT:  Mr. Ewell, come on forward.  Watch your

9  step as you go up the stairs here.

10          THE WITNESS:  Thank you, sir.

11          THE COURT:  Swear you in.

12          THE CLERK:  Please raise your right hand.

13                    **PHILIP LAMONT EWELL**,

14  called as a witness for the Plaintiff, having been duly sworn,

15  testified as follows:

16          THE WITNESS:  I do.

17          THE CLERK:  Please be seated.  State your full name

18  for the record, and spell your last name, please.

19          THE WITNESS:  Yes.  It's Philip Lamont Ewell.  Last

20  name E-w-e-l-l.

21                    **DIRECT EXAMINATION**

22  BY MR. SIEGEL

23  Q.  Okay.  And, Mr. Ewell, are you presently employed?

24  A.  No, sir.

25  Q.  And where do you presently live?

 1  A.    In southern California.

 2  Q.    Okay.  And did you come up here today to testify in this

 3  case?

 4  A.    Yes, sir.

 5  Q.    Okay.  Now, Mr. Ewell, have you ever been an employee of

 6  the City of Oakland?

 7  A.    Yes, I have.

 8          THE COURT:  Mr. Ewell, can I have you pull the

 9  microphone just a little closer?  Make sure the jury can hear

10  you.  There you go.  Thank you.

11  BY MR. SIEGEL

12  Q.    Okay.  And when were you first an employee of the City of

13  Oakland?

14  A.    In October of 1991.

15  Q.    And how long were you employed, beginning in October of

16  1991?

17  A.    Until the end of June 1997.

18  Q.    And during that period of time, what position or positions

19  did you have?

20  A.    I was hired as the City's Fire Chief, which began in 1991.

21  And approximately four years after that, I was appointed as the

22  Deputy City Manager.  From there, the Assistant City Manager.

23  Q.    And after 1997, where did you go to work?

24  A.    I went to work for the City of Durham, North Carolina, as

25  the City Manager.

1  Q.   And after that?

2  A.   I left in 2001 -- or at the end of 2000.  And I began as

3  the Assistant City Manager for the City of San Diego in 2001.

4  Q.   And did you receive a promotion while you were at

5  San Diego?

6  A.   Yes.  I was appointed as the City Manager of the City of

7  San Diego in 2004.

8  Q.   And after leaving that position, did you move to another

9  city?

10  A.   Yes, sir.  In 2006 I became the City Manager of the City

11  of Santa Monica, California.

12  Q.   How long did you serve in that position?

13  A.   Approximately four years, before I decided to retire.

14  Q.   And after you retired from your position in Santa Monica,

15  did you have occasion to work again in Oakland?

16  A.   Yes, I did.

17  Q.   And when was that?

18  A.   I believe sometime in 2011.

19  Q.   And what did you do in Oakland in 2011?

20  A.   I was asked to come and serve as the Interim City

21  Administrator, until they identified and appointed someone to

22  that position.

23  Q.   Okay.  So in 2011, who was it who asked you to be the

24  Interim City Administrator in Oakland?

25  A.   That would be Mayor Jean Quan.

1  Q.   And approximately how long after you started was a

2  full-time or regular City Administrator appointed?

3  A.   I'd say within the four- or five-month period that I was

4  here, toward the back end.

5  Q.   Okay.  And who was the person who was appointed?

6  A.   Ms. Deanna Santana.

7  Q.   Did you have anything to do in suggesting that Ms. Santana

8  become the City Administrator in Oakland?

9  A.   I recommended her.  Yes.

10  Q.   And to whom did you recommend her?

11  A.   To Ms. Quan, and to the appointed interview panel.

12  Q.   Okay.  And had you worked with Ms. Santana previous to

13  2011?

14  A.   Yes, I did.

15  Q.   And when was that?

16  A.   During the early '90s she was a management assistant, and

17  working directly with me.

18  Q.   When you were with Oakland?

19  A.   Yes.

20  Q.   Okay.

21  A.   Yes.

22  Q.   And had you worked with her in any other place?

23  A.   No, sir.

24  Q.   Had you stayed in touch with her?

25  A.   Periodically, yes.

1  Q.   Okay.  Now, was there yet another time after you had acted

2  as Interim City Manager in Oakland that you returned to Oakland

3  to help out as an employee of the City, or a consultant to the

4  City?

5  A.   Yes.

6  Q.   And what was that, sir?

7  A.   That was in -- forgive me, because I'm just not clear on

8  the -- on the years or the months, but I think in the year

9  2012.

10  Q.   Okay.  And what was it that you did in the year 2012?

11  A.   I was asked to come up and assist with labor negotiations.

12  Q.   And who asked you do that?

13  A.   Originally, Ms. Santana asked.  And -- and then it was

14  followed up by Ms. Quan.

15  Q.   And did you agree to do that?

16  A.   Initially, no.  I had declined, and thanked Ms. Santana

17  for the offer, but said that I thought that I was done.

18  Q.   Okay.  If you could perhaps pull the microphone over a

19  little closer, to make sure everyone can hear you.  Thank you.

20       So after Mayor Quan called you, did you relent, and come

21  back to Oakland to work?

22  A.   After quite a bit of back and forth, yes, I said that I

23  would.  If she and Ms. Santana discussed it and agreed, then I

24  would come back.

25  Q.   And for approximately how long did you return?

1  A.   Not very long.  I don't remember in time, but no more than

2  a couple of months.  Two or three months, at the most.

3  Q.   Did you actually assist in bargaining when you returned to

4  Oakland?

5  A.   Yes.

6  Q.   And any particular contracts?

7  A.   We were -- and I don't remember each of the names.  SEIU

8  was up for renegotiations.  Police and Fire.  And there were a

9  couple of others.  I just don't remember the bargaining units.

10 Q.   And when you were doing that work with the City of

11 Oakland, with -- who were the staff people with whom you

12 worked?

13 A.   Directly with Ms. Preston.  And periodically I would

14 consult with the Mayor's Office, but working directly with

15 Ms. Santana.

16 Q.   Okay.  In terms of working with Ms. Preston, had you

17 worked with her previously?

18 A.   You know, I -- the answer is I don't believe so.

19      During the deposition, I thought I remembered her in

20 the -- in the late 1997 before I left, but upon reflection,

21 after the deposition, I recall meeting her for the first time

22 coming back in 2011.

23 Q.   Okay.  And how did you find it working with Ms. Preston

24 when you were working on these contracts?

25          MR. LAFAYETTE:  Objection.  Relevancy.

 1            THE COURT:  Sustained.

 2        Can you focus in on what aspect you're asking about?

 3   BY MR. SIEGEL

 4   Q.    Okay.  Did you actually observe Ms. Preston participate in

 5   labor negotiations with you?

 6   A.    Yes, sir.

 7   Q.    And what did you observe in that regard?

 8   A.    Well, we assigned ourselves to different responsibilities

 9   and different labor groups.  And we would meet following some

10   of those table discussions.  We would meet, and decompress, and

11   share thoughts and ideas.  So I -- I worked very closely with

12   her.

13   Q.    And what did you observe with respect to her knowledge

14   with respect to the field of labor negotiations?

15            MR. LAFAYETTE:  Objection.  Relevancy.

16            THE COURT:  Overruled.

17            THE WITNESS:  That she was very knowledgeable in her

18   field, and was up to date on all of the labor laws as we

19   anticipated going through certain reviews.

20   BY MR. SIEGEL

21   Q.    Did you receive feedback from representatives of the

22   various unions regarding Ms. Preston's job performance?

23            MR. LAFAYETTE:  Objection.  Relevancy.

24            THE COURT:  Overruled.

25            THE WITNESS:  Occasionally, yes.

EWELL - DIRECT / SIEGEL

1  BY MR. SIEGEL

2  Q.   And what sort of feedback did you receive?

3  A.   For the most part, that she was very tough, and sometimes

4  could be difficult; but that she was quite knowledgeable.

5  Q.   Did you observe as to whether there were respectful

6  relationships between Ms. Preston and the unions?

7  A.   Based on my observation, because of --

8        MR. LAFAYETTE:  Objection.  Relevancy.  Calls for

9  speculation.  Opinion.

10        THE COURT:  Objection to speculation is sustained.

11  And it's also vague.

12    Can you be more precise about what you're asking about?

13        MR. SIEGEL:  Okay.

14  Q.   Did you observe Ms. Preston interacting with

15  representatives of the labor organizations?

16  A.   Yes.

17  Q.   And in those observations, were you able to determine

18  whether the unions treated Ms. Preston with respect?

19  A.   Yes.

20        MR. LAFAYETTE:  Objection.

21        THE WITNESS:  Oh, sorry.

22        MR. LAFAYETTE:  Relevancy.

23        THE COURT:  Overruled.

24  BY MR. SIEGEL

25  Q.   And did you observe as to whether there were disagreements

EWELL - DIRECT / SIEGEL

1  you have?

2  (Reporter requests clarification.)

3          **THE COURT:**  I just heard, "Oh, sorry."  Is that the

4  question you're referring to?

5      I think the question was:  In these observations, were you

6  able to determine whether the unions treated Ms. Preston with

7  respect?

8          **THE WITNESS:**  The answer is "Yes."

9  **BY MR. SIEGEL**

10  **Q.**   And the next question is:  Did you observe disagreements

11  between Ms. Preston and representatives of the labor

12  organizations?

13  **A.**   Yes.

14  **Q.**   And were those professional disagreements, or personal

15  disagreements, or something else?

16  **A.**   In my presence, they were always professional; never

17  personal.

18  **Q.**   Did you and Ms. Preston meet together with Ms. Santana to

19  discuss what the plans were, in terms of approaching and

20  dealing with the labor organizations?

21  **A.**   Yes.

22  **Q.**   And following those meetings, did you have an opportunity

23  to observe whether Ms. Preston followed Ms. Santana's

24  directions?

25  **A.**   During the meetings that we held with Ms. Santana, yes, to

1   the best of my knowledge.  The answer is "Yes."

2   Q.   Were you involved -- I think you said you were involved

3   with negotiations with the Firefighters Union, which is

4   Local 55.  Correct?

5   A.   Yes, sir.

6   Q.   And during those negotiations, did you hear complaints

7   from the representatives of Local 55 regarding Ms. Preston?

8   A.   On a couple of occasions, yes.

9   Q.   And what was the nature of those complaints?

10  A.   The first was a lack of follow-up on particular items that

11  were still left to be done.  And I don't recall specifically

12  what they were.

13       And the same as I stated earlier; that periodically,

14  they'd say that she was tough.

15  Q.   Okay.  Were you present and did you participate in

16  negotiations having to do with the return of some of the

17  concessions that the unions had made a few years earlier, due

18  to economic problems?

19  A.   That -- if we're referring to the year 2011, yes.  That

20  was during the first -- that was when I first came back:  In

21  2011.  And so we had to negotiate with labor.  And Local 55 was

22  one of those.

23  Q.   Okay.  And that was over concessions?

24  A.   Yes, sir.

25  Q.   And were you present going into that later period, where

1    there was conversation of returning some of the concessions to

2    the unions?

3    **A.**    If I understand you correctly, yes.

4    **Q.**    And did those conversations involve, at least in part,

5    returning to the unions furlough days that they had previously

6    conceded?

7    **A.**    That was part of the discussion, yes.

8    **Q.**    Could you just briefly explain to everyone what you mean

9    or what we mean by "furlough days that had been previously

10   conceded"?

11   **A.**    And you'll have to forgive me.  I'm going to be general

12   and vague because I don't remember all of this now, but there

13   were -- there were days or a dollar amount that we needed to

14   try and capture to help with balancing the budget.  And those

15   furlough days were days given back to the City with no pay, so

16   that we could reduce the -- their costs:  The employee costs.

17   And they became furlough days.

18   **Q.**    So employees were given compulsory days off for which they

19   were not paid?

20   **A.**    That's correct.

21   **Q.**    And that's one of the ways in which the City balanced the

22   budget?

23   **A.**    Yes.

24   **Q.**    But going back to the time when you returned at the end of

25   2012, was there a discussion about how to return some of those

**EWELL - DIRECT / SIEGEL**

1  days that had been furloughed back to the bargaining units?

2  **A.**   There was a discussion about whether or not they should be

3  returned; and if so, how many.  Yes.

4  **Q.**   Do you recall if there were any issues that arose

5  regarding how to fix a dollar value to the furlough days that

6  were being returned?

7            **MR. LAFAYETTE:**  Objection, Your Honor.  This is

8  remote and not relevant.

9            **THE COURT:**  You're moving to something relevant, I'm

10  hoping; or what's the probative value?

11            **MR. SIEGEL:**  Well, Your Honor, my understanding from

12  previous questioning of the plaintiff was that the Defense was

13  criticizing Ms. Preston because of this very issue.  And that's

14  why it's relevant, is Defense has made it an issue.

15       So if we're not going to make it an issue, I suppose --

16            **THE COURT:**  All right.  Let's move along.  Keep

17  going.

18            **MR. SIEGEL:**  Okay.

19            **THE COURT:**  Overruled.

20  **BY MR. SIEGEL**

21  **Q.**   All right.  So were there problems in cal -- in figuring

22  out how to calculate the value of the furlough days that were

23  being returned?

24  **A.**   Yes.  There were some discrepancies or some questions

25  about whether or not it was valid -- the methodology was valid.

EWELL - DIRECT / SIEGEL

1   **Q.**   Okay.  And in acting as a labor negotiator, from what

2   office in the City did you obtain the data that would be used

3   to figure out the value of the furlough days that were being

4   returned?

5   **A.**   Well, we had someone assigned to us -- I believe her name

6   was Ms. Donna Hom -- who was responsible.  I -- when I came

7   back, I asked to have someone that we could access directly;

8   and to use one person, so that we could have consistency.  And

9   I believe that was Ms. Donna Hom was assigned.

10  **Q.**   And when you were back negotiating these contracts, did

11  you interact at all with Chief Howard Jordan?

12  **A.**   I did briefly, mainly for just catching up as old friends,

13  acquaintances.

14  **Q.**   And in the context of those conversations, did he convey

15  to you any complaints about Ms. Preston's job performance?

16  **A.**   None to me.

17          **MR. LAFAYETTE:**  Objection.  Relevance, Your Honor.

18          **THE WITNESS:**  Sorry.

19          **THE COURT:**  Overruled.

20          **THE WITNESS:**  None.  Not to me, no.

21  **BY MR. SIEGEL**

22  **Q.**   Why was that you -- well, let me ask you this.  Was it

23  your decision to terminate your engagement with the City of

24  Oakland that?

25          **MR. LAFAYETTE:**  Objection.  Relevance, Your Honor.

EWELL - DIRECT / SIEGEL

1  Part of the motions *in limine.*

2      MR. SIEGEL:  Okay.  I didn't quite finish my

3  question, but --

4      THE COURT:  All right.  Let's not have dialogue

5  between counsel.  Is that an objection and response?  What's

6  the purpose of the examination -- this question, Mr. Siegel?

7      MR. SIEGEL:  The purpose of the question and the

8  examination is to elicit from Mr. Ewell what was taking place

9  in the executive ranks of the City of Oakland regarding labor

10  relations at the time he left.

11      MR. LAFAYETTE:  Objection, Your Honor.  That question

12  doesn't go to that issue.

13      THE COURT:  Yeah.  Sustained.

14  BY MR. SIEGEL

15  Q.  Okay.  How did you find the atmosphere in the City of

16  Oakland with respect to labor relations and negotiations during

17  the months you served there at the end of 2012 and early 2013?

18      MR. LAFAYETTE:  Objection.  Vague and ambiguous.

19  Overbroad.

20      THE COURT:  Sustained.

21  BY MR. SIEGEL

22  Q.  Did you have any disagreements with the City Administrator

23  that led to your leaving --

24      MR. LAFAYETTE:  Objection, Your Honor.  It is -- the

25  subject of motions *in limine.*  It is not relevant.  Improper

1    character.

2            **THE COURT:**  The relevance objection is sustained.

3    **BY MR. SIEGEL**

4    **Q.**   During the time that you were there, was there

5    conversation about the concessions that you'd mentioned earlier

6    that were being asked of the union-represented employees?

7            **MR. LAFAYETTE:**  Objection.  Relevancy.

8            **THE COURT:**  Sustained.

9    **BY MR. SIEGEL**

10   **Q.**   Did you have any conversations with LaWanna Preston

11   regarding how it was she was feeling about her treatment at the

12   City of Oakland at the time you were there assisting with labor

13   relations?

14           **MR. LAFAYETTE:**  Another objection of hearsay,

15   Your Honor.

16           **MR. SIEGEL:**  This goes to --

17           **THE COURT:**  Overruled.

18       But the first question is:  Did you have any

19   conversations?

20           **THE WITNESS:**  Yes.

21   **BY MR. SIEGEL**

22   **Q.**   And in those conversations, did she reveal to you how she

23   was feeling emotionally regarding her employment at the City of

24   Oakland?

25           **MR. LAFAYETTE:**  Objection.  Hearsay.

 1          THE COURT:  Sustained.

 2  BY MR. SIEGEL

 3  Q.   As a result of your conversations with Ms. Preston, did

 4  you draw any conclusions regarding whether she was experiencing

 5  emotional distress?

 6          MR. LAFAYETTE:  Objection.  Lack of foundation, and

 7  hearsay.

 8          THE COURT:  Sustained.

 9      You can lay a foundation for whether and when he observed

10  something.

11  BY MR. SIEGEL

12  Q.   Okay.  During the time that you were working in assisting

13  with labor relations at the City of Oakland, before you left

14  did you have occasion to make observations of LaWanna Preston's

15  emotional state, based upon your visual observations of her or

16  based on what you heard her say or present?

17          MR. LAFAYETTE:  Objection.  It's compound with regard

18  to the word "say," and constitutes inadmissible hearsay.

19          THE COURT:  Overruled.

20      I only want you to tell the jury if you had an opportunity

21  to do those things; not what you heard from her.

22          THE WITNESS:  Yes, sir, I did.

23

24

25

1  BY MR. SIEGEL

2  **Q.**   Okay.  And what did you observe in that regard?

3  **A.**   On one occasion, we were wrapping up our debriefing for

4  the day.  And as we got to the back end of our discussion for

5  the evening, she switched --

6           **THE COURT:**  Let's stop there.  I want to hear what

7  you observed; not what she said.  And that's a fine line.

8           **THE WITNESS:**  I observed her crying.

9  BY MR. SIEGEL

10 **Q.**   And based upon what you observed/learned, did that crying

11 have to do with conditions at work?

12          **MR. LAFAYETTE:**  Objection.  It is compound as framed.

13 It's vague, and solicits hearsay testimony.

14          **THE COURT:**  Overruled.

15          **THE WITNESS:**  Could you repeat the question, please?

16 BY MR. SIEGEL

17 **Q.**   When you observed that she was crying, did it appear to

18 you that what she was crying about had to do with what was

19 taking place at work?

20          **MR. LAFAYETTE:**  It also calls for speculation.

21          **THE COURT:**  Mr. Lafayette, you have to object.

22          **MR. LAFAYETTE:**  I'm sorry.  I'm sorry, Your Honor.

23 Objection.  Also calls for speculation.

24          **THE COURT:**  Overruled.

25          **THE WITNESS:**  Yes.

1  BY MR. SIEGEL

2  **Q.**   And what did you observe in that regard?

3          **MR. LAFAYETTE:**  Objection.  He's -- that's previously

4  asked and answered.  It appears to solicit hearsay testimony.

5          **THE COURT:**  Sustained.

6  BY MR. SIEGEL

7  **Q.**   Did you learn at some point after you left the City of

8  Oakland on this last stint of labor relations -- did you learn

9  that Ms. Preston had been fired?

10  **A.**   Yes.

11  **Q.**   And when you learned that, what did you do?

12          **MR. LAFAYETTE:**  Objection.  Relevancy.

13          **THE COURT:**  Overruled.

14          **THE WITNESS:**  I reached out to her.

15  BY MR. SIEGEL

16  **Q.**   Did you speak with her?

17  **A.**   I left a message on her phone message machine.  And

18  sometime later, she called back.

19  **Q.**   And in that telephone conversation, did you have occasion

20  to make any observations regarding her emotional state?

21          **MR. LAFAYETTE:**  Objection to the extent it calls for

22  hearsay testimony.

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  Yes.  She appeared to still be visibly

25  upset over what had transpired.

1  **BY MR. SIEGEL**

2  **Q.**   And did you offer her any assistance after you learned

3  that she had been terminated from her job?

4          **MR. LAFAYETTE:**  Objection.  Relevancy.

5          **THE COURT:**  Overruled.

6          **THE WITNESS:**  I offered to assist her in locating a

7  new position, and gave her my permission to serve as a

8  reference for her, should she need me.

9  **BY MR. SIEGEL**

10 **Q.**   Now, sir, did you -- at the time you left the City of

11 Oakland, did you prepare a summary of the status of the

12 negotiations that you had been engaged in?

13 **A.**   Yes.

14 **Q.**   Would you turn to the blue-fronted binder on your left?

15 Can you turn to Tab 14, please?

16 **A.**   Mm-hm.

17 **Q.**   Can you -- can you identify that document?

18 **A.**   Yes.  This is the document that I prepared as a summary

19 report.

20 **Q.**   And did that document give advice to the City regarding

21 what needed to be done in the negotiations?

22 **A.**   It was based on my opinion, but yes.

23 **Q.**   And did you specifically provide that document to

24 Ms. Preston?

25 **A.**   I provided it to Ms. Preston asking her to forward it to

1  Ms. Santana.

2  **Q.**   Okay.   And why did you provide it to Ms. Preston?

3  **A.**   Because I was working directly with her.   We were

4  constantly sharing updates on where we were.   And so I thought

5  that she'd be the best place to send it, and then she could

6  forward it on.

7  **Q.**   And at the time you did that, did you believe that she

8  would continue the negotiation work that you had begun?

9  **A.**   Yes.

10 **Q.**   Okay.   And did you -- were you confident that she could do

11 that successfully?

12          **MR. LAFAYETTE:**   Objection.   Relevancy.

13          **THE COURT:**   Are you intending to offer this exhibit?

14          **MR. SIEGEL:**   Yes.

15          **THE COURT:**   Is there an objection to the exhibit

16 continuing --

17          **MR. LAFAYETTE:**   Yes, Your Honor.   We object to this

18 document as to relevancy in this proceeding.

19          **THE COURT:**   The objection for relevancy 401, 403 is

20 sustained.   And also lack of authenticity as of this moment.

21     There can be further foundation about that.

22 **BY MR. SIEGEL**

23 **Q.**   Okay.   Let me ask you.   Do you have an understanding or a

24 recollection as to when precisely you forwarded Exhibit 14 to

25 Ms. Preston?

1   **A.**   Within a week or two of my withdrawing from engagement

2   with the City.

3   **Q.**   Do you recall whether at the time you forwarded it to her,

4   you had attached an e-mail cover sheet to it?

5   **A.**   I'm sure I did.  Just don't recall it.

6           **MR. SIEGEL:**  Okay.  Your Honor, I'd like to show

7   Mr. Ewell a document that is Bates stamped LP 252, to perhaps

8   refresh his recollection on the timing of all of this.

9           **THE COURT:**  Whether his recollection's refreshed or

10  not, I'm excluding Exhibit 14.  So you can refresh his

11  recollection, but I don't want you to waste time on something

12  that's not coming in.

13          **MR. SIEGEL:**  Okay.  At least we can set the date.

14  **Q.**   Let me show you what's been Bates stamped LP 252.  Is that

15  a copy of Exhibit 14, with your cover e-mail?

16  **A.**   Yes.

17  **Q.**   And does that refresh your recollection as to when it was

18  that you forwarded Exhibit 14 to Ms. Preston?

19  **A.**   Yes.

20  **Q.**   And when was that?

21  **A.**   February 20th, 2013.

22  **Q.**   Okay.  And did you cc a copy of it to Ms. Santana?

23  **A.**   Yes.

24          **MR. SIEGEL:**  Okay.  Thank you.  Those are all of the

25  questions I have.

| 1 | THE COURT:  Thank you.  Cross-examination? |

     1              **THE COURT:**  Thank you.  Cross-examination?

     2              **MR. LAFAYETTE:**  Yes, Your Honor.

     3                  **CROSS-EXAMINATION**

     4   **BY MR. LAFAYETTE**

     5   **Q.**   Good afternoon.

     6   **A.**   Good afternoon, sir.

     7   **Q.**   When you came back the last time you were with the City of

     8   Oakland, did you leave at approximately February 2013?

     9   **A.**   Yes, sir.

    10   **Q.**   And how long had you worked during that time period you

    11   were back?  From when to when?  About three months?

    12   **A.**   Two to three months.  I don't remember exactly.

    13   **Q.**   And so had you worked with LaWanna Preston at any point in

    14   time prior to that three months?

    15   **A.**   I believe during the time that I came in 2011, yes.

    16   **Q.**   And you were there for about five months?

    17   **A.**   Yes, sir.

    18   **Q.**   And was she someone who was just in City Hall with you, or

    19   did you work closely with her?

    20   **A.**   She was someone that I worked closely with around labor

    21   issues.

    22   **Q.**   Okay.  And so with regard to the negotiations that took

    23   place after you left, you were not involved in those; were you?

    24   **A.**   No, sir.

    25   **Q.**   And with regard to issues that arose after you left, you

1  were not involved with those, either; were you?

2  **A.**    No.

3  **Q.**    And with regard to issues involving someone named

4  "Deb Grant," you were not involved with those, either; were

5  you?

6  **A.**    No.

7  **Q.**    Are you friends with Ms. Preston?

8  **A.**    I believe so.  Yes.  I mean --

9  **Q.**    And are her lawyers paying for you to come up today?

10  **A.**    They're reimbursing me.  Yes.

11  **Q.**    And prior to today, have you seen her since her

12  termination?

13  **A.**    No.

14  **Q.**    And the exchange that you talked about after she was

15  terminated -- that was all telephonic?

16  **A.**    Yes, sir.

17        **MR. LAFAYETTE:**  No further questions, Your Honor.

18        **THE COURT:**  All right.  Ladies and gentlemen of the

19  jury, we'll take our afternoon break now for ten minutes.  It's

20  also an opportunity to write any questions, if you wish, of

21  this witness.  And then we'll return with further examination

22  after that.

23     Mr. Ewell, if you can hang on for ten more minutes, we'll

24  see if we have any additional questions for you.  You can step

25  down or stay here; whichever you choose.  We're in recess.

1           THE WITNESS:  Thank you, sir.

2   (Recess taken from 2:35 p.m. until 2:42 p.m.)

3   (Proceedings were heard out of presence of the jury:)

4           THE COURT:  Back on the record.  The jurors are not

5   present.  There are no questions for the jury.  So Mr. Ewell,

6   you are excused.  Thank you very much for traveling up this

7   way.

8           THE WITNESS:  Thank you very much.

9           THE COURT:  Let's call in our jurors, and we'll have

10  our next witness.

11          MR. LAFAYETTE:  We have Ms. Katano out there, but

12  we're still on Ms. Preston, and I guess it's plaintiff's call.

13          THE COURT:  It is plaintiff's call.  Mr. Siegel, who

14  are we going to have next?

15          MR. SIEGEL:  We're going to have Ms. Preston finish.

16          THE COURT:  All right.  Ms. Preston, if you can

17  return to the stand.

18      (Proceedings were heard in the presence of the jury:)

19          THE COURT:  All right.  Our jurors have returned.

20  Thank you.  Everyone, you may be seated.  Ms. Preston will

21  return to the stand for her cross-examination.  And

22  Ms. Preston, you remain under oath.

23              __CROSS-EXAMINATION__    (resumed)

24  BY MR. LAFAYETTE:

25  Q.   Good afternoon, ma'am.

PRESTON - CROSS / LAFAYETTE

1   **A.**   Good afternoon.

2   **Q.**   With regard to the TPTs, these are temporary part-time

3   employees; right?

4   **A.**   Correct.

5   **Q.**   And they are part of a group of people that are covered by

6   the collective -- the memorandum of understanding?

7   **A.**   Yes.

8   **Q.**   And this is only SEIU?

9   **A.**   Other units have part-time employees, but SEIU had, in the

10  City of Oakland, a separate part-time employee Collective

11  Bargaining Agreement, a separate MOU that was separate from

12  their full-time employees.

13  **Q.**   Now, just so that I understand it, there was no dispute

14  that the City was collecting the dues from the non-TPT

15  employees; correct?

16  **A.**   None that I'm aware of, no.

17  **Q.**   Okay.  So the only -- so with regard to all those people

18  who were city employees who were members of unions, for all of

19  those except for the ones in SEIU that were TPTs, the City was

20  collecting the dues?

21  **A.**   To the best of my knowledge.

22  **Q.**   Now, the TPTs were a separate group of people who only

23  worked part time and temporary; right?

24  **A.**   Yes.

25  **Q.**   Okay.  And had this always been a category under the

1  memorandum of understanding, or was this something that

2  happened as a result of the furloughs?

3  A.   No.  When I started working there in 2007, and I was given

4  sets of the Collective Bargaining Agreements, when I started

5  over there, they had a temporary part-time Collective

6  Bargaining Agreement.

7  Q.   Okay.  So now, there's a process that's used in business

8  today, sometimes it's onboarding, sometimes it's orientation,

9  but it relates to when people start work someplace; right?

10  A.   Yes.

11  Q.   Okay.  And so when people start work orientation, let's

12  call it that, when they start with the orientation, are there

13  groups of people that sit down with them to explain what's

14  going to happen to them as an employee?

15  A.   There, in the City of Oakland, there was supposed to be a

16  monthly orientation for new employees when they would hire,

17  they were supposed to go to this meeting to learn how the City

18  works, basically, and their benefits.

19  Q.   To explain the benefits and how things work; right?

20  A.   I believe that was the purpose of that particular meeting.

21  Q.   And were people supposed to sit down with him to also

22  explain to them what their obligations were going to be if they

23  were part of a union?

24  A.   Not at the orientation, no.

25       MR. LAFAYETTE:  I'd like to show the witness

1  Exhibit 1M.  I think I may have to help her with that, Your

2  Honor, if I could.

3          **THE COURT:**  Not in evidence.

4          **MR. LAFAYETTE:**  No, it's not.

5  **Q.**  Let me see if this will refresh your recollection.  I'll

6  wait for you to get there.

7  **A.**  Okay.

8  **Q.**  Do you see Exhibit 1M?

9  **A.**  1M as in Mary, or N as in Nancy?

10  **Q.**  Mary.

11  **A.**  Okay, yes.  Yes.

12  **Q.**  And is that an email from you dated April 2, 2013 at the

13  top of the page?

14  **A.**  Yes.

15  **Q.**  "So are you advising that Ian did it for years, now Sonia

16  is presenting.  Our presentation does not include anything

17  about union dues."

18      Do you recall if that's a conversation about your group

19  going to orientations and providing information to new

20  employees?

21  **A.**  It appears to be an email from me to Trinette Gist

22  Skinner, Deb Grant, Kip Walsh, saying that Sonia would now be

23  presenting, but does not include anything about union dues.

24  **Q.**  And you're responding to the question that says, "who has

25  been presenting a new employer orientation for employee

1  relations;" correct?

2  **A.**    Yes.

3  **Q.**    And this discussion is all about who goes to the new

4  employee orientations and provides the new employees with

5  information with regard to union dues; isn't it?

6  **A.**    I didn't read the whole chain.  I don't know what the

7  whole discussion is about.

8  **Q.**    Well, I'll take you to Bates stamp 437, and there's an

9  email there from Deb Grant that you're involved in at April 2,

10  2013?

11  **A.**    Yes, it's -- it starts out with an email from Trinette to

12  Kip and Deb and Katano.  It says, "Will you please respond to

13  the question below.  DHR and recruitment benefits at hire.

14  What information are employees provided regarding union dues,

15  fair share fee deductions.

16  **Q.**    Now, was your department responsible for explaining to new

17  employees all those issues related to the memorandums of

18  understandings and their obligations as union members?

19  **A.**    No.  Union dues -- in organized labor there's a thing

20  called Hudson packages, and the union is supposed to supply the

21  employer on an annual basis a Hudson package, and a Hudson

22  package contains all the information as relates to their

23  appropriate union that they're represented by, what the dues

24  are, if they are fee payer, what that is, if they're a

25  full-time member, what that is.  That's not something that

1  management discusses.  Management was supposed to distribute

2  the Hudson package.

3      MR. LAFAYETTE:  Okay.  I'm sorry, Your Honor, I did

4  it again.

5  Q.  With regard to these Hudson packages.  So to the extent

6  that an employee needed to know that money would be taken out

7  of their check for union dues or administrative fees, that

8  Hudson package is the thing that would explain that to the

9  employee; correct?

10  A.  Correct.

11  Q.  And that package is something that the union is supposed

12  to give to the employer so that the employer can pass it on to

13  let the employee know that they may not be getting all the

14  money that they think they're going to get; right?

15  A.  Yes.  Well, the union has two options.  Yes, the union --

16  some employers have agreements where they provide the employer

17  with the Hudson packages, and they distribute it, and some

18  unions have agreements that say the employer will provide the

19  union with all the home addresses of employees, and then the

20  union can mail the Hudson packages to them.  So there's really

21  two different ways that new employees can receive that

22  information.

23  Q.  And the reason it's done like that is so that the employer

24  is not in the position of having to explain to people that

25  money is going to be taken out of their check as something

PRESTON - CROSS / LAFAYETTE

1  other than something that the employer wants; right?

2  **A.**    Well, no, not really.  If you are in -- if you're hired

3  under a classification that you belong to a union, you have to

4  pay a fee.  So there's what they call a service fee or a full

5  membership fee.  And so I believe when people are hired in

6  personnel, and this doesn't happen at the employer orientation,

7  they have the -- when they're filling out their forms, they can

8  mark a form or a box to say they want to become a full union

9  member or they want to be a fee payer.  What the employer is

10 not supposed to do is discuss with the employee which option

11 they choose, because the employer can't recommend to an

12 employee or try to persuade an employee to either join the

13 union or not join the union.

14 **Q.**    Now, at the time that this email was sent, were you

15 already in bargaining with SEIU?

16 **A.**    April 2nd, I think we had started.  I think it was at the

17 beginning of the process.  From what I remember I think

18 bargaining started around March.

19 **Q.**    Was the TPT issue part of these negotiations that started

20 in or about March?

21 **A.**    Actually, not.  One of the things that I had proposed was

22 to have the TPT table bargain at the same time as the full-time

23 table, but the union did not wish to do that.  The union wanted

24 the TPT contract to go after they completed the full-time

25 contract.  So around this time, the SEIU bargaining was

**PRESTON - CROSS / LAFAYETTE**

1  centered around the full-time contract and not the part-time

2  contract.  The part time had not even begun bargaining yet.

3  **Q.**  So as of this date, however, you were aware that there was

4  going to be a need to negotiate a TPT contract with SEIU?

5  **A.**  Yes, I was aware the contract was expiring, which is why I

6  requested they be bargained at the same time.

7  **Q.**  When did you close the table with SEIU with regard to the

8  non-TPT issues?

9  **A.**  Oh, I don't remember that date.  That was a few years ago.

10  **Q.**  Was it prior to June 30?

11  **A.**  I don't know.

12  **Q.**  But on June 26th, the TPT issue landed in your lap in a

13  different way, didn't it?

14  **A.**  Yes.

15  **Q.**  The TPT issue landed in your lap with Mr. Keffer filing a

16  grievance; right?

17  **A.**  Correct.

18  **Q.**  So let's take a look at Exhibit 2C.

19  **A.**  Okay.

20  **Q.**  Now, was this grievance properly presented to the City?

21  **A.**  No, I believe this is the grievance that Winnie Anderson

22  sent Mr. Keffer an email about.

23  **Q.**  So when I say presented, let me explain, was it served on

24  the right people?

25  **A.**  No.

1  Q.   Who should it have been served on?

2  A.   It should have been served to the payroll department.

3  Q.   The payroll department.  This is a class action grievance;

4  right?

5  A.   It's a class action grievance, but I believe the contract

6  had language in it that stated something to the effect that

7  grievances should be resolved at the lowest possible level, and

8  what that means is that your initial grievance should go to the

9  unit who had the ability to respond at the lowest possible

10 level, and if it wasn't resolved at that level, then there's

11 steps where you move it up to different levels.

12 Q.   Are you sure that's the way the class action grievance is

13 supposed to be handled, ma'am?

14 A.   Well, it would depend on what the issue is of the class

15 action grievance.

16 Q.   Would you like to see the memorandum of understanding to

17 refresh your recollection as to how a class action grievance is

18 supposed to be handled?

19 A.   That would be helpful.

20 Q.   Okay.  I'd like to show you what's been previously marked

21 as Exhibit 6B.

22      And so when a grievance is filed -- and while he's getting

23 that we'll talk some more.  When a grievance is filed, you have

24 the opportunity to respond to it in a fixed amount of time;

25 right?

1  A.   Yes.  Every grievance process has time lines and when you

2  have to respond.

3  Q.   And with SEIU, was that timeline ten days?

4  A.   I don't remember.  I have to see the contract.  I haven't

5  read the Oakland contracts in years.

6  Q.   Okay.  I'll help you with that too.  But you had a fixed

7  amount of time to respond to the grievance, and then the union

8  had a fixed amount of time to do something else; right?

9  A.   They had a fixed amount of time to -- if a grievance was

10  filed in a department, the department had a certain amount of

11  time, the immediate supervisor, to respond.  If the union was

12  not satisfied with that response, then I believe the second

13  step would be the department head.  And if the union was not

14  satisfied with that response, I believe the step three response

15  then could go to the Employee Relations Unit.

16  Q.   Now, there are multiple types of grievances that can be

17  filed; right?

18  A.   Yes.

19  Q.   One type of grievance is a grievance where you're

20  complaining about one of your co-workers; right?  That's a type

21  of grievance?

22  A.   Well, not -- no.  A grievance is defined -- if you read

23  the beginning of the grievance process, it has a definition,

24  and each MOU has slightly different language, but I believe the

25  language in Oakland's contract said a grievance was defined as

1  an infraction or a misinterpretation of the Collective

2  Bargaining Agreement, or civil service rules or disciplinary

3  action, and I think those are the three types.  Just trying to

4  remember.  Kind of old to remember that far back, but that's

5  kind of what I think.  I don't think this is the part-time MOU.

6  **Q.**  You don't think this is the what?

7  **A.**  Part-time MOU.  This is the SE -- you're asking about the

8  SEIU part-time MOU or the full-time MOU?

9  **Q.**  So is the grievance procedure different?

10 **A.**  It may be.  I would have to look at it.  Part-time

11 temporary employees don't have the same rights and privileges

12 as full-time permanent employees, so I'm not sure.  I don't

13 remember if it was the same --

14 **Q.**  So you don't remember if they were the same.  Do you

15 remember what the terms were as they relate to grieving?

16 **A.**  Not off the top of my head.  I'd have to read it.

17 **Q.**  Do you know what the time limits were for purposes of

18 grieving?

19 **A.**  At this point in time I mainly remember San Francisco

20 contracts.  I'd have to read the Oakland contracts.

21 **Q.**  Do you know if the union was required to file a grievance

22 within a specific time limit of an event taking place?

23 **A.**  I really don't remember what the part-time MOU says.

24 **Q.**  So this grievance was served on you, Ms. Lara, a number of

25 other people on June 26th; correct?

1   **A.**   That's what this email says.

2   **Q.**   And you got it on that day, didn't you?

3   **A.**   I assume so.

4   **Q.**   And you looked at it, and you gave direction to

5   Mrs. Anderson; correct?

6   **A.**   Yes.

7   **Q.**   Now, the issue in this grievance, the resolution request

8   is the same resolution request that surfaces in a grievance

9   that comes later, isn't it?

10  **A.**   I have to look at both grievances to make sure they say

11  the same thing.

12  **Q.**   Look at Exhibit 3G.  I'm only asking about what I'm going

13  to call the section that's called "requested resolution."  It's

14  the only thing I'm asking about.  They are both requesting the

15  same result, aren't they?

16  **A.**   Yes, they appear to be.

17  **Q.**   There's a big difference between the two of them, though;

18  right?

19  **A.**   Which -- what are you --

20  **Q.**   One is signed?

21  **A.**   Yes.

22  **Q.**   Which one is the only one that's actually signed?

23  **A.**   The one under Exhibit 2C is signed.

24  **Q.**   Is that the June 26th one?

25  **A.**   Yes.

PRESTON - CROSS / LAFAYETTE

1  Q.   There is no signature on the other one, is there?

2  A.   No, I don't believe it's required though.

3  Q.   You don't believe or you don't know?

4  A.   I don't believe.  I'm not a hundred percent sure that the

5  part-time MOU requires the grievance be signed.  I'm not sure

6  if that is one of the conditions, which is why I asked to see

7  the language.

8  Q.   Now, neither one of these actually refers to Katano

9  Kasaine, does it?

10 A.   No.

11 Q.   Neither one of those actually refers to payroll, does it?

12 A.   No.

13 Q.   Neither one of these refers to a meeting that took place

14 on August 6, 2013, does it?

15 A.   No.

16 Q.   So one of these you handled by writing a letter pointing

17 out the defects; correct?

18 A.   I believe Winnie Anderson sent something out.

19 Q.   At your direction?

20 A.   Correct.

21 Q.   The other one contains the same defects, doesn't it?  On

22 the face of the document it contains the same defects plus one,

23 meaning it's not signed; right?

24 A.   I would not refer to that as a defect, nor do I believe

25 that's a requirement to file a grievance.

1  Q.   But the other defects that you found in the first one

2  still exist in this one, don't they?

3  A.   No, there's a major difference.

4  Q.   Well, in terms of the document itself, in terms of the

5  document, ma'am, both of the documents are identical, aren't

6  they?

7  A.   They appear to be.

8  Q.   And so to the extent they are identical, if the face of

9  the first one contains a defect, then the second one contains

10 the exact same defect, doesn't it?

11 A.   The information as Ms. Anderson stated should have been

12 initially dealt with in the payroll department.  The difference

13 in the second grievance is, is that the payroll department

14 informed the union in a meeting in front of witnesses that they

15 were not deducting dues.  Therefore, it would not have been

16 appropriate for staff to then write back to the union to say go

17 to the payroll department.

18 Q.   Well, let's go back.  Whatever happened on August 6th was

19 not a grievance, was it?

20 A.   The act?

21 Q.   Whatever happened on August 6th, when you guys had that

22 meeting on August 6th, that was not step one of a grievance

23 procedure, was it?

24 A.   I was not at the meeting, and when someone publicly states

25 they're violating the Collective Bargaining Agreement, that is

1    grievable.

2    **Q.**   My only question, ma'am, is haven't you already said that

3    whatever happened on that August 6th meeting was not step one

4    of a grievance?

5    **A.**   No, it was not step one.

6    **Q.**   Thank you.  Now, in your deposition you first became aware

7    of this issue with the June 26th grievance; correct?  The

8    TPT -- the TPT dues not all getting collected, you first became

9    aware of that on June 26th; right?

10   **A.**   I believe so.

11   **Q.**   But you testified differently in your deposition under

12   penalty of perjury; right?

13   **A.**   I, I believe that in my deposition --

14   **Q.**   I --

15           **THE COURT:**  Let her answer the question, please.

16       Yes, you may answer.

17           **THE WITNESS:**  Thank you.  I believe in my deposition

18   I was shown a grievance and part of an email and not the

19   complete information.  When I left the deposition, I went and

20   reviewed the complete transition -- transactions that occurred,

21   and realized that it was two separate grievances, and the 6/26

22   grievance had died, because it was not processed further

23   through the union.

24           **MR. LAFAYETTE:**  I'd like to read from the witness's

25   deposition transcript at page 137:7 through 11.

1          THE COURT:  One moment.  Which volume of the

2   transcript binders?

3          MR. LAFAYETTE:  Volume 1, Your Honor.  137,

4   line 7 through 137 line 11.

5          THE COURT:  Are you sure that's in volume 1?  Which

6   tab?

7          MR. LAFAYETTE:  Yes, Your Honor.

8          THE COURT:  Front, middle, back?

9          MR. LAFAYETTE:  I couldn't hear you, Your Honor.

10          THE COURT:  Front, middle, back?

11          MR. LAFAYETTE:  I have my excerpts that I'm working

12   with, Your Honor, so I'll look at the full transcript.  Back,

13   volume 1, 137, Your Honor, line 7 through 11.

14          THE COURT:  I just need to have a copy of it.

15          MR. LAFAYETTE:  Oh.

16          THE COURT:  I've got binder, so you could tell me

17   where in the binder.

18          MR. LAFAYETTE:  Oh, I see.  I thought, Your Honor,

19   you asked me which volume of the deposition.  There's two

20   volumes of that.

21          THE COURT:  All right.

22          MR. LAFAYETTE:  Thank you, Your Honor.

23          "Q.          Ms. Preston, I think you

24              indicated that you first learned about the

25              TPT dues collection issue when Winnie

1                   Anderson and Sonia Lara returned from the

2                   August 6th meeting; is that correct?

3           "A.        Correct."

4    Q.    Now, that meeting, when you set it up for Ms. Katano to go

5    to that meeting on August 6, was it your understanding that

6    that meeting was supposed to be part of the union negotiation

7    process?

8    A.    It was an informational meeting regarding information

9    requests the union had made to assist them in bargaining.

10   Q.    Was it part of the union bargaining process?  Yes?

11   A.    It was not -- I wouldn't call it part of the bargaining

12   process.  Bargaining is bargaining.  This was an informational

13   meeting to get information.

14          MR. LAFAYETTE:  I'd like to read from the witness's

15   deposition transcript, page 139:5 through 139:15.

16          THE COURT:  Proceed.

17   BY MR. LAFAYETTE:

18          "Q.        Do you remember what the purpose

19          was of the August 6, 2013 meeting?

20          "A.        It was another bargaining session,

21          and part of the issues that had been

22          discussed were the union's request for

23          information about exactly who was in their

24          bargaining unit, who they represented.  They

25          wanted an accurate count, I believe, of who

PRESTON - CROSS / LAFAYETTE

1              was in their bargaining unit.

2              "Q.          Do you know what information was

3              being exchanged that addressed that

4              particular question?

5              "A.          No, I was not at the meeting."

6    Q.   So you understood that this was going to be a bargaining

7    meeting; right?

8    A.   I understood that it was an informational meeting to deal

9    with information the union had requested during bargaining.

10   Q.   So when Ms. Anderson -- up until this point in time had

11   Ms. Lara been involved with this particular union?

12   A.   She had done work with SEIU tables.  We all went to

13   several tables, so --

14   Q.   Had she been involved in the bargaining for TPT contracts

15   in July of 2013?

16   A.   I don't remember what table Sonia Lara was at in July.

17   Q.   Now, they came back and you asked for their notes; right?

18   A.   I asked them to make sure they took notes and to make sure

19   they had accurate notes.

20   Q.   And they gave them to you?

21   A.   I believe they showed them to me.

22   Q.   And when they showed them to you, you read them; correct?

23   A.   I believe I glanced at them.  I was in my office working

24   on something else when they came in to tell me about the

25   meeting.

1  Q.   And just to be clear, Ms. Anderson told you that whatever

2  the comment was that Ms. Katano made, she had not written them

3  in her notes; right?

4  A.   Either Sonia or Winnie, one of them told me that they did

5  not write down her statements in the notes.

6          MR. LAFAYETTE:   I'd like to read from the witness's

7  deposition transcript at page 98:18 through 98:25.

8          THE COURT:   Proceed.

9  BY MR. LAFAYETTE:

10          "Q.          All right.  And you looked at

11          those notes when they gave them to you?

12          "A.          I don't know if I looked at the

13          notes.  I remember Sonia.  Sonia showed me

14          her notes, and I remember Winnie telling me

15          that she did not incorporate that statement

16          in her notes.

17          "Q.          Winnie said that or Sonia?

18          "A.          Winnie."

19  Q.   Now, did you ask them to go back and edit their notes?

20  A.   Every one of them said they didn't include the statement

21  in their notes.  I told them they needed to amend their notes

22  to reflect everything that was stated at the meeting.

23  Q.   So the notes that you ultimately produced in this case are

24  not notes that were contemporaneously taken at the time the

25  meeting took place; is that accurate?

1  **A.**    There were notes that they both took.  My recollection is

2  what I said to the staff was if there was -- if there was

3  comments made during the meeting that were significant and you

4  did not include them in your notes, you need to include them in

5  your notes.

6  **Q.**    And did you think that this issue of whatever it was that

7  Ms. Katano said was significant?

8  **A.**    Absolutely.

9  **Q.**    And so you were basically asking them to go back to their

10 notes and make sure that that significant event was in there;

11 accurate?

12 **A.**    I told them if anything was stated of that magnitude, it

13 should be reflected in their notes.

14 **Q.**    Now, as of this August 6th meeting, were you at that point

15 bargaining with the union regarding TPTs?

16 **A.**    Yes.

17 **Q.**    Was one of the issues on the table how to handle

18 dissemination of information to the TPTs?

19 **A.**    I don't remember all the issues on the table.

20 **Q.**    Under this agreement, this MOU, did the union have 15 days

21 to grieve something from the date that it became aware of the

22 problem?

23 **A.**    I'm going to repeat myself.  Could you show me the

24 contract?  I don't know.  You haven't shown me the language.

25 **Q.**    Okay.  Were you at this point in time in any way involved

1  in the negotiations with the union relating to TPTs?

2  **A.**   I was the chief spokesperson.

3  **Q.**   So you were involved?

4  **A.**   In bargaining the TPT contract, yes.

5  **Q.**   Were you still bargaining that contract up until September

6  of 2013?

7  **A.**   The contract was still being bargained up until it was

8  being bargained even when I was terminated.   It had not been

9  completed.

10  **Q.**   Would you take a look at 3H?   This is a document prepared

11  by the union and submitted to you?

12  **A.**   Yes.

13  **Q.**   And it's a document where the City and the union were

14  discussing setting up a temporary part-time employee committee?

15  **A.**   It's a proposal from the union to do so.

16  **Q.**   Now, after the grievance came in from the union in

17  September, did Deanna Santana give you an explanation as to why

18  she thought somebody other than you should be proceeding with

19  that grievance?

20  **A.**   At one point she said that she didn't believe that I

21  should investigate the grievance, because Ms. Kasaine was equal

22  to me, we were both directors, and that because we were peers,

23  that I should not be investigating it.

24  **Q.**   Well, didn't she really say to you that she thought --

25  that she said she wanted to make sure that the investigation

**PRESTON - CROSS / LAFAYETTE**

1  was not biased?

2  **A.**   She may have said that.

3  **Q.**   Well, take a look at Exhibit 3M for me.  And Exhibit 3M

4  reflects your protestation of not being allowed to conduct this

5  grievance, does it?

6  **A.**   It's an email from me to Deanna clarifying the

7  conversation that we had just had prior to me sending it.

8  **Q.**   And in it you wrote:  "Make sure the investigation was not

9  biased," didn't you?  I'll read it specifically.

10       You stated you were going to have the City Attorney's

11  Office conduct a grievance investigation because you wanted to

12  make sure the investigation was not biased.  Wasn't that your

13  understanding as to what she had told you about you conducting

14  this investigation as opposed to someone else?

15  **A.**   That was part of it.

16  **Q.**   Now, as of that moment in time, September 12, 2013, how

17  many days did you have to respond to the union's grievance?

18  **A.**   If you will show me the language in their contract, I will

19  respond to that.  I do not remember off the top of my head.

20  **Q.**   So as you sit here right now, you don't know how many days

21  you had to file a response to the union's grievance that came

22  in to you on September 6th; right?

23          **MR. SIEGEL:**  Your Honor, I'm going to object.  This

24  is repetitive.

25          **THE COURT:**  Sustained.  Let's move on, please.

1 **BY MR. LAFAYETTE:**

2 **Q.**   Okay.  So with regard to the grievance, at some point --

3 at that moment in time, September 12th, how many different

4 documents did you have in your office relating to the TPT dues

5 issues?

6 **A.**   In the Employee Relations Division?

7 **Q.**   Yes.

8 **A.**   I don't remember that.

9 **Q.**   Well, did you have a document from Sonia Lara from

10 August 6th, a statement?

11 **A.**   If you're referring to her notes for bargaining, her notes

12 would have been in her bargaining binder.  I didn't have them

13 personally.

14 **Q.**   But you were aware of them, weren't you?

15 **A.**   I was aware of them, but I didn't have them.

16 **Q.**   Were you also aware at that time of Ms. Winnie Anderson's

17 notes?

18 **A.**   I was aware of them.

19 **Q.**   Were you also aware of the June 26th grievance?

20 **A.**   I was aware of it.

21 **Q.**   Were you also aware of the emails related to that

22 grievance?

23 **A.**   If I was copied on them.

24 **Q.**   Now, weren't you copied on the June 26th grievance, and

25 then you gave direction to Winnie Anderson on how to proceed?

1  A.   Yes.

2  Q.   So after you got that -- so when you sent -- when you were

3  asked for your file to send it to the City Attorney's Office,

4  the only document that you sent was the unsigned grievance

5  filed in September; correct?

6  A.   It was the only active grievance.

7  Q.   And you didn't think it might be helpful to the interest

8  of the city to send all the other things that you were aware

9  of; right?

10 A.   The prior grievance had died.

11 Q.   So you didn't think it was necessary to send the

12 August 6th letter, the notes from the August 6th meeting.  You

13 didn't think that would be helpful for the City to know as it

14 proceeded forward with the grievance; right?

15 A.   As I stated, I did not have notes.  I was not at the

16 meeting.  It would have been helpful if Sonia and Winnie had

17 provided the notes that they took at the meeting, but I was not

18 in possession of those.

19 Q.   Now, can you take a look at Exhibit 3W?  I think we've

20 just looked at that.  I'll move forward.

21      Take a look at Exhibit 3X.

22 A.   S as in Sam?

23          MR. LAFAYETTE:  X as in xylophone.  Now this is an

24 email.  I think it's in evidence, Your Honor.

25          THE COURT:  No, I don't believe it is.

1  BY MR. LAFAYETTE:

2  Q.    Take a look at Exhibit 3Z.

3  A.    Not X?

4        MR. LAFAYETTE:  3Z, zebra.  I think that's in

5  evidence, Your Honor?

6        THE COURT:  Yes, it is.

7  BY MR. LAFAYETTE:

8  Q.    This is an email from Mr. Keffer dated September 27, 2013.

9        Do you see that?

10  A.   Yes.

11  Q.   And he said he's escalating the grievance; right?

12  A.   Yes.

13  Q.   Did you talk to the union that morning?

14  A.   I don't know if I had any conversations with them that

15  morning.

16  Q.   Why don't you take a look at Exhibit 4D.  Is that a

17  grievance you wrote on Sunday, September 29?  Is that an email

18  you wrote on Sunday, September 29, at 4:07 p.m.?

19  A.   Yes.

20  Q.   Do you write on Friday, September 27, 2013 you had a

21  conversation with Dwight McElroy?

22  A.   Yes.

23  Q.   So you had a conversation with Dwight McElroy the very day

24  that another member of that same union escalated a grievance;

25  correct?

1  **A.**   Yes.

2  **Q.**   And did you have some other email communications with

3  members of that same union before that union escalated this

4  matter to a next tier grievance?

5  **A.**   I don't remember.  You'd have to show me the emails.

6  **Q.**   Do you remember having other communications with the union

7  that morning, on that Friday?

8  **A.**   I spoke to at least one union rep every day, sometimes

9  more, so --

10  **Q.**   Did you have any conversations with that union about this

11  particular grievance?

12  **A.**   I don't know.

13  **Q.**   So now, in this document that you've just identified,

14  right, we were just looking at, the one that you sent on Sunday

15  the 29th at 4:40 p.m., that's Exhibit 4C.  Would you take a

16  look at 4C?

17         **MR. SIEGEL:**   4D?

18  **BY MR. LAFAYETTE:**

19  **Q.**   4C.  Do you have it there?

20  **A.**   Yes.

21         **MR. LAFAYETTE:**   I'd like to move this into evidence

22  Your Honor.

23         **MR. SIEGEL:**   It's in.

24  **BY MR. LAFAYETTE:**

25  **Q.**   So I'd like to go down this with you, ma'am.  You see, at

 1  the bottom of this you say "Katano -- could we put that up,

 2  please?

 3      You said Katano had violated the investigatory process by

 4  contacting the person who filed the grievance regarding her

 5  conduct and attempted to coerce him to drop the grievance.

 6      So first of all, no one in the union put Ms. Katano's name

 7  in any grievance, did they?

 8  **A.**   Not --

 9  **Q.**   Put her name in the grievance?

10  **A.**   Not in the written grievance.

11  **Q.**   Okay.  So then you say this is a violation of MMB.  Is MMB

12  the Meyers Milias Brown Act?

13  **A.**   Yes.

14  **Q.**   And you say section 3502.

15  **A.**   Yes.

16  **Q.**   Have you ever read section 3502?

17  **A.**   Yes.

18  **Q.**   Section 3502 doesn't relate to this issue, does it?

19  **A.**   I would not remember that off the top of my head.

20  **Q.**   I'd like to show you 5W.  I'll be asking for 5W, 5X and

21  6B.

22  **A.**   Is that here?

23  **Q.**   He's going to bring them up.

24          **THE COURT:**  Mr. Lafayette, you're cruising under the

25  same admonition as this morning asking about the same documents

1  that are not in evidence and are not going to be in evidence.

2         MR. LAFAYETTE:  I am going to ask to refresh her

3  recollection if they do not.

4         THE COURT:  Make it very brief.

5         MR. LAFAYETTE:  Yes.

6  BY MR. LAFAYETTE:

7  Q.   Does this refresh your recollection that this is actually

8  the law, the code section enacted by the California state

9  legislature, the Meyers Milias Brown Act?

10         MR. SIEGEL:  I don't think that was the question that

11  we were refreshing recollection on, Your Honor, so I object on

12  that.

13         THE COURT:  Sustained.

14         MR. LAFAYETTE:  I'll rephrase.  I'll rephrase.

15         THE COURT:  I repeat my admonition that you're going

16  into irrelevant and excluded areas.  So ask your question

17  again.

18  BY MR. LAFAYETTE:

19  Q.   You're basically saying that Katano was violating these

20  laws; right?

21  A.   I believe 3502 -- I'd have to look at the MMB, but I

22  believe 3502 has different sections to it.  It's not just --

23  there are subsections in 3502, and what it speaks to, I'd have

24  to see it.

25  Q.   So you're basically saying she violated these laws, but

```
 1   35 -- does this refresh your recollection, that section 3502

 2   talks about a right to -- a right to join or abstain individual

 3   representation?

 4               MR. SIEGEL:  Your Honor, same objection.

 5               THE COURT:  Sustained.  Move on.

 6   BY MR. LAFAYETTE:

 7   Q.   Do any of those code sections actually state that Katano

 8   Kasaine --

 9               THE COURT:  Sustained.  Please take your documents

10   back and move on to a different topic.  This one is completed.

11   BY MR. LAFAYETTE:

12   Q.   Did you have any basis for writing a letter saying that

13   Ms. Katano Kasaine had violated sections of the law?

14   A.   Yes.

15   Q.   And is your justification based upon the code sections

16   that you cite here?

17   A.   It would be the entire section.  There's a section in the

18   Meyers Milias Brown Act that says an employee shall have a

19   right to participate in union activities without coercion,

20   interference, or intimidation.  That's the section I was

21   referring to.

22               MR. LAFAYETTE:  Well, Your Honor, I should have the

23   opportunity to impeach testimony.

24               THE COURT:  That's part of the pretrial preparation

25   process, so we can talk about it outside the presence of the
```

 1  witness.

 2          **MR. LAFAYETTE:**  That's fine, Your Honor.  We can.

 3  Okay.

 4          **THE COURT:**  Next question.

 5  BY MR. LAFAYETTE:

 6  **Q.**  Yes.  That document that we were just looking at, do you

 7  know who Cheryl Thompson is?

 8  **A.**  Yes.

 9  **Q.**  Was Cheryl Thompson still an employee of the city on

10  September 29, 2013?

11  **A.**  No.

12  **Q.**  How long had she not been an employee of the city?

13  **A.**  Few years.  I don't know the exact date.

14  **Q.**  Did you understand her to be a consultant with Deborah

15  Edgerly working for the union?

16  **A.**  No.

17  **Q.**  Did you send her this same communication?

18  **A.**  Yes.

19  **Q.**  And did you send it to her that same day?

20  **A.**  What section was that email to Cheryl Thompson in?

21  **Q.**  Take a look at Exhibit 4D, ma'am.

22  **A.**  E?

23  **Q.**  D as in David.

24  **A.**  It was sent on Sunday, September 29.

25          **MR. LAFAYETTE:**  Yes.  And did you send this same --

1   so I'd like to move 4D into evidence, Your Honor.

2            THE COURT:  One moment.

3            MR. SIEGEL:  Your Honor, that document is in

4   evidence.  It is Exhibit 41, and 4C, which was admitted on

5   September 15th.

6            THE COURT:  So no objection, in other words?

7            MR. SIEGEL:  Well, it's in.  It's all right.  I

8   offered it, but I like it.

9            THE COURT:  4D.  What was admitted was 4C.

10           MR. SIEGEL:  Right.

11           THE COURT:  He's moving in 4D.

12           MR. LAFAYETTE:  Which is different.

13           THE COURT:  So --

14  BY MR. LAFAYETTE:

15  Q.   I'd like for you to next turn to --

16           THE COURT:  Well, you're moving 4D in, so the

17  question is, is there any objection to 4D, Delta?

18           MR. SIEGEL:  I have no objection.

19           THE COURT:  All right.  4D is admitted.

20      (Trial Exhibit 4D received in evidence)

21           THE COURT:  Proceed.

22  BY MR. LAFAYETTE:

23  Q.   Please take a look at Exhibit 4I.

24      Now, was Latonda Simmons your friend?

25  A.   Yes.

1  Q.   Did you send this to Latonda Simmons?

2  A.   Yes.

3  Q.   And did you send it to her at 10:03 p.m.?

4  A.   Yes.

5  Q.   Is this a true and correct copy of the email exchange

6  between you and Ms. Simmons?

7  A.   I'm not certain.  The headings are taken off, and there's

8  been some cut and pasting, but it appears to be.

9          MR. LAFAYETTE:  I'd like to move Exhibit 4I into

10  evidence, Your Honor.

11          THE COURT:  Any objection?

12          MR. SIEGEL:  No objection.

13          THE COURT:  No objection?

14          MR. SIEGEL:  No objection.

15          THE COURT:  4I is admitted.

16      (Trial Exhibit 4I received in evidence)

17  BY MR. LAFAYETTE:

18  Q.   Who was Latonda Simmons, other than your friend, who was

19  she?

20  A.   She is the clerk for the Oakland City Council.

21  Q.   So when you wrote an email saying in your opinion that

22  Ms. Katano Kasaine had violated these statutes, Ms. Latonda

23  Simmons wrote back to you "hahahahaha"?

24  A.   Yes.

25  Q.   Now, after you did that, we come to Monday, September 30;

1  right?  So during -- before you went to that closed session of

2  the City Council, did you have email exchanges with the union

3  concerning giving the union information that had -- that

4  related to the grievance?

5  **A.**   I don't remember that.  If you have emails to show me, I

6  can review them.

7  **Q.**   I'd like to show you -- ask you to take a look first at

8  Exhibit 40.

9  **A.**   This goes up to J.  There is no 40 in this book.  There is

10  no 40 in this book.

11  **Q.**   I'll come over.  Actually, take a look at 4N?

12  **A.**   N?

13  **Q.**   Yes.  Is 4N an email between you and Winnie Anderson?

14  **A.**   Yes.

15  **Q.**   Is this an email where the union is asking for information

16  which Ms. Anderson believes relates to the class action

17  grievance?

18  **A.**   I have to read it.

19  **Q.**   If you look at the first page, the second -- the third

20  paragraph down on the first page.

21  **A.**   Could I read the entire --

22  **Q.**   First page.

23          **THE COURT:**  Yes.  You can read the entire document.

24          **THE WITNESS:**  Thank you.  (Witness examines

25  document.) okay.

PRESTON - CROSS / LAFAYETTE

1  BY MR. LAFAYETTE:

2  Q.   Did she tell you that she thought giving these documents

3  had an impact on the grievance?

4        MR. SIEGEL:  Well, Your Honor, I'm objecting.  If he

5  wants to put the exhibit in evidence, that's fine, but

6  otherwise counsel should not be reading it.

7        MR. LAFAYETTE:  I'll move it into evidence.

8        THE COURT:  Are you objecting on hearsay grounds?

9        MR. SIEGEL:  Yes.

10       THE COURT:  Granted.  Sustained motion.

11    You want to move the document into evidence?

12       MR. LAFAYETTE:  Yes, Your Honor.

13       THE COURT:  Any objection to that?

14       MR. SIEGEL:  No.

15       THE COURT:  Exhibit 4N is admitted into evidence.

16    (Trial Exhibit 4N received in evidence)

17  BY MR. LAFAYETTE:

18  Q.   She says, "The dilemma in adding you to the email stream

19  was the concern of the class action grievance, and if Sequonite

20  was trying to file another one based just for OPR;" is that

21  what she told you?

22  A.   That's part of what's written in the email.

23  Q.   Did you then turn around and tell her that she should go

24  ahead and give them the information notwithstanding that

25  concern?

1  **A.**   My instructions to her was that the union has a right to

2  the information they requested, and because of that right, we

3  should provide it to them.

4  **Q.**   Did you send --

5  **A.**   The employer has an obligation -- when the union requests

6  information pertaining to their bargaining units, the employer

7  cannot refuse to give it to them.  You're required to.

8  **Q.**   Did you communicate to Barbara Parker that you were doing

9  this?

10 **A.**   No, I did not.

11 **Q.**   All right.  Was it your responsibility as the chief

12 negotiator to bring it to the attention of the City

13 Administrator any inappropriate conduct that you might have

14 observed taking place during the collective bargaining process?

15 **A.**   It depends on the conduct and who was doing it.

16          **MR. LAFAYETTE:**  I'd like to read from the witness's

17 deposition transcript.

18          **THE COURT:**  At?

19          **MR. LAFAYETTE:**  Page 189:22 through 192.

20          **THE COURT:**  Was that in the second volume of the

21 deposition transcript?

22          **MR. LAFAYETTE:**  Yes, Your Honor.

23          **THE COURT:**  You may proceed.

24 **BY MR. LAFAYETTE:**

25          "**Q.**        Regardless of who it was, was it

PRESTON - CROSS / LAFAYETTE

1            your responsibility as the chief negotiator

2            to bring to the attention of the City

3            Administrator any inappropriate conduct that

4            you might observe taking place during the

5            collective bargaining process?

6       "A.      Yes."

7            MR. SIEGEL:  Your Honor, I'm going to object that

8    this is incomplete and misleading and request that counsel read

9    through line 21 on the same page, because there's no conflict

10   between what she said in the deposition and what she just said.

11           THE COURT:  For completeness?

12           MR. SIEGEL:  Yes.

13           THE COURT:  Mr. Siegel, why don't you read the rest

14   of it.

15           MR. SIEGEL:  Okay.

16           MR. LAFAYETTE:  Not during my examination, Your

17   Honor.

18           THE COURT:  During your examination.  You gave your

19   emphasis.  He can give his own.

20           MR. SIEGEL:  So then the next question is:

21       "Q.          All right.  And if your

22            supervisor at that time was Deanna Santana,

23            it would have been your responsibility as the

24            chief negotiator to bring inappropriate

25            conduct to her attention?

1          "A.       Yes.

2          "Q.          And if it had been Dan Lindheim,

3      the same would be true, you would have been

4      responsible as the chief negotiator to bring

5      inappropriate conduct to his attention?

6          "A.       Yes.

7          "Q.          That was one of your job

8      responsibilities; correct?

9          "A.       It was not written in my job spec,

10     but I believe as the Employee Relations

11     Manager it -- at that time if I saw

12     something, depending, it would depend on the

13     action.  If that's something that I should --

14     I could deal with or something that should be

15     raised to that level.

16         "Q.          All right.

17         "A.       So you really need to be more

18     specific."

19         MR. SIEGEL:  Thank you, Your Honor.

20         THE COURT:  Back to you, Mr. Lafayette.

21     How much more time do you anticipate in your examination?

22         MR. LAFAYETTE:  I'm pushing fast.  I think I might

23 wrap up in the next 15, if that's what we're looking at, Your

24 Honor.

25         THE COURT:  You have 15 minutes remaining in your

PRESTON - CROSS / LAFAYETTE

1    examination.

2    **BY MR. LAFAYETTE:**

3    **Q.**   Did you ever communicate to anyone at the city that you

4    thought someone was pressuring you to do something unlawful

5    with regard to Ms. Desley Brooks?

6    **A.**   I spoke with Deanna Santana.

7    **Q.**   As of the date of your termination, had you reported to

8    any governmental agency that anyone had ever instructed to you

9    make a false statement about Desley Brooks?

10   **A.**   I spoke to Deanna Santana.

11           **MR. LAFAYETTE:**   Judge, I'd like to read from the

12   witness's deposition testimony, page 171, line 11 through 15.

13           **THE COURT:**   One moment.   Proceed.

14   **BY MR. LAFAYETTE:**

15           "Q.          As of that date, had you reported

16           to any government agency that anyone had ever

17           instructed you to make a false statement

18           about Desley Brooks with regard to the

19           Rainbow Teen Center report?

20           "A.          No.

21           "Q.          As of October 30 -- October 3rd,

22           2013, had you ever reported to Deanna Santana

23           that you believed that she was pressuring you

24           to make a written false statement about

25           Desley Brooks with regard to the Rainbow Teen

1              Center agenda report?"

2  **A.**   Are you asking me?

3  **Q.**   Yes.

4              **THE COURT:**  That's the new question.

5              **MR. LAFAYETTE:**  You want me to rephrase?

6              **THE COURT:**  Say it again.  It was not clear when you

7  were finishing the transcript and when you were asking a new

8  question.

9  **BY MR. LAFAYETTE:**

10             "Q.          As of October 3rd, 2013, did you

11             ever report to Deanna Santana that you

12             believed that she was pressuring you to make

13             a written false report about Desley Brooks

14             with respect to the Rainbow Teen Center

15             agenda?"

16 **A.**   Prior to -- I was fired on October 3rd, so prior to

17 October 3rd I spoke with her.

18             **MR. LAFAYETTE:**  I'd like to read from the witness's

19 deposition testimony, page 17.

20             **THE COURT:**  Go ahead.

21             **MR. LAFAYETTE:**  172, lines 18 through 22.

22             **THE COURT:**  You may.

23 **BY MR. LAFAYETTE:**

24             "Q.          As of October 3rd, 2013, did you

25             ever report to Deanna Santana that you

```
 1              believed that she was pressuring you to make

 2              a written false report about Desley Brooks

 3              with respect to the Rainbow Teen Center

 4              agenda report?

 5          "A.        No."

 6   A.   May --

 7   BY MR. LAFAYETTE:

 8   Q.   Did you ever -- prior to your termination, did you ever

 9   report to Barbara Parker that you believed that she was

10   pressuring you to make a false written report about Desley

11   Brooks with respect to the Rainbow Teen Center agenda report?

12   A.   Oh, that's a question?

13   Q.   Yes.

14   A.   I don't believe I said that to Barbara Parker.

15   Q.   As of October 3rd, 2013, did you ever report to any

16   governmental agency that anyone was pressuring you to make a

17   written false report about Desley Brooks with respect to the

18   Rainbow Teen Center agenda report?

19   A.   I spoke with Deanna Santana prior to October 3rd.

20          MR. LAFAYETTE:  I'd like to read from the witness's

21   deposition transcript at page 173, lines 4 through 8.

22          THE COURT:  You may.

23   BY MR. LAFAYETTE:

24          "Q.         As of October 3rd, 2013, did you

25              ever report to any governmental -- government
```

1              agency that anyone was pressuring you to make

2              a false written report about Desley Brooks

3              with respect to the Rainbow Teen Center

4              agenda report?

5         "A.      No."

6    BY MR. LAFAYETTE:

7    Q.   As of October 3rd, 2013, did you ever report to any law

8    enforcement agency that anyone was pressuring you to make a

9    written false report about Desley Brooks with respect to the

10   Rainbow Teen Center agenda report?

11   A.   You're asking me now?

12   Q.   Yes.

13   A.   No.

14   Q.   As of October 3rd, 2013, did you ever report to anyone in

15   a position of authority to take action regarding the alleged

16   misconduct that anyone was pressuring you to make a false

17   statement about Desley Brooks with respect to the Rainbow

18   center agenda report?

19   A.   I spoke with Deanna Santana.

20        MR. LAFAYETTE:  I'd like to read from the witness's

21   deposition testimony, page 73.

22        THE COURT:  173.

23        MR. LAFAYETTE:  173 through starting

24   line 21 through 174, line 1.

25        THE COURT:  Proceed.

PRESTON - CROSS / LAFAYETTE

1  BY MR. LAFAYETTE:

2          "Q.          As of October 3rd, 2013, did you

3          ever report to anyone in a position of

4          authority to take action regarding the

5          alleged misconduct that anyone was pressuring

6          you to make a false statement about Desley

7          Brooks with respect to the Rainbow Teen

8          Center agenda report?

9          "A.        No."

10          MR. SIEGEL:  Well, again, Your Honor, I think that

11  counsel should continue reading on that page from lines 2 to

12  10, or I can, if that's all right.

13          THE COURT:  That's a different question.  Proceed.

14          MR. LAFAYETTE:  Thank you, Your Honor.

15  Q.   As of October 3rd, 2013, did you ever report to any

16  government agency that anyone instructed you to make a verbal

17  false statement about Desley Brooks at the City Council meeting

18  on or about March 6, 2012?

19  A.   You're asking me now?

20  Q.   Yes.

21  A.   Could you repeat the question?

22  Q.   As of October 3rd, 2013, did you ever report to any

23  government agency that anyone instructed you to make a verbal

24  false statement about Desley Brooks at the City Council meeting

25  on or about March 6, 2012?

1   A.    I spoke with Deanna Santana.

2            MR. LAFAYETTE:  I'd like to read from the witness's

3   deposition testimony, page 174:18 through 22.

4            THE COURT:  You may.

5   BY MR. LAFAYETTE:

6            "Q.        As of October 3rd, 2013, did you

7            ever report to any government agency that

8            anyone instructed you to make a verbal false

9            statement about Desley Brooks at the City

10           Council meeting on or about March 6, 2012?

11           "A.        No."

12           THE COURT:  All right.  Now, new question.

13  BY MR. LAFAYETTE:

14  Q.    As of October 3rd, did you ever report to any law

15  enforcement agency that anyone instructed you to make a verbal

16  false statement about Desley Brooks at the City Council meeting

17  on approximately March 6, 2012?

18  A.    No.

19  Q.    As of October 3rd, 2013, did you ever report to the

20  Oakland City Council that anyone instructed you to make a

21  verbal false statement about Desley Brooks at the City Council

22  meeting on October -- on March 6, 2012?

23  A.    No.

24  Q.    As of October 3rd, 2013, did you ever report to anyone

25  authorized to take action regarding alleged misconduct that

1  anyone instructed you to make a verbal false statement about

2  Desley Brooks at the City Council mating on approximately

3  March 6, 2012?

4  **A.**   Did -- I'm sorry.  Could you repeat the question?

5  **Q.**   As of October 3rd, 2013, did you ever report to the

6  Oakland City Council that anyone instructed you to make a

7  verbal false statement about Desley Brooks at the City Council

8  meeting on approximately March 6, 2012?

9  **A.**   No, I did not report it to the entire City Council.

10          **MR. LAFAYETTE:**  I'd like to read from the witness's

11  deposition transcript, Your Honor.

12          **THE COURT:**  No, I think her answer is consistent.

13  **BY MR. LAFAYETTE:**

14  **Q.**   So is it your responsibility, ma'am, if a department head

15  does not comply with the MOU, is it your report -- is it your

16  responsibility to stop it?

17  **A.**   I didn't have any authority to tell department heads what

18  to do.  If it came to my attention a department head was doing

19  something in violation of a Collective Bargaining Agreement or

20  a city policy, I would go to that department head and explain

21  to them, you know, what they were doing that would be in

22  violation.

23  **Q.**   And if that didn't remedy the problem, was it your

24  responsibility to bring it to the Administrator's attention?

25  **A.**   Yes.

1  Q.   And was it your responsibility to bring it to Council's --

2  to Council -- you prepared agenda reports; right?

3  A.   I prepared labor agenda reports, yes.

4  Q.   Yes.  And was it your responsibility to bring to Council's

5  attention those things as they related to labor?

6  A.   It would be -- it would depend on the issue.  If it was

7  something that Council needed to approve, it was something that

8  Council didn't need to approve, Council didn't have to approve

9  everything related to labor.

10 Q.   If it was something significant, was it your

11 responsibility to bring it to Council's attention if it related

12 to labor?

13 A.   It would depend on what it is.

14 Q.   If it was significant?

15 A.   It would depend on what it is.  For instance, if you have

16 department heads who are hiring people to drive buses that

17 don't have commercial vehicles, I didn't go report that to

18 Council.  That would be something I would report to the City

19 Administrator.  If it was something that was under the realm of

20 Council's authority, but staff, including department heads, you

21 wouldn't report to the Council that department heads were doing

22 things inappropriately.

23 Q.   Going to October 2, you cannot deny that you had a

24 telephone call with Deanna Santana that day, can you?

25 A.   I don't believe I had a telephone conversation with Deanna

1  Santana that day.  I know for sure I didn't call her and yell.

2          MR. LAFAYETTE:  I'd like to read from the witness's

3  deposition testimony, page 212:03 to 212:14.

4          THE COURT:  Proceed.

5  BY MR. LAFAYETTE:

6          "Q.        Do you remember having a

7          telephone call with her that you placed to

8          her in her offices at City Hall?

9          "A.        I don't know.  It's possible.

10         "Q.        All right.  Do you remember the

11         tone of that discussion?

12         "A.        I don't remember the discussion at

13         all.

14         "Q.        All right.  So you don't remember

15         what was discussed or the tone?

16         "A.        No.

17         "Q.        All right.  But she never did say

18         anything -- all right.  But she never did say

19         anything to you directly about --

20         "A.        We never spoke again after that."

21         THE COURT:  Read the next four lines too, five lines.

22         MR. LAFAYETTE:  I have to change books, Your Honor.

23  Just a second.

24         THE COURT:

25         "Q.        Let me finish my question.

1            "A.        No.

2            "Q.            Part of it.  After the

3         October 1st closed session in which the issue

4         about the union grievance came up, you never

5         had any further discussions with Ms. Santana

6         about that issue?

7            "A.        No."

8         MR. LAFAYETTE:  I'll read the next passage, Your

9    Honor, because I was going to do that.

10           THE COURT:  To what?

11           MR. LAFAYETTE:  To 22.

12           THE COURT:  Proceed.

13           MR. LAFAYETTE:

14           "Q.            All right.  And you don't recall

15        whether you had any discussion with her on

16        October 2nd about anything?

17           "A.        No."

18           THE COURT:  You're on your final question.

19   BY MR. LAFAYETTE:

20   Q.   Did you, in front of Sonia Lara, share documents and

21   information with the union to assist in their negotiations with

22   the City?

23   A.   Absolutely not.

24           THE COURT:  All right.  Time is up.  Ladies and

25   gentlemen, thank you for your attention today.  I'll remind you

1   of the instruction not to discuss the case with anyone while

2   you're not here, and before you've heard all the evidence, and

3   most importantly, keep an open mind until you have heard all

4   the evidence, and we'll return tomorrow at 9:00 a.m.  Thank you

5   very much.

6          (Proceedings were heard out of presence of the jury:)

7          **THE COURT:**  Ms. Preston, you may step down.  Thank

8   you.

9      All right.  On the record, without the jurors present.

10  We'll have redirect, if desired, by plaintiff's counsel, and

11  then questions from the jurors, and then what will be after

12  that?

13         **MR. SIEGEL:**  So I believe we have three further

14  witnesses tomorrow; correct?

15         **MS. MEHTA:**  Correct.

16         **MR. SIEGEL:**  Katano Kasaine.

17         **MS. MEHTA:**  Then we have four, including Ms. Kasaine,

18  Barry Donelan, TC Everett, Dwight McElroy.

19         **THE COURT:**  McElroy.

20         **MS. MEHTA:**  TC Everett, Barry Donelan, Dwight

21  McElroy, and Katano Kasaine.

22         **THE COURT:**  And what order will you call them in?

23         **MR. SIEGEL:**  Kasaine will be first.  The others as

24  they're able to get here; right?  Is there a problem?

25         **MS. MEHTA:**  Dwight has to be in the morning.

 1          MR. SIEGEL:  Okay.  So Dwight will be next.  After

 2   Katano Kasaine, it will be Dwight McElroy.

 3          THE COURT:  If you are lengthy in your examination,

 4   you're going to be limiting your opportunity to cross-examine

 5   witnesses during the direct case, so you will need to be

 6   punctual.

 7          MR. SIEGEL:  Oh, yes, definitely.

 8          THE COURT:  Yes.

 9          MR. LAFAYETTE:  I guess if he finishes, that's where

10   we go.  I think he'll finish tomorrow.  We have Sonia Lara, we

11   have Scott Johnson, and we have our economist Mr. Cohen.

12          MS. MEHTA:  What's your last one?  I'm sorry.

13          MR. LAFAYETTE:  Cohen, the economist.

14          THE COURT:  And for Mr. Cohen, what's your expected

15   length of testimony?

16          MR. LAFAYETTE:  I'm going to look at my notes, but we

17   might be done.  I'm monitoring what evidence came in, and I'm

18   really trying not to duplicate stuff.

19          THE COURT:  All right.  So yesterday at the end of

20   the day we talked about some of the legal issues involving the

21   jury instructions and verdict form.  To the extent either party

22   wishes to file something in writing to address those concerns,

23   I need that tomorrow by 8:00 a.m.  You're not required to put

24   it in writing.  You might be prepared to discuss it in person,

25   but that discussion is going to be at the end of the day

 1   tomorrow or during some break.  I don't want to get to the end

 2   and not have given you an opportunity to address the legal

 3   issues, and I need the weekend to finalize those documents to

 4   be ready for the end.  So if it's in writing, it's by morning.

 5   If it's not in writing, it's not going to be in writing.

 6       If there's going to be a Rule 50 motion at the close of

 7   the evidence, then you should be prepared for that, both

 8   parties.  If that motion is going to be in writing, and you

 9   want it to be considered immediately, then you need to have it

10   filed in writing at the time of the close of evidence.

11           MR. LAFAYETTE:  Yes.

12           THE COURT:  So, again, that's more homework for you

13   to work on now.  That's without knowing what might be in the

14   motion, but I'm just alerting both parties to the timing of it.

15   That's likely coming tomorrow.

16           MR. LAFAYETTE:  Yes.

17           THE COURT:  And if it is in writing, I will consider

18   it in writing, and it might assist the Court in making a proper

19   ruling on the motion.  So that's something both parties should

20   be prepared for tomorrow, and we'll take it up immediately upon

21   the -- depending on the timing of when the day that occurs, you

22   should be prepared to take it up immediately upon the close of

23   plaintiff's case.

24           MR. LAFAYETTE:  We'll do that, Your Honor.

25           THE COURT:  Anything else we should resolve today?

1          **MR. LAFAYETTE:**  I don't think so, Your Honor.

2          **THE COURT:**  Mr. Siegel?

3          **MR. SIEGEL:**  So your instruction about 8:00 a.m.

4   tomorrow includes further proposed jury instructions?

5          **THE COURT:**  Further proposed, modification, or new

6   jury instruction or a verdict form, that's when I need it.

7          **MR. SIEGEL:**  Okay.

8          **THE COURT:**  I excluded reference to -- not a

9   reference to.  I excluded some proposed exhibits that were

10  statutes, rules, and I stopped further examination for them on

11  those topics.  Let me elaborate on why I stopped the further

12  examination on the topics.

13      The documents themselves I excluded as not being timely

14  disclosed, but you are impeaching the witness with them, not

15  just seeking to have the documents themselves admitted.  My

16  conclusion at that moment was that there had been sufficient

17  examination about what she knew and the reasonableness of her

18  belief, and given the length of the examination, and the need

19  to get it done in a timely way, that we had had sufficient

20  examination, so that was the basis for my excluding further

21  questioning on the topic.

22         **MR. LAFAYETTE:**  Can we propose those as additional

23  jury instructions, because they are the law?

24         **THE COURT:**  I would consider, as I mentioned

25  yesterday from both parties, some further explanation about

```
 1   what the law is, if it's narrow.

 2              MR. LAFAYETTE:  Yes.

 3              THE COURT:  And part of the concern of the jury

 4   distraction during examination was the potential going into

 5   mini sub topics, and the jury didn't have it in front of them.

 6   I think this is an area of potential jury confusion --

 7              MR. LAFAYETTE:  I understand, Your Honor.

 8              THE COURT:  -- in the extreme level, so that's why I,

 9   rather than have it been done live in front of the jury, I

10   would like the parties to confer about what the agreements

11   might be and do it outside their presence instead of having

12   argument in front of them about what the law is to confuse them

13   even further.

14              MR. LAFAYETTE:  Thank you, Your Honor.

15              THE COURT:  See you tomorrow.  Thank you.  We're in

16   recess.

17   (Proceedings adjourned at 4:05 p.m.)

18   I certify that the foregoing is a correct transcript from the

19   record of proceedings in the above-entitled matter.

20
```

*Lydia Zinn*

```
21   _____     September 17, 2015
     Signature of Court Reporter/Transcriber   Date
22   Lydia Zinn

23
```

*Rhonda Aquilina*

```
24   _____     September 17, 2015
     Signature of Court Reporter/Transcriber   Date
25   Rhonda Aquilina
```