**Volume 1**

**Pages 120 - 234**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

```
DARYELLE LAWANNA PRESTON,        )
                                 )
          Plaintiff,             )
   VS.                           )     NO. C 14-02022 NC
                                 )
CITY OF OAKLAND; DEANNA SANTANA, )
in her individual capacity;      )
and DOES 1 through 10, inclusive,)
                                 )
          Defendants.            )
_____)
```

San Francisco, California
Monday, September 14, 2015

**PARTIAL TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Daryelle Lawanna Preston:
                    Siegel & Yee
                    499 14th Street, Suite 220
                    Oakland, CA 94612
                    510) 839-1200
                    (510) 444-6698 (fax)
               **BY:  SONYA MEHTA**
                    **DANIEL MARK SIEGEL**


Reported By:  Lydia Zinn, CSR No. 9223, FCRR
              Rhonda Aquilina, CSR No. 9956, RMR, CRR
              Official Reporters

1   **APPEARANCES (Continued):**

2   For Defendants City of Oakland; Deanna Santana:
                       City of Oakland

3                        Office of the City Attorney
                       One Frank Ogawa Plaza, 6th Floor

4                        Oakland, CA  94612
                       (510) 238-3601

5                        (510) 238-6500 (fax)
                BY:  **MARIA BEE**

6                       **JAMES F. HODGKINS**
                      **JENNIFER N. LOGUE**

7                       **OTIS MCGEE, JR.**

8                        Lafayette & Kumagai LLP
                       101 Mission Street, Suite 600

9                        San Francisco, CA  94105
                       (415) 357-4600

10                      (415) 356-4605 (fax)
                BY:  **AFRICA EVANGELINE DAVIDSON**

11                       **SUSAN TAYEKO KUMAGAI**
                      **JESPER IHDE RASMUSSEN**

12                       **GARY T. LAFAYETTE**

13                        Villareal Hutner
                       575 Market Street, Suite 1700

14                        San Francisco, CA  94105
                       (415) 632-4116

15                      (415) 512-7674 (fax)
                BY:  **ROSS ALLEN BOUGHTON**

16                       **DAVID ADRIAN LUCERO**

17                        Haapala Thompson and Abern
                       1939 Harrison Street, Suite 800

18                        Oakland, CA  94612
                       (510) 763-2324

19                      (510) 273-8534 (fax)
                BY:  **JODY STRUCK**

20

21

22

23

24

25

PROCEEDINGS

1                    **I N D E X**

2     Monday, September 14, 2015 - Volume 1

3                                                    **PAGE   VOL.**

4     Opening Statement by Mr. Siegel               123    1
      Opening Statement by Mr. Lafayette            149    1
5
      **PLAINTIFF'S WITNESSES**                      **PAGE   VOL.**
6
      **SANTANA, DEANNA**
7      (SWORN)                                        173    1
      Direct Examination by Mr. Siegel              174    1
8
                      **E X H I B I T S**
9
      **TRIAL EXHIBITS**                    **IDEN   EVID   VOL.**
10
       6                                            191    1
11
       7                                            193    1
12
       8                                            189    1
13

14

15

16

17

18

19

20

21

22

23

24

25

1   <u>**Monday - September 14, 2015**</u>                    <u>**12:53 p.m.**</u>

2                    P R O C E E D I N G S

3                       ---o0o---

4   (Jury selection and instructions reported but not transcribed.)

5        (Proceedings were heard out of presence of the jury:)

6        **THE COURT:**  Welcome back.  Please be seated.  Our

7   jurors are assembled and ready to return.  Any further issues

8   before we bring them in?

9        **MR. SIEGEL:**  Not for the plaintiff, Your Honor.

10       **MR. LAFAYETTE:**  No, your Honor.

11       **THE COURT:**  All right.  Let's bring them in.

12                  (pause in proceedings.)

13       (Proceedings were heard in the presence of the jury:)

14       **THE COURT:**  All right.  Welcome to our jurors.

15  Everyone else can be seated.

16       And as promised, we will start with the opening

17  statements, and plaintiff may proceed.

18       **MR. SIEGEL:**  Thank you, Your Honor.

19                  <u>**OPENING STATEMENT**</u>

20       **MR. SIEGEL:**  Good afternoon.  I hope everyone had a

21  good lunch.

22       You may think this, without even hearing the evidence, but

23  Oakland City Hall is a pretty tough place to work, a location

24  where people are very competitive.  There's lots of sharp

25  elbows, if you want to put it that way.  You have business

1   people and developers who are looking for business; you have

2   labor unions looking for better contracts; you have politicians

3   who are looking for influence; you have community groups; you

4   have groups based on racial and ethnic groups, and it's a tough

5   place to work.

6       Lawanna Preston was hired to make sure that people follow

7   the rules.  She was hired in 2007 to be in charge of labor

8   relations, meaning it was her job to negotiate with the unions

9   who represent the City employees to handle grievances, that is

10  complaints, that the unions would make in which they claim

11  there's a violation of the contract.  She was in charge of

12  investigating employees who were accused of bad conduct,

13  misconduct.

14      The person who hired her was a city administrator by the

15  name of Deborah Edgerly.  And in Oakland, the City

16  Administrator's job is the top job.  That's the top-appointed

17  person, the person who is in charge of running the Government

18  on a day-by-day basis.  I'm not talking about the elected

19  leaders like the mayor or City Council members, and so on, but

20  the City Administrator was the top person.  And when Deborah

21  Edgerly hired Ms. Preston, she told her very candidly that

22  things were a mess, that people did what they want, that they

23  didn't follow the rules, that things were chaotic.  There were

24  lots of problems, and she essentially appointed Lawanna Preston

25  to be the new sheriff in town to make sure that things got

1    straightened out.  And what you will hear is that Lawanna

2    Preston did exactly that.  She brought order to labor relations

3    by being fair to both sides.  She made sure that employees were

4    disciplined if they engaged in misconduct.

5         One of the things that she found when she started work was

6    that in the City's corporations yard -- and if you don't know

7    what that is, corporations yard is where maintenance employees

8    and other civil employees reported for work and where the City

9    trucks and other vehicles that they used were maintained.  She

10   learned that about 3:00 o'clock in the afternoon people stopped

11   working in the corporations yard and started to drink, and that

12   some people opened the trunks of their cars and there were full

13   bars inside, and this is one of the issues that she addressed.

14   Because she did her job the way she was hired to do, Lawanna

15   Preston was fired.

16        Now, before I go into the facts of the case in greater

17   detail, I just want to emphasize very briefly what Judge

18   Cousins said earlier, which is that we have two claims in this

19   case.  They're both retaliation claims.  One is under the First

20   Amendment to the United States Constitution, the other is under

21   California Labor Code Section known as 1102.5.  But there's a

22   lot of overlap between the two.  The First Amendment claim is

23   brought only against the City Administrator who fired

24   Ms. Preston, Deanna Santana, who is here in court, who a couple

25   of -- after a couple of interim people, was the person who

1    assumed the job that Deborah Edgerly had had.

2        And the First Amendment claim basically is that Lawanna

3    Preston stepped out of her role as an employee and raised

4    issues about the way in which some things were being run in

5    city government, and she did so because either these were

6    matters of public concern or she skipped over her direct

7    supervisor to tell the public or elected politicians about

8    these problems, or basically raised things that were not simply

9    part of her job.  And I'll explain that later.

10       And then the Labor Code is similar, but doesn't require

11   that she step out of her job, even if a person in their job

12   reports on misconduct, violations of state or federal law, or

13   other types of corruption, they are safe from retaliation.  And

14   Judge Cousins explained some of these things already, and he'll

15   give you more detailed instructions at the end of the trial to

16   help you evaluate the evidence and make your decision.

17       Now, as I mentioned, Ms. Preston was hired in July of

18   2007.  Before that, she had really worked her way up from kind

19   of the bottom of the totem pole.  She started out her career

20   working in stores.  She became a parking enforcement officer

21   for the City of Berkeley, then became the supervisor, and then

22   went to work for the Service Employees International Union,

23   which is a very large union.  It represents a lot of public

24   employees, actually, all over the United States, and she rose

25   in that job from being a field representative to ultimately

 1  being the person in charge of the SEIU's operations in San

 2  Francisco and also its political director.

 3       But in 2007, as I mentioned, some people would say, well

 4  she switched sides from the Union side to the management side.

 5  But what she will tell you is that what she was interested in

 6  was the whole process of labor relations and doing a good job

 7  as a labor relations representative.  She felt she could do it

 8  for the Union or she could do it for the City of Oakland, and

 9  Deborah Edgerly, as I mentioned, hired her.

10       Things went very, very well for over four years.  In 2011,

11  Deanna Santana was hired as the City Administrator by Mayor

12  Jean Quan, who had become mayor in the beginning of 2011.  And

13  not to knock Ms. Santana, but she had never before worked as a

14  city administrator.  She was not particularly experienced in

15  issues of labor relations or employee relations.  And I think

16  what you will find is that she was a little bit defensive when

17  things happened that she felt were not under her control or

18  when things happened that she did not expect, she reacted

19  negatively, and that's the kind of manager that she was.

20       Nonetheless, things went well for the first year or so

21  after Ms. Santana was hired.  In fact, in January 2012,

22  Ms. Santana actually promoted Lawanna Preston.  She promoted

23  her from being in charge of employee relations within the human

24  relations -- Human Resources Department.  In other words, she

25  was reporting to the head of human resources -- she promoted

1    her to a position where she was reporting directly to

2    Ms. Santana, in other words, as a department head.  So instead

3    of reporting to the human resources director, she became a peer

4    of the human resources director, and again reported directly to

5    Ms. Santana, and that was in January 2012.

6        In the spring of 2012, Ms. Santana, who took this

7    responsibility on herself, did a performance evaluation for

8    Lawanna Preston, and here's some of the things she said about

9    her.  She said that "Lawanna is a great asset for the City.

10   Her knowledge, skills, and abilities provide needed leadership

11   to employer relations.  She attempts to resolve grievances at

12   the lowest level.  Lawanna has established great working

13   relationships with organized labor and demonstrates a high

14   level of professionalism and integrity."  And she went on and

15   on and on, and that was what Deanna Santana had to say about

16   Ms. Preston in the middle of 2012.

17       Well, at the same time that this was going on, that is

18   this evaluation, a problem arose in Oakland that kind of goes

19   back to what I said a few minutes ago, about something called a

20   Rainbow Teen Center.  The Rainbow Teen Center was a building

21   that was established in East Oakland in one of the poorest,

22   most crime-ridden parts of the community.  But the City did not

23   complete the building of the center or staff it, so what

24   happened is that one of the members of the Oakland City

25   Council, and I think we have to be fair about this, kind of

1    stepped outside her role as an elected official and made sure

2    that this Teen Center was opened, and that it was staffed, and

3    it was done in order to serve the kids who lived in that

4    community who needed those services.  But this was not the City

5    council member's job, okay.  This is the job of staff, not the

6    City council member.  And you'll hear from the City council

7    member, her name is Desley Brooks, tomorrow, and she'll talk a

8    little bit about this.

9         Whether she was right or wrong is really irrelevant for

10   purposes of this trial, but it became a big issue.  It became

11   an issue, because there's a question of was the City going to

12   pay the bill for fixing up the Center?  Was the City going to

13   pay the staff who were working in the Center?

14        And so a report was commissioned by Ms. Santana, and

15   Ms. Santana asked Ms. Preston and an assistant city manager

16   named Fred Blackwell to write up a report about what had

17   happened with the Rainbow Teen Center and what should happen in

18   the future, and so they did that.  And Ms. Preston, in her part

19   of the report, discussed how things were not done properly in

20   terms of the staff, and how they should be done.

21        As the report was being completed, Ms. Santana and the

22   City Attorney of Oakland, a woman named Barbara Parker, who you

23   will also see tomorrow, suggested that what should be included

24   in the report a statement that indicated that Council member

25   Brooks had violated the law, had violated the Oakland City

1  Charter, and should be reported to the Alameda County District

2  Attorney for possible prosecution.

3       Now, when Ms. Parker and Ms. Santana suggested to

4  Ms. Preston that that paragraph go into the report, and you'll

5  see the report, Ms. Preston said no.  Number one, it's not our

6  job, the City staff, to decide whether City-elected officials

7  should be prosecuted; and number one, to tell you the truth,

8  she said a lot of the elected officials in Oakland are engaged

9  in similar conduct, where they, you know -- you've heard the

10 expression *they stepped out of their lanes*, *they didn't stay in*

11 *their lanes* -- they tried to influence the staff in city

12 government, and to pick on Desley Brooks, who was the only

13 black woman on the City Council, would be racially

14 discriminatory, and Ms. Preston will tell you she thought that

15 would violate the laws against racial discrimination.  And she

16 will tell you that when she put her foot down on that issue,

17 Ms. Santana and Ms. Parker were angry at her.  They didn't like

18 it, but ultimately they gave in, because they needed to do this

19 report.

20      Well, this report was ultimately completed on

21 February 24th, 2012.  On March the 6th, 2012, there was a

22 meeting of the Oakland City Council, and you'll hear this

23 meeting is probably like an only-an-Oakland experience.  This

24 was a chaotic meeting.  The council chambers were jammed to

25 capacity, people lined up to speak to support Desley Brooks or

1   to oppose Desley Brooks, to criticize her of what she had done

2   of stepping outside her role as a Council member, or to praise

3   her for getting this center opened in East Oakland.

4        And an issue arose in that center -- excuse me -- in that

5   meeting where the question was whether Ms. Santana had advised

6   Ms. Brooks that Ms. Santana and the park & rec director were

7   going to have one director for both the Rainbow Teen Center and

8   another center.  And the question was whether Ms. Santana had

9   actually told Ms. Brooks about that, and Ms. Brooks said no,

10  you never mentioned that; you never told me we were going to

11  have one director for both centers.  And Ms. Santana, who sits

12  up on the podium at the City Council meeting, called out to

13  Ms. Preston and Mr. Blackwell, *Step up to the mic and tell the*

14  *City Council that in fact I had given Desley Brooks that*

15  *information*.

16       Now, you'll hear from Fred Blackwell.  He's going to be in

17  tomorrow, I believe, or maybe the next day.  He'll say he

18  didn't want to be called up to the mic.  He thought things were

19  not as clear as Ms. Santana portrayed them to be, so he just

20  avoided going up there.  Ms. Preston went up to the mic

21  reluctantly and told the council *I'm sorry, I have to disagree*

22  *with Ms. Santana.  Desley Brooks was not present when that*

23  *information was given about having one director for both*

24  *centers.  That's a mistake that Ms. Santana made.*  You would

25  think no big deal.

1      But after March 6th, things really started to go downhill

2  between Ms. Santana and Ms. Preston.  Ms. Santana became cold

3  with her, didn't have their regular weekly meetings, often

4  excluded her from group meetings.  But things went on, and as I

5  mentioned, there was that tremendous evaluation.  It was never

6  signed, but it was done.

7      Now, things are moving ahead.  Jump ahead almost one year

8  later, one year later, an issue arises regarding collective

9  bargaining.  And, you know, this may seem like technical stuff,

10  maybe it is, maybe it isn't, but it's the law.  The City of

11  Oakland had a policy about how it would negotiate with the

12  unions that represent its employees:  You have fire fighters,

13  you have police officers, you have construction workers, truck

14  drivers, you have a big unit of clerical employees which was

15  represented by SEIU.  And City policy, as it's relevant here,

16  has two aspects.  One, the policy was that employee relations

17  does the negotiating; okay?  We don't want department heads,

18  whether it's the police chief or the fire chief or the park &

19  rec chief to go out cutting their own deals with their unions;

20  and secondly, we want to make sure that before you make a

21  proposal to a union, you go to the City Council and get their

22  approval.  The City council said, look, we don't want the

23  negotiators going to meet with the unions and offer them pay

24  raises or other benefits without advance Council approval.  So

25  again, that was Ms. Preston's job, was to make sure that that

1   policy was followed.

2        Well, in June of 2003, the fire chief, who was, you know,

3   a fine person, not trashing her, not criticizing her, but

4   nonetheless, she either didn't know the rules or there was some

5   other issue that arose, she met with the firefighters unions,

6   it's called Local 55, and negotiated a deal with them to extend

7   something called the para transit or para-something program for

8   a month, and Ms. Preston found out about it.  Ms. Preston said

9   to the fire chief, Ms. Reed, *You can't do this; you have to go*

10  *through employee relations, number one, and we have to get*

11  *Council approval, and there was no Council approval.*

12       And Ms. Preston then told Ms. Santana about what the fire

13  chief had done.  Well, Ms. Santana didn't like that news.  She

14  didn't like that news, because it was embarrassing to her that

15  a department head who reported to Ms. Santana was going out,

16  breaking the rules, violating the requirements that the Oakland

17  City Council had put on its department heads, and she also was

18  upset because she and the fire chief were colleagues who had

19  worked together.  Ms. Santana came to Oakland from San Jose.

20  That's where she worked before she came to Oakland.  The fire

21  chief, Teresa Reed, had also worked in San Jose, and

22  Ms. Santana was the one who was responsible for bringing

23  Ms. Chief Reed to Oakland.  So it was kind of an embarrassment

24  to her.  And she's like, *Well, what's the big deal?  We don't*

25  *need Council approval*, and so on.

1      Ms. Preston says, *now, wait a minute.  There's a law*

2  *that's involved here, it's called the Meyer Milias Brown Act*,

3  and that's the state law which governs labor relations between

4  the employees of a city, like Oakland, and the City itself.

5  And if you have people who don't have authority making

6  agreements with the unions, then the unions can turn around,

7  when they find out that they've made an agreement that was not

8  valid, and scream that this is what's called an unfair labor

9  practice, and that the City had misrepresented itself again by

10  sending someone to the table who didn't have the authority to

11  make that deal.

12      So for all these reasons, Ms. Preston was trying to

13  enforce the rules.  Ms. Santana is unhappy again, embarrassed,

14  her appointee is embarrassed, and they had to straighten it all

15  out.  And what you'll hear is that the firefighters Union was

16  very upset about all this, because they will say they went to

17  the table, they made an agreement, then they're told the

18  agreement is not valid, and they felt a little disappointed.

19  They felt like they had been had, so to speak.  But they were

20  able to straighten things out.  They went to the City Council

21  after the fact, the City Council ratified the agreement, and

22  everything was smoothed over.  But, again, Ms. Santana was sore

23  at Ms. Preston because of the way that it was handled.

24      Now, the third big incident comes up almost immediately

25  thereafter.  The agreement with the firefighters Union was

1    ratified in July, then in August, another problem develops.

2    This problem involves employees who were called temporary

3    part-time employees, in other words, they're not permanent

4    employees, they're not full-time employees, they're temporary

5    part-time employees, TPTs they're called.  These employees were

6    one of the bargaining groups that was represented by the

7    Service Employees International Union.

8        Now, under the contract between the Union and the City of

9    Oakland, and under state law, the same law I mentioned earlier,

10   the different section of the Meyer Milias Brown Act, the City

11   is obligated to deduct Union dues from the paychecks of

12   employees who are part of this bargaining unit and remit the

13   money to the Union.  And lo and behold it turned out there was

14   a failure to do this.  The way the Union found out about it is

15   that there was a discussion, public discussion about how many

16   temporary part-time employees the City of Oakland was employing

17   at that time, and that number was far greater than the number

18   of employees for whom dues were being deducted and sent to the

19   SEIU.

20       So on August 6th, 2013, there was a meeting, and at that

21   meeting were several people from the Union, the City's finance

22   director, a person by the name of Katano Kasaine, and two of

23   Ms. Preston's subordinates.  And everyone, they will tell you,

24   you will hear from several of the people who were at this

25   meeting, were very surprised when Ms. Kasaine said, *oh, I*

1   *haven't been deducting the dues from the temporary part-time*

2   *employees. I was afraid that if I did, people would complain*

3   *about it. My phone would be ringing off the hook.* That's what

4   she said.

5       And Ms. Preston's two subordinates who were there, a woman

6   by the name of Winnie Anderson, another woman by the name of

7   Sonia Lara, go back to Ms. Preston and said, *Hey, guess what?*

8   *Guess what Ms. Kasaine just admitted at a meeting*? And the

9   SEIU people are angry. They're going to file a grievance.

10  This may cost the City a lot of money, because apparently this

11  practice had been going on not just briefly but for years, and

12  we've got to figure out what to do about it.

13      So Ms. Preston basically says, *Look. Okay. Calm down.*

14  *We'll fix this. I'll investigate the problem, and we'll do*

15  *what we need to do.* And again, she was concerned that this was

16  a violation of state law, as well as the City's agreement with

17  the Service Employees Union.

18      So she begins to investigate it. And what happens next is

19  that she contacts Ms. Katano Kasaine and says, *Look. We need*

20  *to talk about this. I want to interview you.* And Ms. Kasaine

21  says, *You don't need to interview me. I don't have anything I*

22  *need to say about this.* And, in fact, what you will hear is

23  that Ms. Kasaine has denied, ever since August 6th, 2013, that

24  she made the statement at the meeting. She denies that, even

25  though everybody else who was at the meeting, the Union side,

1    the management side all heard it, some people wrote notes.

2    You'll hear from people who will bring these notes into court.

3    But, for whatever reason, including even when I took her

4    deposition a few months ago, Ms. Kasaine denies she ever made

5    that statement.

6         Ms. Preston begins to investigate the grievance.  Within a

7    week, Ms. Santana took away from Ms. Preston the responsibility

8    to investigate the grievance.  She said no -- this is on

9    September -- September 19th, excuse me, September 12th, 2013.

10   Ms. Santana says to Ms. Preston *You're not going to investigate*

11   *this grievance*.  *I'm going to turn it over to the City*

12   *Attorney*.  So Ms. Preston says *Why?*  *This is my job to*

13   *investigate the grievance*.  The City Attorney's job is not to

14   investigate grievances.  In fact, the City Attorney will admit

15   that she had never been asked to investigate a grievance before

16   that.  But they wanted to take Ms. Preston out of the loop.

17   And, again, Ms. Santana was unhappy about this.  It was

18   embarrassing to her.  Katano Kasaine was one of her prime

19   subordinates, a person that she had an alliance with, so they

20   tried to take Ms. Preston out of the loop on the investigation

21   of the grievance.

22        Well, next thing that happens, and we're kind of coming to

23   a head on that just now, is that Ms. Kasaine, without any

24   approval from anyone, contacts the president of the Union, a

25   guy by the name of Dwight McElroy, and asks him to drop the

1    grievance, and he reports that to Ms. Preston.  Ms. Preston

2    immediately turns around and sends a memo to Ms. Santana and to

3    the City Attorney, Barbara Parker, and says *Look.  This is what*

4    *just happened here.  Ms. Kasaine is interfering with the*

5    *grievance process.  That's going to get us in trouble again.*

6    *That's a violation of the law.  You need to allow the grievance*

7    *process to go ahead.*

8          So everything is getting pretty chaotic right now, and

9    things are not working the way they're supposed to.  There's a

10   City Council meeting on October the 1st, 2013, and at that

11   meeting in closed session there was supposed to be a

12   conversation not about this grievance, but about the

13   negotiations between the City and the same Union, the Service

14   Employees International Union, on various contract issues.

15         And when the Union and City are negotiating contracts,

16   each side puts forward written proposals to the other side, and

17   on the SEIU proposal to the City, which was being looked at by

18   City Council members at this meeting on October 1st in closed

19   session, there's a statement that says, "SEIU is not going to

20   drop its grievance."  In other words, the SEIU people were

21   saying we're willing to negotiate on these contract issues.

22   We're not going to drop the grievance.

23         Before that meeting, on October 1st, Ms. Santana had told

24   Ms. Preston not to bring up the issue of the grievance, not to

25   bring it up.  Ms. Preston said *Fine.  I won't bring it up.*  But

 1   the City Council members looking at the statement, one of them

 2   says to Ms. Preston *What's this about a grievance that SEIU is*

 3   *not going to drop?*  And Ms. Preston has to tell the truth.  She

 4   said, *Well, there's a grievance because of this dues problem.*

 5   This was on October 1st, 2013.

 6        The next day, Ms. Santana decides to fire Ms. Preston, the

 7   very next day, October 2nd.  So when Ms. Preston comes to work

 8   on the morning of October 3, one of Ms. Santana's assistants is

 9   standing there at the door to Ms. Preston's office with a

10   security guard and says, *I'm sorry, Lawanna, you're fired*,

11   gives her a statement of her termination, and that's kind of

12   the way it went.

13        Now, I want to mention just a couple of things before we

14   go on to the next stage of this.  At no time was Ms. Preston

15   ever counseled about bad performance.  You will see, depending

16   upon how many documents are introduced in this case, there is

17   not one piece of paper where Ms. Santana says to Ms. Preston

18   *I'm unhappy with your performance, this is how you have to*

19   *change, I'm thinking of firing you*, or anything like that.

20   There was never any counseling.

21        When I asked Ms. Santana in her deposition, *Well, you*

22   *know, as a City Administrator, you know you have to document*

23   *things before you fire someone.  Why didn't you document your*

24   *dissatisfaction with Ms. Preston if you claim there was this*

25   *dissatisfaction?*  Her answer was "I don't know.  I don't know."

1    That's her answer.  And she was never counseled.  There was

2    never a discrimination.

3         Now, the next thing I want to speak about briefly is how

4    the City of Oakland keeps changing its story about the reasons

5    for the termination.

6         So on October 3, when she's fired, she's given something

7    called a Notice of Termination that's an official City of

8    Oakland form.  And do you see what it says on the bottom there,

9    it says "reasons of separation;" do you see that?  There's two

10   columns.  One column says "lack of work," the other column says

11   "discharged."  So it didn't say she was discharged, they said

12   because it was because of lack of work, and they said "see

13   attached form."  And the attached form says, "Dear,

14   Ms. Preston, your services are no longer required."  There was

15   never any explanation given there as to why she was being

16   terminated, and as I said, they fill out the form that says

17   "lack of work."

18        Now, in the context of this trial, as Judge Cousins

19   mentioned earlier, each side is allowed to send what are called

20   interrogatories to the other side, and these are written

21   questions that have to be answered in writing, and then they

22   have to be sworn under oath under penalty of perjury.  So of

23   course my team did that in the course of trial, and we sent

24   interrogatories to the City of Oakland, and they had to answer

25   them.  So here was their answer.  We asked them:  "Describe in

1    detail each reason for plaintiff's termination."  So there's

2    this language where they object and say they're not going to

3    answer them and so on.  They say:  "Without waiving any

4    objection, and in an effort to provide as complete a response

5    as possible, complete a response as possible, responding party

6    states that plaintiff was an at-will employee, and as such

7    could be terminated or could leave her employment for any

8    reason or without any reason.

9        "Responding party further states that plaintiff disclosed

10   confidential information inappropriately to third parties not

11   authorized to receive it."

12       We never heard what that confidential information is, by

13   the way.

14       "Responding party states that plaintiff failed to maintain

15   the professional relationship with the City Administrator, and

16   failed to maintain professional relations with other

17   colleagues."  So that's what they wrote.

18       Now, this statement comes in December 2014, about 14

19   months after she's fired, and it's sworn to by Deanna Santana,

20   a document called a "verification," which is attached to it,

21   where Deanna Santana swears that it's true and signs it under

22   penalty of perjury.

23       In the same set of interrogatories, we asked her to

24   identify the people who made the decision to fire Ms. Preston,

25   and the answer was:  "Deanna Santana made it by herself."

 1          Well, okay.  That's the story.  As I said, we've never had

 2     any identification of confidential, quote-unquote, information

 3     that was disclosed.  Ms. Preston will testify that all the

 4     information she had she was authorized to have, all the

 5     information she disclosed she was authorized to disclose.

 6          In terms of not maintaining professional relationships,

 7     the statement I read to you from the 2012 performance

 8     evaluation is the only statement, the one and only statement

 9     that Deanna Santana ever made to Ms. Preston regarding her

10     relationships with other people, and it says, as I read, that

11     it was professional.

12          Okay.  So, well, they decided they needed another set of

13     reasons, so what they did is about a month after the document

14     that I just read to you, they filed what are called

15     supplemental answers to these interrogatories, and they did

16     that in January of 20 -- where are we now, 2015?

17          Now, and in that document, they went on for about four

18     pages as to all the reasons that they fired Ms. Preston, so

19     they said they were unprofessional relationships, complaints

20     about the way in which she treated her colleagues, and she sent

21     actionable labor-related reports to City Council in closed

22     session.  I just want to comment on that.

23          Ms. Preston had the authority explicitly and clearly to

24     send reports on labor relations to the City Council, and often

25     the City Council wanted those reports, and we have evidence of

1   this documented.  They wanted the reports promptly.

2       Now, generally speaking, there was kind of a long lead

3   time for submitting reports to the City Council prior to

4   meetings, but negotiations are going on on a kind of

5   quick-paced basis, and the Council wanted reports, timely

6   reports.  So yes, sometimes Ms. Preston, as she had the

7   authority, would send a report to the City Council maybe a week

8   or three days or even a day before a Council meeting, because

9   that was what she was supposed to do.

10      There was another issue they brought up way after the

11  fact, that Ms. Preston had interfered with an investigation of

12  an employee in the Human Resources Department who was accused

13  of buying computers without proper authorization.  Well, it

14  turned out this employee had in fact had bought some computers

15  that were more powerful than the City's IT network was capable

16  of accommodating, and they got sent back, and then there's an

17  investigation about it.  And the investigation was within the

18  Human Resources Department, because the employee who ordered

19  the computers worked in the Human Resources Department.

20      Well, by the time the investigation is moving into its

21  completion, completion stages, an employee in the Human

22  Resources Department by the name of Sonia Lara moved into the

23  Employee Relations Department to work for Ms. Preston.  And the

24  head of human resources, on basically really her last day of

25  employment, reached across department lines without getting

 1   Ms. Preston's authorization and asked Ms. Sonia Lara to write

 2   up a report on these computers.  When Ms. Preston found out

 3   about that, this was again something that was being done

 4   outside policy.  It wasn't just the kind of insult that her

 5   staff person had been asked to write a report without getting

 6   her permission.  The real problem was is that Ms. Preston and

 7   her new staff person were responsible for investigating the

 8   proposed disciplinary action against the woman who ordered the

 9   computers, someone by the name of Deb Grant.  And Ms. Preston

10   quite clearly didn't want someone who was investigating the

11   disciplinary matter also to be a witness in the same matter, so

12   she said to Sonia Lara, she said, *look, you're not submitting a*

13   *witness statement on this*, and she took the witness statement

14   away from her, and she did it for the reasons that I have just

15   described.

16       In any case, you know, the explanations go on.  I'm quite

17   sure that you'll hear new explanations during this trial of the

18   reasons that they fired her.  And I'm just going to mention one

19   other thing on the reasons issues.

20       As I mentioned earlier, the meeting with the City Council,

21   at which Ms. Preston spoke to the Council about the SEIU

22   grievance, occurred on October 1st, and on the morning of

23   October 3rd, she was fired.  In her deposition, because I took

24   Ms. Santana's deposition, and she was under oath, and I asked

25   her explain all the reasons as to why you fired Ms. Preston,

1    and she told me this, and you'll hear it from her lips, and

2    from reading the deposition, she said, *well, the last straw was*

3    *something that occurred on October 2nd, the day after the City*

4    *Council meeting.*

5         On October 2nd, Ms. Santana testified: *I was in my office*

6    *at City Hall, and I was having a meeting.  And Ms. Preston*

7    *called up on the telephone, and I put her on the speakerphone,*

8    *and she started to berate me and to call me names and to make a*

9    *big stink about the fact that I had taken her off the*

10   *responsibility for investigating the SEIU grievance, and that*

11   *was the last straw.  So I decided, after all the problems I had*

12   *been having with her, on October 2nd, when she made this*

13   *abusive call to me, to fire her.*

14        So I said to Ms. Santana, I said, *Well, Ms. Santana, who*

15   *else was in the room with you when Ms. Preston made this*

16   *abusive telephone call.*  And she said *Well, it was the City*

17   *attorney, Barbara Parker, and Otis McGee.  Who is Otis McGee?*

18   *Otis McGee is also an attorney.  At that point we were hiring*

19   *him to investigate the SEIU grievance.  And so he and*

20   *Ms. Parker are in my office when Lawanna Preston was berating*

21   *me in this angry and disrespectful way over the telephone.*

22        You know what I do; right?  I took Otis McGee's

23   deposition, and I asked Mr. McGee, I said, *Were you at that*

24   *meeting on October 2nd?  Yes, I was.  Well, let me ask you*

25   *this.  Did you hear Lawanna Preston be rating and abusing*

1    *Deanna Santana?*  His answer was:  *I don't recall hearing*

2    *anything like that*.   I don't recall hearing anything like that.

3    That kind of ends the story in terms of the termination, the

4    reasons for the termination, the excuses for the termination.

5         So there's good news and bad news here for Ms. Preston.

6    The bad news is she gets fired from a job that she had had for

7    six or so years, which paid $157,000 a year at the time of her

8    termination, and which was convenient for her to get to work,

9    paid for her living expenses and her son's living expenses, and

10   so she was out of her job in October of 2013.

11        The good news is that it didn't take her long to find a

12   new job.  In fact, by January of 2014, she had been hired to

13   work for the City and County of San Francisco in a similar job

14   doing employee relations, and by the end of 2014, in the City

15   with four times as many employees as Oakland, she was promoted

16   to do the same job that she was doing in Oakland, to be in

17   charge of employee relations for the City and County of San

18   Francisco.  The job didn't pay quite as well, and different

19   pension arrangements.

20        So Ms. Preston is actually, even though she's landed on

21   her feet, shown what a good employee she is, she has lost

22   considerable amount of money, and you will hear from an

23   individual who would say -- a Stanford-trained economist by the

24   name of Margo Otis, who will come in and testify, I think

25   Wednesday, and will talk about how she calculated Ms. Preston's

OPENING STATEMENT / SIEGEL

1    losses, and that those losses come to over $800,000 over the

2    course of her life.

3          Three elements to this.  Number one is past wage loss.  In

4    other words, from the day she was fired up until today, what's

5    the difference between what she was making in Oakland, and what

6    she made in San Francisco, that's about 92,000.

7          And then there's future wage loss, which, to explain the

8    process, calculation, how much she will lose from today up

9    until her retirement age.  And what economists do when they

10   calculate future losses, they do something called reducing it

11   to present value.  And let me explain what I mean, probably

12   some of you know about this already.  But you say, well, if her

13   loss is, say, $40,000 a year for 20 years, well, if you just

14   add that up, 20 times 40 is $800,000.  But you don't need

15   $800,000 to pay her $800,000 at the rate of 40,000 per year for

16   20 years, you need a lesser amount, because whatever that

17   amount is, you calculate it in a way so that if you invest it

18   in a safe -- safe investments like treasury bonds or something,

19   how much will you need today to invest in these bonds and get

20   your 40 grand a year for 20 years, and then it's all used up.

21   So the future wage loss is -- present value of future wage loss

22   is $253,000.

23         And then the third element of the lost wages is the

24   reduction in your pension benefits.  Now, again, as bad luck

25   would have it, Oakland and San Francisco are part of different

1   pension systems.  Oakland is part of the CALPERS system, which

2   I'm sure many of you have heard of, which is the main Public

3   Employee Pension System in the state of California, hundreds of

4   thousands of employees who belong to that.  San Francisco has

5   its own.  It's called San Francisco Employees Retirement

6   System, and it doesn't pay as well, and the employee

7   contribution is greater.  So that the difference to Ms. Preston

8   over the course of her lifetime calculated from her retirement

9   date to the date on which her life expectancy will end, is

10  about $495,000, so that's where we get the $839,000 economic

11  loss.

12       There's also for you to decide a fair amount to compensate

13  her for her emotional distress, her embarrassment, her

14  humiliation as a result of what they did to her over in Oakland

15  for doing her job and making sure that the rules were followed.

16       And then finally, if you choose to, you can award punitive

17  damages against Ms. Santana, because of her misconduct in

18  firing an employee who did nothing except what she was supposed

19  to do.  Thank you.

20       **THE COURT:**  Thank you very much, Mr. Siegel.  Let's

21  take at least a stand-up and stretch break.  If you need to use

22  the restroom, please feel free to do that, too.  We'll come

23  back in five minutes for the defense opening statement.

24                    (Recess taken at 1:40 p.m.)

25                    (Proceedings resumed at 1:45 p.m.)

 1        (Proceedings were heard in the presence of the jury:)

 2        **THE COURT:**  All right.  The jurors are back.  Everyone

 3   seems to be here.  You may proceed.

 4        **MR. LAFAYETTE:**  Thank you, Your Honor.

 5                        **OPENING STATEMENT**

 6        **MR. LAFAYETTE:**  Good afternoon.

 7        There are always two sides to every story, and I'm now

 8   going to tell you the other side.  I'm going to tell you some

 9   facts you didn't hear before.  I'm going to tell you about

10   people whose names weren't mentioned to you before.

11        Deanna Santana came to the City of Oakland on August 1,

12   2011.  Prior to that, she had not worked with Ms. Preston ever,

13   and when she came to the City of Oakland on August 1, 2011,

14   there was some problems, clear, a budget deficit, a budget

15   deficit made more substantial when the state of California

16   decided in December of 2011 to eliminate redevelopment

17   agencies.

18        So during that time period, up until that time period,

19   Ms. Santana had her hands full trying to manage a budget, an

20   increasing deficit, and realizing that the only way to do that

21   was to flatten the organization of the City of Oakland -

22   flatten it meaning reducing, eliminating levels of management,

23   which is what she started on doing.  And in the midst of that,

24   in the midst of that, there's something that has been alluded

25   to in here that has not been fleshed out that I want to talk

 1  about, something called Rainbow Teen Center.

 2       Now, it starts out as a discussion about whether or not a

 3  vendor should be paid.  And Ms. Santana, as the City manager, a

 4  City Administrator says *I'm going to put two people on this*

 5  *issue into evaluating whether or not this vendor should be*

 6  *paid*, and the vendor was a company called Pulte Homes.  Now,

 7  Pulte had gone out and done work at this center, which no one

 8  is going to knock the idea that this center was probably

 9  necessary, probably is a good thing.  But the net result of it

10  is this center was built without people complying with the

11  rules and the guidelines mandated by the state of California

12  and the City of Oakland to make sure that funds of the City are

13  not expended on whim, and are not expended without public

14  accountability.  That's what Ms. Santana started realizing when

15  she started getting information back from Mr. Blackwell and

16  from Ms. Preston that people were hired in the Center without

17  being vetted, that people were hired to work with children

18  without being processed through those systems that needed to be

19  handled, that people were being hired without complying with

20  the civil service rules.  All of those were things which were

21  landing on Ms. Santana's desk, and more importantly, they were

22  landing in the newspapers.  Yeah, the newspaper reporters were

23  circling, trying to find out what had happened, trying to find

24  out whether or not the City Council person who was in charge,

25  who was also the Vice-Mayor, had participated in violation of

1  City policy, City ordinances.

2       Now, I heard Mr. Siegel say something about Ms. Santana's

3  background, so let me tell you who she is; okay?

4       Ms. Santana didn't just drop out of the sky.  She got her

5  undergraduate degree from the University of Berkeley,

6  University of California at Berkeley, got her Masters at MIT in

7  City Planning, and then did additional work in the School of

8  Public Policy at the University of California Berkeley, and

9  after that, she took a series of jobs in public government

10  ending up at, just before coming to the City of Oakland, as

11  the -- I think it's Deputy City Manager for San Jose where she

12  handled a budget that included 3,000 employees underneath her

13  and over $500 million in a budget.  That's who came to Oakland

14  on August 1, 2011.

15       What happens?  We get to talking about these different

16  events that are taking place.  We talked about something called

17  Rainbow Teen Center.  We talked about a City Council meeting.

18  We talked about the fire department.  Now let's put some flesh

19  on the bones and look and see what all of this really means,

20  and the timeline.  Because you see, everything that's talked

21  about in this case, everything that's talked about in this case

22  takes place over a two-year period of time, less than, or just

23  about, between the time she's hired on August 1, and the time

24  that Ms. Preston is terminated on October 3rd, 2011 to 2013.

25       So, Ms. Preston, Ms. Santana, City of Oakland, Rainbow

1   Teen Center, firefighters Union, dues collection, those are the

2   issues as I see it, as I've heard it, refusal to falsify a

3   report, that's what the judge read, refusal to provide false

4   testimony to the City Council, report that the City of Oakland

5   was already entering into a contract with the Fire Department's

6   Local 55, reporting that the City of Oakland was allegedly

7   failing to collect Union dues.

8       Let's move forward.  Let's put some dates with these

9   events.  The report, February 2012, so let's talk about that

10  for a second.

11      February 2012, Ms. Preston says she did something which

12  led to her getting fired 18 months later, not the day after,

13  not the week after, not the month after, 18 months later.

14  That's what she says.  She says there's a City Council meeting

15  on March 6th, 2012, and she says she did something at that City

16  Council meeting which led to 18 months later her losing her

17  job.

18      I'm going to talk about what all happened in the 18 months

19  between those events, from the date of those meetings until the

20  date of her separation of employment.  You see, that's the

21  timeline.  I know it's a little squiggly, but it's going to get

22  straight at some point.  Here.  Date of Santana hiring, date of

23  termination, what's the next thing you see?  The 18 months.

24  You see that's February right there, 2012, termination date

25  (indicating).

1    So let's talk about these things for a second.  What is

2    this Rainbow Teen, and what is this meeting?  Let's put some

3    meat here.

4         Ms. Preston and Mr. Blackwell, along with Ms. Orologas,

5    were charged with, one, gathering information, two, preparing a

6    report that would go to City Council which would outline the

7    events that had happened which led to the problem which the

8    newspapers were circling about.

9         So at some point Ms. Santana says, *okay, looks to me like*

10   *there's something here that's not just people being outside of*

11   *their lanes, but there might be more to it than just people*

12   *being outside of their lanes, and I need to know, and I need to*

13   *know what my courses of action are if that's in fact the case.*

14   *Am I supposed to just sweep this up under the carpet, or am I*

15   *supposed to do something with it?*  And she needs to know,

16   because she's not been at the City of Oakland for more than

17   approximately six months, and she needs to know how Oakland

18   works, and that's the subject of the conversation:  What can we

19   do?  What can we do?  That's the conversation that she engages

20   in.  You're going to hear from the people who were present

21   during that conversation where they discussed what's supposed

22   to happen.

23        And you know what the most amazing thing that you're going

24   to hear?  You're going to hear that Ms. Santana concluded that

25   she didn't think that she had enough or that she should put

1    anything in a report that said anything about anybody going to

2    a DA.  She thought that she should put in the report as much as

3    she could about what they knew, and she thought she should put

4    in a report that what she had found may lead to the possibility

5    of other investigations.

6         And what you're going to hear is that what she said, what

7    she wanted to do is exactly what was done, and what you're

8    going to hear is that Ms. Preston agreed with her, and

9    Ms. Preston signed off on that same report that identified the

10   risks, the possibilities of people doing things that they

11   shouldn't have done, and a statement that indicates that there

12   was a need for a possible future investigation, *but it's up to*

13   *you, City Council, to decide*.  That's the way that played out,

14   and that was it.

15        And you're not going to hear anybody say that Ms. Santana

16   was angry at that meeting, Ms. Santana was steaming at that

17   meeting, Ms. Santana starting doing stuff to her after that

18   meeting.  No.  You are going to hear that after that meeting a

19   supplemental report was prepared based on questions from the

20   City Council.  And after that meeting, Ms. Preston was invited

21   to come to the City Council meeting, which she did.  And during

22   that meeting a question was asked.  That's what you're going to

23   hear is said, that she's at the meeting, a question was asked,

24   and she's asked to stand up and say something.

25        Now, what was the question?  You won't have to listen to

1   me or Mr. Siegel.  Oakland City Council meetings are

2   videotaped.  You're going to get to see the videotape of the

3   Oakland City Council meeting, and when you see it, you're going

4   to hear the question framed.  The question was, again, and this

5   is Ms. Brooks:

6       "City Council member gave me her word when we met on the

7   22nd or 23rd of last month that we would maintain the staff

8   that was there.

9       "Ms. Santana:  That's -- that's not true.

10      "Ms. Brooks:  That's absolutely true.

11      "Ms. Santana:  What we said is we would fold them into an

12  existing open recruitment, and they need to meet minimum

13  qualifications."

14      Stop.  Why?  Because these are people who didn't go

15  through civil service; these are people who weren't vetted to

16  work with children; these are the people who needed to be

17  properly integrated into the City, and there was some who

18  didn't meet those qualifications.

19      "Ms. Santana:  The report already notes that we know for a

20  fact that some do not meet qualifications.  I do believe in

21  that conversation we raised it with you."  That was

22  Ms. Santana's statement.

23      And then Ms. Santana says:  "I would ask either Lawanna or

24  Fred to confirm."  That's what Ms. Preston was asked to

25  confirm, whether or not there was some who didn't meet minimum

1  qualifications.

2      So what did she say?  "At the meeting with Council member

3  Brooks, we did discuss maintaining staffing ratios at the

4  Center so that all the programs that were currently programs

5  that were there could be facilitated.  As the City

6  administrator stated, there in previous reports it was clear

7  that there were certain employees that were currently working

8  there did not meet the minimum requirements."

9      Ms. Preston goes on to say:  "I don't believe we made a

10 commitment that every person there would be there.  What we

11 said is that we would keep the programs going."  That's what

12 she said.  She responded directly to what Ms. Santana asked,

13 and confirmed it.

14     When you read -- when you listen to this transcript and

15 you hear it and you watch them, you will see that Ms. Brooks

16 intercedes and asks her a different question, which she

17 answers.  But that was a response to a different question, not

18 Ms. Santana's request that she come up and speak to.

19     But after that what happened?  Is Ms. Santana angry at

20 her?  Is Ms. Santana mad at her?  What's the evidence?  You see

21 the evidence is a document that you will see that that evening

22 Ms. Preston writes an email to Ms. Santana, and she says.

23 Wait.  How does this go?  "I think you came out of the meeting

24 looking good.  You took the high road and held your position.

25 I am sorry I had to contradict you tonight.  I hated doing it,

1   but I had to tell the truth.  I hope you understand."

2       What does Ms. Santana write back?  Does she say *I'm angry,*

3   *I'm mad, I agree you contradicted me.*  No, she wrote back:

4   "You did not contradict me.  I was answering specifically to

5   her comment restaffing stays," which is what I read.  And it

6   goes on.  You'll see this.  You'll see that Ms. Santana's

7   position all along was that you didn't contradict me, you and I

8   are on the same page, there is no problem here.

9       So after that, does Ms. Santana do something negative to

10  her?  No.  Ms. Santana decides and announces that the

11  transition team for the Rainbow Teen Center is now going to be

12  Ms. Preston and Mr. Blackwell, and sends out an email to that

13  effect.  So there, that's the first thing.

14      Second thing, after that, this "re this promotion" that

15  was talked about, the promotion actually needs to be in

16  context, and Ms. Santana will do a wonderful job of explaining

17  that to you.  But suffice it to say, that the money part of

18  that didn't come into play until April, and you will hear that

19  Ms. Santana actually increased the general compensation to

20  Ms. Preston after those two events took place.

21      What you're also going to hear is that she did not give

22  her that performance evaluation.  That did not happen.  And

23  you're going to hear someone come into this courtroom and tell

24  you exactly what that thing is, and who did it; okay.  That's

25  what's going to happen in this courtroom.  But Ms. Santana has

1    already testified under oath that she didn't do that

2    performance evaluation that Mr. Siegel spoke about.

3         So now you got that.  You get the increase in the salary.

4    Now, was everything rosy from that point into the end of her

5    employment?  Absolutely not.  Absolutely not.  You see these

6    red lines on the bottom of this screen (indicating)?  These red

7    lines indicate problems that arose with regard to

8    Ms. Santana -- Ms. Preston after these events took place, after

9    she assumed the position as the Director of Labor Relations.

10   You see, up until this point in time, she was reporting up

11   through Ms. Gourdine.  She didn't have to report to the City

12   Administrator.  She didn't have to do certain things, meet with

13   certain people, and have all that she had done now being

14   reviewed.  Now she's in the big room, and now everything that

15   she does or does not do is now much more illuminated, and

16   that's what starts happening now.  And to the extent that she

17   says that she was unaware, that would be untrue, and you'll see

18   it.

19        These events that we're talking about here, what are they?

20   May 11th, 2012, Scott Johnson comments to her about her failure

21   to get along with her co-workers, and one specifically, Katano

22   Kasaine, Budget Director.  You'll hear this.  You will hear

23   that Ms. Preston was so taken by what Mr. Johnson said to her,

24   that she wrote her own email back responding to his comments

25   and criticisms about her performance.

1          Next one is at July 20.  Andrea Gourdine, the Human

2     Resources Director starts making complaints about her and

3     commenting about how she's not being able to work with her

4     cooperatively.

5          August 15, Scott Johnson is commenting to her again about

6     a performance issue relating to processing of audits and

7     processing of money relating to audits and paying checks

8     without a proper paper trail.

9          I can't see that far anymore, but that looks like

10    January 4, 2013.  I'm hoping that's what it is, but that would

11    be the Union now.  You see, let's talk about her role.  Her

12    role is to be the focal point, the City's focal point, the

13    knowledge leader, that place that you go to in the City if you

14    have concerns relating to bargaining agreement.  We call them

15    MOUs when it's government, as opposed to Collective Bargaining

16    Agreement.  They're called memorandums of understanding.  Hers

17    is the department.  If you want to know the process to get

18    something done, you go to her.  If you want to know how are you

19    supposed to do it, you go to her.  If you've got an employee

20    who is a problem, you go to her.  She's the person.  She is the

21    knowledge base for all this information.  She's the consultant

22    to the departments.

23         A fire chief knows how to fight fires, that's what fire

24    chiefs know.  Fire chiefs are not supposed to be those people

25    who know all things about MOUs.  They go to the people who

1    handle that and say *Help me, help me do this*; right?  That's

2    where we're going to go with this; right?

3         So now, now the unions are complaining though.  They're

4    complaining and saying that Ms. Preston is doing things that

5    they don't like.  But look.  They'll come here and tell you.

6    They'll tell you.  And all of this is going to Ms. Santana.

7    These things are not being unsaid.  They're going to

8    Ms. Santana.

9         This keeps going on, more and more complaints, more and

10   more frictions, and finally you get to this (indicating).  You

11   see, that's Internal Affairs.  So let's talk about Internal

12   Affairs for a second.

13        The internal Affairs we normally associate with the police

14   departments, and they're the people that conduct

15   investigations.  They're called Internal Affairs.  So there's

16   something that happens that's a problem, and it's not a simple

17   problem.  The City has a budget deficit.  You're not supposed

18   to be spending money that you don't have.  You're not supposed

19   to be buying computers that you don't have money for.  If

20   you're going to buy things, you're supposed to have a contract

21   approved by the Council in order to move forward.

22        So now what's happened is not that somebody bought a

23   computer that was just too powerful, it's that somebody bought

24   a computer, it is that somebody has got people working for them

25   and doing things for them.  And that's where Andrea Gourdine

1    lands in this issue, and she wants to know why and how this is

2    going on, and she goes to a person who reported to her, Sonia

3    Lara.  But you won't hear Sonia Lara testify in this case until

4    we put on our case, but Sonia Lara was a person who ultimately

5    transfers over to start working for Ms. Preston.  But before

6    she does that, she's asked by Ms. Gourdine:  *I need you to*

7    *prepare a written statement describing what you witnessed and*

8    *what you understood had happened*.  Well, in her written

9    statement that she prepared was a reference to Ms. Preston.

10   We'll talk about that.

11         So now, when Ms. Preston walks up to a copy machine and

12   she sees it there and she sees her name in it, she tears it up

13   (indicating).  She calls Ms. Lara in, and she tells Ms. Lara

14   *you work for me now*, and then she gives this excuse, and she

15   says, *You may be the witness for something, but you work for me*

16   *now*.  And then she says, *you may have to investigate,* which

17   that piece right there, just take that piece right there,

18   because that piece right there goes to Ms. Santana, the person

19   who is supposed to be monitoring and conducting investigations

20   in the workplace is tearing up statements (indicating), and the

21   justification for tearing up the statement is you might have to

22   investigate.  It dawns on Ms. Santana that if the issue is a

23   witness versus an investigator, you take the witness, and you

24   get somebody else to investigate.

25         When this happens, coupled with everything else that's

1    happening, Ms. Santana is like *I've got the wrong person in*

2    *this job. I've got the unions complaining. I've got coworkers*

3    *complaining. I've got torn up witness statements. I've got*

4    *the wrong person in this job.* But then she says: *We are about*

5    *to go into bargaining with the Fire Departments Union, the*

6    *Police Departments Union, the SEIU, and this is the person I*

7    *got? If I change horses in the middle of the stream, how much*

8    *disruption is this going to cost? How much disruption is this*

9    *going to create? Can I just get through the bargaining before*

10   *I do this?* And you're going to hear that she talks to somebody

11   else about it, the Mayor.  You see, she and the Mayor discuss

12   it, and they -- and they have similar minds about this.  Yes,

13   but before bargaining?  Just before bargaining?

14        So now, that red that you're showing there, that's showing

15   the date that Internal Affairs started its investigation, and

16   that last piece of that red, which is I think September 30,

17   October 1, 2013, that's when the investigation report was

18   completed, and that's when John Lois, who conducted the

19   investigation report, presented his findings to Ms. Santana.

20   But along the way he had been telling her about the things that

21   he was uncovering.  For example, after Ms. Lara was actually

22   interviewed by Internal Affairs, Ms. Preston called her into

23   her office and had the subject of the investigation, Ms. Grant,

24   there with her, with the two of them saying things like: *We're*

25   *just friends, you can tell us what happened in there with the*

1    *investigators.*  And to Ms. Lara's credit she says, *No, I can't.*

2    *No, I can't.*  This was given to her.  You'll hear Ms. Lara talk

3    about what she went through and how troubling that was for her.

4         So now, that puts us into the spring of 2013.  We're going

5    into bargaining now.  So you heard something about the -- I'll

6    tell you this.  The complaints didn't stop during the

7    investigation.  We'll talk about those when we get there, but

8    there are more complaints that come in, more complaints that

9    come in, more complaints that come in, more complaints that

10   come in, more complaints that come in; okay?

11        So now, we come to this issue of the firefighters.  I told

12   you before, you see, Ms. Preston's group is the group that's

13   supposed to be assisting the Department in their negotiating

14   efforts, helping them make sure that they don't violate rules

15   and stuff, guiding them, giving them direction.

16        The fire chief came to the City in March 2012.  She had

17   been someplace else before.  "She," a woman.  And she came to

18   the City as the fire chief, and she didn't -- she was getting

19   her feet solid with the City itself.  And so finally they wound

20   up, in June of 2013, June 2013, in June 2013, she realized

21   there's a program for paramedics to increase the number of

22   paramedics available for City fire companies to be able to go

23   out and help people, that there's a component of that that is

24   going to expire on June 3rd, and they have been talking with

25   the Union about whether or not they're going to let that

 1  component expire or if they want to do something more for the

 2  people of the City of the Oakland.  That's what the discussion

 3  is.

 4       So now, Ms. Preston had Winnie Anderson, who was one of

 5  her people who she had a lot of confidence in, who worked with

 6  her in labor relations in her department.  And before that, she

 7  had another person, Ms. Gist, I forgot her last name, Skinner,

 8  who had now moved over to fire.  So, on I think that's probably

 9  June 17th, Ms. Gist-Skinner writes an email, and she writes

10  this email -- Your Honor, could I move a little closer so I can

11  see?

12            THE COURT:  You may.

13            MR. LAFAYETTE:  Thank you.

14       She writes this email to Ms. Anderson, who is one of

15  Ms. Preston's subordinates.  She says, "The current city MOU

16  has a paramedic support program which has been in place since

17  1999.  The MOU status, the PSP termination, terminates if the

18  City does not -- City/Union do not reach agreement prior to

19  6/30.

20       "On June 17, OFD met with Local 55, the Union, to discuss

21  whether PSP would continue."  And she goes on, and she says:

22       "Also, given the impending program end date, in light of

23  negotiations and the budget workloads, Local 55 was open to

24  extending the PSP for a brief period, 30 days.  If this is to

25  occur, we will need a side letter, a side letter extending the

1    term of the contract for 30 days to complete negotiations."

2        Now, is the Fire Department out there doing this on its

3    own?  No, it's going to Ms. Preston's group and telling them

4    this is where we are.  Now, does Ms. Preston's group stand up

5    and say *Hey, you can't do this*.  *Hey, you need to go to*

6    *council*.  *Hey, there are rules out there you need to follow*.

7    Is Ms. Preston's group doing it?  Watch and see.

8        "Dear Trinette," this is from Ms. Anderson, "Happy Monday.

9    Here is a draft side letter to allow the parties to extend the

10   PSP program into July 30."

11       So Ms. Preston's group prepares the side letter.

12   Ms. Preston's group sends the side letter to the Fire

13   Department for the Fire Department to use.  The Fire Department

14   is doing what it's supposed to do.  It's going to Labor and

15   it's asking for assistance.  Labor is giving the assistance,

16   and it's telling them to go forward.

17       What happens after that?  Let's see.

18       "For our conversation, we would like to sign the side

19   letter and make good faith negotiations," on June 28th.  That's

20   the Fire Department writing to Labor saying this is what we

21   want to do.  Is Labor saying *Oh, no, stop, you can't do that*?

22   Is Labor saying, *You're doing the wrong thing*?  No, Labor is

23   saying *Go ahead*.  In fact, Labor goes to the meeting, signs the

24   agreement, and after they sign it, they get other people's

25   signature on it.  You know, who is not at that meeting?  The

1  fire chief.  The fire chief signs it later.  The fire chief is
2  not there for those kinds of things.  The fire chief is not
3  there to go to a meeting to do this.  The fire chief is running
4  the Fire Department; okay?

5      So now what happens?  Seems like Fire is working with the
6  Department of Labor; is that what they're supposed to do?  What
7  happens?  This is what happens.  July 2nd is what happens.
8  July 2nd, Winnie Anderson is sitting in a conference room with
9  a representative from Fire, representatives from the Union, and
10  representative from Treasury, Donna Hom.  Donna Hom gets up to
11  leave, whispers into Winnie Anderson's ear: *Psst, you can't
12  agree to anything*.  Winnie Anderson: *I understand*.  Okay.  On
13  her way out she runs into Ms. Preston, Ms. Hom does, and she
14  tells Ms. Preston that they're in the room and they're talking.
15  Ms. Preston then sends an email or a text message to
16  Ms. Anderson and says *You need to stop*, and she does.

17      And then, this is about July 3rd, Ms. Preston sends an
18  email not to the City Administrator, her boss, no, not to the
19  deputy mayor, no, not to the Deputy City Administrator, no.
20  She sends a letter to the City Attorney, and she said *I want to
21  know if the fire chief has the authority to sign the temporary
22  agreement extending the contract by 30 days*.  At no point does
23  she say the Fire Department came to us for advice.  At no point
24  does she say we prepared the document.  At no point does she
25  say that we signed the document.  She -- you're not going to

1    see any documents where she forwarded that request to the City

2    Attorney's Office to the City Administrator.

3         The City Attorney's Office writes a letter back to her

4    saying, *Hey, you need to prepare a memo that lays out what*

5    *you're talking about, and you need to run it by the City*

6    *Administrator so we can follow our protocols for making sure*

7    *that we're giving advice as we're supposed to give advice.*

8    *Because you just can't call us up and start asking us stuff.*

9    *There's a process and procedure.*  And they copied the City

10   Administrator.

11        And the City Administrator looks at what they wrote and

12   said *Look, if the question is whether or not the Fire*

13   *Department can sign a TA, the fire chief, the answer is no.*

14   The answer is no.  Simple.  It's real simple.  There's a

15   procedure, and it wasn't followed, period.  And Ms. Preston's

16   department didn't enforce it, didn't enforce it, didn't give

17   guidance and direction.

18        So the City Administrator did this, facilitates it and

19   gets it done, gets it done, no big issue.  You're not going to

20   hear anybody say that there was some hostility here.  There

21   wasn't any.  That's just over.  That's over with.  So when they

22   talk about this Fire Department thing, that's what that's

23   about; okay?

24        Then we're going to get to this other issue, this last

25   issue, and I'm going to talk about this document issue; okay?

1    I'll put this document on the screen.  That document.  You see,

2    that's a grievance; okay.  That's a grievance, and that's a

3    grievance that's filed September 2, 2011.  Actually, it's dated

4    that day, but it's transmitted to the City on September 5 by an

5    email from Mr. Keffer at the Union; okay.  And he's filing a

6    grievance.  You can't see it.  You can't see it.  He's

7    basically saying that he wants the City to start paying,

8    collecting the dues and administrative fees, period.

9         Okay.  To say that there was tension between Ms. Preston

10   and Ms. Kasaine would be an understatement; okay.  And so when

11   this happens, Ms. Preston sends an email to Ms. Kasaine saying

12   *I need to investigate this*.  Now, you're going to hear a couple

13   people asking the question why do you need to investigate this?

14   And what does this really have to do with me?  Because you know

15   and I know and people you work with know that what's been

16   happening with regard to these Union dues, period, end of

17   story.

18        So finally, it becomes rather than investigate this

19   issue -- because you don't see Ms. Kasaine's name in that

20   document at all, at all.  Whether or not it's becoming an issue

21   of investigating that issue of collecting those dues,

22   Ms. Preston's email becomes it's an investigation of Katano

23   Kasaine.

24        Now, Ms. Kasaine says *I felt like I'm being set up here*.

25   Ms. Kasaine says *I don't know what's going on here, but I do*

1    *not believe that I can get a fair investigation from*

2    *Ms. Preston*, and she says that to the City manager -- to the

3    City Administrator.  And the City Administrator is sitting

4    there now looking at torn up witness statements, questioning

5    people about what they've said to Internal Affairs, so on and

6    so on.  And she says, *for the integrity of whatever this*

7    *investigation is, it needs to have somebody do it other than*

8    *Ms. Preston, because everybody is entitled to fairness*, and if

9    there's any perception of unfairness, then the whole process is

10   tainted.  And she said *no, no, no, we're going to go a*

11   *different direction*.

12        Ms. Preston doesn't like it, and she continues to press

13   this issue throughout the month of September.  The City

14   Administrator has said *I have made up my mind*.  *I am going to*

15   *use someone else*.  And she continues to press this issue to the

16   point that, as far as the City Administrator is concerned, it

17   is becoming insubordination.

18        Finally, we get to the last week of September, kind of

19   wrapping up bargaining; okay.  John Lois' report has come out

20   that's talked about the tearing up of the report, the talking

21   to -- and Ms. Preston has explanations for everything.  She

22   will, and she'll tell you about them.  And the City Manager is

23   like *okay, I got that, I got that, I got that, and now we've*

24   *got this grievance, I got that too*.

25        But here's the problem.  Ms. Preston talks about urgency

1   with regard to this grievance:  *I got to get it done now, I've*

2   *got to get it done now, I've got to get it done now*.  Well, now

3   she is going to tell you herself under oath, and you're going

4   to say that that grievance, the first time that those issues

5   arose was not on September 2, it was on June 26th.  You see on

6   June 26th, the Union first filed a grievance addressing those

7   issues, June 26th, two months earlier.

8        Why the urgency in September when she's had it since

9   June 26th?  And we're going to talk about the way she directed

10  people to handle it when it came in on June 26th, and how

11  that's so fundamentally different than what's happening now.

12  We're also going to talk about that August 6th meeting.

13       So you get to a point where the City Administrator says,

14  *Okay.  I'm done*.  And then she gets a phone call, and she'll

15  describe it for you, and you'll look at the emails that came in

16  along with it.  It was hostile.  It was unpleasant.  And yes,

17  there were witnesses there.  And Mr. McGee will be here, and he

18  will tell you what happened.  He didn't say it didn't happen.

19  He'll tell you what happened.

20       So the termination took place, and when it took place,

21  they didn't want to let her get near her computer.  You want to

22  know why?  I'll tell you why.  Howard Jordan.  Howard Jordan

23  was a former police chief.  Howard Jordan calls Ms. Santana up

24  on the phone and he says, *Hey, look.  You better be careful,*

25  *because Ms. Preston is trying to undermine your position in*

1    *Union negotiations*.  Others were telling her that she's sharing

2    information with the Union so that the Union could use it to

3    its betterment.  Ms. Lara will tell you what she overheard and

4    witnessed herself.

5         And so at the fire -- at the police chief's direction, and

6    in accordance with policies, in accordance with the City, she

7    started monitoring Ms. Preston's email, and sure enough, she

8    was sending information.  She was sending it to Mr. Siegel.

9    She was sending it to people that shouldn't be getting it.  And

10   they decided at that point, *Look*.  *We don't know what she's*

11   *going to do, so we're going to have to separate her in such a*

12   *way that she doesn't get a chance to get to the computers and*

13   *do stuff to them*, period, end quote.  And so she was

14   terminated, and that was that, and that was it.

15        I think she got the job offer either before or just after

16   the termination took place.  We'll find out about that, as she

17   has been working ever since then.

18        So going back to what this case is about, that she's

19   retaliated against for free speech or she's retaliated against

20   for reporting something involving the Fire Department, we will

21   talk about all of that at the end of this case in the context

22   of the facts that I've laid out, the exhibits that you will

23   see, and in the context of the witnesses who will appear here.

24        I'd like to thank you for your patience.  I would like to

25   sit down now, because I'm tired; okay.  But we can now start

 1   hearing what people have to say, as opposed to what me and

 2   Mr. Siegel say.  Thank you, Your Honor.

 3        **THE COURT:**  Thank you very much.  That ends our

 4   opening statements.  It's a good time for a break for everyone.

 5   Let's come back in ten minutes, at 2:38 for our first witness

 6   called by the plaintiff.  Thank you very much.

 7                  (Recess taken at 2:28 p.m.)

 8                  (Proceedings resumed at 2:42 p.m.)

 9        (Proceedings were heard out of presence of the jury:)

10        **MR. LAFAYETTE:**  Your Honor, I have a quick question.

11        **THE COURT:**  All right.  Quick.

12        **MR. LAFAYETTE:**  Mr. Siegel mentioned the

13   interrogatories in his opening, and they are not marked as an

14   exhibit in this trial at all, and so I am concerned about that,

15   and then he referenced the originals when they have been

16   amended, and my understanding is you use the amendeds and not

17   the originals.  I had two issues, one, they're not marked.

18        **THE COURT:**  All right.  Well, if they're going to try

19   to bring in an exhibit that's not an exhibit, then we'll deal

20   with it then, but I'm not going to deal with anything about the

21   opening statement.

22        **MR. LAFAYETTE:**  Thank you, Your Honor.

23        **MR. SIEGEL:**  And actually, the Court's rules asked us

24   to designate discovery items that we were going to use at

25   trial, and we did, so we didn't also mark them as exhibits, but

1    they're in your pretrial binder, or whatever it was called.

2        **THE COURT:**  And I think there are some interrogatories

3    that are marked as exhibits, so --

4        **MR. LAFAYETTE:**  Those were defendant's exhibits, Your

5    Honor.  But if Mr. Siegel can -- I can always be persuaded if

6    there's something there, I'll take a look at it.

7        **THE COURT:**  Okay.  We'll move on.  Call in the jurors.

8        (Proceedings were heard in the presence of the jury:)

9        **THE COURT:**  All right.  Our jurors have returned.

10   Please be seated everyone.

11       And the plaintiff, please call your first witness.

12       **MR. SIEGEL:**  Thank you, Your Honor.  We will call

13   Deanna Santana.  We call her under Federal Rule of evidence

14   611(c)(2).

15       **THE COURT:**  Ms. Santana, if you will please come

16   forward.  And this is the witness stand on this side.  Watch

17   your step as you go up.  My deputy will swear you in.

18       **THE CLERK:**  Please raise your right hand.

19                        **DEANNA SANTANA**,

20   called as a witness for the **PLAINTIFF**, having been duly sworn,

21   testified as follows:

22       **THE WITNESS:**  I do.

23       **THE CLERK:**  Please be seated.

24       Please state your name for the record.

25       **THE WITNESS:**  Deanna J. Santana.

1          **DIRECT EXAMINATION**

2          **MR. SIEGEL:**  Okay.   Thank you.

3  **Q.**   Ms. Santana, you served as the Oakland City Administrator

4  from August 1st, 2011 until March 4, 2014; is that correct?

5  **A.**   Yes.

6  **Q.**   Okay.   And the City Administrator is the highest ranking

7  employee within the City of Oakland; is that right?

8  **A.**   Yes.

9  **Q.**   Okay.   And reports, a City Administrator, to the Mayor and

10  City Council?

11  **A.**   No.

12  **Q.**   Who does the City Administrator report to?

13  **A.**   The Mayor.

14  **Q.**   And not the City Council?

15  **A.**   That's correct.

16  **Q.**   Doesn't the City Council have the authority to approve the

17  termination of the City Administrator?

18          **MR. LAFAYETTE:**  Objection.   Relevance, too, Your

19  Honor.

20          **THE COURT:**  Overruled.   You may answer the question.

21          **THE WITNESS:**  Can you repeat the question, please?

22  **BY MR. SIEGEL:**

23  **Q.**   Doesn't the City Council have the authority to approve the

24  termination of the City Administrator?

25  **A.**   I believe the Mayor has to consult with the City Council.

SANTANA - DIRECT / SIEGEL

1    Q.    Okay.  Now, before going to work for Oakland in August of

2    2011, you worked for the City of San Jose?

3    A.    Yes.

4    Q.    And what was your position there?

5    A.    My last position was Deputy City Manager.

6          THE COURT:  Can we pause for a second?  Can you pull

7    the microphone a little closer to you to allow the jury to hear

8    you?

9          THE WITNESS:  Yes.

10         THE COURT:  Okay.

11   BY MR. SIEGEL:

12   Q.    And long before that, you worked for the City of Oakland

13   in the mid-to late 1990s; correct?

14   A.    Yes.

15   Q.    And you worked for the individual at the time who was the

16   City Manager by the name of Craig Coshun (sic)?

17   A.    Yes.

18   Q.    And what was your position at that time?

19   A.    I was a management intern and an Administrative Analyst

20   II.

21   Q.    Okay.  And did you work with an individual by the name of

22   Lamont Ewell?

23   A.    Yes.

24   Q.    And what was Mr. Ewell's position at the time?

25   A.    He was the Interim Assistant City Manager.

SANTANA - DIRECT / SIEGEL

1   Q.   And would it be fair to say that Mr. Ewell became your

2   mentor?

3   A.   Yes.

4   Q.   And would it be fair to say that when you applied to be

5   the City Administrator in Oakland, that Mr. Ewell supported

6   you?

7   A.   Yes.

8   Q.   Now, soon after you became the City Administrator, did you

9   go about hiring some of your top assistants?

10  A.   Yes.

11  Q.   And you hired Scott Johnson and Fred Blackwell; is that

12  right?

13  A.   Yes.

14  Q.   And you hired them as Assistant City Administrators?

15  A.   Yes.

16  Q.   And there was a problem in their hiring, because you were

17  advised by the Human Resources Director Andrea Gourdine that

18  they could be paid at rates that turned out not to be correct;

19  is that right?

20          **MR. LAFAYETTE:**  Objection, relevance, Your Honor.

21          **THE COURT:**  Overruled.  You may answer.

22          **THE WITNESS:**  Can you repeat the question, please?

23  BY MR. SIEGEL:

24  Q.   Sure.  Isn't it true that when you made job offers to

25  Scott Johnson and Fred Blackwell to be your Assistant City

**SANTANA - DIRECT / SIEGEL**

1  Administrators, you were given faulty advice as to how much you

2  could pay them by Human Resources Director Andrea Gourdine?

3  **A.**  No.

4  **Q.**  You weren't given faulty advice?

5  **A.**  Yes.

6  **Q.**  Isn't it true that the offers to Mr. Blackwell and

7  Mr. Johnson indicated that these offers would be exempt from

8  wage freezes that had been enacted by the City Council?

9  **A.**  Yes.

10  **Q.**  And that was incorrect; correct?

11  **A.**  That was information from Kip Walsh.

12  **Q.**  Kip Walsh, who was an assistant to Andrea Gourdine?

13  **A.**  Yes.

14  **Q.**  And ultimately, Andrea Gourdine had to apologize because

15  she embarrassed you by giving you faulty advice as to how these

16  individuals could be compensated?

17          **MR. LAFAYETTE:**  Objection, Your Honor, relevance.

18          **THE COURT:**  Overruled.  You may answer.

19          **THE WITNESS:**  No, she -- I didn't ask for an apology.

20  I was asking for how to correct the error.

21  BY MR. SIEGEL:

22  **Q.**  Isn't it true that Andrea Gourdine apologized?

23  **A.**  Yes.

24  **Q.**  Okay.  And isn't it also true that Lawanna Preston, who at

25  that time was working for Andrea Gourdine, helped correct the

1    error that Andrea Gourdine staff had made?

2            MR. LAFAYETTE:  Objection, argumentative as phrased.

3            THE COURT:  Overruled.  You may answer.

4            THE WITNESS:  We were looking at how to resolve the

5    faulty information.

6    BY MR. SIEGEL:

7    Q.   That's correct.  And isn't it true that Lawanna Preston

8    helped you resolve the faulty information?

9    A.   Yes.

10   Q.   Okay.  And isn't it also true that it was a few months

11   after that that you promoted Lawanna Preston to be the Director

12   of Employee Relations?

13   A.   It was happening all at about the same time.

14   Q.   Okay.  And she was promoted to the position of Director of

15   Employee Relations in January 2012; correct?

16   A.   Yes.

17   Q.   And in that capacity, she became a peer, that is, she was

18   at the same level as Andrea Gourdine, whereas in the past she

19   had reported to Andrea Gourdine?

20   A.   Yes.

21   Q.   And isn't it also true that in the spring of 2012, you and

22   the members of your direct staff, in the City Administrator's

23   Office, undertook to provide performance evaluations of the

24   various people who reported to you?

25   A.   Yes.

1   **Q.**   And isn't it true that in that context you took specific

2   responsibility to provide an evaluation of Ms. Preston?

3   **A.**   Yes.

4   **Q.**   Okay.  And in fact, a draft performance evaluation for

5   Ms. Preston was prepared; is that right?

6   **A.**   One was prepared.

7   **Q.**   One was prepared.  Who prepared it?

8   **A.**   I don't know.

9   **Q.**   Okay.  Would you please look at Exhibit 12 in the binder

10  in front of you?

11          **MR. LAFAYETTE:**  Does it have a date, counsel?

12          **MR. SIEGEL:**  A date, no.  Actually, it's not dated,

13  but it's apparent from the context that it covers the year that

14  ended May 1st, 2012.

15  **Q.**   Do you recognize this document?

16  **A.**   I've seen it through this process, the deposition.

17  **Q.**   Okay.  In fact, I showed it to you at your deposition; is

18  that right?

19  **A.**   Yes.

20  **Q.**   And in your deposition, you acknowledged that that was the

21  performance evaluation that was prepared for Lawanna Preston in

22  the spring of 2012?

23          **MR. LAFAYETTE:**  Objection, improper use of the

24  deposition, ask a witness to summarize what happened there.

25          **THE COURT:**  Sustained.  Can you just ask your question

1    flat out and out?

2    **BY MR. SIEGEL:**

3    Q.   Okay.  Isn't that in fact the evaluation that was prepared

4    by your office for Lawanna Preston?

5         **MR. LAFAYETTE:**  Objection, calls for hearsay.

6         **MR. SIEGEL:**  I haven't even finished my question, Your

7    Honor.

8         **THE COURT:**  Start the question again.

9    **BY MR. SIEGEL:**

10   Q.   Okay.  Isn't that in fact the evaluation that was prepared

11   for Ms. Preston for the year that ended May 1st, 2012?

12        **MR. LAFAYETTE:**  Objection, vague.  It is calling for

13   hearsay.

14        **THE COURT:**  Overruled.

15        **THE WITNESS:**  I don't know.

16   **BY MR. SIEGEL:**

17   Q.   Okay.  Do you recall me asking you about this at your

18   deposition?

19        **MR. LAFAYETTE:**  Objection, improper use of a

20   deposition.

21        **THE COURT:**  Overruled.

22        **THE WITNESS:**  Yes.

23   **BY MR. SIEGEL:**

24   Q.   Okay.  And I did take your deposition on March the 18th,

25   2015; is that right?

SANTANA - DIRECT / SIEGEL

1  A.    I don't remember the date.

2  Q.    Okay.  You've read the deposition in preparation for your

3  testimony today; am I correct?

4  A.    Yes.

5  Q.    And would it be helpful if I showed you the deposition so

6  you could recall the date?

7  A.    Sure.

8  Q.    Showing you Volumes 1 and 2 of your deposition, does that

9  refresh your recollection that I took your deposition on

10  May 18 -- excuse me -- march 18 and March 23?

11  A.    It does.  Thank you.

12  Q.    Okay.  And prior to each session of your deposition, did

13  you take an oath to tell the truth?

14  A.    I did.

15       MR. SIEGEL:  Your Honor, I'd like to read from

16  page 100 of Ms. Santana's deposition, beginning on line 10.

17       THE COURT:  One moment.  What is your objection to

18  reading this portion?

19       MR. LAFAYETTE:  I don't think it's inconsistent with

20  what she's answering.

21       THE COURT:  I'm asking Mr. Siegel.

22       MR. LAFAYETTE:  Oh, I'm sorry.

23       MR. SIEGEL:  As a party, Ms. Santana is subject to

24  having her deposition read for any purpose, including the truth

25  of the matters asserted.

1          **THE COURT:**  But what's the purpose?  What are you

2     going for here?  Are we going to read her whole deposition?

3          **MR. SIEGEL:**  No.

4          **THE COURT:**  All right.  So tell me why, why are you

5     going to this subject?

6          **MR. SIEGEL:**  Okay.  I want to show that she was shown

7     the evaluation at her deposition.  She first denied she did it,

8     then she acknowledged that she did it, and ultimately --

9          **THE COURT:**  Where is that?  What page is that?

10          **MR. SIEGEL:**  So it starts out on page 100, then it

11     continues on page 102, lines 6 through 23, and then on

12     page 103, excuse me, going from line 25 on page 102 through

13     line 5 on 103.

14          **THE COURT:**  Is there somewhere here that's going to

15     authenticate this document and overcome the hearsay objection?

16     I don't see it, so --

17          **MR. SIEGEL:**  She says on page 103 in

18     lines 2 through 5.

19          **THE COURT:**  Is that the best you've got?

20          **MR. SIEGEL:**  That's the best I have, yes.

21          **THE COURT:**  All right.  The objection is sustained.

22     BY MR. SIEGEL:

23     **Q.**    Okay.  Let me try this another way.

24          Do you acknowledge that that evaluation was done by your

25     office?

1          **MR. LAFAYETTE:**  Objection, cumulative, Your Honor,

2   vague and ambiguous.

3          **THE COURT:**  Overruled.

4          **THE WITNESS:**  I don't know.

5   **BY MR. SIEGEL:**

6   **Q.**   You don't know; okay.  Do you acknowledge that this

7   evaluation was placed in Ms. Preston's personnel file?

8   **A.**   I don't know.

9   **Q.**   Okay.  Do you recall that you were the person who promoted

10  Ms. Preston in January of 2012?

11  **A.**   Yes.

12  **Q.**   Do you acknowledge that in the performance evaluation, you

13  refer to yourself in the first person by saying:  "I promoted

14  you in January of 2012"?

15         **MR. LAFAYETTE:**  Objection, question is argumentative,

16  lacking in foundation.

17         **THE COURT:**  Overruled.

18         **THE WITNESS:**  Can you repeat the question?

19  **BY MR. SIEGEL:**

20  **Q.**   Sure.  Isn't it true that in this evaluation, which is

21  marked as Plaintiff's Exhibit 12, you comment about your role

22  in promoting Ms. Preston and do it in the first person, that

23  is, use the word "I" to refer to yourself?

24  **A.**   I did not.

25  **Q.**   Okay.  Would you look at page 2 of Exhibit 12?  Are you

SANTANA - DIRECT / SIEGEL

1    there?

2    **A.**    I'm there.

3    **Q.**    Do you see the box at the top of the page?

4    **A.**    I do.

5    **Q.**    Didn't you write, quote, "In January, I requested you take

6    over the responsibility of supervising the EOPD Unit.   You

7    agreed, and immediately contacted staff to provide support and

8    supervision"?

9    **A.**    I did not.

10    **Q.**    You did not write that?

11    **A.**    No.

12    **Q.**    Did you ask someone to write it on your behalf and to

13    refer to you by use of the word "I"?

14    **A.**    I don't recall.

15    **Q.**    You don't recall; okay.   Do you recall reading this

16    evaluation?

17    **A.**    No.

18    **Q.**    Do you recall that I asked you to read it during your

19    deposition?

20    **A.**    Yes.

21    **Q.**    And did you read it during your deposition?

22    **A.**    I scanned it.

23    **Q.**    Okay.   And do you recall stating during your deposition

24    that there was no part of it that you disagreed with?

25    **A.**    No.

1          **MR. SIEGEL:**  Okay.  I'd like to refer to Ms. Santana's

2    deposition, page 106, Your Honor.

3          **THE COURT:**  Line?

4          **MR. SIEGEL:**  Page 105 -- sorry.  Page 105,

5    line 12 through 106, line 6.

6          **MR. LAFAYETTE:**  I'm sorry.  105?

7          **MR. SIEGEL:**  Line 12.

8          **MR. LAFAYETTE:**  Through?

9          **MR. SIEGEL:**  6:6.

10         **MR. LAFAYETTE:**  I think it calls for speculation on

11   her part.

12         **THE COURT:**  Mr. Siegel, what is your question that you

13   want to ask Ms. Santana about this?

14         **MR. SIEGEL:**  That at her deposition she read the

15   evaluation and said there was nothing that she would have taken

16   out.

17         **THE COURT:**  Why don't you ask that question?  Where is

18   it in that section?  You read a part of the deposition, you

19   read part of the evaluation and asked her about part of the

20   evaluation.

21         **MR. SIEGEL:**  Oh, I see.  You're referring to the

22   summary part.  Okay.  I can narrow it to that.

23   **Q.**  Do you recall reading the summary part of the evaluation

24   and indicating that you would not have taken anything out of

25   it?

1              **MR. LAFAYETTE:**  That misstates that.

2              **THE COURT:**  Sustained.  You're asking her to repeat

3    her deposition testimony.

4    **BY MR. SIEGEL:**

5    **Q.**   Let me ask it the other way.  Would you look at, again,

6    looking at Exhibit 12, the next -- the page that's Bates

7    stamped Oakland 1080, which states "overall evaluation," and

8    would you read that paragraph?

9    **A.**   "Lawanna is a great asset --

10             **THE COURT:**  Hold on a second.  I apologize,

11   Ms. Santana.  Read it to yourself first, because I don't know

12   if you wrote it, if you read it before.

13             **THE WITNESS:**  Oh, I'm sorry.

14             **THE COURT:**  First familiarize yourself with it.  The

15   document itself is not in evidence.

16             **THE WITNESS:**  (witness examines document)  Okay.

17   **BY MR. SIEGEL:**

18   **Q.**   Okay.  Now, in May of 2012, does that paragraph reflect

19   your overall evaluation of Ms. Preston's performance?

20   **A.**   I think it partially reflected her performance.

21   **Q.**   Okay.  Is there any part of that statement that you did

22   not believe to be true in May of 2012?

23   **A.**   I would have made some changes to some of the language and

24   included a couple of additional summary statements.

25   **Q.**   Okay.  But my question is slightly different.

1        Is there any part of it that you would not have believed

2    to be true in May of 2012?

3    **A.**   I think for the most part I would have allowed for it to

4    go through, with the exception of adding some additional

5    statements.

6    **Q.**   Okay.  Would you kindly now read it out loud?

7    **A.**   (reading) "Lawanna is a great asset to the City.  Her

8    knowledge, skills, and abilities to provide needed leadership

9    in employee relations, NE OPD.  She attempts to resolve

10   grievances at the lowest possible level.  Lawanna has

11   established great working relationships with organized labor,

12   and demonstrates a high level of professionalism and integrity.

13   She provides excellent consultation to the City Attorneys, City

14   Administrator, and other management staff.  Lawanna has

15   demonstrated extensive knowledge of legal standards and

16   guidelines governing employee relations and activities --

17   employee relations activities, legal and professional

18   standards, and procedures.  Lawanna assigns, reviews,

19   participates in and coordinates the work of subordinate staff."

20   **Q.**   Okay.  Thank you.  Now, Ms. Santana, in -- during 2012,

21   was one of the problems that you were dealing with problems

22   relating to the Rainbow Teen Center?

23   **A.**   Yes.

24   **Q.**   Okay.  And in a nutshell, would it be fair to summarize

25   the problems being the fact that a member of the City Council

**SANTANA - DIRECT / SIEGEL**

1  had undertaken to commission the renovation of the Center and

2  the hiring of staff to run the Center?

3  **A.**   Yes.

4  **Q.**   Okay.  And that staff member was Desley Brooks; is that

5  right?

6  **A.**   No.

7  **Q.**   Who was --

8  **A.**   Vice-Mayor Desley Brooks.

9  **Q.**   Vice-Mayor, okay.  She was a member of the City Council;

10  correct?

11  **A.**   City Council, not staff.

12  **Q.**   Okay.  And Vice-Mayor Brooks was the Council member who

13  represented the area of East Oakland where the Rainbow Teen

14  Center was located?

15  **A.**   Yes.

16  **Q.**   And is it also true that in early 2012, you asked Fred

17  Blackwell and Lawanna Preston to review what had occurred

18  vis-a-vis the Rainbow Teen Center?

19  **A.**   No.

20  **Q.**   Did you not ask them to write a report about it?

21  **A.**   It was late 2011.

22  **Q.**   Okay.  I see.  You asked them to do it in late 2011, and

23  they ultimately presented a report to you in February of 2012;

24  is that correct?

25  **A.**   Yes.

SANTANA - DIRECT / SIEGEL

1  Q.   Okay.  Would you look at Exhibit 8 in the binder in front

2  of you.

3        Do you recognize that document?

4  A.   Yes.

5  Q.   Is that the Agenda Report regarding the Rainbow Teen

6  Center dated February 24, 2012?

7  A.   Yes.

8  Q.   And it's signed by Lawanna Preston and Fred Blackwell?

9  A.   (witness examines document)  Yes.

10          MR. SIEGEL:  Okay.  Your Honor, I'd offer Exhibit 8.

11          MR. LAFAYETTE:  I can't find Exhibit 8, Your Honor.

12  We're using a different number system.  Could I take a look at

13  what Mr. Siegel has?

14          MR. SIEGEL:  Sure.  Also, it's not in your joint

15  binder, is the problem.

16          THE COURT:  Is this not the same document as defense

17  Exhibit N or --

18          MR. LAFAYETTE:  It is the same as -- I have it, and I

19  don't have an objection to it, Your Honor.

20          THE COURT:  All right.  With no objection, Plaintiff's

21  Exhibit 8 is admitted into evidence.

22          (Trial Exhibit 8 received in evidence)

23  BY MR. SIEGEL:

24  Q.   Now, is it true, Ms. Santana, that prior to the

25  finalization of the report, there were various drafts of the

1  report that were produced and discussed by staff?

2  **A.**   Yes.

3  **Q.**   And did one of those drafts include suggestions by the

4  City Attorney?

5  **A.**   Yes.

6  **Q.**   And was one of the suggestions that the City Attorney put

7  into an earlier draft that Ms. Brooks be referred to the

8  Alameda County District Attorney for purposes of investigation

9  and potential prosecution?

10          **MR. LAFAYETTE:**   Objection, Your Honor.   It violates

11  the attorney-client privilege, Hall versus City.

12          **THE COURT:**   Why is that not privileged?

13          **MR. SIEGEL:**   Because it's a document that has been

14  made public in this litigation and elsewhere, and is subject to

15  much public conversation, and I have a copy of it, which was

16  not produced by the defendants in this case.

17          **MR. LAFAYETTE:**   He's asking about a document -- a

18  conversation with the City Attorney.

19          **THE COURT:**   All right.   For now, the objection will be

20  sustained, and we'll take this up further before the witness

21  returns tomorrow.

22  **BY MR. SIEGEL:**

23  **Q.**   Okay.   Would you look at Exhibit 6.   6 is also Exhibit Q,

24  Mr. Lafayette.

25          Is Exhibit 6 a draft of Exhibit 8 that included

1    suggestions from various people, including the City Attorney?

2          **MR. LAFAYETTE:**  Same objection, Your Honor,

3    attorney-client privilege.

4          **THE COURT:**  Mr. Lafayette, on your Amended Joint Trial

5    Exhibit list, this document appears without objection.

6          **MR. LAFAYETTE:**  And I have an objection, Your Honor.

7    My objection is the attorney-client privilege.

8          **THE COURT:**  All right.  That was waived on Saturday.

9    The objection is overruled.  You may proceed.

10          **MR. SIEGEL:**  Thank you.

11   **Q.**   Is Exhibit 6 a draft report --

12   **A.**   Yes.

13   **Q.**   -- of the document that eventually became Exhibit 8; is

14   that right?

15   **A.**   Yes.

16          **MR. SIEGEL:**  Your Honor, I'd offer Exhibit 6.

17          **MR. LAFAYETTE:**  Same objection, Your Honor, the

18   attorney-client privilege and relevance.

19          **THE COURT:**  Overruled.  Exhibit 6, which is the same

20   as Exhibit Q, is admitted.

21       (Trial Exhibit 6 received in evidence)

22   **BY MR. SIEGEL:**

23   **Q.**   Would you look at page 16 of Exhibit 6.

24       Is the hard-to-read paragraph at the bottom of that page

25   suggested language from City Attorney Barbara Parker?

1          **MR. LAFAYETTE:**  Objection, misstates the document.

2  It's argumentative as phrased.

3          **THE COURT:**  Overruled.  You can answer.

4          **THE WITNESS:**  Yes.

5  **BY MR. SIEGEL:**

6  **Q.**   And isn't it true that prior to the production of

7  Exhibit 6, you yourself had expressed an interest in whether

8  you had the authority to turn -- to refer Ms. Brooks to the

9  Alameda County District Attorney?

10          **MR. LAFAYETTE:**  As phrased the question is ambiguous.

11          **THE COURT:**  Overruled.

12          **THE WITNESS:**  Can you repeat the question?

13  **BY MR. SIEGEL:**

14  **Q.**   Yeah.  Isn't it true that prior to Ms. Parker adding the

15  language we've just been discussing into Exhibit 6, you

16  yourself had expressed an interest on turning over the

17  investigation of Ms. Brooks to the District Attorney?

18          **MR. LAFAYETTE:**  Same objection.

19          **THE COURT:**  Overruled.

20          **THE WITNESS:**  No.

21  **BY MR. SIEGEL:**

22  **Q.**   Okay.  Would you look at Exhibit 7, please?  And this is

23  also Exhibit O, letter O.

24          **THE COURT:**  Thank you.

25          **MR. LAFAYETTE:**  Same as defendant's what, counsel?

1              **MR. SIEGEL:**  O, letter O.

2     **Q.**   Is Exhibit 7 an email exchange between yourself and

3     Barbara Parker that you also shared with Fred Blackwell,

4     Lawanna Preston, Sabrina Landreth, Deborah Barnes, Alexandra

5     Orologas and Doryanna Moreno?

6     **A.**   Yes.

7     **Q.**   And isn't it true that you were asking the City Attorney

8     whether you had the authority to initiate an investigation of a

9     Council member?

10    **A.**   Yes.

11             **MR. SIEGEL:**  Your Honor, I'd offer Exhibit 7.

12             **MR. LAFAYETTE:**  Same objection on privilege, Your

13    Honor.

14             **THE COURT:**  Overruled.  See document 137.  Exhibit 7

15    is admitted into evidence.

16        (Trial Exhibit 7 received in evidence)

17             **MR. SIEGEL:**  Thank you.

18    **Q.**   So if I could just read part of this, Your Honor.

19        On Monday, February 20, 2012, you wrote a memo to the City

20    Attorney Barbara Parker and others in which you asked the

21    question:  Quote, "Do I have the authority to initiate an

22    investigation on a Council member, or does the City Council

23    need to put this in place?"  You wrote that; correct?

24    **A.**   Yes.

25    **Q.**   And you wrote that because you wanted to have the Alameda

SANTANA - DIRECT / SIEGEL

```
1   County DA investigate whether Council member Desley Brooks had

2   committed a violation of the City charter; correct?

3             MR. LAFAYETTE:  Objection, it's argumentative as

4   phrased.

5             THE COURT:  Overruled.

6             THE WITNESS:  No.

7   BY MR. SIEGEL:

8   Q.   Okay.  So you didn't want to have the District Attorney

9   investigate Desley Brooks?

10  A.   The -- they may have already been concurrently looking

11  into it.  I know the FBI was already looking into it.

12  Q.   And you know that because Howard Jordan told you; correct?

13  A.   No.

14  Q.   How do you know that?

15  A.   I was -- I had provided information to the FBI on their

16  inquiry.

17  Q.   So you had provided information to the FBI to help them

18  conduct an investigation of Desley Brooks?

19  A.   Yes.

20  Q.   And I assume that you wanted them to conduct that

21  investigation; correct?

22  A.   I was responding to an information request from the FBI.

23  Q.   So the FBI asked you whether Desley Brooks had committed

24  some type of crime?

25  A.   They were inquiring about the media articles and
```

SANTANA - DIRECT / SIEGEL

1    requesting information.

2    **Q.**   Okay.  And would it be fair to say that as of

3    February 2012, you had a very poor relationship with Desley

4    Brooks?

5    **A.**   No.

6    **Q.**   Would you say you had a good relationship with her?

7    **A.**   We had a working relationship.

8    **Q.**   That was -- you didn't have a choice in that; right?  She

9    was on the City Council, and you were the City Administrator?

10   **A.**   We were transacting, and we were -- I was responsive to

11   her inquiries and to her requests.

12   **Q.**   Would it be fair to say that your interactions were

13   sometimes hostile?

14        **MR. LAFAYETTE:**  Objection, question is vague and

15   ambiguous and not relevant.

16        **THE COURT:**  Overruled.

17        **THE WITNESS:**  Not until January 2012.

18   **BY MR. SIEGEL:**

19   **Q.**   Okay.  Well, when was it that you turned over information

20   about her to the FBI?

21   **A.**   During the winter of 11/12.

22   **Q.**   Okay.  Getting back to the report.

23        When Exhibit 6 was drafted, that is the version of the

24   final report that included Ms. Parker's comments, isn't it true

25   that you had a conversation about whether the language -- about

SANTANA - DIRECT / SIEGEL

1   turning over Ms. Brooks to the DA with Lawanna Preston?

2   **A.**   Yes.

3   **Q.**   And isn't it true that Lawanna Preston did not want to see

4   the language suggested by Barbara Parker included in that

5   report?

6           **MR. LAFAYETTE:**  Objection, it's misstating the

7   language in the document, and that makes it argumentative.

8           **THE COURT:**  Overruled.

9           **THE WITNESS:**  We both did not.

10  **BY MR. SIEGEL:**

11  **Q.**   Okay.  So she didn't want it in there, and you agreed with

12  her, you didn't want it in there either?

13  **A.**   We both did not want it in there.

14  **Q.**   Okay.  So the language was taken out?

15  **A.**   Yes.

16  **Q.**   Okay.  And the report then proceeded; correct?

17  **A.**   Yes.

18  **Q.**   And there was then a meeting of the Oakland City Council

19  on March the 6th, 2012; is that right?

20  **A.**   Yes.

21  **Q.**   And was that the meeting at which the February 24 final

22  report was presented to the Council?

23  **A.**   Yes.

24  **Q.**   And there was also an open session of the City Council on

25  that date; is that right?

SANTANA - DIRECT / SIEGEL

1   A.   Yes.

2   Q.   There was a public session and a closed session?

3   A.   Yes.

4   Q.   Okay.  And at the public session, there were scores of

5   people there who wanted to be heard on the issue of the Rainbow

6   Teen Center; is that right?

7   A.   Yes.

8   Q.   And would it be fair to say that the people who spoke at

9   the Council meeting had different opinions about the Rainbow

10  Teen Center?

11  A.   Yes.

12  Q.   Some of them praised Desley Brooks for getting this Center

13  open in a community that needed its services; is that right?

14  A.   Yes.

15  Q.   And some of them criticized her because she had bypassed

16  normal City Council proceedings, or excuse me, normal City

17  proceedings to authorize Pulte to fix up the Center and also to

18  hire staff?

19  A.   Yes.

20  Q.   Okay.  And, in fact, in the February 24 report, that was

21  prepared by Mr. Blackwell and Ms. Preston, they outlined the

22  departures from normal City practice and policy that Ms. Brooks

23  had got into; is that right?

24  A.   Yes.

25  Q.   Okay.  So it wouldn't be fair to say that even Mr. --

**SANTANA - DIRECT / SIEGEL**

 1   either Mr. Blackwell or Ms. Preston was attempting to excuse

 2   Ms. Brooks' actions?

 3        **MR. LAFAYETTE:**  Objection.  It requires speculation

 4   for her part, assumption and opinion.

 5        **THE COURT:**  Sustained.  And the question was also

 6   compound and incomplete, so can you rephrase it to be clear

 7   what you're asking?

 8   **BY MR. SIEGEL:**

 9   **Q.**   Okay.  Did you approve the final version of the report

10   that was presented or signed by Blackwell and Preston?

11   **A.**   Yes.

12   **Q.**   Okay.  So we don't need to go into it.

13        Now, also at that meeting there was an issue that arose

14   when you and Ms. Brooks disagreed about what information had

15   been provided to Ms. Brooks regarding the staffing of the

16   Rainbow Teen Center; correct?

17        **MR. LAFAYETTE:**  Objection, Your Honor.  I think this

18   was one of your motions in limine.

19        **THE COURT:**  Which one?

20        **MR. LAFAYETTE:**  The one related to questioning people

21   about what's on the videotape.

22        **THE COURT:**  Overruled.

23   **BY MR. SIEGEL:**

24   **Q.**   Do you remember the question?

25   **A.**   I don't.

SANTANA - DIRECT / SIEGEL

1    **Q.**    Okay.  You and Ms. Brooks had a disagreement, at the

2    March 6th meeting, about what information had been given to

3    Ms. Brooks regarding the staffing of the Rainbow Teen Center?

4    **A.**    Yes.

5    **Q.**    Okay.  And after that disagreement proceeded for a minute

6    or two minutes, you asked Ms. Preston and Fred Blackwell to

7    come to the podium and confirm your recollection of what had

8    occurred?

9    **A.**    Yes.

10   **Q.**    And Ms. Preston --

11            **THE COURT:**  Let me pause for a moment.  So there's a

12   videotape of this incident; correct?

13            **MR. SIEGEL:**  In part, yes.

14            **THE COURT:**  And are you going to show it?

15            **MR. SIEGEL:**  Yes.

16            **THE COURT:**  All right.  Then show it rather than have

17   her say what's in it.  Choose one or the other.

18            **MR. SIEGEL:**  Okay.  All right.  Then I will put that

19   aside.  I'm not going to show her right now.

20   **Q.**    After the meeting on March the 6th, did Ms. Preston

21   apologize to you for the statements that she had made at the

22   March 6th meeting?

23   **A.**    Yes.

24   **Q.**    Okay.  And you, in effect, said no apology was necessary,

25   because, in your view, you and Ms. Preston had agreed as to

SANTANA - DIRECT / SIEGEL

1    what occurred at the meeting?

2              **MR. LAFAYETTE:**  Objection, best evidence.

3              **MR. SIEGEL:**  No, this is not --

4              **THE COURT:**  Overruled.

5              **THE WITNESS:**  Yes.

6    BY MR. SIEGEL:

7    **Q.**    Okay.  Now, is it fair to say that this incident, that is

8    on the -- regarding the report and the March 6th meeting,

9    represented a turning point in your relationship with

10   Ms. Preston?

11   **A.**    No.

12   **Q.**    Okay.  Would you agree that your relationship up until

13   March the 6th, 2012 was a positive relationship?

14   **A.**    Yes.

15   **Q.**    And after that, it wasn't so positive anymore; correct?

16   **A.**    No.

17   **Q.**    Did it continue to be positive?

18   **A.**    Yes.

19   **Q.**    How long did it continue to be positive?

20   **A.**    Through about December to January, 2012-'13, the end of

21   the year.

22   **Q.**    So -- and would it be fair to say that at no time during

23   calendar year 2000 did you ever give Ms. Preston a reprimand?

24   **A.**    Yes.

25   **Q.**    And at no time during calendar year 2000 did you ever

SANTANA - DIRECT / SIEGEL

1   memorialize in writing --

2            THE COURT:  You mean 2000, is that what you said.

3            MR. SIEGEL:  Through 2012.  Did I misspeak?

4            THE COURT:  I just heard you say 2000, so --

5            MR. SIEGEL:  Sorry.  Thank you.

6   **Q.**   Would it be fair to say that at no time through the end of

7   2012, did you memorialize any criticism, negative criticism of

8   Ms. Preston's job performance?

9   **A.**   I think I sent some emails.

10  **Q.**   During 2012.

11  **A.**   I think I sent emails -- I may have sent emails or

12  directed staff to send emails.

13  **Q.**   To her?

14  **A.**   Yes.

15  **Q.**   That critiqued her job performance?

16  **A.**   Yes.

17  **Q.**   And can you identify those emails at this time?

18  **A.**   There were -- there were issues with closed session

19  procedures being followed, and there's emails that instruct her

20  on closed session procedures, and that's what's coming to mind

21  right now.

22  **Q.**   Okay.  So then are you saying that your relationship with

23  her at the time those emails were written regarding closed

24  session procedures was no longer positive?

25  **A.**   I think we were just working together.

SANTANA - DIRECT / SIEGEL

1   **Q.**   Just trying to work out the process?

2   **A.**   Right.

3   **Q.**   Okay.  All right.  So in early 2013, an issue arose

4   regarding the negotiations between the City of Oakland and the

5   Firefighters Local 55; is that right?

6   **A.**   Yes.

7   **Q.**   Okay.  And at that point, the chief of the Oakland Fire

8   Department was an individual by the name of Teresa Reed; is

9   that right?

10  **A.**   Yes.

11  **Q.**   And Teresa Reed is someone with whom you had worked in the

12  City of San Jose?

13  **A.**   Yes.

14  **Q.**   And were you responsible within the City of Oakland for

15  hiring Teresa Reed as the fire chief?

16  **A.**   Yes.

17  **Q.**   Okay.  And I take it you were supportive of her role as

18  fire chief?

19  **A.**   Yes.

20  **Q.**   The City of Oakland had a policy that prior to proposals

21  being made to union-represented city employees, those proposals

22  had to be vetted and approved by the City Council; is that

23  right?

24  **A.**   Yes.

25  **Q.**   Okay.  And you learned, did you not, that Teresa Reed had

SANTANA - DIRECT / SIEGEL

1  violated that policy by reaching agreements with the

2  Firefighters Union, also known as Local 55?

3       **MR. LAFAYETTE:**  Objection, argumentative, and calling

4  for an opinion as framed.

5       **THE COURT:**  Overruled.

6       **THE WITNESS:**  That's what I read.

7  **BY MR. SIEGEL:**

8  **Q.**  Okay.  And where did you read that?

9  **A.**  In an email from Doryanna Moreno and the Attorney's

10  Office.

11  **Q.**  Okay.  Now, you spoke with Chief Reed about this matter;

12  is that right?

13  **A.**  Yes.

14  **Q.**  Okay.  And isn't it in fact true that in your conversation

15  with Chief Reed, she indicated that the reason she had

16  negotiated and reached this agreement with the Local 55 was

17  that you told her to do that?

18       **MR. LAFAYETTE:**  Objection, constitutes hearsay.

19       **THE COURT:**  What's the purpose of the question, truth

20  or something else?

21       **MR. SIEGEL:**  It is to demonstrate the existence of a

22  disagreement between Ms. Santana and Ms. Reed.

23       **MR. LAFAYETTE:**  Objection, relevance.

24       **THE COURT:**  Hearsay objection is sustained.

25

SANTANA - DIRECT / SIEGEL

1  BY MR. SIEGEL:

2  Q.   Let me approach this a different way.

3       Isn't it true that you criticized Lawanna Preston and

4  people on her staff for allowing Chief Reed to negotiate with

5  the Firefighters Union without getting City Council approval?

6  A.   I don't think so.

7  Q.   Well, isn't it true that you -- that one of the reasons

8  that you ultimately made the decision to fire Ms. Preston was

9  because of her failing to give appropriate guidance to Chief

10  Reed in allowing therefor Chief Reed to violate City policy?

11  A.   Yes.

12  Q.   Okay.  So you felt that there was a violation of City

13  policy, and you thought that Lawanna Preston and her staff was

14  responsible for it?

15  A.   I thought that Lawanna had failed us in guiding the

16  process.

17  Q.   Okay.  And did you speak with Chief Reed about that?

18  A.   I don't recall.

19  Q.   Let me ask you this.  Is it true that Chief Reed did not

20  criticize Lawanna Preston and instead indicated that the

21  problem was your fault, because you had advised Chief Reed to

22  go ahead and have these negotiations?

23       MR. LAFAYETTE:  Objection, compound, constitutes

24  hearsay, relevancy.

25       THE COURT:  Hearsay and compound objections are

SANTANA - DIRECT / SIEGEL

1  sustained.

2  **BY MR. SIEGEL:**

3  **Q.**   Okay.  Isn't it true that one of the reasons that you

4  fired Lawanna Preston was because of the incident with Chief

5  Reed negotiating with Local 55 without City Council approval?

6          **MR. LAFAYETTE:**  Objection, it's cumulative.

7          **THE COURT:**  Overruled.

8          **THE WITNESS:**  I thought Employee Relations had failed

9  the City with providing proper guidance.

10  **BY MR. SIEGEL:**

11  **Q.**   Okay.  And isn't that one of the reasons for your decision

12  to fire Lawanna Preston in October?

13  **A.**   Yes.

14  **Q.**   Okay.  And do you recall having a conversation with the

15  chief about how it came to be that she negotiated with Local 55

16  without Council approval?

17  **A.**   I think there were email transactions.

18  **Q.**   Okay.  And isn't it true that in your transactions with

19  Chief Reed, she did not blame Lawanna Preston, but instead she

20  blamed you?

21          **MR. LAFAYETTE:**  Objection, hearsay, and the documents

22  are their own best evidence.

23          **THE COURT:**  Sustained.  Hearsay objection sustained.

24  **BY MR. SIEGEL:**

25  **Q.**   Okay.  All right.  In any case, was it an embarrassment to

1    the City that an agreement had been made with Local 55 without

2    City Council approval?

3            **MR. LAFAYETTE:**  Objection, requires speculation on the

4    part of the witness.

5            **THE COURT:**  Sustained.

6    **BY MR. SIEGEL:**

7    **Q.**   Was it an embarrassment to you as City Administrator that

8    your fire chief had made an agreement with Local 55 without

9    your approval?

10   **A.**   No.

11   **Q.**   Do you think this reflected badly on your administration?

12           **MR. LAFAYETTE:**  Objection, requires her to speculate.

13           **THE COURT:**  Overruled.

14           **THE WITNESS:**  I thought it just needed to be cleaned

15   up.

16   **BY MR. SIEGEL:**

17   **Q.**   Well, it's true, isn't it, that Local 55 had to be advised

18   that the agreement that Chief Reed had made on June 28th, 2013

19   had to be retracted?

20           **MR. LAFAYETTE:**  Objection, lacking in foundation,

21   constitutes hearsay.

22           **THE COURT:**  Sustained.  One moment.  Let me advise the

23   jury.

24        There have been a number of objections, I warned you about

25   those, and I've sustained a number of them, and therefore the

1    witness is not allowed to answer them, and to remind you,

2    you're not to speculate what the answer would have been if I

3    had allowed the question.

4        The hearsay objection goes to statements made by someone

5    who is not here in court.  So there have been references to

6    Chief Reed, who is not here in court, and what Chief Reed said

7    or wrote.  And Chief Reed can be called as a witness in this

8    case, and can be asked what Chief Reed said or wrote, and

9    that's a more direct way of getting information for you to

10   consider, rather than asking a witness here to state what

11   another person said who is not here.

12       The reason for the rule is that since that person is not

13   here to be challenged about what he or she said, it's not as

14   reliable as information -- as asking the person who is here,

15   Ms. Santana, what Ms. Santana said or did.  So the purpose of

16   the rule is to get more direct information for the jury to

17   consider.  You may proceed.

18           **MR. SIEGEL:**  Thank you.

19   **Q.**   Isn't it true that members of Local 55 complained to you

20   about what had occurred with the agreement being reached on

21   June 28 and then having to be withdrawn?

22   **A.**   Yes.

23   **Q.**   Okay.  And wasn't that a problem for you?

24           **MR. LAFAYETTE:**  Objection, it's vague and ambiguous as

25   phrased.

1              THE COURT:  Overruled.

2              THE WITNESS:  It was correctable.

3    BY MR. SIEGEL:

4    Q.   And, in fact, it was corrected?

5    A.   Yes.

6    Q.   You went back to the City Council in July, and they said,

7    *Okay, we'll approve this agreement retroactively*?

8    A.   Yes.

9    Q.   That's what happened; right?

10   A.   Yes.

11   Q.   Okay.  And just to clean up one point, did Chief Reed

12   complain to you about Ms. Preston's job performance?

13   A.   She expressed that she was confused.

14   Q.   Okay.  But did she explain to you about Ms. Preston's job

15   performance?

16   A.   I don't recall.

17           MR. SIEGEL:  Your Honor, Ms. Santana's deposition at

18   page 83, lines 2 through 4.

19           THE COURT:  One moment.

20           MR. LAFAYETTE:  Which page, counsel?

21           MR. SIEGEL:  83, lines 2 to 4.

22           THE COURT:  All right.  You can read that.

23           MR. SIEGEL:  Thank you.

24       "Q.  Was she, referring to Chief Reed, one of the

25       individuals who complained to you about Ms. Preston's

SANTANA - DIRECT / SIEGEL

1    behavior or job performance?

2    "A.  I don't think so."

3  Q.  Now, did an issue arise in 2013 concerning whether Deb

4  Grant, an employee of the Human Resources Department, had

5  improperly ordered some computer equipment for herself and for

6  her staff?

7  A.  Yes.

8  Q.  Okay.  And was that investigation referred by you -- let

9  me rephrase that.

10    Did you refer that matter for investigation to the

11  Internal Affairs Department of the Oakland Police Department?

12  A.  I referred it to two places, the City Auditor, and to the

13  Internal Affairs Department.

14  Q.  Okay.  And that's part of the Oakland Police Department?

15  A.  Yes.

16  Q.  Okay.  And isn't it true that that was a unique event in

17  terms of your administration, that is, the referral to the

18  Internal Affairs Department of the Police Department of a

19  matter involving the behavior of an employee who was not an

20  employee of the Police Department?

21  A.  Yes.

22  Q.  Okay.  And prior to referring this matter to the Internal

23  Affairs Department of OPD, did you consult with Chief Howard

24  Jordan?

25  A.  I don't remember if it was Chief Howard Jordan or Chief

1   Sean Whent.  It may have been both.  Chief Howard Jordan was

2   transitioning out, and Chief Sean Whent was transitioning in.

3   **Q.**   Okay.  When did Chief Howard Jordan leave the City of

4   Oakland?

5   **A.**   Early 2013.

6   **Q.**   Okay.  And isn't it in fact true that even after Chief

7   Jordan left the Oakland Police Department, you considered to

8   consult with him?

9   **A.**   I'm sorry.  Repeat the question.

10  **Q.**   Didn't you continue to consult with Howard Jordan after he

11  left employment with the City of Oakland?

12  **A.**   Yes.

13  **Q.**   You and he had developed a friendship?

14  **A.**   Yes.

15  **Q.**   Okay.  And isn't it true that he is the one who

16  recommended to you that you use Internal Affairs to investigate

17  the matter of the computers that were ordered by Deb Grant in

18  the Human Resources Department?

19  **A.**   He may have, but I tend to remember Chief Sean Whent more

20  active in implementing it.

21  **Q.**   Okay.  In any case, the Internal Affairs division of the

22  Police Department investigated the actions of Deb Grant; is

23  that right?

24  **A.**   That's correct.

25  **Q.**   And they also investigated at your request the actions of

**SANTANA - DIRECT / SIEGEL**

1  Lawanna Preston to determine whether she had improperly

2  interfered with the investigation of Deb Grant; is that right?

3  **A.**   Yes.

4  **Q.**   And isn't it also true that at the conclusion of that

5  investigation, they did not recommend to you grounds for

6  disciplinary action against either Deb Grant or Lawanna

7  Preston?

8  **A.**   No.

9  **Q.**   Am I correct?

10  **A.**   That wasn't their role.

11  **Q.**   What was their role?

12  **A.**   To conduct an investigation and make findings.

13  **Q.**   Okay.  And did they make findings that led to the

14  discipline of Deb Grant?

15           **MR. LAFAYETTE:**  Objection, relevancy, and Ms. Grant's

16  right to privacy.

17           **THE COURT:**  Overruled.  You may answer.

18           **THE WITNESS:**  Can you repeat the question?

19  **BY MR. SIEGEL:**

20  **Q.**   Isn't it true that the findings made by Internal Affairs

21  did not lead to any disciplinary action taken against Deb

22  Grant?

23  **A.**   I don't know.

24  **Q.**   You don't know?

25  **A.**   I don't know.

SANTANA - DIRECT / SIEGEL

1    **Q.**   Okay.  Did you discipline Deb Grant as a result of the IA

2    investigation?

3    **A.**   I did not.

4    **Q.**   Did anyone?

5    **A.**   I don't know.

6    **Q.**   Okay.  Well, did the findings of the Internal Affairs

7    division of the Police Department lead to any disciplinary

8    action taken against Lawanna Preston?

9    **A.**   It was one of the reasons why I chose to terminate.

10       **MR. SIEGEL:**  Your Honor, I'd like to read

11    Ms. Santana's deposition, page 22, lines 3 through 23.

12       **THE COURT:**  And how does it differ from what you just

13    covered?  Or what -- how is it not cumulative to what you just

14    discussed?

15       **MR. SIEGEL:**  The deposition testimony was that there

16    was no disciplinary action taken against either Deb Grant or

17    Lawanna Preston.

18       **THE COURT:**  In one place you asked "did you," and the

19    other one the question was "was any action taken," so you asked

20    different questions at deposition than here.  Do you want to

21    clarify here?

22    **BY MR. SIEGEL:**

23    **Q.**   Okay.  Were you aware of any disciplinary action taken

24    against Deb Grant as a result of her -- the allegation that she

25    had improperly attempted to procure computer equipment?

SANTANA - DIRECT / SIEGEL

1   **A.**   I am not.

2   **Q.**   You're not aware of any; correct?

3   **A.**   Right.

4   **Q.**   And no disciplinary action was taken against Lawanna

5   Preston; is that right?

6   **A.**   It was one of the reasons why I terminated her.

7          **MR. SIEGEL:**  Your Honor, again, looking at

8   lines 19 through 23.

9          **THE COURT:**  I think she just clarified it right now.

10  You got her to say the same thing as what she said during the

11  deposition.

12         **MR. SIEGEL:**  She said "no" in the deposition.

13         **THE COURT:**  And she just said "no" to disciplinary

14  action here as well.

15         **MR. SIEGEL:**  No, she said, *That was one of the reasons*

16  *I terminated her*.

17         **THE COURT:**  That's a different question.

18         **MR. SIEGEL:**  Okay.  All right.

19  **Q.**   Isn't it true that no disciplinary action was taken

20  against Lawanna Preston as a result of the Internal Affairs

21  investigation?

22  **A.**   Yes.

23  **Q.**   You said there was disciplinary action taken against her

24  as a result of the Internal Affairs investigation?

25  **A.**   It's one of the reasons why I terminated her.

1          **THE COURT:**  If you want to read your question and

2     answer, you can.  I think you're perhaps confusing the jury

3     more with the contrast.  I'm not trying to contribute to their

4     confusion, but if you think it's helpful...

5          **MR. SIEGEL:**  I apologize if I'm confusing anyone.  The

6     testimony on lines 23 -- excuse me, 19 to 23 of the deposition

7     was:

8          **"Q.**  And was any disciplinary action taken against Lawanna

9          Preston as a result of her involvement in that

10         investigation or her allegation that she had interfered

11         with the investigation?

12         **"A.**  No."

13    **Q.**   Now, do you recall when the Internal Affairs Department

14    completed its investigation of the Deb Grant and Lawanna

15    Preston matter?

16    **A.**   Yes.

17    **Q.**   When was that?

18    **A.**   Late September.

19    **Q.**   Late September; okay.  So this was going on concurrently

20    with the conversations regarding the grievance filed by SEIU

21    concerning the dues collection for temporary part-time

22    employees?

23    **A.**   Yes.

24    **Q.**   Okay.  And how did you learn that -- well, let me rephrase

25    that.

1    Did you learn that at a meeting involving representatives

2  of the Employee Relations Department and the SEIU, that Katano

3  Kasaine had made a statement to the effect that dues were not

4  being collected from the temporary part-time employees?

5  **A.**   Yes.

6  **Q.**   Okay.  And how did you learn that?

7  **A.**   I think Lawanna called me.

8  **Q.**   Okay.  And was that a concern to you?

9  **A.**   Yes.

10 **Q.**   Did you realize that there was potentially a violation of

11 the agreement between SEIU, Local 1021, and the City of

12 Oakland?

13 **A.**   Yes.

14 **Q.**   And also a violation of state law, if the allegation is

15 true?

16 **A.**   Yes.

17     **MR. LAFAYETTE:**  Objection, calls for a legal

18 conclusion.

19     **THE COURT:**  Overruled.  The answer is "yes."

20     **THE WITNESS:**  Yes.

21     **THE COURT:**  Okay.

22 **BY MR. SIEGEL:**

23 **Q.**   Now, when Lawanna Preston told you that she was going to

24 investigate the grievance that SEIU had filed, did you

25 determine to remove authority for that investigation from her?

SANTANA - DIRECT / SIEGEL

1   **A.**   Yes.

2   **Q.**   Okay.  And did you then ask the City Attorney to take

3   responsibility for that investigation?

4   **A.**   No.

5   **Q.**   Who did you ask to take responsibility, if anyone?

6   **A.**   I asked the City Attorney to help me get a third-party

7   investigator.

8   **Q.**   Okay.  And did the City Attorney do that?

9   **A.**   Yes.

10  **Q.**   And who did the City Attorney find to act as a third-party

11  investigator?

12  **A.**   Mr. Otis McGee.

13  **Q.**   And Mr. McGee is an attorney; is that correct?

14  **A.**   Yes.

15  **Q.**   And he is currently employed by the Oakland City

16  Attorney's Office; is that right?

17           **MR. LAFAYETTE:**  Objection, hearsay, lacking in

18  foundation.

19           **THE COURT:**  Overruled.

20           **THE WITNESS:**  Yes.

21  **BY MR. SIEGEL:**

22  **Q.**   Okay.  In fact, you were present at the deposition of

23  Lawanna Preston in this case; weren't you?

24  **A.**   Yes.

25  **Q.**   And it was Mr. McGee who took her deposition; is that

1   right?

2            MR. LAFAYETTE:  Objection, relevance, Your Honor.

3            THE COURT:  Sustained.

4   BY MR. SIEGEL:

5   Q.   Okay.  To your knowledge, Mr. McGee served as counsel for

6   you in this case?

7            MR. LAFAYETTE:  Objection, relevance, Your Honor.

8            THE COURT:  Sustained.  Let's move on to a different

9   topic.

10           MR. SIEGEL:  Okay.

11  Q.   Did Lawanna Preston disagree with your decision to take

12  away responsibility for the investigation of the SEIU dues

13  issue?  Did she complain about that to you?

14  A.   Yes.

15  Q.   Okay.  And when did she do that?

16  A.   Multiple times.

17  Q.   Okay.  Did she do that in writing or orally or both?

18  A.   Both.

19  Q.   Okay.  And nonetheless, you decided to do that; is that

20  right?

21  A.   Yes.

22  Q.   Now, was there an incident at a meeting of the City

23  Council on October 1, 2013 where SEIU negotiations were being

24  discussed by the Council in closed session?

25  A.   Yes.

**SANTANA - DIRECT / SIEGEL**

1   **Q.**   Okay.  And were you present?

2   **A.**   Yes.

3   **Q.**   And was Lawanna Preston present?

4   **A.**   Yes.

5   **Q.**   And just to be clear, what was on the agenda was not a

6   discussion of the grievance, but was a discussion of the

7   negotiations between the City and the SEIU?

8   **A.**   Yes.

9   **Q.**   And is it also true that the City Council had before it at

10  that closed session meeting the proposals that had been

11  advanced by both sides in the negotiation?

12  **A.**   Yes.

13  **Q.**   So what we're talking about is that the City put its

14  proposals in writing, and the SEIU put its proposals in

15  writing?

16  **A.**   Yes.

17  **Q.**   Okay.  And isn't it true that the proposals of the SEIU

18  included a statement to the effect that by proposing various

19  items to settle the contract, they were not proposing to

20  withdraw the grievance they had filed over the failure to

21  deduct dues?

22  **A.**   I don't recall.

23  **Q.**   Okay.  Is it true that prior to the October 1 meeting, you

24  had instructed Lawanna Preston not to bring up the SEIU

25  grievance?

**SANTANA - DIRECT / SIEGEL**

1    A.    No.

2    Q.    Had you discussed it with Lawanna prior to that meeting?

3    A.    Yes.

4    Q.    And what had you discussed with her?

5    A.    We talked about my decision to have a third-party

6    investigator.  We talked about the transition of documents and

7    just going forward with the information that we had.

8    Q.    Okay.  The grievance had been filed early September;

9    correct?

10   A.    Yes.

11   Q.    Okay.  Had you planned to have it discussed at the City

12   Council meeting on October 1?

13   A.    I assumed it would come up.

14   Q.    Okay.  How did you assume that or why did you assume that?

15   A.    I thought it would either be raised as a question or that

16   Lawanna would raise it, or that there was enough communication

17   between SEIU and Council members that they likely may even.

18   Q.    Okay.  Did you have any conversation with Lawanna Preston

19   regarding whether she should bring up the grievance in the

20   meeting with the City Council on October 1?

21   A.    I don't recall telling her not to bring it up.

22   Q.    Okay.  Did she bring it up?

23   A.    I think she did.

24   Q.    Okay.  And did she bring it up in response to a question

25   from a member of the Council?

1    **A.**    I don't recall.

2    **Q.**    Okay.  Do you recall how it came up during the meeting?

3    **A.**    I recall that Lawanna made reference to it, Vice-Mayor or

4    Councilmen Brooks asked questions, and we responded to those

5    questions.

6    **Q.**    Were you unhappy that Lawanna had brought up the grievance

7    during the closed session of the City Council on October 1?

8    **A.**    I wasn't surprised.

9    **Q.**    Okay.  You weren't -- were you displeased, I guess is the

10   better question?

11   **A.**    It wasn't something that would generally come up in a

12   closed session hearing.

13   **Q.**    Okay.  So you were neither pleased nor displeased?

14   **A.**    I think it was just reflective of a pattern of behavior

15   that I had become accustomed to --

16   **Q.**    Okay.

17   **A.**    -- from Lawanna.

18   **Q.**    When she brought things up to the Council without

19   authority; is that what you mean?

20   **A.**    She would submit reports to Council members without my

21   opportunity to review, without the City Attorney's opportunity

22   to review, and this was reflective of that pattern of behavior.

23   **Q.**    Wasn't it Lawanna Preston's responsibility to keep the

24   City Council apprized of the status of labor negotiations?

25   **A.**    Yes.

SANTANA - DIRECT / SIEGEL

1  Q.   And didn't that responsibility sometimes arise outside of

2  the normal preparation of reports in advance of City Council

3  meetings?

4        **MR. LAFAYETTE:**  Objection, requires speculation on

5  this witness's part.

6        **THE COURT:**  Overruled.

7        **THE WITNESS:**  Can you repeat the question?

8  **BY MR. SIEGEL:**

9  Q.   Yeah.  Didn't it sometimes occur that the press of

10 business would require a report to the Council on labor

11 negotiations more quickly than the normal process of preparing

12 reports for the Council?

13 A.   Yes.

14 Q.   Okay.  Now, you thought that when Lawanna provided

15 information regarding the SEIU grievance during the October 1

16 meeting, she was acting outside of protocol; is that right?

17 A.   By that time she had already been removed, and I had the

18 information in terms of the status of the topic.

19 Q.   So my question, I repeat, do you think that she was acting

20 outside of the protocol when she provided the information to

21 the Council on October 1?

22 A.   Yes.

23 Q.   Okay.

24       **THE COURT:**  Mr. Siegel, we're very close to the end

25 for today, and if you have some further questions, you can ask

**PROCEEDINGS**

1   a few more.

2   **BY MR. SIEGEL:**

3   **Q.**   Okay.  And you decided to terminate Ms. Preston's

4   employment on October 2; correct?

5   **A.**   Yes.

6   **Q.**   And that occurred in part because she called you on the

7   telephone and essentially yelled at you while you were having a

8   meeting with Otis McGee and Barbara Parker?

9   **A.**   I had already determined that I was going to terminate her

10   beforehand, and the letter was going to be issued either that

11   Friday or Monday, and after she yelled at me and was

12   insubordinate, I made the decision to terminate her the next

13   day.

14   **Q.**   Okay.  And you made that decision on October 2; correct?

15   **A.**   To issue her the letter on Thursday.

16   **Q.**   And at the time that she yelled at you, you were in a

17   meeting with Barbara Parker and Otis McGee; is that correct?

18   **A.**   Yes.

19   **Q.**   And Ms. Preston was on speakerphone?

20   **A.**   Yes.

21          **MR. SIEGEL:**  That's a good time to stop.

22          **THE COURT:**  Thank you very much, Ms. Santana.  You may

23   step down.

24          And ladies and gentlemen of the jury, that completes your

25   day of service.  Thank you for your endurance today.  We'll

PROCEEDINGS

1    resume tomorrow at 9:00 a.m., and we'll have some business to

2    go over before then.

3        You can, of course, leave your notes, and you're

4    instructed to leave your notes, in the jury room.

5        I remind you of the admonishment I gave you earlier today

6    about not doing any research of your own in the case, only

7    consider the evidence presented in court, and not talk to

8    anyone about the case while it's ongoing.  So remember those

9    admonishments.

10       There will be lots of traffic tomorrow.  The

11   Salesforce.com Conference kicks off tomorrow, as well as the

12   usual traffic in San Francisco, so BART is an excellent option,

13   and allow extra time for travel.  Thanks very much.

14       (Proceedings were heard out of presence of the jury:)

15           **MR. LAFAYETTE:**  I would like, Your Honor, to get --

16           **THE COURT:**  Back on the record.

17       Please be seated out there.  Jurors are not present.

18       All right.  A few administrative issues, and then we'll

19   get ready for tomorrow.

20       Mr. Siegel, when you review the transcript, you'll see

21   conservatively more than 50 times you say the word "okay" after

22   you hear an answer that you seem to agree with, and that's a

23   form of vouching for the witness and agreeing with the witness,

24   and testifying to the jury.  You should not do that, because

25   you're not a witness.  And if you keep doing it, I'll remind

PROCEEDINGS

1    the jury that you're a witness, and they should give no credit

2    to your agreement of this agreement.  You, of course, can

3    disagree with your arguments --

4            MR. SIEGEL:  I understand.  I wasn't even conscious of

5    it.

6            THE COURT:  It's a common thing in questioning.  But

7    when you review the transcript, you'll see that every time.  So

8    see if you can work on that tomorrow with your further

9    examination.

10        Let's talk about the documents.  So Mr. Lafayette, you

11   made an objection to a document that appears in what you

12   submitted in your Amended Joint Exhibit list on Saturday,

13   document 137, and in that document there are a number of

14   defense objections to other documents.  There's no defense

15   objection to that document, which was Exhibit Q.  So I'll give

16   you a chance to elaborate on why I should not be giving credit

17   to what the defense filed as its exhibit list with objections

18   on Saturday.

19           MR. LAFAYETTE:  It was an inadvertent -- it was

20   inadvertence, Your Honor, because when I look at the document,

21   you really can't see it very clearly, but when you see it, it's

22   not an insert of language in the document, it's really an

23   opinion that's given.  It's -- so that was the nature of also

24   my objection to mischaracterizing the document and

25   argumentative, because when you read the language that he's

1   looking at, it's not saying add this language, it's actually

2   giving opinion and asking a question or saying this is what you

3   can do, and these are your options.  And that was the nature of

4   my objection to his question, and that's why I'm saying it's

5   the appearance of the document.

6        THE COURT:  All right.  Those are all objections that

7   could have been made earlier and weren't.  I'll give you a

8   chance until 8:00 a.m. tomorrow to revise this exhibit list and

9   to not call it an Amended Joint Trial Exhibit list unless it

10  actually is joint, and it's not an opportunity to add exhibits.

11       MR. LAFAYETTE:  No.

12       THE COURT:  But if there are objections which you

13  failed to make inadvertently on Saturday, I'll give you until

14  8:00 a.m. tomorrow to put the objections in writing.  I'm not

15  promising I will sustain the objections, but I'll give you an

16  opportunity to raise them.

17       MR. LAFAYETTE:  Thank you, Your Honor.

18       MR. SIEGEL:  Your Honor, can I say something about

19  that?

20       THE COURT:  You may.

21       MR. SIEGEL:  It's not that the objections weren't made

22  on Saturday, they weren't made in the last version of the Joint

23  Exhibit List or when these documents were used at deposition or

24  in the motion for summary judgment or ever.

25       MR. LAFAYETTE:  I don't think that document was used

PROCEEDINGS

1   in deposition.  I could be wrong.

2        THE COURT:  Defendants need to speak in the microphone

3   so we actually have a recording that they make.

4        MR. LAFAYETTE:  Thank you, Your Honor.  I don't

5   believe that either of those documents were used in a

6   deposition, I could be wrong, but that's my recollection.

7        THE COURT:  All right.  I can't resolve that question

8   right now.

9        There were also plaintiff's exhibits identified in docket

10  120, and that's a binder I have before me.  There's a column

11  for stipulations, objections, and it doesn't reflect any

12  objections or stipulations.  So my question to the defense is

13  do you object to these documents?  Of course I just admitted a

14  handful of them, but I imagine there's going to be more coming

15  tomorrow and the day after.  So am I going to be guessing in

16  front of the jury or can you tell me if you're objecting or

17  stipulating to these documents?

18        MR. LAFAYETTE:  I'm not sure which ones you have in

19  front of you, Your Honor.

20        THE COURT:  Well, you submitted something called a

21  Joint Trial Exhibit list.  It appears that that was not

22  accurate.  And plaintiffs have submitted, back in docket 120,

23  what they called their amended, excuse me, not amended, Updated

24  Exhibit list.  That document was not identified as being joint,

25  but it did have columns for stipulations and objections.

PROCEEDINGS

1        What I asked for was a joint, joint exhibit binders with

2   both parties objections so that I could actually rule.  What I

3   have instead are the parties have got different copies of the

4   same documents with different numbers, sometimes with

5   objections, sometimes not.

6              **MR. LAFAYETTE:**  I think I can help, Your Honor.

7              **THE COURT:**  Please.

8              **MR. LAFAYETTE:**  Way back, way, way back we prepared

9   initial -- we exchanged document lists between ourselves.

10   After we did that, my office took the laboring oar of making a

11   joint exhibit list, which was filed.  We had the pretrial

12   conference, and you then instructed us to -- if there was

13   something more to put it on and send it to you the following

14   week, and that -- and I can't look at the date on it right now,

15   but I know there was a joint exhibit list that was a true joint

16   exhibit list that everybody had signed off on back in the

17   middle of August.  That's the one I think should be the

18   operative exhibit list, and joint because that was a joint

19   exhibit list, and that's the one that the binders that we

20   presented to you is based upon.

21        The only thing that that new list that you got on Saturday

22   does is includes those 15 new documents at the end, but

23   otherwise, that is a joint list prepared by both parties.

24              **THE COURT:**  All right.  And other than the 15

25   documents, does that mean that the defense has raised every

PROCEEDINGS

1   objection in the objection column?  You've raised every

2   objection to any document set forth in that chart?

3        **MR. LAFAYETTE:**  I think what we did -- I think that

4   was the intent, Your Honor.  I just heard I think that was the

5   intent.  I think what we did was attempted to capture -- if you

6   look at -- if you just look at the one that's dated 9/12,

7   because that's the one sitting in front of you --

8        **THE COURT:**  That's the one sitting in front of me,

9   too.

10       **MR. LAFAYETTE:**  If you look at the one page 5, for

11  example, you will see that there's objections that defendant

12  raised at 1E, and then you see where we captured plaintiff's

13  objections at 1F, so that was the intent of that document.

14  That's about all I can say right now.

15       **THE COURT:**  All right.  And given that intent, that's

16  why I was surprised when you raised an objection here in court

17  that was inconsistent with what you put in writing on Saturday,

18  and that I relied upon as being your position.

19       **MR. LAFAYETTE:**  I understand, Your Honor.

20       **THE COURT:**  Does plaintiff have objection to any of

21  those documents set forth in document 137, other than what is

22  set forth in the objection column, and there are plaintiff's

23  objections to some of the documents.

24       **MR. SIEGEL:**  Is 137 the one that was filed Saturday?

25       **THE COURT:**  Correct.

1    **MR. SIEGEL:**  To the extent to which that copies what

2    was in the previous joint exhibit list, except for the addition

3    of the new exhibits, all of our objections are in there.

4        **THE COURT:**  And that's what it appears to me.  It

5    appears to me that the entries identified as plaintiff's

6    objections are the same as prior, but I wanted to make sure

7    that you viewed it the same way.

8        **MR. SIEGEL:**  Yes.

9        **THE COURT:**  All right.  Then what I need is either for

10   the -- there would be one true joint trial exhibit list and one

11   true joint trial binder or for plaintiffs updated exhibit list,

12   docket 120, to have a cross-reference so that when we have two

13   versions of the same document --

14       **MR. LAFAYETTE:**  It --

15       **THE COURT:**  Yes.

16       **MR. LAFAYETTE:**  All of the documents in plaintiff's

17   original and supplemental exhibit list are in that document

18   that you have in front of you.  They're all right there.  And

19   for me, it's easier if we do that, because I think we've

20   created binders for the witnesses, for everybody else based

21   upon that, and if we use that, then we're not going to have any

22   confusion here.

23       **THE COURT:**  Well, that's putting the burden on the

24   plaintiff when they're putting on their case tomorrow.  So I'm

25   already putting a burden on you, and you started to do it

 1    today, Mr. Siegel.

 2            **MR. SIEGEL:**  We can cross-reference --

 3            **THE COURT:**  When you bring up Exhibit 15, say this is

 4    the same as Defense Exhibit blah, blah, blah.

 5            **MR. SIEGEL:**  And we did that, frankly, because we were

 6    having time problems coordinating the joint list, and we wanted

 7    to be sure and meet whatever the Court's deadline was.

 8            **THE COURT:**  I understand.  I just wanted to make sure

 9    that we all understand what's in evidence and what's not, and

10    ultimately the jury will understand it.

11        Now, so far they haven't seen a single exhibit, and that's

12    another -- you know, once an exhibit is admitted, you're

13    welcome to show it to them, put it on the screen, give it to

14    them in paper.  I think that they will feel a little more

15    included and have better questions and have a better

16    understanding of the evidence if they see some of it.  There

17    was a lot of information referenced to them from emails and

18    documents, which, if you're planning to save all of that until

19    the deliberations, I think you collectively might be

20    disappointed in the accuracy of their analysis.  But that's for

21    you to -- it's a presentation point that they'll give you

22    feedback on in the end.

23        All right.  Any other issues about the evidence?

24        Yes, Mr. Lafayette?

25            **MR. LAFAYETTE:**  Not about the evidence, they're about

**PROCEEDINGS**

1    witnesses.

2          **THE COURT:**  All right.  What is your request?

3          **MR. LAFAYETTE:**  There's one witness we would like to

4    call out of order, and that's Howard Jordan, and that's because

5    he's gone on -- he leaves Thursday, so we want to try to get

6    him in here if we could on Wednesday.  That was one.

7          And I think there are two witnesses that plaintiff has

8    that we may need to shuffle around.  I know he wanted Fred

9    Blackwell, and I'll just -- I'm not sure if he subpoenaed him

10   or not, but Mr. Siegel called me on Friday and asked if I could

11   get him.  I said I will try.  He said that in the deposition

12   transcript, the City indicated that it would produce

13   Mr. Blackwell.  I have not been able to reach him.  Now, I'm

14   just telling you, it's not for lack of trying.  I have not been

15   able to reach him.  I have called him on multiple numbers, and

16   I cannot reach him, and I just want everyone to realize that

17   that's a problem, and I will continue to try to resolve the

18   problem, but I haven't reached him.  That's number one.

19         **THE COURT:**  I think that's number two, actually.

20   Howard Jordan was number one.

21         **MR. LAFAYETTE:**  That's right.  And number 3 is Katano

22   Kasaine.  I think plaintiff's counsel wanted her here tomorrow,

23   but she's unavailable until.  She can make it Thursday.  I just

24   can't get her here on Wednesday.  I just have to move her

25   around, and maybe that frees up bringing Howard Jordan in.

**PROCEEDINGS**

 1    He's quick.

 2         THE COURT:  Mr. Siegel, are you done with your

 3    examination of Ms. Santana or is it going to continue?

 4         MR. SIEGEL:  It's going to continue.

 5         THE COURT:  And who are you calling next?

 6         MR. SIEGEL:  At Mr. Lafayette's request, we gave him a

 7    list last week of who we wanted to call which day, and so we

 8    had scheduled for after Ms. Santana Otis McGee, Barbara Parker,

 9    Fred Blackwell, Desley Brooks, and in that order.  I suppose if

10    Blackwell is not available tomorrow, we could have him another

11    day.

12         Mr. Lafayette is correct, in the -- Mr. Blackwell's

13    deposition reflects that I asked whether he would be available

14    for trial, as Ms. Bee who is present, and Mr. Blackwell both

15    said on the record that he would be, and that was -- you know,

16    what I do with deposition is say, *Look, give me your home*

17    *address, but you don't have to if you just promise to show up*

18    *at trial*, and if the attorney representing the witness says,

19    *We'll produce him*, then I refrain from demanding a home address

20    for subpoena purpose, and that's what I did with Mr. Blackwell

21    and many of the other witnesses.

22         THE COURT:  All right.  Well, I don't know where he is

23    either, so I can't solve the problem for you.  But I can say my

24    expectations are that we won't have any dark period tomorrow.

25    We're in trial, and so there needs to be a next plaintiff

**PROCEEDINGS**

1   witness.  If Mr. Blackwell is not here, there's going to be

2   somebody else, and you've got to figure out who it's going to

3   be.

4        Any objection to having Mr. Jordan go out of order

5   Wednesday?

6             **MR. SIEGEL:**  No.

7             **THE COURT:**  So we'll plan for Howard Jordan to testify

8   on Wednesday at a time to be determined based on -- we'll

9   figure out at the end of the day tomorrow.

10            **MR. SIEGEL:**  So if Blackwell is not going to be

11  available tomorrow, then I would ask the City to produce Chief

12  Reed, who is next on our list, and then we will produce Winnie

13  Anderson; can we do that tomorrow, and then we'll deal with it?

14       As I said to Mr. Lafayette last week, if we are moving

15  faster than we thought, or slower, we'll just continue the same

16  order and move people up or back.

17            **THE COURT:**  Very well.

18            **MR. SIEGEL:**  So we can have Reed and Anderson tomorrow

19  and move Blackwell.

20            **THE COURT:**  All right.  And Mr. Siegel, anything

21  further for me to resolve today?

22            **MR. SIEGEL:**  And you're saying Katano is unavailable

23  until Thursday?

24            **MR. LAFAYETTE:**  Until Thursday.  And I will check

25  with -- I reserved Chief Reed and Winnie Anderson.  Winnie

**PROCEEDINGS**

1   Anderson is not a City employee.  She works for East Bay Mud,

2   so I arranged for them to come in Wednesday.

3         **THE COURT:**  You're exceeding my ability to memorize

4   everyone's schedule and fix it.  I can't fix it, so keep

5   working on it together.

6         **MR. LAFAYETTE:**  We will, Your Honor.

7         **THE COURT:**  Make sure there's somebody here waiting in

8   the hallway ready to go.  Our jurors are coming from long

9   distances, one from as far away as Santa Rosa, so we need to

10  respect their time.  Be here on time tomorrow.

11       I don't anticipate we need to have a need for further

12  evidentiary hearing before court.  We resolved things now.  I'm

13  expecting another witness here at 9:00, so we'll start promptly

14  at 9:00, and we'll proceed.  Thanks very much.

15                  (Proceedings adjourned at 4:15 p.m.)

16                          ---oOo---

17

18

19

20

21

22

23

24

25

1

2

3                    **<u>CERTIFICATE OF REPORTER</u>**

4          I certify that the foregoing is a correct transcript

5     from the record of proceedings in the above-entitled matter.

6

7     DATE:   Monday, September 14, 2015

8

9

10

11     _____

12           Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                    Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25