**Volume 5**

**Pages 938 - 1152**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

```
DARYELLE LAWANNA PRESTON,          )
                                   )
            Plaintiff,             )
    VS.                            )      NO. C 14-02022 NC
                                   )
CITY OF OAKLAND; DEANNA SANTANA,   )
in her individual capacity;        )
and DOES 1 through 10, inclusive,  )
                                   )
            Defendants.            )
_____)
```

San Francisco, California
Friday, September 18, 2015

**PARTIAL TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Daryelle Lawanna Preston:
                        Siegel & Yee
                        499 14th Street, Suite 220
                        Oakland, CA 94612
                        510) 839-1200
                        (510) 444-6698 (fax)
                  BY:   **SONYA MEHTA**
                        **DANIEL MARK SIEGEL**


Reported By:  Lydia Zinn, CSR No. 9223, FCRR
             Rhonda Aquilina, CSR No. 9956, RMR, CRR
             Official Reporters

**APPEARANCES (Continued):**

For Defendants City of Oakland; Deanna Santana:
                        Lafayette & Kumagai LLP
                        101 Mission Street, Suite 600
                        San Francisco, CA  94105
                        (415) 357-4600
                        (415) 356-4605 (fax)
                   BY:  **AFRICA EVANGELINE DAVIDSON**
                        **SUSAN TAYEKO KUMAGAI**
                        **GARY T. LAFAYETTE**

ALSO PRESENT:  Kelvin Su

```
 1                          I N D E X

 2

 3    Friday, September 18, 2015 - Volume 1

 4
      PLAINTIFF'S WITNESSES                    PAGE   VOL.
 5
      PRESTON, LAWANNA
 6    (PREVIOUSLY SWORN)                        943    5
      Redirect Examination by Mr. Siegel       943    5
 7
      KASAINE, KATANO
 8    (SWORN)                                   956    5
      Direct Examination by Mr. Siegel         956    5
 9    Cross-Examination by Mr. Lafayette       977    5
      Redirect Examination by Mr. Siegel       993    5
10
      MC ELROY, DWIGHT WAYNE
11    Direct Examination by Ms. Mehta          994    5
      Cross-Examination by Mr. Lafayette      1008    5
12    Redirect Examination by Ms. Mehta       1017    5
      Recross-Examination by Mr. Lafayette    1024    5
13
      EVERETT, TC
14    (SWORN)                                  1028    5
      Direct Examination by Ms. Mehta         1029    5
15    Cross-Examination by Mr. Lafayette      1035    5

16    DEFENDANTS' WITNESSES                    PAGE   VOL.

17    JOHNSON, SCOTT
      (SWORN)                                  1069    5
18    Direct Examination by Mr. Lafayette     1070    5
      Cross-Examination by Mr. Siegel         1082    5
19    Further Cross-Examination by Ms. Mehta  1097    5

20    COHEN, MARK
      (SWORN)                                  1098    5
21    Direct Examination by Mr. Lafayette     1098    5
      Cross-Examination by Mr. Siegel         1110    5
22    Further Cross-Examination by Mr. Siegel 1128    5

23

24

25
```

**I N D E X**

**DEFENDANTS' WITNESSES**                                    **PAGE**   **VOL.**

**LARA, SONIA**
(SWORN)                                                      1130      5
Direct Examination by Mr. Lafayette                          1131      5

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|----------------|------|------|------|
| 3I             |      | 979  | 5    |
| 4K             |      | 984  | 5    |
| 28             |      | 1000 | 5    |
| 32             |      | 966  | 5    |
| 69             |      | 1028 | 5    |

<u>**Friday - September 18, 2015**</u>                    <u>**9:02 a.m.**</u>

P R O C E E D I N G S

---o0o---

(Proceedings were heard out of presence of the jury:)

**THE COURT:**  Just to demonstrate the Court's own technology prowess, we shut down ECF last night for this morning just to give you an extra challenge for trial, but that technological problem seems to have cured, and I did receive and review 151 through 155 that were filed, and so those are all timely, and I appreciate it, and I'm sorry for anxiety that the Court's technology caused the parties.

If you could also -- you may have done this in the last few minutes, but if you could send a copy to the proposed order inbox in Word form, that will assist us in utilizing them and turning them into the final documents.

**MR. SIEGEL:**  I'm sorry.  I'm not sure what you're referring to.

**THE COURT:**  So the jury instruction that you filed this morning --

**MR. SIEGEL:**  Yes.

**THE COURT:**  -- ms. Mehta filed it, if you could send a copy of it in Word form, Word document, to my proposed order inbox.

**MR. SIEGEL:**  Oh, okay, sure.

**THE COURT:**  Then we could use it in editing and

 1  creating a final document.

 2       MR. SIEGEL:  Just for the record, I filed it at about

 3  7:00 last night.

 4       THE COURT:  And that was just before the system shut

 5  down, and I got that and reviewed it.  I couldn't review it

 6  last night because I couldn't access ECF either.  I read it

 7  this morning.

 8     All right.  Our jurors are present.  We're ready to

 9  resume, and it's going to be Ms. Preston back on the stand.

10       MR. SIEGEL:  For redirect.

11       THE COURT:  Correct.

12     (Proceedings were heard in the presence of the jury:)

13       THE COURT:  All right.  Good morning to our jurors.

14  Welcome back.  Happy Friday.  We resume with our presentation

15  of the plaintiff's case.

16     And Ms. Preston, if you can return to the stand for the

17  Redirect Examination, and you remain under oath.

18                       **LAWANNA PRESTON**,

19  Called as a witness for the PLAINTIFF, having been previously

20  duly sworn, testified further as follows:

21       THE COURT:  You may proceed.

22       MR. SIEGEL:   Thank you.

23                    **REDIRECT EXAMINATION**

24  BY MR. SIEGEL:

25  **Q.**   Good morning, ladies and gentlemen.

1        So I would like to read briefly from Ms. Preston's

2    deposition, Volume 2, taken on April 29, 2015, page 174,

3    lines 2 through 17.

4            THE COURT:  One moment, please.  You may proceed.

5            MR. SIEGEL:  Thank you.  Question to Ms. Preston:

6    "Q.  Did you ever tell Deanna Santana that you believed

7        that she had instructed you to make a false statement,

8        verbal false statement about Desley Brooks at the City

9        Council meeting on approximately March 6, 2012?

10   "A.  After the meeting, I sent Ms. Santana an email

11       stating that I was sorry, something to the effect about

12       sorry that I had to contradict her at the Council meeting,

13       and we spoke later that night in which I apologized and

14       said the same thing.

15   "Q.  And other than the statement that you've just now

16       given, which you've testified to at the last session, did

17       you ever tell Deanna Santana anything else regarding your

18       belief that she had instructed you to make a false

19       statement about Desley Brooks?

20   "A.  Other than a conversation we had that night, no, we

21       did not discuss it again."

22           MR. SIEGEL:  And then, Your Honor, also page 176,

23   line 7 through 177, line 18.

24           THE COURT:  You said 176:7 or --

25           MR. SIEGEL:  Yes.

1          **THE COURT:**  That starts with an answer rather than a

2     question.  Can you start it with a question?

3          **MR. SIEGEL:**  Well, actually, this is the way it

4     started.  There was a break, and then Ms. Preston came into the

5     deposition and made the statement that appears right there,

6     without a question.

7          **MR. LAFAYETTE:**  My objection is this is all cumulative

8     to the videotape.

9          **THE COURT:**  That's overruled.

10    Let's start with a question on 175:18 as being the most

11    recent question before that answer, for context for her answer.

12         **MR. SIEGEL:**  175?

13         **THE COURT:**  175, line 18.

14         **MR. SIEGEL:**  Okay.  So Question at 175, line 18:

15    **"Q.**  As of October 3, 2013, did you ever report to anyone

16         authorized to take action regarding alleged misconduct

17         that anyone instructed you to make a verbal false

18         statement about Desley Brooks at the City Council meeting

19         in approximately March 6, 2012?

20    **"A.**  No."

21    Then there's a break.  Returning to the deposition, the

22    witness states, that's Preston:

23    **"A.**  So I want to clarify two -- two points.  Apparently,

24         I was -- didn't understand a couple of the questions that

25         you -- you asked.  And the two clarifying points I want to

1    make is, one, about the night of the City Council meeting

2    when I was asked to come to the mic, and -- and state that

3    Desley Brooks was provided information regarding staff at

4    the Teen Center.  I didn't know which question it was, but

5    I just want to be clear that -- that I was called to the

6    mic by Deanna Santana.  She called my name three times and

7    said come to the mic and tell the Council that Ms. Brooks

8    has been provided this information.  So I was instructed

9    by Ms. Santana to do that, then that is when I stood up

10   and said, I'm sorry, Ms. Brooks had not been provided that

11   information.  So one of your questions was related to

12   that.  I want to --

13        MR. LAFAYETTE:  I'm sorry, Your Honor.  I thought he

14   was going to 18 on that page.

15        MR. SIEGEL:  No, no, 18 on the next page.

16        THE COURT:  Next page.  Keep going.

17   "A.  So I was instructed to, by Ms. Santana, to do that,

18   then that is when I stood up and said I'm sorry,

19   Ms. Brooks has not been provided that information.  So one

20   of your questions was related to that.  I want to clarify

21   that that is my statement.  That's always been my

22   statement.

23        "The second point I want to clarify is that during the

24   process of drafting the Rainbow Teen Center report, there

25   were many, many drafts.  This went on for a very long

 1      time, and there was a period of time during the drafting

 2      process when the City Attorney, Barbara Parker, had

 3      amended the report to include language that stated that we

 4      would recommend that we refer Ms. Brooks to the Oakland DA

 5      for violating Charter Section 218, which is a misdemeanor

 6      under the Charter, and Ms. Brooks could then be removed

 7      from the Oakland City Council.  When that language was in

 8      there, I did inform Ms. Santana at that time that I would

 9      not sign a report that had that in there.  So I want to

10      make sure I testified to that in the past.  But apparently

11      you asked a question during the last, yes, series of

12      question, it could be misconstrued whether or not that is

13      my -- that is my statement.  And that is my statement.

14  BY MR. SIEGEL:

15  Q.   Now, just to be clear.  Yesterday you expressed some

16  uncertainty about whether you had made a telephone call to

17  Ms. Santana on October 2.

18  A.   I don't have uncertainty.  I did not make that phone call

19  to Ms. Santana on October 2nd.

20  Q.   Did you ever make a phone call to Ms. Santana when you

21  yelled at her or were abusive or rude?

22          MR. LAFAYETTE:  Cumulative, Your Honor.

23          THE COURT:  Overruled.

24          THE WITNESS:  No, never during my entire tenure

25  working with her.

PRESTON - REDIRECT / SIEGEL

1   BY MR. SIEGEL:

2   Q.   Okay.  Now, just the last thing is could you explain for

3   the jury the process by which the City deducts dues from an

4   employee's paycheck?

5   A.   When employees are hired, there's a series of documents

6   they're provided in the hiring package, and one of the

7   documents that is -- should be in their hiring package is

8   whether or not they want to sign up to either be a full-fledged

9   member of a union or if they want to be a fee payer.  A fee

10  payer is a reduced cost if you don't wish to be a full-fledged

11  member, and the employee then checks off a box for that.  And

12  additionally, the employer is supposed to provide the employee

13  with a Hudson package, which details the union's finances and

14  how much -- what percentage of their budgets go to

15  representation versus political work and other activities of

16  the union.

17  Q.   Okay.  Now, what if the employee does not check off either

18  box, either to be a full member or a fee payer?

19  A.   If you are hired into a classification where there is

20  agency shop, if you don't wish to be a full-fledged member, at

21  a very minimum you're required, pursuant to MMB, to be a fee

22  payer.  You can't be hired into a classification represented by

23  a union and not pay anything.  You're required to pay

24  something.  And so the employer is required, pursuant to Meyers

25  Milias Brown, to at the very least deduct what the service fees

1  are.

2  **Q.**  And --

3       **MR. LAFAYETTE:**  Your Honor, I would just object that

4  the testimony calls for a legal conclusion.

5       **THE COURT:**  Overruled.

6  **BY MR. SIEGEL:**

7  **Q.**  And what happens if the employee doesn't check either box?

8       **MR. LAFAYETTE:**  That was the last question.

9  Objection, asked and answered.

10      **MR. SIEGEL:**  It wasn't quite clear.

11      **THE COURT:**  Overruled.

12 **BY MR. SIEGEL:**

13 **Q.**  If the employee doesn't check off either box, what

14 happens?

15 **A.**  The employer should deduct a service -- what they refer to

16 as service fees from that employee as a union deduction.

17 **Q.**  Okay.  And just -- again, to clarify.  Were the temporary

18 part-time City of Oakland employees who were represented --

19 excuse me.

20      Were the temporary part-time City of Oakland employees,

21 who were the subject of the grievance we were discussing

22 yesterday, were they part of a bargaining unit?

23 **A.**  Yes, they were represented by Service Employees

24 International Union, and they were subjected to the agency shop

25 language.

 1          **MR. SIEGEL:**  Okay.  Thank you.  Nothing else, Your

 2    Honor.

 3          **THE COURT:**  All right.  You haven't been sitting in

 4    your chairs long, but this may be an opportunity to ask any

 5    questions of Ms. Preston if you want to.  So we're going to

 6    take a brief break, and if you wish to write down any

 7    questions, you may.  Again, you're not required to, but we'll

 8    return in five minutes or as long as necessary for the jury to

 9    formulate any questions.

10       (Proceedings were heard out of presence of the jury:)

11          **THE COURT:**  Ms. Preston, you may step down, and we'll

12    be back in five minutes.  Thank you.

13                     (pause in proceedings.)

14       (Proceedings were heard out of presence of the jury:)

15          **THE COURT:**  Please be seated.  Jurors are not present.

16    We have three notes from the jury that include subparts with

17    six total questions.  On jury note 17, which has three

18    questions, the first question concerns a document in part

19    that's not in evidence, so I think the question -- so it can be

20    answered without going into that.  But if it turns into a

21    request for the document be produced to the jury, I'm going to

22    have to explain that the document itself is not in evidence,

23    but I think the question -- I'll still ask it.

24       And the third question has been addressed by Ms. Preston

25    previously.  In some ways she might find it to be a repetitive

PRESTON - REDIRECT / SIEGEL

```
 1  question, but I think the jury is asking about it, so I'm going

 2  to ask the question, and she can address it.  And if the

 3  parties wish to follow-up on it, they may.  So while it might

 4  draw a cumulative objection or an unnecessary question --

 5  objection, even though the jury is asking, at least one juror

 6  is asking about it, I'm inclined to ask it, because we've asked

 7  the other questions that they've asked, and I don't want to

 8  single out a single question as being improper when there are

 9  six questions asked.

10      Mr. Siegel, what do you think to my proposed approach?

11          MR. SIEGEL:  That's fine, Your Honor.

12          THE COURT:  Mr. Lafayette?

13          MR. LAFAYETTE:  That's fine, Your Honor.

14          THE COURT:  All right.  Let's call the jurors back in.

15      (Proceedings were heard in the presence of the jury:)

16          THE COURT:  All right.  Our jurors have returned, and

17  we have three sets of questions with several sub questions

18  within them.

19      Ms. Preston, I'll read them to you one at a time, and I'll

20  read them twice each so that you have a full context of the

21  question.  Several of them have several subparts.

22      The first question is:  How were you informed that you

23  were an at-will employee; for example, employment contract,

24  offer letter, and then any other written document or a

25  personnel action form?
```

1          So I'll repeat it again.  How were you informed that you

2     were an at-will employee; for example, employment contract,

3     offer letter, any other written document, or personnel action

4     form?

5          THE WITNESS:  My offer letter stated I was an at-will

6     employee, and also I believe the personnel transaction form

7     that's filled out when I was hired had the box marked as I was

8     at-will.

9          THE COURT:  Next question.  This refers to progressive

10    discipline.  Does progressive discipline apply to department

11    heads or just to managers at the City of Oakland?

12         To restate it again.  Does progressive discipline apply to

13    department heads or just to managers at the City of Oakland?

14         THE WITNESS:  Department heads are not subject to

15    progressive discipline.  Department heads -- all department

16    heads are at-will and can be let go.

17         THE COURT:  Next question.  There was testimony about

18    an evaluation of you in 2012.  The question is did you have any

19    input into the writing of that evaluation in 2012?

20         THE WITNESS:  Yes, I did.

21         THE COURT:  And can you elaborate on what your input

22    was?

23         THE WITNESS:  The process was we received evaluations

24    from the City Administrator's Office.  You were supposed to

25    fill in in the comment section comments that are -- and list

**PRESTON - REDIRECT / SIEGEL**

 1   accomplishments that you felt you had accomplished during that

 2   period, and then the evaluator, Ms. Santana, would be able to

 3   amend, correct, add or delete any comments and mark the

 4   appropriate boxes and then meet with you.  That was the process

 5   as it was explained to me.

 6        **THE COURT:**  Next question:  Did you apply for the same

 7   position that you were hired to fill on an interim basis?

 8        So I'll ask it again.  Did you apply for the same position

 9   that you were hired to fill on an interim basis?

10        **THE WITNESS:**  I'm not sure what the HR -- I'm not sure

11   which --

12        **THE COURT:**  I'm not sure either, so if you don't

13   understand the question, then that's a fair response, and your

14   attorneys may wish to follow-up if they wish to.

15        Next question.  Now, this refers to a phone call referred

16   to in testimony from October the 2nd, and the question is:  Did

17   you call to Ms. Santana's cell or desk phone and did

18   Ms. Santana inform you that the call was on speakerphone?

19        So the question again is did you call to Santana's cell or

20   desk phone, and did Ms. Santana inform you that the call was on

21   speakerphone?

22        **THE WITNESS:**  No, I did not.  And Ms. Santana

23   frequently would put people on speakerphone without telling

24   them.  But no, I did not.

25        **THE COURT:**  Next question.  When you testified that

1   Barbara Parker added language to the Rainbow Teen Center report

2   about referring Councilwoman Brooks for possible prosecution,

3   was that the bracketed language that has been shown to the jury

4   or some other language?

5        To repeat it all again.  When you testified that Barbara

6   Parker added language to the Rainbow Teen Center report about

7   referring Councilwoman Brooks for possible prosecution, was

8   that the bracketed language that has been shown to the jury or

9   some other language?

10       **THE WITNESS:**  It's the bracketed language that we had

11  the discussion about.

12       **THE COURT:**  Thank you.  Mr. Siegel, would you like to

13  follow-up on any of those questions from the jury?

14       **MR. SIEGEL:**  Yes, just on this issue of the jobs.

15  **Q.**   The first job you had with the City of Oakland was which

16  one, Ms. Preston?

17  **A.**   Labor Relations Manager, I believe was the title.  I was

18  hired as the HR Labor Relations Manager initially.

19  **Q.**   That was the first job?

20  **A.**   That was my first job.

21  **Q.**   And did you apply for it?

22  **A.**   Yes.

23  **Q.**   And did you fill it on an interim basis before you were

24  appointed?

25  **A.**   No.

PRESTON - REDIRECT / SIEGEL

1   Q.   And then the second job was the ER Director?

2   A.   Yes.

3   Q.   And did you apply for that?

4   A.   No, I did not.

5   Q.   And did you fill it on an interim basis?

6   A.   No, I did not.

7   Q.   And now, the question was -- question three was, was the

8   call, I imagine October 2nd, on her cell phone or on her desk

9   phone?  And you just said "no"?

10  A.   No.

11  Q.   Does that mean it was neither?

12  A.   Neither.  Neither.

13          MR. SIEGEL:  Okay.  Thank you.

14      Mr. Lafayette, do you have any follow-up to those

15  questions?

16          MR. LAFAYETTE:  No, your Honor.

17          THE COURT:  Thank you.  Ms. Preston, you may step

18  down.  Thank you very much.

19      And if counsel will call your next witness, please.

20          MR. SIEGEL:  Yes.  We'll call Katano Kasaine, please.

21          THE COURT:  All right.  Someone can alert Ms. Kasaine.

22          MR. LAFAYETTE:  We'll get her, Your Honor.

23          THE COURT:  Thank you.

24                  (pause in proceedings.)

25          THE COURT:  Please come forward.  Watch your step

 1  there, and we'll swear you in.

 2          **THE CLERK:**  Please raise your right hand.  Could you

 3  stay standing?  Please raise your right hand.

 4                          **KATANO KASAINE**,

 5  called as a witness for the **PLAINTIFF**, having been duly sworn,

 6  testified as follows:

 7          **THE WITNESS:**  Yes, I do.

 8          **THE CLERK:**  Please be seated.  Speak clearly into the

 9  microphone.  State your full name, and spell your last name,

10  please.

11          **THE WITNESS:**  Katano Kasaine, K-A-T-A-N-O, last name

12  is K-A-S-A-I-N-E.

13                        **DIRECT EXAMINATION**

14  BY MR. SIEGEL:

15  Q.   Now, Ms. Kasaine, are you employed by the City of Oakland?

16  A.   Yes.

17  Q.   And how long have you been employed by the City of

18  Oakland?

19  A.   Nearly 20 years.

20  Q.   So what year were you employed?

21  A.   In 1995.

22  Q.   And what was your job?

23  A.   When I first came, I was a temporary employee.

24  Q.   Doing what kind of work?

25  A.   Treasury work.

**KASAINE - DIRECT / SIEGEL**

1   **Q.**   Okay.  And what was your next job?

2   **A.**   Treasury.  I had a PSC-14, which was -- at that time it's

3   still the type of treasury public employee.

4   **Q.**   Okay.  And after that?

5   **A.**   A treasury analyst.

6   **Q.**   And after that?

7   **A.**   Investment supervisor.

8   **Q.**   And after that?

9   **A.**   I became the Assistant Treasury Manager.

10  **Q.**   Okay.  And before you came to work for the City of

11  Oakland, what sort of work did you do?

12  **A.**   Before I came, I was -- I did work before.  My work -- I

13  have a business administration degree.  I worked for Durable

14  Medical Supply, then I went to college for my masters, and when

15  I came back, I came directly to Oakland from graduation.

16  **Q.**   So you came directly to the City of Oakland in 1995 after

17  graduating from?

18  **A.**   Loma Linda University.

19  **Q.**   Okay.  Great.  Now, I want to call your attention to a

20  meeting that occurred on August 6th, 2013.  Do you recall that

21  meeting?

22  **A.**   Yes, I do.

23  **Q.**   Okay.  Would you -- there's a binder to your left.  There

24  are several binders.  Would you grab the one that has the blue

25  cover?  Would you open up to tab 25, please?

1        Do you recall receiving this email?

2    **A.**    Yes.

3    **Q.**    Okay.  And you received a memo from Lawanna Preston

4    indicating that the meeting is to be an information session

5    only?

6    **A.**    The email came from Winnie Anderson.

7    **Q.**    Right.  The email at the bottom came from Winnie Anderson,

8    and then there's an email at the top to you from Lawanna

9    Preston dated August 5, 2013?

10   **A.**    Yes.

11   **Q.**    Okay.  And so you attended that meeting; is that right?

12   **A.**    Yes.

13   **Q.**    Okay.  And Joe Keffer was present; was that right?

14   **A.**    I believe so.

15   **Q.**    You know Joe Keffer, don't you?

16   **A.**    Yes.

17   **Q.**    Okay.  And do you recall that there was a conversation

18   regarding the issue of the deduction of union dues for

19   temporary part-time employees?

20   **A.**    I remember towards the end there was a conversation about

21   that, yes.

22   **Q.**    Okay.  And do you recall that during that conversation,

23   you informed the people who were there that your department had

24   not been collecting dues from temporary part-time employees for

25   several years?

1    **A.**    I made no such statements.

2    **Q.**    You didn't say anything like that?

3    **A.**    Absolutely not.

4    **Q.**    Did you say anything about the collection of union dues at

5    that meeting?

6    **A.**    There was discussion about union dues at that meeting.

7    **Q.**    And what did you say?

8    **A.**    It depends on what question they asked me at the time,

9    which I don't recall specifically, but there were discussions.

10   **Q.**    Well, do you recall saying anything about the issue of the

11   collection of union dues at that meeting?

12   **A.**    I recall the union questioning the collection of union

13   dues.  I specifically recall them questioning a list that they

14   had received with roughly 1,500 people on the list.

15   **Q.**    Okay.  And -- but do you recall saying anything about

16   whether dues were being collected for temporary part-time

17   employees?

18   **A.**    No.

19   **Q.**    You recall saying nothing about that?

20   **A.**    I recall -- I don't recall that the conversation was that

21   specific.  I recall that there was some dialogue about the list

22   of 1,500 people versus what they believed they had been

23   collecting, about 700 or somewhere between 7-to 800.  So the

24   dialogue was why do we have a list of about 1,500 people?  We

25   only thought we had X.  That was the dialogue.

1   Q.   Okay.  Do you recall that following the meeting on

2   August 6th, you received an email message from Winnie Anderson?

3   A.   You actually showed me that email when I -- when you

4   deposed me.  At that time that I didn't recall that I received

5   that email.

6   Q.   Okay.  And let me --

7   A.   And I never replied that email.

8   Q.   Okay.  Take a look at Exhibit 29, please, in the binder.

9        Now, that email says at the top:  "Thank you for being

10  part of the informational session with SEIU TPT bargaining

11  team.  Throughout the course of bargaining, the union has

12  raised the issue that dues had not been taken out of TPT

13  employees' paychecks.  You did confirm that dues had not been

14  taken, and that you will be taking action in deducting dues

15  from paychecks of TPT, S11 employees."

16       And you're saying you never received that email?

17  A.   I'm not saying I never received it, and it looks -- and as

18  I told you back then, it came after work.  And at the time I do

19  receive a lot of emails.  I never replied, and I wish sitting

20  here that I had seen and replied to that email.

21  Q.   But you never did reply to it?

22  A.   No.

23  Q.   And during that period of time, were you not reading your

24  emails?

25  A.   I have a lot -- at that period of time, I was managing two

1   departments, city treasury and HR departments, and I got a lot

2   of emails, so sometimes I didn't read every email, yes.

3   **Q.**   Okay.  Well, do you recall that after August the 6th, you

4   received further inquiries regarding the issue of the union

5   dues collection?

6   **A.**   I recall emails that came from Lawanna Preston after they

7   received a grievance.

8   **Q.**   Okay.  Do you recall receiving any emails from Deanna

9   Santana?

10  **A.**   Within that same trail of emails she did email me too.

11  **Q.**   Okay.  Well, do you recall receiving an email message from

12  Deanna Santana on August 6th also in the evening?

13  **A.**   I don't recall the specific email.

14  **Q.**   Would you look at Exhibit 26, please?

15       Do you recall receiving this email?

16  **A.**   Yes.

17  **Q.**   Okay.  So that email came in just a little bit later than

18  the last email that I sent you; correct?

19  **A.**   Yeah.  But this email has nothing to do with the last

20  email at all.

21  **Q.**   Oh, my point is that Exhibit 29 from Winnie Anderson came

22  in on August 6th at 5:26, and this email from Deanna Santana

23  came in on August 6th at 5:55, excuse me, in the morning, in

24  the morning; right?  So do you recall receiving this email?

25  **A.**   Again, I don't even know if I replied either one of these

1    emails.  This email came before those meetings at 5:00 a.m. and

2    this email had no relation, absolutely no relation with the TPT

3    conversation with Winnie Anderson.

4    Q.   So what was it that Mayor Quan was interested in?

5    A.   Mayor Quan wanted us, as I was the HR director, to work

6    with the departments to understand our work ethic with TPTs.

7    We actually had about a month of conversation meeting with

8    every department documenting how they utilize TPTs, what they

9    use them for, who they call in or not call in, separate from

10   any negotiation.  It was just work plan of how we utilize TPTs.

11   This is a start of that dialogue.

12       Again, I don't remember if I replied to this, but I can

13   tell you we spent about a month talking about TPTs.  We had

14   binders meeting with every department separately.  HR was doing

15   this with the departments just trying to kind of level how we

16   utilize TPTs.

17   Q.   Okay.  Now, after the meeting on the 26th, you learned

18   that there was a grievance that had been filed; is that right?

19   A.   Yes.

20   Q.   Okay.  And how did you learn that?

21   A.   I got an email from Lawanna, I believe.

22   Q.   Okay.  And did Ms. Preston want to speak with you about

23   the grievance?

24   A.   I believe she wanted to investigate about the grievance,

25   yes.

**KASAINE - DIRECT / SIEGEL**

1   **Q.**   Okay.  And would you look at Exhibit 31, please?

2   **A.**   (witness examines document).

3   **Q.**   Do you recall, first of all, receiving an email from

4   Lawanna Preston on September 8th at 4:14 in the afternoon?

5   **A.**   I have seen this email, yes.

6   **Q.**   Okay.  And did you respond to that email?

7   **A.**   At sometime I did.  I think I did reply to these emails.

8   **Q.**   Okay.  And you knew then at September 8 there was a

9   grievance regarding the failure to deduct union dues from

10  temporary part-time employees; correct?

11  **A.**   Based on this email, yes.

12  **Q.**   And you knew that was true, right, that dues were not

13  being deducted from all temporary part-time employees?

14  **A.**   Absolutely not.

15  **Q.**   That's not true?

16  **A.**   Not true.  We do collect union dues.

17  **Q.**   From all temporary part-time employees?

18  **A.**   I don't know from all, but based on that email, I can't

19  answer just looking at an email from anybody that do we -- are

20  we collecting, are we not?  But do we have a process where we

21  collect union dues?  Yes, there's absolutely process of how we

22  collect union dues, what we collect.  But this is not an answer

23  right or wrong, it's really a matter of looking at

24  documentation.  Did we collect from every employee?  Was every

25  employee working at that time?  Did they have a payroll?  These

1  are temporary summer youth, most of them, and so I couldn't

2  answer that question just by looking at that.

3  Q.  But you could answer it by looking at the payroll records

4  for people in that job category; correct?

5  A.  Absolutely.  If somebody took the time to do an analysis

6  and analyze whatever period we're looking at, you can answer

7  that question.

8  Q.  Okay.  And you understood that that's what Ms. Preston

9  wanted to speak with you about; correct?

10        MR. LAFAYETTE:  Objection, requires speculation on her

11  part.

12        THE COURT:  Overruled.

13        THE WITNESS:  I understood she wanted to talk about

14  this email, what she put in the email.

15  BY MR. SIEGEL:

16  Q.  She wanted to talk about the grievance; correct?

17  A.  I understood that she wanted to investigate about the

18  grievance.

19  Q.  Okay.  And did you agree to speak with her?

20  A.  No.

21  Q.  Okay.  And in fact, she wrote you another email about two

22  days later saying that the "grievance was very serious, and we

23  have a short window to respond.  Please provide me with dates

24  and times of your availability;" correct?

25  A.  Yes.

KASAINE - DIRECT / SIEGEL

1   Q.    Okay.  And again, is there some reason why you did not

2   respond and meet with her?

3   A.    Yes.

4   Q.    What was the reason?

5   A.    So I read, and I think I replied to her, that if I

6   received this kind of grievance, which is a Step 1 grievance in

7   my mind, there is a process.  I did not understand in her email

8   about an investigation of me, so that's when I said I don't see

9   in this union request where you need to be investigating me.

10  Again, I was an HR director, so I understand how to reply a

11  grievance from the union.  And her method and the way she went

12  about it was concerning.

13  Q.    Okay.  Well, isn't it true that in addition to Ms. Preston

14  asking that you meet with her, that your boss Deanna Santana

15  also asked that you meet with Ms. Preston?

16  A.    Yes, but I talked to Ms. Deanna Santana about my concerns.

17  Q.    Okay.  Would you look at Exhibit 32?  Does Exhibit 32 --

18  is that an email message that you received from Deanna Santana

19  on September 10th?

20  A.    Yes.

21  Q.    And you read this one?

22  A.    I read it, and I called her, and I talked to her.

23  Q.    My question is did you read it?

24  A.    Yes.

25          MR. LAFAYETTE:  Objection.  He cut her off, Your

KASAINE - DIRECT / SIEGEL

1    Honor.

2              THE COURT:  Overruled.

3              MR. SIEGEL:  And Your Honor, offer Exhibit 32.

4              MR. LAFAYETTE:  No objection, Your Honor.

5              THE COURT:  32 is also 3K.

6              MR. LAFAYETTE:  Yes.

7              THE COURT:  And it's in evidence.

8              MR. SIEGEL:  Okay.  Thank you.

9         (Trial Exhibit 32 received in evidence)

10   BY MR. SIEGEL:

11   Q.   So let's look at the top.  So this is an email you

12   received from Ms. Santana on September 10 about 7:00 p.m.;

13   correct?

14   A.   Yes.

15   Q.   And did this email slip your attention or did you actually

16   read it?

17   A.   I read it, and I actually did not email back, but I did

18   talk to Ms. Santana.

19   Q.   And did you tell Ms. Santana that you were too busy to

20   meet about the grievance?

21   A.   No, I told her that I was very concerned about the way

22   Lawanna Preston was going about resolving this grievance.

23   Q.   Okay.  Well, do you recall being -- let me ask you this.

24        Was there any reason besides your work schedule that you

25   did not want to meet with Ms. Preston?

KASAINE - DIRECT / SIEGEL

1    **A.**    Yes.

2    **Q.**    Okay.  Is the reason that you were reluctant to meet with

3    Ms. Preston is that you were very busy at the time, and your

4    time was important?

5    **A.**    Originally, when she started sending me emails, I was out

6    of town, and I did not -- I told her that I will talk to her

7    when I return.  I actually ran into her, and I said, *What is*

8    *the concern?*  What is -- why are we -- *why are you wanting to*

9    *investigate?*  And she just sort of blanketly said, *Well, I just*

10   *want to talk to you because of what was said*.  And I said, *What*

11   *was said*?  So I said to her this is not the normal way you

12   respond to a Step 1 grievance.  This is not the first time a

13   union can say I want to know about X.  It's a very simple

14   systematic way of responding to a grievance.

15        I did not understand her methods, neither did Anderson,

16   why she wanted to investigate me.  And again, this is a person

17   who we had very little relationship, so I was very concerned,

18   and that was my concern that I took to Deanna.

19   **Q.**    Okay.  You knew that Lawanna Preston was the Employee

20   Relations Director?

21   **A.**    Yes, and she was -- at that time Employees Relations, not

22   the full position, was not ER Director, but she was in that

23   slot, yes.

24   **Q.**    She was an ER director, and she reported directly to

25   Ms. Santana; is that correct?

1   **A.**   In -- she was the ER designated director, but the position

2   at that time did not exist as ER Director, but she had those

3   responsibilities, yes.

4   **Q.**   Wait a minute.  Isn't it true that in January 2012,

5   Ms. Santana appointed Ms. Preston as ER Director?

6           **MR. LAFAYETTE:**  Objection, lacking in foundation,

7   requires hearsay testimony from this witness.

8           **THE COURT:**  Overruled.

9           **THE WITNESS:**  Yes, she was ER Director on our payroll.

10  I paid her as an HR director, because we didn't yet create the

11  full position of an ER Director.

12  **BY MR. SIEGEL:**

13  **Q.**   Okay.  So Ms. Santana was incorrect when she had her as ER

14  Director?

15  **A.**   No, she was correct, but you're making a differential

16  about what's in our payroll system and what her

17  responsibilities were.  Yes, her responsibilities were ER

18  Director, but up to that point, she had a placeholder title.

19  So technically -- but yes, she has those responsibilities.

20  **Q.**   Okay.  But you understood that it was her responsibility

21  to oversee the City's relationships with its collective

22  bargaining representatives; correct?

23  **A.**   Yes.

24  **Q.**   Including looking into grievances?

25  **A.**   Yes.

1   Q.   Okay.  Now, was one of your reasons for not wanting to

2   meet with her was that you didn't -- was that you thought the

3   grievance was straight forward; right?

4   A.   Yes.

5   Q.   And the grievance was not against you; correct?

6   A.   Yes.  The way it's written, no, it wasn't against me.

7   Q.   And it was simply, in terms of investigating the validity

8   of the grievance, all that had to be done was to run a request

9   to the payroll system; correct?

10  A.   Yes, or the union could have submitted.  At that time, the

11  union had a responsibility also to submit and say you're not

12  collecting from A, B, C, D.  None of that was done.  Typically,

13  that's the process.

14  Q.   Okay.  So you didn't feel singled out by this grievance,

15  did you?

16  A.   I was feeling that, that's the whole point.  When she kept

17  talking about investigation, it was confusing.  And I did email

18  her back and say *I am not clear why you think I need to be*

19  *investigated by the union asking about unions dues*.

20  Q.   Did you think that you were being investigated or that the

21  issue was being investigated?

22  A.   The way it was written -- and, again, I understand labor

23  relations as much as I understood HR.  You don't go and start

24  investigating the individual.  You typically -- step 1 should

25  go to the department to validate the union concern:  Are we

1    collecting union dues or not.  Simple Step 1, that should have

2    come to our department to validate this issue.  It is not about

3    investigating Katano.

4    **Q.**   Okay.  So did -- but again, Ms. Kasaine, no one said they

5    were investigating you, did they?

6    **A.**   Lawanna said that to me.

7    **Q.**   When did she say that?

8    **A.**   In passing.  As I said, I ran into her and I asked her,

9    what is the -- what is the concern?  She said things were said

10   in August 6th that I need to investigate, that's what she said.

11   And actually, that's when I said to Deanna I'm concerned about

12   this.

13   **Q.**   You did not think it was appropriate for people to ask you

14   for your version of what was said at the August 6 meeting?

15   **A.**   If it was a simple -- if it was about what was said, then

16   that's a different issue.  It wasn't about what was said.  The

17   union -- the union grievance was very specific:  Are we

18   collecting or not?  What was said was not the grievance.  It

19   was whether we're collecting union dues or not, not what was

20   said.

21   **Q.**   And did you answer that question?  Did you run a report to

22   determine whether dues were being collected from all the TPT

23   employees?

24   **A.**   I never got to that, because it -- this issue took its own

25   life.

KASAINE - DIRECT / SIEGEL

1   Q.   So you never determined whether the union --

2            MR. LAFAYETTE:   Objection, Your Honor.   He cut her off

3   again.

4            MR. SIEGEL:   Sorry.

5            THE COURT:   Sustained.   Did you finish your last

6   answer?

7            THE WITNESS:   I was going to say it never got to that,

8   it just -- this is where we are.   We've never really resolved

9   that issue of that specific claim.

10  BY MR. SIEGEL:

11  Q.   You've never resolved it?

12  A.   The City is still talking to the union, but that is still

13  not a resolved issue, no.

14  Q.   And you never ran a report to determine whether dues were

15  being collected from all TPT employees?

16  A.   I was never told to answer this specific question, but

17  unions do get weekly reports to determine this issue.

18  Q.   Okay.   Let me ask you this.   At the time that Ms. Preston

19  was trying to have a conversation with you, did you have any

20  fear or concern that she was going to do something

21  inappropriate if you met with her?

22  A.   Absolutely.   At the end I started feeling that.

23  Q.   Okay.   Do you recall me asking you this in your

24  deposition?

25  A.   I think you asked me a question similar to that, I think.

1   Q.   And did you tell me in your deposition that you had no

2   fear that Ms. Preston was going to do anything inappropriate?

3   A.   Originally I did not, that's why I emailed her and said

4   let's talk, and I did not -- originally I thought, okay, this

5   is a grievance, but when I ran into her, that's when I was

6   concerned.  And when Deanna sent me that email, and I did not

7   reply, I actually picked up and called and talked to Deanna.

8   Q.   Now, I took your deposition on March the 19th of this

9   year; correct?

10  A.   I think so.

11  Q.   And you swore -- it's not there.  But you did swear to

12  tell the truth?

13  A.   Yes.

14  Q.   And at that time did you tell me that you had no fear

15  about what Ms. Preston was going to do something inappropriate

16  to you?

17           MR. LAFAYETTE:  Your Honor, I have one objection.  Her

18  transcript is up there, and Mr. Siegel just told her it was

19  not.

20           MR. SIEGEL:  Oh, I'm sorry.  It's not in the binder.

21           THE COURT:  He wasn't asking her to look at it.  He

22  was asking her recollection.

23           THE WITNESS:  I don't remember exactly what I told you

24  that day.  But was I afraid of Lawanna that she was going to do

25  something to me?  No.  But was I concerned about this

 1  investigation angle that she put in this grievance?  Yeah.

 2          MR. SIEGEL:  Your Honor, I'd like to read from the

 3  witness's deposition.

 4          THE COURT:  At?

 5          MR. SIEGEL:  At 35, lines 21 through 25.

 6          MR. LAFAYETTE:  I think he should --

 7          THE COURT:  I don't see any question and answer

 8  starting on that line.

 9          MR. SIEGEL:  Page 35, line 21.

10          THE COURT:  You may proceed and exclude the objection.

11  BY MR. SIEGEL:

12  Q.  Okay.  So my question to you, Ms. Kasaine, was:

13      "Q.  At that time did you have any fear or concern about

14      whether Ms. Preston was going to do something

15      inappropriate to you if you met with her?"

16      Your answer was:

17      "A.  No, no."

18  Q.  Let me ask you this question.  Did you feel that anyone in

19  the city government was being unfair to you regarding this

20  grievance issue?

21  A.  I don't -- that's such a blanket question.  I don't know

22  that anybody was feeling -- I don't know their feelings.  All I

23  know is that the way Ms. Preston went about this grievance was

24  not normal.  She didn't answer my question when I asked her:  I

25  don't understand, and I don't see why you require an

1   investigation in this type of grievance.  It's a Step 1

2   grievance that's asking whether or not we are collecting union

3   dues.

4         **MR. SIEGEL:**  Your Honor, I'd like to read from the

5   witness's deposition at page 36, lines 2 through 4.

6         **THE COURT:**  Proceed.

7         **MR. SIEGEL:**  This is my question to you at your

8   deposition:

9         "Q.  Did you feel that anyone in the city government was

10        being unfair to you regarding this grievance issue?"

11        And your answer was:

12        "A.  No."

13  **BY MR. SIEGEL:**

14  **Q.**   Next question.

15        Did you feel that Ms. Preston was trying to blame you for

16  something?"

17  **A.**   Are you reading or are you asking me?

18  **Q.**   I'm asking you.

19  **A.**   I -- honestly at that time, and as I said, I believe I did

20  not know where she was going with it.  I did not understand

21  where she was going with it.  Because as I said, typical

22  grievance should be answered very simply by answering the

23  grievance, not trying to investigate.  That was always my

24  concern, but --

25        **MR. SIEGEL:**  Your Honor, I'd like to read from this

 1    witness's deposition at page 36, lines 5 through 7.

 2              **THE COURT:**  Proceed.

 3              **MR. SIEGEL:**

 4        **"Q.**  Did you feel Ms. Preston was trying to blame you for

 5        something?

 6        **"A.**  At this time no."

 7    **Q.**    Now, here's my question to you now.  Later on did you

 8    think she was trying to blame you for something?  I'm asking

 9    you this question now, Ms. Kasaine.

10    **A.**    I don't know.  As I said, I just didn't know why she was

11    trying to investigate.

12    **Q.**    Okay.  And did you think that the grievance could be

13    answered without your help?

14    **A.**    It could, but I could support it.  It's really a grievance

15    of whether we were paying union dues.  It would come to my

16    department, and we would have been able to answer that

17    question, and it could have been sent to us specifically *What's

18    going on?  Why are we not collecting*?  That was the normal

19    course of business.

20              **MR. SIEGEL:**  And Your Honor, I'd like to read from the

21    witness's deposition at page 36, lines 14 through 17.

22              **THE COURT:**  Proceed.

23              **MR. LAFAYETTE:**  It's consistent, Your Honor.

24              **MR. SIEGEL:**

25        **"Q.**  And you thought it could be answered without your

**KASAINE - DIRECT / SIEGEL**

1        help?"

2        Your answer at your deposition was:

3        **"A.**  Yes."

4   **BY MR. SIEGEL:**

5   **Q.**    Now, Ms. Kasaine, after the grievance was filed, did you

6   have a conversation with Dwight McElroy in an attempt to

7   resolve the grievance?

8   **A.**    No.

9   **Q.**    You never did?

10  **A.**    No.

11  **Q.**    You never contacted him?

12  **A.**    Absolutely not.

13  **Q.**    And you never had a conversation with him about the

14  grievance?

15  **A.**    He called me about the grievance.  He called me.

16  **Q.**    And you did not speak with him?

17  **A.**    He called me, left me a message that I needed to call him

18  again.  I was HR Director.  I had no idea why he called me.  I

19  talked to him about different things daily.  He left me a

20  message in the morning sometime, and he said *I want to talk to*

21  *you.  Call me back.*  I called him later in the evening when I

22  had time, and he simply said to me that *I want you to set up a*

23  *meeting to talk about this grievance so we can resolve it*, and

24  he specified that he would get me to add him and Pandolfo and

25  Keffer, and the way he said it was like *Just do it, just do it.*

1    It was very weird, very odd, and he hung up.  That's the extent

2    of our conversation.

3    **Q.**    Okay.  And did you speak with anyone in the union about

4    attempting to resolve the grievance?

5    **A.**    No.

6    **Q.**    Okay.  And you said you were HR Director at the time?

7    **A.**    At the time, yes, I was interim.

8    **Q.**    Is that after Andrea Gourdine left?

9    **A.**    After the other interim person left after Gourdine.

10   **Q.**    Okay.  When was that?

11   **A.**    I don't remember the dates, but I started interim in HR in

12   June 2013, I believe.

13            **MR. SIEGEL:**  Thank you.  Those are all the questions I

14   have.

15            **THE COURT:**  Thank you.  And any cross-examination?

16            **MR. LAFAYETTE:**  Thank you, Your Honor.

17                        <u>**CROSS-EXAMINATION**</u>

18            **MR. LAFAYETTE:**  I'd like to approach the witness, Your

19   Honor, and see if I could show her her deposition testimony.

20   **Q.**    Ms. Kasaine, I've just put in front of you a copy of your

21   deposition transcript, and if you could, I'd like you to turn

22   to page 33 of your transcript.

23   **A.**    Okay.

24   **Q.**    Is there a document -- is that the page where the

25   examination commenced that Mr. Siegel was just referencing to

1    you?

2    **A.**    It looks like it, yeah.

3    **Q.**    And did he reference it by first pointing out to you

4    something referred to as Exhibit 4?  Take a look at line 20 on

5    page 33.

6    **A.**    It's going to -- yes, I see that line.

7    **Q.**    And do you see behind your transcript there is some tabs

8    which show the Exhibits 1, 2, 3, 4, 5, 6?

9    **A.**    (witness examines document).

10         **MR. LAFAYETTE:**  Could I help her, Your Honor?

11         **THE WITNESS:**  I see 5 and 6.  Oh, thank you.

12   **BY MR. LAFAYETTE:**

13   **Q.**    It's all right.  Do you see Exhibit 4?

14   **A.**    Yes.

15   **Q.**    Is Exhibit 4 a document that has a date on it

16   September 10, 2013?

17   **A.**    Exhibit 4 has two emails, one on September 27, and one at

18   2:29 p.m. and one at 4:16 p.m.

19         **MR. LAFAYETTE:**  Your Honor, I'll represent that that's

20   the same as Exhibit 3I.

21         **THE COURT:**  One moment.  Is there any objection to

22   that representation?

23         **MR. SIEGEL:**  No.  And there's no objection to the

24   exhibit going in.

25         **THE COURT:**  Proceed.

1           MR. LAFAYETTE:  Thank you, Your Honor.

2    Q.   So can we put Exhibit 3I on the screen, please?

3        So at the time that Mr. Siegel was examining you in your

4    deposition, he was examining you with regard to your state of

5    mind with regard to the date of Exhibit I, which is

6    September 10, 2013 --

7           MR. SIEGEL:  Your Honor --

8           MR. LAFAYETTE:  -- correct?

9           MR. SIEGEL:  -- it's leading.

10          THE COURT:  Overruled.  I think you meant 3I, not I.

11          MR. LAFAYETTE:  3I, yes, Your Honor.

12          THE WITNESS:  Okay.

13   BY MR. LAFAYETTE:

14   Q.   So I'm going to ask you a series of questions relating to

15   the examination which takes place on page 33, through line --

16   through page 37.

17          THE COURT:  And I'm sorry, just for the record, 3I is

18   admitted in evidence?

19          MR. LAFAYETTE:  Yes, Your Honor.

20          THE COURT:  So I'm admitting.

21      (Trial Exhibit 3I received in evidence)

22          THE COURT:  Go ahead.

23   BY MR. LAFAYETTE:

24   Q.   So in Exhibit 3I when you wrote on September 10:

25   "Lawanna, I'm out of the office till Thursday.  In reading the

1   grievance, it is not clear to me why you think you need to

2   interview me to respond.  In any event, I will call you to

3   discuss when I return."

4        As of that date, had you had a conversation with

5   Ms. Preston?

6   **A.**   No.

7   **Q.**   As of that date, had Ms. Preston told you that she was

8   interested in investigating you in connection with this

9   grievance?

10  **A.**   No.

11  **Q.**   As of that date, did you have in your mind the concerns

12  that you've now raised here today?

13  **A.**   As of that date, no.

14  **Q.**   Did your concerns materialize on some later date?

15  **A.**   Yes.

16  **Q.**   And when was that later date when your concerns arose with

17  regard to what Ms. Preston was doing?

18  **A.**   When she kept pushing for interviews with me,

19  investigatory interviews.

20  **Q.**   So after that date of September 10, did you have a concern

21  that Ms. Preston was trying to do something inappropriate?

22          **MR. SIEGEL:**  Objection.  It's leading, Your Honor.

23          **THE COURT:**  Overruled.

24          **THE WITNESS:**  I had a concern to where I discussed

25  with Deanna when she emailed me about meeting with Lawanna.

1    BY MR. LAFAYETTE:

2    Q.   So in that conversation that you had with Ms. Santana, did

3    you explain to Ms. Santana what your concern was?

4    A.   I was concerned of the nature of how she was trying to

5    resolve this grievance, and why investigating is the first

6    thing that she wanted to do.

7    Q.   Now, let's talk about the way in which these TPT issues

8    are rolled up.

9         Now, the TPT people, the people who were employees in that

10   category, are they always with the City?

11   A.   No.

12   Q.   Could you explain generally how the TPT employees would

13   come and go?

14   A.   So the TPTs, or the temporary exempt employees of the

15   city, are hired throughout the year, but mostly during the

16   summer sessions.  A lot of them, parks and recreation will hold

17   a session to hire a lot of folks, so they do as they are

18   seasonal, a lot of them are, a few of them stay throughout the

19   year but a lot of them are seasonal.

20   Q.   So are these like students who work throughout the

21   majority of the summer?

22   A.   The majority of them are students during the summer, yes.

23   Q.   And these people, with regard to what your department

24   does, does it provide a list of all the TPTs to the union?

25   A.   The union, as requested, on a biweekly or monthly basis,

1  they do get reports of their employees who were hired, who were

2  terminated, so the union does get lists periodically, yes.

3  **Q.**   Okay.  Was there difficulty in determining which ones of

4  the TPTs were still employees of the city?

5  **A.**   It's not a difficulty of determining, but if you look

6  at -- and this was my issue, this list, it doesn't mean that

7  because there's a list, there is a payment.  Parks & rec, for

8  example, likes to keep its employees to come back, because it

9  is a huge process to hire employees.  It takes a while to

10 fingerprint and do all that, so we don't take them off the

11 system.

12     So when I talked -- and I remember this was the

13 conversation.  I could have a list of 1,500, but it doesn't

14 mean they're actively getting paid.  It also could mean in that

15 list you have multiple assignments.  You will appear -- this is

16 one of the things that I remember them asking -- you can appear

17 three times on the list.  So if you're just looking at a

18 number, there are reasons why a list looks longer or more

19 people, because you could have multiple assignments as a TPT.

20 You could be on the list because you were hired and we didn't

21 take you out of the system.  So looking at that list versus who

22 got paid and whether you got deductions, it's a different

23 issue.

24     In addition, just because you ran a payroll doesn't mean a

25 TPT who worked four hours will get a deduction.  There's a

1    hierarchy of deductions, taxes, other issues, so there is a

2    threshold for each union, and I think for them it's $10 that it

3    stops.  So that hierarchy can stop.  So you can't just look at

4    a list and decide we're not collecting.  It is simple.

5    **Q.**    So if someone says "Are you collecting the dues from each

6    and every person on that list," that you have now described,

7    are you in a position to say yes or no?

8    **A.**    I couldn't, and that's why I know emphatically I would

9    never answer that question somebody just ask me, because I know

10   what it takes to make that determination.  There are so many

11   variables.  And, as a manager, I'm sitting over here on the

12   fifth floor -- my staff being payroll on the third floor, and

13   the people actually doing that work would know the question a

14   whole lot better than I would -- and my first thing would be

15   let me check, let me call, and get systematically to answer

16   that question.  That's why when somebody said I confirmed.  Not

17   possible.

18   **Q.**    All right.  So now, could you take a look at something

19   called Exhibit 4K?  I'll find it for you back here.

20        Do you recognize Exhibit 4K, ma'am?

21   **A.**    Yes.

22   **Q.**    Is 4K an email dated October 1, 2013 at 5:55 p.m.?

23   **A.**    Yes.

24   **Q.**    Is that an email that you wrote?

25   **A.**    Yes.

1  Q.   Is that an email to Dwight McElroy?

2  A.   Yes.

3           MR. LAFAYETTE:  Your Honor, I'd like to move this

4  document into evidence.

5           MR. SIEGEL:  No objection.

6           THE COURT:  4K is admitted.

7       (Trial Exhibit 4K received in evidence)

8           THE COURT:  Proceed.

9  BY MR. LAFAYETTE:

10  Q.   4K.  Is this an email that you wrote to -- advising

11  Mr. McElroy:  "Unfortunately, I will have to decline your

12  offer, because I'm not the appropriate person to hold these

13  discussions."

14  A.   Yes.

15  Q.   Did Mr. McElroy call you on the phone to discuss the union

16  grievance?

17  A.   Yes, that's when he called me, and I talked to him and

18  sent him this reply.

19  Q.   And you sent him this reply?

20  A.   Yes.

21  Q.   And did he call you in October 1, 2013?

22  A.   I think he called me the day before.

23  Q.   So this is on a Tuesday?

24  A.   Late.  He called me in the morning.  I replied late

25  evening, and the next day I sent him an email back.

1  **Q.**   All right.  So did you ever discuss this union grievance

2  with Mr. McElroy?

3  **A.**   No.

4  **Q.**   Prior to you sending him this email, did you bring his

5  call to the attention of Deanna Santana?

6  **A.**   Yes, I did talk to Deanna about this strange call that I

7  got from McElroy.

8  **Q.**   Now, you have an undergraduate degree?

9  **A.**   Do I have an undergraduate, yes.

10  **Q.**   Yes?

11  **A.**   Yes.

12  **Q.**   And where is that from?

13  **A.**   It's Dominican University.

14  **Q.**   And do you have a Master's in Public Health

15  Administration?

16  **A.**   Yes.

17  **Q.**   And that's the one from Loma Linda?

18  **A.**   Yes.

19  **Q.**   And when was it that you became the City Treasurer?

20  **A.**   In 2004.

21  **Q.**   And what are your responsibilities as the City Treasurer?

22  **A.**   I manage city cash, investments, debt, I also manage -- in

23  beginning 2006, payroll, and in 2012, retirement.

24  **Q.**   Now, Payroll reports under you?

25  **A.**   Yes.

**KASAINE - CROSS / LAFAYETTE**

1    **Q.**   Is there a person who is the payroll chief, so to speak?

2    **A.**   I have a supervisor.  I have a couple of supervisors, yes.

3    **Q.**   And who are the supervisors in the payroll department?

4    **A.**   The supervisors in the Payroll Department is Sharon Holman

5    who does the day-to-day, and I have Doris Chang, who does the

6    technical side.

7    **Q.**   So if you wanted to get information about the specifics of

8    some payroll activity, are those the people that you would go

9    to?

10   **A.**   Yes.

11   **Q.**   So likewise, if Ms. Preston wanted to get the specifics of

12   these payroll issues, are those the individuals that you would

13   refer her to?

14   **A.**   Yes.

15   **Q.**   Do you have any reason to believe that she doesn't know

16   those people?

17   **A.**   No.

18           **MR. SIEGEL:**  Objection.  Well --

19   **BY MR. LAFAYETTE:**

20   **Q.**   Now, prior to September of 2013, did you have the occasion

21   to complain to Scott Johnson about Ms. Preston?

22   **A.**   I probably did that on a couple of occasions, yes.

23   **Q.**   And I'd just like to show you just a couple of documents

24   in that regard.

25           Would you take a look at Exhibit 1C?

1   **A.**   Which book?

2            **MR. LAFAYETTE:**  Oh, I'll find it.  Sorry, Your Honor.

3            **THE COURT:**  This document is not yet in evidence.

4            **MR. LAFAYETTE:**  I understand, Your Honor.

5   **BY MR. LAFAYETTE:**

6   **Q.**   Is Exhibit 1C an email that you wrote on or about

7   August 14, 2012?

8   **A.**   Yes.

9   **Q.**   Is this in the nature of a complaint to Scott Johnson

10  concerning Ms. Preston?

11           **MR. SIEGEL:**  Your Honor, I object.  I think this

12  should be handled by question and answer rather than leading

13  questions about a document that's not in evidence, and which is

14  hearsay.

15           **THE COURT:**  Are you intending to seek to admit this

16  Exhibit.

17           **MR. LAFAYETTE:**  I'll move the document into evidence,

18  Your Honor.

19           **THE COURT:**  All right.  The objection under Rule 401,

20  403 and 802 is sustained, so I'll not allow further questions

21  about this document.

22           **MR. LAFAYETTE:**  Thank you, Your Honor.

23      Is the document in evidence, Your Honor?

24           **THE COURT:**  The document is not in evidence.  I'm

25  excluding it.

1    BY MR. LAFAYETTE:

2    **Q.**   With regard to the subject, did you complain to Deanna

3    Santana on August 14, 2012 about something that Ms. Preston had

4    done?

5    **A.**   I don't remember exactly what they -- I have complained

6    about.

7    **Q.**   Could you look at Exhibit 1C and see if that refreshes

8    your recollection of the date?

9    **A.**   Exhibit 1C in this document?

10   **Q.**   I'll show you where to look, ma'am.

11        Did you, on August 14, did you copy Ms. Santana on a

12   complaint that you had concerning Ms. Preston?

13   **A.**   Yes.

14        **MR. LAFAYETTE:**  I'd like to move the document into

15   evidence, Your Honor.

16        **THE COURT:**  The objection was already sustained.

17   Nothing changed.  Move on.

18   BY MR. LAFAYETTE:

19   **Q.**   Now, you said you had an understanding about the way a

20   grievance works.

21   **A.**   Yes.

22   **Q.**   And could you explain to me what your understanding is

23   with regard to the way a grievance works?

24   **A.**   So if a union files a grievance on an employee, you

25   typically look at that grievance of where it's going or who are

**KASAINE - CROSS / LAFAYETTE**

1   they complaining or what is it that they are complaining

2   against.  And typically those grievance, unless it's specific

3   reasoning, needs to go directly to H -- ER, it could go to the

4   department.  But even when it goes to ER, the first thing that

5   you would look at is what is it that they are grieving about

6   and go directly to the source of the folks they are grieving to

7   collect the information, or for them to be able to answer that

8   grievance.  In other words, you give the department or the

9   folks an opportunity to respond.

10      **MR. LAFAYETTE:**  No further questions at this time,

11  Your Honor.

12      **THE COURT:**  Thank you.  Ladies and gentlemen, we're

13  going to take a morning break now for ten minutes.  During that

14  period if you wish to write down any questions for this

15  witness, you may, but you're not required to.  We'll return at

16  10:40.  Thank you.

17      (Proceedings were heard out of presence of the jury:)

18      **THE COURT:**  You may step down.

19      **MR. LAFAYETTE:**  Your Honor, I just have one question

20  about the last exhibit.  It seems to me we had laid a

21  foundation for that document, that it was a document she wrote.

22  It's a complaint in the time period that's relevant to the

23  case.

24      **THE COURT:**  The objection which was raised before

25  trial was under 401 and 403.  Under 403, it is a document that

1   I find is not probative of an issue in the case, and the

2   foundational gap that's missing is any testimony from

3   Ms. Santana that that tied in any way to her dismissal in 2013.

4   That's one component of it.  It talks about a lot of other

5   topics of fish ratings, which I find to be far afield from the

6   reasons of her termination or anything raised to this point in

7   this case; therefore, it would be confusing to the jury and

8   also cumulative to the jury, given the many other things that

9   have been presented to the jury as bases for Ms. Preston's

10  termination.

11          MR. LAFAYETTE:  Could I speak to that, Your Honor?

12          THE COURT:  You may.

13          MR. LAFAYETTE:  Thank you.  Plaintiff has put in a lot

14  of testimony about how no one talked to her about complaints,

15  no complaints were brought to her attention.  They have pointed

16  out that -- and there has been so much of that it's almost

17  impossible to capture.  Plaintiff asked Ms. Santana when it was

18  that she started changing her view with regard to Ms. Preston,

19  and she said it was in 2012.

20      Given where we are with this --

21          THE COURT:  She said nothing connecting it to fish

22  ratings and this treasury report.

23          MR. LAFAYETTE:  And I haven't examined on that.

24          THE COURT:  You had a long opportunity to examine on

25  that.

1      **MR. LAFAYETTE:**  I haven't covered that, Your Honor.

2      **THE COURT:**  Okay.  You've had opportunity to, so I'm

3  making a ruling based on the evidence in the case.

4      **MR. LAFAYETTE:**  And I appreciate what the Court is

5  saying, and I'm saying that I think it's relevant.  It's been

6  made relevant by the enormous amount of information that has

7  been presented by plaintiff.

8      **THE COURT:**  Any probative value is substantially

9  outweighed under Rule 403 by the danger of unfair prejudice,

10  confusion, and it's cumulative to other evidence in the case,

11  so it's excluded.

12      **MR. LAFAYETTE:**  I appreciate and understand, Your

13  Honor.

14      **THE COURT:**  All right.  Thank you.

15                      (Recess taken at 10:34 a.m.)

16                  (Proceedings resumed at 10:42 a.m.)

17      (Proceedings were heard out of presence of the jury:)

18      **THE COURT:**  Back on the record.  Remain seated.

19  Jurors are not present.  There are no questions from the

20  jury -- thank you -- for this witness.

21      Mr. Siegel, do you have any further examination?

22      **MR. SIEGEL:**  Yes.

23      **MS. MEHTA:**  Yes.

24      **THE COURT:**  All right.  Just two other things about

25  the evidence.  We're now at approximately 64 documents that are

1    in evidence from both parties, many of the documents used by

2    both parties.  I think that is -- both parties have had an

3    opportunity, and probably too much anyway, to put those

4    documents before the jury.  My concern is the jury's ability to

5    process all that information at the end, and, in my view, is

6    reaching the saturation point as to the amount of information

7    they need to resolve the issues in the case.  So part of my

8    evidentiary ruling on the last document is the cumulative

9    nature of all the testimony in documents, and that's going to

10   be part of my analysis going forward too.  So it might be

11   probative of something, not just that document, but more

12   documents that we might have introduced coming down the

13   pipeline.  It might be probative, but at this point they have a

14   lot of documents used by both parties to demonstrate points.

15   We don't need three exhibits to demonstrate one point when one

16   will do, so that's part of my ruling.

17        Also, that document was objected to by plaintiff before

18   trial, and if you don't want to have a evidentiary discussion

19   in front of the jury, you can bring it up before a witness if

20   you know you're going to use it, and we can discuss it then.

21   The defense is on fair notice of the objection, and that's the

22   risk you take when you don't bring it up before the testimony

23   continues.

24        Let's call in the jury, please.

25        (Proceedings were heard in the presence of the jury:)

1        **THE COURT:**  Our jurors have returned.  Please be

2   seated.

3        Mr. Siegel, you may have brief redirect.

4        **MR. SIEGEL:**  Okay.

5                    <u>**REDIRECT EXAMINATION**</u>

6   BY MR. SIEGEL:

7   **Q.**   Ms. Kasaine, you testified a few minutes ago regarding an

8   email you sent to Dwight McElroy on October 1, 2013?

9   **A.**   Yes.

10  **Q.**   Did you know prior to that date that there had been

11  communications involving Ms. Preston, Barbara Parker, and

12  Ms. Santana regarding an allegation that you had spoken with

13  Dwight McElroy prior to September 29th?

14  **A.**   No.

15  **Q.**   That was not brought up to you by anyone?

16  **A.**   No.

17        **MR. SIEGEL:**  Those are all the questions I have.

18        **THE COURT:**  Thank you.  You may step down.  Thank you

19  very much for being here today.

20        **THE WITNESS:**  Thank you.

21        **THE COURT:**  And plaintiff will call her next witness,

22  please.

23        **MS. MEHTA:**  Yes, Your Honor.  Plaintiff calls Dwight

24  McElroy.

25        **THE COURT:**  Mr. McElroy, come on forward and we'll

1   have you seated up here.

2           **THE CLERK:**  Please raise your right hand.

3                   **DWIGHT WAYNE MCELROY**,

4   called as a witness for the Plaintiff, having been duly sworn,

5   testified as follows:

6           **THE WITNESS:**  Yes.

7           **THE CLERK:**  Please remain seated and speak clearly

8   into the microphone.

9        Please state your full name and spell your last name.

10          **THE WITNESS:**  Dwight Wayne McElroy M-C-E-L-R-O-Y.

11          **THE COURT:**  Proceed.

12                  **DIRECT EXAMINATION**

13  BY MS. MEHTA:

14  **Q.**   Good afternoon, Mr. McElroy.  Could you please tell us

15  your current employment?

16  **A.**   I work for the City of Oakland.

17  **Q.**   And what do you do for the City of Oakland?

18  **A.**   I'm a lead person in maintenance services.  I work in

19  Public Works.

20  **Q.**   How long have you worked for the City?

21  **A.**   I think 30, 31 years.

22  **Q.**   And is it at all difficult for you to testify today?

23          **MR. LAFAYETTE:**  Objection.  The question is overbroad.

24          **THE COURT:**  Overruled.  If you can understand the

25  question, you can answer it.

1              **THE WITNESS:**  A little stressful, because some people

2    that I had professional relationships with during my tenure,

3    I'm going to be asked some questions that are going to put some

4    people in -- somebody is going to be in a bad position as a

5    result of my answers.

6    **BY MS. MEHTA:**

7    **Q.**    And sir, are you a member of any union?

8    **A.**    Yes, I am a member of SEIU 1021.

9    **Q.**    And can you please tell us what SEIU stands for?

10   **A.**    Service Employees International Union.

11   **Q.**    Did you ever have an official role with the union, an

12   elected role?

13   **A.**    Yes.  Through my years I have went from steward to chapter

14   chair to vice-president to president.

15   **Q.**    And how long were you president?

16   **A.**    I would say roughly about eight years.  I was moved from

17   v.p. to president based on the president deceased, and so then

18   I was elected I think twice for a three-year term, so I think

19   eight years or so I was president.

20   **Q.**    Were you president in summer of 2013?

21   **A.**    Yes.

22   **Q.**    And were you president of the SEIU part-timers union?

23   **A.**    Not necessarily president.  As we were configured at that

24   time, the president of the full-time chapter was a main cog in

25   the negotiations for the part-time chapters negotiations as

1   well.

2   **Q.**  Who was very active in the part-timers union?

3   **A.**  Michael Pandolfo was.  Actually, if not the president,

4   was -- had the actions and capacity of a president within the

5   part-time chapter.

6   **Q.**  And do you know Ms. Lawanna Preston seated over there?

7   **A.**  Yes, I do.

8   **Q.**  How do you know her?

9   **A.**  I know Ms. Preston as Employee Relations Manager, and

10   formerly before that she was an employee of SEIU.

11   **Q.**  And were you friends at that time when she was an

12   employee of SEIU?

13   **A.**  She spent her time in San Francisco.  I knew of her.  A

14   lot of the time I had seen her and knew her.  We knew each

15   other by face, but as far as being friends, that would not be

16   accurate.

17   **Q.**  Okay.  Well, did you speak with Ms. Preston after

18   Ms. Santana fired her?

19   **A.**  I don't remember, but as a common courtesy, professionally

20   speaking from my capacity in the union, whenever an employee

21   that I had dealt with at a high level was no longer employed,

22   commonly I would make a phone call to say, you know, I learned

23   a little bit from our impacts together the times that we've had

24   to advocate against one another, and I learned that "good

25   luck," and I've learned that with anyone, and I've done it as a

1   rule.

2   **Q.**   So I'm going to turn to an SEIU meeting with management.

3       Were you present at a part-timers meeting with the City on

4   August 6th, 2013?

5   **A.**   Yes.

6   **Q.**   Who was present at this meeting?

7   **A.**   From the City side I would think it was Winnie Anderson,

8   Katano Kasaine, and probably Sonia Lara.

9   **Q.**   Okay.  And from the union side?

10  **A.**   The ones that I will remember being in the room would be

11  Joe Keffer, would be myself, it would be Mike Pandolfo, and

12  probably four or five other people from the part-time and

13  full-time chapter that we felt were valuable assets to what we

14  were trying to accomplish, but I don't remember exactly without

15  looking at a list.

16  **Q.**   Okay.  Thank you.  And what was discussed at this meeting?

17  **A.**   A number of things.  But as we had received information

18  requests that we had had examined and were examining ourselves,

19  we were having some difficulty assessing exactly what the

20  number of temporary employees were in the city and, if, in

21  fact, we were receiving dues by contract -- by contractual

22  agreements, dues collection for the number of temporary

23  employees who were present, and so we ended up asking the

24  direct question:  "Are you collecting dues from temporary

25  employees?"

1  **Q.**  And at this point was this issue about the temporary

2  part-time union dues?  Was this a grievance?

3  **A.**  No.

4  **Q.**  Was your goal then to collect information about the issue?

5  **A.**  Yes.

6  **Q.**  And what provoked these discussions -- I'm sorry.

7  Withdraw.

8      And who are these temporary part-time employees?

9  **A.**  They're individuals who, by definition, should be

10  as-needed and seasonal, and it was our observation that they

11  had exploded well beyond the respective definition and the

12  definition in the civil service rules, et cetera.  And we were

13  concerned that the hiring had went well beyond what we had been

14  able to or had received information from the City to be able to

15  assess the numbers of TPTs as it relates to the number of

16  full-time employees.

17  **Q.**  Do you know if the contract requires the union to know

18  about TPT employees?

19  **A.**  Yes.  Both the full-time and the part-time contract has an

20  element in it that states roughly that the City has to report

21  new hirees to the union, I believe it's monthly or biweekly,

22  and they have to give us a list.

23  **Q.**  And what occurred when you looked at these lists?

24  **A.**  When we -- I can't remember if that's the list that

25  triggered our thought process, but it could have been a

1  position control document.  But whatever.  We became aware that

2  there were some serious discrepancies relative to what the list

3  was showing, and the exact -- the exact dues coming into the

4  chapter.

5  **Q.**  So turning back to the actual meeting on August 6, 2013,

6  what, if anything, did Ms. Kasaine say at that meeting?

7  **A.**  When asked if they were collecting dues from the

8  temporary -- all temporary employees, the answer was no, and

9  the answer was also that her phone would be ringing off the

10  hook if she did, and those were lower end employees.  They

11  didn't make that much money.

12  **Q.**  Mr. McElroy, did you take notes at that meeting?

13  **A.**  Yes, ma'am, yes.

14      **MS. MEHTA:**  Your Honor, I'd like to introduce

15  Exhibit 28, also known as 2R, 2 Robert, Rainbow.

16      **THE COURT:**  Isn't 28 2Y according to your chart?

17      **MS. MEHTA:**  I am -- it's Plaintiff's Exhibit 28, and

18  it should be Defendant's Exhibit 2R.

19      **THE COURT:**  Well, the list provided by you identified

20  it as 2Y, so let's be clear what exhibit it is.

21      **MS. MEHTA:**  2 yellow then.  All right.

22  **Q.**  Mr. McElroy --

23      **MR. SIEGEL:**  It is 2Y.

24      **THE COURT:**  Thank you.

25

 1   BY MS. MEHTA:

 2   Q.   Mr. McElroy, do you recognize this, what appears to be

 3   handwritten notes from August 6, 2013?

 4   A.   Yes, I recognize it.

 5   Q.   And what is it?

 6   A.   It is my notes from that meeting on that day at that

 7   moment.

 8   Q.   And did it appear to be a fair and accurate copy of your

 9   notes?

10   A.   Yes.

11        MS. MEHTA:   Your Honor, I move to admit Exhibit 28,

12   2Y, into evidence.

13        MR. LAFAYETTE:   I object, Your Honor.   It's hearsay

14   and cumulative.

15        THE COURT:   Overruled.   Exhibit 28 is admitted.

16        (Trial Exhibit 28 received in evidence)

17        THE COURT:   You may proceed.

18   BY MS. MEHTA:

19   Q.   Mr. McElroy, these are your notes, and on the bottom, you

20   wrote:  "Katano states she did not take dues from temp.  Phone

21   would ring off hook.  Low end of pay scale."

22   A.   Yes.

23   Q.   I read that correctly?

24   A.   Yes.

25   Q.   Mr. McElroy, did Ms. Santana ever question you about the

**MCELROY - DIRECT / MEHTA**

1  statement on the screen here?

2  **A.**   I don't recall that.

3  **Q.**   After Ms. Kasaine made this statement, what did the union

4  do in that meeting?

5  **A.**   We let a couple of minutes go by, and then we called a

6  caucus, which is the city leaves the room and the union is left

7  alone, and we talked about what she had just said and how we

8  were kind of extremely surprised at the answer, and we decided

9  to ask it again.

10      That line is drawn because -- the line is drawn after the

11  caucus, and we asked her the second time she said it, that's

12  when I wrote that.  So we asked the same question when they

13  came back in the room, and the answer was the same, a little

14  elusive, but the same answer.

15  **Q.**   Did SEIU decide to file a grievance about the failure to

16  collect dues?

17  **A.**   Yes.  Mike Pandolfo and myself, Joe Keffer, who was the

18  business agent, the staff person in charge of who was leading

19  our negotiations.  We discussed it, and it was just -- there

20  was no room -- I'm a president, Joe was staff, and Mike is the

21  one who at the time was the most active TPT who was actually

22  acting as a president, and for that to be said in our presence,

23  relative to our membership, and that's who we're there for, we

24  are there to protect and to do the business of our membership,

25  and that's what I was elected to do, and for me to not confront

1   that issue would make me a culpable partner in the non-dues

2   deduction, and I wasn't going to participate in that.  The only

3   thing that I could do is pursue for them to be made whole.  I

4   serve at the -- I served at the request of my membership, and I

5   knew what my role was.

6   Q.   And when you filed this grievance, at what step did you

7   file it?

8   A.   I believe we filed it at 3, being the lowest level

9   possible that we could resolve it.

10  Q.   And why did you file it at Step 3?

11  A.   It was -- it ranged citywide.  It touched every aspect of

12  the work that the City of Oakland provides; therefore, the only

13  level that it could be start to attempt to resolve it was Step

14  3.  Step 2 did not have the scope of authority to deal with

15  anything of that magnitude.

16  Q.   Any other reasons that you decided to file at Step 3?

17  A.   Well, it would have been kind of, respectfully, I'd say,

18  trying to get the fox to help you out in the hen house.

19  Q.   What do you mean by that?

20  A.   The person who did not collect the dues is going to

21  have -- it had been my experience in the City of Oakland there

22  are times when people have more of a need to cover their tracks

23  than to do the right thing, so therefore it was my professional

24  judgment that 3 gave us an opportunity to resolve it at the

25  lowest level possible.

1   Q.   Okay.  And in the union contract, the MOU between SEIU and

2   the City, can staff change the level of a grievance?

3           MR. LAFAYETTE:  Objection, lacking in foundation.

4           MS. MEHTA:  Withdrawn.

5   Q.   So I'm turning back to Ms. Preston a little bit.

6        Did Ms. Preston ever encourage you to file a grievance?

7   A.   I filed -- we filed the grievance without having any

8   discussion with Ms. Preston.  Any discussion with Ms. Preston

9   came after the grievance was filed.

10  Q.   And in the discussions after you filed the grievance with

11  Ms. Preston, was she encouraging of you to file the grievance,

12  to go forward?

13  A.   I clearly remember her saying that she was going to

14  investigate it.  And it is common that the Employee Relations

15  person investigate a grievance at 3rd, but I think it was to

16  the -- I think it was -- for her to say she was going to

17  investigate it meant that it was a very serious matter.

18  Q.   Now, did you ever ask Ms. Preston to provide you

19  confidential information about the City's bargaining position?

20  A.   No.

21  Q.   Did she write down a confidential bargaining position on a

22  piece of paper, tear that part of the paper, and hand it to

23  you?

24  A.   No.

25  Q.   Did the union always get what they wanted in negotiations

**MCELROY - DIRECT / MEHTA**

1    with Ms. Preston?

2              **MR. LAFAYETTE:**  Objection, relevancy.

3              **THE COURT:**  Overruled.

4              **THE WITNESS:**  No.  I mean, no.  Our general consensus

5    that was -- Lawanna was a little heavy on punitive measures

6    against our members, and there were times when we thought that

7    things should have went a little less punitive and more

8    educational and we could have got the same result.  So that's

9    far from where our thinking on Ms. Preston was.

10   **BY MS. MEHTA:**

11   **Q.**   And in your observations, did Ms. Santana support

12   Ms. Preston's positions in negotiations?

13             **MR. LAFAYETTE:**  Objection, lacking in foundation.

14             **THE COURT:**  Sustained.

15   **BY MS. MEHTA:**

16   **Q.**   Was Ms. Santana ever present at negotiations?

17   **A.**   I believe every one -- maybe full-time now and again, but

18   as a rule no.  And I can't remember if she ever was at the

19   part-time table.

20   **Q.**   What did you observe of Ms. Santana's approach towards

21   SEIU?

22             **MR. LAFAYETTE:**  Objection, relevancy, character, over

23   breadth.

24             **THE COURT:**  Sustained.  And also lack of foundation.

25

1    BY MS. MEHTA:

2    Q.   So moving forward a little bit, after you filed the

3    grievance.   Did Ms. Kasaine ever call you?

4    A.   Yes.

5    Q.   And what did she say to you?

6    A.   There was -- she wanted to know how she could make the

7    grievance go away.

8    Q.   Did she offer you anything in exchange?

9    A.   I think there was some promise to make it right, but I

10   didn't entertain -- I can't remember clearly what exactly she

11   promised, because I could not as an elected president even

12   entertain at this point the grievance going away.   It had to go

13   through the process at this point, and any going away would

14   have to be done through the process, which is meet us at 3rd

15   step, and we can have discussion about, you know, how to remedy

16   the situation.

17        But as far as Dwight McElroy or Mike Pandolfo or anyone

18   being tied to some underground stuff, that wasn't going to

19   happen.

20   Q.   I'm going to turn to the investigation of the grievance.

21        At some point did you become aware that the City was going

22   to investigate the City's failure to collect dues?

23   A.   Yes.

24   Q.   How did you become aware of that?

25        MR. LAFAYETTE:   Objection, hearsay.

1    **THE COURT:**  Overruled.

2    **THE WITNESS:**  Well, the first --

3    **THE COURT:**  You may answer.

4    **THE WITNESS:**  The first person that I said, as I

5  stated before, Lawanna said she was going to investigate it,

6  and then later on, we started having meetings with the City

7  Attorney, the outside attorney, Katano, and a number -- just a

8  host of individuals over at the City Attorney's Office relative

9  to the grievance itself.

10    One, one part was --

11    **MR. LAFAYETTE:**  Objection.  It's outside the scope of

12  the question.

13    **THE COURT:**  All right.  Sustained.  Let's move on to

14  the next question.

15  **BY MS. MEHTA:**

16  **Q.**  Now, was it unusual for Ms. Preston to handle the

17  investigation?

18    **MR. LAFAYETTE:**  Objection, cumulative.

19    **THE COURT:**  Sustained.

20  **BY MS. MEHTA:**

21  **Q.**  Who normally handled investigations of SEIU grievances?

22    **MR. LAFAYETTE:**  Objection, lacking in foundation.

23    **THE COURT:**  Sustained.

24  **BY MS. MEHTA:**

25  **Q.**  Did anyone investigate SEIU grievances at Step 3?

1   **A.**    Yes.

2   **Q.**    Who was that?

3   **A.**    Employee --

4           **MR. LAFAYETTE:**  Objection, lacking in foundation,

5   hearsay.

6           **THE COURT:**  Sustained.  What other investigation is

7   relevant?

8           **MS. MEHTA:**  Only the investigation into the TPT dues.

9           **THE COURT:**  Then ask about that investigation.

10           **MS. MEHTA:**  Okay.

11  **Q.**   Who would handle the investigation of the TPT dues?

12           **MR. LAFAYETTE:**  Objection, relevancy, lacking in

13  foundation and hearsay.

14           **THE COURT:**  Sustained.

15  **BY MS. MEHTA:**

16  **Q.**   You stated that the City Attorney took over the

17  investigation.

18           **MR. LAFAYETTE:**  Objection, misstates the witness's

19  testimony.

20           **THE COURT:**  Sustained.

21  **BY MS. MEHTA:**

22  **Q.**   Who handled the TPT investigation?

23           **MR. LAFAYETTE:**  Objection, relevancy.

24           **THE COURT:**  Sustained.  This is not for this witness.

25

1   **BY MS. MEHTA:**

2   **Q.**   Mr. McElroy, did you attend meetings at the City

3   Attorney's Office regarding the grievance?

4   **A.**   Yes.

5   **Q.**   Was Ms. Kasaine present?

6   **A.**   Yes.

7           **MR. LAFAYETTE:**  Objection, relevancy, subject of the

8   media.

9           **THE COURT:**  Sustained.

10  **BY MS. MEHTA:**

11  **Q.**   Has the grievance been resolved?

12          **MR. LAFAYETTE:**  Objection, relevancy, and subject of

13  the media.

14          **THE COURT:**  Overruled.

15          **THE WITNESS:**  I understand it's being set for

16  arbitration.

17          **MS. MEHTA:**  Thank you.  No more questions.  Just stay

18  up there.

19          **THE COURT:**  Cross-examination?

20          **MR. LAFAYETTE:**  Yes, Your Honor.

21                        **CROSS-EXAMINATION**

22  **BY MR. LAFAYETTE:**

23  **Q.**   Good morning, sir.

24  **A.**   Good morning.

25  **Q.**   The meeting on August 6, 2013, when you had that meeting,

1  while you were at that meeting, by the time that meeting had

2  started, had you commenced bargaining with the City?

3  **A.**   The best way I can answer your question would be that we

4  done the caucus, at some point the City comes in, and then we

5  begin to bargain, but that's the best answer I have for you.

6  **Q.**   Prior to August 6, had the City and the union started

7  bargaining?

8  **A.**   I believe so.

9  **Q.**   And as part of that bargaining that the City and the union

10  was going through, was there an issue with regard to the number

11  of TPTs there were in the city?

12  **A.**   I can't remember today exactly when we started to notice,

13  but we were compiling information as we went to try and figure

14  out exactly what the discrepancies were.

15  **Q.**   And that's because the City would give you lists

16  periodically of the number of TPTs; right?

17  **A.**   The list which the City had given us actually wasn't as it

18  was written in the contract, and that's one of the things that

19  we discovered, that the list was very -- they were giving us a

20  total employee list which did not denote which employees were

21  temporary, which employees were new hires and who weren't.

22  That's what we found out.

23  **Q.**   So you had a list that included people who you thought

24  shouldn't be on the list?

25  **A.**   Sir, it wasn't me.  We had a list at our business -- our

**MCELROY - CROSS / LAFAYETTE**

1  main office where those lists go, could not denote exactly who

2  the new hirees were and weren't.

3  **Q.**   So in this meeting that was set up that took place on

4  August 6th, was it your expectation that you would get some

5  information about that list and how that list was prepared?

6  **A.**   Yes.

7  **Q.**   Okay.  And did Ms. Kasaine come to explain to you, as far

8  as you could tell, how that list was prepared?

9  **A.**   I know that we had asked for that, and I'm not sure if

10  that's the date, but that is one of the -- that is one of the

11  things that Katano did.

12  **Q.**   Okay.  And when she did that, did you have the list in the

13  room with you?

14  **A.**   I don't remember.  Joe would have had it.

15  **Q.**   Okay.  And did either one of you ask her if all the people

16  on that list -- if the City was collecting dues from all the

17  people on that list?

18  **A.**   I believe the question was asked, maybe not using those

19  exact terms.

20  **Q.**   And she said the City was not collecting dues from all the

21  names that were on that list; didn't she?

22  **A.**   No, my note says what she said.

23  **Q.**   I'm asking you about what she said though.

24  **A.**   I don't recall her saying that.

25  **Q.**   Are you saying she didn't or are you saying you don't

**MCELROY - CROSS / LAFAYETTE**

1  recall?

2  **A.**   No, I'm saying I don't recall her saying that.  And I do

3  recall what I wrote it being very clear what my thoughts were

4  at that moment, and that's why I wrote it down that way.

5  **Q.**   Are you saying she didn't say it, or are you saying you

6  don't recall one way or the other as you sit here today?

7  **A.**   As I sit here today, without notes, without my bargaining

8  notes, you're correct, I would not want to say one way or the

9  other.

10  **Q.**   Okay.  And after she said whatever she said about that

11  list and collecting dues, did she explain that not all of the

12  names on that list were active city employees?

13  **A.**   We would have known that, using the city's own employees,

14  some of them were not currently working.

15  **Q.**   Did she say it?

16  **A.**   I don't recall.

17  **Q.**   Okay.  I'm sorry, Your Honor.

18      Do you recall getting an email from Ms. Katano Kasaine in

19  October of 2014 -- 13, stating that she would not meet with

20  you?

21  **A.**   No, I don't recall getting the email.

22  **Q.**   So after the meeting of August 6, did you continue to

23  participate in negotiations with the City concerning the TPTs?

24  **A.**   Yes.

25  **Q.**   In those negotiations, was there ever any discussion about

1  the lists that the City was creating for the TPTs?

2  **A.**   I don't -- you have to give me more.  What lists are you

3  referring to, sir?

4  **Q.**   Did the City periodically give to the union lists of

5  employees who were at the city who were part of the union?

6  **A.**   Yes.

7  **Q.**   In the negotiations, did you continue to have

8  conversations with the City with regard to those lists?

9          **MS. MEHTA:**  Objection, misstates testimony.

10          **THE COURT:**  Overruled.  You can answer the question.

11          **THE WITNESS:**  I've answered it as clearly as I can

12  based on not having notes from 2013, and this is 9/17 is it --

13  9/18, 2015, I've answered as clearly as I can.

14  **BY MR. LAFAYETTE:**

15  **Q.**   At some point did you, as part of the negotiations with

16  the union, enter into a side agreement that was signed by

17  Ms. Preston?

18          **MS. MEHTA:**  Objection, vague, foundation.

19          **MR. LAFAYETTE:**  I'll withdraw it.

20  **Q.**   Would you take a look at Exhibit 4P?  I'll help you.

21          **THE COURT:**  Also 43 might be easier.

22          **MR. LAFAYETTE:**  43.

23          **THE COURT:**  Yes.

24          **MR. LAFAYETTE:**  Thank you, Your Honor.

25  **Q.**   Exhibit 43 is a tentative agreement signed on October 2,

MCELROY - CROSS / LAFAYETTE

1   2013; do you see that?

2   **A.**   Yes.

3   **Q.**   Do you see your name on there?

4   **A.**   Is this number 26?

5   **Q.**   October 2, 20 --

6         **THE COURT:**  Yes, it says that at the bottom right-hand

7   corner; right.

8         **THE WITNESS:**  Okay.

9   **BY MR. LAFAYETTE:**

10  **Q.**   Do you see your name on there?

11  **A.**   Yes, I'm reading it, sir.   (witness examines document)

12  Yes.

13  **Q.**   Do you know who drafted this document?

14        **MS. MEHTA:**  Objection, speculative.

15        **THE COURT:**  Overruled.  The question is does he know.

16        **THE WITNESS:**  Normally, at bargaining, either the City

17  side or our side drafts it and everybody signs it, so no, I

18  don't remember exactly who drafted the document.

19  **BY MR. LAFAYETTE:**

20  **Q.**   That's fine.  So now, there's a statement in here that

21  talks about payroll deductions as they relate to dues; correct?

22  **A.**   Yes.  Yes.

23  **Q.**   So did you -- did the union and the City continue

24  bargaining up through October 2, 2013 with regard to the issue

25  of the collection of union dues?

**MCELROY - CROSS / LAFAYETTE**

1   **A.**   I'm sorry.  Would you repeat your question?

2   **Q.**   Did the union and the city continue bargaining up until

3   October 2 on issues relating to the collection of union dues?

4   **A.**   This looks like carryover language, actually, which means

5   it's in all contracts.  This is not new language that -- this

6   looks like carryover language, which means it stands in

7   contracts from '9, '11, '13, into '15, so --

8   **Q.**   But you signed this agreement on October 2, and I'm simply

9   asking was there continued bargaining over issues related to

10   the collection of union dues up through October 2, 2013?

11   **A.**   Do you mean specific to our issue with the non-collection

12   of dues?

13   **Q.**   Generally about the collection of dues.

14   **A.**   I don't remember.

15   **Q.**   When you do these side letters, in your experience does

16   the affected department sign the side letter?

17   **A.**   Sir, that's not a side letter.

18   **Q.**   Okay.  In these tentative agreements, in your experience,

19   does the affected department sign the tentative agreement?

20   **A.**   Whomever is at the table signs the agreement, normally the

21   chief negotiator and a few others, whoever is in the room at

22   that time.

23   **Q.**   Would it be accurate that you believe, but you're

24   uncertain, that you had a conversation with Ms. Preston where

25   Ms. Preston encouraged you to file the grievance?

1   **A.**    Sir, I believe that we filed a grievance based on -- in

2   terms of discussion of SEIU, nothing having to do with anything

3   other than the statement that was made in bargaining.

4        I was a major contributor to the fact that it was

5   imperative, and there was no way out that we had to sign it.

6   We had to file a grievance.  But no one other than SEIU members

7   were in that discussion.

8             **MR. LAFAYETTE:**  I'd like to read from the witness's

9   deposition testimony, page 41, lines 1 through 9.

10            **THE COURT:**  One moment.

11            **MS. MEHTA:**  Objection.  This is not inconsistent.

12            **MR. LAFAYETTE:**  And if the Court would like, I can

13   read through 14, Your Honor.

14            **THE COURT:**  I agree with the defense -- or excuse me,

15   I agree with the plaintiff's objection, so the objection is

16   sustained.

17   **BY MR. LAFAYETTE:**

18   **Q.**    After the grievance, did you have a conversation with

19   Ms. Preston where she encouraged you to go forward with the

20   grievance?

21   **A.**    No, sir.

22            **MR. LAFAYETTE:**  I'd like to read that same passage,

23   Your Honor.

24            **MS. MEHTA:**  Objection.  Not inconsistent.

25            **THE COURT:**  You're saying 41, line what?

1          MR. LAFAYETTE:  41, lines 1 through 14.

2          THE COURT:  You may read.

3          MR. LAFAYETTE:

4      "Q.  Did you ever have a telephone call with Lawanna

5      Preston where she said words to that effect, encouraging

6      SEIU to file the grievance?

7      "A.  I may have had a conversation, but I believe it was

8      post grievance.  I don't ever remember -- it was a

9      foregone conclusion when it left her mouth that there was

10     going to be a grievance filed.  Nobody -- you know, it was

11     like A, B, C, and with C being the grievance.

12     "Q.  Do you deny then that Lawanna Preston ever said words

13     to you that she was encouraging SEIU to file the

14     grievance?

15     "A.  Post?

16     "Q.  No, before the grievance was filed.

17     "A.  I don't recollect that."

18          THE COURT:  All right.  New question.

19 BY MR. LAFAYETTE:

20 Q.  During the meeting on August 6th, did Ms. Katano tell you

21 that if the union requested, she would send the list of the TPT

22 employees?

23 A.  It doesn't mean she didn't say it, but I'm just not

24 recalling that, and that's what I mean when I say I do not

25 recall.

1          **MR. LAFAYETTE:**  Your Honor, I don't have any further

2     questions.

3          **THE COURT:**  Thank you.  Redirect?

4                        <u>**REDIRECT EXAMINATION**</u>

5     BY MS. MEHTA:

6     **Q.**   Just one question.  The notes -- your notes that I showed

7     on the screen that said -- these notes that you wrote;

8     correct --

9     **A.**   Yes.

10    **Q.**   -- states "Katano states she did not take dues from temp.

11    Phone would ring off hook.  Low end of pay scale."

12         Do you believe these were accurate notes of what you heard

13    and observed in that August 6th meeting of what Ms. Kasaine

14    said?

15    **A.**   Yes.  She said it twice.

16         **MS. MEHTA:**  Thank you.  No further questions.

17         **THE COURT:**  We're going to take a short break.  If the

18    jurors have any questions you'd like to pose, that's now your

19    opportunity to do so.  We'll return in five minutes.

20         Mr. McElroy, if you can stick with us for a few more

21    minutes, please.

22         **THE WITNESS:**  Yes.

23         (Proceedings were heard out of presence of the jury:)

24         **THE COURT:**  We're in recess for five minutes.  Thank

25    you.

```
 1                    (Recess taken at 11:26 a.m.)

 2                (Proceedings resumed at 11:31 a.m.)

 3           THE COURT:  The jurors are not present.  They're

 4     formulating some questions, it appears.

 5        I just want to check on the schedule of who is coming

 6     next, and when we should schedule a lunch break.

 7           MR. SIEGEL:  We have one other witness who is waiting

 8     to testify, Ms. Everett, and so --

 9           THE COURT:  And?

10           MR. SIEGEL:  She will be brief.

11           THE COURT:  Is Mr. Donelan testifying as well?

12           MR. SIEGEL:  He's not here this morning, so we may not

13     call him if he doesn't show up in the next 15 minutes.

14           THE COURT:  And after Ms. Everett, is there another

15     witness that you're going to call, or is that going to be the

16     end of the plaintiff's case?

17           MR. SIEGEL:  That will be the end.

18           THE COURT:  All right.  And do you think we'll get

19     done with, roughly speaking, we'll get done with Ms. Everett

20     before lunch time?

21           MR. SIEGEL:  We should.

22           THE COURT:  All right.  Ms. Mehta, any documents that

23     you're going to seek to introduce through Ms. Everett?

24           MS. MEHTA:  Yes, Your Honor, Plaintiff's Exhibit 15,

25     and I think it's 10, as in orange, but it's --
```

 1            MR. SIEGEL:  Yeah, it is 10.

 2            THE COURT:  The document was objected to by the

 3   defense.  Is the defense going to maintain its objection to --

 4            MR. LAFAYETTE:  I'm looking at it, Your Honor.  Not

 5   relevant.

 6            THE COURT:  Does that mean the answer is yes?

 7            MR. LAFAYETTE:  Yes, that's yes, Your Honor.

 8            MS. MEHTA:  May I respond, Your Honor?

 9            THE COURT:  Yes.  What's the probative value of the

10   document?

11            MS. MEHTA:  Sure.  So one of Ms. Santana's and the

12   City's reasons for terminating Ms. Preston is because she

13   downloaded documents from a hard drive from her computer, but

14   this shows -- goes to show that she was having problems with

15   that computer, and thus provides other reasons for why she

16   might download documents.

17            THE COURT:  She didn't testify to that effect.

18            MS. MEHTA:  Ms. Santana?

19            THE COURT:  Ms. Preston didn't say anything about

20   that.

21            MS. MEHTA:  No, but Ms. Preston really had no reason

22   to.  I believe Ms. Santana in the opening statement of

23   defendants and in discovery they have put forth several --

24            THE COURT:  I don't care what's in discovery.  We're

25   here in trial.  I don't think there's been any assertion here

 1   in trial so far, and the defense could still put something on,

 2   that would make this document probative.

 3          **MS. MEHTA:**  We have reason to believe that Ms. Sonia

 4   Lara will testify to these events that she saw TC Everett, you

 5   know, unethically downloading documents from Ms. Preston's

 6   computer, and, again, this is because -- our assertion is that

 7   it's because Ms. Preston's computer was extremely

 8   malfunctional.

 9          **THE COURT:**  All right.  So the question is, in

10   anticipation of testimony from Lara, will be responding to

11   that, that might make it probative.

12          **MS. MEHTA:**  Yes, Your Honor.

13          **THE COURT:**  So let me ask the defense.  Are you

14   intending to solicit testimony from Ms. Lara about the topic in

15   the June 6th emails?

16          **MR. LAFAYETTE:**  No.  The testimony, to be clear, the

17   testimony from Ms. Lara relates to August of 2013.  It only

18   relates to the purchase of a one terabyte hard drive that

19   Ms. TC Everett did for Ms. Preston, but it has nothing to do

20   with this document.

21          **MS. MEHTA:**  But it will go -- I mean, why did TC

22   purchase the hard drive for Ms. Preston?

23          **THE COURT:**  All right.  You can ask TC about that, but

24   the email I'm going to exclude is not probative, and under 403

25   if probative, there's a danger of jury confusion.

1          Any other documents that you're intending to produce?

2          **MS. MEHTA:**  No, your Honor.

3          **THE COURT:**  All right.  Let's check on the jurors.

4          **MR. LAFAYETTE:**  There is a problem, Your Honor.

5  Ms. Everett apparently was sitting in the courtroom.  I didn't

6  know her.

7          **MS. MEHTA:**  No, she was not.  She was absolutely not,

8  Your Honor.

9          **MR. LAFAYETTE:**  She was just here.  I just --

10         **THE COURT:**  I'm not worried, because the document that

11 was discussed is being excluded, so --

12         **MR. LAFAYETTE:**  Thank you, Your Honor.

13         **THE COURT:**  And I don't know her either, so I think no

14 harm, no foul.  But thank you for letting me know.

15         **THE CLERK:**  Can we have the witness back on the stand,

16 please, Mr. McElroy.  Thank you.

17         **THE COURT:**  All right.  Let's call the jurors back in.

18     (Proceedings were heard in the presence of the jury:)

19         **THE COURT:**  All right.  Our jurors are returning.

20 Please be seated everyone.

21     Mark McElroy, you remain under oath.  The jurors have

22 several questions for you, and these are the questions.  They

23 have several parts, so I'll read the entire question twice so

24 you can get the entire context of the question before

25 answering.

 1      First question is about the grievance process:  Is it

 2   correct that a Step 3 grievance is a type of grievance, and not

 3   a stage of how a grievance is handled?  For example, could a

 4   Step 1 grievance mature into a Step 2 grievance, or a Step 2

 5   grievance become a Step 3 grievance?

 6      Just to read it all again.  Is it correct that a Step 3

 7   grievance is a type of grievance, and not a stage of how a

 8   grievance is handled?  For example, could a Step 1 grievance

 9   mature into a Step 2 grievance, or a Step 2 grievance become a

10   Step 3 grievance?

11      **THE WITNESS:**  Yes, you're correct.  The way the

12   grievance process works is you're encouraged to have an

13   informal discussion first with a simple shop matter, and you

14   attempt to resolve it at the lowest level possible, that being

15   economically sound as well as good for relations.  If it isn't

16   resolved there, there's Step 1, which is with the supervisor,

17   so you're trying to resolve a matter with the supervisor.  Step

18   2 is with the department, as our structure is designed.

19   Normally, the department head or a designatee would be the

20   judge or the person you would be meeting with in making your

21   case with.  Now, if something is vaster than a department,

22   which in SEIU's thinking this issue was not a department issue,

23   it was all across the City, therefore, Step 3 would be

24   considered the only starting point.  That being -- Step 4 being

25   arbitration where you're actually having an arbitrator resolve

 1   the matter if you cannot resolve it at Step 3.

 2        Does that answer your question?

 3        **THE COURT:**  Next question is related.  When a

 4   grievance is filed, how does it show what step grievance it is?

 5   How does the union indicate this to the City?

 6        **THE WITNESS:**  Normally, we'll write across the top, if

 7   it isn't at Step 1, we will write across the top "filed at..."

 8   and then a short reason why it is reasonable to file it at that

 9   level.  And also contractually, there are certain grievances

10   that are filed at 2 for expediency relative to a termination

11   where somebody's job is on the line, you're not going to

12   resolve that at a lower level, so you're allowed to file higher

13   up the chain to get to the end.

14        **THE COURT:**  All right.  Ms. Mehta, do you have any

15   follow-up questions from the jurors' questions?

16        **MS. MEHTA:**  Very briefly.

17   **BY MS. MEHTA:**

18   **Q.**  Putting on the screen Exhibit 3Z as in zebra, it has been

19   previously admitted.

20        I know this is hard to read, so I'm going to read a little

21   bit for you.  This appears to be an email from Joe Keffer to

22   Deanna Santana, Ms. Preston, and some other people, cc'd to

23   you, Mr. Dwight McElroy, on the date of September 27th, 2013.

24        Do you recall receiving this email?

25   **A.**  Yes, yes, I do.

**MCELROY - RECROSS / LAFAYETTE**

1  **Q.**  And it's -- the first sentence says:  "SEIU filed a

2  grievance at the third step of the MOU Article 15 regarding the

3  failure of the city to collect dues or agency fees as required

4  by the contract.

5       Is that correct, Mr. McElroy?

6  **A.**  Yes.

7            **MS. MEHTA:**  Thank you.  No more questions.

8            **THE COURT:**  Mr. Lafayette, any further examination?

9                       **RECROSS-EXAMINATION**

10 **BY MR. LAFAYETTE:**

11 **Q.**  Just with regard to that document, that date, that very

12 date, did you have communications with Ms. Preston that day,

13 September 27, 2013?  Did you have communications with

14 Ms. Preston on that date?

15 **A.**  I don't remember if I did or didn't.  The only reason I

16 remember that document is because I helped compose it.  And

17 Joe, the business agent, he sent -- I was part of putting that

18 verbiage together in that email.

19            **MR. LAFAYETTE:**  Your Honor, I'd like to show the

20 witness a document to see if it refreshes his recollection.

21      I understand your admonition, Your Honor.

22            **THE COURT:**  Go back to ask your question.

23 **BY MR. LAFAYETTE:**

24 **Q.**  Does this document refresh your recollection if there were

25 communications between Ms. Preston and the union on

1   September 27th at approximately 2:39 p.m.?

2   **A.**   (witness examines document) I remember this email.

3   **Q.**   So does it refresh your recollection that there were

4   communications between the union and Ms. Preston at 2:39 p.m.?

5   **A.**   I'd have to look at the title.  I just remember the text.

6   I remember the message.

7   **Q.**   Would it be accurate that as of 2:29 p.m., the union had

8   not advised the City that it was proceeding to Step 4 of the

9   grievance process?

10  **A.**   Is that a question?

11  **Q.**   Yes.

12  **A.**   Would you repeat your question, please.

13  **Q.**   Would it be accurate as of 2:29 p.m. on September 27th,

14  2013, when the union was engaging in communications with

15  Ms. Preston, it had not advised the City that it was proceeding

16  to Step 4 of the grievance process?

17  **A.**   Not having -- (witness examines document)  This is a

18  communication from Lawanna.  This is not us engaging.

19  **Q.**   Take a look at -- maybe if you take a look at the first

20  email on the page, which is below Ms. Preston's email, does

21  that refresh your recollection that the union sent Ms. Preston

22  an email?

23  **A.**   This is Joe Keffer.

24  **Q.**   Does it refresh your recollection that you were copied on

25  the email, and that the union as of that moment had not

1    proceeded to the grievance -- to Step 4?

2    **A.**   I was copied.

3    **Q.**   Does it refresh your recollection that the union had not

4    provided to Step 4?

5    **A.**   No, because I don't have a full booklet of communications

6    that could be contradictory to this, so no.  It is sent by Joe,

7    and it is asking what their intentions are, and it does refresh

8    my memory, the text, and I do remember.

9    **Q.**   What do you remember?

10   **A.**   I remember the -- I remember "Good afternoon" -- I

11   remember what's in this email on the top portion of it, I

12   remember that.  Once I looked at it, I did recall that.

13   **Q.**   What did you remember from the text at the top?  What does

14   that refresh your recollection on?

15   **A.**   (witness examines document) that the City Administrator

16   was taking over the grievance as it states here.

17   **Q.**   And as of 4:16 p.m. when that was done, the union had not

18   moved forward to Step 4 yet, had it?

19   **A.**   I'm not sure, sir.

20   **Q.**   Take a look at Exhibit 3X again.

21          **MR. SIEGEL:**  You mean 3Z?

22          **MR. LAFAYETTE:**  B, I'm sorry.

23          **MR. SIEGEL:**  Z.

24          **MR. LAFAYETTE:**  Z as in zebra, Z.

25          **THE WITNESS:**  Where is that?

1  **BY MR. LAFAYETTE:**

2  **Q.**   3Z was written at 6:14 p.m.; right?  I'm sorry.  Excuse

3  me.  Was sent at 6:00 o'clock p.m.?

4  **A.**   Yes.

5  **Q.**   And that's the first time that the union notified

6  management that it was moving to Step 4 of the grievance

7  process, isn't it?

8  **A.**   I don't know, sir, but I see that this particular email is

9  doing that, but I can't say today that that is the only time or

10  the first time that it was done, but I can say that this email

11  is saying exactly that.

12  **Q.**   So last piece of this, September 27th, that same Friday,

13  did you have any conversations with Ms. Preston?

14  **A.**   I don't -- no, no.  I have a problem, because we have a

15  grievance that is outstanding, and I believe he's being

16  probative relative to the outcome of something that has nothing

17  to do with this case.  It has to do with the arbitration that's

18  coming up that they may be representing in the next couple of

19  months on the dues grievance.

20  **Q.**   I'm just asking you, sir, if you had a conversation at all

21  on September 27th, that Friday, with Ms. Preston?

22  **A.**   No, sir, I don't recall having a conversation with her at

23  that time.

24          **MR. LAFAYETTE:**  No further questions, Your Honor.

25          **THE COURT:**  Do you have any further questioning within

 1    the confines of --

 2            MS. MEHTA:  Yes, Your Honor.  I'd like to offer Trial

 3    Exhibit 69 that Mr. Lafayette was referring to.

 4            THE COURT:  69?

 5            MS. MEHTA:  Yeah.  I don't know why it has that --

 6            MR. LAFAYETTE:  No objection, Your Honor.  I have

 7    copies.

 8            THE COURT:  Do I have a copy?

 9            MR. LAFAYETTE:  I'll give you one, Your Honor.

10            THE COURT:  All right.  Exhibit 69 is admitted into

11    evidence.

12        (Trial Exhibit 69 received in evidence)

13            THE COURT:  Mr. McElroy, you may step down.  Thank you

14    very much for being here.

15        Ms. Preston may call her next witness, please.

16            MS. MEHTA:  Yes.  Ms. Preston will call Ms. TC

17    Everett.

18            THE CLERK:  Would you remain standing and raise your

19    right hand.

20                        **TC EVERETT**,

21    called as a witness for the **PLAINTIFF**, having been duly sworn,

22    testified as follows:

23            THE WITNESS:  Yes.

24            THE CLERK:  Thank you.  Please be seated.  Please

25    state your full name and spell your last name.

1          **THE WITNESS:**  TC Tana Everett.  Last name is spelled E

2      as in echo, V as in Victor, E as in echo, R as in Robert, E as

3      in echo, T as in tango, T as in tango.

4                          **DIRECT EXAMINATION**

5      **BY MS. MEHTA:**

6      **Q.**    Good afternoon, Ms. Everett.

7      **A.**    Good afternoon.

8      **Q.**    Let me ask you, what is your current employment?

9      **A.**    City of Oakland.

10     **Q.**    And how long have you worked for the City of Oakland?

11     **A.**    18 years, seven months.

12     **Q.**    What is your title at the City of Oakland?

13     **A.**    Currently my title is Microcomputer Systems Specialist 1.

14     **Q.**    And what are your job duties?

15     **A.**    I work on everything that is computer-related for the City

16     of Oakland.  The only things that I don't work on

17     computer-related are the actual hard land network and servers.

18     But if you have a computer, wireless, all those types of

19     things, that's what I work on.

20     **Q.**    And in 2013, you were working on City of Oakland

21     computers?

22     **A.**    Absolutely.

23     **Q.**    Ms. Everett, do you know Ms. Lawanna Preston?

24     **A.**    I do.

25     **Q.**    Do you know Ms. Sonia Lara?

1    **A.**    I do.

2    **Q.**    How do you know Ms. Sonia Lara?

3    **A.**    Sonia has been working for the City for quite some time.

4    I've had interaction with her through Employee Relations

5    before.

6    **Q.**    And how do you know Ms. Preston?

7    **A.**    Same, through Employee Relations.  She was the Employee

8    Relations Director and Personnel Director for a while.

9    **Q.**    And did you work on Ms. Preston's computer when she worked

10   for the City of Oakland?

11   **A.**    Yes.

12   **Q.**    And was her computer functional?

13   **A.**    Periodically.

14   **Q.**    And was a part of your job duties to help her with her

15   periodically functional computer?

16   **A.**    Yes.

17   **Q.**    Did you provide Ms. Preston with a hard drive?

18   **A.**    Yes.

19   **Q.**    Do you know when you did that?

20   **A.**    I would think it would probably be the summer of 2013.

21   **Q.**    And why did you provide her with a hard drive?

22           **MR. LAFAYETTE:**  Objection to the extent it calls for

23   hearsay testimony.

24           **THE COURT:**  Overruled.

25           **THE WITNESS:**  I provided her with a hard drive,

**EVERETT - DIRECT / MEHTA**

1  because one of the reasons why I was called into work on her

2  computer was it was unstable, and so I had a great fear that

3  she was going to lose data.  Because you could go and -- for

4  instance, her Outlook, you could click on Outlook, and you

5  could go have lunch and come back before it would open an

6  email, and so I really feared that data was going to be lost,

7  and we needed to back said data up.

8  **BY MS. MEHTA:**

9  **Q.**   And did you provide hard drives to other City of Oakland

10  directors?

11  **A.**   Directors and other staff as well.

12  **Q.**   Did you give her this hard drive in the City of Oakland

13  offices?

14  **A.**   I may have provided it to her in her office, yes.

15  **Q.**   And was anyone else present when you did this?

16  **A.**   Not to my recollection, no.

17  **Q.**   Sonia Lara was not present?

18  **A.**   No.

19  **Q.**   Did Ms. Preston pay you for this hard drive?

20  **A.**   She did.

21  **Q.**   Was this unusual?

22  **A.**   No.

23  **Q.**   Why not?

24  **A.**   Because generally, if I provide hardware, software for

25  that matter, to employees of the city, I actually do that

**EVERETT - DIRECT / MEHTA**

1  through my outside company with my discount, and then I sell it

2  or sell it to them, you know, as theirs, because it's theirs.

3  It's not being sold to them as a city -- as a city piece of

4  equipment, it's being sold to them as a personal piece of

5  equipment.

6  **Q.**   And they would go and get reimbursed by the City for this?

7  **A.**   If they did --

8         **MR. LAFAYETTE:**  Objection, lacking in foundation,

9  hearsay.

10        **THE WITNESS:**  Excuse me.

11        **THE COURT:**  Overruled.  You can answer the question

12 fully if you wish to.

13        **THE WITNESS:**  I don't know where they would get -- I

14 mean, never was there any money -- or any check from the City

15 of Oakland given to me.  It was always cash.

16 **BY MS. MEHTA:**

17 **Q.**   And did you help Ms. Preston download files from her work

18 computer onto this hard drive?

19 **A.**   Yes.

20 **Q.**   Why?

21 **A.**   Because we were backing up the data so that it would not

22 be lost, and so that she could use this hard drive as well off

23 campus, so if she wanted to plug it into her laptop at home to

24 work with it, she could.

25 **Q.**   Did you help other city directors download documents onto

1   hard drives?

2   **A.**   Absolutely.

3         **MR. LAFAYETTE:**  Objection, relevancy.

4         **THE COURT:**  Overruled.

5         **THE WITNESS:**  Absolutely.

6   **BY MS. MEHTA:**

7   **Q.**   And did you advise directors to back up data on hard

8   drives?

9   **A.**   Yes.

10  **Q.**   To your knowledge, is it against city policy to back up

11  data on portable hard drives?

12  **A.**   No.

13  **Q.**   Now, did the City of Oakland ever question you about this

14  downloading data onto a hard drive for Ms. Preston?

15        **MR. LAFAYETTE:**  Objection, relevancy, and may violate

16  attorney-client privilege.

17        **THE COURT:**  Sustained.  Can you clarify who you're

18  talking about?

19  **BY MS. MEHTA:**

20  **Q.**   Did your -- did City of Oakland -- withdrawn.

21        Were you ever disciplined by the City of Oakland for

22  downloading these documents for Ms. Preston?

23        **MR. LAFAYETTE:**  Objection, relevancy.

24        **THE COURT:**  Sustained.

25

**EVERETT - DIRECT / MEHTA**

1  BY MS. MEHTA:

2  **Q.**   Were you ordered by the City to attend an interview about

3  this case with defendant's attorneys?

4        **MR. LAFAYETTE:**  Objection, relevancy and

5  attorney-client privilege.

6        **THE COURT:**  Sustained.

7  BY MS. MEHTA:

8  **Q.**   Did the City ever send you a letter about this case?

9        **MR. LAFAYETTE:**  Objection, relevancy, attorney-client

10  privilege.

11        **THE COURT:**  Sustained.

12        **MS. MEHTA:**  Were you interviewed by attorneys for the

13  City?

14        **MR. LAFAYETTE:**  Objection, attorney-client privilege,

15  relevancy.

16        **THE COURT:**  Sustained.

17        **MS. MEHTA:**  Were you instructed not to discuss this

18  case with anyone?

19        **MR. LAFAYETTE:**  Objection, attorney-client privilege,

20  relevancy.

21        **THE COURT:**  Sustained.  Let's go into witness

22  questions.

23  BY MS. MEHTA:

24  **Q.**   And Ms. Everett, you still work for the City of Oakland;

25  correct?

EVERETT - CROSS / LAFAYETTE

1    A.    Yes.

2    Q.    And you still are working on directors' computers?

3    A.    Yes.

4          MS. MEHTA:  No more questions.

5          THE COURT:  Any cross-examination?

6          MR. LAFAYETTE:  A little bit, Your Honor.

7                        CROSS-EXAMINATION

8    BY MR. LAFAYETTE:

9    Q.    You've been to Ms. Preston's house?

10   A.    Yes.

11   Q.    You work on the computer at her house?

12   A.    Yes.

13   Q.    You go have martinis with Ms. Preston?

14   A.    Yes.

15         MR. LAFAYETTE:  No further questions, Your Honor.

16         THE COURT:  At this time, ladies and gentlemen, we're

17   going to take a break.  If you have any questions for the

18   witness, that will be the opportunity to pose them.  If you

19   don't have any questions, it will be time for us to take a

20   lunch break.  So we'll check in with you in a few minutes to

21   see if you have any written questions for the witness.

22         (Proceedings were heard out of presence of the jury:)

23         THE COURT:  Ms. Everett, you may step down.  And if

24   you could hang around for a few more minutes, we may have some

25   more questions, it remains to be seen.  And I thank you for

 1   sticking around this morning.  I know you've been waiting.

 2            **THE WITNESS:**  Not a problem.

 3            **THE COURT:**  Ms. Mehta, would you like to make an offer

 4   of proof as to what I've excluded from Ms. Everett.  Noting in

 5   docket 102 the stated purpose of the testimony was Oakland's

 6   policy on access to employee emails and computer reliability.

 7   Those questions seemed to be far outside the scope of that

 8   anticipated testimony, and also the privilege objections made.

 9   So what was the probative value that your proffer is that was

10   going to be discovered through those questions?

11            **MS. MEHTA:**  So I discussed with you the reason why I

12   was asking her about why I would have liked to ask her about

13   the malfunctioning computer email, and then the reason why I

14   was asking Ms. Everett about whether the City interviewed her

15   is because we learned after that docket was filed, that the

16   City of Oakland and its outside counsel had deposed

17   Ms. Everett.  She gave sworn testimony under oath, and they

18   failed to notice us.

19            **THE COURT:**  They deposed her as part of this case?

20            **MS. MEHTA:**  Yes, Your Honor.  I have a letter here and

21   a declaration from Ms. Everett stating:  "I'm an attorney

22   defending the City of Oakland in a lawsuit filed in federal

23   court, Preston -v- City of Oakland --

24            **THE COURT:**  That is from whom?

25            **MS. MEHTA:**  This is from Meyers, Nave who was counsel

 1    before Lafayette, Kumagai.

 2             **THE COURT:**  Dated?

 3             **MS. MEHTA:**  Dated January 9, 2015.  And I did not get

 4    the information from Ms. Everett that she was being interviewed

 5    under oath with a court reporter until a couple weeks ago.

 6             **THE COURT:**  She was deposed or she was examined?  Can

 7    I see the letter you're referring to?

 8             **MS. MEHTA:**  Absolutely.  And I'll also give you her

 9    declaration, which shows that she was interviewed under oath

10    with a court reporter.

11         So we had no notice of this, and we also had no

12    disclosure.  I found this out because the City would not

13    produce Ms. Everett, so we had to subpoena her, and I had to

14    call her and tell her about coming to show up.

15             **THE COURT:**  And when did you receive this information?

16             **MS. MEHTA:**  Less than two weeks before trial.

17             **THE COURT:**  Why are you telling me about it now?

18             **MS. MEHTA:**  We believed that it would be relevant, and

19    we would be able to question Ms. Everett on the stand.

20             **THE COURT:**  All right.  You can take it up further

21    after trial.  Let's have the jurors.  We have a few questions

22    from our jurors.  Let's call them in.

23         (Proceedings were heard in the presence of the jury:)

24             **THE COURT:**  All right.  Our jurors have returned.

25    Please be seated, everyone.

**EVERETT - CROSS / LAFAYETTE**

1   　　Ms. Everett, we have a few questions from the jury.  You

2   remain under oath.  Treat these just as you treated the other

3   questions in the case.

4   　　The first question is why does the City of Oakland not

5   provide working or functional computer equipment to their

6   employees and require them to purchase computer equipment to do

7   their jobs?  I'll read it all again so you have a full

8   question.

9   　　　　　**THE WITNESS:**  Thank you.

10   　　　　**THE COURT:**  Why does the City of Oakland not provide

11   working/functional computer equipment to their employees and

12   require them to purchase computer equipment to do their jobs?

13   　　　　**THE WITNESS:**  The City of Oakland normally does

14   provide functioning equipment.  The life cycle of most

15   computers is three to five years.  Depending on where your

16   computer is in that life cycle, it may or may not be as fully

17   functional as it was when we first put it on your desk.

18   　　As far as buying hard drives, you can -- or buying any

19   other kind of equipment, the City's policy with certain

20   equipment is that the agency buys it or the person buys it.

21   For instance, if I get a request right now for a mouse, the

22   City of Oakland does not provide that.  Now, if your agency

23   wants to buy it, they can.  If you want to buy it, you can.

24   But the City of Oakland does not provide it.

25   　　　　**THE COURT:**  All right.  Next question:  Is it city

**EVERETT - CROSS / LAFAYETTE**

1    policy to allow unsecured portable hard drives and flash drives

2    in and out of secured facilities?  And there's a second part of

3    the question.  I'll read you both parts.

4        What type of security is in place to keep this portable

5    data secure and untampered?  So I'll read it all again.

6        Is it city policy to allow unsecured portable hard drives

7    and flash drives in and out of secured facilities?  And what

8    type of security is in place to keep this portable data secured

9    and untampered?

10        **THE WITNESS:**  When you say secured facilities, that is

11   a very narrow definition.  There are very few things in the

12   City of Oakland that would be considered that, but if they are

13   secured, for instance, the Oracle system, no, you would not be

14   able to bring one in and out.  As far as your desktop computer,

15   yes, unless you are someone that's working somewhere that is

16   like police, some police can't.  Police that deal with child

17   crimes and stuff like that, they can't.  But just the average

18   City of Oakland employee, yes, you can bring in a flash drive;

19   yes, you can bring in a hard drive; yes, you can back up that

20   data, and there are no securities around that, to my knowledge.

21        **THE COURT:**  Thank you.  Any follow-up on those

22   questions from plaintiff's counsel?

23        **MS. MEHTA:**  No, your Honor.

24        **THE COURT:**  Any follow-up on those questions from

25   defense counsel?

1    **BY MR. LAFAYETTE:**

2    **Q.**   Does the City have servers?

3    **A.**   Yes.

4    **Q.**   Do the servers back up email?

5    **A.**   Email servers would have back up on it, yes.

6    **Q.**   And does the City provide share points or server storage

7    for information documents employees want to save?

8    **A.**   Yes.

9    **Q.**   And so if an individual wanted to make sure that their

10   data was saved, they could back it up and save it on the

11   servers?

12   **A.**   They could.

13   **Q.**   The only information that would be pulled off -- that a

14   crash would hamper would be that information on the C drive?

15   **A.**   Maybe, maybe not.

16          **MR. LAFAYETTE:**  No further questions, Your Honor.

17          **THE COURT:**  All right.  Thank you very much for being

18   here.  You may step down.

19          **THE WITNESS:**  Thank you.

20          **THE COURT:**  Does plaintiff have a next witness?

21          **MR. SIEGEL:**  Your Honor, the plaintiff rests.

22          **THE COURT:**  All right.  Ladies and gentlemen of the

23   jury, we've reached a milestone in the case.  The plaintiff has

24   completed her case.  A reminder that you're not to reach any

25   conclusions or to weigh the evidence until you've heard all the

 1   evidence, and there's still more evidence to come.

 2       This will give us an opportunity to take a lunch break.

 3   We'll return at 1:10 p.m., just less than an hour from now, for

 4   the presentation of evidence from the defendants.   Thanks very

 5   much for your continued attention.

 6       (Proceedings were heard out of presence of the jury:)

 7            **THE COURT:**  Back on the record.

 8       The jurors are not present.  Yes, Mr. Siegel.

 9            **MR. SIEGEL:**  Oh, I'd just like to know who the defense

10   is going to be presenting this afternoon, if's that's a fair

11   and reasonable question.

12            **THE COURT:**  It is.

13            **MR. LAFAYETTE:**  We have a Rule 50 motion that we're

14   going to bring.

15            **THE COURT:**  All right.

16            **MR. LAFAYETTE:**  But in addition to that, we have lined

17   up witnesses.  We have Scott Johnson, we have Lara -- Sonia

18   Lara, we have Mr. Cohen, our expert consultant, and depending

19   upon how we go, we have a small amount from Ms. Santana to

20   clean up.

21            **THE COURT:**  All right.

22            **MR. LAFAYETTE:**  That may be it, Your Honor.

23            **THE COURT:**  That may be it for your entire case, or

24   may be it for the afternoon?

25            **MR. LAFAYETTE:**  For the entire case.

1    **THE COURT:**  All right.  Do you want to present your

2    Rule 50 motion now or 45 minutes?

3    **MR. LAFAYETTE:**  45 minutes would be fine, Your Honor.

4    **THE COURT:**  All right.

5    **MR. LAFAYETTE:**  That would be appreciated.

6    **THE COURT:**  Then let's reconvene at 1:00 o'clock.

7    You'll eat quickly, and reconvene at 1:00 o'clock for the Rule

8    50 motion and opposition.  Talk to you then.  We're in recess.

9            (Lunch recess was taken at 12:17 p.m.)

10   **AFTERNOON SESSION**                                    **1:00 p.m.**

11   (Proceedings were heard outside the presence of the jury:)

12   **THE COURT:**  Good afternoon.

13   **MR. SIEGEL:**  Good afternoon, Your Honor.

14   **MR. LAFAYETTE:**  Good afternoon, Your Honor.

15   **THE COURT:**  The jurors are not present.  And I'm ready

16   to receive defendants' motion under Rule 50(a) for a judgment

17   as a matter of law, now that there's been a completion of the

18   plaintiffs case-in-chief.  You may proceed.

19   **MR. LAFAYETTE:**  Thank you, Your Honor.  I will

20   reference, within my remarks to the Court, motion for summary

21   judgment, because I think the Court's ruling on the motion for

22   summary judgment laid out what was before us as we moved

23   forward.

24   **THE COURT:**  I think, yes, the order on summary

25   judgment.  The law also framed, as I know it, in our proposed

1    jury instructions on verdict form, has the same elements that

2    the plaintiff must prove, so yes, I agree.

3         **MR. LAFAYETTE:**  And -- and as to the -- I'm not going

4    to go through all of the case law about what this motion is,

5    because I think we all know that.

6         **THE COURT:**  Yeah.  And the standard is set forth in

7    Rule 50(a).  And that is --

8         **MR. LAFAYETTE:**  Yes.

9         **THE COURT:**  -- once a party's been fully heard, and

10   the Court finds that a reasonable jury would not have a legally

11   sufficient evidentiary basis to find for the party at issue,

12   the Court may resolve the issue against the party.  That's

13   50(a)(1)(A) or -- (B).

14        **MR. LAFAYETTE:**  So I would start, Your Honor, with the

15   Labor Code claim against the City of Oakland first.  And I am

16   specifically tracking through the Court's proposed instruction.

17   And the first item that the Court identifies there is a

18   disclosure to Santana that the proposed Rainbow Teen Center

19   Report was racially discriminatory.

20        In this case, plaintiff said that there was a concern of

21   hers, but she never testified that she said that to Santana.

22   Moreover, every witness who's testified has said that they

23   never heard such a comment.  Fred Blackwell said he didn't hear

24   it, Deanna Santana said she didn't hear it, and Barbara Parker

25   said she didn't hear it.  So there's actually no evidence,

1   whatsoever.  That may have been Ms. Preston's concern; that she

2   actually articulated that to someone.  And in order for it to

3   become actionable, it has to be something that's articulated

4   that someone can could react to and respond to.  And we don't

5   have that.

6        If I go to the second one -- disclosed to Santana and/or

7   City Attorney and/or City Councilmember Desley Brooks that the

8   Fire Chief was bargaining and entering into a union agreement

9   without approval from the City Council -- the totality of the

10  evidence in this case shows that this was nothing like what it

11  looks like in the Complaint.

12       The uncontroverted testimony of Winnie Anderson in this

13  case is what is controlling here.  Winnie Anderson says that at

14  every step of the way, she advised Ms. Preston of what she was

15  doing.  And she said specifically, though she may not have

16  shown her the actual document that was signed --

17       **THE COURT:**  Let me pause for a second as to the

18  standard.  When you use the term "totality," and focus on the

19  evidence that you think is most favorable to you, my reaction

20  is that I can't grant your motion.  The jury might go your way

21  if they're weighing the totality and are looking at one

22  evidence over another; but at this stage of the proceedings, I

23  have to view the evidence that's in evidence in the light most

24  favorable to the plaintiff, and weigh any inferences in their

25  favor if I'm going to grant a motion right now without putting

1    on any further evidence.

2        So rather than frame it that way, because then, if I agree

3    with you, the Ninth Circuit would say that I applied the wrong

4    standard, tell me why that's the only evidence, if that's the

5    case, and that plaintiff has not met her burden.

6        **MR. LAFAYETTE:**  The only evidence we have in this case

7    is that Winnie Anderson was advised in the first instance that

8    the Fire Department wanted a Side Letter.

9        Winnie Anderson drafted the Tentative Agreement.

10   Winnie Anderson drafted the Tentative Agreement.

11   Winnie Anderson did not show that draft of the Tentative

12   Agreement with Ms. Preston; but Winnie Anderson told

13   Ms. Preston that she was preparing the Tentative Agreement, and

14   that the Tentative Agreement was to be signed.

15       The testimony in this case is, though Ms. Preston may not

16   have actually seen the Tentative Agreement, she was aware that

17   the Tentative Agreement was going to be signed.  And she never

18   contradicted that in her testimony.  In her testimony, the only

19   thing that she said was she didn't see the Tentative Agreement

20   before it was signed.

21       So then we get to the issue of what happens with the

22   Tentative Agreement.  In this case, it is Donna Hom who points

23   out in the first instance that there might be a problem; and

24   that, too, is uncontroverted.  And it's after Donna Hom

25   identifies that there might be a problem that Ms. Preston does

PROCEEDINGS

 1  one thing -- and one thing only -- and she asks City Attorney

 2  for an opinion.  She didn't report anything.  She asked

 3  City Attorney for an opinion as to whether or not the City

 4  Fire Chief had the authority to sign the TA.  That's what she

 5  did.

 6      Now --

 7          **THE COURT:**  So your point is that asking for an

 8  opinion is not sufficient to satisfy disclosure requirement?

 9          **MR. LAFAYETTE:**  That's correct.  And that's within the

10  framework of what she is supposed to do:  To go to

11  City Attorney if she has a legal question.

12      And when Ms. Santana says, *I don't think this is a legal*

13  *question*, or says, *What's the legal question in the memo -- in*

14  *the e-mail*?, and she says she doesn't have the authority,

15  Ms.  -- the only thing that Ms. Preston writes back is -- the

16  legal -- the legal opinion is, *What do we tell the union?*

17  That's consistent, now, with what her role and responsibility

18  is, as the person who is in charge of the -- these labor

19  issues:  What do you tell the union?  That's not a report.

20      So then it becomes an issue of her report to

21  Councilperson Brooks.  She reports this to

22  Councilperson Brooks, but I carefully asked

23  Councilperson Brooks, *Did she tell anybody about that?*

24      And she said, *No.*

25      *Did she share it with anyone?*

1    She says, *No*.

2        There is no testimony that whatever she said to

3    Councilperson Brooks was ever reported to anyone else within

4    her work group, so that they could react on it.   A hallmark of

5    a claim of retaliation is that the person who's accused of

6    retaliation has to know of your participation in a protected

7    act.   There is no testimony in this case that anyone was aware

8    of this alleged protected act of a report to

9    Councilperson Brooks.

10       And then when you get to what it was that was reported to

11   Councilperson Brooks, there is nothing.   It's just not

12   truthful.   And that's the only way I can say it.   The

13   uncontroverted testimony in this case is that those statements

14   and the thing that she sent to Councilperson Brooks were not

15   truthful.   She writes in there that the Fire Chief had forced

16   one of her subordinates to sign this.   The uncontroverted

17   testimony in this case is that's not true.

18       Winnie Anderson said that's not true.   Winnie Anderson

19   said she'd never even talked to the Fire Chief before this

20   event took place.   Winnie Anderson also says that she relayed

21   that information to Ms. Preston before this e-mail was sent.

22       And so you cannot have a protected act predicated upon a

23   misrepresentation; but more importantly, to the extent that

24   that was even done, it was not distributed to the people who

25   were making decisions.   That's out.

**PROCEEDINGS**

1    You go to the -- (Reading) -- disclose the City Council

2    and/or Sandre Swanson that the service had filed a grievance

3    regarding the noncollection of union dues from separate

4    Temporary Part Time employees.

5         There's no testimony here that anyone knows that she sent

6    that e-mail to Sandre Swanson.

7         That's, again, one of those issues.

8         The second issue is to the extent that she reported that

9    to counsel, that's something that she does.   She prepares the

10   agenda reports.   She went to counsel.   Counsel asked the

11   question.   She responded to the question.   Her responding to

12   the question in the closed-session meeting is part of her job.

13   That's what she was supposed to do.

14        Then you look at the context of what we're looking at

15   here; that there is a grievance.   There are thousands of

16   grievances filed against the City of Oakland.   And to say that

17   someone reporting that a grievance has been filed can't

18   possibly be the case.

19        So you take a look at what she's alleging in the grievance

20   that she says.   And what she says in her memo -- in her e-mail

21   that she sends to Deanna Santana, and later to Sandre Swanson,

22   is that she had a conversation with Dwight McElroy on Friday.

23        Mr. McElroy just took the stand.   Mr. McElroy just said he

24   did not speak to her on Friday.   Again, we have something that

25   appears manufactured in this court.   No -- that is manufactured

**PROCEEDINGS**

1    in this court.

2        And so at the end of the day, none of those items that

3    she's talking about in any way, whatsoever, rise to the level

4    of being protected acts, are outside of the scope of her work,

5    or were communicated to people who were in a position to take

6    the actions that were taken.

7        We move on from there to the -- to issue of the -- and so

8    I've now discussed the Rainbow Teen report, the Fire Chief, the

9    grievance.  And then we get to the issue of whether or not

10   there's any evidence in this record that anybody acted

11   retaliatory on those things.

12       And so the testimony that we have in this case is that,

13   with regard to the Rainbow Teen issue, one, that no one

14   testified that they were aware that she was talking about race

15   issues there.  All of the people who have testified have said

16   they all oppose that language in the Rainbow Teen report.  And

17   more specifically when you actually look at the language in the

18   Rainbow Teen report, the language is in the nature of an

19   opinion.  It is not in the nature of an assertion.  And that

20   testimony is clear and unequivocal.  And plaintiff has not

21   testified otherwise.  You've had the drafter of the language

22   say it.  You've had the City Administrator say it.  And you had

23   Fred Blackwell say it.  And there's no testimony that indicates

24   there was anything other than an opinion of options available.

25       No one -- there's no of testimony that anyone pressured

1   her to put some language in a document that was untruthful; let

2   alone that are related to race.

3        **THE COURT:**  I don't want to rush you, but I do want

4   you to leave time for Count One.  And I have to have

5   plaintiff's response, too.  And our jurors are now waiting.  So

6   be brief.

7        **MR. LAFAYETTE:**  Thank you.

8      Refused to include -- I think I've hit those, but there's

9   no evidence, also, of any intent or of anyone doing anything

10  because of those things.

11     And the Court's motion -- in a ruling on the Court's

12  motion for summary judgment, the Court pointed out that between

13  Rainbow Teen in 2012 and termination in 2013, there was an

14  allegation that she had become cold.  We've now fleshed that

15  out.  There is no -- there is no facts.  This Court has not

16  been presented with any facts to show that.

17     In fact, the only thing that this Court has seen is that

18  there were complaints made from -- from the date of that event

19  in 2012 up to the present that were problematic.  The Deb Grant

20  issue and investigation, which report came out on October 30.

21  That -- these different things where -- different people have

22  talked about.  Those are the only things we have.

23     But there's no testimony in this case of any specifics

24  that were actually done with regard to hostility, tone,

25  demeanor, for Ms. Deanna Santana to plaintiff.

PROCEEDINGS

1        Now --

2            **THE COURT:**  All right.  I need to get plaintiff's

3    view.  Mr. Siegel, Ms. Mehta, can you respond on this cause of

4    action as to what you think the evidence shows?

5            **MR. SIEGEL:**  Well, you know, the only way in which

6    Defense makes its point here is by disregarding the plaintiff's

7    testimony.  And the plaintiff's testimony is certainly

8    sufficient to support a jury verdict in plaintiff's behalf.

9        She testified that she said to Deanna Santana that putting

10   the language in the report regarding reporting Desley Brooks to

11   the DA was racially discriminatory, and that she was against

12   that.

13       Further, none of the witnesses mentioned by Mr. Lafayette

14   claim to have been present in those conversations.  So the fact

15   that people didn't hear it is no more significant than the fact

16   that you or I didn't hear it.  We weren't there.  But the

17   plaintiff said it.

18       And she also then got into the interaction with Santana at

19   the City Council meeting on March 6th, which Santana tried to

20   brush off by saying that they really agreed; they didn't have a

21   disagreement.  Plaintiff testified that they did.

22       Regarding the Local 55 TA, if you look at Exhibit 20, it's

23   the report that she made regarding the temporary -- excuse

24   me -- the deal between Local 55 and the -- and the City that

25   was a ULP.  She also testified that she told Ms. Santana about

 1   that.  So again, there's evidence.

 2       With respect to the grievance, not only did she explain

 3   her concerns to Ms. Kasaine in Exhibit 31, as she testified to

 4   that.  She cc'd that to Santana, and told Deanna Santana about

 5   the grievance and about her concern.

 6       She then followed up regarding the interference of

 7   Ms. Kasaine with respect to that grievance in Exhibit 41.

 8       As to evidence of Ms. Santana's hostility to her, besides

 9   the fact that she was fired -- and the City and various

10   defendants have given the Court now, by my latest count, five

11   different explanations as to why -- prior to being fired, she

12   was subjected to what I would submit is improper, unlawful

13   surveillance of her communications without following the rules.

14   I think that's a hostile act.

15       Taking her off the responsibility to investigate a

16   grievance that was within her specific expertise and job

17   responsibility -- it can be seen as a way of interfering with

18   the appropriate resolution of that grievance.

19       The failure to conduct dues, as we indicated in our

20   proposed jury instructions, is a violation of --

21       **THE COURT:**  Is there record evidence as to when the --

22   what you're calling "surveillance" occurred?

23       **MR. SIEGEL:**  Ms. Santana says that it began sometime

24   in the middle of 2013.  And that is consistent with what

25   Mr. Jordan said; that it was in the middle of 2013.

PROCEEDINGS

1          **THE COURT:**  All right.  I am taking the motion for

2     judgment as a matter of law and 50(a) as to the second count

3     under submission.  It may be renewed at the end of the case.

4          Let's turn to Count One.

5          **MR. LAFAYETTE:**  Thank you, Your Honor.

6          **THE COURT:**  The particular concern I have -- and I'll

7     start with you, Mr. Siegel.  There are a number of different

8     elements to it.  The first is that Preston spoke as a citizen,

9     and not as part of her official duties.  That's the first

10    element that must be proved by a preponderance of the evidence

11    by Ms. Preston.  This is an issue we dealt with on summary

12    judgment.

13         As to the March 6th, 2012, Council meeting, I granted

14    summary judgment on that portion of the claims.

15         So we've got three other buckets:  The RTC Report, the

16    Firefighters Local 55 agreement, and the noncollection of union

17    dues.

18         **MR. SIEGEL:**  Well, you know --

19         **THE COURT:**  Let me phrase.  Under *Dahlia*, there are

20    three considerations:  Whether the speech was made within the

21    chain of command; if the speech reflected broad concerns about

22    corruption or systemic abuse outside professional duties, then

23    it's more likely private speech; and third, if the speech was

24    made in direct contravention of a supervisor's orders, then

25    it's more likely private speech.

1    What is the evidence in each of those areas that Preston

2  spoke as a citizen, and not as part of her official duties?

3    **MR. SIEGEL:**  With respect to the Rainbow Teen Center

4  Report, the fact that she countermanded the instruction of her

5  supervisor; that she wanted to see this language in the report

6  is, itself, a factor that is discussed in *Dahlia*, and which was

7  discussed by the Court.

8    **THE COURT:**  What supervisor said she wanted the

9  language in the report?

10    **MR. SIEGEL:**  Ms. Santana.

11    **THE COURT:**  Which -- said what language in the report?

12    **MR. SIEGEL:**  That she wanted in the report a

13  recommendation to the City Council that Ms. Brooks be referred

14  to the DA.

15    **THE COURT:**  Is that how Ms. Santana testified?

16    **MR. LAFAYETTE:**  No, it's not how she testified.

17    **MR. SIEGEL:**  Ms. Santana?

18    **THE COURT:**  Yes.

19    **MR. SIEGEL:**  No.  Ms. Santana denied that this ever

20  happened.  Ms. Preston testified to that; that she was told by

21  Ms. Santana that she wanted the language in the report.

22  Ms. Preston said she refused to put the language in the report,

23  and that ultimately Ms. Santana backed down, and the report

24  went forward without the language.

25    The -- the issue, though, was also a matter of public

 1  concern.  I mean, the Court has seen a snippet of that
 2  City Council meeting, where the whole --
 3         THE COURT:  The City Council meeting is not the -- is
 4  not -- I've already thrown that out on this issue.
 5         MR. SIEGEL:  But the City Council meeting demonstrates
 6  that the issue was a matter of public concern.  The issue of
 7  Ms. Brooks --
 8         THE COURT:  I don't think that she was speaking there
 9  as a private citizen.  She was speaking in her role as a public
10  employee at that City Council meeting.
11         MR. SIEGEL:  Perhaps we're rushed, and I'm not able to
12  make my point clearly.
13         THE COURT:  I don't want to rush you, because this is
14  important.
15         MR. SIEGEL:  Okay.  The question is:  Was it an issue
16  of public concern?  Right?
17         THE COURT:  That's not the only issue.
18         MR. SIEGEL:  It's one issue.
19         THE COURT:  It's a separate element.  So the very
20  first -- the very first 1983 element is number one.  And I'm
21  looking at the instructions to the jury.  Did Preston speak as
22  a citizen, and not as part of her official duties?
23      Second, was the speech not a matter of public concern?
24      So those are separate -- related but separate elements of
25  the claim.

1    **MR. SIEGEL:**  Okay.  My understanding of *Dahlia* is, in

2    determining whether a person spoke as a citizen or as an

3    employee, the factor of whether the issue is one of public

4    concern is a factor to be considered in deciding whether the

5    person spoke as a citizen or as a public employee.  So the --

6         **THE COURT:**  The topic.  The topic being discussed.

7         **MR. SIEGEL:**  The topic.  Right.  And the topic is *What*

8    *does the City of Oakland do about Desley Brooks?*, which we

9    know -- if we don't know it from other places, we know from the

10   March 6th meeting that the City of Oakland was very concerned

11   about Desley Brooks, and how she -- she should be treated.

12       Now --

13       **THE COURT:**  How does that come to a conclusion that

14   she was speaking privately, and not as a public employee?

15       **MR. SIEGEL:**  I mean, I guess I -- I've said it twice.

16   I'm not making myself clear.  I think that the topic of the

17   conversation is one of the points that the Ninth Circuit has

18   told us to consider in deciding not just about whether it was

19   an issue of public concern, but whether the employee spoke as a

20   citizen -- private citizen or as a public employee.

21       Second -- or third, if the speech was made in direct

22   contravention to her supervisor's orders, then it is more

23   likely private speech.

24       So when your supervisor said, *I want you to do this*, and

25   you say, *I'm not going do this because I think it would be*

1    *racially discriminatory and illegal,* that, I believe, is in

2    contravention.

3            **THE COURT:**  And what was the *I want you to do this*?

4            **MR. SIEGEL:**  *I want this language in the report.*

5            **THE COURT:**  And the testimony, as I recall, at our

6    trial was that the bracketed language from Ms. Parker was not

7    language from the report; it was advice.  So the statement

8    you're making of a witness saying, *I want this language in the*

9    *report* -- whose mouth did that come out of?

10           **MR. SIEGEL:**  Ms. Santana's.

11       And the question -- I mean, again, I think that would be

12   to parse the process a little more finely than it can.  I don't

13   disagree that Ms. Parker's note was not proposed language, but

14   the point of her note was -- that Brooks can be reported or

15   should be reported to the DA, is taken by Ms. Santana to -- to

16   mean:  I want you to put in the report to Ms. Preston language

17   that Brooks was in violation of City Charter, and should be

18   reported to the DA.  That was Ms. Preston's testimony.  And

19   Ms. Preston said, *I'm not going do it*.  And Ms. Preston said

20   that Ms. Santana ultimately gave in.  So I think that's

21   contravention to orders.

22       Then the other factor, second:  If the speech reflects

23   broad concerns about corruption or systemic abuse outside

24   professional duties, then it is more like private speech.

25       So concern about the issue of discrimination and

 1   discriminatory enforcement of City rules is a matter of broad

 2   public concern, and is a matter that can be interpreted as

 3   corruption or systemic abuse outside professional duties.

 4           THE COURT:  What about it is corruption?

 5           MR. SIEGEL:  Well -- well, to abuse your authority to

 6   report an African-American singled out from a group of

 7   City Councilmembers for potential prosecution leading to the

 8   loss of her position on the City Council is a matter of -- I

 9   believe that fits within the category of corruption or systemic

10   abuse.

11           THE COURT:  All right.  Continue.

12           MR. SIEGEL:  On the RTC, or on the other issues?

13           THE COURT:  On the other two issues.

14           MR. SIEGEL:  Okay.  So when the matter of entering

15   into -- department heads entering into agreements which are not

16   enforceable and potentially subject to sanction under the

17   Meyers-Milias-Brown Act is a matter of public concern, and it

18   represents -- and it represents a matter of systemic abuse.

19       In fact, Ms. Preston's testimony was that way back in

20   2012, she coöperated with the City Administrator's Office to

21   send out a directive to department heads that they were not to

22   go outside of their authority in reaching agreements with labor

23   organizations.  She testified on the stand -- Ms. Preston

24   testified on the stand that the agreement on the -- extending

25   the paraprofessionals program was outside of the Fire Chief's

 1   authority.

 2       Everybody apparently agreed, although when she told

 3   Ms. Santana about it, Ms. Santana told her that she wasn't

 4   interested in that issue; but she did tell Ms. Santana about

 5   it, and she told at least one member of the City Council about

 6   it.  And again, that was going outside the chain of command to

 7   do that.  And it is a matter of systemic abuse, under *Dahlia*,

 8   if --

 9           THE COURT:  So telling the City Council is outside of

10   the chain of command?

11           MR. SIEGEL:  Yes.  Her chain of command is directly to

12   the City Administrator.

13           THE COURT:  And what about the corruption or systemic

14   abuse?

15           MR. SIEGEL:  The systemic abuse is, as she

16   testified -- and again, this came up earlier in 2012 -- this

17   was a widespread concern that City department heads were

18   violating their legal obligations, and making agreements.  And,

19   you know, as the law reflects, Your Honor, that means that this

20   could lead to unfair labor practices, as Ms. Preston testified;

21   and identified a section of the Meyers-Milias-Brown Act that

22   she thought was being violated by having people without

23   authority enter into agreements which must be later withdrawn.

24           THE COURT:  All right.  Let's move on, to the

25   noncollection of union dues.

1    **MR. SIEGEL:**  So again the noncollection of union dues

2    was a matter which we have heard was of concern within SEIU,

3    within the City administration, from the Mayor and other public

4    officials.

5        Ms. Brooks testified that she had been contacted by the

6    SEIU prior to the October 1 meeting.  When she asked

7    Ms. Preston about it, when Ms. Preston addressed Ms. Brooks'

8    question at the October 1 meeting, she did it in direct

9    contravention to her supervisor's instructions, clearly,

10   leading to some displeasure within the following two days, at

11   the latest.  Again, it's a matter of systemic abuse, because

12   it's a violation of state law, and can lead to charges

13   against -- against the City.

14       **THE COURT:**  Wasn't the grievance process central to

15   what her public-employee responsibilities were?  Isn't that

16   what her job was, was to respond about the grievance process;

17   to investigate and talk about it?

18       **MR. SIEGEL:**  Certainly it was.  Certainly it was, but

19   the issue of this particular grievance mushroomed outside of

20   the responsibility that Ms. Preston had, and became, as we've

21   said, a matter of concern by officials and in the community.

22       **THE COURT:**  But was she speaking as a private citizen

23   or a public employee when she raised her concerns?

24       **MR. SIEGEL:**  When she initially raised her concerns,

25   it was as a public employee.

1    **THE COURT:**  And at what point did she begin to speak

2  as a private citizen?

3    **MR. SIEGEL:**  When she was taken off the grievance, and

4  when she shared the grievance with persons outside her chain of

5  command, including, again, members of the City Council; staff

6  in the City administration who were not within her reporting

7  relationship with Ms. Santana.

8    **THE COURT:**  And who at City Council did she first

9  share her concern with; or what particular City Council

10  communications do you think was outside the chain of command?

11    **MR. SIEGEL:**  Okay.  She reported it to Sandre Swanson.

12  And that's Exhibit 33, also known as 3M.

13    **THE COURT:**  All right.  Mr. Lafayette, the answer to a

14  number of these questions has been reporting to the

15  City Council as being outside the chain of command.  Do you

16  agree that the City Council is outside the chain of command, or

17  is that in the chain of command?

18    **MR. LAFAYETTE:**  That's in the chain of command.  I

19  mean, it's clear.  She goes to the -- she goes to the

20  closed-session meetings, and she goes to the Council meetings.

21  And her role in those proceedings is to explain -- and she says

22  this herself -- what's happening with regard to labor, and

23  what's happening with regard to the union negotiations.  That's

24  what she's there for.  And so this is all within that.

25    And -- and I would say one other thing.  And you need only

1  take a look at -- it's variously been marked as different

2  documents in this case, but her e-mail of September 29, 2013 --

3        **THE COURT:**  Give me one of the numbers.

4        **MR. LAFAYETTE:**  4H.  4G.

5     -- where she writes, "In my capacity as the Employee

6  Relations" --

7        **THE COURT:**  Don't give me a document that's not in

8  evidence.

9        **MR. LAFAYETTE:**  Which one was it?

10        **MR. SIEGEL:**  I want to say something else about the

11  chain-of-command issue.

12        **THE COURT:**  All right.  I'll come back to you in a

13  minute.

14        **MR. SIEGEL:**  Okay.

15        **MR. LAFAYETTE:**  4F?

16        **THE COURT:**  Also not in evidence.

17        **MR. LAFAYETTE:**  4C?

18        **THE COURT:**  In evidence.  Go ahead.

19        **MR. LAFAYETTE:**  (Reading.)  "In my capacity as the

20  Employee Relations Director, it is my obligation and

21  responsibility to provide you the following information."

22     She is basically explaining that what she's talking about

23  with regard to these grievances is her obligation and her

24  responsibility as this director --

25        **THE COURT:**  Well, the question is:  To whom?

1          That doesn't answer the chain of command.   That is an

2     e-mail to Barbara Parker and Deanna Santana.   Now, they're in

3     the chain of command.

4          The question is:   Is speaking to the City Council going

5     outside the chain of command?   Is it going behind the back or

6     outside of the responsibility that she might have to her direct

7     supervisors?

8          **MR. LAFAYETTE:**   In this case, there's no evidence that

9     she went --

10          This is the evidence in this case.   She went to the City

11     Council closed session on October 1.   And there was a notation

12     in a report that she had prepared for Council relating to the

13     status of the process.   So she prepared it specifically for

14     Council.   And in there, the testimony in this case is there was

15     a notation that there was a grievance filed.   And Councilperson

16     Brooks asked, *What's this grievance about?*   And she explained

17     it.

18          And so the only evidence that we have in this case is

19     evidence that she brought that matter to the attention of

20     Council in a closed session with Council on a report that she

21     prepared as part of her job and responsibilities.   And that's

22     all that there is.   There's nothing more to this than that.

23          **THE COURT:**   All right Mr. Siegel.

24          **MR. SIEGEL:**   First of all, the document that Counsel's

25     referring to is not a document that she prepared.   It was a

1    document that SEIU prepared reflecting its bargaining position.

2        And Ms. Brooks read a note on that document or a statement

3    on that document that said, *We're not going to give up our*

4    *grievance,* and asked Ms. Preston about it; and Ms. Preston

5    responded.

6        But on the chain-of-command issue, I mean, it's kind of

7    ironic that we're talking about it.  The chain of command of

8    all City employees in the City of Oakland ends with the City

9    Administrator.  Period.  In fact, the allegation against

10   Ms. Brooks was that she violated a criminal statute by

11   attempting to give direction to a City employee or City

12   employees.  The evidence is clear that no person in the City of

13   Oakland may tell a City employee what to do, except the City

14   Administrator.

15       And the redress that the Council and the Mayor have if

16   they don't like what the City Administrator is doing is to fire

17   the City administration; but again, you know, the whole fight

18   with Ms. Brooks was that she was violating the chain of command

19   by attempting to direct City employees.

20       So you can't have it both ways.

21       **MR. LAFAYETTE:**  Speaking to this issue of whether

22   Preston's speech was made within Preston's chain of command --

23   her chain of command is up through the City Administrator to

24   the City Council.  And the only place that this thing was made

25   was to Ms. Preston, the City Council, and that's it.  And it

**PROCEEDINGS**

1    was part of the regular reporting about the status of

2    grievances and the status of the negotiation.  This is normal.

3    That's all that was.  And we have not heard any testimony in

4    this case -- none -- that says anything other than that.

5         You didn't hear her say that she stepped outside of her

6    job as the labor-relations director to make this report.  That

7    testimony never came in this trial.  There has been no

8    testimony that at any point in time she stepped out of her job

9    to do anything.  That's the subject of what we're talking about

10   here.  There's nothing.  And because there's nothing in this

11   record that shows it, that's why this -- all of these should be

12   taken out.  There's nothing here.

13        You go to -- it -- you go to the writing of the report.

14   Who does she say she talked to?  It's in her chain of command.

15   It's in her chain of command.

16        I heard Mr. Siegel say something about corruption.  The

17   only -- it's turning the whole discussion on its ear.  The

18   corruption is not saying -- there was no report of any

19   corruption on her part.  None.

20        And there was no report of any systematic abuse; and there

21   couldn't have been, because Ms. Deanna Santana had been at the

22   City only six months.  That is the testimony in this case.

23   She'd only been there six months.  There was no report of

24   systematic anything here:  Abuse, corruption.

25             **THE COURT:**  I've been keeping the jury waiting a long

1    time.  I'm going to take a two-minute recess, come back, and

2    tell you what I think.

3    (Recess taken from 1:36 p.m. until 1:43 p.m.)

4         **THE CLERK:**  Remain seated and come to order.  Court is

5    now in session.

6         **THE COURT:**  All right.  Thank you for your

7    presentations.  As to the motion on the first cause of action

8    under 1983 against Deanna Santana, I'm granting the motion for

9    a judgment as a matter of law as to that cause of action only.

10        The law in full is set forth on in the order on summary

11   judgment.  To me, the key Ninth Circuit case is the *Hagen* case,

12   which provides that speech which owes its existence to an

13   employee's professional responsibilities is not protected by

14   the First Amendment.

15        And in each of the categories of evidence we've

16   reviewed -- the RTC Report, the Local 55 issues, the SEIU

17   grievance issues, all of the speech at trial -- I think a

18   reasonable juror could only find owed its existence to

19   Ms. Preston's professional responsibilities.  Therefore, that

20   speech is not protected by the First Amendment.

21        Even though there is still another cause of action where

22   that same speech could lead to a retaliation claim as to 1983,

23   the standard is set forth in *Dahlia* and other cases.  And I

24   find that, even giving any inferences to plaintiff's favor,

25   that plaintiff has not established by a preponderance of the

 1   evidence that Preston spoke as a citizen, and not as part of

 2   her official duties.

 3       Therefore, under Rule 50(a), I must grant the motion, and

 4   dismiss the charge in Count One against Ms. Santana.  The

 5   written Order will follow.

 6       Now the question is what to tell the jury about that, if

 7   we tell the jury about that.  Of course, we have to tell the

 8   jury about that before the end -- but whether and what to tell

 9   them now.

10       My intention is to tell them at some point, but I don't

11   think we need to tell them immediately, because -- but you tell

12   me if you feel differently; whether it's going to change the

13   witnesses you call, and what you're going to ask them.  It

14   could impact an evidentiary ruling, as far as the scope of the

15   case and what's relevant.  Ultimately, I think the right thing

16   do is to not tell the jury why the count has been dismissed;

17   but ultimately to tell them that they're no longer deciding

18   that count.

19       That's something we can discuss further before the closing

20   instructions; but Mr. Lafayette, Mr. Siegel, do you have a

21   different view as to what I should tell them now?

22       **MR. LAFAYETTE:**  I'm inclined to defer, Your Honor,

23   saying anything at this point in time.

24       **MR. SIEGEL:**  I agree.

25       **THE COURT:**  All right.  I'm not going to say anything

1   now.  And I will then therefore expect the parties not to make

2   any comment on it.  It could be highly prejudicial if the

3   Defense made any comment, even if it's in a question about the

4   Court's ruling or the Court's interpretation of the evidence.

5   So I caution you not to make any inference about how I feel

6   about the evidence, because the Court -- of course, the jury

7   has heard from me that I am not taking a view of the evidence,

8   and I'm not deciding it.  It's for them to decide.

9        If that's changed in some way --

10       And I'll explain to them at the proper time why there's a

11  been a change; but for now, I don't want them to speculate

12  about why it's being dropped.

13       Conversely, there could be a reverse inference, which is

14  that the City or Ms. Santana has admitted the charge, and is --

15  the reason they're not considering that evidence is because

16  Ms. Santana's admitted she violated the First Amendment rights.

17  That would also be an improper inference.

18       So no party is going to make an assertion that there

19  should be some inference drawn from the disappearance of the

20  First Amendment retaliation claim in Count One.

21       All right.  Let's call on the jurors.  And our first

22  witness will be?

23            **MR. LAFAYETTE:**  Mr. Scott Johnson.

24            **THE COURT:**  All right.  Thank you.

25  (Proceedings were heard in the presence of the jury:)

1           **THE COURT:**  All right.  Our jurors have returned.  I

2   apologize to them for the lengthy delay, which was caused by me

3   and not by the parties.  We had some legal issues to resolve

4   that were important to resolve.  It took longer than I

5   anticipated.  In the end, it was time we had to spend.  And I'm

6   sorry that I didn't give you more time for your lunch, so that

7   you could come back at a more leisurely pace.

8       But we are moving ahead with the Defense case now, and

9   I'll ask the defendants to call their first witness.

10          **MR. LAFAYETTE:**  Yes, Your Honor.  Defendants call

11  Scott Johnson.

12          **THE COURT:**  Mr. Johnson, if you could please come

13  forward.

14          **THE CLERK:**  Please remain standing and raise your

15  right hand.

16                          <u>**SCOTT JOHNSON**</u>,

17  called as a witness for the Defendants, having been duly sworn,

18  testified as follows:

19          **THE WITNESS:**  I do.

20          **THE CLERK:**  Thank you.  Please be seated.  Please

21  state your name and spell your last name.

22          **THE WITNESS:**  Scott Johnson.  J-o-h-n-s-o-n.

23          **THE COURT:**  You may proceed.

24          **MR. LAFAYETTE:**  Thank you, Your Honor.

25

<u>**DIRECT EXAMINATION**</u>

**BY MR. LAFAYETTE**

**Q.**   Mr. Johnson, are you currently employed?

**A.**   Yes, I am, sir.

**Q.**   Where do you work?

**A.**   I work for MGO, a CPA firm.

**Q.**   And how long have you been there?

**A.**   I've been there since January of this year.

**Q.**   And at some point in time did you work for the City of Oakland?

**A.**   Yes, I did.

**Q.**   And from what time period did you work -- what -- from what date to what date did you work for the City of Oakland?

**A.**   It was approximately September 2011 until around September 2013.

**Q.**   And what was your position at the City of Oakland?

**A.**   I was the Assistant City Administrator.

**Q.**   As the Assistant City Administrator, did you have oversight over any particular activities?

**A.**   Yes, sir.

**Q.**   What were they?

**A.**   I had -- generally I had oversight of all of the administrative-services departments, along with Public Works. So the Finance Director, the Controller, the Treasurer, HR, IT, the City Clerks Office, the Office of Employee Relations at

1  some times, and the Public Works Department.  In addition, I

2  also had responsibilities where I was Controller-Treasurer for

3  the -- the Coliseum Authority.  And I also sat on behalf of the

4  City Administrator on a couple of the Council committees.  So

5  I -- I was a liaison for the Council and the Mayor, as well on

6  behalf of the City Administrator.

7  **Q.**   Did you get any sleep?

8  **A.**   Ha, ha, ha.

9  **Q.**   It's a lot.  Okay.  So where did you work before the City

10 of Oakland?

11 **A.**   Prior to working for the City of Oakland I was the Finance

12 Director for the City of San Jose for over 10 and a half years.

13 **Q.**   And do you have an undergraduate degree?

14 **A.**   Yes, I do.

15 **Q.**   Tell me about your education.

16 **A.**   I have -- I have a bachelor of science degree, major in

17 business administration with a minor in accounting.  I'm also a

18 certified public accountant -- so I'm a CPA -- and also a

19 certified global management accountant.

20 **Q.**   All right.  Thank you.  So in 2012 were you reporting to

21 Deanna Santana?

22 **A.**   Yes, sir.

23 **Q.**   And as a report to Deanna Santana, did you have any

24 responsibilities with regard to Ms. Preston?

25 **A.**   Yes, I did.

**Q.** And during the time that you were there, did you have occasion to communicate to Ms. Santana problems involving Ms. Preston?

**A.** Yes, I did, on a number of occasions.

**Q.** And the problems -- without going into a lot of detail here, what were they?

**A.** Sure. If I may, you know, the HR Director reported to me. So initially we -- we did a reorganization in the City because of various budget challenges. Eventually, Ms. Preston was appointed as the Employee Relations Director. Prior to that time, she worked directly for the HR Director, Andrea.

So I -- when I first started with the City, I got an overview from her on what was going on in the department, and issues that she was faced with. Primarily during the time after the reorganization, when Ms. Preston became the Employee Relations Director, there were a number of challenges in -- in working with her.

I was also one of -- want to also clarify that in my role, I was almost like a chief operating officer. In addition to the departments that reported to me, I helped in various respects on bridging the gaps, and making things happen in regards to priorities for the City projects and other initiatives. So from time to time, department heads or other staff would come to me, where they had issues in dealing with Ms. Preston. There were some that had been documented; others

1    where I had to counsel her.  And on numerous occasions -- at

2    least several occasions -- I had conversations privately with

3    Ms. Santana in regards to those particular issues.

4    **Q.**  Did some of those issues involve challenges that

5    Ms. Preston had with Ms. Kasaine?

6              **MR. SIEGEL:**  Your Honor, that's leading.

7              **THE COURT:**  Sustained.

8    **BY MR. LAFAYETTE**

9    **Q.**  Did you talk to Ms. Santana about any issues involving

10   Ms. Preston and Ms. Kasaine?

11   **A.**  Yes, I did.  And -- and there are also some e-mails

12   between Ms. Santana, Ms. Preston, and Ms. Katano [sic] in

13   regards to -- sometimes I had -- I had to be the referee.

14       Other times I had to counsel them in regards to their

15   demeanor, and the way -- their -- quite frankly, in

16   Ms. Preston's case I had to talk to her on several occasions

17   about, from my view, how I felt that -- and other people felt,

18   when they came to me -- that she conducted herself in an

19   unprofessional manner, where she would intimidate, berate.  And

20   some -- many people were afraid to get on the wrong side of

21   her.

22             **MR. SIEGEL:**  Objection, Your Honor.  Move to strike.

23   It's not responsive.  And it's too vague.  And it's contrary to

24   the grounds given by the City for the termination.

25             **THE COURT:**  Well, sustained as to being not responsive

1    to the question.

2         So the jury will disregard the answer.

3         I'll allow to you reask it, and focus on things you talked

4    to Ms. Santana about, because I think your answer went far

5    beyond things you talked to Ms. Santana about.

6         **THE WITNESS:**  Sure.  Can you repeat the question,

7    please?

8    **BY MR. LAFAYETTE**

9    **Q.**   What types of concerns regarding Ms. Preston did you bring

10   to the attention of Ms. Santana?

11   **A.**   On at least three occasions that I recall, I specifically

12   had concerns which I discussed with Ms. Santana about the

13   manner in which Ms. Preston conducted herself.  I was concerned

14   how she treated others within the organization and outside the

15   organization, because they would come to me.  And sometimes I

16   would is see it firsthand.  And I had conversations that, from

17   my view, I felt --

18        **MR. SIEGEL:**  Objection.  That's not responsive.

19        **THE COURT:**  Sustained.

20   Just say what you told Ms. Santana.

21        **THE WITNESS:**  Okay.

22        **THE COURT:**  Focus on that.

23        **THE WITNESS:**  I'm sorry.  I am trying to answer the

24   question, because that's the conversation that I had with

25   Ms. Santana.

1    BY MR. LAFAYETTE

2    Q.   Did you express your view to Ms. Santana?

3    A.   Yes, I did.

4    Q.   What view did you express to Ms. Santana?

5    A.   I felt that many times, the manner in which she conducted

6    herself was unprofessional, and that it didn't align with my

7    values system and the way I felt that especially executives

8    within the organization should be conducting themselves.

9    Q.   Now, I'd like to ask you about something involving a

10   person named Deb Grant.  Do you know who I'm talking about

11   here?

12   A.   Yes, sir, I know Deb Grant.

13   Q.   Did you bring something to the attention of Ms. Santana

14   involving Deb Grant?

15   A.   Yes, I did.  Do you want to know what the situation was?

16   I'm sorry.

17   Q.   Yes, please.

18   A.   Okay.

19            MR. SIEGEL:  Your Honor, it calls for hearsay.

20            THE COURT:  Overruled.

21       But don't repeat what someone else said.  You can just

22   state the scene.

23   BY MR. LAFAYETTE

24   Q.   Just set the setting.

25   A.   Okay.  The HR Director came to me with a situation related

1  to in particular procurement that Deb Grant was involved in

2  related to procuring some computers.  Then there was --

3            THE COURT:  Let's have a next question.

4            THE WITNESS:  Okay.

5  BY MR. LAFAYETTE

6  Q.   And did she explain to you in any way whatsoever that

7  something had happened with regard to her concern involving

8  Ms. Preston?

9  A.   Yes.

10 Q.   And what was it -- and is this something that you

11 ultimately brought to Ms. Santana's attention?

12 A.   Yes, it was.

13 Q.   What was it that you brought to Ms. Santana's attention?

14 A.   Ms. Preston.

15           MR. SIEGEL:  Your Honor, I'm going to object again.

16 I'm sorry.  This is now -- I think it's been double hearsay.

17 What this witness heard from Andrea Gourdine, and someone said

18 to Andrea Gourdine, that's now repeated to Ms. Santana.

19           MR. LAFAYETTE:  It's offered for the state of mind of

20 Ms. Santana, the decision maker, as to the information that was

21 provided to her.

22           THE COURT:  The objection's sustained.

23      Next question.

24 BY MR. LAFAYETTE

25 Q.   Did the information that you brought to Ms. Santana's

1  attention relate to something that Ms. Preston had done?

2  **A.**   Yes, it did.

3  **Q.**   And did you communicate it to her in such a way that it

4  concerned you?

5  **A.**   Yes.

6  **Q.**   What is it that you told her concerned you?

7         **MR. SIEGEL:**  Objection.   Again, it's going to be

8  hearsay or double hearsay.

9         **THE COURT:**  Sustained.

10 **BY MR. LAFAYETTE**

11 **Q.**   Did you communicate to her --

12       What exactly did you say to her?

13        **MR. SIEGEL:**  Again, it's going to be hearsay.

14        **MR. LAFAYETTE:**  It's his -- it's not hearsay if it's

15 coming from him; what he said.

16        **MR. SIEGEL:**  I'm sorry, Your Honor.   It is hearsay.

17 Plus this witness' state of mind is not at issue in the case,

18 so it can't be an exception to the hearsay rule.

19        **THE COURT:**  That -- for that basis, it is sustained.

20        **MR. LAFAYETTE:**  I'm sorry?

21        **THE COURT:**  It's not a state of mind of this witness

22 that you're getting.

23        **MR. LAFAYETTE:**  It goes to the state of mind of the

24 decision maker, and what information she had that was brought

25 to her attention.

1           **THE COURT:**  The objection's sustained.

2    **BY MR. LAFAYETTE**

3    **Q.**   Did you share with her any written documents at the time?

4    **A.**   I -- I don't recall.

5    **Q.**   With regard to this issue, do you know what further action

6    was taken?

7    **A.**   An investigation was pursued.

8    **Q.**   Investigation was pursued.

9           And do you know which part of the City conducted the

10   investigation?

11   **A.**   The Police Department.  Internal Affairs.

12   **Q.**   Did you talk to Ms. Preston about these events?

13   **A.**   I don't believe I did, because there was an investigation

14   pursued.

15   **Q.**   At some point were you involved in the union negotiations?

16   **A.**   Yes.

17   **Q.**   Do you have an understanding as to why you became involved

18   in the union negotiations?

19   **A.**   Yes.

20   **Q.**   Why?

21   **A.**   Well, in -- in my role as the Assistant City

22   Administrator, to try to meet an agreement with the bargaining

23   groups.

24   **Q.**   Now, was there a moment in time when people barged into

25   your office?

**JOHNSON - DIRECT / LAFAYETTE**

1  **A.**   Yes, sir.

2  **Q.**   And what happened?

3       **MR. SIEGEL:**  Objection.   There's no foundation for

4  this.

5       **THE COURT:**  Sustained.

6    Which union negotiations are you referring to, and which

7  time period?

8  **BY MR. LAFAYETTE**

9  **Q.**   Was there -- were union -- did union members barge into

10  your office?

11  **A.**   Yes, they did.  SEIU.

12  **Q.**   Did they express some concerns about having to deal with

13  Ms. Preston?

14  **A.**   Yes.

15       **MR. SIEGEL:**  You know, again, Your Honor, there's no

16  foundation for this.  It's --

17       **THE COURT:**  Is that an objection?

18       **MR. SIEGEL:**  Yes.  Objection.  No foundation.

19  Relevance.  403.

20       **THE COURT:**  The objection's sustained.

21    You can ask more foundational questions.

22  **BY MR. LAFAYETTE**

23  **Q.**   Did it have do with Ms.

24    Did these people who came into your office -- did it have

25  to do with Ms. Preston?

**JOHNSON - DIRECT / LAFAYETTE**

1  **A.**   Yes, sir.

2  **Q.**   And, whatever happened in your office, did you report what

3  had happened to you in your office to Ms. Santana?

4  **A.**   Yes, I did.

5  **Q.**   So what happened in your office that related to

6  Ms. Preston that you reported to Ms. Santana?

7         **MR. SIEGEL:**  You know, again, Your Honor, there's lack

8  of foundation as to who, when, where.  403.

9         **THE COURT:**  Sustained.  When was this?

10 **BY MR. LAFAYETTE**

11 **Q.**   Approximately when was it?

12 **A.**   I'm sorry, sir.  I don't recall the date, but actually it

13 is documented in a newspaper article.

14 **Q.**   It was in a newspaper article?

15 **A.**   Yes.

16 **Q.**   Was in the spring of 2013?

17 **A.**   Yes, it was.

18 **Q.**   What happened?

19 **A.**   Approximately 20 union representatives barged into my

20 office, pushed past my administrative assistant, and they

21 requested to speak to me, because they were not happy that --

22 that they were -- they felt that they were not getting their

23 point across, and not getting coöperation from the

24 bargaining -- or the City bargaining group:  Ms. Preston and

25 her group.  So they wanted to be heard.

1    **Q.**   Did you report this to Ms. Santana?

2    **A.**   Yes, I did.

3    **Q.**   Did you ever counsel Ms. Preston about her behavior?

4    **A.**   Yes, I did.

5    **Q.**   What you understood had happened between Ms. Preston and

6    the Deb Grant incident -- did that concern you?

7    **A.**   Yes, sir, it did.

8            **MR. SIEGEL:**  Objection.  Move to strike.

9            **THE COURT:**  Objection based on?

10           **MR. SIEGEL:**  His state of mind and his concern is not

11   relevant.

12           **THE COURT:**  Sustained.

13   **BY MR. LAFAYETTE**

14   **Q.**   Did you express that concern -- your concern to

15   Ms. Santana?

16   **A.**   Yes, I did.

17   **Q.**   And what was your concern about that event that you shared

18   with Ms. Santana?

19   **A.**   The concern about destroying documents.

20   **Q.**   Yes?  The concern about what?

21   **A.**   Destroying documents, and the lack of objectivity in the

22   particular matter.

23   **Q.**   And was that in the early part of 2013?

24   **A.**   Yes.

25   **Q.**   And after you shared that with Ms. Santana, did you make

 1  any suggestions to Ms. Santana as to what further actions

 2  should be pursued?

 3  **A.**   Yes, I suggested an investigation should be pursued.

 4         **MR. LAFAYETTE:**  No further questions, Your Honor.

 5         **THE COURT:**  Thank you.

 6      Cross-examination.

 7         **MR. SIEGEL:**  Thank you.

 8                     <u>**CROSS-EXAMINATION**</u>

 9  **BY MR. SIEGEL**

10  **Q.**   Mr. Johnson, I take it you worked with Ms. Santana in

11  San Jose?

12  **A.**   Yes.

13  **Q.**   And she hired you?

14  **A.**   In San Jose or --

15  **Q.**   No.  Here, in Oakland.

16  **A.**   Yes, sir.

17  **Q.**   And soon after you came to Oakland, an issue arose

18  regarding the terms of your -- the financial terms of your

19  employment.  Correct?

20  **A.**   An issue arose?

21  **Q.**   Yeah.

22         **MR. LAFAYETTE:**  Objection.  Relevance.  Lack of

23  foundation.  Cumulative.

24         **THE COURT:**  The second question --

25      Overruled.

1   **BY MR. SIEGEL**

2   **Q.**   Yes.  Wasn't there a concern about whether the terms --

3   the financial terms of your employment that had been offered to

4   you were, in fact, not properly communicated to you because

5   they violated City policy?

6   **A.**   I'll have to say "No" the way the question was asked.

7   **Q.**   Okay.

8   **A.**   I don't think so.  It was -- the question was not factual.

9   **Q.**   Okay.  Wasn't there a problem with the terms -- financial

10  terms of your employment, in the sense that Ms. Santana had

11  been given advice regarding -- from one of Andrea Gourdine's

12  staff members regarding those terms, and they turned out not to

13  be proper?

14          **MR. LAFAYETTE:**  Objection.  Hearsay.  Foundation.

15  Requires this witness to speculate.

16          **THE COURT:**  Overruled.

17      You can answer if you know.

18          **THE WITNESS:**  I -- I really can't respond to the

19  question.  I --

20  **BY MR. SIEGEL**

21  **Q.**   You don't have any recollection of there being an issue

22  regarding your compensation at the time you were hired?

23  **A.**   An issue by who?

24  **Q.**   By anyone.  Do you recall there was an issue?  Are you

25  just not wanting to answer my question?

1              **MR. LAFAYETTE:**  Objection.  That's argumentative,

2    Your Honor.  And it's --

3              **THE COURT:**  Sustained.

4    **BY MR. SIEGEL**

5    **Q.**   Was there an issue regarding your compensation?  Yes or

6    no?

7              **MR. LAFAYETTE:**  Objection, Your Honor.  The witness --

8    it's been previously asked and answered.  It is argumentative.

9              **THE COURT:**  Overruled.

10             **MR. LAFAYETTE:**  It is overbroad.

11             **THE COURT:**  Overruled.

12             *Was there an issue regarding your compensation?* is the

13   question.

14             **THE WITNESS:**  If -- I guess the question is if anyone

15   had a question about my compensation.

16        There was a provision, yes.  It wasn't the City

17   Administrator.  It wasn't the Mayor.  It wasn't -- you know, so

18   some employees had an issue related to days off that some

19   employees had.  I actually worked those days.  It was not part

20   of my agreement when I -- when I first started working for the

21   City when I negotiated.  So some employees brought that up, but

22   it was not an issue of the administration or of the Mayor's

23   Office or the Council that I'm aware of.

24   **BY MR. SIEGEL**

25   **Q.**   Was it an issue of -- was Ms. Santana, to your knowledge,

1    unhappy with the advice she had gotten from Andrea Gourdine's

2    office concerning the terms of your employment?

3            **MR. LAFAYETTE:**  Objection.  Relevancy.  Hearsay.

4    Foundation.

5            **THE COURT:**  Overruled.

6        If you know.

7            **THE WITNESS:**  Can you repeat the question, sir?

8    **BY MR. SIEGEL**

9    **Q.**   I'll go on to something else.  You said you spoke with

10   Ms. Santana three times regarding Ms. Preston's actions?

11   **A.**   Yes, at least three times.

12   **Q.**   What were the dates of those?

13   **A.**   I don't have the specific dates, sir.

14   **Q.**   Can you give me the months?

15   **A.**   No.

16   **Q.**   Can you give me the year?

17   **A.**   Well, I'm sure it was 2012, 2013.

18   **Q.**   In other words, it occurred at some point while you were

19   employed?

20   **A.**   Right.  Absolutely.

21   **Q.**   Not before or after?

22   **A.**   It followed after the reorganization, in which she was

23   appointed as the Employee Relations Director.

24   **Q.**   Okay.  So it was after she was promoted?

25   **A.**   Yes.

**JOHNSON - CROSS / SIEGEL**

1   **Q.**   Okay.  But you don't know the dates?

2   **A.**   I don't have the specific dates, no.

3   **Q.**   And you didn't write any memos about these concerns that

4   you expressed?

5   **A.**   Well, Ms. Preston wrote an e-mail as to my concerns.

6           **MR. LAFAYETTE:**  Objection, Your Honor.  He's cutting

7   the witness off.

8           **THE COURT:**  Sustained.

9       Let's have question and answer.

10          **MR. SIEGEL:**  Sorry.

11          **THE COURT:**  You may answer the question, Mr. Johnson,

12  if you didn't get a chance to finish.

13          **THE WITNESS:**  I -- I responded in regards to an e-mail

14  that Ms. Preston wrote me in regards to some of those concerns

15  that I talked to Ms. Preston about, also.

16  **BY MR. SIEGEL:**

17  **Q.**   Did you write memos to Ms. Santana indicating your

18  concerns about LaWanna Preston's conduct?

19  **A.**   I don't recall writing a memo to her.  I do know we had

20  some verbal conversations.

21  **Q.**   Now, you know from your years in public service that it is

22  considered good standard that when there are issues of employee

23  work performance, those issues should be documented in writing.

24  Correct?

25          **MR. LAFAYETTE:**  Objection.  Lacking foundation.

1          THE COURT:  Overruled.

2          THE WITNESS:  Do you want me to answer the question?

3          THE COURT:  Yes.

4          THE WITNESS:  I do know that it is perfectly

5    appropriate in regards to performance that you give the

6    employee an opportunity, and you can provide them oral

7    counseling.  And that's what I did.

8    BY MR. SIEGEL

9    Q.   Of course, that wasn't an answer to the question I asked

10   you.  My question was --

11         MR. LAFAYETTE:  Objection.  It's argumentative.

12         THE COURT:  Mr. Siegel, comment?  No.

13      Question?  Yes.

14   BY MR. SIEGEL

15   Q.   Do you have an understanding, Mr. Johnson, based upon your

16   years of public service, that the professional standard is to

17   document in writing problems with employees' work performance?

18         MR. LAFAYETTE:  Objection.  Calls for expert

19   testimony.  The witness has not been so designated.  Calls for

20   opinion.

21         THE COURT:  Overruled.

22      If the witness has information to that effect.

23         THE WITNESS:  I think that's your opinion.  I -- I

24   don't believe that that is a standard.  I believe that here,

25   again, you don't always have to write something down and

1    document it when you're counseling an employee.  It's perfectly

2    acceptable in the industry where you can give individuals oral

3    counseling.  And that's what I was -- that's what I did.

4    BY MR. SIEGEL

5    Q.    Now, when you went to Ms. Santana, were you giving

6    Ms. Santana oral counseling?

7    A.    I wasn't giving her counseling.  I was sharing

8    information --

9              MR. LAFAYETTE:  Objection, Your Honor.

10             THE COURT:  What was your objection?

11             THE WITNESS:  Sorry.

12             MR. LAFAYETTE:  I thought I heard a different

13   question.

14             THE COURT:  Overruled.  Overruled.

15        BY MR. SIEGEL

16   Q.    Okay.  Now let me ask you this.  During 2012 were there

17   responsibilities divided up among people in the City

18   Administrator's Office for the evaluation of various directors

19   who reported to them?

20   A.    I do recall we started the process.  We never did finish

21   it.  Employees were asked to do a self-evaluation first, but

22   unfortunately because of everything else and all of the other

23   priorities, from what I recall, we never did complete that

24   process.

25   Q.    Okay.  The process was gun?

1   **A.**   The process began where the employees provided a

2   self-evaluation.

3   **Q.**   And was it Ms. Santana's responsibility under the division

4   of labor that you had to evaluate LaWanna Preston?

5   **A.**   That I had to evaluate LaWanna Preston?

6   **Q.**   No; that Ms. Santana was evaluate LaWanna Preston.

7   **A.**   Oh.  I'm not familiar with that requirement.

8   **Q.**   Okay.  Wasn't it agreed among yourself, Fred Blackwell,

9   and Deanna Santana which of your reports each of you would

10  evaluate?

11  **A.**   Yes.  However, as I staid earlier, we -- we went through a

12  self-evaluation process.  The employees provided a

13  self-evaluation.  We didn't complete that process.

14  **Q.**   Let me ask the question again.  Wasn't there an agreement

15  among yourself, Fred Blackwell, and Ms. Santana as to which

16  employees each of you would evaluate?

17  **A.**   Yes, there was.

18  **Q.**   And wasn't it agreed that Ms. Santana would take

19  responsibility for evaluating LaWanna Preston?

20  **A.**   I believe so.

21  **Q.**   Now, was it you who recommended that the Police Department

22  Internal Affairs Division look into the Deb Grant situation?

23  **A.**   I don't recall if it was me who made the recommendation.

24  I know that we had a conversation who could do it, because

25  Ms. Preston had oversight of the administrative arm that

1   usually does that investigation; but because she was involved,

2   we needed either to hire outside counsel, or to have the Police

3   Department do it.  So the decision was to have the Police

4   Department do the investigation.

5   **Q.**   And whose decision was that?

6   **A.**   Ultimately, it was the City Administrator.

7   **Q.**   Ms. Santana's?

8   **A.**   Yes.

9   **Q.**   And did the Police Department do that investigation?

10  **A.**   If I recall correctly, I believe so.  They started it

11  before I left.

12  **Q.**   And didn't they complete the investigation?

13  **A.**   I don't recall.  I don't know if it was completed until

14  after I left the City.

15  **Q.**   When precisely did you leave?

16  **A.**   In September 2013.

17  **Q.**   Don't you recall that the Police Department presented its

18  report to Ms. Santana prior to that?

19  **A.**   I don't recall that.  No.

20  **Q.**   Okay.  Do you recall whether Ms. Santana suffered --

21  excuse me -- whether Ms. Preston had any discipline, at all --

22  even a verbal counseling -- imposed on her as a result of

23  allegations regarding the investigation of Deb Grant?

24          **MR. LAFAYETTE:**  Objection.  Lacking in foundation.

25          **THE COURT:**  Overruled.

1        **THE WITNESS:**  Can you repeat the question, please?

2    BY MR. SIEGEL

3    **Q.**   Do you recall whether Ms. Preston was disciplined in any

4    way because of the allegations regarding her role in the

5    Deb Grant investigation?

6    **A.**   I don't believe I would have -- I don't believe I would

7    have knowledge of that, because she reported to Ms. Santana.

8    So generally, when someone is being disciplined or counseled,

9    it's -- it's with the employee and -- and their direct

10   supervisor.  So I don't think I would have been a party to that

11   counsel.

12   **Q.**   Okay.  So your answer to my question is you're unaware of

13   any discipline imposed on Ms. Preston as a result of this?

14        **MR. LAFAYETTE:**  Objection.  Misstates the witness'

15   testimony.

16        **THE COURT:**  Sustained.

17   BY MR. SIEGEL

18   **Q.**   Did Ms. Santana tell you that she had imposed any

19   discipline on Ms. Preston?

20   **A.**   I don't recall such a conversation.

21   **Q.**   When you were involved in union negotiations in 2013, was

22   that with the SEIU?

23   **A.**   One of the bargaining groups, yes.

24   **Q.**   And do you recall what months that was?

25   **A.**   It seemed like we were negotiating all of the time, so --

1  **Q.**   Okay.  And on the occasion when SEIU members barged into

2  your office, was that on the same occasion when they presented

3  a demand that Ms. Santana be fired?

4  **A.**   No.

5  **Q.**   Isn't it true that during that labor uproar, there was a

6  demand that Ms. Santana be fired?

7        **MR. LAFAYETTE:**  Objection.  Constitutes hearsay.  Also

8  violates, I believe, this Court's Order with regard to

9  character evidence.

10       **THE COURT:**  Sustained.

11 **BY MR. SIEGEL**

12 **Q.**   You mentioned that there was a news article about this?

13 **A.**   Yes.

14 **Q.**   Do you recall the content of that news article?

15 **A.**   It was a very brief article.  I received a call that

16 evening from a local reporter, asking me about the situation.

17 And he said it was corroborated by three independent

18 individuals that approximately 20-plus union representatives

19 barged into my office, occupying my office; refused to leave

20 until I listened to what their concerns were.

21 **Q.**   And was your office part of the City Administrator's

22 Office --

23 **A.**   Yes.

24 **Q.**   -- at City Hall?

25 **A.**   Yes.

1   Q.   Okay.  And was it in your particular room that they

2   barged, or was it the whole City Administrator's Office?

3   A.   No.  It was my -- my specific office, yes.

4   Q.   And fair to say that they were unhappy with the City's

5   approach in the negotiations?

6          MR. LAFAYETTE:  Objection, Your Honor.  As framed,

7   calls for speculation.

8          THE COURT:  Overruled.

9   BY MR. SIEGEL

10  Q.   The union was unhappy about the City's approach in the

11  negotiation?

12  A.   They were unhappy specifically about Ms. Preston not

13  listening to their concerns and not -- you know, it was

14  generally the interaction that they had with Ms. Preston.

15  Q.   They were unhappy because they weren't getting what they

16  wanted at the table.  Is that fair?

17  A.   I don't believe that was the issue.

18  Q.   They thought Ms. Preston was too hard-nosed?

19  A.   I wouldn't say "hard-nosed."  I don't think that's the

20  term that they used.

21  Q.   They say she was insufficiently responsive to their

22  concerns?

23  A.   They didn't appreciate the -- the tone and the treatment

24  that they were receiving at the bargaining table.

25         MR. SIEGEL:  Thank you.  Those are all of the

1   questions I have.

2          **THE COURT:**  Thank you.  Any further examination,

3   Mr. Lafayette?

4          **MR. LAFAYETTE:**  No, Your Honor.

5          **THE COURT:**  All right.  Ladies and gentlemen, we're

6   going to take a brief break.  If you wish to pose any

7   questions, you may.  You're not required to.  And we'll return

8   in five minutes, or when you finish any questions.  Thank you

9   very much.

10         **THE CLERK:**  All rise.

11  (Proceedings were heard outside the presence of the jury:)

12         **THE COURT:**  We have a few questions for Mr. Johnson of

13  a factual nature.

14         **MR. LAFAYETTE:**  Before the jury comes in, Your Honor,

15  there's an issue that has arisen that needs your attention.

16         **THE COURT:**  Yes.

17         **MR. LAFAYETTE:**  On our Witness List and on Plaintiff's

18  Witness List, there is a Barry Donelan.  Plaintiffs had led us

19  to believe, up until approximately just before lunch, that they

20  were calling Mr. Donelan.  And so we were prepared to examine

21  Mr. Donelan.  He's on our Witness List.  And so when you asked

22  me this morning who we were calling, I identified who,

23  believing that plaintiffs would be calling Mr. Donelan.

24  Mr. Donelan is here to testify.  And plaintiffs, from what I

25  gather, are trying to tell him to go home, but he's being

 1    calling in our case.

 2          MS. MEHTA:  Your Honor, I didn't tell him to go home.

 3    I told him that he was under subpoena from us.  I had called

 4    him.  And I told this Court that we weren't going to call him.

 5    And I told him at 12 noon, as soon as we were released, that we

 6    would not be calling him.  The defendants have not subpoenaed

 7    Mr. Donelan.  So all I told Mr. Donelan is it's his choice if

 8    he wants to testify.  What he told me is the City has said to

 9    him that he will be disciplined if he does not testify today.

10          MR. LAFAYETTE:  He's not --

11          THE COURT:  I don't need to get into his motive and

12    resolving that.  We have also got other witnesses to come, so I

13    don't want to disrupt them.  And I want to get Ms. Lara and

14    Mr. Cohen in and out.  Do you still wish to -- you don't still

15    wish to call him?

16          MS. MEHTA:  We don't.

17          THE COURT:  You had an opportunity to and decided not

18    to.  Right?

19          MS. MEHTA:  Oh.  Are you allowing us to now call him?

20          THE COURT:  I'm asking what your preference is.

21          MS. MEHTA:  No.  We have no preference.

22          THE COURT:  All right.  Well, it's not a matter of

23    surprise for any party.  He was on both parties' lists.  What I

24    would be concerned about is if he were precluded from

25    testifying this morning somehow by the Defense, and that's why

1  he didn't testify; and now he's coming in, despite plaintiff's

2  intentions of having wanted him to testify.

3      From what I've heard, and given what's left in the case,

4  I'm not sure what he's going to be testifying to that's

5  probative of the remaining issues in the case.

6          **MR. LAFAYETTE:**  If he says anything more than three

7  minutes in this courtroom, I will be shocked.  It is really

8  only to confirm that he made the comments that went to

9  Deanna Santana.  That's it.  It's really that.  It's very

10  short.

11        **MS. MEHTA:**  I would ask that you hold Mr. Lafayette to

12  those three minutes.

13        **THE COURT:**  The jury will agree.

14      Mr. Johnson, come on forward.  Let's get the jury back in

15  here.

16  (Proceedings were heard in the presence of the jury:)

17        **THE COURT:**  All right.  Thank you to our jurors who

18  are returning.  Everyone else may be seated.

19      Mr. Johnson, a few questions from our jurors.  You remain

20  under oath.  Two parts to the question.  I'll read both parts,

21  so you have the entire thing.  The question is:  How did you

22  resolve the situation regarding the 20 union reps in your

23  office?  And what were the actions you told them you would

24  take?

25          **THE WITNESS:**  The first question was:  How did I

JOHNSON - FURTHER CROSS / MEHTA

1  resolve the issue?

2          THE COURT:  How did you resolve the situation?

3          THE WITNESS:  Okay.  I agreed to listen to them.

4  Initially I called security.  I listened to them.  I told them

5  I'd make no promises.  And then I went and met with

6  Ms. Santana, and told her about their concerns.  And I told

7  them that we would be talking to them later that afternoon

8  during negotiations.  And that's what we did.

9          THE COURT:  Any follow-up from the Defense?

10          MR. LAFAYETTE:  No, Your Honor.

11          THE COURT:  Any follow-up from plaintiff?

12                   **FURTHER CROSS-EXAMINATION**

13      BY MS. MEHTA

14  **Q.**  Mr. Johnson, isn't it true when these SEIU members did

15  this bargaining action in your office, that you called

16  Ms. Preston to deal with it?

17          THE WITNESS:  No, that's the absolutely not true.

18          MS. MEHTA:  No more questions.

19          THE WITNESS:  I called security.

20          THE COURT:  Mr. Johnson, you may step down.  Thank you

21  very much.  You're excused.

22          THE WITNESS:  Thank you.

23  (Witness excused.)

24          THE COURT:  And the Defense will call your next

25  witness, please.

1            **MR. LAFAYETTE:**  Mark Cohen, Your Honor.

2            **THE COURT:**  Ladies and gentlemen, Mr. Cohen is the

3    same type of witness as Dr. Ogus, who you heard during

4    plaintiff's case.  An expert witness is allowed to testify as

5    an expert, and to opine based on the witness' prior skills and

6    experiences.

7         Come on forward, please.

8            **THE CLERK:**  Step up, and remain standing, and raise

9    your right hand, please.

10                           **MARK COHEN**,

11   called as a witness for the Defendants, having been duly sworn,

12   testified as follows:

13           **THE WITNESS:**  I do.

14           **THE CLERK:**  Thank you.  Please be seated.  Please

15   state your full name, and spell your last name.

16           **THE WITNESS:**  My name is Mark Cohen.  C-o-h-e-n.

17                        **DIRECT EXAMINATION**

18   BY MR. LAFAYETTE

19   **Q.**   Good afternoon, Mr. Cohen.  What is your profession?

20   **A.**   I'm a financial statistical and rehabilitation economist.

21   **Q.**   Okay.  What is that?

22   **A.**   I analyze economic loss in personal-injury matters and

23   employment disputes and commercial disputes.  I do fair market

24   valuations of labor services, and different types of valuations

25   of intangibles.

**COHEN - DIRECT / LAFAYETTE**

1   **Q.**   And how long have you been doing that?

2   **A.**   Thirty-one years.

3   **Q.**   Who do you work for?

4   **A.**   I work for Cohen Volk Economic Consulting Group.

5   **Q.**   And what type of cases do you typically consult on?

6   **A.**   I would say more than half the work I do involves

7   individuals.  So analyzing loss of earnings, benefits; in some

8   instances care costs; different types of compensation plans.

9   **Q.**   And what percentage of your work involves personal injury

10  or job loss?

11  **A.**   I would say 50 to 60 percent.

12  **Q.**   What's the balance of your work?

13  **A.**   So I'll do business disputes.  Maybe a factory burns down,

14  and somebody caused that to happen.  And so they'll be suing

15  someone who caused that factory to burn down.  And I would

16  evaluate the lost profits of the factory.

17       Or there was a breach of contract; something like that.

18       In some instances, I'm engaged outside of litigation.  So

19  where there's, let's say, two entities -- a labor group, and a

20  management group -- and they're trying to come to terms on how

21  much to pay people, or what the wage increases should be for

22  that period of time that they're looking at.

23       So these types of engagements are -- make up the other

24  portions of the work I do.

25  **Q.**   Do you have an undergraduate degree from the University of

**COHEN - DIRECT / LAFAYETTE**

1  California at Berkeley?

2  **A.**   Yes.

3  **Q.**   And what's that in?

4  **A.**   Business administration, with an emphasis in finance.

5  **Q.**   And do you have a master's degree from Boston University?

6  **A.**   I do.

7  **Q.**   And what's that in?

8  **A.**   That's a master's of business management, with an emphasis

9  in internal finance.

10 **Q.**   Did you graduate first in your class?

11 **A.**   At Boston University, yes.

12 **Q.**   So now have you been qualified as an expert to testify in

13 court?

14 **A.**   Yes.  I've testified in federal and state courts together

15 probably close to 150, 200 times.

16 **Q.**   And then in your litigation work, what percentage of your

17 engagements have been for defendants in cases?

18 **A.**   I would say somewhere between 50 to 70 percent.

19 **Q.**   And have you consulted with federal, state, and municipal

20 governments before?

21 **A.**   Yes, I have, both when they were acting in the position of

22 plaintiff and as a defendant, as well.

23 **Q.**   Now, do you have two masters' degrees?

24 **A.**   Yes, I have another master's degree.

25 **Q.**   What's that in?

**COHEN - DIRECT / LAFAYETTE**

1    A.    That's in vocational rehabilitation and career counseling.

2    Q.    Why did you get two masters' degrees?

3    A.    Well, so much of my work is involved in engaged with

4    evaluating economic loss to people who have lost their jobs or

5    been injured, that having the additional knowledge is helpful

6    in helping determine, you know, how people react after an

7    injury or job loss, how their careers are impacted, and how

8    they recover over time.

9    Q.    Have you taught in any colleges?

10   A.    Yes.  I taught at the M.B.A. level at Dominican University

11   in San Rafael.  I taught internal finance and monetary systems,

12   investments.

13         And then I also taught at the undergraduate level at a

14   European business school.  There I taught statistics, I taught

15   money and banking, and I also taught business management.

16   Q.    Let's go to this case.  What were you asked to do?

17   A.    Well, I was asked, if there was a finding of liability,

18   what would the economic losses be to Ms. Preston, given her

19   discharge.

20   Q.    Did you --

21   A.    And I was also -- I'm sorry.  I was also asked to comment

22   on the other work product of Margo Ogus, who's another

23   economist.

24   Q.    Did you review material prepared by Margo Ogus?

25   A.    I did.

COHEN - DIRECT / LAFAYETTE

1  **Q.**    Did you have some concerns about it?

2  **A.**    I do.

3  **Q.**    Before we go into yours, why don't you tell us about the

4  concerns you had with Margo Ogus' report?

5  **A.**    Okay.  Well --

6        **THE COURT:**  Before we go into your concerns, are you

7  tendering this witness as an expert?

8        **MR. LAFAYETTE:**  Yes, Your Honor.

9        **THE COURT:**  Is there any opposition to that?

10       **MR. SIEGEL:**  There's no opposition to -- to him being

11  an expert based upon the expert witness report that was filed

12  with the Court; but I don't believe, unless I have missed

13  something, that he had any expert opinions in the report

14  regarding Dr. Ogus' work.  So I don't -- so I think that that

15  aspect of his testimony is not appropriate.

16       **THE COURT:**  And it's the April 1st, 2015, report that

17  you're referring to.  Correct?

18       **MR. SIEGEL:**  Yes.

19       **THE COURT:**  And would you, Mr. Siegel, like to examine

20  the witness about his background and experiences, or you have

21  no objection to him being tendered as an expert to the extent

22  of the April 1st report?

23       **MR. SIEGEL:**  I have no objection.

24       **THE COURT:**  All right.  And are you intending to

25  solicit testimony beyond the April 1st report?

1          **MR. LAFAYETTE:**  No, Your Honor, I will not.

2          **THE COURT:**  All right.  Then I will permit continued

3     examination.  And we'll defer and give plaintiffs an

4     opportunity to cross-examine at the completion of the opinion

5     testimony; but to the extent there's any testimony beyond the

6     April 1st report, the objection will be sustained.

7          **MR. SIEGEL:**  Thank you.

8     BY MR. LAFAYETTE

9     **Q.**   Now, did you review documents in connection with this

10    matter?

11    **A.**   I did.

12    **Q.**   What documents did you review?

13    **A.**   I have the plaintiff's response to the City of Oakland's

14    special interrogatories set one; plaintiff's payroll records

15    from 2008 to 2013 at the City of Oakland.  I have the

16    plaintiff's 2012 W-2 statement; defendant's responses to

17    Ms. Preston's supplemental interrogatories set one;

18    miscellaneous personnel records for Ms. Preston at the City of

19    Oakland.  I have Ms. Preston's deposition transcript, and the

20    City of Oakland's Memorandum of Understanding with the

21    confidential management employees association for 2013 through

22    15.  I also have Dr. Ogus' economic loss report.

23         And then I did additional work, as well.

24    **Q.**   So, now, did you do an independent -- did you do any

25    independent research in making your evaluation?

1    **A.**    Yes.   So in doing my research, I accessed City and County

2    of San Francisco's websites.   And there, they publish

3    information.   Same with the City of Berkeley, the California

4    Public Employees Retirement System, and the City of Oakland.

5          Additionally, I spoke with Katano Kasaine, who's the

6    Treasurer at the City of Oakland.

7          And then in addition to that, I did some extra research

8    with respect to worklife expectancies of California public

9    employees through their actuarial evaluations that are

10   published separately.

11   **Q.**   All right.   Now, have you prepared calculations that

12   outline your findings?

13   **A.**   I have.

14   **Q.**   And with regard to your findings, assuming that

15   Ms. Preston was wrongfully terminated, did you make a

16   conclusion -- well, why don't you tell me what you found?

17   **A.**   Well, I -- I have a set of calculations that separate the

18   losses into a past period that starts from the day of

19   termination up until the trial date; and then a future period,

20   which goes from the trial date to the end of the statistically

21   normal life expectancy for Mrs. Preston.   And then I also had

22   tabulated the total of the past and the future.

23         And I can go through each of the figures which represent

24   the elements of the loss, if you like.

25         **MR. LAFAYETTE:**   Your Honor, would it be appropriate,

1    with the Court's permission, for him to write what he's talking

2    about on the board?

3         THE COURT:  It is.  And I think that would assist the

4    jury's understanding of his testimony.  So with that purpose in

5    mind, you may.

6         MR. LAFAYETTE:  Move this over (indicating)?  There's

7    even a marker there.

8         THE COURT:  If you can do it so they can see it,

9    that's the objective.

10         THE WITNESS:  So in the first segment I have the past

11   loss.  And the first element there is the earnings plus the

12   benefits without termination.  So this is what she would have

13   earned in the past at the City of Oakland, had she remained

14   there.  That's 303,303.  And that essentially is the average

15   stated in 2013 through 2015 dollars of her earnings stated

16   based on her last job title.

17       That actual annual pay that I started with was 168,000 --

18   it was $168,022 a year.  And then the MOU -- the Memorandum of

19   Understanding -- provided a 1 percent wage increase in the

20   interim time over this period.  And from that number, I

21   subtract out her required contributions to the retirement plan,

22   because I treat the retirement plan separately later on.

23       The second element is the mitigation earnings.  And the

24   mitigation earnings are essentially the earnings she has earned

25   to mitigate or reduce her loss.  These are the earnings that

1   Ms. Preston has earned with the City of San Francisco since the

2   termination.  And I'll put this in brackets, so you know it's a

3   negative number.  That comes off the loss.  It's 199,777.

4       Now, at the time Ms. Preston was let go from the Oakland

5   employer, she had generated benefits through the retirement

6   plan there.  If she had elected to take her retirement benefit

7   at that moment, she could have offset her loss some more.  So

8   I'll call that "mitigation pension."  I'll just call it "PERS,"

9   since we don't have much space.  And that is $54,620.  And that

10  is a value based on if she had elected to take the benefits at

11  the two -- at age 55, the plan is 2.7 percent per year of your

12  service multiplied by your final compensation rate.  And that

13  would have provided approximately 28,000-some-odd dollars per

14  year if she had elected to take that.

15      And then there would have also been a cost-of-living

16  increase in this past period, as well.

17      So when we add up the past loss with these components, the

18  total is $48,906.

19      Then we have the future loss.  The first component there,

20  again, are earnings and benefits without termination.  And

21  that's $641,672.  And that is based on the calculation of what

22  her current rate of pay would be as of today, which is $169,703

23  per year.

24      The CalPERS retirement statistics for a person of

25  Ms. Preston's age and the amount of service that she had would

1    have taken her to age 61-point -- 61.43 years old.  So she

2    would have worked another 4.31 years in the future.

3        And so I used the 4.13 years.  I used the 169,703 per

4    year.  And then I discount that to present value.  The discount

5    rate's very small:  2.25 percent.  And then I also subtract out

6    what her contributions would have been to the CalPERS plan.  We

7    end up with the $641,672 number.

8        But from that, we have additional elements to consider.

9    The second element is, well, at the end of that period of work,

10   she would have had a pension without the termination from.

11   PERS.  And that has a value of $820,085.  And that's based on

12   this 2.7 percent per year, multiplied by the annual rate of

13   pay, multiplied by the years of service, starting when she

14   would retire, going until the end of a normal life expectancy,

15   discounted back to present value.  The amount of money you need

16   today in order to replace that stream of income.

17       The stream of income, itself, in today's dollars -- not

18   inflated, but in today's dollars -- would be $57,468 per year;

19   but of course by that time, it would be worth -- the nominal

20   dollars or the dollars in the future would be more.  But since

21   we're talking -- I'm just putting things in today's terms, and

22   calculating present value from today, it's appropriate to at

23   least get a sense of what that is.

24       But we also have to consider other elements in the

25   evaluation.  So while Ms. Preston would have earned these

1   earnings and -- and benefits had she stayed with the City of

2   Oakland, now she's transitioned over to City and County of

3   San Francisco.  And there, she would have mitigation earnings.

4   And that, again, I'll put in brackets.  It's $595,547.

5        And how I derive that number is essentially taking what

6   she's earning today, which is about $138,000 a year; studying

7   her ramp-up with the City of Oakland in the past.  See how well

8   she did over the first five years.  And assuming essentially

9   that she'll -- she'll show value to her employer, like she

10  showed value to her employer at Oakland, so that by the fifth

11  year of employment, which is where -- how long it took her to

12  get to where she was in Oakland, she would get to where she

13  will be with the City and County of San Francisco.

14       When I tallied that up, present value, subtract out the

15  employer -- the employee contributions to the retirement plan,

16  it totals $595,547.

17       But then we have to also subtract out the pension benefits

18  that she would be eligible for with the -- with the discharge.

19  So the fourth element is the mitigation PERS up there.  We'll

20  call it "mitigation PERS" here.  That is $500,525.

21       So if you recall earlier I said, well, it's about a

22  $28,000 a year benefit if she had elected at that point in time

23  to receive her PERS benefit from her work with Oakland.  So we

24  subtract that continuing benefit off, because we've calculated

25  the loss benefit based on the assumption that she would have

1   stayed with the City of Oakland until her retirement.  This

2   $500,000 offset is what she had already essentially earned up

3   until she was discharged.

4        The fifth element is the mitigation pension.  And I'm

5   going to call it "SFERS."  So that's the San Francisco

6   Employees Retirement System.

7        So given that she's now an employee at the City of

8   San Francisco, she's also earning a benefit there.  And the

9   value of that, which again is mitigation -- and in brackets,

10  therefore -- is $260,133.  And again, that's based on their

11  standard formula.  It's about 2.3 percent of her annual

12  earnings, multiplied by the years of service, multiplied by a

13  final compensation rate.

14       So when we take into account all of the past -- I'm

15  sorry -- the future figures and add them up, we have a total

16  future loss.  And that is 105,553.

17       So to get the complete loss, we would -- we would add the

18  past loss of 48- to the future loss of 105-, and we would get a

19  total past-plus-future loss of 154,459.

20  **BY MR. LAFAYETTE**

21  **Q.**  So is it your professional opinion that, assuming that she

22  was -- her termination was unlawful, that $154,459 would be her

23  loss?

24  **A.**  Yes.

25       **MR. LAFAYETTE:**  No further questions, Your Honor.

1      **THE COURT:**  Thank you.  Cross-examination?

2      **MR. SIEGEL:**  Yes.  Thank you.

3                          <u>**CROSS-EXAMINATION**</u>

4   BY MR. SIEGEL

5   **Q.**   So, Dr. Cohen, I guess I just want to take a few minutes

6   to go over some of these you same figures with you.  Okay?

7   **A.**   Okay.

8   **Q.**   All right.  So looking at the past-loss chart, 303,303 is

9   what I believe you calculated; was what she would have actually

10  earned if she'd remained with the City of Oakland from

11  October 1, 2013, through April of this year?

12  **A.**   Yes.

13  **Q.**   Okay.

14  **A.**   No.  I'm sorry.  Not through April of this year.

15      Through September 14, 2015, which is the trial date.

16  **Q.**   Okay.  So you did your report in April, but you were

17  projecting through September?

18  **A.**   Right, because at that point in time we knew when the

19  trial date was.

20  **Q.**   Okay.  So from January 2014 through September of this

21  year -- roughly two years and eight months?

22  **A.**   No.  It's less than two years.  It's from October 2013 to

23  September 2015, so that's less than two years.

24  **Q.**   That's assuming she remained in Oakland?

25  **A.**   Right.

1  Q.   Okay.  And you calculated that her mitigation earnings,

2  which were to be subtracted from that, is what she actually

3  earned in San Francisco during that period of time?

4  A.   Based on the information we had on a standard wage rate

5  over this period of time.

6  Q.   So -- and the difference between 303- and 199- is roughly

7  $103,000.  Correct?

8  A.   Yes.

9  Q.   But then you also subtracted what you called "mitigation

10  PERS" of $54,620.  Is that right?

11  A.   Right.

12  Q.   And what are the assumptions behind that number?

13  A.   Well, there's no real assumption.  This is what she was

14  entitled to if she -- if she took her normal retirement from

15  Oakland at that point in time.  She had worked there, and

16  accrued a certain amount of benefits at that point in time.  So

17  because I'm calculating the loss benefits based on all time she

18  would have worked in the future with Oakland, and that came out

19  to 820-, we have to subtract out the value of the benefits that

20  she actually earned up until she left Oakland.  So in the past

21  period, that would have been the 54,620.

22  Q.   So did she actually get retirement benefits based on her

23  employment in Oakland in the amount of 54,620, as of the date

24  of this trial?

25  A.   No.  She received more than that, because she made a

1   different kind of election, but I had to make an assumption --

2          **MR. SIEGEL:**  But just --

3          **MR. LAFAYETTE:**  Objection.  He's cutting off --

4          **MR. SIEGEL:**  I'd move to strike, and ask that the

5   witness answer my questions and not use them as springboards

6   for --

7          **THE COURT:**  Overruled.

8       He answered your question.  You can ask it again in a

9   different way if you like --

10          **MR. SIEGEL:**  Okay.

11          **THE COURT:**  -- or ask him to clarify.

12  **BY MR. SIEGEL**

13  **Q.**   Yes or no?  Did she receive annual pension benefits from

14  PERS based upon her Oakland employment?

15  **A.**   No.

16  **Q.**   Okay.  How long did she work in the City of Oakland?

17  **A.**   Approximately 6.2 years.

18  **Q.**   And isn't it true that in order to get a PERS pension, you

19  need to have 10 years in?

20  **A.**   No.

21  **Q.**   Isn't it true that if you retire with less than 10 years,

22  what you get is a choice between leaving the money in until age

23  65, or a lump sum?

24  **A.**   No, not at her age.

25  **Q.**   What was her age when she retired -- when she left the

**COHEN - CROSS / SIEGEL**

1   City of Oakland?

2   **A.**   Fifty-five.

3   **Q.**   And it's your testimony -- based on what? -- that with

4   less than 10 years, she could have retired at age 55, and

5   received those pension benefits?

6   **A.**   Based on the CalPERS calculator.  They have -- they have

7   an online calculator.  You plug in your age, your date of

8   birth, your years of service, the date of retirement, your

9   earning rate, and -- and it will tell you what your annual rate

10   is.  And I have it here.  Plus I also looked at the CalPERS

11   retirement system summary plan description.  And -- and both of

12   those, together, provided the backup to assert that that's what

13   she'd be entitled to.

14       And this is not the first time I've done this.  I've done

15   this hundreds of times over my career.

16   **Q.**   So are you suggesting that Ms. Preston made a bad decision

17   by taking $80,000 out of her retirement plan, instead of

18   getting the choice of 20-something-thousand per year for the

19   rest of her life?

20   **A.**   I am.  And she made the same bad choice earlier when she

21   left the City of Berkeley, and cashed out of that plan earlier,

22   as well.

23   **Q.**   Okay.  But you do agree that she hasn't gotten that PERS

24   pension benefit, as you've described it?

25   **A.**   Well, she's gotten more than the 54,000 that I calculated.

1  **Q.**   Right, but you have calculated 54 plus 500 present value

2  of future PERS benefits for a total of roughly $555,000.

3  **A.**   Well, that's right; but if I were going to actually just

4  do it based on the cash-out, then I would not calculate

5  $820,000 of loss.  If she cashed out, let's say, when she

6  retired from the City of Oakland, she wouldn't get 820,000,

7  either.

8       So I'm doing an apples-with-apples approach.

9       This is different than the approach that Dr. Ogus took,

10  which I consider apples and oranges.

11       **THE COURT:**  Let's stop there, because if you didn't

12  disclose that before you trial, you don't get to say it now.

13       **THE WITNESS:**  Okay.

14       **THE COURT:**  Next question.

15  **BY MR. SIEGEL**

16  **Q.**   All right.  So in your future loss, you have earnings

17  without termination of $641,672.  And how did you calculate

18  that?

19  **A.**   I calculated that based on the rate of pay at today's

20  date, which would have been the $169,703 per year, for

21  approximately 4.31 years in the future; reduced the amount by

22  the contribution she would have to make to the pension plan,

23  had she stayed, because they make the pension calculations

24  separately; and then discounted it to present cash value, with

25  a 2.25 percent net discount rate.

1  Q.   Did you make any assumptions as to how much her earnings

2  would have increased on a year-by-year basis, had she remained

3  in Oakland?

4  A.   Yes.

5  Q.   And what was your assumption?

6  A.   In speaking with representative at the City of Oakland,

7  and given Ms. Preston's last wage increase there, they -- they

8  indicated that cost-of-living increases would be what she could

9  expect moving forward.  So I assumed cost-of-living increases.

10  Q.   In what amount?

11  A.   Well, the amount would be as a difference between interest

12  returns and wage increases.  It's common for economists to look

13  at that relationship between the two.  That's what I did in

14  this case.  And that difference is 2.25 percent.  So the wage

15  increases are embedded in the net discount rate.

16  Q.   So my question is:  What did you assume regarding her wage

17  increases would have been on a year-by-year basis, had she

18  remained in the City of Oakland?

19  A.   Okay.  I don't think you're understanding what I did.

20  It's the same -- well, I can't say this.

21      But economists don't like, if they don't have to, to

22  forecast a particular wage increase.  I didn't do it -- other

23  economists don't do it -- because you don't have to do it.  You

24  just have to look at the relationship between interest returns

25  and wage increases generally over time.  And both interest

1    returns and wage increases change over time based on general

2    price inflation.  So the difference I used is 2.25 percent.

3         So perhaps her cost-of-living increases will go up by

4    2 percent a year.  And the interest rates will be, let's say, 3

5    and a quarter or 4 and a quarter.  But maybe her wage increases

6    will be 1 percent a year, like they were in 2013.  And then the

7    interest rates will be, like, 3 and a quarter percent.

8         So interest rates, as well as wage increases, as well as

9    the price inflation changes every year.  So what we do is not

10   to try and pinpoint a particular rat, because it's not

11   necessarily the most accurate.  It's more accurate to look at

12   the relationship between the interest returns and the wage

13   increases.

14   Q.   Okay.  Surprisingly, Doctor, I do know what you're talking

15   about.  And it strikes me from what you've testified is that in

16   order to compare wage increases and interest rates, you have to

17   have numbers for both of those terms.

18        In other words, if a wage increases are zero, and interest

19   rates are 5 percent, the answer's 5 percent.  If wage increases

20   are 5 percent and interest rates are 5 percent, then the term

21   is zero.

22   A.   Correct.

23   Q.   So in order to come up with your calculation, you need to

24   make an assumption about wage increases as well as interest

25   rates.  So what I want to know is:  What assumption did you

1    make about wage increases when you calculated earnings without

2    termination?

3    **A.**   Well, again, I don't think we're communicating.  I didn't

4    use any one number.  When I go back and study the relationship

5    between earning increases and interest returns, I go back many

6    years.  I went back to 1983.  1983 was a year in which our

7    financial markets were deregulated.  So I've studied the

8    relationship between interest returns and wage increases over

9    that period of time.

10        So let's say in 1983, the interest return was 10 percent

11   and wage increase was 8 percent.  So that would be a 2 percent

12   difference.

13        And the next year was 1984.  And the different -- maybe

14   interest rates were 5 percent, but wage increases were

15   4 percent.  That would be a 1 percent difference.

16        And then the next year it would be a different number.

17        And then I averaged those figures up together.  So there

18   isn't one number that I used.

19   **Q.**   Did you make a prediction about the relationship between

20   wage increases and interest rates for the period beginning

21   October 1, 2013, going forward to the expected conclusion of

22   Ms. Preston's work life?

23   **A.**   Yes.

24   **Q.**   And --

25   **A.**   That was the 2.25 percent.

**COHEN - CROSS / SIEGEL**

1  **Q.**   And what are the two numbers that are combined to generate

2  the 2.25 percent?

3  **A.**   There aren't two numbers.  This is what I'm saying.

4      It's an average of 30 -- approximately 32 numbers:  The

5  difference between each of the interest returns and wage

6  increases for each year going back to 1983.

7  **Q.**   And your calculation was based on your work that, over the

8  period of Ms. Preston's expected future work life, interest

9  rates would exceed pay increases by 2.25 percent?

10  **A.**   Right.

11  **Q.**   Notwithstanding the fact that during the last period of

12  time, Ms. Preston's wage increases averaged something between 4

13  and 5 percent, and interest rates are about 1 percent?  Is that

14  right?

15  **A.**   That's not right.

16  **Q.**   Isn't it true that the -- that the interest rate today is

17  about 1 percent?

18  **A.**   Well, it depends on the vehicle you're looking at.

19  **Q.**   Okay.  All right, but we can move off of that.

20      The other thing you assumed in looking at her future

21  losses is that Ms. Preston would stop working at age 61.

22  Correct?

23  **A.**   Correct.  That's based on the average for the PERS

24  employees.

25      If I had assumed that she worked longer, actually, my

1   loss -- the losses would be less.

2   **Q.**   The losses would be less, even though her earnings would

3   be greater?

4   **A.**   Yes.

5   **Q.**   Okay.  How does that -- how does that calculate?

6   **A.**   Well, it calculates because her PERS -- her PERS

7   retirement benefit at Oakland -- it caps out at 2.7 percent at

8   55.  So it's not going to increase in value the way her

9   San Francisco benefit is going to increase, because she's going

10   to have a greater percentage of her earnings, in addition to

11   the number of years of service, contribute to a higher wage

12   increase over time.

13        Part of the reason that people retire, let's say, before

14   age 65 with CalPERS is because they essentially have an

15   incentive to do so, because they max out the actuarial value of

16   their PERS plan around 55, depending on -- well, if they

17   started young, 55.  If they started a little older, maybe 60.

18        But again, because I looked at the actuarial tables for a

19   person with her years of service, and her age, the average was

20   about 61 and a half.

21   **Q.**   Okay.  So to sum up, without asking her what her plans

22   were, in terms of how long she planned to work, your

23   calculations are based on the assumptions she would retire or

24   stop working at age 61?

25   **A.**   Right.  I have nothing else to work with.  There was no

1    indication of how long she wanted to work, so I used the

2    average.  And as I say, if I use 65, my figures would be lower.

3    Q.   All right.  Well, let's talk about that.  Her -- the next

4    item is the pension without termination.  Now, that assumes

5    that she would have continued to work until age 61, and then

6    would have retired, and then would collect that CalPERS

7    pension.  Correct?

8    A.   Right.

9    Q.   And for how many years did you assume that she would

10   collect the CalPERS pension?

11   A.   Twenty -- oops -- 22.59 years.

12   Q.   Until age what?

13   A.   She'd be about 84 years old.  84.02.

14   Q.   Okay.  So you assumed a life expectancy to 84?

15   A.   Right.

16   Q.   Okay.  And then you calculated mitigation earnings.  Is

17   that right?

18   A.   Yes.

19   Q.   And how did you do that?

20   A.   Well, again, I took her current rate of pay, and assumed

21   annual increases based on her first five years with the City of

22   Oakland.  And by that point in time, she would catch up to what

23   she would have been expected to earn, had she stayed with the

24   City of Oakland.  The pay scales at the City of San Francisco

25   are higher than those at the City of Oakland.

1   **Q.**   Okay.  So in order to calculate her future earnings with

2   the City of San Francisco, you didn't go into that same process

3   of using wage rates and interest rates and the 2.25 discount

4   rate?

5   **A.**   Oh, no.  I did that -- yes, I did that, as well.  That's

6   included during -- over this period of time.  So it's all

7   discounted to present value after I subtract out the

8   contributions she would have to make to City and County of San

9   Francisco's pension plan.

10  **Q.**   Okay.  So if -- you did -- this calculation is in what you

11  call Table 9 of your earnings -- of your report.  Correct?

12  **A.**   Correct.

13  **Q.**   And in Table 9 you indicated that during the current year

14  she would earn $138,000.  Correct?

15  **A.**   Right.

16  **Q.**   And you assumed that in the next year she would earn

17  $146,000?

18  **A.**   Approximately.

19  **Q.**   Well, 145,926.  Correct?

20  **A.**   Yes.

21  **Q.**   That's $8,000 pay increase?

22  **A.**   Right.

23  **Q.**   And what led you to believe that she would get an $8,000

24  pay increase between the current year and next year?

25  **A.**   Well, when you look at the idea that she's been considered

1    wrongfully discharged, she should be able to earn in the

2    marketplace what she's worth.

3        So if I go back in time to when she started at the City of

4    Oakland at a lower position than where she ended up, and I go

5    back and I start at the City of San Francisco, where she

6    started at a lower position than where she'll end up, because

7    that position today is a lower position, even though it's -- it

8    may be paid -- well, it's a lower position than what she held

9    at the City of Oakland.  The pay scales for that position allow

10   her to increase further than the pay scales at the City of

11   Oakland.

12       But putting that aside, if you just start her out at the

13   lower position in each place, and I move her up in the same way

14   that she actually moved up at the City of Oakland with the City

15   of San Francisco, she'll catch up in five years.

16   **Q.**   Okay.

17   **A.**   And so her actual history is the basis from which I am

18   calculating her wage increases in the future.

19       And thus far, we know she started in the first year, and

20   she actually had a much more than an $8,000 increase in her

21   first year.  She had on the order of -- I think it was close to

22   a $30,000 -- well, no -- a $20,000 increase.  So, so far, she's

23   on track.

24   **Q.**   Okay.  We'll get to that salary increase, but I just want

25   to establish that in your calculation of mitigation earnings

1    that is Roman numeral II, line 3, you assumed that in each of

2    the next four years, Ms. Preston would receive a pay raise of

3    approximately $8,000?

4    **A.**    Correct.

5    **Q.**    Now, did you consider that the one pay raise that she

6    received in San Francisco was as a result of being promoted?

7    **A.**    Yes.

8    **Q.**    Okay.  And did you investigate whether there were similar

9    promotional opportunities available to her in San Francisco, so

10   that she could be promoted once, twice, three, four, five

11   times?

12   **A.**    I didn't need to, because within this pay range that she's

13   in right now, she can earn well in excess of what I have her

14   earning at the time of her retirement.  So she doesn't even

15   need to have a promotion in order to catch up with what she

16   would have earned, had she remained with the City of Oakland.

17   **Q.**    Isn't it true that the City and County of San Francisco

18   has posted a wage increase for employees Ms. Preston's --

19   excuse me -- job classification of 3 percent for next year?

20   **A.**    That's a cost-of-living increase.  This is not a merit

21   increase.  So there's the difference.

22        She's in a band that allows for increases to move up to

23   get to the higher level of the band.  When she left the City of

24   Oakland, she was already at the higher level of the band in her

25   position.

1    At the City of San Francisco, she's not at the higher

2 level of the band yet within her position.  And so she's

3 entitled, if she can, if you assume that she's, you know,

4 operating at the standard that she should be, to earn the wage

5 increases that her skill set would allow for.

6 **Q.**   So in any case, that -- that's your assumption.  She's

7 going to be a great employee in San Francisco, and she will get

8 about an $8,000 pay increase each of the next four years?

9 **A.**   No, not a great employee; an employee that has the skill

10 set that she had demonstrated at the City of Oakland.  So I'm

11 assuming in this case that if she's not a good employee --

12    Maybe that's why --

13    I don't know why she was let go, but if she's not a good

14 employee, then maybe there's zero damage, but if --

15    I'm just assuming that she has the skill set she says she

16 does; and that that market rate certainly will be reflected in

17 San Francisco, in comparison to Oakland.

18 **Q.**   Okay.  Do you know whether -- on how many occasions

19 Ms. Preston received a pay increase of as much as $8,000 during

20 the time she worked for the City of Oakland?

21 **A.**   In her first year of employment it was approximately that.

22    In the second year of employment it was approximately

23 that.

24    In her third year of employment it was approximately that.

25    And in her fourth year of employment it was a little less.

1          And then in the fifth year it was much less.

2   **Q.**   She received a promotion in 2012.  Is that right?

3   **A.**   Well, her pay didn't go up very much from 2012 -- from

4   2011 to 2012.  It went up about -- well, let me see here.  It

5   went up about $7,000.  So she may have received a promotion,

6   but it went up $7,000.  So --

7   **Q.**   Okay.

8   **A.**   I mean, that's close to 8-.

9   **Q.**   Now, the third -- or excuse me.  The fourth line in your

10  future loss, again, is assuming the PERS pension that she would

11  continue to receive about 27-, $28,000 a year while she works

12  in San Francisco, and continuing through her life expectancy.

13  **A.**   Right.

14  **Q.**   Correct?

15          And your fifth line -- it assumes that she gets the

16  San Francisco Employee Retirement System pension.

17  **A.**   Correct.

18  **Q.**   Is that correct?

19          And how many years do you have to work in San Francisco to

20  get that pension?

21  **A.**   Well, you don't have to work, I don't think, more than

22  five years if you're age 60; but she'll have more service than

23  that.

24  **Q.**   She'll have an additional four years, in addition to the

25  two or so she's had up to now?

1    **A.**   Right.

2    **Q.**   But you're --

3    **A.**   You only need five.

4    **Q.**   Your testimony is you can vest with a pension like that at

5    five years?

6    **A.**   Well, no.  You'd have to work to -- excuse me.

7        You have to be her age; have her years of service, which

8    would be about 6.2 or so, I think, at that time; and have

9    her -- her wage rate.  And then you would get that pay.

10            **MR. SIEGEL:**  I have no further questions.

11            **THE COURT:**  Any redirect examination?

12            **MR. LAFAYETTE:**  No, Your Honor.

13            **THE COURT:**  Ladies and gentlemen, we're going to take

14    a short break now.  If you wish to pose any questions, you may.

15        As with Dr. Ogus, I won't permit this witness to give any

16    new opinions, but he may elaborate on the opinions which he's

17    given here in court.  So if you can confine your questions to

18    what he's given here in court, I'll permit the questions.  And

19    we'll come back in five minutes.

20        If you can hang on for that, thank you very much.  We're

21    in recess.

22            **THE CLERK:**  All rise.

23    (Proceedings were heard outside the presence of the jury:)

24            **THE COURT:**  I've got a legal question for you to think

25    about while you step out.  I've dismissed the only federal

1    claim in the case.  And the question is a jurisdictional one,

2    under 28 U.S.C. Section 1367(c), which gives me discretion to

3    have supplemental jurisdiction over the rest of the case.  My

4    intention will be to keep supplemental jurisdiction over the

5    rest of the case, but if the parties have views on that, you

6    don't need to express them now.  We'll have a future

7    opportunity to make your views known.

8          So we're in recess for five minutes.

9          **MR. LAFAYETTE:**  Thank you, Your Honor.

10   (Recess taken from 3:24 p.m. until 3:30 p.m.)

11         **THE COURT:**  Back on the record.  Mr. Cohen, if you can

12   come to the stand, we've got one follow-up question from the

13   jurors, which is a factual question.  We'll bring our jurors

14   in.

15   (Proceedings were heard in the presence of the jury:)

16         **THE COURT:**  Our jurors are back.  Everyone may be

17   seated.

18         Mr. Cohen, this is a question from our jurors.  You remain

19   under oath.  The question is as to Figure 2, Number 4 in your

20   calculation.  And the question is:  Does this amount assume

21   that Ms. Preston would be receiving an annual pension from

22   CalPERS while working at San Francisco?

23         Just to state it again:  Does this amount assume

24   Ms. Preston would be receiving an annual pension from CalPERS

25   while working at San Francisco?

1      **THE WITNESS:**  It assumes she could have, if she'd

2  wanted.  Yes.

3      **THE COURT:**  Any follow-up from the Defense?

4      **MR. LAFAYETTE:**  No, Your Honor.

5      **THE COURT:**  And from plaintiff's counsel?

6      **MR. SIEGEL:**  Just one question.

7                  <u>**FURTHER CROSS-EXAMINATION**</u>

8      **BY MR. SIEGEL**

9  **Q.**  Do you have an understanding why it was that Ms. Preston

10  withdrew her contributions to CalPERS?

11  **A.**  She did that in her -- with her prior CalPERS employment.

12  She withdrew it.  And so it just seems like a practice that she

13  has.

14  **Q.**  And did you learn from any source -- for example, in your

15  conversations with Mr. Lafayette or people in the Oakland City

16  Attorney's Office -- as to the reasons that she engaged in that

17  practice of cashing in her CalPERS pension?

18  **A.**  Well, I didn't have a conversation, but I -- but I saw she

19  wanted the money, and she indicated that in her deposition.

20  **Q.**  And did she indicate why she wanted the money?

21  **A.**  Well, she wanted to make up the difference in her annual

22  pay at that moment; but that, in my mind, is -- it's not an

23  economically rational decision, because in two years, you know

24  that difference would have been made up, and more.

25  **Q.**  Do you recall reading in her deposition that the reason

1   she did was that she could pay her bills?

2          MR. LAFAYETTE:  Your Honor, I'd just object to this on

3   the basis of hearsay testimony.  He's an expert, but --

4          THE COURT:  Overruled.  If he read and relied upon it,

5   he can answer.

6          THE WITNESS:  Well, I read it.  I don't know if I

7   could rely upon it, because the difference wasn't that --

8   that --

9          To me, you know, if you're making over $100,000 a year,

10   and the difference between taking an annual pension that will

11   pay you for your life and getting the cash out is, let's say,

12   $40,000 for one year, I think that's not an appropriate

13   decision.  There are other ways to come up with that money,

14   whether you're -- even -- it would even make more sense to go

15   on a credit card or take out a loan, or anything other than --

16   than making that decision at that point.

17   BY MR. SIEGEL

18   Q.  Doctor, regardless of whether you think that Ms. Preston

19   made a good decision, it's, in fact, true that when you read

20   her deposition you learned that the reason she made that

21   decision was so that she could pay her bills?

22   A.  Well, that's what she had indicated.  She wanted to get

23   the money now.

24   Q.  To pay her bills?

25   A.  Well, I don't know exactly how she framed it at that

1    point.

2            **MR. SIEGEL:**  Nothing further.

3            **THE COURT:**  You may step down.  Thank you very much.

4            **THE WITNESS:**  Thank you.

5    (Witness excused.)

6            **THE COURT:**  The Defense, call your next witness,

7    please.

8            **MR. LAFAYETTE:**  Thank you, Your Honor.  Defense calls

9    Sonia Lara.

10           **THE COURT:**  Mr. Lafayette, if you're preserving the

11   chart for later, you should cover it up.

12           **MR. LAFAYETTE:**  I was wondering if we should mark it,

13   Your Honor.

14           **THE COURT:**  You can mark it --

15           **MR. LAFAYETTE:**  Yes.  I'll cover it up.

16           **THE COURT:**  -- but preserve it.

17           **MR. LAFAYETTE:**  I'll take care of that after today.

18           **THE COURT:**  Ms. Lara, come on forward, please.

19           **THE CLERK:**  Remain standing, and please raise your

20   right hand.

21                        <u>**SONIA LARA**</u>,

22   called as a witness for the Defendant, having been duly sworn,

23   testified as follows:

24           **THE WITNESS:**  Yes.

25           **THE CLERK:**  Thank you.  Please be seated.

1    **THE WITNESS:**  Okay.

2    **THE CLERK:**  Please state your full name and spell your

3    last name.

4    **THE WITNESS:**  Okay.  Full name, Sonia Lara.  L-a-r-a.

5    <u>**DIRECT EXAMINATION**</u>

6    **BY MR. LAFAYETTE**

7    **Q.**  Now, Ms. Lara, where were you born?

8    **A.**  Oakland, California.

9    **Q.**  Have you always lived in Oakland?

10   **A.**  All my life.

11   **Q.**  All right.  So now did you go to school in Oakland?

12   **A.**  Yes, I did.

13   **Q.**  And prior to working for the City of Oakland, did you work

14   any place else?

15   **A.**  Yes, I did.

16   **Q.**  Where?

17   **A.**  I worked -- prior to City of Oakland, I worked at McKesson

18   Corporation here in San Francisco.  Prior to that I worked in a

19   place called Solaris, which was a subdivision of Monsanto,

20   which is headquartered in Chicago.  Before that, I worked for

21   the Clorox company in Oakland.

22   **Q.**  For which?  Clorox company?

23   **A.**  Mm-hm.

24   **Q.**  Are you nervous?

25   **A.**  A little.  My first time.  So --

**LARA - DIRECT / LAFAYETTE**

1   **Q.**   So remember what year it was that you came to the City of

2   Oakland?

3   **A.**   2002.  August of 2002.

4   **Q.**   You came to Oakland in 2006.  What position did you take?

5   **A.**   Say that again.

6   **Q.**   What position -- I'm sorry?

7            **THE COURT:**  She said "2002."

8            **THE WITNESS:**  I said "2002."  And you said "2006."

9   **BY MR. LAFAYETTE**

10   **Q.**   When you came to the City of Oakland in 2002, what

11   position did you have?

12   (Reporter requests clarification.)

13            **THE WITNESS:**  I came in as an exempt limited duration

14   for the Employee Relations Department.

15            **BY MR. LAFAYETTE**

16   **Q.**   And who did you report to at that time?

17   **A.**   I reported to Michael Rich.

18   **Q.**   Now, at some point in time did you meet LaWanna Preston?

19   **A.**   I did.

20   **Q.**   And what year was that?

21   **A.**   That was approximately September or August of 2007, when

22   she was hired for the City of Oakland.

23   **Q.**   Now, did you work with her at that point?

24   **A.**   I didn't report to her, but she -- but Employee Relations

25   was in HR, and I was in HR, so we worked together.

1   **Q.**   So would it be accurate the two of you worked together

2   from approximately 2007 until she left?

3   **A.**   Yes.

4   **Q.**   Did you become friends?

5   **A.**   Yes.

6   **Q.**   Now, March 2012 --

7   **A.**   Uh-huh.

8   **Q.**   -- did Ms. Preston leave to go to another department?

9   **A.**   What happened was Employee Relations Department separated

10  from Human Resources Department, and became a stand-alone

11  department reporting to the City Administrator.  She was still

12  in the same floor that HR was in.  But that's what happened.

13  **Q.**   And did you continue to see her almost on a daily basis?

14  **A.**   Yes.

15  **Q.**   Now, did you have any responsibilities in conducting

16  investigations?

17  **A.**   During a what period of time?

18  **Q.**   At any point in time you were with the City.

19  **A.**   Yes.

20  **Q.**   And which period of time was that?

21  **A.**   That was when I transferred over to the Employee Relations

22  Department.

23  **Q.**   And when was it that you transferred over to the Employee

24  Relations Department?

25  **A.**   That was last two weeks in December of 2012.  So I would

1    say maybe effective after December 14.

2    **Q.**   Do you know if Ms. Preston did investigations while you

3    were there?

4    **A.**   No, I don't know.

5    **Q.**   Now, is there something that you tell each and every boss

6    that you've ever had?

7    **A.**   Yes.

8    **Q.**   What is it that you tell each and every boss?

9    **A.**   Okay.  When I get new bosses, the very first thing they

10   ask me is, *What can I do for you?*

11        So what I say to them is -- I ask three things.  Never ask

12   me to lie for you; never ask me to destroy documents that

13   should not be destroyed; and respect me.

14   **Q.**   That's it?

15   **A.**   That's it.

16   **Q.**   And when you went to work for Ms. Preston, did you tell

17   her that?

18   **A.**   Yes.

19   **Q.**   At some point in time, were you asked to prepare a written

20   statement in connection with something involving Deb Grant?

21   **A.**   Yes.

22   **Q.**   Who asked you to do that?

23   **A.**   LaWanna Preston.

24   **Q.**   LaWanna Preston?

25   **A.**   Mm-hm.

**LARA - DIRECT / LAFAYETTE**

1  Q.    Did someone ask you to prepare a statement before

2  Ms. Preston did?

3  A.    Yes.  Andrea Gourdine.

4  Q.    Andrea Gourdine?

5  A.    Yes.

6  Q.    And did this have something to do with computers?

7  A.    Yes, it did.

8  Q.    And the statement that you prepared?

9  A.    Mm-hm.

10  Q.    Do you remember if it referenced Ms. Preston by name?

11  A.    The initial one that I prepared for Ms. Gourdine, no, it

12  did not.

13  Q.    Okay.  So now this document that you prepared -- did it

14  come to your attention at any point in time that Ms. Preston

15  had found it?

16  A.    Yes.

17  Q.    How did that come to your attention?

18  A.    I was in her office, and she gave me the sheet.  And she

19  said, *Did you write this?*

20      I said, *Yes.*

21      And she said, *The position that you're in, you cannot do*

22  *this.*  And she grabbed it and ripped it.

23  Q.    Ripped it?

24  A.    Yes.

25  Q.    And then what did she do with it?

1    **A.**    Threw it away.

2    **Q.**    Threw it away?

3    **A.**    Mm-hm.

4    **Q.**    Did she explain to you why it was that you couldn't

5    prepare a witness statement to something that you had seen?

6    **A.**    Because in the position that I was now in, in Employee

7    Relations, that was not my job to do.

8    **Q.**    From where you sit --

9    **A.**    Excuse me?

10   **Q.**    From where you were at that point in time --

11   **A.**    Mm-hm.

12   **Q.**    -- was that a logical response?

13   **A.**    No.  If I'm a witness to any event, I would just prepare

14   the witness statement.  I wouldn't initiate the investigation.

15   I wouldn't be part of it.  The part I would be is as a witness.

16   **Q.**    Did you explain to Ms. Preston that Andrea Gourdine, the

17   head of Human Resources, had asked you to prepare this

18   statement?

19   **A.**    Yes.

20   **Q.**    Did she tell you that if Ms. Gourdine had a problem, then

21   you were to tell Ms. Gourdine to call her?

22   **A.**    Yes.

23   **Q.**    Did you leave Ms. Preston's office, and report to

24   Ms. Gourdine?

25   **A.**    I did.

**LARA - DIRECT / LAFAYETTE**

1   **Q.**   Did you explain to her what had happened?

2   **A.**   Yes, I did.

3   **Q.**   Did you apologize?

4   **A.**   I did.

5   **Q.**   At some point, were you directed to write another

6   statement?

7   **A.**   Yes.  A couple of days later I got a call from

8   Ms. Gourdine.

9   **Q.**   And did she tell you who it now was who was directing you

10  to prepare this new statement?

11  **A.**   Yes.

12  **Q.**   Who was that?

13  **A.**   Scott Johnson.

14  **Q.**   Now, did you prepare such a statement?

15  **A.**   I did.

16  **Q.**   And after you prepared that statement, did you get

17  interviewed by anyone?

18  **A.**   After I did that statement, I get a call from Internal

19  Affairs.

20  **Q.**   And did you go talk to them?

21  **A.**   I did.

22  **Q.**   And after you spoke with them, did anyone contact you

23  about what you'd said?

24  **A.**   Yes.

25  **Q.**   Who was -- tell me what happened.

1  **A.**   We were bargaining during that time.  And I get called

2  into LaWanna Preston's office.  And when I walk in there,

3  Deb Grant's there.  I wasn't surprised.  We were in bargaining,

4  and we would ask Deb Grant for information on benefits.

5       However, the door was closed.  And then they were ask --

6  both asking me, *So what happened?  Did you get called into this*

7  *interview?*

8       And I'm like, *What?*

9       So, yes, I was questioned about it.  And I said, *You guys*

10  *can't question me on this.  Please don't.*

11       And they're, like, *Well, we're girlfriends.*

12  **Q.**   Who said that?

13  **A.**   Deborah.

14  **Q.**   She said, *We're girlfriends?*

15  **A.**   Mm-hm.

16  **Q.**   And they were asking you to tell them what had happened in

17  your Internal Affairs interview?

18  **A.**   Correct.

19  **Q.**   How did you feel?

20  **A.**   I felt bad.

21  **Q.**   What did you say to them?

22  **A.**   I said, *You can't ask me that.  It's an investigation.*

23  **Q.**   After that happened, did you get called in for a second

24  interview with Internal Affairs?

25  **A.**   I did.

**LARA - DIRECT / LAFAYETTE**

1   **Q.**   What happened?

2   **A.**   What happened in the --

3   **Q.**   Second interview.

4   **A.**   -- second interview?

5        So I get into the interview.  I'm thinking it's the same

6   event.  However, the officer on the other end hands me an

7   anonymous note.  And he says, *Who do you think wrote this?*

8        And I'm reading it.  It's all about what happened; of me

9   being in LaWanna Preston's office with Deb Grant, and them

10  questioning me.

11       And I'm like:  Who knew this?

12       So as I'm reading the way that a person would write, I --

13  my first initial reaction was:  Oh, that was Andrea Gourdine.

14  It had to be her.  How did she know?  I never talked to her

15  about that.  I don't know.

16  **Q.**   So they asked you about the meeting that had taken place

17  in Ms. Preston's office with Deb Grant, where they were asking

18  you about what you'd said?

19  **A.**   Correct.

20  **Q.**   Were you, Deb Grant, and Ms. Preston girlfriends -- the

21  three of you?

22  **A.**   To me, the definition of a girlfriend is very different.

23  We were co-workers.  We never did anything out of the

24  workplace.

25       There was one time that LaWanna did take me out for

1  drinks.  It was my birthday.  But we went with outside counsel,

2  as well.

3  **Q.**   Now, after that interview did Ms. Preston contact you

4  again concerning this issue?

5  **A.**   Yes, she did.

6  **Q.**   Tell me what happened.

7  **A.**   So she had just came back from maybe like a mini vacation

8  that she had.  And she asked me to come in her office.  I

9  walked in her office.  We closed the door.  She was putting on

10  her tennis shoes.  And she says, *I need to ask you something.*

11  *Can we pinky swear?*

12      So I did.

13      I -- I said, *Oh, my God*.  In my head I'm like, *What's she*

14  *going to ask me?*

15      And then she says, *Were you interviewed again?*

16      All I did was I sat down.  I didn't say anything.  And I

17  started crying.  I started crying because I just could not

18  believe she was going do this to me again, of asking me what

19  happened in an investigation.

20  **Q.**   What did you say to her?

21  **A.**   I said, *Why are you doing this to me?  Why are you asking*

22  *me again?*

23  **Q.**   Did she say something regarding pinky swears?

24  **A.**   Yeah, I did say that.  I said that before she even asked

25  me, she said, *Can we pinky swear?*  And we pinky swear.

**LARA - DIRECT / LAFAYETTE**

1   **Q.**   Pinky finger swear?

2   **A.**   Pinky finger swear.  And then she asked me a question.

3   **Q.**   After that meeting -- during that meeting, did Ms. Preston

4   say anything to you about a lawyer?

5   **A.**   She did.

6   **Q.**   What did Ms. Preston say to you during that meeting about

7   a lawyer?

8   **A.**   She wanted me to provide her information because she was

9   going to give Dan Siegel, her attorney, documentation.

10   **Q.**   Was this in the spring or the summer of 2013?

11   **A.**   Oh, no.  This was in the summer.  No.  This had to be --

12   yeah.  Couldn't be the spring -- not at all -- because she went

13   on vacation.  She just came back from a vacation.  Had to be,

14   like, in August, because that's when her birthday is; and that

15   was her birthday that she went on vacation for.

16   **Q.**   Did she indicate to you that she thought because of this

17   Deb Grant thing, and her asking you these questions of the

18   Internal Affairs, that her job was in trouble?

19           **MR. SIEGEL:**  Objection.  Calls for speculation.

20   Leading.

21           **THE COURT:**  Sustained.

22   **BY MR. LAFAYETTE**

23   **Q.**   Did she say anything to you about her job being in

24   trouble?

25   **A.**   Yes.  That's why she wanted me to produce more information

1  for her.

2  **Q.**   Now I'll talk to you about something called the TPT union

3  dues.  All right?

4  **A.**   Okay.

5  **Q.**   You know what I'm talking about there?

6  **A.**   I know what you're talking about.  Mm-hm.

7  **Q.**   Okay.  Now, these are dues for Temporary Part Time people.

8  Right?

9  **A.**   Correct.

10 **Q.**   And these are people who work for short periods of time,

11 maybe in the summer or maybe for a holiday; but they're

12 short-period people.

13 **A.**   Correct.

14 **Q.**   Now prior to August 6 of 2013 --

15 **A.**   Okay.

16 **Q.**   -- did you have any responsibilities for the bargaining

17 table with regard to the TPT union?

18 **A.**   No, I didn't.

19 **Q.**   So on or about August 6, were you told that you would be

20 going to an informational meeting with the TPT union?

21 **A.**   Yes.

22 **Q.**   Who, up until that point in time, had been assigned

23 responsibility for that table?

24 **A.**   Winnie Anderson.

25 **Q.**   Now, during that meeting was there a discussion about the

1    list of names on the payroll list?

2    **A.**   Yes.

3    **Q.**   Did Katano Kasaine say something about the list includes

4    names of people who were not active?

5    **A.**   Correct.   Yeah, she did.

6    **Q.**   Did she say something to the effect of:   The list includes

7    double names and triple names, in some instances?

8    **A.**   Yes.

9          **MR. SIEGEL:**  Wait a minute.   Excuse me.   I want to

10   object.   That's a leading question.   I'd ask that the answer be

11   stricken.

12         **THE COURT:**  Sustained.   The jury will be reminded that

13   the attorneys asking questions are not witnesses, and that's

14   why they're not allowed to ask leading questions on direct

15   exam.

16   **BY MR. LAFAYETTE**

17   **Q.**   Did Katano Kasaine say anything about whether all of the

18   names on the list included people who were current employees?

19   **A.**   She did.

20   **Q.**   What did she say?

21   **A.**   She said that the list that we currently have in place has

22   all every single TPT that has been enrolled as a TPT, whether

23   they're in an active; whether they're not active.   What I mean

24   by active or nonactive:   Whether they're getting paid that pay

25   period, or if they're not -- they're in the books, but not

1   getting paid; that kind of stuff.

2   **Q.**   Did she --

3   **A.**   Sorry -- or they have two or three services.  For example,

4   a TPT could be in Parks and Rec, being a lifeguard; but then he

5   could also have another TPT, being a library aide.  So you

6   would have multiple names of people.

7   **Q.**   Did she say that -- anything about there being a problem

8   with documenting whether or not any current TPT was actually

9   eligible to be assessed dues?

10  **A.**   So she did.  She did say -- she mentioned that there was a

11  couple of people that she could not take dues of, due to the

12  fact of the number of hours that they worked.  So, for example,

13  there are people that work maybe a possible of five hours in a

14  week, in a pay period.  The City can't take every single penny

15  that they have.  They're not making enough money, making $15 an

16  hour; possibly 12.  And if they're only working 20 hours in a

17  pay period, they first have to take any garnishments.  There

18  are other rules of what to take first, before you're able to

19  take union dues.

20  **Q.**   So under the Memorandum of Understanding --

21  **A.**   Mm-hm.

22  **Q.**   -- did people have to make a certain amount of money in a

23  pay period, in order to be assessed?

24  **A.**   It's not in the MOU, no.  It's not in the Memorandum of

25  Understanding.  It's not in the contract.

1    **Q.**    So after all of this was said --

2    **A.**    Mm-hm.

3    **Q.**    -- was the question asked of Ms. Kasaine if every -- if

4    the City was taking dues for each person who was named on that

5    list?

6    **A.**    Yes.

7    **Q.**    And what did Ms. Kasaine say to that question?

8    **A.**    She said *No*.

9    **Q.**    And did you guys take a caucus after that?

10   **A.**    Yes, we did.

11   **Q.**    What's a caucus?

12   **A.**    A caucus is like a brief -- we get out of meeting and we

13   said, *Okay. We're going to brief, and we're going to have an*

14   *internal meeting to talk about what was just discussed*, either

15   to prep her, or to say, *Let's fix whatever you said,* or

16   whatever the case might be; but it's kind of like an internal

17   team caucus; an internal team meeting.

18   **Q.**    Is this something that happens when you're participating

19   in bargaining?

20   **A.**    Yes, it is.

21   **Q.**    Did you consider this to be a part of the bargaining

22   process with the union?

23   **A.**    I did.

24   **Q.**    Did you consider this to be the first step of a grievance?

25   **A.**    No.

1    Q.   So did Ms. Kasaine explain ultimately what she meant by
2    her comment?
3    A.   Yes.  She came back, and she then explained what she meant
4    by her comment.
5    Q.   And when she explained it, what did she say?
6    A.   So she said that -- same thing I had said a little bit
7    earlier, which is that it all depends on the number of hours an
8    employee makes.  And apparently, then you're able to take some
9    dues or not.  If they are making only five hours a week or
10   biweekly, there's nothing to take.  They also have to sign up,
11   so that's what she told them.
12   Q.   Did she say there was some -- you said something about
13   signing up.
14   A.   Yep.
15   Q.   What does that mean?
16   A.   It's a -- I don't know how to call it, but it's like a
17   little card where they enroll, where they say, "I want to be
18   part of the union.  Take union dues off."  And then the payroll
19   rep does that.
20   Q.   All right.  And did she indicate in any way whatsoever
21   whether or not she had cards for all of these people?
22   A.   She did not have cards for all of those people.
23   Q.   After -- and did -- was there ever a point in the
24   conversation where you believed she said something to the
25   effect of:  I will be getting phone calls from people?

LARA - DIRECT / LAFAYETTE

1    **A.**   Yes.

2                **MR. SIEGEL:**  Objection.   Leading.

3                **THE COURT:**  Sustained.

4    **BY MR. LAFAYETTE**

5    **Q.**   Did she say anything about phone calls from people?

6    **A.**   Yes, she did.

7    **Q.**   What was it that she said?

8    **A.**   She said, *Me and my staff do not want to get that number*

9    *of phone calls, if we start taking the dues without the cards*

10   *being filled.*

11   **Q.**   Now, after that happened, did you witness a conversation

12   taking place between Ms. Preston and Dwight McElroy?

13   **A.**   Yes.

14   **Q.**   Did you witness a conversation between the two of them

15   relating to the possible filing of a grievance?

16   **A.**   Yes.

17   **Q.**   Tell me where this meeting took -- where this conversation

18   took place.

19   **A.**   It was in Ms. Preston's office.

20   **Q.**   And were you already there, or did Mr. McElroy come in?

21   **A.**   I was already there.   And --

22   **Q.**   And what happened?

23   **A.**   This was an actual phone call.   LaWanna says, *I'm going to*

24   *call Dwight*.   She picks up the phone and starts to dial.   She

25   calls him.   And she says, *Dwight, this is LaWanna*.

**LARA - DIRECT / LAFAYETTE**

1    I can't hear what he's saying.  I just hear what she says.

2    *Just want to make sure that you don't --*

3    Could I say the word?

4  **Q.**  You can say it.

5  **A.**  *-- pussy out on filing a grievance.*

6    I don't know what he said on the other side.  I just heard

7  what she said.

8  **Q.**  And after that, was a grievance filed against the City?

9  **A.**  Yes.

10 **Q.**  And was it a grievance filed from the union that

11 Mr. McElroy is a part of?

12 **A.**  Yes.

13 **Q.**  And was that the grievance relating to the TPT dues

14 collection?

15 **A.**  Correct.

16 **Q.**  At the time that that grievance was filed, were you now

17 responsible for the negotiations with the union involving a

18 TPTs?

19 **A.**  Yes.

20 **Q.**  Were there discussions taking place during those

21 negotiations relating to the collection of dues, and

22 information necessary to collect dues?

23 **A.**  During the bargaining sessions?

24 **Q.**  Yes.

25 **A.**  Yes.

PROCEEDINGS

1   **Q.**  Did those types of discussions in bargaining continue up

2  through the filing of that grievance?

3   **A.**  Yes.

4   **Q.**  Did they continue after the filing of that grievance?

5   **A.**  Yes.

6   **Q.**  I'd like for you to look at Exhibit 17.

7          **THE COURT:**  We're going to have to stop there.  We're

8  out of time for the day.

9          **MR. LAFAYETTE:**  Okay.

10         **THE COURT:**  Ladies and gentlemen of the jury, we're

11  going to excuse you for the weekend.  The good news is that I

12  expect this case, as far as the presentation of evidence, will

13  conclude on Monday, and the case will be turned over to you for

14  your deliberations on Monday afternoon; but you still can't

15  reach a conclusion yet.  Don't discuss the case over the

16  weekend.  Don't weigh any of the evidence, because you haven't

17  heard it all yet.  And remember my admonition not to do any of

18  your own research in collecting of evidence outside the

19  courtroom here.  So you're excused until Monday.

20      Further final instruction:  You may come at 10:00 o'clock

21  on Monday, rather than 9:00 o'clock.  I do have some legal

22  issues to discuss with the parties that will set up the final

23  instructions to you.  And to avoid having you wait for the

24  final instructions, I'm going to give you a little extra time

25  so you won't be waiting around.  So we'll see you at 10:00 a.m.

1    Monday morning back here.  Thank you very much for your

2    continued attention.

3           **THE CLERK:**  All rise.

4    (Proceedings were heard outside the presence of the jury:)

5           **THE COURT:**  The jurors are not present.

6       Ms. Lara, you may also step down, with the request to

7    return on Monday at 10:00 a.m. also.

8           **THE WITNESS:**  Okay.

9           **THE COURT:**  Sorry we couldn't get you finished today.

10   (Witness excused subject to recall.)

11          **THE COURT:**   Does the Defense have a view as to

12   whether you are still going to call Mr. Donelan?

13          **MR. LAFAYETTE:**  We're not.  We've decided not to call

14   Mr. Donelan.

15       And I think if we have anything -- and I will do this

16   quickly.  I will do this over the weekend -- it may be a short

17   amount for Ms. Deanna Santana, who I said we would reserve.

18   And I will try my best to make that as short as possible.

19          **THE COURT:**  Very well.  A reminder that for her

20   examination, she'll be a friendly witness, so it can't be

21   direct examination -- excuse me -- it can't be a leading

22   examination.  It needs to be her testifying.

23       And then we will be ready for the instruction on the law,

24   and the closing arguments.

25          **MR. LAFAYETTE:**  Yes, Your Honor.

1        **THE COURT:**  So at 9:00 a.m. we -- counsel and I --

2   will convene to talk about the closing instructions and the

3   Verdict Form.  With the Rule 50(a) motion having been granted

4   as to Count One, there are going to need to be changes to the

5   instructions of law and to the Verdict Form.  You can

6   anticipate that I will have to you, over the weekend at some

7   point, a written order with the proposed Final Instructions and

8   Verdict Form, which you'll need to respond to as late as

9   9:00 a.m. on Monday morning.  So that's when we'll finalize the

10  Final Instructions.

11       If we do make any further changes, we'll get them to you

12  in writing, but maybe not very long before the Final

13  Instructions, but that will be your opportunity to object and

14  raise any further issues of law.

15       **MR. LAFAYETTE:**  That's fine, Your Honor.

16       **THE COURT:**  And we will have a closing -- I anticipate

17  we'll have the closing arguments and turn the case over to the

18  jury on Monday afternoon.

19       **MR. LAFAYETTE:**  Thank you, Your Honor.

20       **THE COURT:**  Mr. Siegel.

21       **MR. SIEGEL:**  I haven't totally rejected the idea of

22  having some rebuttal testimony, so I don't want to be --

23       **THE COURT:**  What is it you contemplate?

24       **MR. SIEGEL:**  -- surprising.

25       Well, the thing that I'm most contemplating is doing some

**PROCEEDINGS**

1    work regarding Mr. Cohen's testimony concerning eligibility for

2    PERS and S.F. retirement system pensions.

3              THE COURT:  And who would be rebutting that?

4              MR. SIEGEL:  Well, that's what I've got to figure out.

5    First of all, I want to figure out whether I have evidence that

6    shows that he's wrong.  And then, if so, we can testify to it.

7              THE COURT:  All right.  I won't make any promises in

8    that department, but thank you for bringing it up.

9              MR. SIEGEL:  Okay.

10             THE COURT:  Have a good weekend.  We're in recess.

11   (At 4:22 p.m. the proceedings were adjourned.)

12   I certify that the foregoing is a correct transcript from the

13   record of proceedings in the above-entitled matter.

14   _Lydia Zinn_

15   _____  September 18, 2015
     Signature of Court Reporter/Transcriber   Date

16   Lydia Zinn

17   _(signature)_

18   _____  September 18, 2015
     Signature of Court Reporter/Transcriber   Date

19   Rhonda Aquilina

20

21

22

23

24

25