**Volume 6**

**Pages 1053 - 1241**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

```
DARYELLE LAWANNA PRESTON,        )
                                 )
          Plaintiff,             )
                                 )
  VS.                            )      NO. C 14-02022 NC
                                 )
CITY OF OAKLAND; DEANNA          )
SANTANA, in her individual       )
capacity; and DOES 1 through     )
10, inclusive,                   )
                                 )
          Defendants.            )
_____  )
```

San Francisco, California
Monday, September 21, 2015

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Daryelle Lawanna Preston:
                    Siegel & Yee
                    499 14th Street, Suite 220
                    Oakland, CA 94612
                    510) 839-1200
                    (510) 444-6698 (fax)
            BY:  **SONYA MEHTA**
                 **DANIEL MARK SIEGEL**


Reported By:  Lydia Zinn, CSR No. 9223, FCRR
              Rhonda Aquilina, CSR No. 9956, RMR, CRR
              Official Reporters

1054

1    <u>**APPEARANCES (Continued):**</u>

2    For Defendants City of Oakland; Deanna Santana:
                        Lafayette & Kumagai LLP
3                       101 Mission Street, Suite 600
                        San Francisco, CA  94105
4                       (415) 357-4600
                        (415) 356-4605 (fax)
5              BY:  **AFRICA EVANGELINE DAVIDSON**
                    **SUSAN TAYEKO KUMAGAI**
6                   **GARY T. LAFAYETTE**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
1                          I N D E X

2

3  Monday, September 21, 2015 - Volume 6

4
                                              PAGE   VOL.
5  Jury Instructions                          1138    6
6  Closing Argument by Mr. Siegel             1159    6
   Closing Argument by Mr. Lafayette          1194    6
7  Rebuttal Argument by Mr. Siegel            1230    6

8  DEFENDANTS' WITNESSES                       PAGE   VOL.

9

10 LARA, SONIA (RECALLED)
   Direct Examination resumed by Mr. Lafayette 1085   6
11 Cross-Examination by Mr. Siegel            1093    6
   Redirect Examination by Mr. Lafayette      1113    6
12 Recross-Examination by Mr. Siegel          1114    6

13

14 SANTANA, DEANNA
    (SWORN)                                   1115    6
15 Direct Examination by Mr. Lafayette        1115    6
   Cross-Examination by Mr. Siegel            1124    6
16 Redirect Examination by Mr. Lafayette      1133    6
   Recross-Examination by Mr. Siegel          1136    6

17                     E X H I B I T S

18 TRIAL EXHIBITS                    IDEN  EVID  VOL.

19 1N                                      1067    6

20 1Q                                      1067    6

21 1N                                      1121    6

22 1Q                                      1121    6

23 2E                                      1241    6

24 3N                                      1124    6

25
</pre>

1   **Monday - September 21, 2015**                           **8:06 a.m.**

2                        **P R O C E E D I N G S**

3                              **---oOo---**

4   (Proceedings were heard outside the presence of the jury:)

5           **THE COURT:**  Please be seated.  Welcome back.

6      All right.  As anticipated, jurors are not present.  Is

7   Mr. Siegel with us?

8           **MS. MEHTA:**  He'll be right here.

9           **THE COURT:**  All right.  I'll hold on for him for a

10  moment.

11          **MS. MEHTA:**  Thank you.

12  (Pause in proceedings.)

13          **MR. SIEGEL:**  Good morning, Your Honor.

14          **THE COURT:**  Good morning.

15     All right.  Let's talk about some of the logistics, and

16  then some of the legal issues to be determined for our Final

17  Jury Instructions, and Verdict Form.  This weekend I published

18  to the parties the proposed Final Instructions and Verdict Form

19  in Dockets 158 and 159.

20     First, a little record clean-up.  Both sides put on

21  testimony of experts.  Plaintiffs had Dr. Ogus.  Defense had

22  Mark Cohen.  There was no objection from either party to the

23  expert testimony of either witness.  The magic language of them

24  being tendered as witnesses was not used, but I did find them

25  to be proper expert witnesses within the confines of what you

1    had previously disclosed before trial.  And I did permit and do

2    find them to be appropriate experts as tendered.  And I wanted

3    to put that on the record.

4        There was objection to rebuttal testimony being provided

5    by Mr. Cohen, and that was because there had not been before

6    trial a disclosure of a rebuttal report by Mr. Cohen where he

7    opined as to his disagreement or agreement with Dr. Ogus'

8    report.  So I did not permit testimony beyond the confines of

9    what has been disclosed before trial.

10       I posed a question to the parties on Friday about

11   subject-matter jurisdiction, to see if you had any -- and I

12   gave -- my tentative view is there is supplement jurisdiction

13   under 28 U.S.C. 1367(c), and intended to keep the case for the

14   remainder of trial.

15       Any objection to my tentative view?

16           MR. LAFAYETTE:  No, Your Honor.

17           MR. SIEGEL:  No, Your Honor.

18           THE COURT:  All right.  Ms. Lara will be coming back

19   to the stand at 10:00 o'clock.  What's the expected remaining

20   time for her?  And let's talk about kind of the schedule for

21   this morning.

22           MR. LAFAYETTE:  I think I have about 20 to 25 minutes

23   for Ms. Lara.  I think I have about 20 to 25 minutes with

24   Ms. Santana.  And then it's my expectation I will rest.

25           THE COURT:  All right.  Mr. Siegel, you've made

PROCEEDINGS

1  reference to keeping your options open for rebuttal.  What are

2  your intentions, based on the proposition that there will be

3  about 50 minutes remaining of direct examination?

4        **MR. SIEGEL:**  So far we have no plans to present

5  rebuttal.

6        **THE COURT:**  All right.  If that remains your plan --

7  of course, I'll check in with you again once the Defense

8  rests -- I would plan then, time permitting, to give the Final

9  Instructions to the jury probably at that time, take a lunch

10  break, and come back from the lunch break for the closing

11  arguments, if everything's following according to the schedule

12  that you've proposed.

13        Let's talk about the exhibits that will go to the jury.

14  So both parties have, of course, put in a number of paper

15  documents.  There's one video.  Right now there's not a single

16  one or two binders that have the evidence that's in evidence,

17  and others been excluded.  So right now we have a record of

18  what's in evidence.  We have binders that have more than what's

19  in evidence.  And we only want to give the jury what's in

20  evidence.

21        So I want to -- and we've been keeping track, of course,

22  and publishing each day the minutes.

23        Based on what you've reviewed, has either party identified

24  any errors in what the Court has stated is in evidence or not

25  in evidence; the minutes reflected in the Court records?

1        **MR. LAFAYETTE:**  No, I have not, Your Honor.

2        **MR. SIEGEL:**  I have not, either.

3        **THE COURT:**  Correct.  So it might be ideal if we had

4   a table of contents for the jury as to what's in evidence,

5   similar to what I have, which is something -- a document that

6   has its number and information on --

7        Yes.

8        **MR. LAFAYETTE:**  I think my office did such a thing

9   this weekend.  And it may need to be tweaked, but I will call

10  my office and see if they could do that.  They may be able to

11  even assemble a smaller binder that includes the things that

12  were in evidence; and if so, I'll try to get that up here this

13  morning.

14       **THE COURT:**  That would be great.  I think that would

15  be a good idea.  It's not mandatory for the jury to review it,

16  but I think helpful to understanding if there was something

17  that showed an exhibit number.  If there's a document

18  description that's unobjectionable from both parties, that

19  would be great.

20       Yes.

21       **MR. LAFAYETTE:**  And I think the document has a

22  corresponding key, so that you can see the Plaintiff's

23  Exhibit Number and Defense Exhibit Number.

24       **THE COURT:**  I think that would be good.  So ideally

25  if we had a single binder -- or two binders if it doesn't fit

**PROCEEDINGS**

 1   in one binder -- that says, "Evidence for the Jury to

 2   Consider," that would be great.  Of course, I want plaintiff to

 3   be able to see it and agree to it, too.  And maybe, plaintiff,

 4   you have your own -- Ms. Preston has her own list, and so

 5   forth.

 6       And I will check it against mine.  So if we can get that

 7   here before lunch, I can look at it during lunch and make sure

 8   I have no problems with it.  And -- but let's make that our

 9   plan.

10       If we don't get that document here, then I'm putting it

11   upon the parties to still work together to get a binder

12   together that's going to be the things for the jury to review,

13   and to make sure that we have your okay before the jury starts

14   looking at it.  Our objective is not to have them inadvertently

15   look at some document that's not in evidence, and then us have

16   to figure out how to fix the problem.  So we'll try to get that

17   right ahead of time.

18       Are the parties intending to play the video during closing

19   arguments?

20           **MR. SIEGEL:**  Yes.

21           **MR. LAFAYETTE:**  I think both of us will.

22           **THE COURT:**  All right.  And do you have a plan as to

23   which hardware you're going to use to display it?

24           **MR. SIEGEL:**  Yes.

25           **THE COURT:**  What is your plan?

**PROCEEDINGS**

1    MR. SIEGEL:  We have the laptop set up here.  And

2  we're ready to go when I make the argument.

3    THE COURT:  So same way it was done during the

4  examination?  Same laptop, or you're going to use your laptop

5  this time?

6    MR. SIEGEL:  Yes.  It's got some other things on

7  there we're going to use, as well.

8    THE COURT:  You've tested it.  We're ready to go

9  technologically?  I knocked on wood for you.  All right.  Very

10  good.

11    And then what is your intention as to the jury's review of

12  that video during their deliberations?

13    MR. LAFAYETTE:  I guess we have not set -- I

14  apologize, Your Honor.  I think you were suggesting a computer

15  with basically nothing on it but this?

16    THE COURT:  I was inviting you to ask for that; but I

17  did say, when I said it, that it needed to be asked for more

18  than a few minutes before it's actually going to be used.  So

19  that your request?  And if so, can you specify for me what the

20  media that you are going to insert into it is, and what

21  software it needs to run on?

22    MR. LAFAYETTE:  I think we can put it on flash drive.

23  Okay?

24    THE COURT:  And what format is the video?

25    MR. LAFAYETTE:  Kelvin's not in here.  I think it's

1    the --

2              **MR. SU:**  MP4.

3              **THE COURT:**  Does it have any funky encryption?

4              **MR. SU:**  It does not.

5              **THE COURT:**  Okay.  And is it going to be -- are you

6    going to have isolated just the part for the jury that's in

7    evidence?

8              **MR. SU:**  Just the part that we played.

9              **THE COURT:**  All right.  Does that mean that the rest

10   of the document can't be viewed by the jury?  So is there a

11   clip that has only the part -- how are we going to prevent the

12   jury from watching other parts of the video?

13             **MR. LAFAYETTE:**  It's only that piece.

14             **THE COURT:**  All right.

15             **MR. LAFAYETTE:**  We cut that from the --

16             **THE COURT:**  So you've got it cut?  Precut?  And

17   there's nothing else on the flash drive, except for that file.

18   Correct?  So it's going to be a flash drive with a single thing

19   on it, which is this video, and nothing else.  All right.

20        Barbara, I may ask or Jean to ask Stefan or someone from

21   the IT Department to see if we can use the Court's computer

22   with the capability to view on a flash insert an MP4 file

23   during the deliberations.

24        All right.  So we'll get that request going, with the hope

25   that it's available and can be used by the jury.

**PROCEEDINGS**

1    All right.  What are your contemplated closing-argument

2  durations?

3         **MR. SIEGEL:**  I am planning on approximately 50

4  minutes for my argument, and 20 minutes for my rebuttal

5  argument.

6         **THE COURT:**  Five zero?  Fifty minutes, you said?

7         **MR. SIEGEL:**  Yes.

8         **THE COURT:**  And for the Defense?

9         **MR. LAFAYETTE:**  I'll tell you, Your Honor, I'm always

10 bad about this.  I think it's about an hour, but I don't --

11 that's what I think.

12        **THE COURT:**  All right.  I think an hour would be an

13 appropriate amount of time for the closing arguments.  And I'm

14 not going to shut you down if you're a little bit over that.

15    At the same time, my professional advice is that the

16 attention span of the jurors might end sooner than an hour.

17 And at some point after an hour, especially if it's after lunch

18 and it's warm in here, you might be not helping yourself for

19 going beyond an hour.  That's for you to decide.

20    I will be watching for their glassy expressions to see if

21 anyone's eyes are closing.  And you should be attending to

22 that, too.  And if it's my glassy expression, then we

23 particularly have a problem; but let's shoot for an hour, and

24 not more than that.

25    Once we get into the deliberation time period -- of

**PROCEEDINGS**

1  course, I think it looks like it will be likely we might have

2  some deliberations today.  Stay close by, and give your phone

3  number to my deputy so that you can be reached.

4      After the trial if there is a verdict reached -- or

5  whether or not -- once we reach the end, my policy on speaking

6  with the jurors is that I will discuss with them the potential

7  interest of the attorneys to talk with the jurors after the

8  trial.  They're not required do that, of course.  I give them

9  the option of coming back in here to talk with you if you would

10 like to talk with them; or exiting out the back door, and not

11 speaking with you.  And I just ask you to respect their

12 decision if they don't want to speak with you, to let them go;

13 and if they do want to speak with you, to be respectful and to

14 discuss with them what you can do better the next time, and

15 what worked and didn't work.  And that will be here in the

16 courtroom.

17      So I'll give them that option.  They've got two doors to

18 go through.  And I think can be helpful to get feedback from

19 the jurors about their experience.

20      Does that work for everybody?

21          **MR. LAFAYETTE:**  Yes, Your Honor.

22          **THE COURT:**  All right.  Any other issues before we

23 turn to the Jury Instructions and Verdict Form?

24          **MR. LAFAYETTE:**  Just one item, Your Honor.

25      In the interest of efficiency, I thought I would let you

1  know that with Ms. Santana, there are three documents that I

2  may use.  And I wanted to alert you to what they were.

3        **THE COURT:**  I appreciate that.  Which are the three

4  that you're -- these are three documents you're going to move

5  into evidence, or just three that you're using?

6        **MR. LAFAYETTE:**  Yes; that I will move into evidence

7  1N, 1Q, and 1T.

8        **THE COURT:**  N, Q, and T.  Right?

9        **MR. LAFAYETTE:**  Yes.

10        **THE COURT:**  Give me a moment to refresh my memory as

11  to what those documents are.

12        1N and 1Q did not have a pretrial objection.

13        1T did have a pretrial objection both for relevance,

14  Rule 403, and hearsay under Rule 802.

15        Does Ms. Preston maintain her objection to 1T?

16        **MR. SIEGEL:**  Yes.

17        **THE COURT:**  All right.  And let's start with

18  relevance.  What is the probative value of 1T?

19        **MR. LAFAYETTE:**  It shows a discourse between

20  Ms. Santana and Ms. Preston in the June time period

21  specifically about the labor negotiations, and with regard to

22  information that's being shared with the union unfiltered.  And

23  this is happening just prior to the issues that arise with

24  regard to the bargaining of the TPT of the -- with the Fire

25  Department.  It's basically an e-mail stream between the two of

1  them, where Ms. Santana is pointing out to Ms. Preston and

2  Ms. Preston is writing back with regard to the way in which

3  this process is being managed.

4       **MR. SIEGEL:**  I have a hard time seeing the relevance

5  to any of the issues in the case.  And we may start getting --

6  having a side inquiry into the budget process.  It's going to

7  take a lot of time.

8       **MR. LAFAYETTE:**  It really goes to her performance.

9  It's not the budget.  It's her performance.  And she's

10  basically criticizing her for giving documents to the union

11  without first looking at them.  It's Ms. Preston then going to

12  the extreme and saying, "I don't manage the budget," when

13  that's not the issue, at all.  This is not about the budget.

14  This is about the process.

15       **THE COURT:**  My ruling on Document 1T is that the

16  objection for lack of relevance and under Rule 403 is

17  sustained.  The document, if probative, would be -- the value

18  would be substantially outweighed by the danger of confusion

19  and distraction of the jury, because most of this document

20  concerns costs, you know -- cost process, budgeting process --

21  and deals with facts that so far have not been presented to the

22  jury.

23      There's an e-mail string here that -- to go through the

24  entire string would bring up issues that have not been

25  presented to the jury yet, and would likely take a lot of time

1   for them to understand.  And, if relevant of anything, that

2   relevance would be outweighed by this lengthy period of time

3   and confusion on things which are not central to the case.

4        So for those reasons 1T is excluded.

5             **MR. LAFAYETTE:**  I would just say, Your Honor, that if

6   you look at the last string where she says and your review and

7   work with them can correct that -- this is really one where she

8   is doing what Mr. Siegel has said has not been done, which is

9   the coaching of her, and the explaining to her that she's not

10  doing her job.  That's the relevance of the document.  And I

11  think if Mr. Siegel's going to stand up and cite, as he did in

12  his opening, that that's not something that was done, then I

13  think that's what we're offering it for.

14            **THE COURT:**  All right.  The objection is sustained.

15       1N and 1Q will be admitted.  They were not objected to

16  before trial.

17  (Trial Exhibits 1N and 1Q received in evidence.)

18            **THE COURT:**  All right.  Any other issues from the

19  Defense before we turn to the Jury Instructions and Verdict

20  Form?

21            **MR. LAFAYETTE:**  No, Your Honor.

22            **THE COURT:**  And, Mr. Siegel, any other issues from

23  Ms. Preston before we turn to the Verdict Form?

24            **MR. SIEGEL:**  No.

25            **THE COURT:**  All right.  All right.  Then turning to

1    the Jury Instructions, both parties had Documents 151 and 154,

2    proposed special Jury Instructions that had instructions of the

3    law as to particular provisions of the law that they suggested

4    that we read to the jury for their deliberations.

5         Now the Court denies these proposals to include special

6    Jury Instructions with the text of the state laws that Preston

7    claims she reasonably believed City of Oakland employees

8    violated, and I'm going to explain why.

9         California Labor Code Section 1102.5 requires that Preston

10   disclosed or refused to participate in an act that she

11   reasonably believed was a violation of state or federal law.

12   As set out in my Summary Judgment Order, Docket Number 99, the

13   Court interprets, quote, "reasonable belief of a violation of

14   law," unquote, to mean that Preston must point to some legal

15   foundation for her suspension, as outlined in *Love versus*

16   *Motion Industries, Inc.*, 209 F. 2d. 1128, 1135, Northern

17   District of California 2004.

18        A *prima facie* case under the Labor Code requires Preston

19   to demonstrate her reasonable belief of a violation of law, and

20   not that she prove that a law was actually violated.

21   Therefore, the Court believes it would be confusing for the

22   jury to be instructed on the content of the laws that Preston

23   believed were being violated in more detail than they are being

24   advised in my proposed Final Instructions.  I'm concerned that

25   the jurors could mistakenly believe that she should evaluate

1   precisely whether City of Oakland employees were violating the

2   law.  This would be unfairly prejudicial to Preston, because it

3   would suggest it's her burden to prove more than what is

4   necessary to prove a *prima facie* case under Labor Code Section

5   1102.5.  Therefore, in the proposed Final Instructions, I've

6   included a more detailed summary of Preston's claims; but I

7   will not instruct the jury on the specifics of the laws that

8   Preston alleges she had a reasonable belief were violated.

9       Furthermore, the California Labor Code claim embodies the

10  same principles as the federal Whistleblower Protection Act.

11  And the California Appellate Court stated, in *Mize-Kurzman* --

12  Mize, M-i-z-e hyphen K-u-r-z-m-a-n -- *versus Marin Community*

13  *College District*, 202 Cal. App. 4th 832, 848, a 2012 case, that

14  federal decisions can guide the interpretation of California's

15  law, as the goal in provisions are essentially the same.

16      In the *Van Asdale* -- V-a-n space A-s-d-a-l-e -- *versus*

17  *International Game Tech* case, 577 F. 3d. 989 at 997,

18  Ninth Circuit, 2009, the Ninth Circuit held that, quote, "An

19  employee need not cite a Code section he believes was

20  violated," unquote, to qualify for protection under the

21  Sarbanes-Oxley Act.

22      So for those reasons, I'm not intending to instruct the

23  jury with the proposed instructions from the parties in Dockets

24  151 and 154.

25      Now, starting with plaintiff, do you have any objection to

1    the Final Jury Instructions as proposed in Docket 158?

2         **MR. SIEGEL:**  Well, Your Honor, I do believe that the

3    proposed instructions that we presented on the law would be

4    helpful to the jury in evaluating whether Ms. Preston had a

5    good-faith belief in what she was talking about.  Otherwise, it

6    becomes kind of abstract, and allows one to assume or even

7    argue that she didn't have a good-faith belief that the law was

8    being violated.  So that's why we proposed the instructions,

9    and continue to do so.  Otherwise, I have no objection to the

10   Court's instructions.

11        **THE COURT:**  And, of course, the Defense proposed

12   different instructions on what the law is as to the statutes

13   that she had a good-faith belief in, or from their perspective

14   didn't have a good-faith belief in.  So if we were to give your

15   instructions of the law, should we also be giving their

16   instructions of the law?

17        **MR. SIEGEL:**  No.  I mean, it's the plaintiff's burden

18   to show that she had a good-faith belief.

19        It would just be to confuse the jury.  You might as well

20   give them the whole Labor Code and say, *Well, she couldn't have*

21   *a good-faith belief that this 1500 sections were violated.*

22        The focus -- the effort should be to focus the jury on

23   the -- on principles of law or statements of law that support

24   the plaintiff's position.  But -- so I thought that the

25   instructions proposed by the Defense were just a diversion.

1          **THE COURT:**  All right.

2          **MR. SIEGEL:**  Again, you could propose any section of

3    the law.

4          **THE COURT:**  All right.  Thank you.

5       And does the Defense have any objections to the proposed

6    Final Jury Instructions?

7          **MR. LAFAYETTE:**  Only -- not in the section you're

8    speaking about, Your Honor, but it's different.

9          **THE COURT:**  I want to take all objections now.  So

10   what is your objection?

11         **MR. LAFAYETTE:**  It's on page 8, and it appears on

12   lines 13 through 15.

13         **THE COURT:**  All right.

14         **MR. LAFAYETTE:**  And there are two comments that we

15   would make.  One:  The statement that disclosure is protected,

16   even though disclosing the information may be part of Preston's

17   job duties.  I have looked at the Ninth Circuit's opinion on

18   this subject, and I think this Court probably has an opinion on

19   this subject.  The only thing I would point out is that, to the

20   extent that this language actually appears in the statute --

21   and I'm sure the Court's aware of this -- it didn't appear in

22   the statute until 2014.  It wasn't part of the statute in 2013,

23   when all of the decisions were actually being made, and the

24   facts arose in this case.

25       And I know that there is still an uncertainty.  I know

1    that at some point after that, the State Legislature amended

2    the statute.  I think it was in 2013.  2013.  And so this

3    language didn't become effective in 2014.

4        And there are some cases that address summary-judgment

5    motions, and whether summary-judgment motions should be granted

6    on this theory; but that's a different story than whether or

7    not the jury should be instructed that this is the law.  And so

8    I just believe that that statement shouldn't be there if it

9    wasn't in the statute at the time.  And that's my position.

10   So -- and I will go to the second issue.

11            **THE COURT:**  Go ahead.

12            **MR. LAFAYETTE:**  The second issue has to do with a

13   statement that -- we think this should be in there.  And that

14   is this section of the California Labor Code does not apply to

15   violations of city ordinances, because it does not.  And --

16            **THE COURT:**  Can you direct me to the page and section

17   you're referring to, as far as --

18            **MR. LAFAYETTE:**  It's not in the Order, at all.

19            **THE COURT:**  Where would it be in the instruction?  If

20   I'm going to --

21            **MR. LAFAYETTE:**  It would be in the paragraph -- I

22   would think it would be in the paragraph we were just looking

23   at.

24            **THE COURT:**  And tell me very precisely what it is

25   that you think should be added.

1          **MR. LAFAYETTE:**  Oh, just a second, Your Honor.

2      I may have directed you to the wrong location.  I can give

3  you the language, though.  Quote, "This section of the Labor"

4  -- "This section of the California Labor Code does not apply to

5  violations of a City ordinance."

6          **THE COURT:**  All right.  Focusing on this language --

7  Mr. Siegel, did you hear the proposed language?

8          **MR. SIEGEL:**  Yes.

9          **THE COURT:**  Do you agree to it, or disagree?

10          **MR. SIEGEL:**  I disagree, Your Honor.  I think in

11  general, it's not good practice to advise the jury about what

12  the law is not.  The instruction affirmatively states that

13  Preston must have reasonably believed that City of Oakland's

14  policies violated federal or state rules or regulations.  That

15  certainly supports the Defense argument that merely violating

16  Local Rules is not a violation, but doesn't have to be in the

17  instructions.  Again, it's just a negative.  And there are a

18  lot of things that don't fit here.

19          **THE COURT:**  All right.  I'm going to rule on this

20  one.  I'm going to take out the commas from that sentence, so

21  there's not an inference that regulations is something

22  different than federal or state rules.  In other words, there

23  could be an inference that regulations are City ordinances or

24  City regulations, but it's not.  "Regulations" is modifying

25  federal and state rules.

1    I agree with Ms. Preston's counsel that that rule does

2  not -- that sentence does not require the opposite to be stated

3  in order for it to make sense.  So I'm not going to give the

4  additional instruction about what the law is not, but I will

5  modify the sentence by taking out those two commas.

6         **MR. LAFAYETTE:**  Which paragraph are you at,

7  Your Honor?

8         **THE COURT:**  Page 8, line 12.  That's where it would

9  make sense to add your proposed sentence if I were going to add

10  it, but I'm not going to.

11    Mr. Siegel, what is your reaction to the proposal to

12  delete the sentence on page 8, lines 14 to 15?

13         **MR. SIEGEL:**  I think the instruction is correct.

14  And, in fact, the California Supreme Court has concluded that

15  that language in the revision to the statute was merely

16  clarifying the intent of the law historically.  And so -- and I

17  can provide you with that citation pretty quickly, although I

18  don't have it at the tip of my tongue; but again, the

19  Supreme Court has said that was the law even before the recent

20  legislative change.

21         **MR. LAFAYETTE:**  Which cite is that, counsel?

22         **MR. SIEGEL:**  The California Supreme Court.

23         **MR. LAFAYETTE:**  Which cite it is it?

24         **MR. SIEGEL:**  I just said I don't have the cite at the

25  tip of my tongue.

1      **THE COURT:**  All right.  I'm going to go check on the

2  case law and review that in a moment.  So I'm going to take

3  that argument under submission.  And I'll be back in a few

4  minutes to confirm.

5      And does the Defense have any response to the Plaintiff's

6  argument about their special instruction on the law that they

7  alleged was violated?

8                  **MR. LAFAYETTE:**  The additional law?

9                  **THE COURT:**  Their special jury instruction on the

10  law.

11                 **MR. LAFAYETTE:**  We would go along with you,

12  Your Honor.

13                 **THE COURT:**  You prefer to have no instruction --

14                 **MR. LAFAYETTE:**  Yes.

15                 **THE COURT:**  -- rather than dueling instructions --

16                 **MR. LAFAYETTE:**  Yes.

17                 **THE COURT:**  -- if that's the way to put it?

18      All right.  Does either party have any objections to the

19  Verdict Form?

20                 **MR. LAFAYETTE:**  Oh, there's one other item,

21  Your Honor.

22                 **THE COURT:**  What is the one other item?

23                 **MR. LAFAYETTE:**  In our pretrial conference we

24  referenced a stipulation that the -- that was executed on

25  February 3rd.  And your Order stated that this shall be read to

**PROCEEDINGS**                                                    1076

1   the jury.  I can give you a copy of it.

2          THE COURT:  I'm sure if you've got --

3   (Whereupon a document was tendered to the Court.)

4          THE COURT:  Thank you.  All right.  And is your

5   proposal that I read the first two paragraphs of this

6   stipulation?

7          MR. LAFAYETTE:  I think that I would probably be

8   happier if you read lines 23 through 26.  I don't think the

9   second paragraph -- I think it's more procedural than

10  stipulation.

11         MR. SIEGEL:  Can someone state what the proposal is?

12  I don't have it.

13         MR. LAFAYETTE:  Oh, here.  I can show you mine.

14         MR. SIEGEL:  Thanks.

15         THE COURT:  This is about the plaintiff's alleged

16  emotional distress.  And it says this stipulation may be read

17  to the jury.  I don't think it would make sense to read the

18  entire document to the jury.

19         MR. LAFAYETTE:  No.  Just that (indicating).

20         MR. SIEGEL:  Well, I guess if I agreed, I can't

21  object; can I?

22         THE COURT:  Well, you can object.  It says the

23  stipulation -- you can't object to the fact of stipulation; but

24  which parts we read to the jury -- it's not spelled out here.

25      So the one other part that I think maybe we should tell

1  the jurors:  The stipulation says Plaintiff may also testify as

2  to her own damages.  We don't want them to infer from this that

3  they should disregard what she said about her own damages, or

4  that this is the only document they should consider as to

5  emotional distress.

6       **MR. LAFAYETTE:**  At the last sentence on paragraph 2.

7       **THE COURT:**  Yes.

8       **MR. LAFAYETTE:**  Yes, Your Honor.  That's fine.

9       **THE COURT:**  So here's what I would read.  "The

10  Plaintiff agrees that she is not making a claim for mental and

11  emotional distress over and above that usually associated with

12  the alleged treatment of Plaintiff at issue in this case."

13       That sounds awfully legal.

14       "And Plaintiff may also testify as to her own damages."

15       In case the jurors have a question, what does "over and

16  above that usually associated with the alleged treatment of

17  Plaintiff at issue in this case" mean?

18       **MR. SIEGEL:**  It means she's not making a claim for

19  psychiatric harm.

20       **THE COURT:**  Maybe we should say that.

21       **MR. SIEGEL:**  That would be fine with me.

22       **MR. LAFAYETTE:**  That's fine.

23       **MR. SIEGEL:**  Merely making a claim for emotional

24  distress.

25       **THE COURT:**  Yeah.  What if we said, "Plaintiff agrees

 1  that she's not making any claim for psychiatric harm"?

 2          MR. SIEGEL:  That's fine.

 3          THE COURT:  Just leave it at that?

 4          MR. SIEGEL:  That's fine.  You'll put it in the

 5  instruction on emotional distress?

 6          THE COURT:  Well, let's think about how we're -- what

 7  we're going to say in the instruction.  First, there was just a

 8  factual stipulation to read to the jury during the evidence.

 9      How about this sentence instead?  "Ms. Preston agrees that

10  she is not seeking damages for psychiatric harm, but is seeking

11  damages for mental and emotional distress."

12      I used the term "damages" rather than "claim," so there's

13  not some confusion about that being a cause of action.

14          MR. LAFAYETTE:  That's fine, Your Honor.

15          MR. SIEGEL:  That's fine.

16          THE COURT:  Then I could give that same instruction

17  on page 10 in the paragraph of noneconomic damage, emotional

18  distress?

19          MR. SIEGEL:  Yes.

20          MR. LAFAYETTE:  Yes, Your Honor.

21          THE COURT:  All right.  So I will read that

22  stipulation of fact to the parties at the close of the

23  defendants' case.  And I'll also insert it into the instruction

24  on page 10.

25      There is a pattern instruction for stipulations.  I don't

1  think we need to do an additional instruction.  I'm just going

2  to put it in there.  It's the only one, so I'm just going to

3  put it in there.  Is that okay, with everyone's agreement?

4          **MR. LAFAYETTE:**  Yes, Your Honor.

5          **THE COURT:**  All right.  Now the Verdict Form.  Any

6  Defense objection to the Verdict Form?

7          **MR. LAFAYETTE:**  No objection.

8          **THE COURT:**  Any Plaintiff objection to the Verdict

9  Form?

10         **MR. SIEGEL:**  No, Your Honor.

11         **THE COURT:**  All right.  I'm going to take it under

12  submission and do a little editing to these documents.  It will

13  be in final form.  I'll come back and tell you in about ten

14  minutes before our -- confirm that our jurors are here.  And

15  we'll get ready to go.  Time line.

16      Thank you very much.  We're in recess.

17         **MR. SIEGEL:**  I have one other matter Your Honor.

18         **THE COURT:**  One other matter.  Yes.  Go ahead.

19         **MR. SIEGEL:**  I would like to move to strike the

20  testimony of Sonia Lara regarding the conversation she says she

21  heard between the plaintiff and Dwight McElroy, on the grounds

22  that to the extent to which that information was provided to a

23  decision maker in this case, it was provided only after

24  Ms. Preston's termination.  And since the Court is not

25  instructing on after-acquired evidence, I think that testimony

1  should be excluded.

2      And in addition, no further testimony should be allowed

3  from Ms. Lara regarding events that she reported to Ms. Santana

4  after Ms. Preston was fired.

5          **THE COURT:**  So refresh my memory, if you will, as to

6  what the testimony was on Friday by Ms. Lara about -- that

7  you're trying to strike.

8          **MR. SIEGEL:**  That she was in Ms. Preston's office;

9  and Ms. Preston was on the telephone with Dwight McElroy, and

10  urged him to file the grievance -- quote, unquote.  The ATPT

11  grievance.  Part-time employees' grievance.

12          **THE COURT:**  And what was the testimony as to when

13  that conversation was?

14          **MR. SIEGEL:**  There was no testimony as to when it

15  was, but I know from other testimony that this witness has

16  given that she reported it to Ms. Kasaine and Ms. Santana after

17  Ms. Preston was fired.

18          **THE COURT:**  And not before?

19          **MR. SIEGEL:**  And not before.  And I think --

20          **THE COURT:**  All right.

21          **MR. SIEGEL:**  There's probably no disagreement about

22  that fact.

23          **MR. LAFAYETTE:**  It's offered for impeachment.

24  Counsel asked --

25          **THE COURT:**  You're impeaching who?

**PROCEEDINGS**

1    **MR. LAFAYETTE:**  Mr. McElroy and Ms. Preston.  They

2    were both asked in this trial if those events took place.  This

3    is a witness who comes back and says that they were lying when

4    they said that in this courtroom.  And impeachment testimony is

5    always appropriate testimony.  Particularly it would go to

6    truth and veracity.

7         **MR. SIEGEL:**  The point is that we have had an

8    argument about after-acquired evidence for quite some time.

9    And the -- the issue, I think, will confuse the jury if it's

10   not clear that these are matters that were not disclosed until

11   after the termination, and therefore cannot be considered in

12   terms of determining the validity or good reasons for the

13   termination.

14        **THE COURT:**  All right.  So I think it might be a

15   situation where, if there is more testimony on this topic, that

16   a limiting instruction should be given to direct the jury the

17   purpose of it, so I'd consider that.

18        I think cross-examination can also clarify -- will give

19   Ms. Preston an opportunity to clarify the sequence of events,

20   because I don't believe from Friday's testimony it was clear

21   the timing of when this conversation occurred; when it was

22   reported; who it was reported to.  That might be further

23   clarified with Defense questioning.

24        And while I will overrule the objection to the extent that

25   you're seeking to strike testimony from Friday, I'm also not

1  going to allow lengthier examination of other events that

2  occurred later -- other so-called "after-acquired evidence" --

3  because there would be a danger of confusion to the jury if

4  they were thinking that that was a basis for the termination,

5  when -- if the record evidence is that that was not the basis.

6      **MR. LAFAYETTE:**  But, Your Honor, my only objection is

7  this.  If they were allowed to come in this courtroom and say

8  that they didn't do these things, then I'm allowed to impeach

9  them with the testimony of someone who was there.

10      **THE COURT:**  And you have.  And you have.

11      **MR. LAFAYETTE:**  That's the only thing I'm saying.

12      **THE COURT:**  But the purpose of impeachment and the

13  rules of impeachment are not unlimited all apart.  It's -- you

14  make your point.  And it has to be proportional to the other

15  parts of the case.  Otherwise, the jury can be confused that

16  it's about the impeachment, rather than about the reason she

17  was fired, and whether there was retaliation or not.

18      So you've already gotten testimony about it.  And I'll

19  allow you to, if you need to, clarify the timing.

20      **MR. LAFAYETTE:**  I'll do that.

21      **THE COURT:**  But if I'm hearing more questions and

22  answers about things that happened later, and Ms. Lara's

23  already been on the stand for a while, longer than she was

24  anticipated in the beginning, I will start to end the

25  testimony.

PROCEEDINGS                          1083

1              MR. LAFAYETTE:   Thank you, Your Honor.

2              THE COURT:   So that's my ruling there.

3         All right.   Back in ten minutes.   Thank you.

4    (Discussion off the record.)

5              THE COURT:   Let's go back on the record, so there's

6    actually a record of what you're saying.   Yes.   Go ahead.

7              MR. SIEGEL:   So the case I was --

8              THE COURT:   This is Mr. Siegel speaking.   Go ahead.

9              MR. SIEGEL:   --  trying to cite to you -- it turns

10   out it's a Ninth Circuit case.   It's called *Reynolds versus*

11   *City and County of San Francisco*.   576 -- what is it?

12             MS. MEHTA:   576 F. App. 698.

13        And there's also *Satyadi*, a case from 2014.   232 Cal. App.

14   4th --

15             THE COURT:   When you said the number was 232 --

16             MS. MEHTA:   Yes.   232 Cal. App. 4th, 1022.

17             THE COURT:   And you think those cases stand for the

18   proposition that --

19             MS. MEHTA:   -- that the amendments merely clarify the

20   law, and therefore, of course, 11025 never intended for the

21   juries to consider job duties, at all.

22             THE COURT:   Great.   Back in ten minutes.   Thank you.

23   (Recess taken from 9:44 a.m. until 9:57 a.m.)

24             THE COURT:   Back on the record.   The jurors are not

25   present.   We still are absent one juror who it looks like is

1  going to be a little bit late.  So we're going to have a little

2  bit more time for you to get the exhibits clarified, and be

3  ready for when the jury's ready.

4      So the sentence I've added in the closing instruction on

5  page 10 in the section on noneconomic damage emotional distress

6  is, "Preston is seeking noneconomic damages for mental

7  emotional distress, but she is not seeking damages for

8  psychiatric harm," period.  Then, going on to the language

9  previously drafted of, "No fixed standard exists for deciding

10 whether or not these noneconomic damages" -- and so forth.  So

11 that's the one sentence out of there.

12     On page 12 -- excuse me.  Page 8.  The discussion at page

13 8, lines 14 and 15, the sentence in discussion being the last

14 one of that section, "A disclosure is protected, even though

15 disclosing the information may be part of Preston's job

16 duties."

17     I did look at the authorities cited by plaintiff's

18 counsel:  The *Reynolds* case, and *Satyadi versus West*

19 *Contra Costa*.  And I agree with the reasoning in the *Reynolds*

20 Decision that the change in the law was a clarification of

21 existing legislative decision, rather than a change in the law.

22 Therefore, I'm keeping in the sentence in the closing

23 instruction as being a proper one.  So I will be giving that

24 sentence, and overrule the Defense objection to it.

25     So that resolves the remaining Jury Instruction issues.

 1  We will print those out and make copies for you.  And, of

 2  course, copies will be provided to the jurors, as well.

 3       So we'll be in recess until our jurors are ready.  And

 4  then Ms. Lara will be returning to the stand.  Thank you.

 5            **MR. LAFAYETTE:**  Thank you, Your Honor.

 6  (Recess taken from 9:59 a.m. until 10:18 a.m.)

 7            **THE COURT:**  All right.  We're ready to go.  Please

 8  bring in the jurors.  The Defense may call in Ms. Lara so we

 9  can get her ready, too.

10  (Proceedings were heard in the presence of the jury:)

11            **THE COURT:**  Welcome back to our jurors.  We return to

12  trial.

13       Ms. Lara, if you can come on forward and take the stand

14  we'll continue our examination, and after that, the remainder

15  of the Defense case.  And, Ms. Lara, you remain under oath.

16            **THE WITNESS:**  Okay.

17                         **<u>SONIA LARA</u>,**

18  called as a witness for the Defendants, having been previously

19  duly sworn, testified further as follows:

20                   **<u>DIRECT EXAMINATION</u>   (resumed)**

21  BY MR. LAFAYETTE

22  **Q.**   Good morning, Ms. Lara.

23  **A.**   Good morning.

24  **Q.**   I'd like to pick up kind of where we dropped off.  We had

25  been discussing the August 6th, 2013, meeting.  Do you remember

1   that?

2   **A.**   Yes.

3   **Q.**   And at some point in time, I think you said that

4   Ms. Katano explained what she had been doing with the payroll.

5   Do you remember that?

6   **A.**   Yes.

7   **Q.**   And she had indicated that she had been collecting dues

8   based on a report from payroll?

9   **A.**   Correct.

10          **MR. SIEGEL:**  Objection.  Leading.

11          **THE COURT:**  Sustained.

12      And the jury was paying attention on Friday, so let's move

13   ahead with new questions.

14   **BY MR. LAFAYETTE**

15   **Q.**   Did you think there was anything wrong in what she had

16   been doing?

17   **A.**   No.

18          **MR. SIEGEL:**  Objection.  Foundation.

19          **THE COURT:**  Sustained.

20      The jury will disregard the last answer.

21   **BY MR. LAFAYETTE**

22   **Q.**   You are a person in the Labor Relations Department?

23   **A.**   Yes.

24   **Q.**   You have experience with working with memorandums of

25   understanding?

1   **A.**    Yes.

2   **Q.**    Did you believe that, based upon your experience with

3   these memorandums of understanding, and particularly this

4   particular Memorandum of Understanding, that Ms. Katano Kasaine

5   was doing something wrong?

6   **A.**    No.

7   **Q.**    Did you think there was any need to conduct an

8   investigation of Ms. Katano [sic]?

9   **A.**    No.

10   **Q.**    Now, at some point in time did you overhear a conversation

11   between Ms. Preston and Ms. Santana regarding the assignment of

12   an investigation?

13   **A.**    Yes.

14   **Q.**    Was this -- were you -- was the conversation by phone?

15   **A.**    Yes, it was by phone.

16   **Q.**    And were you on the call or were you in the room with

17   someone?

18   **A.**    I was in the room with Ms. Preston.

19   **Q.**    In a room with Ms. Preston.  And Ms. Santana was on the

20   phone?

21   **A.**    Ms. Santana was on the phone.

22         **MR. SIEGEL:**  Objection.  Foundation.

23         **THE COURT:**  Sustained.

24      You can ask further foundational questions about how she

25   knows Ms. Santana.

1  BY MR. LAFAYETTE

2  Q.    How do you know Ms. Santana?

3  A.    Ms. Preston called her, put her on speaker phone, and I

4  heard Ms. Santana's voice.

5  Q.    Did you announce yourself in the room?

6  A.    No.  Ms. Preston basically, with her finger, said to me

7  *Don't say your name*; like (indicating) *Shut up*, I guess.

8  Q.    And in that conversation, did Ms. Preston raise her voice?

9  A.    She raised her voice.

10  Q.    Now, did you witness Ms. Santana advising Ms. Preston

11  advising the union how to negotiate against the City?

12  A.    Yes.

13  Q.    And can you tell me what you observed?

14  A.    It was one day that we were bargaining.  I was in her

15  office -- Ms. Preston's office.  Dwight McElroy comes in.  I

16  wanted to leave.  She said, "No.  You could stay."

17      He then looks at me and tells Ms. Preston, "Is she okay?"

18      Ms. Preston says, "Yeah.  She's okay."

19      I sit down.  And I figured in my head, "Oh, my God.

20  What's going to happen?"

21      Ms. Preston pulls out a piece of paper, and throws --

22  basically tosses it in front of him, and says, "This is how you

23  have to counter to us."

24      He's reading.  He then says, "Okay."  He wants to take it.

25      She says "No."

1    He then says, "Come on.  You're going to make a brother

2    use his pen and paper to write this down?"

3        She then takes it away, grabs a pair of scissors, cuts the

4    top, cuts the bottom, and says, "Here" (indicating).

5    **Q.**   What was on the top and the bottom?

6    **A.**   In the top it had to be the City of Oakland TA or

7    something to that effect.  It had to be some kind of a header

8    that stated the City of Oakland.

9        And at the bottom are signatures.

10   **Q.**   I would ask you to take a look at something in front of

11   you there which is referred to as "Exhibit 4P."

12   **A.**   Okay.

13   **Q.**   Do you recognize Exhibit 4P?

14   **A.**   Yes.

15   **Q.**   Did you sign it?

16   **A.**   I signed it, and I typed it.

17   (Document displayed.)

18   **BY MR. LAFAYETTE**

19   **Q.**   You signed it and you typed it.

20       Does Exhibit 4P in any way whatsoever relate to the issues

21   raised by the collection of dues for TPTs?

22   **A.**   Yes.

23   **Q.**   Does it impact the discussions that you had on August 6,

24   2013?

25   **A.**   Yes.

1  Q.   Can you please explain how?

2  A.   In the August 6th meeting we had discussed with the union

3  of why it was that we weren't deducting dues from every single

4  person on the list, which was, again, because not everybody's

5  active.

6       Two.  They could have had multiple assignments.

7       And, three, they weren't making enough money.

8       We had asked the union at that time if there is someone

9  that we are missing that you know, let us know.  They never

10 did.

11      This now basically says nothing in this section shall

12 relieve the City of its obligations to deduct dues, which means

13 that we would automatically have to pull them out.

14 Q.   You would automatically have to do what?

15 A.   Pull the dues out from the employee.

16 Q.   Even if the union had not given you notice?

17 A.   Correct.

18 Q.   This document is dated October 2, 2013.  This one has a

19 number 26 on it.

20 A.   Mm-hm.

21 Q.   Was this document in the office of the labor director

22 after she was terminated?

23 A.   No.

24 Q.   To your knowledge, was this document only in the

25 possession of the union?

1          MR. SIEGEL:  Objection.  Foundation.

2          THE COURT:  Sustained.

3    BY MR. LAFAYETTE

4    Q.   Now, did you ever receive anything or see anything that

5    indicated that the City Council had approved this Tentative

6    Agreement?

7    A.   No.

8    Q.   Did you ever see anything that indicated that the City

9    Administrator had approved this Tentative Agreement?

10   A.   No.

11   Q.   To your knowledge, was anyone in the City aware that this

12   Tentative Agreement had been entered into, other than you and

13   Ms. Preston?

14         MR. SIEGEL:  Objection.  Foundation, Your Honor.

15         THE COURT:  Sustained.

16   BY MR. LAFAYETTE

17   Q.   Were you surprised that Ms. Preston was terminated?

18   A.   Yes.

19         MR. SIEGEL:  Objection.  Relevance.

20         THE COURT:  Sustained.

21   BY MR. LAFAYETTE

22   Q.   I want to talk to you about something about a terabyte.

23   A.   Hm.

24   Q.   Okay?  Did you witness Ms. Preston pay Ms. Everett for the

25   terabyte?

LARA - DIRECT / LAFAYETTE

1    A.    Yes.

2    Q.    Did Ms. Preston say something regarding how she was going

3    to use the terabyte?

4    A.    Yes.

5    Q.    What did she say?

6    A.    Can I tell a little bit how it happened?

7    Q.    Go ahead.

8              MR. SIEGEL:  Objection.  Not responsive.

9              THE COURT:  Overruled.

10             THE WITNESS:  So I could --

11             THE COURT:  You may answer.

12             THE WITNESS:  Okay.  So I came into the office where

13   Ms. Preston was.  And T.C. Everett was next to Ms. Preston and

14   her computer.  I would come into Ms. Preston's office, as she

15   was my supervisor.  I noticed that they were there.  And I

16   said, "Oh, sorry."  And I was going to go back out.

17        She said, "No, no.  Come in."  She's like, "T.C. bought me

18   a terabyte."  They were exchanging money and receipts.  And

19   says, "And she's downloading everything from my computer."

20   BY MR. LAFAYETTE

21   Q.    Approximately when was it that this occurred?

22   A.    Oh, in the summer.  Maybe July, August.  I can't recall

23   the exact date.

24             MR. LAFAYETTE:  I have no further questions of this

25   witness, Your Honor.

1          THE COURT:  Thank you.

2     Mr. Siegel.

3          MR. SIEGEL:  Thank you.

4                    CROSS-EXAMINATION

5     BY MR. SIEGEL

6     Q.   Good morning, Ms. Lara.

7     A.   Good morning.

8     Q.   So you always seem to be at the right place at the right

9     time.

10          MR. LAFAYETTE:  Objection.  It's argumentative,

11     Your Honor.

12          MR. SIEGEL:  I haven't finished my question.

13          THE COURT:  Let's ask a question.

14          MR. SIEGEL:  Huh?

15          THE COURT:  Let's ask a question.

16          MR. SIEGEL:  Okay.

17     Q.   So you were always at the right place at the right time;

18     weren't you, Ms. Lara?

19          MR. LAFAYETTE:  Objection.  It's argumentative.

20          THE COURT:  Overruled.

21          THE WITNESS:  I guess.

22          MR. SIEGEL:  I guess.  Right.

23     Q.   So let me ask you a question.  You said earlier that

24     whenever you had a new boss you always said, "Don't ask me to

25     lie.  Don't ask me to destroy documents," and treat you with

1    respect.  Is that right?

2    **A.**    Correct.

3    **Q.**    And did you say the same thing to the attorneys for the

4    City when they prepared you for your testimony in this case?

5                **MR. LAFAYETTE:**  Objection.  Attorney-client

6    privilege, Your Honor, and relevancy.

7                **THE COURT:**  Relevancy is sustained.

8                **MR. SIEGEL:**  Okay.

9    **Q.**    Can you please explain to the jury what you've done to

10   prepare your testimony in this case?

11   **A.**    What I've done to prepare it?

12               **MR. SIEGEL:**  Yeah.

13               **THE WITNESS:**  Nothing.

14               **MR. LAFAYETTE:**  Objection.  Relevancy.

15               **THE COURT:**  Overruled.

16               **MR. SIEGEL:**  Nothing?

17               **THE WITNESS:**  Nothing.

18   **BY MR. SIEGEL**

19   **Q.**    You didn't meet with any of the attorneys?

20   **A.**    I met with them.  They were asking me what happened.

21   **Q.**    When did you meet with them?

22   **A.**    Maybe -- I met with -- I met with Sonia on --

23   **Q.**    Let me turn to --

24   **A.**    -- doing the depositions.

25               **MR. LAFAYETTE:**  Objection.  He's cutting her off,

 1    Your Honor.

 2            **THE COURT:**  Sustained.

 3        Let's have question and answer.

 4    **BY MR. SIEGEL**

 5    **Q.**   When did you meet with the attorneys for the City?

 6    **A.**   I met with them maybe during the summer.

 7    **Q.**   The summer of which year?

 8    **A.**   Of this year.

 9    **Q.**   And who was present?

10    **A.**   Of the City?  Of the attorneys?  Otis McGee.

11    **Q.**   Anyone else?

12    **A.**   That was it.

13    **Q.**   Never met with Mr. Lafayette?

14    **A.**   No.  I don't even know who Mr. Lafayette is.

15    **Q.**   He's the person who was just questioning you.

16    **A.**   Oh, Gary.  Sorry.  I didn't know him by last name.  I knew

17    him by first name.  Sorry.

18    **Q.**   I see.

19    **A.**   I met him maybe -- let's see -- September.  It could have

20    been August.  Maybe August of this year.

21    **Q.**   Okay.  And did you also meet with the attorneys for the

22    previous firm -- Meyers Nave -- that was in the case?

23            **MR. LAFAYETTE:**  Objection.  Relevancy, Your Honor.

24            **THE COURT:**  Overruled.

25            **THE WITNESS:**  No.

1   BY MR. SIEGEL

2   **Q.**   Didn't they take a statement from you, where you were

3   sworn to tell the truth?

4   **A.**   No.

5   **Q.**   Okay.  And let me just ask you a few questions about

6   what's occurred here in this case.  You were sorry when

7   Ms. Preston was terminated.  Correct?

8   **A.**   Yes.

9   **Q.**   And she had helped you advance your career in the City of

10  Oakland.  Correct?

11  **A.**   She had recruited me from HR --

12  **Q.**   Okay.

13  **A.**   -- but I'd done Employee Relations before.

14  **Q.**   Okay.  And helped you get a pay raise.  Correct?

15  **A.**   Yeah, she did.

16  **Q.**   And when she was terminated on that date, did you meet

17  with Katano Kasaine?

18  **A.**   Yes.

19  **Q.**   And did she come to your office and tell you that she was

20  now in charge of ER?

21  **A.**   Yes.

22  **Q.**   And did she then take you to meet Ms. Santana?

23  **A.**   Yes.

24  **Q.**   And Winnie Anderson was there, as well?

25  **A.**   Correct.

1   Q.   And you then told Ms. Santana the things that you said in

2   court today and last Friday.  Correct?

3            MR. LAFAYETTE:  Objection.  It's overbroad.

4            THE COURT:  Overruled.

5       You may answer.

6            THE WITNESS:  There was an attorney there from the

7   City Attorney's Office.  Do I still answer, even though it's

8   attorney-client privileged?

9            THE COURT:  Yes.

10           THE WITNESS:  Okay.  Can you repeat the question?

11  BY MR. SIEGEL

12  Q.   Sure.  Did you tell Ms. Santana the things that you've

13  testified in court today and last Friday?

14  A.   Yes, I did.

15  Q.   And who was present from the City Attorney's Office?

16  A.   Barbara Parker.

17  Q.   Okay.  Oh.  So the City Attorney was there?

18  A.   The City Attorney.

19  Q.   Okay.  And let's go through some of those things.  With

20  respect to the investigation of Deb Grant, you wrote a

21  statement that Andrea Gourdine asked you to write.  Correct?

22  A.   Correct.

23  Q.   And by the time you wrote that statement, you were no

24  longer working for Andrea Gourdine.  Correct?

25  A.   Correct.

1  Q.   You were now working in Employee Relations?

2  A.   Correct.

3  Q.   And you understood -- did you not? -- that one of the

4  responsibilities of Employee Relations was to carry out

5  investigations of other employees who were accused of some sort

6  of misconduct?

7  A.   Yes.  I --

8  Q.   In fact --

9  A.   However, Ms. Gourdine had asked me to write the statement

10  before I left Ms. Gourdine.  And, with the transition, I didn't

11  do it.

12  Q.   Okay.  But back to my question.

13  A.   Yes.

14  Q.   You understood when you went to Employee Relations that it

15  was responsible for conducting investigations of employees

16  accused of misconduct?

17  A.   Correct.

18  Q.   And that, in fact, that had been something that

19  LaWanna Preston had been in charge of, even during the time

20  when she was within the Human Resources Division under

21  Ms. Gourdine.  Correct?

22  A.   Correct.

23  Q.   Okay.  And you understood that was one of the main

24  responsibilities?

25  A.   It was one ever the main.  Yes.

1   Q.   And that once you became part of Employee Relations, you

2   would be doing investigations.  Correct?

3   A.   Correct.

4   Q.   And you understood -- or did you understand that it would

5   be a conflict of interest to both be a witness in a case, and

6   to do an investigation of the case at the same time?

7   A.   Yes.  And that's why I wouldn't be doing the

8   investigation.  I was going to -- if I was the witness, I was

9   the witness.

10  Q.   Whose call would that be whether --

11  A.   That would have been Ms. Preston.

12  Q.   That's right.

13  A.   Mm-hm.

14  Q.   And at the time that this incident with the statement

15  occurred, you and Ms. Preston were the only people in Employee

16  Relations who were doing investigations.  Correct?

17  A.   During that time -- ah, no.  I want to say

18  Trinette Gist-Skinner was still there during that time.

19  Q.   When did Ms. Trinette [sic] get transferred to the Fire

20  Department?

21  A.   In June of 2013.

22  Q.   Okay.  And was Ian Appleyard part of the staff at that

23  time?

24  A.   Yes, he was.

25  Q.   And he was out during the period when this Deb Grant

1    investigation took place?

2    **A.**    Yes.

3    **Q.**    Okay.   And now let me ask you:   What was it that was in

4    your statement about Deb Grant?

5    **A.**    The statement contained -- that -- how I purchased --

6    because I was the one that purchased some computers.

7    **Q.**    Okay.

8    **A.**    She wanted -- she called it, "I want a Maserati for me;

9    and I want a" -- I can't remember the other name of the car

10   that she wanted for her second person.   And then she wanted me

11   to purchase computers for the rest of her staff.

12   **Q.**    Okay.

13   **A.**    So IT -- when they got the computers, they weren't

14   compatible to what she needed from her softwares.   And they

15   return it back to me.   So we did that.   That was part of the

16   statement.

17       The other thing that was part of the statement was that

18   Ms. Grant was getting temporary people through a third-party

19   vendor.   And the third-party vendor was a Workers' Comp vendor.

20   And that's not the way of getting temps for the City of

21   Oakland.

22   **Q.**    Okay.   Now, all of the of the facts that were in your

23   statement were facts that could be ascertained from looking at

24   City records.   Correct?

25   **A.**    Correct.

1  **Q.**   Okay.   And so your statement really wasn't necessary to

2  investigate whatever it was that Ms. grant was accused of

3  doing?

4           **MR. LAFAYETTE:**   Objection.   Lacking foundation.

5  Requires speculation.

6           **THE COURT:**   Overruled.

7           **THE WITNESS:**   No.

8  **BY MR. SIEGEL**

9  **Q.**   Okay.   And by the way, you had prepared this statement on

10 your computer.   Correct?

11 **A.**   Yes.

12 **Q.**   So even though Ms. Preston took a copy away -- that is,

13 the copy you had left on the copy machine -- you went back to

14 your computer and printed out another one.   Correct?

15 **A.**   After I got the directive --

16 **Q.**   Right?

17 **A.**   -- from Scott Johnson, yes.

18 **Q.**   Okay.   So she didn't really ruin the evidence.   Correct?

19 The evidence was there on your computer?

20 **A.**   Correct.

21 **Q.**   Okay.   And then were you part of the process where the

22 Internal Affairs Division of the Police Department investigated

23 Deb Grant and Ms. Preston?

24 **A.**   Yes.

25 **Q.**   Okay.   And were you around when they completed their

1  investigation?

2  **A.**    Yeah.  I'm still with the City, so I guess I'm still

3  around.

4  **Q.**    And did you discuss the conclusion of that investigation

5  with Ms. Santana?

6              **MR. LAFAYETTE:**  Lacking foundation.

7              **THE COURT:**  Overruled.

8       You may answer.

9              **THE WITNESS:**  No.

10  **BY MR. SIEGEL**

11  **Q.**    Okay.  Now, you say you just happened to be present when

12  there was a conversation between Ms. Preston and T.C. Everett.

13  Correct?

14  **A.**    Correct.

15  **Q.**    And Ms. Preston -- was this in Ms. Preston's office?

16  **A.**    Yes.

17  **Q.**    Okay.  And that was one of those meetings where you wanted

18  to leave, but Ms. Preston asked you to stay there?

19  **A.**    Yes.

20  **Q.**    And -- and you saw Ms. Preston buy what from Ms. Everett?

21  **A.**    A terabyte.  So a device where you save files, pictures,

22  videos, whatever you want to save, that gets connected to your

23  computer.

24  **Q.**    In other words --

25  **A.**    A flash drive.

1  **Q.**   A flash drive.

2  **A.**   But it's a terabyte?

3  **Q.**   Terabyte?

4  **A.**   Sorry.

5  **Q.**   Which refers to the capacity of the device?

6  **A.**   Correct.

7  **Q.**   So it could hold more information?

8  **A.**   Correct.

9  **Q.**   Okay.  And were you also present when Ms. Preston advised

10  Ms. Everett that her computer wasn't working?

11  **A.**   No.

12  **Q.**   You just weren't part of those meetings?

13  **A.**   No.

14  **Q.**   Were you present when Ms. Everett was explaining to

15  Ms. Preston that if they didn't transfer the data, then it

16  might be lost from Ms. Preston's computer?

17  **A.**   Nope.

18  **Q.**   Oh.  Did you happen to be there when Ms. Santana ordered

19  that Ms. Preston's e-mail be reviewed and accessed?

20  **A.**   No.

21  **Q.**   You weren't part of that meeting.  I see.  Okay.

22          **MR. LAFAYETTE:**  Objection.  Argumentative.  Assumes

23  facts not in evidence.

24          **THE COURT:**  Sustained.

25

1  BY MR. SIEGEL

2  Q.   Now, have you received a promotion in the last period of

3  time?

4           MR. LAFAYETTE:  Objection.  Relevancy.

5           THE COURT:  Overruled.

6           THE WITNESS:  In what period of time?

7  BY MR. SIEGEL

8  Q.   Since Ms. Preston's termination.

9  A.   Yes.  I became appointed to the position.

10  Q.   What's that mean?

11  A.   When Ms. Preston was -- when I was with Ms. Preston, I was

12  an exempt limited duration temporary position.

13       After Ms. Preston left, Katano and Ms. Santana made me --

14  they appointed me into the permanent position.

15  Q.   And you hold that now?

16  A.   Yes.

17  Q.   You said you were present in a meeting or -- excuse me --

18  during the telephone conversation where Ms. Santana was on the

19  telephone, and you were in Ms. Preston's office?

20  A.   Yes.

21  Q.   What was the date of that meeting?

22  A.   I don't recall the date, but it was approximately maybe in

23  July or August.  Actually, it had to be -- it had to be in

24  September, now that I'm thinking about it.

25  Q.   Why did it have to be in September?

1   A.   Because of what Ms. Preston was asking Ms. Santana.

2   Q.   I see.  And what was she asking Ms. Santana?

3   A.   She was asking her to let Katano know to respond to her,

4   because she needed to do an administrative investigation on

5   Katano Kasaine.

6   Q.   So that gets back to that meeting on August 6th.  Right?

7   A.   Yes.

8   Q.   Okay.  And so -- but let me ask you this.  You're saying

9   Ms. Preston didn't tell Ms. Santana that she was on a speaker

10  phone?

11  A.   Correct.

12  Q.   Who initiated that phone call?

13  A.   If I recall, it was Ms. Preston.

14  Q.   Okay.  And what do you recall that Ms. Santana said over

15  that speaker-phone conversation?

16  A.   It seemed like she couldn't speak.  The conversation was

17  quick; but Ms. Santana said, "LaWanna, I will have the

18  City Attorney take care of this investigation."

19  Q.   Oh.  She didn't say, "I'm going to have a third party take

20  care of the investigation?"

21  A.   I couldn't recall that.  What I remembered was

22  City Attorney.

23  Q.   Okay.  Now let's talk a little bit about that August 6th

24  meeting.  You -- you were present.  Is that right?

25  A.   Correct.

1   Q.   And you heard Ms. Kasaine say that she was not collecting

2   union dues from all part-time employees.  Is that right?

3   A.   Not from all.  From some.

4   Q.   Okay.  And by the way, you've testified about that.  Isn't

5   it true that when the City of Oakland has an agreement with a

6   bargaining unit, and the provision of the bargaining unit

7   requires the collection of dues, those dues get collected

8   whether the employee agrees or not?

9         MR. LAFAYETTE:  Objection.  Calls for conclusion.

10  Lacking in foundation.

11        MR. SIEGEL:  Well, Your Honor, she's testified.

12        THE COURT:  Overruled.  Overruled.  You asked the

13  same type of question.

14     You may answer.

15        THE WITNESS:  Okay.  Yes, but we were deducting some

16  of the -- the City was deducting.

17  BY MR. SIEGEL

18  Q.   Okay, but my point is --

19  A.   Mm-hm.

20  Q.   -- it was not necessary for the employee to agree.

21  Correct?

22  A.   Correct.

23  Q.   The contract says collect the dues.  The City's supposed

24  to collect the dues.

25  A.   Correct.

1  Q.   Okay.  And if the employee wants to be a full union

2  member, then the full dues are collected.  Correct?

3  A.   Correct.

4  Q.   And if the employee simply wants to be an agency fee

5  payer, that's what happens?

6  A.   Yes.

7  Q.   And if the plea doesn't sign anything, then the City

8  deducts the agency fees.  Is that right?

9  A.   If there are funds.  Yes.

10 Q.   Okay.  Now, isn't it true that when you heard Ms. Kasaine

11 make these comments at the August 6th, 2013, meeting, you were

12 concerned about her comments?

13 A.   Yes.

14 Q.   And you thought she said something that she should not

15 have said?

16 A.   And that's why we called a caucus.

17 Q.   Okay.

18 A.   We stepped out of the room.

19 Q.   And that's because she said something that she should not

20 have said?

21 A.   Correct.

22 Q.   And what she said that she should not have said is that,

23 "I haven't been collecting these dues"?

24 A.   Correct.

25 Q.   Okay.  And then you and Ms. Anderson met with her?

1   **A.**   Correct.

2   **Q.**   And she went back into the room, and she made the same

3   statement.   Correct?

4   **A.**   She corrected her statement.

5   **Q.**   How did she correct it?

6   **A.**   She corrected by explaining to them that the reason why

7   she wasn't collecting was for the people that -- one, that are

8   only active in the books, but not getting a paycheck; two,

9   they're making -- they're not making enough money, and she's

10  not collecting from every single assignment that they have,

11  because they had multiple assignments.  There were people that

12  had three, or four, or two assignments.

13  **Q.**   And she also said -- didn't she? -- that if she collected

14  dues from all of the employees, her phone would be ringing off

15  the hook?

16  **A.**   Yes.

17  **Q.**   She did say that.  Right?

18  **A.**   She did say that.

19  **Q.**   Okay.  So she denies saying that when she testified in

20  court last week.  That would be an error on her part.  Correct?

21          **MR. LAFAYETTE:**  Objection.  Argumentative.

22          **THE COURT:**  Sustained.

23  And the jury will remember that the attorneys are not

24  witnesses.  And your memory of what other witnesses said will

25  control; not what the attorneys are arguing during court.

1  **BY MR. SIEGEL**

2  **Q.**   Now, you participated in that negotiation on August 2,

3  2013.   Correct?

4  **A.**   August 2?

5  **Q.**   Excuse me.   October 2.

6  **A.**   Yes, I did.

7  **Q.**   When the TA was signed?

8  **A.**   Yes.

9  **Q.**   What time did those negotiations begin?

10  **A.**   They typically would begin --

11      Well, the City takes a little bit of time; but typically

12  around maybe ten.

13  **Q.**   Ten in the morning?

14  **A.**   Ten in the morning.   Mm-hm.

15  **Q.**   And how long did those particular negotiations take place?

16  **A.**   At least for that day, I would say that we went all the

17  way until maybe five.

18  **Q.**   Whole day?

19  **A.**   Yeah, whole day.   Caucus in between, but whole day.

20  **Q.**   Were you with Ms. Preston the whole day?

21  **A.**   Yes, I was.

22  **Q.**   Do you recall her having a meeting with Ms. Santana that

23  day?

24  **A.**   I don't.

25  **Q.**   Okay.   Do you recall her having the telephone conversation

1  with Ms. Santana on October 2?

2  **A.**   No, I don't.

3  **Q.**   Okay.  Now, as a labor-relations negotiator, have you been

4  part of what are known as "sidebars" with union officials?

5  **A.**   Yes, I have.

6  **Q.**   Do you know what a sidebar is?

7  **A.**   Yes.

8  **Q.**   That's when someone from each side gets together away from

9  the negotiating table?

10  **A.**   Correct.

11  **Q.**   Tries to figure out what to do?

12  **A.**   Correct.

13  **Q.**   It's fair to say that during these sidebars, there's some

14  of what occurs that might be described as "horse-trading"?

15  **A.**   Correct.

16  **Q.**   Like, okay.  Let's -- we go back.  If I say this, if you

17  say that, and maybe we'll reach a deal?

18  **A.**   Yes.  Absolutely.

19  **Q.**   With respect to the issue of the Temporary Part Time

20  employees --

21  **A.**   Mm-hm.

22  **Q.**   -- have you ever seen the grievance that SEIU filed in

23  that case?

24  **A.**   I did.

25  **Q.**   Okay.  That was a grievance against the City.  Correct?

1   **A.**   Correct.

2   **Q.**   And it was a grievance against the City for not collecting

3   union dues.  Correct?

4   **A.**   Correct.

5   **Q.**   It's not a grievance against Ms. Kasaine personally; was

6   it?

7   **A.**   No.

8   **Q.**   And Ms. Kasaine, therefore, as far as you're concerned,

9   had nothing to worry about personally because of that

10  grievance?

11          **MR. LAFAYETTE:**  Objection.  Requires speculation.

12          **THE COURT:**  Overruled.

13          **THE WITNESS:**  Correct.  There was nothing for her to

14  worry about because it's not about her.

15          **MR. SIEGEL:**  Nothing to worry about.

16      In fact, have you been involved since then, in terms of

17  trying to figure out this dues issue?

18          **MR. LAFAYETTE:**  Objection.  Relevancy as subsequent

19  remedial.

20          **THE COURT:**  Overruled as a foundational question.

21          **THE WITNESS:**  Yes.

22  **BY MR. SIEGEL**

23  **Q.**   Let me ask you this.

24  **A.**   Mm-hm.

25  **Q.**   Isn't it true that the way the City could find out who was

1  paying dues and who was not is simply by looking at payroll

2  records?

3  **A.**    Correct.   Running reports.

4          **MR. SIEGEL:**  Thank you.   I have no further questions.

5          **THE COURT:**  All right.   Ladies and gentlemen of the

6  jury, we're going to take a break now; an opportunity, if you

7  wish to, to write down any questions.   Again, you're not

8  required to.   We'll come back in ten minutes with those

9  questions or further examination.   Thank you very much.

10          **THE CLERK:**  Please rise.

11  (Recess taken from 10:48 a.m. until 10:58 a.m.)

12  (Proceedings were heard outside the presence of the jury:)

13          **THE COURT:**  Ms. Lara, you may come back to the stand.

14  We have a few questions of a factual nature which I will ask

15  the witness.   Please bring our jurors back in.

16  (Proceedings were heard in the presence of the jury:)

17          **THE COURT:**  All right.   Our jurors have returned.

18  Please be seated.

19      Ms. Lara, you remain under oath.   We have a few questions

20  from our jurors.   I'll ask both of them, so you have the full

21  context.   The questions are:   Are you now the Employee

22  Relations Director; and did you apply for this position?

23          **THE WITNESS:**  The answer is, no, I'm not the Employee

24  Relations Director; and I did not apply for the position.

25          **THE COURT:**  What is your current position?

1          THE WITNESS:  I'm a Principal Employee Relations

2    Analyst.

3          THE COURT:  Any further examination from either party

4    on that topic?

5          MR. LAFAYETTE:  I have further examination, but I can

6    just take that piece of examination.  I'll do it.

7          THE COURT:  Are there any further questions from

8    Mr. Siegel?

9          MR. SIEGEL:  No.

10          THE COURT:  You have no more than two minutes

11    remaining with this witness.  You've already questioned for two

12    days.  Go ahead.

13                    **REDIRECT EXAMINATION**

14    **BY MR. LAFAYETTE**

15    **Q.**   How far is your office from Ms. Preston's office -- was

16    it?

17    **A.**   Was it?  It's about, I guess, three feet.  Whatever the --

18    **Q.**   How often were you in her office?

19    **A.**   Oh, every day.

20    **Q.**   And with regard to the meet -- October 2nd negotiations,

21    were you with her every minute of the day?

22    **A.**   Not every minute of the day.  I mean, I'm pretty sure I

23    went to the rest room.  She probably took meetings, you know.

24    **Q.**   And after Ms. Preston left, who was it that became the

25    Interim Director?

1  **A.**    Katano Kasaine.

2  **Q.**    And what -- did -- was there a change in the status of

3  Ms. Winnie Anderson at that time?

4  **A.**    She became permanent, like I did.  However, they made her

5  the day-to-day supervisor.

6           **MR. LAFAYETTE:**  No further questions, Your Honor.

7           **THE COURT:**  Thank you.

8           **MR. SIEGEL:**  If I may clarify that.

9           **THE COURT:**  You may.

10                    **RECROSS-EXAMINATION**

11  BY MR. SIEGEL

12  **Q.**    So again, October 2nd was date where you negotiated that

13  TA with the union.  Correct?

14  **A.**    Correct.

15  **Q.**    On the dues?

16      Was it your role in, say, September 2013 to go to closed

17  session and discuss labor agreements?

18  **A.**    At that point is when we started going to closed session.

19  **Q.**    When did you start to go?

20  **A.**    I started in September.  Actually, no.  Sorry.  Let me

21  take that back.  First is October.  So it's November.

22  **Q.**    You started in November?

23  **A.**    In November, yes, going to closed sessions.

24  **Q.**    So you don't know whether the October 2nd TA was approved

25  by the Council in closed session before October 2?

 1  **A.**   My understanding from Ms. Preston was that it was approved

 2  by Council.

 3              **MR. SIEGEL:**  It was approved.  Okay.  Great.  Thank

 4  you.

 5              **THE COURT:**  You may step down.  Thank you for being

 6  here on two days.

 7              **THE WITNESS:**  All right.

 8  (Witness excused.)

 9              **THE COURT:**  And the Defense would call its next

10  witness, please.

11              **MR. LAFAYETTE:**  Yes, Your Honor.  The Defense calls

12  Deanna Santana.

13                          **<u>DEANNA SANTANA</u>,**

14  called as a witness for the Defendant, having been duly sworn,

15  testified as follows:

16              **THE WITNESS:**  I do.

17              **THE CLERK:**  You may be seated.

18              **THE COURT:**  We already know her name, so go ahead.

19              **MR. LAFAYETTE:**  Ms. Santana, go ahead.

20                      **<u>DIRECT EXAMINATION</u>**

21  **BY MR. LAFAYETTE**

22  **Q.**   Did you terminate Ms. Preston's employment because she

23  refused to add language to the Rainbow Teen Center Report

24  referring to Desley Brooks for prosecution?

25              **JUROR RODRIGUEZ:**  (Indicating.)

1          MS. MEHTA:  (Indicating.)

2          THE COURT:  Sustained.

3      And, Mr. Lafayette, you need to speak into the microphone

4  and have the witness, because the jury can't hear you, and the

5  witness might not be able to hear you, either.  So start your

6  question again at a louder volume.

7          MR. LAFAYETTE:  Thank you, Your Honor.

8  Q.  Did you terminate his Preston's employment because she

9  refused to confirm a statement at the City Council meeting on

10 March 6?

11 A.  No.

12 Q.  Did you terminate Ms. Preston's employment because she

13 disclosed that the City of Oakland was entering into contracts

14 with firefighters Local 5 without the necessary approval from

15 City Council?

16 A.  No.

17 Q.  Did you terminate Ms. Preston's employment because she

18 disclosed that the City of Oakland was failing to collect

19 Temporary Part Time employee union dues?

20 A.  No.

21 Q.  Did you terminate Ms. Preston's employment because she

22 refused to add language to the Rainbow Teen Center Report

23 referring Ms. Brooks for prosecution?

24 A.  No.

25 Q.  In September of 2013 did you have more than one

1  conversation with Ms. Preston involving her desire to conduct

2  an investigation of Katano Kasaine?

3  **A.**   Yes.

4  **Q.**   Was her voice raised in more than one conversation with

5  you during that time period?

6  **A.**   Yes.

7  **Q.**   Succinctly -- and I'm not asking you to go into details.

8  I just want to ask you a few things here.  Okay?  Can you tell

9  me succinctly the reasons why you, in fact, terminated

10  Ms. Preston's employment?

11  **A.**   LaWanna had two roles -- two chief roles.  One was labor

12  negotiations, and the other was investigations.

13       In labor negotiations what I --

14       Excuse me.  I have a cold.

15       With labor negotiations what I've discovered is that she

16  was not able to get along with the team assigned to labor and

17  budget.  And there were several complaints and discussions

18  about her self-correcting.  She was failing the -- to meet the

19  City's processes with respect to closed session and appropriate

20  review by myself and City Attorney for final reports proposed

21  during closed session.  In some cases we had to establish

22  alternate protocols, because we didn't have an opportunity to

23  review work that we had to sign off on.  And she was not

24  attending regularly the budget and labor meetings where, if she

25  would have attended and participated, she could have been more

1    effective in her role.

2         On the investigations side, there's a couple of standards

3    that an investigation should meet.  It should be fair,

4    impartial, thorough, and complete.  And since she has such a

5    high responsibility within the City for overseeing those

6    investigations, I found that ripping evidence up that a witness

7    was directed to provide that could be investigated and would

8    contribute towards a thorough and complete investigation was

9    unethical and inappropriate.  I had her concerns about her

10   ability to investigate the rest of the workforce.

11        And then when I learned that she pulled that same witness

12   into her office in front of Deb Grant, who was being

13   investigated, that -- to push her to answer questions on an

14   investigation that she was not assigned -- rather, the Police

15   Department -- that appeared unethical.  It appeared that it

16   could be interpreted as intimidating or -- or threatening,

17   because Sonia was a temporary employee.  And always both Winnie

18   and Sonia were working at a temporary status, and they felt

19   their job was at risk.

20        So I lost trust in LaWanna.  I lost trust in her ability

21   to maintain working relationships.  The labor unions were --

22   were already complaining about her.  And her investigative

23   integrity did not meet the standards that I thought needed to

24   be met.

25        I should also add that on -- as I mentioned earlier, there

1   were two investigations on the Deb Grant issue.  The audit did

2   find inappropriate expenditures.  There were retreats,

3   manicures, pedicures.  There were staff that weren't hired

4   within the civil-service process.  There were other

5   expenditures that were not authorized with Council approval or

6   budget allocation.

7   Q.   Okay.  Thank you.  These issues --

8        Did you have conversations with the investigator prior to

9   the final report being released?

10  A.   I did.

11  Q.   The information that you've just shared with us about

12  that -- the Deb Grant issues -- was that shared with you by the

13  investigator prior to the completion of the report?

14  A.   Yes.

15  Q.   Now, approximately when was it that you made up your mind

16  to terminate Ms. Preston's employment?

17  A.   About spring of 2013.

18  Q.   And when you made up your mind to do that, did you share

19  your opinions with anybody else?

20  A.   I did.

21  Q.   With whom?

22  A.   I shared my concerns with Mayor Quan.  And I also shared

23  my concerns and sought the legal guidance of City Attorney

24  Barbara Parker.

25  Q.   Is there any reason why you delayed in actually

1  terminating Ms. Preston's employment since you made the

2  decision in spring?

3  **A.**    Yes.

4  **Q.**    What was that?

5  **A.**    One, we were in the middle of bargaining.  And two, there

6  were vacations planned.  I had the whole month of August

7  planned.

8      And others -- LaWanna had some vacations planned in July,

9  August, I think.  I didn't want to leave -- I didn't want to

10  terminate her and then leave the country.

11  **Q.**    Now -- and why did you pick October 3rd as the date to

12  terminate her?

13  **A.**    The -- the final I. A. report in writing was issued to me

14  on September 30th after hours.  And so I had an opportunity to

15  review its final -- it in its final form on October 1st; and

16  then my concerns around Ms. Preston's behavior with respect to

17  the investigation which I had removed her from.

18  **Q.**    I'd like for you to take a look -- there's a book in front

19  of you there.  And I'm going to shake make sure it's the right

20  one first.  Okay?

21  **A.**    This one?

22  **Q.**    Can you turn -- showing you Exhibit 1N.

23  **A.**    Yes.

24  **Q.**    Is this an e-mail that you received from -- an e-mail

25  exchange between you and Ms. Preston in May of 2013?

1  **A.**   It is.

2          **MR. LAFAYETTE:**  I'd like to move that document into

3  evidence, Your Honor.

4          **MR. SIEGEL:**  No objection.

5          **THE COURT:**  1N is admitted.

6  (Trial Exhibit 1N received in evidence.)

7          **THE COURT:**  Proceed.

8  **BY MR. LAFAYETTE**

9  **Q.**   Can you take a look at Exhibit 1Q?

10 **A.**   I have it.

11 **Q.**   Is that an e-mail that you're copied on from Ms. Orologas

12 to Ms. Preston dated June 13, 2013?

13 **A.**   It is.

14 **Q.**   And is this --

15         **MR. LAFAYETTE:**  I'd like to move this document into

16 evidence, Your Honor.

17         **THE COURT:**  1Q is admitted.

18 (Trial Exhibit 1Q received in evidence.)

19         **THE COURT:**  Proceed.

20 **BY MR. LAFAYETTE**

21 **Q.**   Is this an e-mail where -- did Ms. Orologas send this in

22 your direction?

23 **A.**   She did.

24 **Q.**   And was this to point out that Ms. Preston had missed the

25 past --

1    **MR. SIEGEL:**  Objection.  The document speaks for

2  itself.

3            **THE COURT:**  Sustained.

4            **MR. LAFAYETTE:**  Put it up.

5            **THE COURT:**  And leading.

6  (Document displayed.)

7  **BY MR. LAFAYETTE**

8  **Q.**    You mentioned a few minutes ago something about the labor

9  budget meetings.  Is this an e-mail in reference to that?

10  **A.**    It is.

11  **Q.**    And what was the purpose of these meetings, quickly?

12  **A.**    To review the labor-negotiations strategy, and the budget

13  and fiscal implications with respect to that strategy, and have

14  all hands in the room.

15  **Q.**    Thank you.  And then I'd like for you to take a look --

16        Did her not coming to those meetings impact the

17  negotiation process?

18  **A.**    They did.

19  **Q.**    Explain quickly, please.

20  **A.**    We -- we would talk about fiscal strategy and costing

21  approaches, and the documents that we were preparing for

22  LaWanna to submit to the labor groups; and not having that

23  information.  And she -- her not participating -- it -- the

24  playing lot of catch-up, and having to fill a lot of voids for

25  her.  I didn't understand where her voids might be, and what

 1  her own preparation was for the meetings.

 2  **Q.**   Now, at some point other people were brought into the

 3  negotiating process.  Would that be accurate?

 4  **A.**   Yes.

 5  **Q.**   And can you tell us why other people were brought into the

 6  negotiating process?

 7  **A.**   There had been ongoing, multi-month discussions with

 8  respect to labor agreements.  In some cases, we were making

 9  progress.  In other cases, we weren't.

10       The complaints coupled with the desire to close the

11  tables -- I brought in Sandre Swanson and Fred Blackwell to

12  help participate in support the labor negotiations.

13  **Q.**   Could you take a look at Exhibit 3N?  It should be in the

14  same binder you have there in front of you.

15  **A.**   3N?

16  **Q.**   "N," as in "Nancy."

17  **A.**   N.

18  **Q.**   Is Exhibit 3N a document dated September 12, 2013?

19  **A.**   Yes.

20  **Q.**   And is that an e-mail between you and Ms. Preston?

21  **A.**   Yes.

22            **MR. LAFAYETTE:**  I'd like to move this one into

23  evidence, Your Honor.

24            **MR. SIEGEL:**  No objection.

25            **THE COURT:**  3N -- "Nancy" -- is admitted.

 1  (Trial Exhibit 3N received in evidence.)

 2  (Document displayed.)

 3  **BY MR. LAFAYETTE**

 4  **Q.**   And does Exhibit 3N contain your response to Ms. Preston's

 5  e-mail concerning who, in fact, would be conducting the

 6  investigation?

 7  **A.**   It does.

 8  **Q.**   Now prior to September 27, 2013, did Ms. Preston ever tell

 9  you that a deadline was imminent with regard to responding to

10  the union's grievance?

11  **A.**   I don't think so.

12          **MR. LAFAYETTE:**  No further questions, Your Honor.

13          **THE COURT:**  Thank you.

14      Cross-examination.

15          **MR. SIEGEL:**  Yes, Your Honor.  Thank you.

16                      **CROSS-EXAMINATION**

17  **BY MR. SIEGEL**

18  **Q.**   So would it be fair to say, Ms. Santana, that even now, in

19  the sixth day of trial, you're still coming up with reasons for

20  the termination of Ms. Preston back in October 2013?

21          **MR. LAFAYETTE:**  Objection.  Argumentative,

22  Your Honor.

23          **THE COURT:**  Sustained.

24  **BY MR. SIEGEL**

25  **Q.**   Well, let me ask you this.  Was Ms. Preston terminated

1   because she was an at-will employee, and you could terminate

2   her without cause?

3   **A.**    She was an at-will employee.  And there was enough

4   information for me, in terms of working relationships and

5   performance, that led me to no longer need her services.

6   **Q.**   Well, my question is:  Did you terminate her for no cause,

7   or for cause?

8   **A.**   I terminated --

9               **MR. LAFAYETTE:**  Objection.  It's argumentative and

10  cumulative.

11              **THE COURT:**  Overruled.

12       You may answer.

13              **THE WITNESS:**  I terminated her under her at-will

14  status.

15  **BY MR. SIEGEL**

16  **Q.**   Okay.  So because -- for lack of work?

17  **A.**   We no longer needed her services.

18  **Q.**   Okay.  So that was the reason you gave her?

19  **A.**   That's the reason.

20  **Q.**   Was that correct?

21  **A.**   Yes.

22  **Q.**   And anything else you've come up with since then is not

23  the reason you terminated her?

24              **MR. LAFAYETTE:**  Objection, as it's argumentative,

25  Your Honor.

1     **THE COURT:**  Sustained.

2  **BY MR. SIEGEL**

3  **Q.**  Let me ask you this.  Do you recall answering

4  interrogatories under oath in December of 2014?

5     **MR. LAFAYETTE:**  Objection.  It's cumulative.

6     **THE COURT:**  Overruled.

7     **THE WITNESS:**  I do.

8  **BY MR. SIEGEL**

9  **Q.**  And at that time -- that is, in December 2014 -- was your

10 answer to those interrogatories true and correct?

11 **A.**  Yes.

12 **Q.**  Now let me ask you this.  You did not terminate Preston in

13 June because negotiations were pending?

14 **A.**  That's right.

15 **Q.**  And you needed her to continue to represent the City in

16 those negotiations?

17 **A.**  That's not what I said.

18 **Q.**  That's my question.

19 **A.**  I did not want to be disruptive to the labor or bargaining

20 process.

21 **Q.**  And you wanted Ms. Preston to continue in those

22 negotiations?

23 **A.**  I brought in additional people, and allowed for LaWanna to

24 continue in that process.

25 **Q.**  You didn't fire her in June because you wanted her to

1  continue with the negotiations.  Correct?

2            MR. LAFAYETTE:  Objection.  It's argumentative.

3            THE COURT:  Overruled.

4        You may answer the question.

5            THE WITNESS:  No.  Let me put the context.  We have

6  many tables open.  We had regional strikes with multiple public

7  agencies, where the Bay Bridge was -- the BART was being closed

8  down.  Park services were being closed down.  There were

9  strikes out on the city of Oakland streets.  State legislators

10  were considering legislation for addressing issues where the

11  East Bay gets closed down.  And I didn't want to throw in

12  another dynamic that could further delay how close we were to

13  closing these tables.

14  BY MR. SIEGEL

15  Q.   So you wanted Ms. Preston to continue her work in the

16  negotiations?

17  A.   I wanted to close the tables.

18  Q.   You said, I believe, that you didn't fire her in June

19  because the negotiations were taking place.  Correct?

20  A.   That's correct.

21  Q.   And you wanted her to continue doing the negotiations?

22            MR. LAFAYETTE:  Objection.  Cumulative and

23  argumentative.

24            THE COURT:  Sustained.

25

1  BY MR. SIEGEL

2  Q.   Now with respect to what you learned from Ms. Lara about

3  the Deb Grant investigation -- you learned that after

4  Ms. Preston was terminated.  Correct?

5           MR. LAFAYETTE:  Objection.  It's overbroad.

6           THE COURT:  Overruled.

7           THE WITNESS:  I don't know what you're talking about

8  in terms of with respect to what I learned.  Can you offer more

9  detail?

10  BY MR. SIEGEL

11  Q.   Sure.  You learned after Ms. Preston was terminated --

12       Well, let me go back a step.

13       Isn't it true that on the day Ms. Preston was terminated,

14  you and Ms. Kasaine and Ms. Parker met with Ms. Lara and

15  Winnie Anderson in your office?

16  A.   Yes.

17  Q.   And purpose of that conversation was to see what

18  Ms. Winnie Anderson and Sonia Lara could tell you about

19  Ms. Preston's work?

20  A.   I received a call from Katano and Barbara that Sonia and

21  Winnie were bringing really unusual information to their

22  attention about LaWanna's performance and actions.  I was out

23  of the office.  And we made arrangements to meet in my office

24  when I got there.

25  Q.   Okay.  And they shared with you some of the things

1  Ms. Lara said in this court last Friday and today?

2  A.    They did.

3  Q.    Okay.  So these were things that you learned from her

4  after you terminated Ms. Preston?

5            MR. LAFAYETTE:  Objection.  It's vague.

6            THE COURT:  Overruled.

7            THE WITNESS:  I learned of additional inappropriate

8  behavior after she was terminated, through Sonia and Winnie.

9  BY MR. SIEGEL

10  Q.    Okay.  Now, you also mentioned the IAD investigation.

11  Correct?

12  A.    Yes.

13  Q.    And I think we talked about this when you were testifying

14  last week, but isn't it true that the IAD investigators did not

15  recommend disciplinary action against Ms. Grant or against

16  Ms. Preston?

17            MR. LAFAYETTE:  Cumulative to last week.

18            THE COURT:  Overruled.

19            THE WITNESS:  The IAD is not charged with assigning

20  or recommending discipline.  They're assigned with looking at

21  the facts and making findings of the case.  So, no, they would

22  not have directed or recommended discipline.

23  BY MR. SIEGEL

24  Q.    Didn't the IAD report conclude that both Ms. Grant and

25  Ms. Preston were credible?

1  **A.**   No.  They -- they concluded that the -- that LaWanna's

2  actions needed attention with respect to her role as overseeing

3  citywide investigations.  And --

4  **Q.**   Didn't they conclude that she was credible?

5  **A.**   I don't know what specific location, but if you look at

6  the back page -- the last page of that investigation -- it says

7  that I needed to address the matter.

8  **Q.**   I see what the last page says.  You can look at

9  Exhibit 4J.

10  **A.**   Is it the binder that I have in front of me?  It's Joint

11  Trial Exhibits, Volume One?

12         **MR. SIEGEL:**  I don't know.  It should say which

13  exhibits are -- the front part of it.

14         **THE COURT:**  It's in Volume Two, the second binder.

15         **MR. SIEGEL:**  So it's probably going to be in one of

16  those to your left.  Have you found it?

17         **THE WITNESS:**  I did.  I found it.

18  **BY MR. SIEGEL**

19  **Q.**   So the last page really just includes the names of the

20  people in the Police Department.  Correct?

21  **A.**   The last page?  It does.

22  **Q.**   Okay.  So the -- the next-to-the-last page, which is page

23  41 -- didn't IA conclude that neither Ms. Preston nor Ms. Grant

24  interfered with the IA investigation?

25  **A.**   I was focused on the, "However, their practice of

1  discussing ongoing investigations and their rationale behind

2  this is concerning and should be addressed."  That was my --

3  what my earlier comment was referring to.

4  **BY MR. SIEGEL**

5  **Q.**  Didn't the IA conclude that neither Ms. Preston nor

6  Ms. Grant interfered with the IA investigation?

7  **A.**  The sentence above does say that based on the information

8  gathered during the course of this investigation, there is no

9  evidence to support Ms. Preston or Ms. Grant interfered with

10  the investigation.

11  **Q.**  Okay.  And didn't the IA also conclude that Ms. Preston

12  and Ms. Grant were credible?

13          **MR. LAFAYETTE:**  Objection, Your Honor.  Best

14  evidence.

15          **THE COURT:**  Overruled.

16      And if you could pull the microphone a little closer to

17  you, that will assist the jurors to hear you.

18          **THE WITNESS:**  Okay.

19          **THE COURT:**  Thank you.

20          **THE WITNESS:**  I don't remember.  It's a rather long

21  document.  If you want to -- I just don't remember that

22  statement in there.  I was referenced on the last page.

23  **BY MR. SIEGEL**

24  **Q.**  Okay.  So look at page 34, please.

25  **A.**  I'm there.

1  Q.    Are you there?

2  A.    I am.

3  Q.    You see towards the bottom of the page, just to refresh

4  your recollection.  Is your recollection refreshed that the

5  Internal Affairs Division of the Oakland Police Department

6  determined that Ms. Preston was credible?

7  A.    It says, "LaWanna Daryelle LaWanna Preston was found

8  credible.  She admitted to tearing up those statement;

9  discarding it.  She admitted to engaging in various

10  conversations with Grant concerning the investigation.

11  However, she had no specific recollection of the specific

12  content or their discussion."

13  Q.    Okay.  And they also found Deborah Grant to be credible?

14  A.    It says, "Deb Grant was found credible.  Her statement was

15  consistent with physical evidence and witnesses.  She also

16  admitted to engaging in various discussions with Lara and

17  Preston concerning this investigation.  Grant's candidness

18  suggests that there is no reason to question her credibility."

19  Q.    And just to be clear, the purpose of the IA investigation

20  was twofold.  One, to investigate whether Ms. Grant had maiden

21  appropriate expenditures.  Correct?

22  A.    That was the purpose of the audit.

23  Q.    Okay.  Was it also the purpose of the IA investigation?

24  A.    The -- I wanted to have a concurrent investigation to

25  understand whether there was any criminal activity with respect

1  to the inappropriate procurements.

2  Q.   Right.  And then there was also --

3       So that was one of the topics.

4       And the other topic was whether what happened between

5  Ms. Preston and Ms. Lara interfered with the investigation of

6  Ms. Grant.  Correct?

7  A.   Yes.

8            MR. SIEGEL:  Thank you.  I have nothing further.

9            THE COURT:  Redirect?

10           MR. LAFAYETTE:  Just short.  Very short.

11                    **REDIRECT EXAMINATION**

12  BY MR. LAFAYETTE

13  Q.   Regardless of what the investigation -- those conclusions

14  that were just discussed with Mr. Siegel, was there behavior

15  reported to you involving Ms. Preston that you found

16  problematic, given her position in the City?

17  A.   Yes.

18  Q.   And what was it about her behavior that you found

19  problematic, given her position in the City?

20  A.   As I mentioned earlier, the inability to get along with

21  her work colleagues; the inability to work well with labor

22  unions.  We talked last week about circulating e-mails

23  inappropriately; and in one case, it was related to an

24  investigation, and concerns about violating employees' privacy

25  during investigations.  And then the issues around ripping up

1  evidence, and bringing in a witness who was providing

2  statements to the Police Department in front of the person who

3  was accused of the inappropriate action, to see if she would

4  speak about the nature of her IA investigation interview.  And

5  then just lack of performance.  Insubordination.  She didn't

6  want to accept that I had decided to go elsewhere for an

7  investigation, because she and Katano did not get along.  I no

8  longer trusted her investigation abilities, as well as not

9  following processes with respect to closed-session procedures

10  or attending meetings.

11  **Q.**   Could you just quickly turn to page 40 of the report?

12  That would be Exhibit 4J.

13         **MR. LAFAYETTE:**  You know, Your Honor, I'll just leave

14  it.  I'll just leave it.

15         **THE COURT:**  All right.  We'll take a break then, a

16  short break of about five minutes or as long as needed for the

17  jury to ask any written questions that you wish to.  And we'll

18  return with those questions or further evidence.  Thank you.

19         **THE CLERK:**  Please rise.

20  (Proceedings were heard outside the presence of the jury:)

21         **THE COURT:**  All right.  We've got a question for the

22  witness.  And we'll bring in our jurors to have them hear the

23  answer.

24  (Proceedings were heard in the presence of the jury:)

25         **THE COURT:**  All right.  Please be seated, everyone.

**PROCEEDINGS**

1    Our jurors have returned.  Ms. Santana's still on the stand and

2    remains under oath.  Ms. Santana, a follow-up question from the

3    jurors.  It's got two parts, so I'll read the entire thing

4    before you answer.  The question concerns the October 2nd,

5    2013, telephone call between you and Ms. Preston.  And the

6    question is:  At the time of the October 2nd cell-phone call

7    with Ms. Preston, who, of everyone, was in your office during

8    the speaker-phone conversation?  And what was said by you and

9    Ms. Preston?

10       I'll read it all again.

11       At the time of the October 2nd cell-phone call with

12   Ms. Preston, who, of everyone, was in your office during the

13   conversation?  And what was said by you and Ms. Preston?

14       **THE WITNESS:**  The October 2nd meeting included

15   Barbara Parker, and Otis McGee, and myself.

16       And then the purpose of the meeting was a meet-and-greet

17   for Otis Green.  We were talking about the scope of the

18   investigation and some of the issues, as well as issues around

19   transfer of investigatory documents and evidence.

20       **THE COURT:**  And what was said by you and Ms. Preston

21   during the telephone conversation?

22       **THE WITNESS:**  LaWanna was still expressing concern

23   about my decision to go with a third party.  I did inform her

24   that I was in a meeting with the investigator that had been

25   hired through the City Attorney's Office.  And we talked about

1  the transfer of documents and evidence related to the

2  investigation that was going to be conducted.

3         **THE COURT:**  Mr. Siegel, any follow-up?

4                 **RECROSS-EXAMINATION**

5  **BY MR. SIEGEL**

6  **Q.**  What time was the telephone call?

7  **A.**  It was in the afternoon.

8  **Q.**  Can you be more precise?

9  **A.**  I would have to check my calendar.

10         **MR. SIEGEL:**  That's all.  Thank you.

11         **THE COURT:**  Mr. Lafayette, any further examination?

12         **MR. LAFAYETTE:**  No, Your Honor.

13         **THE COURT:**  You may step down.  Thank you very much.

14  (Witness excused.)

15         **THE COURT:**  Does the Defense have any further

16  evidence to present to the jury?

17         **MR. LAFAYETTE:**  No, Your Honor.  Defense rests.

18         **THE COURT:**  All right.  Ladies and gentlemen of the

19  jury, we've reached a second milestone in the case, which is

20  the close of the Defense evidence.

21      At this time I have a stipulation of fact to read to you.

22  A stipulation of fact is an agreement of the parties as to a

23  fact in evidence.  This is evidence, just like the other

24  evidence you've heard from the witness stand and you will see

25  in documentary form.  It is evidence you can consider in

1  rendering your judgment in the case.  And this is the

2  stipulation of fact.  Ms. Preston is seeking noneconomic

3  damages for mental and emotional distressed, but she is not

4  seeking damages for psychiatric harm.  I'll read it again.

5  Ms. Preston is seeking noneconomic damages for mental and

6  emotional distress, but she is not seeking damages for

7  psychiatric harm.

8       You'll get further instruction about those facts when we

9  get to the closing jury instructions.

10      Mr. Siegel, is there any rebuttal evidence that

11 Ms. Preston wish to put on?

12            MR. SIEGEL:  No, Your Honor.

13            THE COURT:  All right.  So that quickly reaches

14 another milestone in the case, which is the opportunity for

15 rebuttal evidence from Ms. Preston.

16      So at this point, now we have concluded all of the

17 evidence that the jury will consider in its deliberations.  And

18 it's my opportunity to instruct you on the law that you will

19 apply during your deliberations.  And after my instruction of

20 the law, we're going to take a lunch break and return for the

21 closing arguments from each of the attorneys.

22      We have a copy of the closing Jury Instructions somewhere.

23 And if we don't have it yet, maybe we need to make copies.

24            THE CLERK:  We do, Your Honor.

25            THE COURT:  If we can please circulate that -- both a

1 | copy of the Verdict Form and the closing Instructions -- then

2 | you can follow along as I read them to you.  Hold on for one

3 | more minute.  We're going to get the Verdict Form for you.

4 | And as she passes it out, let me thank Barbara Espinoza,

5 | courtroom deputy for Judge Breyer, who's stepping in today to

6 | help us with the trial.

7 |             **THE CLERK:**  Are we missing one?

8 |             **JUROR BRYAN:**  (Indicating.)

9 |                     **JURY INSTRUCTIONS**

10 |            **THE COURT:**  All right.  Members of the jury, now that

11 | you've heard all of the evidence, it's my duty to instruct you

12 | as to the law of the case.  Each of you has received a copy of

13 | these instructions that you may take with you to the jury room

14 | to consult during your deliberations.

15 |      You must not infer from these instructions or from

16 | anything I may say or do as indicating that I have an opinion

17 | regarding the evidence or what your verdict should be.  It is

18 | your duty to find the facts from all the evidence in the case.

19 | To these facts you will apply the law as I give it to you.  You

20 | must follow the law as I give it to you, whether you agree with

21 | it or not.  And you must not be influenced by any personal

22 | likes or dislikes, opinions, prejudices or sympathy.  That

23 | means you must decide the case solely on the evidence before

24 | you.  You will recall that you took an oath to do so.

25 |      In following my instructions, you must follow all of them,

1   and not single out some and ignore others.  They're all

2   important.

3       Summary of the claims and defenses in this case.

4       Now I will give you a brief review of the positions of the

5   parties.  The plaintiff, Daryelle LaWanna Preston, claims that

6   Deanna Santana, acting on behalf the City of Oakland,

7   retaliated against Preston in violation of the California Labor

8   Code by terminating Preston's employment after Preston

9   disclosed or refused to participate in an act that she

10  reasonably believed violated a state or federal law.

11      Four disclosures or refusals are at issue.  First, Preston

12  claims that she refused to add language to the Rainbow Teen

13  Center Report referring Desley Brooks for prosecution, because

14  she believed that doing so would be illegal racial

15  discrimination; or Preston claims that she refused to confirm

16  Santana's statement to Councilmember Desley Brooks at the

17  March 6th, 2012, City Council meeting, because she believed

18  that doing so would be committing perjury; or Preston claims

19  that she disclosed that the City of Oakland was entering into

20  contracts with the Firefighters Local 55 without the necessary

21  approval from the City Council, because she believed that doing

22  so would be a violation of the California Government Code; or,

23  four, Preston claims that she disclosed that the City of

24  Oakland was failing to collect Temporary Part Time employees'

25  union dues, because she believed that the failure was a

1    violation of the California Government Code.

2         The City of Oakland denies Preston's claims.  And the City

3    of Oakland says that Preston was terminated for legitimate

4    reasons having nothing to do with any alleged disclosures of or

5    refusals to participate in violations of state or federal law.

6    According to the City of Oakland, Preston was terminated

7    because she was not performing her job duties adequately.

8         The claims presented now are different than the claims

9    stated at the beginning of the case.  There is no longer a

10   claim being presented against Deanna Santana under Section 1983

11   based on the First Amendment right to free speech.  Therefore

12   you, the jury, are no longer being asked to determine that

13   First Amendment claim.  You should not speculate as to the

14   reasons why.  The fact that you are not determining that claim

15   should have no bearing on your determination of liability and

16   damage on the California Labor Code claim against the City of

17   Oakland.  You must base your decision only on the evidence

18   presented at trial and the law that I am providing to you.

19        The burden of proof.  Preponderance of the evidence.

20        Proof by a preponderance of the evidence means proof that

21   something is more likely than not.  It means that certain

22   evidence, when compared to the evidence opposed to it, has the

23   more convincing force, and makes you believe that something is

24   mother likely true than not.

25        Preponderance of the evidence does not depend on the

1  number of witnesses.  If the evidence on any particular point

2  is evenly balanced, the party having the burden of proof is not

3  to prove that point by a preponderance of the evidence, and you

4  must find against the party on that point.

5      In deciding whether any fact has been proved by a

6  preponderance of the evidence, you may, unless I tell you

7  otherwise, consider the stipulated facts and the testimony of

8  all witnesses, regardless of who called them, and all exhibits

9  received into evidence, regardless of who produced them.

10      Clear and convincing evidence.

11      Clear and convincing evidence is a stricter standard of

12  proof than proof by a preponderance of the evidence.  To

13  establish proof by clear and convincing evidence means to prove

14  something that is highly probable, reasonably certain, and free

15  from serious doubt.

16      Evidence.

17      Evidence you may consider.  The evidence you are to

18  consider in deciding what the facts are consists of, one, the

19  sworn testimony of any witness; two, the exhibits received into

20  evidence; and three, any facts to which the lawyers have

21  agreed.  That's the one stipulation.

22      Evaluation of witness testimony.

23      In deciding the facts in this case, you may have to decide

24  which testimony to believe, and which testimony not to believe.

25  You may believe everything a witness says, or part of it, or

1    none of it.

2        Proof of a fact does not necessarily depend on the number

3    of witnesses who testify about it.  In considering the

4    testimony of any witness, you may take into account, one, the

5    opportunity and ability of the witness to see or hear or know

6    the things testified to; two, the witness' memory; three, the

7    witness' manner while testifying; four, the witness' interest

8    in the outcome of the case and any bias or prejudice; five,

9    whether other evidence contradicted the witness' testimony;

10   six, the reasonableness of the witness' testimony in light of

11   all of the evidence; and, seven, any other factors that bear on

12   believability.

13       The weight of the evidence as to a fact does not

14   necessarily depend on the number of witnesses who testify about

15   it.

16       Expert witnesses.

17       Some witnesses, because of education or experience, are

18   permitted to state opinions and the reasons for those opinions.

19   Opinion testimony should be judged just like any other

20   testimony.  You may accept it or reject it, and give it as much

21   weight as you think it deserves considering the witness'

22   education and experience, the reasons given for the opinion,

23   and all of the other evidence in the case.

24       The expert witnesses who testified in this case were

25   Margo Ogus and Mark Cohen.  An expert witness may be asked to

1  assume that certain facts are true, and to give an opinion

2  based upon that assumption.  This is a hypothetical question.

3  If you determine that any fact assumed in such a question has

4  not been established by the evidence, you should determine the

5  effect of the failure to establish that fact upon the value of

6  an opinion based on that fact.

7      Deposition in lieu of live testimony.

8      A deposition is a sworn testimony of a witness taken

9  before trial.  The witness is placed under oath to tell the

10  truth, and lawyers for each party may ask questions.  The

11  questions and answers are recorded.  You should consider

12  deposition testimony presented to you in court in lieu of live

13  testimony in the same way as if a witness has been present to

14  testify.  The following deposition testimony was presented to

15  you in court in lieu of live testimony:  Joe Keffer.

16      Charts and summaries not received in evidence.

17      Certain charts and summaries not received in evidence have

18  been shown to you in order to help explain the contents of

19  records, documents, or other evidence in the case.  They are

20  not, themselves, evidence or proof of any facts.  If they do

21  not correctly reflect the facts or figures shown by the

22  evidence in the case, you should disregard these charts and

23  summaries, and determine the facts from the underlying

24  evidence.

25      Things you may not consider.

1      In reaching your verdict, you may consider only the

2   testimony and exhibits received into evidence.  Certain things

3   are not evidence, and you may not consider them in deciding

4   what the facts are.  I will list them for you.

5      One.  Arguments and statements by lawyers who are not

6   witnesses are not evidence.  The lawyers representing the

7   parties during the trial are not witnesses.  What they have

8   said in their opening statements and their closing arguments

9   and at other times is intended to help you interpret the

10   evidence, but it is not evidence.  If the facts as you remember

11   them differ from the way the lawyers state them, your memory of

12   them controls.

13      Two.  Questions and objections by lawyers are not

14   evidence.  Attorneys have a duty to their clients to object

15   when they believe a question is improper under the Rules of

16   Evidence.  You should not be influenced by the objection or by

17   my ruling on an objection.

18      Third, testimony that has been excluded or stricken or

19   that you have been instructed to disregard is not evidence, and

20   must not be considered.

21      Four.  Anything you may have seen or heard when the Court

22   was not in session is not evidence.  You are to decide the case

23   solely on the evidence received during the trial.

24      Types of evidence.

25      Evidence may be direct or circumstantial.  Direct evidence

1 is direct proof of a fact, such as testimony by a witness about

2 what that witness personally saw or heard or did.

3 Circumstantial evidence is proof of one or more facts from

4 which you could find another fact.  You should consider both

5 kinds of evidence.  The law makes no distension between the

6 weight to be given to either direct or circumstantial evidence.

7 It is for you to decide how much weight to give to any

8 evidence.

9     By way of example, if you wake up in the morning and see

10 the sidewalk is wet, you may find from that fact that it rained

11 during the night.  However, other evidence, such as a turned-on

12 garden hose, may provide a different explanation for the

13 presence of water on the sidewalk.  Therefore, before you

14 decide that a fact has been proved by circumstantial evidence,

15 you must consider all of the evidence in the light of reason

16 experience and common sense.

17     Evidence in electronic format.

18     The video of the March 6th, 2012, City Council meeting

19 will be provided to you in electronic format, and you'll be

20 permitted to view it in the jury room on a computer provided by

21 the Court.  A Court technician will show you how to operate the

22 computer and how to locate and view that exhibit on the

23 computer.

24     You will also be provided with a paper list of all the

25 paper exhibits received in evidence.  If you need additional

1  equipment or supplies, you may make a request by sending a note

2  through the courtroom deputy.

3      In the event of any technical problem or if you have any

4  questions about how to operate the computer, you may send a

5  note to the courtroom deputy, signed by the presiding juror or

6  by one or more members of the jury.  Be as brief as possible in

7  describing the problem, and don't refer to or discuss any

8  exhibit you are attempting to view.

9      If a technical problem requires hands-on maintenance or

10  instruction, a Court technician may enter the jury room with

11  the courtroom deputy present, for the sole purpose of assuring

12  that the only matter discussed is the technical problem.  When

13  the Court technician or any nonjuror is in the jury room, the

14  jury must not deliberate.  No juror may say anything to the

15  Court technician or any nonjuror, other than to describe the

16  technical problem or to seek any information about how to

17  operate the equipment.  Do not discuss any exhibit or any

18  aspect of the case with the Court technician or any nonjuror.

19      The sole purpose of providing a computer in the jury room

20  is to enable the jurors to view the exhibits received in

21  evidence in the case.  Don't use the computer for any other

22  purpose.  At my direction, technicians have taken steps to make

23  sure the computer does not permit access to the Internet or to

24  any outside database, directory, games, or other materials.

25  Don't attempt to alter the computer to obtain access to such

1    materials.  If you discover, despite our best efforts, that the

2    computer provides access to outside materials, you must inform

3    me immediately, and refrain from viewing any such materials.

4    Please do not remove the computer or any electronic data from

5    the jury room, and don't copy the data.

6        Preston's California Labor Code claim against the City of

7    Oakland.

8        Elements.

9        Preston claims that Santana, acting on behalf of the City

10   of Oakland, terminated Preston in retaliation for a disclosure

11   of information and refusal to participate in unlawful acts.  In

12   order to establish this claim, Preston must prove all of the

13   following.

14       One, that the City of Oakland was Preston's employer.

15       Two, that Santana, acting on behalf of the City of

16   Oakland, believed that Preston disclosed information or refused

17   to participate in acts.

18       Three, that Preston had reasonable cause to believe her

19   violations of or noncompliance with the law.

20       Four, that Santana, acting on behalf of the City of

21   Oakland, terminated Preston.

22       Five, that Preston's disclosure of information and/or

23   refusal to participate in these activities was a contributing

24   factor in the City of Oakland's decision to discharge Preston.

25       Six, that Preston was harmed.

1    And seven, that Santana's conduct acting on behalf of the

2   City of Oakland was a substantial factor in causing Preston's

3   harm.

4    The disclosure of policies that an employee believes to be

5   merely unwise, wasteful, gross misconduct or the like is not

6   protected.  Instead, Preston must have reasonably believed that

7   the City of Oakland's policies violated federal or state rules

8   or regulations.

9    It is not Preston's motivation for her disclosure but only

10   the content of that disclosure that determines whether the

11   disclosure is protected.  A disclosure is protected even though

12   disclosing information may be part of Preston's job duties.

13    The City's of Oakland's defense.

14    If Preston proves that her disclosure or information --

15    Excuse me.  I'll start the sentence again.

16    If Preston proves that her disclosure of information or

17   refusal to participate in an unlawful act was a contributing

18   factor to her termination, the City of Oakland is not liable if

19   it proves by clear and convincing evidence that it would have

20   terminated Preston anyway for legitimate independent reasons.

21    Damages.

22    It is now my duty to instruct you about the measure of

23   damages.  The fact that I'm instructing you about the proper

24   measure of damages should not be considered as my suggesting

25   which party is entitled to your verdict in the case.

1   Instructions about the measure of damages are given for your

2   guidance only if you find that a damages award is in order.  It

3   is for you to determine what damages, if any, have been proved.

4       If you decide that Preston has proved her claim against

5   the City of Oakland, you also must decide how much money will

6   reasonably compensate Preston for the harm.  This compensation

7   is called "damages."  The amount of damages must include an

8   award for each item of harm that was caused by the City of

9   Oakland's wrongful conduct, even if that particular harm could

10  not have been anticipated.

11      Preston does not have to prove the exact amount of damages

12  that will provide reasonable compensation for the harm.

13  However, you must not speculate or guess in awarding damages.

14      The following are the specific items of damages claimed by

15  Preston.  One, economic damages; and two, emotional-distress

16  damages, also known as "noneconomic damages."

17      One, economic damages.  The following are the specific

18  items of economic damages claimed by Preston.  Past lost

19  earnings, future lost earnings, and future pension-plan

20  benefits.  To recover damages for past lost earnings, Preston

21  must prove the amount of earnings she has lost to date.  To

22  recover damages for future lost earnings and future

23  pension-plan benefits, Preston must prove the amount of

24  earnings she'll reasonably be certain to lose in the future as

25  a result of this injury.  If you decide that Preston's harm

1  includes future economic damages or loss of earnings and/or

2  loss of pension-plan benefits, then the amount of those future

3  damages must be reduced to their present cash value.  This is

4  necessary because money received now will, through investment,

5  grow to a larger amount in the future.

6       The City of Oakland must prove the amount by which future

7  damages should be reduced to present value.  To find present

8  cash value, you must determine the amount of money that, if

9  reasonably invested today, will provide Preston with the amount

10  of her future damages.  You may consider expert testimony in

11  determining the present cash value of future economic damages.

12       Noneconomic damages.  Emotional distress.

13       Preston is seeking noneconomic damages for mental and

14  emotional distress, but she is not seeking damages for

15  psychiatric harm.  No fixed standard exists for deciding the

16  amount of these noneconomic damages.  You must use your

17  judgment to decide a reasonable amount based on the evidence

18  and your common sense.

19       Conduct of the jury.

20       Because you must base your verdict only on the evidence

21  received in the case and on those instructions, I remind you

22  that you must not be exposed to any other information about the

23  case or to the issues it involves.  Except for discussing the

24  case with your fellow jurors during deliberations, do not

25  communicate with anyone in any way and don't let anyone else

1   communicate with you in any way about the merits of case or

2   anything to do with it.  This includes discussing the case in

3   person, in writing, by phone or electronic means, e-mail, text,

4   or any chat, blog, website, or other feature.  This applies to

5   communicating with your family members, your employer, media or

6   press, and it includes communicating with people in a trial.

7       If you are asked or approached in any way about your jury

8   service or anything about this case, you must respond that

9   you've been ordered not to discuss the matter, and to report

10  the contact to the Court.  So don't read, watch, or listen to

11  any news or media accounts or commentary about the case.  Don't

12  do any research.  Don't consult dictionaries.  Don't search the

13  Internet.  Don't use other reference materials.  Don't make any

14  investigation of your own in any way.  Don't try to learn about

15  the case on your own.

16      The law requires these restrictions to ensure the parties

17  have a fair trial based on the same evidence that each party

18  had an opportunity to address in court.  A juror who violates

19  these restrictions jeopardizes the fairness the proceedings,

20  and a mistrial could result that would require the entire trial

21  process to start over.  If any juror is exposed to any outside

22  information, please notify the Court immediately.

23      The jury's duty to deliberate.

24      When you begin your deliberations, you should elect one

25  members of the jury as your presiding juror.  That person will

1  preside over the deliberations, and speak for you here in

2  court.  You will then discuss the case with your fellow jurors

3  to reach agreement if you can do so.  Your verdict must be

4  unanimous.

5       Each of you must decide the case for yourself, but you

6  should do so only after you've considered all of the evidence,

7  discussed it fully with the other jurors, and listened to the

8  views of your fellow jurors.  Don't hesitate to change your

9  opinion if the discussion persuades you that you should.  Do

10 not come to a decision simply because other jurors think it is

11 right.  It is important that you attempt to reach a unanimous

12 verdict, but of course, only if each of you can do so after

13 having made your own conscientious decision do not change an

14 honest belief about the weight and effect of the evidence

15 simply to reach a verdict.

16      If it becomes necessary during your deliberations to

17 communicate with me, you may send a note through the courtroom

18 deputy, signed by your presiding juror or by one or more

19 members of the jury.  No members of the jury should ever

20 attempt to communicate with me except by a signed writing.I

21 will communicate with any members of the jury on anything

22 concerning the case only in writing, or here in open court.  If

23 you send out a question, I will consult with the parties before

24 answering it, which may take some time.  You may continue your

25 deliberations while waiting for the answer to any question.

1        Remember that you are not to tell anyone -- including

2   me -- how the jury stands, numerically or otherwise, until

3   after you've reached a unanimous verdict, or have been

4   discharged.  Do not disclose any vote count in any note to the

5   Court.

6        A Verdict Form has been prepared for you, and you've been

7   provided a copy of it.  After you've reached a unanimous

8   agreement on the verdict, your presiding juror will then fill

9   in the form given to you, sign and date it, and will advise the

10  courtroom deputy that you're ready to return to the courtroom

11  to present your verdict.

12       That ends the instructions of the law.

13       It's now 12:09.  We're going to take a lunch break.  And

14  when we return from the lunch break, it will be the closing

15  arguments.  The plaintiff, Ms. Preston, will go first.  Then

16  the Defense will give their closing argument.  And

17  Ms. Preston's team will get the final word.  And then you'll

18  begin your deliberations.

19       I am anxious to get to the deliberations today, so I'm

20  going to ask you to take a 50-minute lunch break.  Return at

21  1:00 o'clock for the closing arguments.  Following those, the

22  case will be yours.  Thank you.  We're in recess.

23            THE COURT:  We're in recess until 1:00 o'clock.

24  (Proceedings were heard outside the presence of the jury:)

25            MR. SIEGEL:  I have -- sorry about this.  There is a

1   problem with the Verdict Form.  The Verdict Form says, in

2   Question 2, "Did Preston prove by a preponderance of the

3   evidence that her disclosure and/or refusal to participate in

4   an act that she reasonably believed violated a state or federal

5   law was a substantial motivating factor for her termination?"

6       I'm focusing on the words "substantial motivating."

7       In the jury instruction, which is verbatim from CACI, it

8   states on Item 5 of the Labor Code violation on page 8, that

9   Preston's disclosure of information and/or refusal to

10  participate in these activities was a contributing factor in

11  City of Oakland's decision.  I believe that the jury

12  instruction is correct, and that the Verdict Form should be

13  modified to reflect the jury instruction.

14       **THE COURT:**  Mr. Lafayette, do you have any immediate

15  response?

16       **MR. LAFAYETTE:**  No, I don't, Your Honor.  I'm

17  looking -- trying to look up CACI, myself, as we speak; but I

18  will have one as soon as that can be done.

19       **THE COURT:**  All right.  I'm going to ask my deputy to

20  give the jury a little more time for lunch, so that we can work

21  that out without them having to wait around.  So let's have

22  them come back at 1:15.  They may have already gone, but if we

23  can, catch them.  And let's talk about it at 1:00 o'clock.

24       **MR. SIEGEL:**  Okay.

25       **THE COURT:**  Get it resolved before we have the

1    closing arguments.

2              **MR. LAFAYETTE:**   Thank you, Your Honor.

3              **THE COURT:**   Thank you.

4    (Recess taken from 12:12 p.m. until 1:00 p.m.)

5    Afternoon Session                                      1:00 p.m.

6    (Proceedings were heard outside the presence of the jury:)

7              **THE COURT:**   All right.   Good afternoon.

8              **MR. SIEGEL:**   Good afternoon.

9              **THE COURT:**   Our jurors are not present.

10        There was an objection to the Verdict Form before we took

11   our break.   And, while one can say that the objection was not

12   timely, I think the best course of conduct is to address it.

13   And my proposal to address it is to amend what was paragraph 2

14   of the Verdict Form, splitting that into 2, 3, and 4, to track

15   the language in the instruction of law given to the jury in

16   paragraphs 5, 6, and 7 on page 8, so there will be consistency

17   between the language.

18        In a prior version of paragraph 2, there was a collapsing

19   of the language from those provisions, but no particular box

20   for a substantial factor in causing Preston's harm.   And

21   there's a different term used.   Now we've got the same

22   terminologies in both the instruction and the Verdict Form

23   broken into three different paragraphs.   So that's my proposed

24   change.   It would not require a change in the instruction,

25   because the instruction given will match this Verdict Form.

1          Does that make sense to you, Mr. Siegel?

2              MR. SIEGEL:  Yes.

3              THE COURT:  And, Mr. Lafayette, does that make sense

4   to you?

5              MR. LAFAYETTE:  It does, Your Honor; but I'm checking

6   to see.  I believe that there is a CACI instruction which

7   defines "contributing factor."  And I think if we're going to

8   use that language, it would be appropriate to use the CACI

9   instruction.  So that's the only thing I'm looking at, because

10  I think there is --

11             THE COURT:  All right.  And have you found anything?

12             MR. LAFAYETTE:  Not yet, Your Honor.  Just a second.

13             THE COURT:  Do we already have copied the revised

14  Verdict Form, potentially, for the jurors?

15             THE CLERK:  No, Your Honor.  Would you like copies

16  for all of the jurors?

17             THE COURT:  Well, hold on for a minute.  I'll give

18  Mr. Lafayette one more minute to raise any further concerns;

19  but yes, potentially we will.

20             THE CLERK:  Okay.

21             THE COURT:  And when we do that, we'll take back the

22  Verdict Form we gave them previously.

23             THE CLERK:  I've done that, Your Honor.

24             THE COURT:  Excellent.  Thank you.

25             MR. LAFAYETTE:  The only one I'm coming up with at

**PROCEEDINGS**

1  this point, Your Honor, is the definition of "substantial

2  factor," which is CACI 430, which says, "A substantial factor

3  in causing harm is a factor that a reasonable person would

4  consider that contribute to the harm, and must be more than

5  remote or trivial factor.  It does not have to be the only

6  cause of the harm."  I'm having someone in my office check, if

7  you'd just give me a couple more minutes.

8         **THE COURT:**  I appreciate that, and the request.  I'm

9  familiar with that pattern instruction.

10        My view is that that language defining "substantial" does

11  very little to nothing to define substantial; that the jurors,

12  in their experience and education, will understand what

13  "substantial" means, and don't need different words to mean the

14  same thing to define it.  So I have considered -- and have that

15  pattern instruction before me -- whether it should give it.

16  And, under the circumstances, I'm not going to give it.

17        A second reason not to give it now is it would draw more

18  attention to that instruction.  Even if I gave an instruction

19  not to pay attention -- not to pay more attention that, I think

20  it would draw a lot of attention that that's going to be the

21  critical thing that the parties are going to be arguing about,

22  is substantial or not substantial.  And it's just not that -- I

23  think there's more danger of confusion rather than clarity.  So

24  I'm not going give that additional instruction.

25        So, Barbara, if you can, make additional copies and then

1    bring in the jury, please.  Thank you.

2        All right.  So I will give them the revised Verdict Form

3    first, and tell them why we changed it.  And then we'll proceed

4    to the closing arguments.

5            **MR. SIEGEL:**  You're going to tell them it's my fault.

6            **THE COURT:**  No, I'm not.

7            **MR. SIEGEL:**  Okay.

8            **THE COURT:**  No one's fault.

9    (Proceedings were heard in the presence of the jury:)

10           **THE COURT:**  All right.  Please be seated, everyone.

11       Ladies and gentlemen of the jury, during the lunch break

12   we made some revisions to the Verdict Form.  The old version of

13   the Verdict Form has been removed.  The revised version of the

14   Verdict Form had been provided to you.  There's no difference

15   in the instruction of law that I gave to you.  It applies

16   equally to the Verdict Form.  This Verdict Form tracks more

17   precisely the language in the closing instructions.  And to aid

18   the jury in its deliberations, we wanted to make sure the

19   language was precise from the instruction to the Verdict Form.

20   So you should use in your deliberations the revised Verdict

21   Form.

22       As I had promised, it's now the plaintiff's opportunity --

23   Ms. Preston's opportunity -- to present her closing argument,

24   followed by the Defense.

25       You may proceed.

1          **MR. SIEGEL:**  Great.  Thank you, Your Honor.  And

2    excuse me for turning my back to the Court.

3                        **<u>CLOSING ARGUMENT</u>**

4          **MR. SIEGEL:**  Good afternoon, ladies and gentlemen.

5    This is my opportunity to present an argument in favor of

6    Ms. Preston.  And, you know, before I start, I want to say

7    something.  Judge Cousins has instructed you that the

8    attorneys' arguments are not evidence; questions, and so on.

9    And, of course, I agree.  It wouldn't matter if I disagree.

10         But my argument is a promise.  And the opening statement I

11   made when we started last week was also a promise.  And,

12   whether it's evidence or not, I expect you to hold me to what I

13   say about the evidence, and what I said about the evidence

14   before we began.

15         Next, please.

16   (Document displayed.)

17         **MR. SIEGEL:**  Okay.  So we've done a little PowerPoint

18   here.  And some of these things you already know.

19         Judge Cousins has given you the Jury Instructions.  I'm

20   going to comment on the Jury Instructions as I go forward, but

21   of course, it's your responsibility to decide what the facts

22   are, and to apply the Court's instructions to the facts.

23         Next, please.

24   (Document displayed.)

25         **MR. SIEGEL:**  One of the fundamental issues in any

1    case is:  What is the burden of proof?  And again, you've had

2    an instruction on that.  It's our job to prove our case by

3    what's called a "preponderance of the evidence," which means

4    that we must prove that Ms. Preston's claim is more likely true

5    than not.

6         And if you've sat through many jury trials, you've

7    probably seen every lawyer give a little different illustration

8    of what this point is, but I like to say imagine you have the

9    scales of justice, and you put a ream -- 500 sheets -- of paper

10   on each side, and it's still completely balanced.  The person

11   who has the burden of proof has to put one more sheet on the

12   scale.  That's a preponderance of the evidence.

13        And on one issue in this case, again, as the Court's

14   instructed you, the burden is on the City of Oakland.  If it

15   contends that it would have made the same decisions -- that is,

16   if it claims it would have fired her, regardless of her

17   protected activities and regardless of whether those protected

18   activities played a role -- it must prove that it would have

19   made the same decision by clear and convincing evidence.  And

20   we can't quite quantify that.  The instructions say they have

21   to prove that it's pretty certain, rather than more certain.

22        I'm sure some of you have heard of the standard of proof

23   beyond a reasonable doubt.  Well, that's not criminal case.

24   This is not a criminal case.  And that's not what we have to

25   prove.

1    So I want to turn, now, to discussing what I think we do

2    have to prove.  Again, this is a somewhat shortened version --

3    Next, please.

4    (Document displayed.)

5         **MR. SIEGEL:**  -- of what the Court's instructions are.

6    So first off, we have to prove one of four protected acts.

7    I believe we've proven all four; but in order to prevail, we

8    have to prove one of these four.  One, that she refused to

9    include language in the proposed Rainbow Teen Center Report

10   that she believed was racially discriminatory.

11   Or, two, she refused to confirm Ms. Santana's statement at

12   the March 6th City Council meeting, because she believed doing

13   so would be committing perjury.

14   Next, please.

15   (Document displayed.)

16        **MR. SIEGEL:**  Or, three, she disclosed to Ms. Santana,

17   City Attorney Parker, or Council Member Brooks that

18   Fire Chief Reed was entering into agreements with the

19   Firefighters Union without City Council approval, and that she

20   made this disclosure because she believed that doing so would

21   violate state law.

22   Or, four, that she disclosed the City's failure to collect

23   union dues for TPT employees because, again, she believed that

24   that failure also violated the law.

25   So we have to prove one of those four things.

 1      Next, we also have to prove that Ms. Preston reasonably

 2   believed -- and I want to stress "reasonably believed."  That's

 3   the standard.  She doesn't have to prove that these actions

 4   actually did violate the law, but that she reasonably believed

 5   that they violated the law, or that she refused to engage in

 6   unlawful activities.

 7      Then the next thing we have to prove is that Ms. Preston's

 8   disclosure or refusal to participate in unlawful activities was

 9   a contributing factor in the decision -- City's decision to

10   fire her.

11      And again, Judge Cousins' instructions, which you have and

12   which you read earlier -- we have to show that it was a

13   contributing factor; not the only factor, not the key factor,

14   but that it was a contributing factor.  That's our burden.

15      And then, finally, that she suffered harm due to these

16   things.

17      So just I want to go over the Verdict Form real quickly

18   with you.

19      Put that on the Elmo.

20   (Document displayed.)

21          MR. SIEGEL:  Okay.  So this is the Verdict Form that

22   you will have.  And it pretty much tracks what I've just told

23   you.

24      Question Number 1.  Did she prove that she disclosed or

25   refused to participate -- that she reasonably believed violated

1  a state or federal law?

2       Yes.

3       Did she prove that her disclosure or refusal to

4  participate was a contributing factor?

5       Again, we think the evidence is yes.

6       Did she prove by a preponderance of the evidence that she

7  was harmed?

8       Well, she was fired, so we think the answer to 3 is "Yes."

9       Did she prove by a preponderance of the evidence that

10  Santana's conduct was a substantial factor in causing her harm?

11       I think that's kind of almost a repeat of Number 4; that

12  it was Miss Santana who fired her, so thought it was

13  Ms. Santana's conduct that caused her harm.

14       And, 5 -- this is where the City -- if they want to defend

15  our claim, they must prove by clear and convincing evidence

16  that it would have discharged her for legitimate independent

17  reasons, absent her disclosure and/or refusal to participate.

18       We think the answer to that is "No."

19       And I'll speak more about those things and about the

20  damages as I proceed; but before I go on I want to say to you

21  that one of the things I would like you to consider is; whether

22  the various explanations given by the City of Oakland are

23  legitimate explanations -- they really do explain why they

24  fired Ms. Preston -- or whether they are what we call

25  "pretext."  "Pretext" is not a word in these instructions, but

1   basically what that means is an excuse.

2        And, you know, in a case like this, where many of the

3   issues are to be resolved by circumstantial evidence, you know,

4   you're not going to get Ms. Santana or someone else standing up

5   and saying, "Oh, we fired her because she's a whistleblower,"

6   or something like that.  So you have to look at the evidence

7   which casts doubt on the City's explanations.  And I would

8   suggest to you that there are three things you might want to

9   look the.  Okay?

10       Number one was the timing of the termination.  And by that

11  I mean that the termination really was decided the day after

12  she spoke to the City Council about the SEIU grievance on

13  October 1.

14       Number two.  I think you need to look at hostilities.  Was

15  there bad blood between Miss Santana and Ms. Preston that

16  extended for some period of time?  And then -- so whether that

17  would cast doubt on the City's explanations.

18       And then the last thing which I want to address right now

19  for a couple of minutes is that there are too many

20  explanations.  You know, when someone asks you, *Why did you do*

21  *this?  Why did you go out for a movie Friday night*? and the

22  answers you get are -- well, there are five different answers,

23  and they're one or the other or something else, and they're not

24  consistent, well, then you might ask, *Are those answers*

25  *pretextual?  Does the fact that there were so many explanations*

1    *mean that none of them are true?*

2          And I would suggest to you that that is exactly what's

3    occurred here.  In fact, I would suggest to you that the City

4    is continuing to manufacture justifications for Ms. Preston's

5    termination every day in this trial.  Every day we hear

6    something new.  This morning we heard, *Well, she didn't go to a*

7    *meeting to discuss the budget*.  First time we've heard that

8    explanation, or whatever it is.

9          But let me go through some of the main ones, because I

10   think -- I hope they're most important.  So let's say:  What

11   did the City do when it first fired her?

12         It sent her a termination notice.  Right?

13         And you would expect -- I mean, this is the City of

14   Oakland.  This isn't the city of two people who live out in the

15   boonies somewhere.  This is a City of 400,000 people.  It has

16   something that I think you probably heard of, called Personnel

17   Action form, which is a form -- an official form in a personnel

18   file -- that explains what it is that the City did.  So here's

19   what the City did when they fired Ms. Preston on October 3,

20   2013.

21   (Document displayed.)

22         **MR. SIEGEL:**  They said -- and look at that box.

23   You'll have this.  This is Exhibit 44.  And you'll have all of

24   the exhibits when you go back to deliberate.

25         So there's a pretty simple looking check box there as to

1  the reasons why someone could be fired.  And there are two main

2  categories:  Lack of Work, or Discharge.

3       And under "Discharge" you see things like insubordination,

4  job performance, off-duty misconduct, violations of City rules.

5  They did not check one of those.  Right?

6       What they did check is, under the column "Lack of Work,"

7  they said, "See attached."  So let's see what the attached

8  says.  And again, this is part of Exhibit 44.  This simply

9  says, "This letter is to inform you that your services are no

10  longer needed."

11       So when they fired Ms. Preston, that was their

12  explanation; their sole explanation; nothing to do with

13  misconduct.

14       And when Mayor Quan testified here last week, she

15  basically repeated that.  She said, *Well, Ms. Preston was not*

16  *terminated for cause*.  I was kind of surprised when she said

17  that, but that's what she said.  She says Ms. Preston was a

18  temporary and probationary employee, who was let go when her

19  work was completed.

20       So again we have the City, as of the moment when it fires

21  her, saying that it's a not-for-cause termination.

22       And then you have Mayor Quan testifying almost two years

23  later to the day, really -- or within a few weeks -- that she

24  was a temporary employee, and that's why she was let go.

25       Well, 14 months later, they had a new reason.  Okay?

1      And I read to you during Ms. Santana's testimony last week

2  when she first testified what is called an "interrogatory

3  response."  And an interrogatory is a discovery vehicle.  It

4  not a deposition, but it's in the same category of things that

5  we do before trial.  We ask the other side to answer questions.

6  And they have to answer them under oath.  And that's because,

7  as lawyers prepare a case for trial, we want to know what we're

8  dealing with.  We want to know if we have to overcome the

9  City's defense.  What is their defense?

10      So here's what they said.  There it is (indicating).

11  (Document displayed.)

12          MR. SIEGEL:  This was 12/17/14, verified under oath

13  by Ms. Santana.  She swore that this was true.  She swore that

14  plaintiff was an at-will employee and, as such, could be

15  terminated or could leave her employment for any reason or

16  without any reason.  Plaintiff disclosed confidential

17  information inappropriately to third parties not authorized to

18  receive it.  Plaintiff failed to maintain a professional

19  relationship with the City Administrator and failed to maintain

20  professional relationships with her colleagues.

21      Now again I read it.  She adopted it.  This is what she

22  said.  This is what she swore to.  Again, a little more than a

23  year.  And I ask you:  Have they shown this in this courtroom?

24  Have they shown that she disclosed confidential information?

25  Have they put in front of you one item of confidential

1  information that she improperly disclosed?

2      And I think you should think about that.  And I think the

3  answer's pretty obviously "No."

4      And what makes that failure even more glaring, in my mind,

5  is that they looked at her e-mail.  I'll talk a little bit

6  about that later, because I find that whole e-mail thing pretty

7  appalling, but we'll talk about it.

8      But for purposes of this moment, when they say she

9  disclosed confidential information, well, what was it?  Was it

10  when she spoke to Dwight McElroy and, according to Ms. Lara,

11  gave him a piece of paper?  No evidence that that was

12  confidential information.

13      And what you've heard is that it's common -- this is why I

14  asked the questions of so many of their witnesses -- to have

15  sidebars during negotiations, where, instead of sitting at this

16  table one or two people from each side go off into a room and

17  see if they could work things out through negotiation.  *Well,*

18  *if you say this, we'll say that.  If you say that, we'll say*

19  *this.*  And we'll talk more about that in a little bit.

20      But how about the October 2 explanation?  This is the one

21  in my mind.  I mean this isn't, you know, one of those real

22  sexy cases where we're going to find the smoking gun under the

23  bed or something like that, but what -- this October 2

24  explanation is something that is as close to a smoking gun as

25  we can find in a case like this.

1    So Ms. Santana testified -- she said it in her deposition;

2   I got her to repeat it on the stand -- the final straw was this

3   meeting on October 2.  I'm in my office with Ms. Parker and

4   Mr. McGee.  And Ms. Preston calls up, and was rude, and

5   screamed at me about my transferring responsibility for the

6   negotiation.  And that was the final straw.  So I typed up the

7   notices, and they were served on her the next day.

8        Well, that might work, except -- and you know very well

9   what the "except" is.  Put yourself in that room for a second.

10   You're there to discuss a grievance.  You're there to discuss

11   this SEIU grievance for not collecting the dues, with the

12   person you've hired to investigate that grievance.  And the

13   person who you've removed from the investigation calls on the

14   phone.  And so you put her on the speaker phone.

15        Don't worry that you didn't tell her she's on a speaker

16   phone.  You put her on a speaker phone.

17        What does she do?  She yells at me.  She screams at me.

18   She's rude and abusive to me because I removed her from the

19   responsibility; but strange to be, none of the two people who

20   were there -- the two attorneys, Ms. Parker or Mr. McGee --

21   confirms it.  The most they'll go is they'll say, *Well, I heard*

22   *Ms. Preston talk in a loud voice*.  That's as far as they'll go,

23   but they won't confirm any conversation.

24        And you know, again, this doesn't make sense to me.

25        The three of them are sitting there, talking about this

1  SEIU grievance.  Ms. Preston allegedly calls up to talk about

2  the grievance and scream about it; and they don't remember one

3  word she said.

4      Again, I think the only inference you can draw from that

5  is that she didn't really say it.  And I don't know if it's a

6  major piece of evidence about it, but you know, when Ms. Lara

7  was on the stand she testified, *Well, you know, I was with*

8  *Ms. Preston on that day all day.*  *We were negotiating that*

9  *agreement with SEIU.*

10     Now, of course, I admit, you know, maybe they weren't

11  together all day.  Maybe Ms. Preston went to the bathroom, and

12  after she went to the bathroom she went out in the hallway and

13  called up, you know, Ms. Santana on the phone and screamed at

14  her.  That's possible, but is it likely?  I would suggest to

15  you that it's not, and that this is just a story that they made

16  up to justify the termination.

17     So let's go to the next slide, please.

18  (Document displayed.).

19     **MR. SIEGEL:**  Obviously, one of the most important

20  questions you will have to decide in this case is who's telling

21  the truth.  Right?  Is it LaWanna Preston, or is it

22  Ms. Santana?

23     And I know all of us have our principles for how we look

24  at other people; how we evaluate them.  I'll tell you one of my

25  principles that -- you can agree or not about my principle --

1  is this.  I don't think people change that much.  You know.  I

2  don't think people go through life into their 40s or 50 years

3  old -- they've been a good employee all their life.  They've

4  been successful.  They've been ambitious.  They've taken on

5  jobs and been praised for their work, and get more

6  responsibilities, and then all of a sudden, they become lousy

7  employees.  They become terrible employees.  They become the

8  kind of employee that you cannot stand to have around.

9       Now again, you may not agree with that perspective on

10  human nature; but you have to ask yourself at least:  Is

11  LaWanna Preston the unprofessional, untrustworthy employee

12  described by Deanna Santana and Scott Johnson, or --

13       And I've listed some things, but even before you get

14  there -- right? -- you think of Ms. Preston's background.

15  Okay?  She grows up.  Benicia.  Martinez.  Goes to high school.

16  Gets a little bit of college.  Can't afford to keep going.

17  What does she do?  She works at a store.  Okay?  Regular,

18  hardworking, blue-collar person.  Get a job, and you do the

19  best you can.

20       Finds a job with the City of Berkeley; not a big, fancy

21  job -- right? -- being a meter maid.  And then she's promoted,

22  so she's a Chief Meter Maid.  And she does that for several

23  years.  And then she has an opportunity to go to work for SEIU.

24  In the course of 17 years, she is promoted; advances through

25  the ranks.  And at the end of the day, she's in charge of the

1  whole San Francisco operation.

2      And then she says to herself, *Well, maybe I will change*

3  *careers a little bit.*  So she goes to work for the City of

4  Oakland.  She's hired by the City of Oakland.  She's hired by

5  the City of Oakland.  And the City Administrator,

6  Deborah Edgerly, says, *LaWanna, we have ourselves a mess here.*

7  *We have guys drinking on the job.  We have people not following*

8  *the rules.  We kind of have a chaotic situation here.  And I*

9  *need you to clean it up.*  And she does.  And she goes to work

10  for the City in 2007.

11      Every year -- and this is, again, something to consider.

12  I haven't quite figured out whether she had three City

13  Administrators or four that she worked for before Ms. Santana;

14  but what you do know is you haven't heard a bad word from any

15  of them about her performance.  Not one document saying that

16  she had problems with one of those City Administrators.

17      Instead, you remember what I said last week.  Oakland's a

18  tough place to work.  Well, think of what people said about

19  Ms. Preston's work.  And let's focus on the people who had no

20  axe to grind.  Right?

21      You heard Fred Blackwell testify.  Fred Blackwell is now

22  the head of the San Francisco Foundation.  He was one of

23  Ms. Santana's top two deputies -- right? -- along with

24  Scott Johnson.

25      What did he say about Ms. Preston?

1        Credible, competent negotiator, who some unions said was

2   too tough at the table.

3        What did Lamont Ewell say?  We brought Lamont Ewell up.

4   Lamont Ewell had been a City Administrator; a City Manager in

5   San Diego; Durham, North Carolina; Santa Monica, California.

6   Was Ms. Santana's mentor.  Right?  Not someone with an axe to

7   grind against her.  I would submit to you that Mr. Ewell was a

8   very neutral, honest witness.  What did he say?

9        He said she's very dedicated, very serious, honest,

10  credible.  A person with integrity.  That's the way he

11  described her.

12       And Sandre Swanson, who was the Deputy Mayor, came in and

13  said she did a great job, and -- and she followed Ms. Santana's

14  instructions.

15       So, you know, you have to start asking yourself:  What's

16  the true picture here?  Is it the true picture of her that's

17  painted by Mr. Johnson or Ms. Santana; or is it the true

18  picture painted by these people who were neutral, and who came

19  here simply because they wanted to tell the truth?

20       We move.

21       So you know, I said, *Does a leopard change their spots?*

22  Right?  I mean, that's really the question you have to ask

23  yourself about Ms. Preston.

24       You know, six months or so after Ms. Santana arrives, she

25  promotes Ms. Preston.  She becomes a director.  Instead of

1   being a manager reporting to the Human Resources Director, she

2   becomes a director in her own right, and reports to

3   Ms. Santana.

4       And then we had that conversation about the nonevaluation.

5   And you know, the evaluation is not in evidence.  Who did it.

6   When it was done -- it's all too confusing.  The Court did not

7   allow it, which I respect; but you remember that I read a

8   statement to Ms. Santana when she was on the stand.

9       And I said, *Would you have agreed with this statement back*

10  *in 2012?*

11      And she said, *Yes, I would.*

12      So this is Ms. Santana's own words describing Ms. Preston

13  as, quote, "a great asset to the City," who provided, quote,

14  "needed leadership to Employee Relations and EOPD," and, quote,

15  "established great working relationships with organized labor,

16  and demonstrates a high level of professionalism and

17  integrity."  So Ms. Santana is forced to agree with Deputy

18  Mayor Swanson, with former City Administrator Ewell, with

19  Fred Blackwell about the qualities of Ms. Preston's work.

20      And the last thing I would like you to consider:  If

21  Ms. Preston was as poor an employee as some people have told

22  you in this courtroom, do you think that City and County of

23  San Francisco, ten weeks after she was fired by Oakland, hired

24  her; and then within a year, promoted her into a job where she

25  now works where she has five times as many union contracts and

1  eight times as many employees as she had to oversee in Oakland?

2  Again, the picture is -- you heard her on the stand --

3  intelligent, professional, dedicated, hardworking, careful

4  person.  She really was the sheriff who City Administrator

5  Edgerly wanted to hire.

6       So let me move, then, to discuss a couple of these issues

7  that involved her whistle blowing; but before I do that, let

8  me -- I mentioned three things to talk about in terms of

9  pretext.  The inconsistent stories.

10      And how about policy?  Reading Ms. Preston's e-mail

11  without authorization or any good reason.  And you can look at

12  the policy.  It's Exhibit Number 1.  I just want to mention

13  very briefly what it says, because I would urge you to treat

14  the language as serious, not just as vague and uninformative.

15  So the language says only agency department heads and the City

16  Manager have authority to request access.  It doesn't say the

17  City Manager can just help herself, or anything like that.  It

18  says the City Manager has authority to request.  And then, if

19  you go over to the next page, it talks about that there will be

20  a statement maintained by the Office of Information and

21  Technology which will be a record of the request.

22      Now, not only is my explanation -- my discussion --

23  consistent with the language.  I would submit to you it's

24  consistent.  And the only way to have a policy that's

25  consistent with common sense and our human sensitivities --

 1    right?  I mean, we live in a world where we've been told by

 2    Edward Snowden and others that our e-mails, our telephone

 3    calls, our daily travels around town are subject to being

 4    looked at by government agencies, and without our knowing it,

 5    without anybody's permission.  And I don't know if you agree,

 6    but I find that horrifying.  It's one thing to track people who

 7    are criminals or who have done something bad; but to just go

 8    around and vacuum up people's personal information is something

 9    I find offensive.

10       And I find it offensive when City Attorney of the City of

11    Oakland says, *Well, that's fine*.  She can just do what she

12    wants.  She doesn't need permission.  And not only that, she

13    doesn't even have to make a record of it.  You would think at

14    least you would have a record of it, so that at some point if

15    there's a dispute about what the City did and why they did it,

16    there would be some document somewhere that Ms. Santana signed

17    and said, *On this date I ordered access to her e-mail*

18    *because* -- I don't know what -- *I found she was looking at porn*

19    *or her computer* or something like that.  And there it is for

20    anybody to see.

21       But no.  No statement.  So I don't believe it.

22       But certainly, as I said before, they did this.  We don't

23    know how long they did it, but we know one thing:  They didn't

24    find anything that was interesting enough to bring to your

25    attention in this courtroom.  And I think that's a point I

1  would urge to you consider.

2      And then secondly, they removed her from the TPT grievance

3  investigation.

4      And you have to ask yourselves why.

5      Pretty clear that that was a big part of her job.  Even

6  Ms. Lara admitted that this morning.  It was a big part of

7  Ms. Preston's job to do these investigations.  And they took

8  her off it.  And I'll mention the reason for that in a few

9  minutes.  And then she -- they fired her of the day after she

10  disclosed the grievance to the City Council.

11      And, you -- you know, I would submit to you that one of

12  the things that was going on here was that Deanna Santana found

13  herself to be very embarrassed by what Ms. Preston was doing.

14  Very embarrassed.

15      Ms. Preston refuses to go along with the language in the

16  RTC Report.  She contradicts Ms. Santana at the City Council

17  meeting.  And you'll see the tape in a minute.  She points out

18  that the Fire Chief, who was one of Ms. Santana's hires -- one

19  of her colleagues from San Jose -- was violating the Charter.

20  She points out that Ms. Kasaine is violating the law.

21      And then at the City Council meeting on October 1, where

22  Ms. Santana told Ms. Preston, *Don't talk about the grievance*,

23  and a Councilmember said, *What's this about a grievance*? and

24  Ms. Preston told her, that was the last straw; not that

25  make-believe conversation on October 2.  Ms. Santana was

1    embarrassed because Ms. Preston was constantly pointing out to

2    people that Ms. Santana was perhaps not doing everything she

3    was supposed to do.  And removing her from the TPT grievance

4    investigation was a way to try to avoid more of that

5    embarrassment.

6         So let me talk a little bit about the three specifics or

7    the four specifics; first of all, on the RTC -- on the Rainbow

8    Teen Center.  And let me say, first of all, you know, talking

9    about who has a horse in what race, we don't have a horse in

10   the contest between Ms. Santana and Desley Brooks.  We don't

11   really care, to be honest with you, whose side you're on about

12   that; whose side anybody's on.

13        In fact, that was LaWanna Preston's complete approach to

14   that issue.  She wasn't on anybody's side, but I -- first thing

15   I want to show you about this is that Ms. Santana, despite

16   denying it, was looking for a way to turn that report into an

17   investigation.

18        And how do we know that?

19        We know that because on February 20, she asked Ms. Parker,

20   *Do I have the authority to initiate an investigation of a*

21   *Councilmember?*

22        Now, please look.  This is Exhibit 7.  It's in evidence.

23   She began the process.  And again ask yourselves the question:

24   Unless I was interested in initiating an investigation, why

25   would I ask the City Attorney if I had the power to?  There are

a lot of things she could have asked.  Do I have the power to

put the City on a four-day week?  Do I have the power to, you

know, declare Tuesday a new City holiday?

She asked her, *Do I have the power to initiate the*

*investigation?*

And Ms. Parker's response was, *You do.  You do.*

And if you look at Ms. Parker's note on -- what is it? --

page 16 of Exhibit 6, which is the -- one of the drafts,

Ms. Parker goes on at considerable length to explain what power

Ms. Santana had to start an investigation of Desley Brooks.

Now, you know, again, regardless of which side you were

on, you could tell from Ms. Brooks' testimony Ms. Santana's

testimony that there's not a lot of love lost between the two

of them.  And so it's not hard to imagine that Ms. Santana was

looking at Ms. Brooks as someone who might be better off being

a City Councilmember in Berkeley or someplace else, rather than

Oakland.  And so that's what she wanted to do.

Ms. Preston says, *No, I'm not -- I'm not having that.*

*It's not the job of staff to initiate investigations of*

*Councilmembers, and I think it's racially discriminatory.*  But

again, unless you think that Ms. Preston was taking sides in

this dispute, look at the final report, itself.  In that report

you'll see many criticisms of Councilmember Brooks' behavior.

And, as you heard from everyone, it was Ms. Preston's job to do

the part of the report that dealt with the hiring at the

1   Rainbow Teen Center.  So the report's full of that -- problems

2   with the hiring -- written by Ms. Preston.  She didn't have a

3   horse in the race, either.  She's trying to be straight,

4   straight arrow, right down the middle.  She didn't take sides.

5        And then we have the March 6th City Council meeting,

6   and -- where Ms. Preston declined to support Ms. Santana's

7   statements.  So we'll go on TV for a second.  And you'll have

8   this, by the way.  You can run it back, run it forward.  Slow

9   it down as much as you want, because it's fast and furious.

10  (Videotape was played but not reported.)

11            **MR. SIEGEL:**  Okay.  So just I want to stop it,

12  because to me, that's the key transaction there.

13  Ms. Santana -- you see her there, saying part of what we had

14  discussed with Ms. Brooks was that there would be one site

15  director for two sites.  And Ms. Brooks breaks in and says, *No,*

16  *we didn't discuss that.*  Right?  So that's the disagreement

17  between the two of them.

18       Go ahead.

19  **(Videotape resumed.)**

20            **MR. SIEGEL:**  Okay.  You can see there's a dispute

21  between the two of them.  And you know what was going on was

22  slightly confusing -- right? -- because they were talking about

23  the staffing ratio for the Rainbow Teen Center, and the issue

24  of the director.

25       And it appears that Ms. Santana was saying that we

 1  discussed both of those in the room with Ms. Brooks.  And when

 2  Ms. Preston gets up, she says, *No.  We talked about the*

 3  *staffing scenario, but we didn't discuss the two-director*

 4  *situation.*

 5       And that was that.  You know?

 6       But later that evening, as you saw -- and I'm sure we'll

 7  hear -- Ms. Preston e-mails Ms. Brooks; apologizes for

 8  contradicting her.  Ms. Brooks -- excuse me -- e-mails

 9  Ms. Santana; apologizes for contradicting her.  And Ms. Santana

10  e-mails back claims you didn't contradict me.  But you know

11  that's kind of a pattern.  I have to say.

12       It's like when the issue of the firefighters contract

13  arose.  And Ms. Preston complains about that.  Ms. Santana

14  says, *Well, I agreed with you all of the time.*  But we'll see.

15  Right?  So that's the RTC thing.  I think it's clear that very

16  least that's proven is that Ms. Preston essentially defied her

17  boss in public in front of a large, rowdy meeting of Oakland

18  residents.

19       Then the issue of the unauthorized bargaining -- I guess I

20  think this is the clearest one of the three.  We've got a City

21  policy -- no one's contradicting it -- that you need Council

22  approval before negotiations.  Agreements made without approval

23  may violate state law.  That's what Ms. Preston told you the

24  other day.

25       And the rationale for that -- okay? -- is this.  When

1  people sit down at a bargaining table and reach an agreement,

2  each side has a right to assume that they have a deal.  You

3  make a deal with someone, you assume that the person sitting

4  across the table from you has the authority.  If that person is

5  selling you a car and you buy that car, you have a right to

6  assume that he owns the car.  Otherwise, he wouldn't be selling

7  it to you.

8      If you have people at the negotiating table making deals

9  with unions that they don't have the authority to make, the

10  union's going to be unhappy.  And you heard they were unhappy.

11     Chief Reed had to clean that particular mess up.  And they

12  were unhappy with her.  They were unhappy with Ms. Preston.

13  They were unhappy because the City negotiators made a deal

14  without that authority; and it's also a violation, as

15  Ms. Preston said, of state law; of the Meyers-Milias-Brown Act,

16  which essentially confirms what I just mentioned.

17     Now we know that Ms. Preston disclosed that improper

18  bargaining, because she wrote this e-mail, which is Exhibit 20,

19  which is in evidence, where she discloses the bargaining to

20  City Attorney and to Councilmember Brooks.

21     And you may ask, *Why did she do that?*

22     Well, she did it because another exhibit, which explains

23  why, which is Exhibit 18, where Ms. Santana's says, *What's the*

24  *legal question to answer?  Teresa had no authority to sign the*

25  *extension.*

1    So Ms. Santana's contribution of to interchange is to say,

2  *Well, Ms. Preston was right*; but that was her position after

3  the fact, once it became embarrassing.

4    And really what she did is that she threw the Chief under

5  the bus.  Right?  You heard Chief Reed.  There's all this

6  confusion.  Right?  There's a lot of confusion in this case

7  from the City.  What really happened?

8    Well, you heard what Chief Reed setted.  What Chief Reed

9  said is that Trinette, who worked for the Fire Department in a

10  labor-relations capacity, told the Chief that everything was

11  set.  They had approval.  They had agreement to do it.

12    And even more so, Chief Reed testified that in her

13  conversations with City Administrator Santana, City

14  Administrator Santana said, *Oh, yeah.  Go and talk to Local 55.*

15  *Let's try and get this thing resolved.*

16    When everything falls apart, when all heck breaks loose,

17  Ms. Santana says to Chief Reed, *No.  I didn't tell you you*

18  *could negotiate.  It must be LaWanna's fault, or it must be*

19  *Winnie Anderson's fault, or it must be somebody else's fault.*

20  *It's not my fault.*  But again, whatever you think of

21  Chief Reed, she had no reason to make this up.  She had no

22  reason to go to the table and negotiate with Local 55, except

23  that her boss told her that everything was okay number the

24  problem developed.

25    And then there's the union-dues issue.  Move on to that.

1    Okay.  So I guess one factual question you'll have to decide

2    when you begin to negotiate is:  Did Katano Kasaine go into

3    this meeting on August 6th and say, *I have not been collecting*

4    *the dues for the part-time employees, because if I did, my*

5    *phone would ring off the hook?*

6          Yeah.  What's the evidence on that?

7          Well, two union reps who are in the room -- Joe Keffer,

8    whose deposition we read; and Dwight McElroy -- both said

9    that's what she said.  Winnie Anderson, the City side of the

10   negotiations, said that Ms. Kasaine said that.  And even

11   Ms. Lara, although she kind of tried to duck it on Friday,

12   admitted this morning that that's exactly what Katano Kasaine

13   meant.

14         And, just in case there's any doubt about it, please look

15   at Exhibit 29.  Okay?  Exhibit 29 is, I think, an important

16   exhibit.  And it's the e-mail that Winnie Anderson wrote to

17   Ms. Kasaine immediately after they had this meeting.  And she

18   writes, "Throughout the course of bargaining, the union has

19   raised the issue that dues had not been taken out of TPT

20   employee paychecks.  You did confirm that dues had not been

21   taken, and that you will be taking action in deducting dues

22   from paychecks of TPT" -- whatever it is -- "Local 1021

23   employees."

24         Now again, you put yourselves there.  You've been in a

25   negotiation.  One of the people on your side -- right? -- not

1   opposing side -- after the negotiations says, *Look*.  *You said*

2   *this*.  *What's the problem?*

3        And you think to yourself, *I didn't really say that*.  *I*

4   *don't agree*.  *Winnie Anderson's wrong*.

5        What's the first thing you do?

6        You send an e-mail back.  *Dear Winnie, You got that wrong*.

7   *I never said that during the negotiations*.  And you try to

8   resolve it.

9        What's her excuse?  Here we are, two-years-plus later.

10  *Oh, I had too many e-mails that day*.  *I never got to that one*.

11  Right?  I mean, she's got all of the e-mails from Ms. Santana.

12  Ms. Preston.  Somehow she gets all of the other e-mails.  This

13  one just fell through a crack in the floor or something, and

14  she didn't respond to it.

15       Well, you know, I'm sorry.  Ms. Kasaine is just not

16  telling the truth.  And for her to sit here and insist, in the

17  face of all of this evidence to the contrary, that she never

18  said what everybody else said she said is, to my mind, pretty

19  absurd.  Pretty absurd.

20       And, you know, one of the Judge's instructions has to do

21  with the fact that if you think that a witness has lied to you,

22  well, you may have to take that into account when you evaluate

23  the rest of the testimony of that witness.

24       Now, what did Ms. Preston try to do?  She heard about the

25  problem from Winnie Anderson, Sonia Lara, and tries to fix it.

1  And what does she do?  Contacts Ms. Kasaine and says, *I want to*
2  *talk to you*.

3       And what's Ms. Kasaine say?  *Oh, I don't want to talk to*
4  *you*.  *Why do we have to talk?*  *I'm too busy*.  All of these
5  excuses and, you know, come up with different reasons why she
6  wouldn't talk.

7       Was she afraid of Ms. Preston?  Was she worried that
8  Ms. Preston would twist her words?  I asked her that.  You
9  know, she said, *I'm not afraid of Ms. Preston*.  *This was not*
10 *something where I felt personally threatened*.

11      It's something.  And Ms. Lara confirmed that when I asked
12 her the same question.  It's something you can figure out just
13 by looking at the payroll records.  This wasn't witch hunt
14 directed at Ms. Kasaine or anyone else.  It was problem that
15 the City has to face.

16      You look at the payroll records.  You run a report that
17 says -- okay -- for each SEIU 2021 represented employee, what
18 union dues were collected from them?  Were there periods of
19 time when they worked when there were no dues collected?
20 That's all there was to it.  It wasn't a threat to Ms. Kasaine.

21      But you know this became, again, a problem -- a legal
22 problem -- because, as Ms. Preston testified,
23 Meyers-Milias-Brown Act requires that if you have a contract
24 with a union and the contract says, "Collect union dues," if
25 you don't collect the union dues, it's an unfair labor practice

1    and a violation.   So -- and it was an embarrassment at the

2    October 1, City Council meeting when Desley Brooks asked about

3    it.   And Ms. Preston, as she said, had to tell the truth,

4    because that's the way she conducts business.

5        So the firing was not justified by the City of Oakland.

6    It wasn't a no-cause or at-will firing.   There is no evidence

7    that justifies what they wrote in response to interrogatory in

8    December 2014.   No disclosure of confidential information.

9        And then the last point I want to bring up on this is the

10   issue of unprofessional.   You know, that's one of those

11   charges.   Anybody could say, *Well, you know, Dan Siegel's*

12   *unprofessional.*

13       *Well, why do you say that?*

14       *Well, someone told me he was unprofessional.*

15       *Well, who is that person?*

16   *I don't remember.*

17       So what I did is I made a list of all of the people who

18   testified in this trial who were City of Oakland employees who

19   actually had experience with LaWanna Preston.   And I want you

20   to see whether anything that any of these people said suggested

21   that she was unprofessional.

22       Winnie Anderson didn't say she was unprofessional.

23       Fred Blackwell said she was real professional.

24       T.C. Everett, the IT person -- she said she got along with

25   Ms. Preston well.

1      Lamont Ewell negotiated with her; said she was

2  professional, and a person of integrity.

3      You know, even Scott Johnson -- right?  So they bring in

4  Scott Johnson on Friday.  And Scott Johnson sits up on the

5  stand and says, *Well, she was a bully.  People were afraid of*

6  *her.  People said she was unprofessional.  People said she*

7  *mistreated her.*

8      I asked him*, Tell me one person.  Give me an example of*

9  *what person.*

10      You know, Johnson didn't say that Ms. Preston was

11  unprofessional to him.  He said that these unnamed people --

12      Well, who were they?  They weren't in this list.  Who were

13  the people who thought she was unprofessional that justified

14  her hiring?

15      And I have not really come up with anything.

16      They brought in Ms. Santana's friend, former Chief Jordan.

17      They brought in Kasaine, who said she wasn't afraid of

18  Ms. Preston, who said she had no complaints.

19      Same with Ms. Lara, who testified this morning.

20  Ms. Preston treated her well; helped her get a raise; helped

21  her get a transfer.  She cried when Ms. Preston was fired.

22      Mr. McGee testified briefly.  Ms. Parker testified.

23  Neither of them said that Ms. Preston was unprofessional.

24      Teresa Reed -- despite the fact that she was criticized by

25  Ms. Preston for improper negotiations, she had no problem with

1    Ms. Preston.  I asked her, *Did you report Ms. Preston to City*

2    *Administrator Santana because of anything?*

3         *No.  I have no complaints against her.*

4         So who?  Who?

5         So all right.  We're winding up here.

6         No.  There we go.

7    (Document displayed.)

8         **MR. SIEGEL:**  A red herring is a smelly fish.  This is

9    something I learned quite a while ago.  You know, many of us

10   use the expression "red herring," but perhaps everyone who uses

11   the expression knows where the expression comes from.  Where

12   the expression comes from is really tracking fugitive slaves,

13   where people with dogs would go out after slaves in the swamps,

14   and so on.  So some of the fugitives learned that you could

15   distract the dogs with a dead fish; and you carried the dead

16   fish.  And at certain point you run one way, and throw the dead

17   fish in the other way.  And you hope the dog goes after the

18   fish instead of you.

19        That's what a red herring is.  It's a way to distract

20   attention.  So we've had a lot of that.  We've had the

21   allegation that Ms. Preston couldn't investigate the SEIU

22   grievance, because there was bad blood between her and Kasaine.

23        Well, there's no evidence of bad blood.  There's some

24   professional disagreements.

25        Anyway, as I said a minute ago, it didn't have to do with

1  Kasaine.  It had simply to do with looking at the payroll

2  records.  Ms. Preston helped the unions undermine the City.

3      Now, yeah, even in this world, you can't have it both

4  ways.  Either Mr. Preston was such a tough negotiator, that the

5  union people were angry at her and went into Mr. Johnson's

6  office to complain about her; or she was giving away the store

7  out the back door.  Doesn't make sense that she would do both.

8      Did the undermine the Deb Grant inquiry?

9      Finally we got Ms. Santana to admit that even though she

10  had the Police Department investigate this issue, the police

11  came back and said Ms. Preston did not undermined any

12  investigation.  She was credible.  Deb Grant was credible.

13  Deb Grant was not punished.  She wasn't punished.  No

14  documentation.  I pointed that out before.

15      You know, again, if we're talking about the corner grocery

16  store, maybe there's no personnel records.  If you work for the

17  City of Oakland, with thousands of employees, or any other

18  city, there are personnel records.  And every manager who is

19  beyond kindergarten knows that if you have problems with an

20  employee, you document it.  You document it.  You document it.

21  You create a paper trail, so if it comes time to fire, you've

22  got the documentation.

23      The June 26th grievance.  June 26th SEIU grievance was

24  dead, because it wasn't pursued.  I don't know what the

25  importance of that is.  Maybe we'll hear it in a little

1   while -- whether it was Chief Reed or Trinette who asked

2   Winnie Anderson to sign the deal.  Big deal.  Big deal.

3       Winnie Anderson signed it.  Ms. Preston didn't want it

4   signed.  She made it clear after the fact she didn't want it

5   signed.

6       So we think we've proven that Ms. Preston's whistleblowing

7   activities was a contributing cause.  We think we've proven

8   that the City of Oakland's explanations don't hold water.  And

9   we think Ms. Preston is entitled to damages.

10      And go through them quickly.  Dr. Ogus pointed out that

11  the difference between what she would have earned had she

12  stayed in Oakland and what she actually earned up until April

13  of this year was 92,000.

14      Look at the future -- the present value of future losses;

15  again, comparing Oakland employment to San Francisco

16  employment.  It's 252 and change.

17      And the pension losses.  409,000 after you deduct the

18  80,000 or so she cashed out when she quit.  She withdrew her

19  contribution.  Now it's interesting if you look at the next

20  slide.  Before we do that --

21      You're too quick for me.

22          **MS. MEHTA:**  (Indicating.)

23          **MR. SIEGEL:**  I know.  I see.

24      The total is 754.  Okay.  Now I'm going to go to the next

25  slide.

 1      Mr. Cohen says, *No, it's not 754.  It's only 154.*  And the

 2   reason for that is that City of Oakland should get a credit,

 3   because Ms. Preston got this pension from PERS.  So that should

 4   be a credit in terms of how much they owe.

 5      In other words, there's a big problem with that, of

 6   course, which is that she didn't get the pension from PERS.

 7   When she was fired, number one, she needed the money.  So she

 8   cashed out her 80 grand.

 9      And maybe in a financially smarter place or in a

10   financially smarter world she would have said, *Well, I'll just*

11   *let that 80,000 sit; and instead I'll get my pension.*  25,00 a

12   year next year and the near after.

13      She didn't do it because she needed the money then.  And

14   that's not her fault.  And the City should not get credit for a

15   pension she never received, when she didn't have the

16   opportunity to earn that pension because they fired her?

17      So, you know, the Court's instructions don't ask you to

18   think hypothetically about what she might have done.

19      Sure, she might have left the City of Oakland, and gone to

20   work for a Wall Street bank, and made half a million dollars a

21   year; and then City of Oakland would be asking her for money.

22   But she didn't.  She did the best she could with her kid in

23   high school; her house and other expenses.  She cashed out her

24   pension.  And so you don't get to subtract it.

25      And if you look at these numbers, what Mr. Cohen did is he

1  gave Oakland credit for 54,620 in past losses, and 500,000 in

2  future losses.  If you don't give Oakland the credit for those

3  two numbers, then his number is 709,604, which is really very

4  close to this -- Dr. Ogus' numbers.

5       And I'm not even going to argue with you about the other

6  assumptions he made.  She was going to retire at age 61.  I

7  mean, I wish I was on that retirement track.  I would retire.

8  I will tell you that it would have been a few years ago; but

9  here where she's at, and she's continuing to work, and plans to

10 continue to work.

11      And then finally, general damages.  This is the other

12 item.  And, as Judge Cousins indicated, this number's in your

13 discretion.  There's no fixed standard.  It's up to you.  Come

14 up with a fair number.

15      Please consider the following, though.  Her history and

16 the achievements of her life.  The pride she obviously had,

17 still has in her work.  Her reputation.  A lack warning.  Just

18 being kicked out.  No notice.  The humiliation of coming to

19 work one day, and finding a security guard outside your office,

20 and not letting you go in there even to pick up your children's

21 photos.  And the distress.

22      You know, I want to say this.  When Ms. Preston was fired

23 on October 3, 2003 [sic], she had no way of knowing how things

24 would work out.  Right?  She had no way.  She could have been

25 unemployed now.  Right?  And so that's why she had to cash out

 1    her $80,000 and do what she did.

 2         But as I said earlier, it's simply a reflection of her own

 3    qualities as a human being and as an employee -- a competent,

 4    professional labor-relations professional -- that she got the

 5    job in City and County of San Francisco.  So that obviously

 6    mitigates her distress.  We'd be in a different situation if we

 7    came in here today and Ms. Preston was living in her car or

 8    something like that; but the stress that she suffered on

 9    October 3, until things started to look better a few months

10    later -- it's something that I urge you to compensate her for.

11         Thank you.

12         **THE COURT:**  All right.  Thank you.

13         We're going to take a five-minute recess, along with a

14    stretch.  And it will be the Defense opportunity for a closing

15    statement -- closing argument when we return.  Thank you.

16    (Recess taken from 2:23 p.m. until 2:31 p.m.)

17         **THE COURT:**  Please be seated, ladies and gentlemen.

18         Now the City of Oakland's opportunity for closing

19    argument.

20    (Proceedings were heard in the presence of the jury:)

21                        **CLOSING ARGUMENT**

22         **MR. LAFAYETTE:**  Good afternoon.  You would think,

23    based upon what I just heard from Ms. Preston's counsel, that

24    it is the City of Oakland that has the burden in this case.

25    You would think that we lived in a country where you could get

1  sued, and unless you came up with an explanation for something,

2  you would be held liable.  The whole concept of *You made the*

3  *allegation; you prove it*, seemed to have been completely lost

4  in the closing that I just heard.  There was nothing there that

5  said, *The plaintiff has the burden of proving this, this, this,*

6  *this, and this*, and that she had presented evidence to meet

7  that.

8       And instead what I think I heard was if the City of

9  Oakland can't justify its termination, it's automatically

10  liable.  End of story.  Go home.

11       That's not the way the law works.  That's not the way the

12  law in this country has ever worked.

13       The plaintiff sues.  The plaintiff has an obligation and a

14  responsibility to present evidence to show and meet each and

15  every one of the elements assigned to her; and if she doesn't,

16  case is over.

17       This is the instruction that the Court read to you.  The

18  burden of proof.  Proof by a preponderance of the evidence

19  means proof that something is more likely than not.  It means

20  that certain evidence, when compared to the evidence opposed to

21  it, has the more convincing force, and makes you believe that

22  something is more likely true than not.  If the evidence on any

23  particular point is evenly balanced, the party having the

24  burden of proof has not proved that point by a preponderance of

25  the evidence, and you must find against the party on that

1    point.

2        What does that mean?

3        That means that, quite frankly, the City could just sit

4    there and do nothing.  And it has no obligation to do anything

5    until and unless the plaintiff has actually established those

6    facts necessary to meet the elements that I am going to talk

7    about today that are being assigned to the plaintiff to meet.

8        That's the way our judicial system works.

9        So what plaintiff spent the entire time talking about,

10   *Well, I don't think that there is enough evidence of this*, or

11   *At different points in time someone*, or --

12       But basically to criticize whether or not all of these

13   reasons for termination were rolled up into one item or not,

14   but not to talk about whether or not the plaintiff has actually

15   met her burden.

16       Let us not be confused.  Let us not be misdirected.  Let

17   us stay completely and totally on point as we go through this

18   process.

19       So let me talk about where we start.  We start here.  Was

20   there a reason to fire her?

21       Yeah.  You say, first of all, she was at will.

22       And though this second question here -- progressive

23   discipline was not required -- you may remember that that was

24   something ambiguous; and it was ambiguity created by the

25   plaintiff in this case.  When I asked under cross-examination

1  about whether or not progressive discipline applied, she said

2  something to the effect of, *Well, it's what we normally do,* or

3  something.

4      And then only when you, the jury, asked a question -- a

5  point-blank question -- Were you subject to progressive

6  discipline? -- did we get a clean, clear answer.  And the

7  clean, clear answer was, *No, not in my level*.  And, you see,

8  that's because people at the level we're talking about are not

9  the machinists.  They're not the mechanics.  They're not the

10  secretaries.  They're not the people who don't make these

11  decisions.

12      This person's position was an important position to the

13  City.  And it was important to have someone in that position

14  who would not abuse nor give the appearance of abusing the

15  position of power that was associated with that position.  It

16  is a powerful position when you say that you can conduct

17  investigations of someone.  That is a level of power that

18  should be wielded with the most delicate touch in hand; because

19  otherwise, it gives you the power to intimidate.  That's not

20  appropriate.  That's not appropriate.

21      Just cause?

22      No, we don't need it.  The City didn't need anything.  She

23  was an at-will employee, and she's admitted it.  That meant she

24  could be fired for any reason, or no reason at all, with or

25  without notice.  That's what the law says.  That's what she

 1   said she understood at every step of the way.

 2        So what is it that she has to prove?

 3        This is what she has to prove.  And there are four things

 4   that she has to prove; one of these four.

 5        And let's talk about that for a second.  Over and almost

 6   two-year period of time she's worked with Ms. Santana.  At no

 7   point in time did you ever hear her make a complaint.  You

 8   didn't hear her come up and say, *I complained to somebody that*

 9   *I was being treated poorly*.  *I complained to someone that* -- no

10   -- *that Ms. Santana is doing something to me inappropriately*.

11   Where was that testimony?  I didn't hear it.  I didn't hear her

12   say anything at any point or any way where she wrote a

13   memorandum saying, *I think someone's trying to fire me*.  I

14   didn't hear that.  I didn't hear her write a memorandum or see

15   her write an memorandum or e-mail or anything that suggested

16   anything of the sort, but this is where we are.

17        So what happens?

18        She gets fired for legitimate reasons.  Period.

19        And then so what did she do?

20        She reaches back through her time, and she grabs

21   everything that she could put her hands on, and throws it up

22   against the wall and says, *One of these just might stick*.  *One*

23   *of these, someone just might say, "I will run with that one."*

24   *And I will take it*.  *And they will give me three quarters of a*

25   *million dollars*.  Bam!

1      That's what happens here.

2      You see, you didn't hear her reach out back in 2012 or

3  2013.  No.

4      This is, *I got fired, so now I'm going to reach back and*

5  *grab everything that's ever happened.  I'm going to throw it up*

6  *on the wall and see if it sticks*.

7      And I'm going to walk us through each and every one of

8  these items, to make sure that each and every one of us clearly

9  sees that she has not met her burden with regard to either one

10  of these items.  So let's look at them.

11      Preston claims that she refused to add language to the

12  Rainbow Teen Center Report referring Desley Brooks for

13  prosecution, because she believed that doing so would be

14  illegal racial discrimination.  We are talking about that in

15  detail.

16      Preston claims that she refused to confirm Santana's

17  statement to City Council Brooks' -- Desley Brooks -- at the

18  March 6th, 2012, City Council meeting, because she believed

19  that doing so would be committing perjury.

20      Did anybody hear or see her being sworn and placed under

21  penalty of perjury?  Because I didn't hear it, and I didn't see

22  it.  But we're going to talk in more detailed specifics about

23  that, too.

24      Three.  Preston claims that she disclosed that the City of

25  Oakland was entering into contracts with Firefighters' Local 55

1  without the necessary approval forms from City Council, because

2  she believed that doing so would be a violation of the

3  California Government Code.  We're going to speak more

4  specifically about that, but I want you to remember the context

5  of that, because you see the context of that is a failure of

6  her department.  And the context of that is what she really

7  attempted to do was take the failure of her department, and

8  place it on someone else.

9      And we know that because of what Winnie Anderson testified

10  to reluctantly.  Winnie Anderson sat in that chair in this room

11  and she said, *At each step of the way when I was dealing with*

12  *the Fire Department, I was communicating with Ms. Preston*.  She

13  says Ms. Preston may not have actually seen the Tentative

14  Agreement, but she knew about it.  And she knew it was going to

15  get signed.  That's what she knew.

16      And then we're going to talk about the misrepresentation

17  Ms. Preston make when she communicates to Desley Brooks.  We're

18  going to talk about all of it.

19      We get to this fourth one.  Preston claims that she

20  disclosed that the City of Oakland was failing to collect

21  Temporary Part Time employees' union dues, because she believed

22  that the failure was a violation of the California Government

23  Code.

24      Not true, either.  I mean, the simple explanation is; when

25  the union sent the grievance over -- I mean, you look at the

1   document.  They didn't just send it to her.  They sent it to

2   Deanna Santana, too.  They sent it to the Mayor.  So where is

3   it that she brought it to someone's attention?  It was already

4   at everybody's attention.  She didn't do that.

5        But we're going to go through:  What does she have to

6   prove in order to meet each one of these elements?

7        You see, this is the Court's instruction to you, as well.

8        Preston claims that Santana, acting on behalf of the City

9   of Oakland, terminated Preston in retaliation for her

10  disclosure of information and refusal to participate in

11  unlawful acts.  In order to establish this claim, Preston must

12  prove all of the following, and she must prove each and every

13  one of these items for each and every one of those claims by a

14  preponderance of the evidence.  And you're never going to see

15  on that list that the City has a burden there.

16       Take a look at it.  What's the first one?  That the City

17  was -- City of Oakland was Preston's employer.  That's a

18  no-brainer.  It was.

19       That Santana, acting on behalf of the City of Oakland,

20  believed that Preston disclosed information or refused to

21  participate in acts.  I'm going to go through each one of

22  those, and you're going to see that that's absolutely not been

23  proven.

24       That Preston had reasonable cause to believe or violations

25  of or noncompliance with the law, but not just any law.  The

1    Court's instructed you.  It has to be a violation of federal

2    law or a violation of state law.  It cannot be a violation of a

3    city ordinance, a city resolution, or a city anything.  It has

4    to be a violation of a federal or a state law.  Period.  End of

5    question.  And I'm going to tell you we're not going to find

6    that in this record.

7            That Preston --

8            That Santana, acting on behalf of the City, terminated

9    Preston.  Well, okay.  She did.

10           But here's the next one:  That Preston's disclosure of

11   information and/or refusal to participate in these activities

12   was a contributing factor in City of Oakland's decision to

13   discharge Preston.

14           Well, where is that evidence?  I didn't hear it.  I didn't

15   hear a single soul come into this courtroom and say they heard,

16   they saw, they suggested, they believed that Ms. Santana was

17   doing something because of one of those four elements.  Where

18   is the evidence?  You always have to ask yourself:  Where is

19   the evidence that supports that?  There isn't any.

20           That Preston was harmed.

21           That Preston's disclosure of information -- refusal to

22   participate in these -- was a contributing factor.

23           No.  No evidence.

24           That Preston was harmed.

25           Well, okay.  She lost her job, but not because of those

1   other items.

2        That Santana's conduct, acting on behalf of the City, was

3   a substantial factor in causing Preston's harm.  She fired her,

4   but that's not the issue.

5        Preston must have reasonably believed that City of

6   Oakland's policies violated federal or state rules or

7   regulations; not city.  And when we go through this, we're

8   going to see the significance of that phrase, "not city."

9   Okay?

10       So now let's go to the first of these:  California Labor

11  Code.  I've already talked to you about the burden of proof.

12  You're supposed to treat the City fairly.

13       So let's go to this Rainbow Teen Center Report.  So what

14  is it that she has to prove with regard to the Rainbow Teen

15  Center Report?  Each and every one of those elements.  Each and

16  every one of those.  You can't skate.  You can't slide.  You've

17  got to cover each and every one of those.

18       So let's talk about it.

19       No evidence this ever occurred.

20       No evidence Santana believed Preston was refusing to

21  participate in an act made unlawful by state or federal law.

22  No evidence that Preston even believed a violation of law was

23  taking place of a federal or state nature.

24       No evidence Santana terminated her because of this.

25       And let's talk about the detailed specifics of this.

1    First of all, let's go back.

2    What was it that Fred Blackwell said?  You see, madam

3    court reporter here has been gracious enough to create a

4    transcript.  You should rely upon your own memory, but I'll

5    tell you what it was that she caught that Fred Blackwell said

6    about this whole incident.  This is examination from

7    plaintiff's counsel.

8    "Question:  Mr. Lafayette asked you where Ms. Santana had

9    wanted to put language in the Rainbow Teen Center Report

10   regarding potential referring Ms. Brooks to the District

11   Attorney.  And your recollection was that Ms. Santana did not.

12   Is that right?"

13   "Answer:  That's correct."

14   I'm sorry.  I thought he just said that Ms. Preston --

15   Mr. Blackwell was a credible witness.  He was.  And

16   Mr. Blackwell has just said there is no evidence whatsoever

17   that Ms. Santana suggested that such language be placed in that

18   report.  So where is this coming from?

19   Do you recall --

20   So having said that, where is the testimony?  Maybe it's

21   here.

22   "Question:  Now I'll try and get my language right here.

23   Okay?  Did Ms. Santana ever suggest to you that you could -- a

24   suggestion of criminal charges in a final report?"

25   "Answer:  No."

1     "Did she ever draft language suggesting criminal charges

2  in the final report?"

3     "Answer:  No."

4     "Did she ever insert language into the draft report

5  stating that this matter should be referred to the DA?"

6     "Answer:  No, not that I recall."

7     "Question:  Did she ever tell you guys in a meeting that

8  something in connection to the report should be, in her

9  opinion, referred to the DA?"

10     "Answer:  I don't recall that."

11  (As read.)

12     Where is the evidence in the first instance that this

13  actually ever happened?

14     Didn't happen.

15     So then we go to the next issue about this; about whether

16  or not it happened.  Let's look at the document Exhibit 6 at

17  page 102.  Now, I remember that this document was almost

18  impossible to decipher, but I remember there were a couple of

19  people who came in and testified exactly what this document

20  was.  And the clear unambiguousness of this document is:  It's

21  an opinion.  It's an opinion from City Attorney, basically

22  stating *This is what I understand the rules and regulations*

23  *provide*.

24     And with regard to the passage that talks about the DA, it

25  says that the Council's role is to set policies and make budget

 1  decisions.  Council also can censure a Councilmember on direct
 2  CAO to seek investigation and action by DA.
 3       So the only policy issue revolves around whether to go to
 4  the DA; whether to expend resources to retain an independent
 5  investigator; and whether Council wants to go on record with a
 6  policy that mirrors Charter 21, although that is not necessary.
 7       Now, what is it that plaintiff told us?
 8       Plaintiff tried to tell us this that this was language to
 9  be inserted into the agreement, into the document.
10       You can read it for yourself, and you can see that that's
11  nothing more than an opinion.  And that's consistent with what
12  Fred Blackwell said.  That's consistent with what
13  Deanna Santana said.  And quite frankly, to the extent
14  plaintiff says that's the language she was talking about, it's
15  consistent with what she said.
16       There is no evidence in this record whatsoever that anyone
17  attempted to coerce her or to force her into putting language
18  in that was untrue.  There's no evidence of anyone suggesting
19  it to her.
20       But what we do know is that the final report, when it was
21  finally created as a final report, it contained the language --
22  and this is a report that plaintiff, herself, says was
23  something that she could stand by, and that she was fine with,
24  and she didn't have any problems with it.
25       Well, if you look at that report at page 876, it goes on

1  to state, "facts related to inappropriate actions on the part

2  of staff or the Vice Mayor."  And it's talking about in the

3  connection of, "Staff notes that if the City Council requires a

4  report on past incidents, that the City Council directs the

5  City Administrator to allocate funding for an independent

6  review that includes, among other things, facts related to

7  inappropriate actions on the part of staff or the Vice Mayor."

8  That's consistent with what she said she wanted.  That's

9  consistent with everything that we've seen.

10      Let's move forward.

11      Claim Two.  The City Council.

12      I'm going to tell you again -- and I'm going to show you,

13  also -- why what they're saying just isn't true, and why

14  there's no factual support for it.  So when I come back to this

15  first issue that we just looked at in the elements of proof,

16  that Santana, acting on behalf of the City Council, believed

17  that Preston disclosed information, refused to participate in

18  acts -- there's no evidence for that for that first item; is

19  there?

20      That Preston disclosure of information or refusal to

21  participate in these activities was a contributing factor in

22  City of Oakland's decision to discharge Preston.  There is no

23  evidence of that, either.  No one came and testified that, some

24  19 months later, someone wanted to fire her because of

25  something that happened in February of 2012.  There's no

1   testimony about that.

2       And Santana's conduct acting on behalf of the City was

3   substantial factor in causing harm.

4       There's nothing there.

5       Let's go to this one.  She confirmed, first of all,

6   because she believed that doing so would be committing perjury.

7       Let's look at what happened here.  No evidence this ever

8   occurred.  No evidence Santana believed Preston was refusing to

9   participate in an act made unlawful by state or federal law; no

10  evidence that Preston even believed a violation of law was

11  taking place of a federal or state nature.  No evidence of

12  Santana terminating her because of this.

13      This is what I did.  And I could be wrong.  I tried my

14  best to sort of type out exactly what's on that tape, so that

15  you could see it, as opposed to just listening to it, because

16  sometimes our eyes catch things that our ears just don't.  And

17  sometimes it's vice versa.

18      And I can tell you now you're going to read it and you're

19  going to say, *Oh, Mr. Lafayette didn't catch that phrase*.  And

20  there's probably some truth in that.  It's not intentional,

21  but --

22      So this is what I did.  I get to this point and I say,

23  Brooks.  That's not --

24      You see, Santana says, "The staffing configuration in the

25  supplemental memo deletes the director through further

1   discussion."  Through further discussion.  Through further

2   discussion.  So she's explaining in the very first instance,

3   through further discussion, the OPR Director suggested that the

4   Director who oversees the community center -- the Rainbow

5   Community Center -- can oversee both sites.  She's already said

6   that there is now something that's happened through further

7   discussion.

8        Now what happens?

9        *Brooks:  That's not true.  In fact, I can tell you that*

10  *unless they intend to increase the salary of the site director*

11  *of Rainbow, that he cannot and has not indicated that he*

12  *cannot, and that was ever communicated to me.  Again, the City*

13  *Administrator gave me her word when we met on the 22nd or 23rd*

14  *of last month that we could maintain the staff that was there.*

15  That's the issue:  That we could maintain the staff that was

16  there.  That's the issue.

17       And let's see what happens.

18       And that's when Ms. Santana said, *That's not true.  That*

19  *sentence is not true.*

20       And we're going to track it through the rest of this

21  conversation, and we're going to see exactly what happened

22  here.  That's absolutely true.

23       *Ms. Santana:  What we said -- and Fred and LaWanna were in*

24  *the room.  I would ask for them to assist me with this set of*

25  *facts -- what we said is that we would fold them into an*

1  *existing open recruitment and they need to meet minimum*

2  *qualifications.*

3  *Ms. Brooks:  That's absolutely correct, but I was to*

4  *maintain -- it was to maintain staffing that was in place.*

5  There was no conversation -- there was no conversation

6  about having -- so again, her phrase is, "to maintain staff

7  that was in place."

8  Now they're talking over each other.

9  *Ms. Santana:  The report already notes that we know for a*

10  *fact that some did not meet minimum qualifications.  I do*

11  *believe in that conversation we raised it with you.*

12  *Brooks:  No, you did not.  No, you did not.*

13  Now, what is she saying?

14  You did not raise with me that some of these people didn't

15  meet minimum qualifications.

16  *Miss Santana:  I would ask either LaWanna or Fred to*

17  *confirm the facts, because we did spend time on how we were*

18  *going to begin the transition.*

19  So what is it that she's calling Ms. Preston up for?

20  She's calling Ms. Preston up there to confirm that they

21  met with her, and they told her that some of these people

22  didn't meet minimum qualifications -- that's the issue -- and

23  that not all of these people were going to be able to be there.

24  That's the issue.

25  Let's look and see what happens --

1    *Brooks:* --

2    -- before Ms. Preston gets up there, and after Ms. Santana

3    has asked her to come up there.

4    *Brooks:  We talked very specifically about the staff that*

5    *was in place.  There was no conversation about having the*

6    *Rainbow Center Director.*

7    *Santana:  LaWanna, could you please -- who was responsible*

8    *for overseeing the staffing transition side?*

9    So, now, in between the two LaWannas, a new issue is

10   thrown in.  And what do we get what?  Does LaWanna come up and

11   say?

12   *Good evening, Councilmembers.  At the meeting with*

13   *Councilmember Brooks, we did discuss maintaining the staff*

14   *ratios in the Center so that all of the programs that were*

15   *current programs that were there could be facilitated.  As the*

16   *City Administrator stated there in previous reports, it was*

17   *clear there were certain employees that were currently working*

18   *there that did not meet the minimum requirements.*

19   As of that moment when she made that statement, she had

20   answered the question for which she was called up there to give

21   opinion on.  That's it.  That was it.

22   So now what happens?

23   *Ms. Brooks:  There was one employee that did not meet the*

24   *minimum.  And we talked about her, but we've never discussed*

25   *the Rainbow Director.*

1     Now it's going to the Rainbow Director.  And what happens

2   there?

3     *Preston:  At that meeting we did not discuss the current*

4   *Director at Rainbow taking over both facilities.  That was*

5   *proposed to us after that meeting by the --*

6     And then Ms. Brooks jumps in again.  But look there.

7   *Through further discussion, the OPR Director --*

8     You see, there was nothing here.  There was nothing here

9   that in any way indicated that someone asked her to come up

10   there and perjure herself.  Didn't happen.  You want to hear

11   it?

12   (Audiotape was played but not reported.)

13     **MR. LAFAYETTE:**  So now -- so what is it that

14   Ms. Santana thought happened after that meeting?

15     You see.  And that's where you get to look at Exhibit T.

16   Exhibit T is the e-mail exchange that takes place right after

17   that meeting.  And it actually tells you what it was that

18   Ms. Santana thought.

19     So here's the first thing Ms. Preston writes.  "I think

20   you came out of the meeting looking good.  You took the high

21   road, and held your position.  I am sorry I had to contradict

22   you tonight.  I hated doing it, but I had to tell the truth.  I

23   can't read that.  I hope you understand."

24     So now what happens after that?  Does Ms. Santana confirm,

25   *Yes, I agree that you contradicted me.  Yes, I agree that you*

1   *were talking about a violation of state law.  Yes, I agree that*

2   *you were talking about a violation of federal law?*

3        Absolutely not.

4        What she does is she says, *You did not contradict me.  I*

5   *was answering specifically to her comment re: staff staying.  I*

6   *did agree with you when you commented on the Director.  I*

7   *thought you heard me.  We did not agree to keep her staff.  We*

8   *did agree to assist them applying for the position, and noted*

9   *that some did not meet the MQs.  That needed to be clarified,*

10  *which we -- both of them did.  You did tell the truth.  So did*

11  *I.  Not clear where your concern's coming from.*

12       *Preston:  The comment about having the Director of the*

13  *Rainbow Recreation Center manage both sites -- we had that*

14  *discussion with Audree; not Brooks.*

15       *Answer:  Right.  And I agreed with you.*

16       So now, under the circumstances, how can plaintiff meet

17  her elements of proof, and say that, one, the -- one, that

18  Santana, acting on behalf of the City, believed that Preston

19  refused to participate in acts?  That's completely unsupported

20  by this e-mail stream.  It's contradictory to that e-mail

21  stream.

22       How about that Preston's disclosure of information and

23  refusal to participate in these activities was a contributing

24  factor?

25       No.  In order for you to reach that, let me show you what

1   you've got to overlook.  You've got to overlook this time line,

2   you see; something I talked about at the beginning.  That's

3   March 6 and February 24.

4        You'd have to overlook that e-mail that we just looked at;

5   that assignment that she got to be the transition team; that

6   April 25, 2012, criticism that she received from Scott Johnson

7   concerning her activities with Katano Kasaine.

8        And you'd have to overlook something else that they keep

9   talking about:  That evaluation, where she says she was

10  amazing.  How could she possibly be getting an evaluation in

11  May of amazing, when she said that she is the victim of

12  retaliation from activities in February and March?  It is

13  nonsensical.  It is nonsensical.

14       5/11.  Criticisms of others.

15       7/2012.  Other criticisms.  Other criticisms.  Other

16  criticisms.

17       And then we get to the internal investigation, which --

18  she would want you to ignore all of those things that took

19  place, and say that none of that had anything to do with her

20  termination.  None of it.

21       No.  That's not rational.  That's not reasonable.

22       Claim Three.  The Fire Department.  So when does that take

23  place?  You see, the Fire Department is right about here

24  (indicating).

25       What do we know about right about there?

1       We know that the decision had already been made to

2   terminate her.

3       We know that because three people testified to that, and

4   nobody has contradicted that at all.  At all.  Nothing.  We

5   know that Deanna Santana says that once this thing hit with

6   that internal investigation, that was it for her.  And we'll

7   talk about why that was it for her, but that was it.  And we

8   know she talked to the Mayor about it, and the Mayor confirmed

9   it.  And we know that she talked to City Attorney about it, and

10  the City Attorney confirmed it.

11      Where is the evidence that that did not happen?  Where is

12  the evidence that the events which would rationally lead to a

13  decision like that did not occur?

14      It's not there.

15      But let's look at it, anyway.  Preston claims that she

16  disclosed that the City of Oakland was entering into contracts

17  with Firefighters' Local 55 without the necessary approval from

18  Council, because she believed that doing so would be a

19  violation of California Government Code.

20      I'm going to show you why that's absolutely not true.

21  Okay?

22      There's no reporting of a violation, no causation, no

23  statement to Brooks.  The statement to Brooks was a

24  fabrication.

25      We'll talk about all three of those, but let's look at

1  these first.  2E.  Exhibit 2E is the e-mail.

2      Kelvin, could you help me with that, please?

3  (Document displayed.)

4      **MR. LAFAYETTE:**  You see, Exhibit 2E is the e-mail

5  that she does not send to Deanna Santana.  Exhibit 2E is the

6  e-mail that she actually sends to the City Attorney's Office

7  instead.

8      Now, I -- I pondered.  I said, "Well, why is she doing

9  this?  Why is this happening?"

10     And I'll tell you why it's happening.  These tables aren't

11 closing.  The negotiations are not taking place.  And she's

12 receiving criticism for that.  She's not going to the labor

13 budget meetings.  All of the things that are supposed to be

14 happening are not happening in June, and people are bringing

15 these to her attention.  And now you've got one more thing

16 that's come to roost with regard to what her primary function

17 is:  These negotiations.

18     And she already knows that she's on the bubble -- or at

19 least, that's the way she sees it -- because of this Internal

20 Affairs investigation.  So the last thing she could do is be

21 criticized one more time for one more thing that she's done

22 wrong.

23     So rather than go to her boss with this, what does she do?

24     She sends this document to the City Attorney.  And it --

25 there's nowhere in here that she says anything about a

1  violation of state or federal law.  Look at what she writes.

2      "The MOU has explicit language that this provision expires

3  on a specific date.  Does the Fire Chief have the authority to

4  extend a provision in the MOU without Council authorization?"

5      MOU.  Council.

6      "Can the Fire Chief reduce the number of employees a

7  premium to applicable -- to -- in order increase the premium

8  pay without Council authorization?"

9  (As read.)

10     The only thing she's talking about is an agreement between

11 the union and the City, and a City statute or ordinance or

12 something that talks about what people can and cannot do.

13 There is no reference here to a state or a federal violation.

14 And there is nothing where she's indicating such by this

15 communication.  That automatically wipes this issue out.  It's

16 not there.  There's no evidence to support it.

17     So what happens after that?

18     Then she writes this e-mail.  "See attached."  This is the

19 one that she sends to Desley Brooks.  This is Exhibit 21 [sic].

20 (Document displayed.)

21         **MR. LAFAYETTE:**  Exhibit 2I.

22     And when she sends out Exhibit 2I --

23     I want you to think about this when you start thinking

24 about credibility -- okay? -- because when you start looking at

25 something in this case, and the only person who stands up for

1   it is Ms. Preston, I want you to think about this document.

2   And I want you to think about Winnie Anderson when you think

3   about this document.

4       It says here, "See attached.  The Fire Chief conducted a

5   meet-and-confer with Local 55, signed a TA to extend an

6   economic provision of their MOU."

7       Okay.  Where is it that her Department was implicit [sic]

8   in this -- or complicit?  Where is it?  Where is she saying

9   that?

10      She's not.  Okay?

11      "After she completed it, she convinced the newest member

12  of my staff to sign it."

13      That's a complete fabrication.  Winnie Anderson didn't

14  meet with the Chief.  And she said it.  And Winnie Anderson

15  said the Chief didn't make her do anything.  And the Chief said

16  the same thing.

17      Where is that coming from?

18      You see, that's just a complete fabrication.  And when you

19  see a complete fabrication on something like that sent to a

20  sitting City Councilperson, you have to question everything

21  that that person says at that point, because that's just not

22  true.

23      And then she goes on to say, "You know I dealt with that

24  employee."

25      Well, where is the testimony that she dealt with that

1   employee?

2       That didn't happen, either.  None of that happened.

3       So -- and then to the extent that she talked about it

4   further, she's talking about a city resolution.  She's not

5   talking about a state statute or a federal statute.  She's

6   talking about a city resolution.  5548881.  "Only the City

7   Administrator and I have that authority."

8       So the only thing she's talking about is:  They didn't

9   follow a city ordinance.

10      So -- but the real deal is by the time this happened, she

11  can't say that this caused her to be fired, because the

12  decision had already been made; it was just deferred.

13      Claim Four.  TPT.

14      Preston claims that she disclosed that the City of Oakland

15  was failing to collect Temporary Part Time employee union dues,

16  because she believed that the failure was a violation of the

17  California Government Code.

18      I didn't hear that.  There was a bunch about that that I

19  didn't hear, so let's talk about it.  First of all, she didn't

20  do the disclosure.  She can't show that that's why she was

21  terminated.  No evidence was taken into consideration.  And the

22  decision was made before this ever happened.

23      So let's take a look at what we're talking about here.

24  Lets -- let's take a look at Exhibit 3G.

25      Could you give me that one, Kelvin?

1    (Document displayed.)

2         **MR. LAFAYETTE:**  Let's see who disclosed what to who.

3    Can you make that bigger up there?

4    Thank you.  Good.  Yes.

5    You see, this is the e-mail -- okay? -- that contains that

6    grievance.  Joe Keffer sends it to Ms. Preston, Ms. Santana,

7    Mayor Quan.

8    How can she disclose that which was already disclosed?

9    Doesn't make sense; does it?

10   You see, red herrings -- I don't like to talk about red

11   herrings.  I particularly don't like the history of red

12   herrings -- okay? -- but this whole thing is nothing more than

13   one big red herring.  That's what this is.

14   And to talk about what happened in the August 6th

15   meeting -- that's nothing more -- where does that relate to

16   either one of these four claims?  It does not.

17   To talk about looking at e-mails -- that's not one of

18   these issues, either.  That's something to get everybody upset;

19   to talk about things that don't relate to these issues; to try

20   and get people warmed up to say, *Let me do something bad to the*

21   *City*.  It's a red herring, and it's wrong.  It just flat-out

22   wrong to do it.  Why would you bring all of that into this

23   courtroom and this case for any other reason?  Wrong.

24   That -- she didn't disclose anything.  It was already

25   done.  It came in with the e-mail that everybody got it.

1          What else is there that we have to talk about with this?

2          This whole concept about why she shouldn't do it -- that's

3    not an issue in this case, about why she shouldn't do it; but

4    I'm going to talk about it.  She shouldn't have done it,

5    because the person who would have just willingly given her the

6    documents comes in and says, *She's converted this into an*

7    *investigation of me.  It's -- it's not what's in the union*

8    *grievance; but she's made it an investigation of me.  And I*

9    *don't trust her.  I don't trust her motives.*

10         Now, at this point in time did Ms. Santana have reason to

11   question her motives, as well?

12         Yes.  There had been issues between her and Katano Kasaine

13   in the past; but more significantly, there's the internal

14   investigation going on.  And the internal investigation is

15   about her activities as they relate to investigations:  Ripping

16   up statements; telling witnesses they can't participate, and

17   for the most illogical reasons.

18         It would seem basic to anyone:  If the investigator is a

19   witness, find another investigator.  You do not deep-six an

20   investigation simply because the investigator that you want to

21   use is compromised.  Find another investigator.  Find another

22   investigator.  Don't tell someone they can't participate, and

23   as a result, the investigation can't go forward ever,

24   particularly when it's someone who you're friendly with.

25   That's not what you want.  That's not the type of reasoning and

1  thinking that you want from a person who has such a supreme,

2  august position; an important position.

3      That thinking, by itself, should justify being terminated,

4  because it means you don't have a clear understanding of your

5  role, your mission, and your obligation.

6      No evidence that Preston even believed violation of law

7  was taking place of a federal or state nature.  Where is that?

8  Where is it?  There's nothing.

9      Now, none of those were met.

10     See, this is the City's affirmative defense.  We only get

11 here -- we own only get to this -- if, after all of the

12 evidence you've heard, you believe that one of those four

13 things worked.  If you believe that they met the elements of

14 one of those four things, then you get here.  And you don't get

15 here unless you've done that, because you if you conclude that

16 she hasn't made out her case, you close the book and the look

17 at the Jury Instructions.  We'll walk you through it, and

18 you'll see it.  You don't go to this.

19     But if you do get to this -- if for some reason you

20 believe she's made one of those four things work -- then what

21 the law says is Ms. Preston proves that her disclosure of

22 information or her refusal to participate in an unlawful act

23 was a contributing factor to her termination.

24     You see, first she has to prove that it a contributing

25 factor, where there's no evidence of it.  Then the City of

1   Oakland is not liable if it proves clear convincing evidence

2   that it would have terminated Preston anyway for legitimate,

3   independent reasons.

4       You see, counsel on the other side tried to put this in

5   front of everything else.  He tried to put the horse -- the

6   cart in front of the horse.  That's not where this goes.

7       And so have we proven that?  If that's where we wind up,

8   have we proven that?

9       Yes, we have.  First of all, she was at will.  There was

10  no progressive discipline.  She said that.

11      There were frictions with co-workers; frictions with

12  unions; internal investigations.  The did an internal

13  investigation.  So let's get a little bit of detail in here.

14  Let's not just point at the surface there.

15      She responded in May of 2012 to criticisms that

16  Katano Kasaine had, where she acknowledged that, in those

17  criticisms that Katano Kasaine had about her, that there were

18  allegations of bias; allegations of -- and she writes it on May

19  11 where she says, "Over the last few weeks you have stated on

20  several occasions that I need to learn how to get along with

21  Katano Kasaine.  The comments indicate that I'm not a

22  professional, and have difficulty communicating with staff who

23  may disagree with me."

24      I thought I heard that no one said -- told her that she

25  was unprofessional.

1          She writes it in her own memo.

2          I heard her say that she was unaware of these things.

3          It's reflected in Exhibit 1A, as she gives explanation.

4          And then, in true form, what does she do?

5          She attacks everybody else who's crossed her in this memo.

6     You can read it.  You'll see it.  She attacks everybody else

7     after she's criticized.

8          The unions complained about her.  The unions complained to

9     Chief Howard Jordan that she was trying to undermine the City's

10    negotiating positions.  And he brought that to her attention.

11         Scott Johnson talked about these people who came into his

12    office -- 20 of them -- past his assistant, into his physical

13    domain.  And the criticisms they were bringing was about

14    Ms. Preston.  And I saw counsel try hard to try and make it

15    sound like it was something else other than that, but that

16    didn't fly.  It was about Ms. Preston.

17         And then you get to Sonia Lara.  Sonia Lara was simple.

18    "Don't ask me to lie.  Don't ask me to destroy documents.

19    Respect me."

20         And every step of the way she treated her like she was

21    something other than a real person.  First you take her

22    statement, and you tear it up.  That's the first thing you do.

23         Then when you realize there's an Internal Affairs

24    investigation -- a Police Department investigation -- you bring

25    her in with a person who's accused.  And you -- *We're all*

1    *girlfriends, and you can tell us what happens.*

2        The first thing that Ms. Preston should know is an

3    investigation needs to be kept confidential, because if it's

4    not kept confidential, then information leaks; people know

5    what's going to be asked of them; their stories change, morph,

6    become something different.  What a horrible thing to do.

7        And then after she has another interview, you call her in

8    again and pinky-swear?

9        It's just wrong.  And it's wrong for anybody; but the

10   person who says that they're the one to conduct investigations

11   for the entire City -- it is so horribly wrong, that, by

12   itself, it is justification for terminating her.  Period.

13   Clear and convincing.  It couldn't be more clear and convincing

14   than that.

15       I'm not going to summarize all of them, but I'll talk

16   about these damages for a second.  Did you hear anybody come in

17   and say that they witnessed her experience some emotional

18   distress?  No.  Only person who came in here was somebody who

19   said that that's what she told them.  Where are these people

20   who could come in and say they saw this, or they saw that, or

21   they heard this, or they heard that?  No one.  So if you were

22   going to believe that, then the only person you can trust your

23   belief in is Ms. Preston.

24       Then we get to the economic loss.

25       The Court instructed you on what an expert witness is.  An

 1  expert witness is paid.  Period.  End of story.  They're paid.

 2      But I want you to compare the difference between the two.

 3  Was there one expert witness who says that she's worked with a

 4  particular lawyer in this case -- I don't know -- as much as 20

 5  times?  I did the math.  $85,000 that she's gotten from that

 6  one lawyer.  I did the math.  And when that one lawyer asked

 7  her to do something that a Court -- that a Judge in this Court

 8  told her was inappropriate for her to do, she sat here in this

 9  witness chair and she said she did it anyway.  And each and

10  every opportunity that she had to try and make these damages

11  look like something that they were not, she did it.

12      On the other hand, Mr. Cohen comes in, and he's quick.

13  I'll be the first one to tell you he's a quick man.  He's got a

14  quick answer.  He's ready for anything that you've got for him,

15  but he did not say something that anybody came in this

16  courtroom and impeached; did he?  And when he said that there

17  was reciprocity between City and County of San Francisco and

18  PERS, you didn't get anyone to come in this courtroom and say

19  that was wrong; did you?

20      When he said that they could work back and forth, and the

21  money could be used in those different ways, you didn't hear

22  anybody come in this courtroom and say he was wrong; did you?

23      And you didn't hear anybody come in this courtroom and

24  criticize the analysis that he provided.  Period.  You didn't.

25      And then he pointed out that his records indicated that

 1    this was not the first time that Ms. Preston had taken money;

 2    that when she leaves places, she takes the money out.  Now,

 3    here's the question I have.  Where is the funds-transfer slip

 4    that shows what she used the money for?  How do you know that

 5    she didn't roll it over into some other account or fund?  How

 6    has she proved to demonstrate to you what she did with this

 7    money, other than her saying, *This is what I used it for*?

 8         You don't.  You don't.

 9         Credibility of witnesses.  This is where we wind up.  I

10    will remind you that before we leave this, Mr. Cohen said that

11    if by chance you should reach the point where you conclude that

12    we did something wrong and we cannot prove by clear and

13    convincing evidence that we have would have fired her anyway --

14    if you go through all of that and you get here, it's only

15    $154,000, but please don't go there.

16         Credibility of witnesses.  In considering the testimony of

17    any witness, you may take into account the opportunity and

18    ability of the witness to see or hear or know the things

19    testified to, the witness' memory, the witness' manner while

20    testifying.  I like four:  The witness' interest in the outcome

21    of the case, and any bias or prejudice.  Whether other evidence

22    contradicted the witness' testimony.  The reasonableness of the

23    witness' testimony, in light of all of the evidence, and any

24    other factors that bear on believability.

25         And I'm going to ask you:  How many times did Ms. Preston

**CLOSING ARGUMENT / LAFAYETTE** 1228

1  actually get contradicted in this room?  Fred Blackwell

2  contradicted her.  Deanna Santana contradicted her.  Barbara

3  Parker contradicted her.  Sonia Lara contradicted her.

4  Winnie Anderson contradicted her.

5       Can you believe her?  She has an interest in the outcome

6  of the case.  She is biased.  Look at her testimony; the

7  reasonableness of the witness' testimony in light of all of the

8  evidence.  Doesn't exist; does it?  It doesn't.

9       In deciding the facts of the case, you may have to decide

10 which testimony to believe, and which testimony not to believe.

11 You may believe everything a witness says, or part of it, or

12 none of it.  So --

13            **THE COURT:**  Let's bring it to a close.

14          **MR. LAFAYETTE:**  Thank you, Your Honor.

15       At the end of the day, the City didn't do anything wrong;

16 and there's no evidence that it did.  Plaintiff just puts up

17 some stuff and says, *This is what I did*, but there's no

18 evidence that anybody saw that as a violation or, more, that

19 anybody used that as a reason to fire her.  She's not proven

20 that.  She has not shown that.  And that was her burden of

21 proof.

22       Now, in a couple of minutes I'm going to sit down.  I hate

23 sitting down, because I always think I've left something on the

24 floor, and I should have talked about it.  I always think

25 there's something in your mind that you saw that I just didn't

1  key on, and I left it, and I go back over and I fret; but I've

2  got to sit down.  The Judge is going to make me sit down.  Let

3  me sit down.

4      So I'd like to thank you.  And I'd like to remind you of

5  one thing.  Ms. Preston is not entitled to anything from the

6  City of Oakland.  I'm going to ask you to go back there and

7  come back and tell her, because I want to tell other people

8  that this is not an easy pick.  You don't get a chance to just

9  hold stuff up like this and then say, "I've got a case against

10 you, so I'm going to sue you and get money from you."

11      It's not right.  And let's stop it now.

12      I'd like to thank you for your attention.  If I did

13 something that offended any of you in this courtroom, I

14 apologize to you.  Sometimes I can become a bit over the top.

15 And I don't -- please don't take that out against my client.

16 Thank you a lot.

17          **THE COURT:**  Thank you, Mr. Lafayette.

18      Let's take at least a stretch break.  If any of the jurors

19 need to take a rest room break, please take one, as well.

20 Everyone please stand up and stretch.  And Ms. Preston will get

21 the final word.

22 (Pause in proceedings.)

23          **THE COURT:**  Mr. Lafayette, the exhibit table of

24 contents that you had -- did that make it to the courtroom?

25          **MR. LAFAYETTE:**  I think so, Your Honor.

1          **THE COURT:**  All right.  Our jurors have returned.

2    Mr. Siegel you may proceed.

3          **MR. SIEGEL:**  Thank you, Your Honor.

4                        **REBUTTAL ARGUMENT**

5          **MR. SIEGEL:**  I don't want to get all literary on you,

6    but what was it that Shakespeare said about a tale full of

7    sound and fury -- in this case, especially fury -- signifying

8    nothing?

9          Let me -- I'm not going to take much time.  I want to be

10   real quick.  At some of the points, Mr. Lafayette said we

11   reversed the burdens.  You know, his seven, my five, were the

12   same.  There's really only one issue in this case.  We all know

13   that she was an employee.  We all know she complained to

14   Santana.  We know that she thought that what she was seeing was

15   unlawful.  We know she was fired.  We know she was harmed.

16         The only issue -- and I urge you to concentrate -- is:

17   Were her protected activities a contributing factor to the

18   decision to fire her?  The rest, no one disagrees on.

19         So quickly, RTC -- so there was nothing there.

20         Well, we know Ms. Santana asked Ms. Parker if she could do

21   an investigation of Desley Brooks.  We know Ms. Parker said,

22   *Yeah, you can do an investigation.*

23         Ms. Preston didn't make any of that up.  That's in the

24   documents in front of you.

25         We know that Ms. Santana and Ms. Preston discussed that

1  language, because Ms. Preston told you that she did.  That's

2  all.  Very simple.  What did Ms. Santana say?  She didn't

3  understand; she didn't remember.

4       And let me say about testifying on the stand:  Who is the

5  witness who would answer question with, "I don't know."

6       Or does that IAD report -- did the Police Department find

7  that Ms. Preston was credible?

8       *Oh, I don't know.  That says something about -- oh, yeah,*

9  *it does.*  Finally, you know.

10      And how many times did that happen when Ms. Santana was on

11 the stand, when you would ask her a question, and she wouldn't

12 give you a straight answer?

13      How many times did that happen when Ms. Preston was on the

14 stand?  I don't think any times.

15      The issue of the City Council.  Watch the tape.  Did

16 Santana and Brooks disagree?  Any question about that?  Did

17 Ms. Preston stand up in front of the City Council and say to

18 Ms. Santana, *I can't confirm that.  I don't agree*?  I mean, how

19 can Mr. Lafayette say we made that up?  It's there on TV.  It's

20 clear in front of you.  And she was asked to come up.

21      Now, he -- well, a couple of things about that that I

22 think are almost comical.  He says, *How could she claim that*

23 *lying to the City Council would be illegal, when she was not*

24 *sworn to tell the truth under penalty of perjury?*

25      You know, the flip side of that is, of course it's okay to

1   lie, as long as you're not sworn in in a courtroom; but that

2   wasn't Ms. Preston's standard when she got up in front of the

3   City Council either time, as she told the truth.

4       But again, go back to Fred Blackwell for a half a second

5   because he was asked on the stand.  Because -- remember, she

6   said Fred and LaWanna both come up.  He didn't show up.  And he

7   told you why.  He said two things:  One, *I didn't want to get*

8   *between Ms. Brooks and Ms. Santana*; and secondly he said, *What*

9   *Deanna Santana asked us to confirm was not as black and white*

10  *as she put it.*  And he didn't want to get up and affirm her

11  where it wouldn't have been true, and he didn't want to

12  contradict her and get --

13      And what do we get?  That e-mail after the fact.  Even in

14  the after-the-fact e-mail, they disagree.  Ms. Santana says,

15  *Oh, no, we didn't agree.*  Ms. Preston says, *Yeah, we did,*

16  *because the information that we disagreed about was given to*

17  *Audree, who was the Park and Rec Director, not to Ms. Brooks.*

18  So clearly they didn't agree.

19      And then what's the theory here?  That back in March of

20  2012, Ms. Preston was thinking of how she could plan this

21  lawsuit, so she set this up with these e-mails and

22  conversations, thinking that she was going to be fired 18

23  months later, and trying to cover herself?  That doesn't make

24  sense, either.

25      Mr. Lafayette showed you that time line, and -- with all

 1  of those little dates and jots on it, which apparently are

 2  supposed to convince you that there were complaints about

 3  Ms. Preston on all of those dates.

 4      Well, you're going to get a binder with all of the

 5  exhibits that were introduced in this trial when we're

 6  finished.  And ask yourself:  Does that time line represent

 7  anything more than Counsel's imagination?  Because there's not

 8  documentation that corresponds to each of those lines.  And

 9  that, I think, goes to the question of:  When was there a

10  decision about the termination?

11      Well, sure, Ms. Santana says it was in the spring.  And,

12  sure, Ms. Quan, who doesn't even think that Ms. Preston was

13  terminated at all, agrees that this nontermination was

14  discussed in the spring.

15      But I ask you again to use the most important rule in

16  court, which is the rule of common sense.  And here, this is

17  the question.  You think that Ms. Preston is an absolutely

18  rotten, lousy, untrustworthy, hated-by-the-unions,

19  hated-by-management -- the worst labor negotiator in the entire

20  East Bay, if not the whole Bay Area.  And you decide to fire

21  her, but you're going to keep her around for another four

22  months so she can engage in all of these negotiations that

23  she's unqualified to do, untrustworthy to do, can't be trusted

24  to do, when everybody hates her.

25      Now, that may be the most nonsensical explanation of all

 1   of those that you've heard.  And it didn't happen.  And nowhere

 2   did she say when they fired her, "You're being fired because

 3   you're a rotten negotiator."  Nowhere did they say, even 14

 4   months after the termination in the interrogatory answers under

 5   penalty of perjury --

 6       And "penalty of perjury" does mean something.  When you

 7   sign under penalty of perjury, that better be true.  And you'd

 8   better not show up in court a year and a half later and

 9   contradict yourself and make up stuff down the line.

10       They never said they fired her because she tore up

11   Sonia Lara's witness statement; they didn't say that until they

12   got here.  There's nothing in the record:  You're fired because

13   of that.

14       And there's a reason why they didn't say it:  Because the

15   Internal Affairs Division of the Oakland Police Department, who

16   Miss Santana asked to investigate Deb Grant and

17   LaWanna Preston, concludes, as she was forced to admit

18   reluctantly, that there was no fault on either of their part,

19   and that both of them were credible.  A story that's made up in

20   court.  A story that's made up in court.

21       Did she think that there was a violation of the law?

22       In Exhibit 18, which is one of her memos regarding the

23   Fire Department grievance that she writes to Ms. Parker and to

24   Ms. Santana, when Ms. Santana's pooh-poohing this whole thing

25   about this grievance, what Ms. Preston writes -- it's there for

1   you in black and white.  What do we say to Local 55?  Is it a

2   ULP?  "ULP" stands for "unfair labor practice," which is a

3   violation of the Meyers-Milias-Brown Act.  That's state law;

4   not a violation of the Oakland City Charter or a city

5   ordinance; a violation of Meyers-Milias-Brown.

6        Yep.  She made a mistake; one mistake.  And I put that up

7   earlier.  She was wrong; that it wasn't Chief Reed who

8   convinced Winnie Anderson to sign that Tentative Agreement; it

9   was Chief Reed's labor person, Ms. Trinette.  She's the one who

10  convinced Winnie Anderson.  So, you know, we'll fall on our

11  sword on that one if you think it's an important point.

12       You know, regarding the SEIU dues grievance, what

13  Ms. Preston did -- it wasn't like she told people, *Hey, this is*

14  *breaking news*.  What she told people is, *This is a problem, and*

15  *we have to solve it*.

16       And if you look at those e-mails one by one by one, where

17  she's trying to get Ms. Santana to take it seriously, get

18  Ms. Parker to take the seriously, get the whole crowd to take

19  the seriously, and then discloses in one of the other e-mails

20  that's in front of you that Ms. Kasaine was trying to interfere

21  with the grievance resolution by talking to the union

22  representative --

23       And what did she say in that e-mail?  Again, *This is a*

24  *violation of Meyers-Milias-Brown*.  So to accuse her of waiting

25  until years after the fact to point out that what the City was

1 doing was violating state law is directly contrary to the paper

2 in front of you.

3     And again, I just want to stress that the concerns

4 regarding Ms. Kasaine were not so much that the dues weren't

5 being collected, but that she was committing an unfair labor

6 practices.

7     Now again, to finish up here, she was at will.  True, she

8 was at will; but as the Court's instructions make very clear,

9 there is an exception to the at-will doctrine -- is that even

10 though an employee may be technically at will, you cannot fire

11 them if one of the reasons for doing so is whistle-blowing; if

12 that's a contributing factor.

13     You have to look at the timing of these events,

14 particularly October 1 and October 3.  You have to look at the

15 hostility that developed once Ms. Preston started to contradict

16 Ms. Santana.  And you will see that that hostility developed:

17 Her exclusion from meetings, her exclusion from one-on-one

18 conversations, her being taken off the local SEIU grievance,

19 and so on.  So I think the facts are there.

20     I want you to please spend as much time -- make up your

21 minds as individuals.  You need to you need to deliberate.  You

22 need to deliberate individually; to try to agree; but there's

23 no requirement that anyone give up their deeply held

24 conclusions about the case, even if they're a minority in the

25 deliberations.

1    Ms. Mehta reminds me that she disclosed the SEIU grievance

2  to the City Council on October 1.  That's a disclosure.  They

3  didn't know about it.  Desley Brooks asked her about it, and

4  that was actually the incident that led to her head being cut

5  off here.

6    I don't want to argue too much about the damages, but I do

7  want to say again Mr. Cohen wanted to give them $500,000 and

8  credit for CalPERS benefits that Ms. Preston never got.  He

9  argues that she didn't bring in receipts for her mortgage

10  payments.  I mean, come on.  Where's the requirement that she

11  do that?  What do they want to suggest to you; that she took

12  the money and gambled, or did drugs, or something?  I think

13  that's the implication of saying, *Where are the receipts?*  And

14  I think that's slightly scurrilous.

15    And finally, I didn't hear Mr. Cohen say that there was

16  reciprocity between San Francisco and CalPERS programs.  In

17  fact, his calculations, if you remember them, separated those

18  two funds out separately.  And we admit that, God willing, if

19  she lives long enough and retires from San Francisco, she'll

20  get that pension; but she'll never get the CalPERS pension

21  unless you give her the value of it.  Thank you.

22    **THE COURT:**  Thank you very much, Mr. Siegel.

23    We've reached another milestone, which -- it's now time

24  for the jury to begin its deliberations.  So I'm going to ask

25  you to return to the jury room to begin that process now.

1     The attorneys will remain here with me.  It's going to

2   take us a few moments to get the binder admitted documents in

3   to you, and the video.  So you may begin your deliberations

4   before you get those, but you'll have to hold on for a minute

5   before you receive them.

6     One thing, other than selecting your presiding juror, you

7   need to decide quickly is the hours you wish to keep for your

8   deliberations.  During trial and at the beginning of this

9   process, I told you your schedule would be 9:00 to 4:00, and

10  that would be my default for your schedule for any

11  deliberations.  It's almost 4:00 o'clock.  It's 15 minutes

12  until.  If you decided you wanted to stay longer -- and you

13  must all be present for any deliberations -- if you wish to

14  stay longer and you unanimously agree to that, I will force the

15  parties to stay here and I'll stay here while you deliberate

16  for a little while longer.  If you wish to start earlier than

17  9:00 o'clock tomorrow morning, and you all agree, I'll order

18  the parties to be here and I'll be earlier than 9:00 o'clock.

19    That's something you must all agree to.  And you can

20  communicate that to my courtroom deputy.  Then I'll be able to

21  tell the parties when they need to be here and when they don't

22  need to be here, because while you're deliberating, they'll be

23  here, waiting for what you say.  So if you can, confer with

24  each other for a minute just about your schedule and let my

25  deputy know.  Meanwhile, we'll get the admitted documents in to

 1  you in just a few minutes.

 2       We're in recess.

 3  (Proceedings were heard outside the presence of the jury:)

 4       **THE COURT:**  All right.  The jurors are not present.

 5  So, counsel, I've got an evidentiary issue for you.  I've

 6  received the admitted evidence binder.  Mr. Siegel, I don't

 7  know if you've seen this document yet or not.  It has a table

 8  of contents in the front.  It's missing document 5J, which is

 9  in evidence.  I don't know if you --

10       **MR. SIEGEL:**  I haven't seen the binder.

11       **THE COURT:**  All right.  Here's another copy here.  So

12  why don't you come look at it?

13       **MR. SIEGEL:**  Your Honor, have you checked it?

14       **THE COURT:**  I have.  That's why I'm telling you.

15       **MR. SIEGEL:**  Oh.

16       **THE COURT:**  So it's missing 5J.  And it includes 2E.

17  2E was referenced by the defendants during closing.  It's not

18  in evidence.  It's similar to 2H, which is in evidence.  And in

19  the Plaintiff's Exhibit List there were some confusion about

20  which one is 2H and 2E.  And if you see on the table of

21  contents, both are identified as being Plaintiff's Exhibit 18,

22  but they're not both Plaintiff's Exhibit 18.  So do you have

23  something to tell me?

24       **MR. LAFAYETTE:**  I have two 5Js, Your Honor, to put

25  in.

1        **THE COURT:**  Okay.  You mean one for each binder?

2        **MR. LAFAYETTE:**  One for each binder.

3        **THE COURT:**  Mr. Siegel's got the other copy, so why

4   don't you do one there?

5        And 69 is listed in the table of contents.  And I don't --

6   there it is.  Okay.

7        So I confirm that everything that you each put in evidence

8   is in the binder.

9        **MR. LAFAYETTE:**  Okay.

10       **THE COURT:**  The question is what to do about E.  And

11  I know you want to look at it before we get to that question.

12       **MR. SIEGEL:**  And you've also confirmed that nothing

13  is in binder that was not --

14       **THE COURT:**  As far as I can tell.

15       **MR. SIEGEL:**  2E, your Honor, you said.  I will defer

16  to your record keeping.

17       **THE COURT:**  2E.  So in the table of contents, 2E and

18  2H are both listed as Plaintiff's Exhibit 18.

19       **MR. SIEGEL:**  2E.  2H.  Those are both in evidence.

20       **THE COURT:**  Well, by our records, 2E is not in

21  evidence; but if you wish 2E to be in evidence and you agree to

22  it, then that solves the problem.

23       **MR. SIEGEL:**  2E is -- yeah, I agree.  Actually --

24       **MR. LAFAYETTE:**  We both agree.

25       **MR. SIEGEL:**  -- I referred to both of those.

 1          **THE COURT:**  Problem solved.  For the record,

 2  Exhibit 2E is in evidence.  And we may have just missed it.

 3  One second.  And so that will reflect here.

 4  (Trial Exhibit 2E received in evidence.)

 5          **THE COURT:**  And we've added 5J to the binder.  It's

 6  already reflected in the table of contends.

 7      All right.  That concludes that.

 8      So if you would like to, I'll have my deputy give this

 9  version to the jurors.

10          **MR. LAFAYETTE:**  To the jurors?  Okay.

11      And that -- this thing in my hand is the flash drive with

12  the video on it.

13          **THE COURT:**  All right.

14          **THE CLERK:**  And this is all the exhibits?

15          **MR. LAFAYETTE:**  Yes.

16          **THE COURT:**  We'll have some feedback from the jurors

17  on our schedule in just a moment.

18  (At 3:48 p.m. the proceedings were adjourned.)

19  I certify that the foregoing is a correct transcript from the

20  record of proceedings in the above-entitled matter.

21

22  *Lydia Zinn*

23  _____    October 21, 2015
    Signature of Court Reporter/Transcriber    Date
24  Lydia Zinn

25