BARBARA J. PARKER, City Attorney (SBN 069722)
OTIS McGEE, JR., Chief Asst. City Attorney (SBN 071885)
MARIA BEE, Supervising Attorney (SBN 167716)
JENNIFER N. LOGUE, Deputy City Attorney (SBN 241910)
One Frank H. Ogawa Plaza, 6th Floor
Oakland, California 94612
Telephone:  (510) 238-3589
Facsimile:  (510) 238-6500

LAFAYETTE & KUMAGAI LLP
GARY T. LAFAYETTE (State Bar No. 88666)
Email: glafayette@lkclaw.com
SUSAN T. KUMAGAI (State Bar No. 127667)
Email: skumagai@lkclaw.com
101 Mission Street, Suite 600
San Francisco, California 94105
Telephone:  (415) 357-4600
Facsimile:  (415) 357-4605

Attorneys for Defendant
CITY OF OAKLAND

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX  (415) 357-4605

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DARYELLE LAWANNA PRESTON,<br><br>          Plaintiff,<br><br>v.<br><br>CITY OF OAKLAND; DEANNA SANTANA, in her individual capacity; and DOES 1 through 10, inclusive,<br><br>          Defendants. | Case No. 3:14-cv-02022 NC<br><br>Complaint Filed:  3/7/2014<br><br>**DEFENDANT CITY OF OAKLAND'S NOTICE OF MOTION AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:      December 2, 2015<br>Time:      1:00 p.m.<br>Dept.:     D, 15th Floor (San Francisco)<br>Judge:     Hon. Nathanael Cousins |

**NOTICE OF RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, IN THE ALTERNATIVE, MOTION FOR NEW TRIAL**

TO PLAINTIFF AND HER COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on December 2, 2015, at 1:00 p.m. before the Honorable Nathanael Cousins in Courtroom D, 15th Floor, 450 Golden Gate Avenue, San Francisco, California, Defendant CITY OF OAKLAND will move and does hereby move, pursuant to Rules 50(b) and 59 of the Federal Rules of Civil Procedure, for judgment as a matter of law or, in the alternative, motion for new trial.

These motions are made on the grounds that the jury verdict rendered in this matter on September 23, 2015, is not supported by substantial evidence.  Alternatively, the weight of the evidence justifies a new trial.

This motion is based upon this Notice of Motion and Motions, the attached Memorandum of Points and Authorities, the Declaration of Susan T. Kumagai, the trial transcript and exhibits admitted at trial and upon such other evidence or argument that may be presented to the Court at or before the hearing on this motion.

DATED:  October 28, 2015                    LAFAYETTE & KUMAGAI LLP

                                             _/s/ Susan T. Kumagai_
                                            SUSAN T. KUMAGAI
                                            Attorneys for Defendant
                                            CITY OF OAKLAND

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL (Case No. 3:14-cv-02022 NC)

1

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................................1

II.   THE EVIDENCE ..................................................................................................2

    A.   Santana Made The Decision to Terminate Based on Preston's Performance Problems. ...................................................................................2

        1.   Performance Problems That Surfaced Starting In 2011. ............................2

        2.   Santana's Concern With Preston's Ethics In Early 2013. .........................3

        3.   Preston's Continued Inability To Work With The Unions.......................4

        4.   The Deb Grant Investigation. ..................................................................5

        5.   Preston's Insubordination. .......................................................................6

        6.   Decision to Terminate. ............................................................................7

    B.   Preston's Alleged Protected Acts. ....................................................................7

        1.   Preston Claims She Refused To Add Language To The RTC Report Referring Brooks For Prosecution Because Preston Believed That Doing So Would Be Illegal Race Discrimination. ...................................8

        2.   Preston Claims That She Refused To Confirm Santana's Statement At The March 6, 2012 City Council Meeting Because Preston Believed That Doing So Would Be Committing Perjury. .........................9

        3.   Preston Claims That She Disclosed The City Of Oakland Was Entering Into Contracts With Firefighters Local 55 Without The Necessary Approval From City Council, Because She Believed That Doing So Would Be A Violation Of The California Government Code................10

        4.   Preston Claims She Disclosed That The City Was Failing To Collect Union Dues From TPT Employees Because She Believed That The Failure Violated The Government Code. ...................................14

III.   DISCUSSION ....................................................................................................16

    A.   Judgment For The City Is The Only Conclusion To Be Drawn From The Evidence. ..............................................................................................16

        1.   Standard For Renewed Motion For Judgment As A Matter Of Law. .......16

        2.   The Four Acts Were Not Protected Under Section 1102.5. .....................17

            a.   The RTC Report. .............................................................................17

            b.   The March 6 City Council Meeting. ..............................................18

i

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

c.    The TA Signed by Anderson and Reed. .......................................19

d.    Non-Collection of TPT Dues. .....................................................19

e.    Not One Of The Alleged Protected Acts Was A
       Contributing Factor To Preston's Termination. ..........................20

f.    Preston Would Have Been Terminated Regardless Of Her
       Protected Acts For Legitimate, Independent Reasons..................21

B.    In The Alternative, The Weight Of The Evidence Justifies A New Trial. ...........21

1.    The Weight Of The Evidence Justifies A New Trial On Each Of The
       Alleged Protected Acts. ..............................................................22

a.    The RTC Report. ........................................................................22

b.    The March 6, City Council Meeting.............................................22

c.    The Temporary Agreement To Extend The PSP............................22

d.    The SEIU Grievance. ..................................................................23

2.    The Weight Of The Evidence Justifies A New Trial On The City's
       Defense That It Would Have Terminated Preston Regardless Of Her
       Alleged Protected Acts. ..............................................................23

IV.    CONCLUSION ......................................................................................25

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

ii

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

**Federal Cases**

*Callicrate v. Wadsworth Mfg.*,
  427 F.3d 1361 (Fed. Cir. 2005) ...........................................................................16

*Cohen v. Fred Meyer, Inc.*,
  686 F.2d 793 (9th Cir. 1982) ...............................................................................17

*DSPT Int'l, Inc. v. Nahum*,
  624 F.3d 1213 (9th Cir. 2010) .............................................................................21

*E.E.O.C. v. Go Daddy Software, Inc.*,
  581 F.3d 951 (9th Cir. 2009) ...............................................................................17

*Experience Hendrix LLC v. Hendrixlicensing.com Ltd.*,
  762 F.3d 829 (9th Cir. 2014) ...............................................................................22

*Fitzgerald v. El Dorato Cnty.*,
  12-cv-02932 KJN, 2015 WL 966133 (E.D. Cal. Mar. 3, 2015) ...........................17

*Gillette v. Delmore*,
  979 F.2d 1342 (9th Cir. 1992) .............................................................................16

*Love v. Motion Indus., Inc.*,
  209 F. Supp. 2d 1128 (N.D. Cal. 2004) ...............................................................17

*Molski v. M.J. Cable, Inc.*,
  481 F.3d 724 (9th Cir. 2007) ...............................................................................21

*Ostad v. Oregon Health Sciences Univ.*,
  327 F.3d 876 (9th Cir. 2003) ...............................................................................16

*Pratt v. Rowland*,
  65 F.3d 802 (9th Cir. 1995) .................................................................................17

**State Cases**

*Mize-Kurzman v. Marin Community College Dist.*,
  202 Cal. App. 4th 832 (2012) ..............................................................................19

*Mokler v. County of Orange*,
  157 Cal. App. 4th 121 (2007) ..............................................................................17

*Morgan v. Regents of Univ. of Cal.*,
  88 Cal. App. 4th 52 (2000) ..................................................................................17

*Patten v. Grant Joint Union High Sch. Dist.*,
  134 Cal. App. 4th 1378 (2005) ............................................................................17

iii

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

**Statutes**

Labor Code § 1102.5 .......................................................................................... passim

**Rules**

Federal Rules of Civil Procedure 50(b).........................................................................1

Federal Rules of Civil Procedure 59 .............................................................................1

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

iv

L A F A Y E T T E  &  K U M A G A I  L L P
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

### <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

Defendant City of Oakland (the "City") hereby renews its Motion for Judgment as a Matter of Law on Plaintiff Lawanna Preston's Labor Code section 1102.5 claim against the City and in accordance with Federal Rules of Civil Procedure 50(b). Alternatively, the City moves the Court for a new trial under Rule 59.

### I.     <u>INTRODUCTION</u>

Deanna Santana ("Santana"), the former City Administrator for the City of Oakland, made the decision to terminate Lawanna Preston ("Preston") in the spring of 2013. Her decision was based on poor job performance, unprofessionalism and lack of integrity. Although problems with Preston's job performance began to surface in 2011, Santana gave Preston the opportunity to improve with informal counseling. However, Preston's performance problems never improved and only got worse. By early 2013, Santana simply lost all confidence in Preston's ability to do her job effectively and ethically.

In the face of overwhelming evidence of the legitimate, non-retaliatory, reasons for her termination, Preston asserts that she was terminated in retaliation for her engaging in four acts from February 2012 to October 1, 2013. Although some of these events evidence the type of conduct for which Preston was terminated, e.g., unprofessionalism, not one of them contributed to the termination decision. Moreover, the incidents were either too remote in time or occurred after the decision to terminate was made.

Should the Court find that one of these four events was a protected act and also contributed to Preston's termination, the evidence proffered for the City's defense shows that Preston would have been terminated regardless of any protected act.

The substantial evidence admitted at trial permits only one reasonable conclusion that is contrary to the one reached at trial. Therefore, the City's Renewed Motion for Judgment as a Matter of Law should be granted. Alternatively, the jury verdict is contrary to the clear weight of the evidence. Therefore, the Court should grant a new trial to prevent a miscarriage of justice.

///

///

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR,
ALTERNATIVELY, MOTION FOR NEW TRIAL (Case No. 3:14-cv-02022 NC)

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

## II.   THE EVIDENCE

### A.   Santana Made The Decision to Terminate Based on Preston's Performance Problems.

Santana became the City Administrator on August 1, 2011.  (Trial Transcript 174:3-5)[1] She promoted Preston to the position of Employee Relations Director in January 2012.  In that position, Preston became chief spokesperson and labor negotiator for the City.  (337:7-10; 638:4-11)  Prior to her promotion, Preston performed similar duties reporting to H.R. Director Andrea Gourdine ("Gourdine").[2]  (626-12:627:2)  Preston was familiar with and up to date on the Meyers Milias Brown Act ("MMB") and applied the law on a regular basis.  (655:2-12; 869:13-19)

### 1.   Performance Problems That Surfaced Starting In 2011.

As the Assistant City Administrator, Scott Johnson ("Johnson") had the responsibility of overseeing Administrative Services including Employee Relations.  (Vol. 5, 1070:12-1071:6; 1072:5-1073:3)  Upon his hire in September 2011, Gourdine gave Johnson an overview of the H.R. Department and told him of the challenges of working with Preston.  (Vol. 5, 1070:12-15; 1072:1-1073:5)  Also, department heads and other staff approached Johnson on a number of occasions regarding difficulties they had in working with Preston.  (*Id.*)  On numerous occasions Johnson discussed with Santana Preston's inability to get along with others, her unprofessionalism and failure to act in a manner expected of executives.  (Vol. 5, 1071:20-1073:5; 1075:4-8; 1085:9-17)

Johnson counseled Preston on her conduct on several occasions and, at times, even had to act as a referee between Preston and Katano Kasaine, the Assistant Treasury Manager and Preston's peer.  (Vol. 5, 957:1-9; 1073:9-21)  In fact, Preston sent Johnson an email on May 11, 2012, complaining of the number of times he told her she had to get along with Kasaine.  Preston told Johnson that she interpreted his comments to mean that she was unprofessional and was

---

[1] All cites herein refer to the trial transcript and trial exhibits admitted into evidence.  The transcript excerpts and exhibits are attached to the Declaration of Susan T. Kumagai in Support of the subject motions ("Kumagai Decl.").

[2] Former City Administrator Deborah Edgerly hired Preston in 2007, with the understanding that Preston would clean up problems relating to enforcement of policies in the City.  (627:3-628:9)

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL (Case No. 3:14-cv-02022 NC)

2

difficult to get along with. (799:2-800:5) She acknowledged that Kasaine complained about her on several occasions. (800:8-11) Preston admitted that she and Kasaine disagreed on issues and there was friction between them because Kasaine "overstepped her bounds" and that she, Preston, needed to tell her so. (800:24-801:7; 801:12-14)[3]

On August 15, 2012, Preston sent Santana an email complaining about Johnson. Preston complained that Johnson questioned her interpretation of a Memorandum of Understanding ("MOU") relating to COBRA reimbursements. He believed her interpretation was incorrect and would never hold up in an audit. Johnson challenged Preston in his email to her and asked for the specific language from the MOU from which she based her opinion. (804:20-805:16; 806:17-807:25; Exh. 1D)

In a letter dated September 24, 2012, Barry Donelan ("Donelan"), President of the Oakland Police Officers' Association ("OPOA") complained to Santana about Preston. He criticized Preston's job performance and stated he no longer wanted to have informal communications with her. (808:25-809:11) Donelan copied Preston on the letter. (*Id.*)

### 2.   Santana's Concern With Preston's Ethics In Early 2013.

In January 2013, Johnson advised Santana that Preston destroyed a witness's statement prepared for an incident involving the purchase of computers. (209:3-7; Vol. 5, 1081:14-24; 1089:21-1090:8)

In spring 2013, former Police Chief Howard Jordan ("Jordan") advised Santana about a conversation he had with Donelan. Donelan said that Preston was trying to undermine Santana by providing confidential and/or false information about negotiations the City had with the OPOA and the Fire Department. Preston told Donelan that Santana was offering more to the Fire Department than the OPOA regarding furlough days. (515:6-516:19) Jordan told Santana to exercise her authority as the City Administrator and have the City's IT Department analyze Preston's work computer to determine the extent of confidential information she was sharing with others. (517:9-518:2) After Santana consulted with City Attorney Barbara Parker, she had

---

[3] Blackwell testified that he most likely spoke to Santana about the poor work relationship between Preston and Kasaine. (331:1-18; 336:8-337:5)

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL (Case No. 3:14-cv-02022 NC)

3

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

1   IT begin to monitor Preston's emails in April or May 2013.  (243:3-14, 771:6-8)

2   ### 3.    Preston's Continued Inability To Work With The Unions.

3   After bargaining with the unions commenced in early spring 2013, Johnson told Santana

4   that 20 union representatives pushed his assistant aside and barged into his office.  They

5   complained that Preston was not cooperative and they did not appreciate her tone or the treatment

6   they received from her.  (Vol. 5, 1080:16-1081:2; 1093:10-24)  A newspaper reporter contacted

7   Johnson that evening and the incident was reported in an article the next day.  (*Id.*; 1092:12-20)

8   Johnson counseled Preston about her behavior.  (Vol. 5, 1081:3-4)

9   On May 18, 2013, Santana sent Preston an email asking about the status of bargaining

10  with SEIU.  In response, Preston admitted that bargaining was slow.  Preston said she had not

11  participated in the bargaining and instead sent two staff employees Trinette Gist-Skinner

12  ("Skinner") and Winnie Anderson ("Anderson") to the table.[4]  Preston admitted that her

13  participation at the table would only slow bargaining down because "the only reason people want

14  [her] there is to start arguments, lie and try and set [her] up, this is a waste of everyone's time."

15  (Vol. 6, 1067:14-17; Exh. 1N)

16  On June 13, 2013, at Santana's direction, her Chief of Staff Alex Orologas ("Orologas")

17  sent Preston an email about her absences at the last three labor and budget meetings.  She

18  reminded Preston that her attendance at these meetings was critical.  (*Id.*; Vol. 6, 1121:11-1123:1,

19  Exh. 1Q)  These meetings provided valuable information for negotiations and Preston's absences

20  only contributed to delays in bargaining.  (*Id.*)

21  In summer 2013, Santana asked her Assistant City Administrator Fred Blackwell

22  ("Blackwell") to step in and help with bargaining.  Santana told Blackwell that she had concerns

23  about Preston's integrity in the negotiation process.  She believed Preston was not being truthful

24  about the negotiations and discussions during side talks.  (325:22-24; 326:7-21)

25  Mayor Jean Quan and Deputy Mayor Sandre Swanson attended the last four to five

26  bargaining sessions to close the tables.  (597:2-24)  The final offers that were given to the unions

27

28  ─────────

[4] Skinner was transferring out of Employee Relations ("ER") at the time and Anderson recently had been hired as a temporary employee.  (409:18-410:6; 429:1-13; 430:18-20)

4

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

were kept secret between Santana, Swanson, the Mayor and the Budget Director.  They were not shared with Preston to avoid leaks to the union.  (597:19-599:2)

### 4. The Deb Grant Investigation.

In December 2012, Gourdine asked her assistant Sonia Lara ("Lara") to prepare a statement regarding the alleged unauthorized purchase of computers by one of Gourdine's reports, Deb Grant ("Grant").  At the time, Lara was in the process of transitioning out of H.R. into Employee Relations, reporting to Preston.  (Vol. 5, 1133:20-1134:1; 1134:19-1135:9)

Shortly after Lara's transition, Preston found the statement she wrote regarding Grant in a copier.  Preston told Lara she could not participate in the Grant investigation because she now worked for Preston.  (821:15-19; Vol. 5, 1135:13-1136:7)  Preston ripped Lara's statement up and threw it away.  (*Id.*; Vol. 6, 1132:3-12)  Johnson advised Santana that Preston destroyed the statement and complained that Preston lacked objectivity.  The Police Department's Internal Affairs unit ("IAD") commenced an investigation into the purchase of the computers ("Grant investigation") and an audit was conducted as well.  (209:3-13; Vol. 5, 1081:14-24; 1089:21-1090:8)  IAD was retained to gather facts and make findings, not make recommendations regarding corrective action.  (211:4-12; Vol. 6, 1129:13-22)

In summer 2013, Lara was interviewed by IAD for the Grant investigation.  (Vol. 5, 1137:16-21)  Thereafter, Preston called Lara into her office where she and Deb Grant questioned Lara about her interview.  Lara declined to provide any information because the investigation was confidential.  In an apparent attempt to pressure Lara, Grant said, but "we're girlfriends." (Vol. 5, 1137:22-1138:22)

In August 2013, IAD interviewed Lara again about Preston and Grant questioning her after the first interview.  (Vol. 5 at 1139:3-19)  Thereafter, in Preston's office, Preston asked Lara to "pinky swear" and then questioned her again about the second interview with IAD, causing Lara to cry.  (Vol. 5, 1140:3-22)  Preston then told Lara her job was in trouble and that she needed to gather information for her lawyer Dan Siegel.  (Vol. 5, 1141:6-1142:1)

Throughout the Grant investigation, Santana was kept apprised by IAD of its findings including Preston's destruction of Lara's statement and questioning her about the interviews.

L A F A Y E T T E   &   K U M A G A I  L L P
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX  (415) 357-4605

5

1    (Vol. 6, 1119:8-14)  Santana received IAD's final report on the Grant investigation on October 1,

2    2013.  (214:13-18; Vol. 6, 1120:11-17)  Among other things, IAD concluded that Preston's

3    actions needed attention with respect to overseeing investigations and that her practice of

4    discussing ongoing investigations and the rationale behind that practice should be addressed.  The

5    report also indicated that Preston admitted to tearing up Lara's statement and having various

6    conversations with Grant about the investigation.  (Vol. 6, 1129:24-1131:3; 1132:3-12)

7              **5.      Preston's Insubordination.**

8          On September 5, 2013, Santana received an email from Joe Keffer of SEIU, Local 21

9    ("Local 21") forwarding a grievance for failure to collect dues from temporary part-time ("TPT")

10   workers.  (Exh. 3I; 979:17-21)  Preston emailed Kasaine on Sunday, September 8, 2013, advising

11   her of the grievance.  Preston said the grievance was based on an August 6 meeting in which

12   Kasaine was present, and that Preston needed to interview her.  (*Ibid.*)  On September 10, having

13   been copied on a follow up email from Preston to Kasaine, Santana also emailed Kasaine stating

14   that she was "very interested in tracking this matter closely, please ensure a meeting is set."

15   (255:2-9, Exh. 3K; (32))  However, Kasaine was concerned about Preston's motivation and

16   questioned why she was being investigated.  Kasaine verbally told Preston of her concerns and

17   failure to use standard methods to respond to a simple Step 1 grievance.[5]  Kasaine asked Preston

18   why she was being investigated and Preston did not respond.  (967:2-18; 969:20-970:12)

19   Kasaine called Santana and told her about the concerns she had regarding Preston's methods.

20   (965:1-966:22; 967:2-18; Exh. 3K (32))  Thereafter, Santana decided to have a third-party

21   conduct the investigation relating to the TPT grievance.  (Vol. 5, 965:1-966:22; 967:2-18)

22         Preston understood that Santana removed her from the investigation because Santana

23   believed Preston could not be fair and impartial.  (671:12-20; 907:3-15)  On September 12, 2013,

24   Preston sent Santana an email confirming that Santana was going to get the City Attorney

25   involved in the grievance investigation to ensure impartiality.  Preston's email expressed her

---

[5] Nothing on the written grievance indicates it is anything but a Step 1 grievance. Dwight McElroy
testified that Step 3 grievances are clearly identified on the written grievance itself and none was reflected
on the TPT grievance sent by Keffer. (Vol. 5, 979:17-21; 1023:3-13, Exh. 3I)  Moreover, neither ER nor
the union considered the August 6, meeting as part of the grievance process. (Vol. 5, 998:1-3; 1145:24-
25)

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

disagreement with Santana in removing her from the investigation and doubting her ability to conduct an unbiased investigation on a grievance relating to a possible violation of the MOU or MMB.  (Exh. 3M; 671:21-24)[6]

Thereafter, despite being removed from the investigation, on September 18, 2013, Preston informed Santana that she was sending out investigatory interview notices that week.  Santana responded that the City Attorney would contact her regarding the transfer of documents relating to the grievance.  (260:8-261:16; Exh. 3V (36))

In addition to written complaints, Preston verbally complained to Santana and, on at least one occasion, Preston called Santana and raised her voice to her for being taken off the investigation.  (217:11-18; 266:15-24; 346:25-347:3; 359:6-8; 760:1-24; Vol. 6, 1088:2-9)[7]

### 6.    Decision to Terminate.

In spring 2013, Santana made the decision to fire Preston.  (Vol. 6, 1119:15-17)  In about April 2013, with negotiations dragging on longer than expected, Santana told Mayor Quan and City Attorney Barbara Parker ("Parker") that she wanted to fire Preston.[8]  (596:4-16; 759:2-5; 600:5-8; Vol. 6, 1119:15-24)  The Mayor asked Santana not to rock the boat at that time and to wait to fire Preston until union negotiations close.  (596:17-597:4)  After bargaining was completed and Santana returned from being out of the country, Preston was fired on October 3, 2013.  (597:2-4; Vol. 6, 1119:25-1120:17)

### B.    Preston's Alleged Protected Acts.

At trial, Preston claimed that she was a good performer and she got along with colleagues and the unions.  She claims the reasons stated by the City for her termination were a pretext for retaliation based on four unrelated events commencing in February 2012.

///

///

---

[6] Preston forwarded this email to Sandre Swanson.  (*Id.*)

[7] Preston's call to Santana and the raising of her voice was witnessed by Otis McGee, Barbara Parker and Sonia Lara.

[8] Although Mayor Quan did not hire and/or fire department heads, she had the power to veto decisions made by Santana.  (595:5-18)

**1.** **Preston Claims She Refused To Add Language To The RTC Report Referring Brooks For Prosecution Because Preston Believed That Doing So Would Be Illegal Race Discrimination.[9]**

Blackwell and Preston were tasked with gathering facts for a report on alleged improprieties in the administration of the Rainbow Teen Center ("RTC") by City Councilmember Desley Brooks. (281:5-11; 284:13-285:9; 287:9-11; 340:17-24; 638:12-639:5) Preston was responsible for gathering facts specifically relating to allegations that RTC employees were improperly hired in violation of City requirements and civil service processes. (*Id.*) A draft report on the findings was prepared with editing by Santana, Preston, Blackwell, Orologas and Johnson. On February 20, 2012, the draft report was sent to City Attorney Parker for review and advice. (288:5-289:18; 247:3-16; Exh. 7)

After review, Parker provided legal advice on the roles of the City Administrator's Office ("CAO") and the City Council and options for further handling of the matter. Parker's advice was highlighted within the draft report and prefaced with her initials "BJP." The advice was not intended to be included in the report and, to do so, would have been inappropriate. (750:11-751:21; 753:3-23; 191:19-21; Exh. Q) Among other things, Parker's advice included the following:

> BJP – The CAO has power under the charter to administer city and a duty to process administrative actions and manage assets and construction projects in accord with City policies, laws and procedures – these in my view are not policy issues for the Council. The Council's role is to set policies and make budget decisions; council also can censure a councilmember or direct CAO to seek investigation and action by DA. So the only policy issue revolves around whether to go to the DA, whether to expend resources to retain an independent investigator and whether council wants to go on record with a policy that mirrors City Charter 218 – although that is not necessary….

(*Id.*, Exh. Q)

Preston testified that in the past other council members violated the charter and were not referred to the DA's Office. (641:7-24) Preston asserts that the language regarding the Council's option to direct the CAO to go to the DA (the "DA language") targeted Brooks because she is an "African American woman." (*Id.*)

---

[9] The descriptions of the four alleged protected acts herein conform to instructions given to the jury at trial. [DKT #160]

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL (Case No. 3:14-cv-02022 NC)

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
100 SPEAR STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

Preston testified that a "dispute" arose about whether to include the DA language in the RTC report.  (639:22-640:4)[10]  Preston testified she explained to Santana and Parker that it would be inappropriate to include the language in a "report submitted by staff, and particularly at [her] level."  (640:18-641:3)

Blackwell testified that his understanding from Santana was that he and Preston were simply to get the facts and the handling of criminal conduct that was found, if any, did not fall within City Administrator's domain.  (340:17-24)  He does not recall that Santana ever suggested that criminal charges be sought against Brooks or that language regarding referral to the District Attorney be inserted into the RTC report.  (328:6-15)  Santana testified that she never stated to anyone that she wanted to refer Brooks to the District Attorney.  (289:1-14; 295:22-296:13)  Both Santana and Blackwell testified that Preston never indicated to them that she felt she was being directed to insert any language into the RTC report.  (293:20-24; 332:16-333:5)  Although Preston "believes" that she may have had more than one conversation with Santana about proposed language for the report, no evidence exists that Preston told Santana that she thought Brooks was being singled out and/or discriminated against based on her race.  (295:22-296:1; 642:1-25)  Santana did not believe Preston thought something wrong was taking place.  (296:11-13)

###### 2. Preston Claims That She Refused To Confirm Santana's Statement At The March 6, 2012 City Council Meeting Because Preston Believed That Doing So Would Be Committing Perjury.

The portion of the video of the March 6, 2012, City Council meeting in evidence shows that Santana was commenting on the staffing of the Rainbow Teen Center and whether certain employees could be folded into open recruitment.  (Trial Exhibit U)  Brooks raised a separate issue relating to the Director of the RTC managing two sites.  At the podium Preston was not sworn in under penalty of perjury.  (746:15-747:1; Exh. U)  Preston confirmed that the parties did discuss maintaining the staff ratios in the Center so that all of the current programs could be facilitated and that the City Administrator was clear that certain staff did not meet the minimum requirements.  Brooks cut Preston off and interjected her issue regarding the RTC Director and

---

[10] There is no dispute that Brooks violated the Ordinance.  (327:16-328:2; 333:25-334:10)

1   Preston responded that Brooks had not been provided that information.  (*See also* 945:15-946:12)

2   Preston was confused and only believed that she contradicted Santana.  (*Id.*; 644:15-25; 647:7-

3   21; Exh. 10)

4        Santana never thought she was contradicted by Preston.  She believed Preston confirmed

5   her understanding of the facts as she stated at the meeting.  Indeed, Santana's belief that Preston

6   said nothing to contradict her is memorialized in documentary evidence admitted at trial.

7   (297:15-22; 307:2-308:18; Exh. T)

8        **3.    Preston Claims That She Disclosed The City Of Oakland Was**
         **Entering Into Contracts With Firefighters Local 55 Without The**
9        **Necessary Approval From City Council, Because She Believed That**
         **Doing So Would Be A Violation Of The California Government Code.**
10

11       Anderson was hired as a temporary employee in March 2013, as a Senior Employee

12  Relations Analyst reporting to Preston.  (409:22-410:11)  The ER Department had weekly

13  meetings that covered current cases, appeals and bargaining.  The weekly meeting was a

14  mechanism to inform Preston on what her staff was working on.  (429:20-430:12)  Moreover,

15  Preston had a calendar populated with Anderson and Lara's calendars so that everything went

16  through Preston.  (494:2-12)  Also, Anderson made sure Preston knew about everything she was

17  working on.  (427:24-428:3)

18       On June 20, 2013, Skinner sent an email to Anderson and Donna Hom ("Hom"), the

19  Budget Director, notifying them that the Fire Department's paramedic support program ("PSP")

20  would terminate if the City and Local 55 did not reach an agreement before June 30, 2013.

21  Skinner also advised that Local 55 was open to extending the deadline for 30 days to allow for

22  further discussion and, if an extension was agreed upon, a side letter would be needed.  (431:9-

23  432:12; Exh. 1V)[11]

24       The pertinent portion of the MOU relating to the PSP stated as follows:

25       2.9.4.7  Program Termination Date-Unless the City and Union reach agreement
         prior to June 30, 2013, the Promoted Paramedic Support Program shall terminate
26       effective July 1, 2013.  (369:20-370:5, Exh. 2I)

27  _____
    [11] Skinner was transferring to the Oakland Fire Department ("OFD") from ER at this time and, although
28  new to the City, Anderson took over responsibilities for handling Local 55 matters.  (429:1-13; 430:18-
    20)                                                                                                   10

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

Having no knowledge of the issue, Anderson discussed the contents of Skinner's email with Preston on June 20, 2013.  (433:9-25)  On June 24, 2013, Anderson sent Skinner a draft of a Temporary Agreement ("TA") to extend the PSP program to July 30, 2013, indicating it was appropriate to sign.  (435:2-20; 436:21-23; Exh. 1X)  Preston testified that Hom advised her of "a staff person who was in the process of signing a TA to extend the paramedic premium."  (445:5-18; 651:10-20)

At a meeting on June 28, the TA was signed and Anderson signed on behalf of Employee Relations.  (436:10-15; 414:2-415:3, Exh. 2D)  Afterwards, Skinner obtained Fire Chief Theresa Reed's signature because she was not present at the meeting.  (438:7-15; 533:11-18)  Anderson never spoke to Chief Reed about the TA.  (437:7-11)  Hence, Chief Reed never "convinced" Anderson to sign the TA and Anderson never told Preston that she did.  (438:16-21)

It was Anderson's understanding that a meeting scheduled for July 2, with Local 55 would address a modification of the way that premium wages would be paid under the PSP, but the change would not increase the budget.  Therefore, no council authorization was needed. (441:23-443:13)  Anderson informed Preston that the deadline for the PSP was extended for 30 days and Local 55 and OFD were planning to meet on July 2, to commence bargaining.  (439:14-17; 443:25-444:2; 444:10-25)

Hom left the meeting on July 2, before it ended and advised Preston on what was being discussed.  Anderson received a text message from Preston to leave the meeting and go to her office.  Preston told Anderson that ER did not have authorization to negotiate and to stop the meeting.  (415:8-23; 446:7-22; 652:4-9)  Hence, no agreements were reached at the July 2, meeting.  (448:21-449:25; Exh. 2G)[12]  Reed had no discussions with Local 55 on the PSP program through this time period.  (549:25-550:4)

After the July 2, meeting, Preston removed Anderson from handling negotiations with Local 55 and Preston took over.  (450:2-11; 451:15-17)

///

---

[12] Anderson is unaware that any paramedic in the PSP received a three percent premium pay during the extended 30 day period and that any budget adjustment was made.  (485:20-486:5)

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL (Case No. 3:14-cv-02022 NC)

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

Preston testified that she called Santana about the TA.  In the call, Preston told Santana that this was the second time "this happened" and that she was concerned because it was a "significant problem."  Preston stated that the relationship with Local 55 was "not that strong" and "this would do further damage to the relationship."  (656:11-20)

On July 3, 2013, Preston emailed Barbara Parker and Doryanna Moreno ("Moreno") of the City Attorney's Office attaching the signed TA and requesting a legal opinion.  (652:10-653:20; Exh. 2I)  Preston did not copy Santana on the email.  (*Id.*)  In her email, Preston cited to a number of sections of the MOU including the section that provided for the termination of the PSP absent an agreement prior to June 30, 2013.  (*Id.*)  At the end of her email, Preston cited to City Ordinance No. 12903 Section 1.10 and quoted the following language:

> Compensation for represented employees is set forth in its entirety in the Memorandum of Understanding (MOU) between the City and the recognized employee organization.  No additional compensation may be authorized by the City Administrator, any other appointing authority, and Department or Agency head or other employee, officer or official of the City without the City Council's express approval, except as provided in this Ordinance or Ordinance No. 12187 which this Ordinance supplements.  Any such approval/authorization must be memorialized in an amendment to this ordinance or the MOU.  (*Id.*)

Preston asked for a legal opinion on the following:

> 1) The MOU has explicit language that this provision expires on a specific date, does the Fire Chief have the authority to extend a provision in the MOU without council authorization?
> 2) Can the Fire Chief reduce the number of employees a premium is applicable to in order to increase the premium pay, without council authorization?  (*Id.*)

Preston referenced no state or federal law.  On July 4, 2013, Preston forwarded the email requesting a legal opinion to Brooks at her personal email address.  (*Id.*)  Preston falsely represented to Brooks that Chief Reed "signed a TA to extend a [sic] economic provision of their MOU.  After she completed it, she convinced the newest member of my staff to sign it.  you know i dealt with that employee."  (*Id.*)  Preston told Brooks that Chief Reed was not authorized to conduct bargaining or meet and confer and that City Resolution 55881 provides that only the City Administrator and Preston have that authority.  (*Id.*)[13]

---

[13] Despite Plaintiff's comment to Brooks at the time, during subsequent negotiations with Local 55, Preston sat there and did nothing, requiring Reed to do all of the negotiating.  (546:3-21)

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL (Case No. 3:14-cv-02022 NC)

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

1    Moreno responded to Preston's email acknowledging her request for legal advice and

2    Preston's understanding of Ordinance No. 12903.  However, Moreno asked Preston to prepare a

3    memo to the City Administrator/Chief to reflect Preston's understanding and to send it to the City

4    Attorney for review and advice.  Moreno reminded Preston that she needed to follow the City

5    Attorney's protocol for requests for legal assistance including that the request should be sent in

6    writing to Caryl Casden (police and fire matters) or to Moreno and copied to Parker and Randy

7    Hall.  (657:4-18; 658:16-19, Exh. 2H)[14]

8        Moreno copied Santana on her email to Preston.  Santana emailed all in response and

9    commented, "What is the legal question?  Teresa had no authority to sign an extension."  (657:4-

10   658:1, Exh. 2H)  Preston responded, "The legal question is, what do we say to Local 55?  Is it an

11   ULP?"  (658:21-25)

12       Anderson emailed Reed on July 3, 2013, stating that OFD had no authority to sign an

13   extension or have had a conversation with Local 55 regarding the PSP.  Reed responded

14   expressing her confusion with the process and asked where the granting of authority takes place.

15   She stated it was her understanding that Employee Relations drafted the TA, presented it at the

16   June 28 meeting and took the lead to discuss compensation.  Reed also confirmed that no

17   agreements were reached on July 2.  (448:21-450:1; Exh. 2G)  Anderson responded to Reed

18   admitting that Employee Relations or the City Administrator should have advised the Fire

19   Department that City Council approval was needed.  (450:15-451:10)

20       On July 11, 2013, the City Council approved the extension of the PSP to July 30, 2013.

21   (543:4-8)

22       On July 31, 2013, Zac Unger sent an email to Reed, Santana, Stewart McGehee and Dan

23   Robertson complaining about the delay in resolving the PSP issue.  He indicated that he

24   repeatedly reminded Reed, Stewart McGehee, Winnie Anderson and Lawanna about the

25   approaching deadline.  (557:3-21; 556:13-18; Exh. 2U)[15]

26   ────────────────────

27   [14] No evidence was proffered that Preston followed up with a memo in compliance with City Attorney protocol as requested by Moreno.

28   [15] Interestingly, Preston was not copied on this email.  McGehee was the Fire Division Manager and Robertson was President of Local 55.

13

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR,
ALTERNATIVELY, MOTION FOR NEW TRIAL (Case No. 3:14-cv-02022 NC)

**4.    Preston Claims She Disclosed That The City Was Failing To Collect Union Dues From TPT Employees Because She Believed That The Failure Violated The Government Code.**

On June 26, 2013, Preston and Anderson received a grievance from Joe Keffer of SEIU Local 1021 relating to the non-collection of dues from temporary part-time ("TPT") employees. The grievance was based on a list showing approximately 1,500 TPTs had been hired but, according to the union, the dues collected by the City allegedly did not conform to this number. (423:8-25)  Kasaine was not copied on this email.  Preston instructed Anderson to return the grievance to Keffer and tell him that he is required to identify the section of the MOU violated and provide factual information to verify "When, where, who, etc.".  (455:9-456:11; Exh. 2A)

On August 2, 2013, Anderson sent Kasaine an email scheduling an informational meeting with SEIU for August 6, 2013, regarding the TPT list.  (458:23-459:4; Exh. 2W; 902:4-13) Present at the meeting were Anderson, Lara, Kasaine and members of Local 1021.  A dialogue ensued about the list which included seasonal, student employees, a majority of whom were not active but kept on the payroll for purposes of rehire.  (959:19-25; 981:7-983:4; 997:16-25; 1143:17-1144:-19)  The union asked Kasaine whether dues were being collected from "all temporary employees."  Although the testimony is not clear on Kasaine's precise response, a reasonable inference based on the evidence is that Kasaine said she was not collecting dues from all TPTs.  (Vol. 5, 1145:1-8; 420:2-17; 999:5-11)  However, Kasaine explained that the list includes both active and inactive TPTs, some are listed multiple times due to different positions held by them and some made too little or were subject to priority deductions and, therefore, did not make enough to deduct dues.  Further, Kasaine stated that some TPTs did not complete union forms for deductions.  (Vol. 5, 1143:17-1144:19; 1146:5-11)  Kasaine stated that if she deducted dues from those who had not signed up she would get overwhelmed with calls.  (Vol. 5, 1147:5-10; 422:11-15)

After both sides caucused, they returned to the meeting and agreed on terms for moving forward.  (Vol. 5, 1145:9-10)  Anderson confirmed the agreements in an email to Kasaine. Anderson and Lara believed that the issues relating to the TPT deductions were resolved and did not contemplate a grievance being filed.  (462:20-463:14; 466:18-467:3; 487:2-488:16, Exh.

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

14

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

1   2Z)  Neither the union nor Employee Relations believed the August 6, meeting was part of the

2   grievance process.  (997:2-998-3; Vol. 5, 1145:24-25)

3          Lara and Anderson met with Preston and advised her of what happened at the August 6,

4   meeting.  Preston told both to rewrite their notes to include that Kasaine said she was not

5   collecting dues from the TPTs.  (903:17-905:13)

6          On September 2, 2013, Keffer emailed another grievance on the non-collection of dues

7   from TPTs, identical to the one he sent on June 26.  (664:17-25; Exh. 3J)  However, this time

8   Preston did not return the grievance to Keffer as she did with the June 26 grievance.  Instead, she

9   emailed Kasaine stating a grievance was filed and that she needed to interview Kasaine as part of

10  the investigation.[16]  Although Employee Relations helps departments conduct investigations,

11  neither Anderson nor Lara is aware of Preston ever conducting or supervising an investigation on

12  a grievance.  (427:8-14; Vol. 5, 1134:2-4; Vol. 6, 1087:2-9)  Moreover, based on the MOU, Lara

13  did not think Kasaine did anything wrong and did not think an investigation was necessary.

14         On Sunday, September 29, 2013, after being removed from the investigation of the TPT

15  grievance, Preston emailed Parker and Santana.  Preston told them that on Friday, September 27,

16  2013, Dwight McElroy, SEIU President, told her that Kasaine asked him to drop the grievance

17  and she would make sure the union received any money it was entitled to.[17]  (Exh. 4C; 677:13-

18  678:3; 678:21-679:3)  Preston stated that Kasaine violated the investigatory process by contacting

19  the person who filed the grievance and attempting to coerce him to drop the grievance.[18]  She

20  also stated that it is a violation of MMB sections 3502 and 3506 and of the MOU Article 1-

21  Recognition.  (915:6-917:24; Exh. 4I)  Preston testified that Kasaine violated the MMB section

22  that provides "an employee shall have a right to participate in union activities without coercion,

23  interference, or intimidation."  (914:12-21)  Preston sent the email to a former employee Cheryl

24  _____

25  [16] The discussion regarding Preston's attempts to interview Kasaine and Preston's removal from the investigation is discussed above at § II.A.4.

26  [17] Dwight McElroy testified that he did not speak to Preston on September 27, 2013.  (Vol. 5, 1027:20-23)

27  [18] Contrary to Preston's testimony, Keffer, not McElroy, filed the grievance.  (664:17-25; Exh. 3J) Moreover, Keffer testified that McElroy is union president of the full time employees' chapter and was merely sitting in on this meeting for TPTs.  (568:17)  The excerpt from Keffer's deposition at 26:1-10 read

28  by Plaintiff at trial is not included in the trial transcript.  *See* Exhibit GG to Kumagai Declaration.  No evidence exists that Keffer was aware of any requests to drop the grievance.                                  15

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

Thompson and LaTonda Simmons, City Clerk and Clerk of the Council.  Simmons responded "Hahahahaha!!!!"  (915:6-917:24; Exhs. 4D, 4I)

Kasaine had no knowledge that Preston sent Parker and Santana an email about an alleged call to McElroy.  (993:7-16)  In fact, Kasaine testified that on September 29, 2013, McElroy called her to set up a meeting with other union members to discuss the grievance.  (984:15-25)  Concerned, Kasaine spoke to Santana about the strange call from McElroy.  On October 1, 2013, Kasaine emailed McElroy memorializing his telephone call to her and declining his invitation to meet with him and others from the union because she was not the appropriate party to hold the discussion.  (983:18-984:8; 985:4-7; Exh. 4K)[19]

On October 1, 2013, a City Council closed session was held.  The agenda included the status of negotiations.  (217:22-25; 218:5-8; 219:18-23)  Preston testified that Santana told her not to raise the grievance at the closed session while Preston was presenting on the status of bargaining.  However, Preston testified that she believed bargaining with SEIU was "combined" with the TPT grievance.  (679:12-680:10)  When Councilmember Brooks asked a question specifically about the "SEIU grievance" Preston responded "yes."  Preston testified she had an obligation to tell the truth.  (220:2-5; 681:9-17)

## III.   DISCUSSION

### A.   Judgment For The City Is The Only Conclusion To Be Drawn From The Evidence.

#### 1.   Standard For Renewed Motion For Judgment As A Matter Of Law.

Rule 50 permits a district court to grant judgment as a matter of law "when the evidence permits only one reasonable conclusion and the conclusion is contrary to that reached by the jury." *Ostad v. Oregon Health Sciences Univ.,* 327 F.3d 876, 881 (9th Cir. 2003).  A party seeking judgment as a matter of law after a jury verdict must show that the verdict is not supported by "substantial evidence," meaning "relevant evidence that a reasonable mind would accept as adequate to support a conclusion." *Callicrate v. Wadsworth Mfg.*, 427 F.3d 1361, 1366 (Fed. Cir. 2005) (citing *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992)).  The Court

---

[19] There is no evidence that McElroy responded to Kasaine's email.

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL (Case No. 3:14-cv-02022 NC)

1    must "view the evidence in the light most favorable to the nonmoving party … and draw all

2    reasonable inferences in that party's favor."  *See E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d

3    951, 961 (9th Cir. 2009) (internal quotations are citations omitted).

### 2.    The Four Acts Were Not Protected Under Section 1102.5.

5    Under California Labor Code section 1102.5 an employee engages in protected activity

6    when she "discloses to a governmental agency reasonably based suspicions of *illegal activity*."

7    *Mokler v. County of Orange*, 157 Cal. App. 4th 121, 138 (2007) (italics in original).  The

8    employee must "reasonably believe … he was disclosing a violation of state or federal law."

9    *Patten v. Grant Joint Union High Sch. Dist.*, 134 Cal. App. 4th 1378, 1384 (2005).  "To have a

10   reasonably based suspicion of illegal activity, the employee must be able to point to some legal

11   foundation for his suspicion—some statute, rule or regulation which may have been violated by

12   the conduct he disclosed."  *Fitzgerald v. El Dorato Cnty.*, 12-cv-02932 KJN, 2015 WL 966133,

13   at *13 (E.D. Cal. Mar. 3, 2015) (citing *Love v. Motion Indus., Inc.*, 209 F. Supp. 2d 1128, 1135

14   (N.D. Cal. 2004)).

15   Under Labor Code section 1102.5, Preston has the burden of establishing a causal link

16   between at least one of her alleged protected acts and her termination.  *See Morgan v. Regents of

17   Univ. of Cal.*, 88 Cal. App. 4th 52, 69 (2000) (plaintiff must show that she engaged in protected

18   activity, that she was subjected to adverse employment action, and that there was a causal link

19   between the two).  Essential to establishing the causal link is evidence that the employer was

20   aware that plaintiff engaged in the protected activity.  *See Cohen v. Fred Meyer, Inc.*, 686 F.2d

21   793, 796 (9th Cir. 1982); *Morgan v. Regents of Univ. of Cal.*, 88 Cal. App. 4th at 70; *see also*

22   *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) (concluding district court erred by finding

23   causal link between adverse action and protected activity where there was no evidence of

24   defendants' knowledge of plaintiff's First Amendment actions).

### a.    The RTC Report.

26   The DA language was part of Parker's legal advice regarding the roles of the CAO and

27   City Council and the options available including referral to the DA, expenditure of resources to

28   retain an independent investigator and Council going on record with a policy that mirrors City

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

17

1   Charter 218.  (Exh. Q, p. 6)  The draft RTC report speaks for itself.  The legal advice was not

2   intended to be inserted in the report.  (750:25-751:21; 752:24-753:23)  No evidence exists that

3   Santana directed Preston to insert the DA language or that Preston refused a directive by Santana

4   to do so.  Moreover, no evidence exists that Santana believed Preston refused a directive from

5   her.

6          Further, Fred Blackwell testified that he understood any referral to the DA would not be

7   in the City Administrator's domain.  He understood, and Santana confirmed, that the tasks that he

8   and Preston were responsible for were simply to get facts relating to the RTC.

9          Likewise, absolutely no evidence exists that Brooks was being targeted because of her

10  race.  First, Parker is African American and testified at trial.  She was the person to provide

11  advice on options in the draft report.  Second, Brooks was not the only African American on the

12  City Council.  Preston testified that Brooks is the only "African American woman" on the

13  Council, not that she is the only African American, which she is not.  (641:17-24)  Lastly, no

14  dispute exists that Brooks was the only Council Member to violate Charter § 218 with regard to

15  the RTC.

16         No evidence exists that Preston was being forced to insert the DA language or that Brooks

17  was being targeted because of her race.  Any belief that Preston allegedly had that her insertion of

18  the DA language would constitute race discrimination is simply unreasonable.  Preston's alleged

19  refusal to insert language is not a protected act under section 1102.5.

20                    **b.    The March 6 City Council Meeting.**

21         The video of the City Council meeting speaks for itself.  It is evidence that Santana

22  commented on the staffing of the RTC and Preston confirmed her statements.  Otherwise, Preston

23  responded to Brooks' question regarding the RTC Director.

24         No evidence exists that Santana was directing Preston to lie.  Moreover, no evidence

25  exists that Santana believed Preston was refusing a directive.  Santana confirmed her belief in

26  writing.  Further, Preston was not sworn in under penalty of perjury.  Any alleged belief by

27  Preston that she would commit perjury if she testified differently than what she did is not

28  reasonable and, therefore, is not protected under section 1102.5.

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

18

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

### c.   The TA Signed by Anderson and Reed.

Preston sent an email regarding the TA to the City Attorney's Office.  Preston did so to get a legal opinion on whether the Chief Reed violated City Ordinance No. 12903.  First, Preston's email referenced no state or federal law.  Therefore, the email is not a disclosure protected under section 1102.5.  Moreover, her efforts to determine if Chief Reed violated a law is not a protected disclosure.  *Mize-Kurzman v. Marin Community College Dist.*, 202 Cal. App. 4th 832, 859-860 (2012).  For the same reason, Preston's responsive email to Santana stating that the legal question is "What do we say to Local 55?  Is it an ULP?" is not protected under section 1102.5.  Her email reflects a question about what to say to the union.  It is not a disclosure of a reasonably based suspicion that a state or federal law was violated.

In addition, Preston never "disclosed" that Anderson drafted and signed the TA thereby violating City Resolution 55881.  The fact that Preston never told Anderson that her actions violated a law is evidence that Preston did not reasonably believe a state or federal law was being violated by entering into the TA.  Preston went so far as to lie to Brooks that Chief Reed signed a TA to extend an economic provision of the MOU and that she convinced Anderson to sign off on the TA in violation of a City Ordinance.  Despite her efforts to castigate Reed, Preston never stated that Reed violated a federal or state law.

Indeed, Preston who applied the law on a daily basis, could not have reasonably believed Chief Reed's conduct constituted an ULP in violation of the MMB.  The signing of the TA in no way constituted "coercion, interference, or intimidation of an employee's right to participate in union activities."  Reed's conduct, along with Anderson and the union, simply involved the extension of the PSP to discuss premium pay for union members.  Her conduct had nothing to do with an attempt to prevent any employee from his/her right to participate in union activities.

To the extent Preston claims she believed Reed violated the MMB, her belief was unreasonable and therefore not protected.

### d.   Non-Collection of TPT Dues.

The September 2, 2013, grievance was filed by the union and Keffer disclosed it to Santana and the Mayor.  Preston never raised the issue of a violation of the MMB until after she

19

1   was removed from the investigation and in support of her argument to Santana that she was

2   capable of conducting an unbiased investigation.  By that time, an investigation had been started

3   by a third-party.

4      In addition, the evidence shows that Santana asked that Preston not raise the issue at the

5   City Council meeting with her presentation on negotiations because it was not on the agenda.

6   Preston had a difference of opinion that the negotiations and the grievance were combined.

7   Preston's response to a question from Brooks at the City Council meeting on October 1, was

8   simply to confirm that a grievance was filed.  No violation of state or federal law was disclosed.

9   Indeed, the filing of a grievance is not against the law.

10      There is no evidence that Santana asked Preston to lie or not respond truthfully to

11   questions being asked.  Further, no evidence exists that Santana believed Preston refused a

12   directive.

13       **e.**  **Not One Of The Alleged Protected Acts Was A Contributing**

14          **Factor To Preston's Termination.**

15      The first two alleged protected acts occurred in February 2012 (the RTC report) and

16   March 6, 2012 (the City Council meeting).  To the extent these two events can be considered

17   protected acts, no substantial evidence exists that either event was a contributing factor to

18   Preston's termination.  Preston's testimony that after March 6, Santana became distant and

19   excluded her from meetings is not supported by substantial evidence.  Indeed, the evidence shows

20   otherwise.  After the City Council meeting on March 6, Preston was approved for a raise in June

21   2012, and she was not disciplined for complaints regarding her job performance and questions

22   about her integrity.  (789:5-11)  Moreover, contrary to Preston's testimony, the documentary

23   evidence shows Preston was counseled for her absences at critical labor and budget meetings.

24      The next act that Preston claims was protected after the March 6, City Council meeting

25   occurred almost a year and a half later in July 2013 (the TA incident).  By this time, the evidence

26   admitted shows that:

27       &bull; Santana had spoken to Mayor Quan and Barbara Parker about terminating Preston;

28       &bull; Santana discussed Preston's lack of integrity with Fred Blackwell;

20

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

- Because of serious delays in bargaining, Blackwell, Swanson and the Mayor had to close the bargaining tables without disclosing the final offers to Preston;

- Santana had ongoing discussions with Johnson regarding Preston's performance problems and unprofessionalism;

- Santana became aware of Preston's lack of integrity through Johnson, Chief Jordan and IAD;

- Santana was advised by Chief Jordan that Preston was undermining Santana's credibility with the unions;

- Santana had been advised by IAD from January 2013 up to the point of Preston's termination of its findings in the Grant investigation.

The alleged protected acts relating to Chief Reed entering into a TA and the grievance filed regarding the TPT dues on September 2, 2013, had nothing to do with the decision to terminate Preston.  Moreover, in August 2013, Preston told Lara her job was in jeopardy.  Therefore, she knew of her impending termination before the grievance was filed.

Not one of the alleged protected acts contributed to the decision to terminate Preston.

### f.     Preston Would Have Been Terminated Regardless Of Her Protected Acts For Legitimate, Independent Reasons.

As discussed above, evidence shows that Preston was not performing her job duties in a satisfactory manner, she was unprofessional and untrustworthy.  Santana lost all confidence in Preston's ability to do her job properly based on complaints received and personal observations. Preston would have been terminated for legitimate, independent reasons, regardless of her alleged protected acts.

No substantial evidence exists to support Preston's claim that she was terminated in retaliation for engaging in protected acts under Labor Code section 1102.5.  Therefore, the Court should grant judgment as a matter of law in favor of the City.

### B.     In The Alternative, The Weight Of The Evidence Justifies A New Trial.

A new trial is appropriate under Rule 59 if the jury verdict is contrary to the clear weight of the evidence.  *DSPT Int'l, Inc. v. Nahum,* 624 F.3d 1213, 1218 (9th Cir. 2010).  A court should grant a new trial where necessary "to prevent a miscarriage of justice."  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007).  Under Rule 59, the district court can weigh the evidence, make credibility determinations, and grant a new trial for any reason necessary to prevent a

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

21

miscarriage of justice. *Experience Hendrix LLC v. Hendrixlicensing.com Ltd.,* 762 F.3d 829, 841 (9th Cir. 2014).

### 1. The Weight Of The Evidence Justifies A New Trial On Each Of The Alleged Protected Acts.

#### a. The RTC Report.

The evidence shows that the DA language was merely a piece of legal advice from the City Attorney relating to options available to the CAO and Council. No evidence exists that Santana tried to coerce Preston to agree to insert language and/or that Brooks was targeted for referral to the DA based on her race. In fact, the evidence shows that such a belief would be unreasonable because Brooks was not the only African American on the City Council, the advice regarding the language came from an African American woman and there is no dispute that Brooks violated Charter 218. Lastly, no evidence exists that Santana believed Preston refused a directive to insert language in the report.

#### b. The March 6, City Council Meeting.

The video of the March 6, 2012, City Council meeting shows that Santana asked Preston to the podium to confirm her statement regarding staffing, not the management of two sites by the Director. The latter issue, raised by Brooks, is the one Preston testified related to her alleged contradiction of Santana. First, the weight of the evidence shows Preston never contradicted Santana. Second, no evidence exists that Santana believed Preston refused a directive by her. Lastly, any belief by Preston that she would be committing perjury if she commented differently at the podium is unreasonable.

#### c. The Temporary Agreement To Extend The PSP.

The evidence on the signing of the TA shows Preston emailed the City Attorney for a legal opinion in her efforts to determine whether Reed violated a City Ordinance. In doing so, she did not reference any state or federal statute. Likewise, Preston's email to Brooks stated only that a City Ordinance was violated by Reed. Preston's later response to Santana was clearly an effort to determine what to say to the union. Lastly, despite the fact she was apprised of the process all along, Preston never told Anderson to stop because she believed Anderson was

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR, ALTERNATIVELY, MOTION FOR NEW TRIAL (Case No. 3:14-cv-02022 NC)

1  violating any law.  Therefore, any belief that Reed violated any law, when Anderson did not, is

2  not reasonable.

3              d.       The SEIU Grievance.

4          The evidence is clear that the grievance was not "disclosed" by Preston.  The union filed

5  the grievance and sent it to numerous individuals including Santana, Mayor Quan, union

6  members, Preston, and a number of other individuals.  At the time Preston raised the MMB to

7  Santana, she was not doing so to disclose that a state law was violated, but to argue her point that

8  she was capable of conducting unbiased investigations.  By this time Preston knew an

9  investigation was being conducted on the grievance by a third-party.  At the City Council

10 meeting, Preston merely confirmed a grievance was filed.  No evidence exists Santana directed

11 her to do otherwise or that Preston disclosed a violation of state or federal law.

12         The clear weight of the evidence justifies a new trial on whether Preston engaged in any

13 protected act.

14             2.       The Weight Of The Evidence Justifies A New Trial On The City's
                        Defense That It Would Have Terminated Preston Regardless Of Her
15                      Alleged Protected Acts.

16         The legitimate business reasons for Preston's termination are supported by a wealth of

17 evidence and testimony from credible witnesses.  Johnson testified that he reported to Santana on

18 Preston's unprofessionalism, inability to work with colleagues, lack of judgment and lack of

19 integrity.  He also counseled Preston on her actions contrary to her testimony.  Further,

20 documentary evidence admitted supports Johnson's testimony, including emails authored by

21 Preston reflecting criticism of her conduct.  Preston admitted she received a copy of Donelan's

22 letter to Santana criticizing her conduct and stating he did not want to communicate informally

23 with Preston.  No dispute exists that Santana was advised that Preston destroyed Lara's written

24 statement for an investigation in January 2013.  Lara, Barbara Parker and Otis McGee testified

25 that they witnessed Preston, at best, raise her voice to Santana because she disagreed that she

26 should be removed from the grievance investigation.  At worst, Preston was abusive, rude and

27 insubordinate.

28 ///

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW OR,
ALTERNATIVELY, MOTION FOR NEW TRIAL (Case No. 3:14-cv-02022 NC)

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

1    Testimony was also provided that Preston could not be trusted in dealing with the unions.

2    Chief Jordan informed Santana that Preston was trying to undermine her regarding negotiations

3    and that Preston was disseminating confidential information to City employees.  Santana had to

4    bring in others to conclude bargaining in the summer of 2013.  She told Blackwell that she was

5    concerned about Preston's integrity and that she was not truthful on what was happening in

6    negotiations.  Mayor Quan testified that the final offers to the unions were kept secret from

7    Preston, the Chief Negotiator for the City, because they wanted no leaks to the union before the

8    offers were given.[20]

9    Mayor Quan and Barbara Parker testified that Santana told them in the spring 2013 that

10   she wanted to fire Preston.

11   Against overwhelming evidence supporting legitimate business reasons for her

12   termination, Preston argues that the RTC incident and March 6, 2012, City Council meeting

13   contributed to her termination.  The evidence clearly weighs against her arguments.  First, these

14   two events occurred 1 ½ years before her termination during which time she was treated

15   favorably.  Also, contrary to her testimony, Preston was counseled on her job performance and

16   unprofessionalism by Santana, Johnson and Orologas.

17   Preston also asserts that her disclosure that a TA was entered into without authorization in

18   July 2013, and of the SEIU grievance in September 2013, contributed to her termination.  These

19   events may confirm that Preston needed to be fired due to her continued poor conduct, but the

20   weight of the evidence shows they were not contributing factors.  In that regard, the decision to

21   fire Preston had been made in April 2013, based on poor job performance, the inability to get

22   along with co-workers and unions and unethical behavior.  Indeed, Preston told Lara she knew

23   her job was in trouble in August 2013, before the grievance in September 2013, was filed.

24   ///

25

26   [20] Indeed, these suspicions are validated by testimony from Winnie Anderson and Sonia Lara, both of
     whom testified that they personally observed Preston advise the union on how to negotiate.  Anderson
27   witnessed Preston in an elevator with Deborah Egerdly, a union consultant, offering suggestions on how
     to negotiate with the City.  (494:13-24)  Lara testified that she observed Preston give Dwight McElroy a
28   piece of paper telling him how to counter the City's offer.  (Vol. 6, 1088:10-1089:9)  Lara witnessed
     Preston tell McElroy not to "pussy out" and file a grievance.  (Vol. 5, 1147:11-1148:15)

24

1    The weight of the evidence clearly shows that Preston would have been terminated

2 regardless of her protected acts.  Unless a new trial is granted, justice will not be served in this

3 case.

4                                    **IV.**    **CONCLUSION**

5    For the foregoing reasons, Defendant City of Oakland requests judgment as a matter of

6 law be entered in its favor.  Alternatively, the Court should grant a new trial.

7                                         Respectfully Submitted,

8 DATED:  October 28, 2015              LAFAYETTE & KUMAGAI LLP

9

10                                        _/s/ Susan T. Kumagai_
                                        SUSAN T. KUMAGAI
11                                        Attorneys for Defendant
                                        CITY OF OAKLAND

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                                                          25

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
101 MISSION STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605