# EXHIBIT A

**Volume 1**

**Pages 120 - 234**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Nathanael M. Cousins, Magistrate Judge

DARYELLE LAWANNA PRESTON,                )
                                         )
            Plaintiff,                   )
   VS.                                   )   NO. C 14-02022 NC
                                         )
CITY OF OAKLAND; DEANNA SANTANA,         )
in her individual capacity;              )
and DOES 1 through 10, inclusive,        )
                                         )
            Defendants.                  )
_____)

San Francisco, California
Monday, September 14, 2015

**PARTIAL TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff Daryelle Lawanna Preston:
                Siegel & Yee
                499 14th Street, Suite 220
                Oakland, CA 94612
                510) 839-1200
                (510) 444-6698 (fax)
        **BY:**  **SONYA MEHTA**
              **DANIEL MARK SIEGEL**

Reported By:  Lydia Zinn, CSR No. 9223, FCRR
             Rhonda Aquilina, CSR No. 9956, RMR, CRR
             Official Reporters

Case 3:14-cv-02022-NC Document 174-2 Filed 10/28/15 Page 3 of 12
Case3:14-cv-02022-NC Document152 Filed09/18/15 Page55 of 116    174
SANTANA - DIRECT / SIEGEL

1           DIRECT EXAMINATION
2       MR. SIEGEL: Okay. Thank you.
3  Q.   Ms. Santana, you served as the Oakland City Administrator
4  from August 1st, 2011 until March 4, 2014; is that correct?
5  A.   Yes.
6  Q.   Okay. And the City Administrator is the highest ranking
7  employee within the City of Oakland; is that right?
8  A.   Yes.
9  Q.   Okay. And reports, a City Administrator, to the Mayor and
10 City Council?
11 A.   No.
12 Q.   Who does the City Administrator report to?
13 A.   The Mayor.
14 Q.   And not the City Council?
15 A.   That's correct.
16 Q.   Doesn't the City Council have the authority to approve the
17 termination of the City Administrator?
18      MR. LAFAYETTE: Objection. Relevance, too, Your
19 Honor.
20      THE COURT: Overruled. You may answer the question.
21      THE WITNESS: Can you repeat the question, please?
22 BY MR. SIEGEL:
23 Q.   Doesn't the City Council have the authority to approve the
24 termination of the City Administrator?
25 A.   I believe the Mayor has to consult with the City Council.

SANTANA - DIRECT / SIEGEL

```
 1  suggestions from various people, including the City Attorney?
 2          MR. LAFAYETTE:  Same objection, Your Honor,
 3  attorney-client privilege.
 4          THE COURT:  Mr. Lafayette, on your Amended Joint Trial
 5  Exhibit list, this document appears without objection.
 6          MR. LAFAYETTE:  And I have an objection, Your Honor.
 7  My objection is the attorney-client privilege.
 8          THE COURT:  All right.  That was waived on Saturday.
 9  The objection is overruled.  You may proceed.
10          MR. SIEGEL:  Thank you.
11  Q.   Is Exhibit 6 a draft report --
12  A.   Yes.
13  Q.   -- of the document that eventually became Exhibit 8; is
14  that right?
15  A.   Yes.
16          MR. SIEGEL:  Your Honor, I'd offer Exhibit 6.
17          MR. LAFAYETTE:  Same objection, Your Honor, the
18  attorney-client privilege and relevance.
19          THE COURT:  Overruled.  Exhibit 6, which is the same
20  as Exhibit Q, is admitted.
21          (Trial Exhibit 6 received in evidence)
22  BY MR. SIEGEL:
23  Q.   Would you look at page 16 of Exhibit 6.
24       Is the hard-to-read paragraph at the bottom of that page
25  suggested language from City Attorney Barbara Parker?
```

1  behavior or job performance?
2  "A.  I don't think so."
3  Q.  Now, did an issue arise in 2013 concerning whether Deb
4  Grant, an employee of the Human Resources Department, had
5  improperly ordered some computer equipment for herself and for
6  her staff?
7  A.  Yes.
8  Q.  Okay.  And was that investigation referred by you -- let
9  me rephrase that.
10     Did you refer that matter for investigation to the
11  Internal Affairs Department of the Oakland Police Department?
12  A.  I referred it to two places, the City Auditor, and to the
13  Internal Affairs Department.
14  Q.  Okay.  And that's part of the Oakland Police Department?
15  A.  Yes.
16  Q.  Okay.  And isn't it true that that was a unique event in
17  terms of your administration, that is, the referral to the
18  Internal Affairs Department of the Police Department of a
19  matter involving the behavior of an employee who was not an
20  employee of the Police Department?
21  A.  Yes.
22  Q.  Okay.  And prior to referring this matter to the Internal
23  Affairs Department of OPD, did you consult with Chief Howard
24  Jordan?
25  A.  I don't remember if it was Chief Howard Jordan or Chief

Case 3:14-cv-02022-NC   Document 174-2   Filed 10/28/15   Page 6 of 12
Case3:14-cv-02022-NC   Document152   Filed09/18/15   Page92 of 116           211
SANTANA - DIRECT / SIEGEL

```
 1  Lawanna Preston to determine whether she had improperly
 2  interfered with the investigation of Deb Grant; is that right?
 3  A.   Yes.
 4  Q.   And isn't it also true that at the conclusion of that
 5  investigation, they did not recommend to you grounds for
 6  disciplinary action against either Deb Grant or Lawanna
 7  Preston?
 8  A.   No.
 9  Q.   Am I correct?
10  A.   That wasn't their role.
11  Q.   What was their role?
12  A.   To conduct an investigation and make findings.
13  Q.   Okay.  And did they make findings that led to the
14  discipline of Deb Grant?
15          MR. LAFAYETTE:  Objection, relevancy, and Ms. Grant's
16  right to privacy.
17          THE COURT:  Overruled.  You may answer.
18          THE WITNESS:  Can you repeat the question?
19  BY MR. SIEGEL:
20  Q.   Isn't it true that the findings made by Internal Affairs
21  did not lead to any disciplinary action taken against Deb
22  Grant?
23  A.   I don't know.
24  Q.   You don't know?
25  A.   I don't know.
```

1   THE COURT: If you want to read your question and
2   answer, you can. I think you're perhaps confusing the jury
3   more with the contrast. I'm not trying to contribute to their
4   confusion, but if you think it's helpful...
5   MR. SIEGEL: I apologize if I'm confusing anyone. The
6   testimony on lines 23 -- excuse me, 19 to 23 of the deposition
7   was:
8       "Q. And was any disciplinary action taken against Lawanna
9       Preston as a result of her involvement in that
10      investigation or her allegation that she had interfered
11      with the investigation?
12      "A. No."
13  Q.  Now, do you recall when the Internal Affairs Department
14  completed its investigation of the Deb Grant and Lawanna
15  Preston matter?
16  A.  Yes.
17  Q.  When was that?
18  A.  Late September.
19  Q.  Late September; okay. So this was going on concurrently
20  with the conversations regarding the grievance filed by SEIU
21  concerning the dues collection for temporary part-time
22  employees?
23  A.  Yes.
24  Q.  Okay. And how did you learn that -- well, let me rephrase
25  that.

1   right?
2           MR. LAFAYETTE: Objection, relevance, Your Honor.
3           THE COURT: Sustained.
4   BY MR. SIEGEL:
5   Q.   Okay. To your knowledge, Mr. McGee served as counsel for
6   you in this case?
7           MR. LAFAYETTE: Objection, relevance, Your Honor.
8           THE COURT: Sustained. Let's move on to a different
9   topic.
10          MR. SIEGEL: Okay.
11  Q.   Did Lawanna Preston disagree with your decision to take
12  away responsibility for the investigation of the SEIU dues
13  issue? Did she complain about that to you?
14  A.   Yes.
15  Q.   Okay. And when did she do that?
16  A.   Multiple times.
17  Q.   Okay. Did she do that in writing or orally or both?
18  A.   Both.
19  Q.   Okay. And nonetheless, you decided to do that; is that
20  right?
21  A.   Yes.
22  Q.   Now, was there an incident at a meeting of the City
23  Council on October 1, 2013 where SEIU negotiations were being
24  discussed by the Council in closed session?
25  A.   Yes.

1  Q.  Okay. And were you present?
2  A.  Yes.
3  Q.  And was Lawanna Preston present?
4  A.  Yes.
5  Q.  And just to be clear, what was on the agenda was not a
6  discussion of the grievance, but was a discussion of the
7  negotiations between the City and the SEIU?
8  A.  Yes.
9  Q.  And is it also true that the City Council had before it at
10 that closed session meeting the proposals that had been
11 advanced by both sides in the negotiation?
12 A.  Yes.
13 Q.  So what we're talking about is that the City put its
14 proposals in writing, and the SEIU put its proposals in
15 writing?
16 A.  Yes.
17 Q.  Okay. And isn't it true that the proposals of the SEIU
18 included a statement to the effect that by proposing various
19 items to settle the contract, they were not proposing to
20 withdraw the grievance they had filed over the failure to
21 deduct dues?
22 A.  I don't recall.
23 Q.  Okay. Is it true that prior to the October 1 meeting, you
24 had instructed Lawanna Preston not to bring up the SEIU
25 grievance?

SANTANA - DIRECT / SIEGEL

```
 1  A.  No.
 2  Q.  Had you discussed it with Lawanna prior to that meeting?
 3  A.  Yes.
 4  Q.  And what had you discussed with her?
 5  A.  We talked about my decision to have a third-party
 6  investigator.  We talked about the transition of documents and
 7  just going forward with the information that we had.
 8  Q.  Okay.  The grievance had been filed early September;
 9  correct?
10  A.  Yes.
11  Q.  Okay.  Had you planned to have it discussed at the City
12  Council meeting on October 1?
13  A.  I assumed it would come up.
14  Q.  Okay.  How did you assume that or why did you assume that?
15  A.  I thought it would either be raised as a question or that
16  Lawanna would raise it, or that there was enough communication
17  between SEIU and Council members that they likely may even.
18  Q.  Okay.  Did you have any conversation with Lawanna Preston
19  regarding whether she should bring up the grievance in the
20  meeting with the City Council on October 1?
21  A.  I don't recall telling her not to bring it up.
22  Q.  Okay.  Did she bring it up?
23  A.  I think she did.
24  Q.  Okay.  And did she bring it up in response to a question
25  from a member of the Council?
```

```
 1   A.   I don't recall.
 2   Q.   Okay.  Do you recall how it came up during the meeting?
 3   A.   I recall that Lawanna made reference to it, Vice-Mayor or
 4   Councilmen Brooks asked questions, and we responded to those
 5   questions.
 6   Q.   Were you unhappy that Lawanna had brought up the grievance
 7   during the closed session of the City Council on October 1?
 8   A.   I wasn't surprised.
 9   Q.   Okay.  You weren't -- were you displeased, I guess is the
10   better question?
11   A.   It wasn't something that would generally come up in a
12   closed session hearing.
13   Q.   Okay.  So you were neither pleased nor displeased?
14   A.   I think it was just reflective of a pattern of behavior
15   that I had become accustomed to --
16   Q.   Okay.
17   A.   -- from Lawanna.
18   Q.   When she brought things up to the Council without
19   authority; is that what you mean?
20   A.   She would submit reports to Council members without my
21   opportunity to review, without the City Attorney's opportunity
22   to review, and this was reflective of that pattern of behavior.
23   Q.   Wasn't it Lawanna Preston's responsibility to keep the
24   City Council apprized of the status of labor negotiations?
25   A.   Yes.
```

```
 1
 2
 3                    CERTIFICATE OF REPORTER
 4        I certify that the foregoing is a correct transcript
 5   from the record of proceedings in the above-entitled matter.
 6
 7   DATE:   Monday, September 14, 2015
 8
 9
10
11   _____
12        Rhonda L. Aquilina, CSR No. 9956, RMR, CRR
                  Official Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25
```